# Exhibit A

## Part 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Ronald S. Granberg   (Bar # 80111)
Granberg Law Office
134 Central Avenue
Salinas , CA 93901
TELEPHONE NO. (831) 422-6565        FAX NO. (831) 422-5550
ATTORNEY FOR *(Name):* Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY
STREET ADDRESS: 1200 Aguajito Road
MAILING ADDRESS: 1200 Aguajito Road
CITY AND ZIP CODE: Monterey  93940
BRANCH NAME:

**FILED**

JUN 1 5 2011

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
              DEPUTY
      J. CEDILLO

CASE NAME:
Monterey Bay Military Housing, et al. v. Pinnacle Monterey, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[X] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [ ] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* THREE (3)
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 15, 2011

Ronald S. Granberg
(TYPE OR PRINT NAME)                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

*LexisNexis® Automated California Judicial Council Forms*



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<div style="float:right; border:1px solid;">
FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

# FILED

JUN 1 5 2011

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
_____DEPUTY

J. CEDILLO
</div>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Pinnacle Monterey LLC, Pinnacle Irwin LLC, American Management Services
California, Inc., and American Management Services LLC (d/b/a Pinnacle)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Monterey Bay Military Housing, LLC, Clark Pinnacle Monterey Bay, LLC,
Clark Monterey Presidio, LLC, California Military Communities, LLC,

Additional Parties Attachment form is attached.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY<br>1200 Aguajito Road, Monterey , CA 93940 | CASE NUMBER:<br>*(Número del Caso):* |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Ronald S. Granberg    (Bar # 80111)          Fax No.: (831) 422-5550
Granberg Law Office , 134 Central Avenue , Salinas , CA 93901      Phone No.: (831) 422-6565

DATE:                              Clerk, by                              , Deputy
*(Fecha)*   JUN 1 5 2011   CONNIE MAZZEI   *(Secretario)*   J. CEDILLO   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)         ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courtinfo.ca.gov* |

*LexisNexis® Automated California Judicial Council Forms*

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

| [X] Plaintiff | [ ] Defendant | [ ] Cross-Complainant | [ ] Cross-Defendant |
|---|---|---|---|

Clark Pinnacle California Military Communities, LLC and Clark Irwin, LLC

Page ___2___ of ___2___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

*LexisNexis® Automated California Judicial Council Forms*

1   **Ronald S. Granberg, Esq. (Bar No. 232188)**
    **Granberg Law Office**
2   **134 Central Avenue**
    **Salinas, California 93901**
3   **telephone: (831) 422-6565**
    **facsimile: (831) 422-5550**
4

5   **Attorney for:  Plaintiffs**

6

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF MONTEREY**

10  Monterey Bay Military Housing, LLC,          Case No.

11  Clark Pinnacle Monterey Bay LLC, Clark       **COMPLAINT FOR**
                                                 **DECLARATORY AND**
12  Monterey Presidio LLC, California Military   **INJUNCTIVE RELIEF**
    Communities LLC, Clark Pinnacle
13  California Military Communities LLC, and
14  Clark Irwin LLC,

15              Plaintiffs,                       **CASE MANAGEMENT CONFERENCE**
                                                 DATE: _____
16          vs.                                  TIME: 9:00 AM
                                                 PLACE: Courtroom _____, 2nd Floor
17  Pinnacle Monterey LLC, Pinnacle Irwin        1200 Aguajito Rd. Monterey CA 93940
18  LLC, American Management Services
19  California Inc., and American Management
20  Services LLC (d/b/a Pinnacle), and Does 1
21  through 50.

22              Defendants.

23          Monterey Bay Military Housing, LLC ("MBMH"), Clark Pinnacle Monterey

24  Bay LLC ("CPMB"), Clark Monterey Presidio LLC ("Clark Monterey"), California

25  Military Communities LLC ("CMC"), Clark Pinnacle California Military

26  Communities LLC ("CPCMC"), and Clark Irwin LLC ("Clark Irwin") for their

27  complaint against Pinnacle Monterey LLC ("Pinnacle Monterey"), Pinnacle Irwin

28  LLC ("Pinnacle Irwin"), American Management Services California Inc.

**FILED**

JUN 15 2011

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
                                    DEPUTY
J. CEDILLO

1  ("AMSC"), and American Management Services LLC d/b/a Pinnacle ("AMS")

2  (collectively "Defendants" or "Pinnacle") allege as follows:

3  **NATURE AND SUMMARY OF THE ACTION**

4       1.     This complaint seeks declaratory and injunctive relief to prevent

5  Defendants from breaching their fiduciary duties and acting contrary to public

6  policy by taking steps to unilaterally amend two property management agreements

7  to effectively immunize Defendants from liability for their own fraud.  In short,

8  though a fiduciary, Pinnacle seeks to unilaterally amend its property management

9  agreements to effectively prevent the Owners from terminating the management

10 agreements even if Pinnacle commits fraud but later attempts or claims to "remedy"

11 that fraud after it is caught.  Such a proposed unilateral amendment is procedurally

12 improper and contrary to Pinnacle's duties and the public policy of the State of

13 California.

14      2.     Pinnacle is a national property management company that has formed

15 several affiliates, including Defendants Pinnacle Monterey and Pinnacle Irwin, to be

16 minority members in several "Clark Pinnacle" limited liability companies, including

17 CPMB and CPCMC.

18      3.     Clark Realty Capital, L.L.C. ("Clark Realty") is a national property

19 development company that has formed several affiliates, including Plaintiffs Clark

20 Monterey and Clark Irwin, to be majority members in the Clark Pinnacle LLCs,

21 including Co-Plaintiffs CPMB and CPCMC.  Clark Realty acts as the manager of all

22 of the Clark Pinnacle LLCs.

23      4.     The Clark Pinnacle LLCs are in turn the managing members of several

24 "Owner" [1] limited liability companies, including Co-Plaintiffs MBMH and CMC.

25

26   [1]  Although the parties refer to MBMH and CMC, and the other Owner entities, as the Project "Owners," these
   entities actually hold the real property pursuant to fifty-year leases.  The property is subleased from special

27 purpose entities 49% owned by the United States of America, and the United States of America retains ultimate
   fee ownership of the property.  At the Benning Project, the Owner entity FBFC leases the property directly from

28 the United States of America.

1 | These Owner LLCs oversee the provision of property development and property

2 | management services at United States military bases. Specifically, MBMH oversees

3 | the provision of such services at the Presidio of Monterey, in Monterey County,

4 | California ("Monterey Project"), and CMC oversees the provision of such services

5 | at Fort Irwin, Moffat Community Housing Area and Parks Reserve Forces Training

6 | Area, located respectively in San Bernadino County, Santa Clara County, and

7 | Alameda County, California ("Irwin Project").

8 |      5.     Defendant AMS is the corporate parent of Pinnacle. Defendant AMSC,

9 | a subsidiary of AMS, has separately contracted with MBMH and CMC, pursuant to

10 | two "Property Management Agreements," ("PMAs") to provide property

11 | management services in exchange for fees at the Monterey and Irwin Projects,

12 | respectively.

13 |      6.     A separate subsidiary of AMS, American Management Services East

14 | LLC ("AMSE"), has contracted with two other Owner entities, Fort Benning Family

15 | Communities, LLC ("FBFC") and Fort Belvoir Residential Communities, LLC

16 | ("FBRC"), to provide property management services in exchange for fees at Fort

17 | Benning, in Muscogee County, Georgia ("Benning Project") and Fort Belvoir, in

18 | Fairfax County, Virginia ("Belvoir Project"), respectively.

19 |      7.     As set forth more fully below, Pinnacle is attempting to employ certain

20 | deadlock resolution provisions of the CPMB and CPCMC Operating Agreements in

21 | order to alter unilaterally the terms of the PMAs to permit or excuse fraud by AMSC

22 | and its employees at the Monterey and Irwin Projects.

23 |      8.     The efforts by Pinnacle to alter the terms of both PMAs to permit

24 | and/or excuse its own fraud reflect a pattern by Pinnacle of attempting to hide and

25 | insulate itself from its own fraudulent and dishonest conduct. Pinnacle's attempt to

26 | unilaterally amend the Monterey and Irwin PMAs arose only after MBMC and

27 | CMC initiated audits of AMSC's performance as property manager at the two

28 | California projects. Pinnacle's decision to unilaterally amend the Monterey and

1  Irwin PMAs also occurred after similar audits -- of AMSE's performance as

2  property manager at the Benning and Belvoir Projects -- uncovered fraud and other

3  intentional misconduct. Pinnacle's conduct at Fort Benning and Fort Belvoir is

4  currently the subject of litigation in Georgia.

5       9.    The audits of AMSC's property management services at Monterey and

6  Irwin are currently in the preliminary stages.

7       10.    Pinnacle's effort to use its affiliates to unilaterally amend the PMAs is

8  improper self-dealing intended to subvert these ongoing audits and to immunize

9  Pinnacle from the consequences of its own fraud. It is also inconsistent with black

10  letter California law prohibiting contracts that directly or indirectly exempt anyone

11  from responsibility for their own fraud.

12       11.    This complaint is brought by MBMH, CPMB, Clark Monterey, CMC,

13  CPCMC, and Clark Irwin seeking declaratory judgments that the PMAs may not be

14  unilaterally amended by Pinnacle to permit or excuse acts of fraud by AMSC, its

15  agents or employees, or to exempt Pinnacle from liability for such fraudulent acts.

16  This complaint also seeks preliminary and permanent injunctive relief to prevent

17  Pinnacle from taking actions to unilaterally amend these PMAs prior to resolution of

18  the declaratory judgment claims and completion of the ongoing audits at both

19  Projects.

20  **PARTIES**

21       12.    Monterey Bay Military Housing, LLC is a Delaware limited liability

22  company with an address at 2 Bethesda Metro Center, Suite 250, Bethesda, MD,

23  20814. Its registered agent is Corporation Service Company, 2711 Centerville Road,

24  Suite 400, Wilmington, DE 19808.

25       13.    Clark Pinnacle Monterey Bay LLC is a California limited liability

26  company with an address at 2 Bethesda Metro Center, Suite 250, Bethesda, MD,

27  20814. Its registered agent is Corporation Service Company, 2711 Centerville Road,

28  Suite 400, Wilmington, DE 19808.

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

s:00-data\02-client\clark pinnacle\complaint.doc

4

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

1    14.    Clark Monterey Presidio LLC is a Delaware limited liability company.

2  Its registered agent is Corporation Service Company, 2711 Centerville Road, Suite

3  400, Wilmington, DE 19808.

4    15.    California Military Communities LLC is a Delaware limited liability

5  company with an address at 2 Bethesda Metro Center, Suite 250, Betheda, MD

6  20814.  Its registered agent is Corporation Service Company, 2711 Centerville

7  Road, Suite 400, Wilmington, DE 19808.

8    16.    Clark Pinnacle California Military Communities LLC is a California

9  limited liability company with an address at 4401 Wilson Boulevard, Ste 600,

10  Arlington, VA 22203.  Its registered agent is Corporation Service Company.

11    17.    Clark Irwin LLC is a Delaware limited liability company.  Its registered

12  agent is Corporation Service Company, 2711 Centerville Road, Suite 400,

13  Wilmington, DE 19808.

14    18.    Pinnacle Monterey LLC is a Washington State limited liability

15  company.  Its registered agent is National Registered Agents Inc., 1780 Barnes

16  Blvd, SW#G, Tumwater, WA, 98512-0410.

17    19.    Pinnacle Irwin LLC is a Washington State limited liability company.

18  Its registered agent is National Registered Agents Inc., 1780 Barnes Blvd, SW#G,

19  Tumwater, WA, 98512-0410.

20    20.    American Management Services California Inc. is a Washington State

21  corporation.  Its registered agent is National Registered Agents Inc., 1780 Barnes

22  Blvd, SW#G, Tumwater, WA, 98512-0410.

23    21.    American Management Services LLC is a Washington State limited

24  liability company with an address at 2801 Alaskan Way, Suite 200, Seattle, WA

25  98121.  Its registered agent is National Registered Agents Inc., 1780 Barnes Blvd,

26  SW#G, Tumwater, WA, 98512-0410.

27

28

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

x:\60-data\02-client\clark pinnacle\complaint.doc

5

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

# JURISDICTION AND VENUE

22.     This Court has original jurisdiction over the causes of action asserted herein pursuant to the California Constitution, art. VI, § 10.

23.     This Court has specific jurisdiction over Pinnacle Monterey LLC, Pinnacle Irwin LLC, and American Management Services California Inc., because they all have principal places of business in California and have availed themselves of the benefits of doing business in the state.  The subject matter of this dispute arises directly out of these parties' contacts with the State of California.  Pinnacle Monterey LLC has its primary place of business at Fort Monterey in Monterey County, California.  Pinnacle Irwin LLC has its primary place of business at Fort Irwin in San Bernardino County, California.  AMSC has contracted with the Owners of the Monterey Project and the Irwin Project to provide property management services in exchange for fees at both bases, and is a licensed real estate broker in the State of California.

24.     AMS, the corporate parent of the other three Defendants, does business through its affiliates in California including AMSC and purposely avails itself of the benefits of that business and of the State of California.  According to its web site, AMS has six corporate offices in the state of California (more than in any other single state), including branch offices in Irvine/Orange County, Sacramento and San Jose, and field offices at Fort Irwin, Moffett/Parks and Monterey Bay.[1]  AMS shares common management and ownership with the other Defendants and exercises control over the other defendants sufficient to establish an agency relationship under California law.  The dispute at issue arises out of AMS's contacts with the State of California such that exercise of jurisdiction over AMS comports with principles of fair play and substantial justice.  Jurisdiction is therefore appropriate over AMS pursuant to Cal. C.C.P. § 410.10.

---

[1]     See http://www.pinnaclerealty.com/main/corporate_offices/west_region.aspx (last accessed 6/14/2011).

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

x:60-data/02-client/clark pinnacle/complaint 6xc

6

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

25.     Venue is appropriate in this Court pursuant to Cal. C.C.P. § 395.5 because AMSC contracted to perform property management services in this county, and Pinnacle Monterey entered into an agreement to be a member of an LLC that operates a military residential development in this County.  The claims against Pinnacle Irwin and AMS involve common parties and individuals, and substantially similar facts, circumstances, and operative documents, and are thus appropriately joined in this forum.

## GENERAL ALLEGATIONS

**I. Formation of the Monterey and Irwin Projects**

26.     Congress established the Military Housing Privatization Initiative ("MHPI") in 1996 to help the military improve the condition of the housing provided to the members of the armed forces.  According to the United States Department of Defense's website, MHPI "was designed and developed to attract private sector financing, expertise and innovation to provide necessary housing faster and more efficiently than traditional Military Construction processes would allow."  The Office of the Secretary of Defense delegated MHPI to the Military Services and "authorized them to enter into agreements with private developers selected in a competitive process to own, maintain and operate family housing via a fifty-year lease."

27.     Effective October 30, 2003, Clark Monterey and Pinnacle Monterey entered into a limited liability company operating agreement to form CPMB (attached hereto as Exhibit I) for the purpose of being the managing member of MBMH.  Clark Realty is designated as the "Clark Manager," and Pinnacle Monterey is designated as the "Pinnacle Manager."  The CPMB operating agreement states that "[t]he Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

s:\00-data\02-client\clark pinnacle\complaint.doc

7

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

1   the Company," except certain "Major Decisions."  Consent of both the Clark

2   Manager and the Pinnacle Manager is required to approve Major Decisions.

3          28.     Effective October 1, 2003, CPMB entered into a limited liability

4   company operating agreement to form MBMH for the purpose of developing and

5   operating a family-housing portfolio and related facilities at the Monterey Project.

6          29.     Effective October 1, 2003, MBMH entered into a Property

7   Management Agreement with AMSC (attached hereto as Exhibit II).  The term of

8   the PMA is set to last the duration of the fifty-year ground lease between the Project

9   and the United States of America, but §18.1(c)(6) states that the PMA shall

10  automatically terminate upon "theft, fraud, or other knowing or intentional

11  misconduct by [AMSC] or its employees or agents."

12         30.     Effective May 21, 2003, Clark Irwin and Pinnacle Irwin entered into a

13  limited liability company operating agreement to form CPCMC (attached hereto as

14  Exhibit III)for the purpose of being the managing member of CMC.  Clark Realty is

15  designated as the "Clark Manager," and Pinnacle Irwin is designated as the

16  "Pinnacle Manager."  The CPCMC operating agreement states that "[t]he Clark

17  Manager shall have acting authority to make all decisions regarding the

18  management of the Company's business and affairs and the vote or signature of the

19  Clark Manager shall be required to act on, consent to or approve all matters of the

20  Company," except certain "Major Decisions."  Both the Clark Manager's and the

21  Pinnacle Manager's consent is required to approve Major Decisions.

22         31.     Effective May 21, 2003, CPCMC entered into a limited liability

23  company operating agreement to form CMC for the purpose of developing and

24  operating a family-housing portfolio and related facilities at the Irwin Project.

25         32.     Effective March 1, 2004, CMC entered into a Property Management

26  Agreement with AMSC (attached hereto as Exhibit IV).  The term of the PMA is set

27  to last the duration of the fifty-year ground lease between the Project and the United

28  States of America, but §18.1(c)(4) states that the PMA shall automatically terminate

1  upon "theft, fraud, or other knowing or intentional misconduct by [AMSC] or its

2  employees or agents."

3  **II.     Similar Clark-Pinnacle Projects At Fort Benning, GA And Fort Belvoir,**

4  **VA**

5          33.     Affiliates of Plaintiffs and affiliates of Pinnacle have formed similar

6  Clark Pinnacle LLCs and Owner LLCS to privatize family housing and related

7  facilities at the Benning and Belvoir Projects.

8          34.     AMSE provided property management services at Fort Benning until

9  June 2010, when the Benning PMA was terminated based on fraud and other

10 intentional misconduct by AMSE.    AMSE continues to provide property

11 management services at Fort Belvoir pursuant to property management agreements

12 that are substantially similar to the PMAs entered into with AMSC by MBMH and

13 CMC.

14         35.     In November 2009, after an internal audit initiated on behalf of FBFC

15 uncovered evidence of questionable conduct by Pinnacle in managing the Benning

16 Project, the Benning Asset Manager engaged outside auditors to expand the scope of

17 the internal audit.    A similar audit of Pinnacle's performance of property

18 management functions at Fort Belvoir was initiated by the Belvoir Asset Manager

19 on behalf of FBRC.

20         36.     The audits of Pinnacle's provision of property management services at

21 both the Benning and Belvoir Projects are ongoing.   To date, the auditors have

22 uncovered evidence that Pinnacle employees have engaged in systematic fraud at

23 both the Benning and Belvoir Projects over a period of many years.  This pervasive

24 fraud includes bribery, kickbacks and other improper relationships with vendors

25 that, among other things, allowed vendors to charge inflated rates and double bill.

26 Although senior management at AMS was aware of much of the fraudulent and

27 improper conduct at both projects, it not only suppressed the information from

28

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

s:\00-data\02-client\clark pinnacle\complaint.doc

9

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

1    FBFC and FBRC, but also destroyed evidence and allowed the conduct to continue

2    unabated for years.

3        37.    On May 20, 2010, FBFC and FBRC sued AMS and AMSE in the

4    Superior Court of Muscogee County, Georgia (case no. SU10CV2025-F) for fraud

5    and intentional misconduct related to AMSE's performance as property manager at

6    Fort Benning and Fort Belvoir.  The complaint, as amended, alleges eight counts,

7    including fraud, conspiracy to commit fraud, breach of fiduciary duty, aiding and

8    abetting breach of fiduciary duty, unjust enrichment and accounting, and seeks a

9    declaratory judgment that the property management agreements at the Belvoir

10   Project has automatically terminated for cause as a result of theft, fraud, and other

11   knowing and intentional misconduct by Pinnacle and its employees.

12       38.    While discovery in the Georgia case is ongoing, the Georgia court has

13   issued several interlocutory orders against Pinnacle including orders restraining

14   Pinnacle from continuing its practice of document destruction, enjoining Pinnacle

15   from prosecuting a later-filed and overlapping action in Virginia, and dismissing

16   Pinnacle's affirmative claims for basic legal deficiencies.

17   **III.    Asset Managers Initiate Audits at Fort Monterey and Fort Irwin**

18       39.    After the discovery of systematic and pervasive fraud by Pinnacle

19   employees at the Benning and Belvoir Projects, the Monterey Asset Manager and

20   the Irwin Asset Manager initiated audits of the Pinnacle property managers on

21   behalf of MBMH and CMC.

22       40.    Both the Monterey and Irwin audits are ongoing.  As these audits are

23   not yet complete, MBMH and CMC have not yet determined whether Pinnacle or its

24   employees or agents have committed theft, fraud, or other knowing or intentional

25   misconduct at Monterey or Irwin, and have not yet determined whether the PMAs

26   have terminated by event of default, and, if so, on what date(s).  As plainly written,

27   the PMAs automatically terminate if and when AMSC or one of its employees or

28

1    agents commits theft, fraud or other intentional misconduct.  It is therefore possible

2    that the PMAs have already terminated and that they cannot be amended.

3    **IV.    Pinnacle's Scheme to Amend the Monterey and Irwin PMAs to Permit**

4    **Fraud**

5            41.    After the audits were initiated at Fort Monterey and Fort Irwin,

6    Pinnacle attempted to unilaterally amend the PMAs at those projects in order to

7    effectively exempt Pinnacle from liability for its own fraudulent acts in connection

8    with its management of those properties.

9            42.    Section 3.1(b)(3)(E) of the CPMB operating agreement and

10   §3.1(b)(2)(E)  of the CPCMC operating agreement state that it is a Major Decision

11   requiring both the Clark Manager and the Pinnacle Manager's consent to enact

12   "[a]djustments to the terms or conditions of the Property Management Agreement,

13   but the decision to enforce or take any other action with respect to any of the terms

14   or conditions thereof shall not be deemed a Major Decision."

15           43.    Section 3.13(c) of the CPMB operating agreement and §3.13(c) of the

16   CPCMC operating agreement state that "if a deadlock occurs in voting between the

17   Managers or the Members with respect to any matter arising under, relating to, or

18   affecting the terms or conditions of the Property Management Agreement, and if

19   that deadlock or dispute cannot be resolved by mutual agreement within a period of

20   7 days, then, unless the parties to such deadlock or dispute mutually agree

21   otherwise, any such deadlock or dispute shall be determined by the Pinnacle

22   Manager in its sole discretion."  Pinnacle Monterey and Pinnacle Irwin have

23   attempted to use this deadlock provision to unilaterally amend the PMAs to, among

24   other things, provide Pinnacle a right to "cure" its own fraud, and that of its

25   employees, relating to the Monterey and Irwin projects.  Such a cure right would not

26   only allow Pinnacle, despite its fiduciary duties, to commit fraud without risking

27   termination of the PMAs, but it would also actually incentivize Pinnacle to commit

28   fraud.  Under its proposed amendment, Pinnacle could simply cure any discovered

1    fraud and the PMA would remain in effect, and Owner would be barred from

2    terminating Pinnacle as property manager.

3        44.    On May 13, 2011, Stan Harrelson, on behalf of Pinnacle Monterey in

4    its capacity as the Pinnacle Manager of CPMB, sent a letter (attached hereto as

5    Exhibit V) to Clark Realty, in its capacity as the Clark Manager of CPMB, and a

6    nearly identical letter on behalf of Pinnacle Irwin in its capacity as the Pinnacle

7    Manager of CPCMC to Clark Realty, in its capacity as the Clark Manager of

8    CPCMC (attached hereto as Exhibit VI).  The letters seek the Clark Manager's

9    consent to an amendment of the Monterey and Irwin PMAs, and state that if the

10   Clark Manager does not consent, Pinnacle Monterey and Pinnacle Irwin will use the

11   deadlock resolution provisions of the CPMB and CPCMC operating agreements to

12   unilaterally amend the Monterey and Irwin PMAs.

13       45.    The letters state that Pinnacle  seeks to amend Section 18.1(c)(6) of the

14   Monterey PMA (the "Proposed Monterey Amendment") and Section 18.1(c)(4) of

15   the Irwin PMA (the "Proposed Irwin Amendment[1]) to read as follows:

16           "Theft, fraud, or other knowing or intentional misconduct

17           by [AMSC] or its employees or agents **having a material**

18           **adverse affect on [MBMH]; provided, however, (1) if**

19           **[AMSC] takes appropriate measures to correct, and**

20           **otherwise prevent the recurrence of any such events of**

21           **default and (2) [AMSC] remedies any confirmed event**

22           **of default within 15 days of learning of such default (to**

23           **the extent that such default is susceptible of being**

24           **cured), then such acts shall be deemed not to have a**

25           **material adverse affect and the Property Management**

26

27   [1]   The Proposed Irwin Amendment, which states that the entire provision shall be "inserted under" the existing
     section, rather than replacing such preexisting section, appears to be defectively drafted.  However, Plaintiffs
28   believe it was intended to have a substantially similar effect as the Proposed Monterey Amendment.

1             **Agreement      shall      not      be      terminated."**

2             (amended portion in bold)

3       46.    On May 19, 2011, W. Cleveland Johnson, on behalf of Clark Realty,

4 Clark Monterey and Clark Irwin, sent Mr. Harrelson a response to the letters dated

5 May 13, 2011(attached hereto as Exhibit VII).  This response noted that no deadlock

6 existed under the terms of the Operating Agreements, and requested that Pinnacle

7 provide more information relating to interpretation and application of the Proposed

8 Amendments.  The response also asked that Pinnacle answer specific questions

9 about its knowledge, if any, of any acts of -- or allegations of -- fraud, theft or

10 intentional misconduct that have occurred at the Monterey or Irwin Projects.

11       47.    On May 23, 2011, Mr. Harrelson responded to Mr. Johnson's letter

12 dated May 19, 2011 (attached hereto as Exhibit VIII).  This letter from Mr.

13 Harrelson acknowledged that no deadlock existed, and did not demand that Clark

14 Realty vote on the Proposed Amendments.  Mr. Harrelson did not make a full

15 disclosure of Pinnacle's knowledge of any allegations of fraud, theft or intentional

16 misconduct occurring at the Monterey or Irwin Projects, replying instead that

17 Pinnacle had "no information about any events of fraud, theft of misconduct at Irwin

18 or Monterey that would be cause to terminate the PMAs at those projects."  Mr.

19 Harrelson similarly did not answer Mr. Johnson's questions relating to the meaning

20 and application of the Proposed Amendments, and how Pinnacle envisioned acts of

21 fraud being "cured."  Mr. Harrelson ended by proposing "a face-to-face meeting,"

22 but did not specify who would attend this meeting, where it would be held or when

23 it would take place.

24       48.    On June 3, 2011, Mr. Johnson responded to Mr. Harrelson's letter

25 dated May 23, 2011 (attached hereto as Exhibit IX).  Mr. Johnson repeated his

26 request that Pinnacle respond to the specific questions set forth in Mr. Johnson's

27 May 19 letter.  Mr. Johnson stated that it would not be productive to have a face-to-

28 face meeting until Pinnacle provided Clark Realty the answers to its specific

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

s-00-data\02-client\clark pinnacle\complaint.doc

13

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

1 | questions relating to Pinnacle's knowledge of fraud, theft or intentional misconduct

2 | at the Monterey or Irwin Projects.  Mr. Johnson also noted that it would be

3 | inappropriate to agree to the proposed face-to-face meeting while certain claims

4 | made by Pinnacle against several individuals personally in Virginia state court --

5 | which were contrary to the express terms of the parties' agreements -- were still

6 | pending.

7 |        49.     On June 8, 2011, Mr. Harrelson responded to Mr. Johnson's letter

8 | dated June 3, 2011 (attached hereto as Exhibit X).  Noting that Clark Realty had not

9 | voted on either of the Proposed Amendments, and despite that Pinnacle had not

10 | sought to call a vote, Mr. Harrelson nonetheless stated that "Pinnacle declares a

11 | 'Deadlock' regarding the [Proposed Amendments]," and that, absent a meeting, "its

12 | proposed adjustments [to the PMAs] shall become effective on June 16 …"

13 |        50.     On June 14, 2011, Mr. Johnson responded to Mr. Harrelson's letter

14 | dated June 8 (attached hereto as Exhibit XI) reiterating that no deadlock in voting

15 | had occurred, and thus Pinnacle Monterey and Pinnacle Irwin were not entitled to

16 | exercise their alleged deadlock resolution rights .  Mr. Johnson again reiterated

17 | Clark Realty's request for information regarding the meaning and application of the

18 | Proposed Amendments, which it deems necessary before any vote occur, and

19 | demanded that Pinnacle agree not to take any steps to alter the provisions of the

20 | Monterey and Irwin PMAs until Pinnacle responds to Clark Realty's questions and a

21 | vote has occurred.  Mr. Johnson stated that unless Pinnacle gave this assurance by

22 | 12:00 EST, June 15, 2011, Clark Realty would "take all necessary actions to protect

23 | the Projects."

24 | **V.    Pinnacle's Proposed Amendments To The PMAs Are Invalid**

25 |        51.     The purpose and effect of the Proposed Amendments to the PMAs is to

26 | exempt the Pinnacle property managers at the two Projects from liability for their

27 | own fraud by giving the Pinnacle property managers the right to cure such fraud in

28 | the event it is uncovered by the Asset Managers, through internal audits or

1   otherwise.  The Proposed Amendments exceed Pinnacle's limited powers to consent

2   to Major Decisions, violate AMSC's fiduciary duties as property manager and the

3   Pinnacle Managers' fiduciary duties to CPMB, CMCMC and their respective

4   members, and, if allowed to proceed, would make the relevant provisions of the

5   PMAs void as against the public policy of the State of California.

6   **A.   Pinnacle Is Not Authorized To Exercise Its Deadlock Resolution Rights**

7        52.   Under the terms of the CPMB and CPCMC Operating Agreements,

8   Pinnacle may only exercise its deadlock resolution rights if "a deadlock in voting

9   has occurred."

10       53.   Clark Realty has never voted or refused to vote on the Proposed

11  Amendments.

12       54.   Section 3.9 of the CPMB Operating Agreement and §3.9 of the

13  CPCMC Operating Agreement state that, unless the managers consent to conducting

14  the companies' business without formal meetings, "[t]he managers shall meet for the

15  transaction of the Company business. . . ."

16       55.   Pinnacle has not requested and Clark Realty has not consented to

17  carrying out the vote on the Proposed Amendments without a formal meeting.

18       56.   Pinnacle Monterey and Pinnacle Irwin have never provided any notice

19  of a meeting stating the place, date and hour of the meeting, as required by Cal.

20  Corp. §17153.

21       57.   Despite this, Pinnacle has declared that a deadlock in voting exists, and

22  announced that, absent a meeting, "its proposed adjustments [to the PMAs] shall

23  become effective on June 16. . . ."

24       58.   Until the completion of the ongoing audit of the Monterey and Irwin

25  Projects, Plaintiffs are unable to determine whether the Monterey and Irwin PMAs

26  have terminated, and whether the Monterey and Irwin PMAs are susceptible to

27  amendment.

28

**B.**     **The Proposed Amendments Violate Pinnacle's Fiduciary Duties**

59.     As the property manager at the Monterey and Irwin Projects, AMSC leases and collects rents for MBMH and CMC's real property.  AMSC is a "real estate broker" as that term is defined in Cal. Bus. & Prof. Code §10131.

60.     AMSC holds and manages custodial trust accounts for the Monterey and Irwin Projects, is authorized to enter into certain contracts with third-party vendors and pay certain expenses on behalf of MBMH and CMC, and otherwise acts in a confidential and fiduciary capacity for MBMH and CMC.  As such, AMSC owes MBMH and CMC fiduciary duties, including the duty of loyalty and the duty of fullest disclosure of all material facts that might affect Plaintiffs' decision on whether to vote for or against the Proposed Amendments.  Indeed, in the Georgia litigation, while Pinnacle originally argued that "there is no fiduciary obligation" owed by Pinnacle to the Owners, Pinnacle later changed its position to acknowledge the existence of "limited fiduciary duties."

61.     AMS, AMSC and the Pinnacle Managers are under common control. AMS is causing the Pinnacle Managers and AMSC to attempt to enact the Proposed Amendments in violation of AMSC and AMS' statutory and common law duties to MBMH and CMC.

62.     Pinnacle Monterey and Pinnacle Irwin, as managers of California limited liability companies, owe fiduciary duties to the respective companies and the members of those companies, including Clark Monterey and Clark Irwin.  See Cal. Corp. §17153.  These duties include the duty of care and the duty of loyalty.  See Cal. Corp. §16404.

63.     Pinnacle, acting through the Pinnacle Managers, is seeking to permit and excuse its own fraud to the detriment of the Projects.  MBMH and CMC not only do not benefit from the Proposed Amendments, but will be harmed if they lose the ability to fire dishonest property managers who commit or tolerate fraud.  Fraud, by its nature, is often subtle, pervasive, and difficult to detect.  Mere repayment of

1    misappropriated funds or termination of bad actors does not always cure fraud.

2    Trust is an essential component in the fiduciary relationship of a property owner to

3    its property manager. The Proposed Amendments are incompatible with Pinnacle's

4    duties as property manager, because they would provide perverse incentives for

5    Pinnacle and its employees to defraud the projects without fear of termination.

6        64.    The Proposed Amendments are being proposed by the Pinnacle

7    Managers on behalf of and for the benefit of AMSC, an entity that has adverse

8    interests to MBMH and CMC with respect to its rights and obligations under the

9    PMAs. Enactment of the Proposed Amendments would violate Pinnacle's duty of

10    loyalty to refrain from engaging in self-dealing for its own benefit and to the

11    detriment of its fiduciaries.

12        65.    Enactment of the Proposed Amendments would also violate Pinnacle's

13    duty of disclosure. Prior to voting on the Proposed Amendments, Clark Realty has

14    asked that Pinnacle make a full disclosure of what is meant by "material adverse

15    affect (sic)," "appropriate measures to correct," and "confirmed event of default" as

16    these terms are used in the Proposed Amendments, as well as what types of fraud

17    Pinnacle contends are or are not "susceptible to being cured." Pinnacle has failed to

18    answer these questions. Pinnacle's failure to answer Clark Realty's questions

19    regarding the meaning and application of the Proposed Amendments, and questions

20    regarding Pinnacle's knowledge of any allegations of fraud at the Monterey or Irwin

21    Projects, violates Pinnacle's duty of disclosure as a real estate agent and as a

22    manager of CPCB and CPCMC.

23    **C.**    **The Proposed Amendments are Against Public Policy, and Would**

24    **be Void**

25        66.    The Proposed Amendments should be declared invalid and enjoined for

26    the additional reason that they violate the public policy of the State of California.

27    Section 1668 of the California Civil Code states "[a]ll contracts which have for their

28    object, directly or indirectly, to exempt anyone from responsibility for his own

1   fraud, or willful injury to the person or property of another, or violation of law,

2   whether willful or negligent, are against the policy of the law."

3        67.    If the Proposed Amendments take effect, AMSC will be authorized to

4   engage in fraud at the Monterey and Irwin Projects without risking termination of

5   the PMAs.  Pinnacle has argued in parallel litigation in Georgia that the Owner's

6   sole remedy for Pinnacle fraud is a breach of contract claim.  Under this theory, the

7   text of the Proposed Amendments would leave Owners with no remedy at all for

8   fraud that is not "material,[1]" and would subject even material fraud to a Pinnacle

9   right to "cure," presumably allowing Pinnacle to simply repay any ill-gotten gains to

10  the Owners (of any fraud that has been discovered) or investigate and terminate (or

11  perhaps merely reprimand) the employees involved.  Because the Proposed

12  Amendments, by their plain language, are intended by Pinnacle to exempt AMSC

13  from liability for its own fraudulent acts, the Proposed Amendments violate public

14  policy, and should be declared invalid and enjoined.

15                 **FIRST CAUSE OF ACTION**

16      Claim for Declaratory Relief That Proposed Monterey Amendment is Invalid

17    (By MBMH, CPMB and Clark Monterey against Pinnacle Monterey, AMSC and AMS)

18       68.    Plaintiffs reallege, as if fully set forth here, the allegations set forth in

19  the preceding paragraphs of this complaint.

20       69.    There has been no deadlock in voting with respect to the Proposed

21  Monterey Amendment and Pinnacle Monterey is not authorized to exercise its

22  alleged deadlock resolution rights under the operating agreements.

23       70.    The Proposed Monterey Amendment violates Defendants' fiduciary

24  duties to MBMH, CPMB and Clark Monterey.

25       71.    The Proposed Monterey Amendment is unlawful and against the public

26  policy of the State of California under §1668 of the California Civil Code.

27

28   [1] Plaintiffs submit that there is no such thing as an "immaterial" fraud

72. Nonetheless, Pinnacle Monterey has stated its intention and belief that the Proposed Monterey Amendment will take effect as of June 16, 2011.

73. The parties are, therefore, in a position of uncertainty with respect to the validity of the Proposed Monterey Amendment and Defendants' right to enact the same.

74. This represents an actual controversy appropriate for declaratory relief pursuant to §1060 of the California Code of Civil Procedure.

## SECOND CAUSE OF ACTION

Claim for Declaratory Relief That Defendants

May Not Enact the Proposed Irwin Amendment

(By CMC, CPCMC, and Clark Irwin against Pinnacle Irwin, AMSC and AMS)

75. Plaintiffs reallege, as if fully set forth here, the allegations set forth in the preceding paragraphs of this complaint.

76. There has been no deadlock in voting with respect to the Proposed Irwin Amendment and Pinnacle Irwin is not authorized to exercise its alleged deadlock resolution rights under the operating agreements.

77. The Proposed Irwin Amendment violates Defendants' fiduciary duties to CMC, CPCMC, and Clark Irwin.

78. The Proposed Irwin Amendment is unlawful and against the public policy of the State of California under §1668 of the California Civil Code.

79. Nonetheless, Pinnacle Irwin has stated its intention and belief that the Proposed Irwin Amendment will take effect as of June 16, 2011.

80. The parties are, therefore, in a position of uncertainty with respect to the validity of the Proposed Irwin Amendment and Defendants' right to enact the same.

81. This represents an actual controversy appropriate for declarative relief pursuant to §1060 of the California Code of Civil Procedure.

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

t:\60-data\02-client\clark pinnacle\complaint.doc

19

Monterey Bay Military Housing v. Pinnacle Monterey
COMPLAINT

1

**THIRD CAUSE OF ACTION**

2   Claim for Preliminary and Permanent Injunctive Relief Regarding Amendment of

3   the Monterey and Irwin PMAs

4   (By all Plaintiffs against all Defendants)

5

6   82.     Plaintiffs reallege, as if fully set forth here, the allegations set forth in

7   the preceding paragraphs of this complaint.

8   83.     There has been no deadlock in voting with respect to the Proposed

9   Amendments and Pinnacle Irwin and Pinnacle Monterey are not authorized to

10   exercise their alleged deadlock resolution rights under their respective operating

11   agreements.

12   84.     The Proposed Amendments violate Defendants' fiduciary duties to

13   Plaintiffs.

14   85.     Failure to enjoin enactment of the Proposed Amendments would result

15   in irreparable harm to the Plaintiffs by allowing Defendants to exempt AMSC from

16   liability for its own fraud.

17   86.     Preliminary and permanent injunctive relief is appropriate as

18   Defendants are poised to unilaterally amend the PMAs in a manner that violates

19   Plaintiffs' rights with respect to the same subject matter as this action.   Indeed,

20   Pinnacle has declared its explicit intention to do so in the letter from Stan Harrelson

21   attached hereto as Exhibit X.

22   87.     Pecuniary damages would not provide adequate relief in the event

23   Pinnacle takes actions to unilaterally amend the PMAs to immunize itself from the

24   consequences of its own fraud.   The fiduciary duties inherent in Pinnacle's position

25   as property manager and LLC Manager are intangible but essential for protection of

26   the Plaintiffs' rights.   The loss or violation of such duties cannot be compensated for

27   in money.

28

88.     It would be difficult to ascertain the monetary damages required to compensate Plaintiffs in the event Defendants are allowed to move forward with unilateral amendment of the PMAs.  The Proposed Amendments would increase the likelihood that Pinnacle would engage in fraud at the Monterey and Irwin Projects, and potentially prolong any existing fraud.  These risks and harms are not easily ascertainable or quantifiable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants and seek the following relief:

       A.     Judgment declaring that the Proposed Monterey Amendment is invalid.

       B.     Judgment declaring that the Proposed Irwin Amendment is invalid.

       C.     Preliminary Injunction enjoining Pinnacle from enacting the Proposed Amendments until dispositive resolution of Counts I and II of this Complaint.

       D.     Permanent Injunction enjoining Pinnacle from enacting the Proposed Amendments.

       E.     Such other relief deemed appropriate and just by the Court.

Date:  June 15, 2011

Ronald S. Granberg, attorney for Plaintiffs

///

///

# EXHIBIT I

<u>THE PRESIDIO OF MONTEREY/NAVAL POSTGRADUATE
SCHOOL MILITARY HOUSING</u>

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

TABLE OF CONTENTS

ARTICLE I ORGANIZATIONAL MATTERS ................................................................ 1
    1.1    Formation of Company. ................................................................ 1
    1.2    Name. ................................................................................................ 1
    1.3    Principal Office and Registered Agent. ........................................ 2
    1.4    Certificate of Formation. .............................................................. 2
    1.5    Purpose. ........................................................................................ 2
ARTICLE II MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION OF PROFITS
    AND LOSSES ................................................................................ 2
    2.1    Members; Percentage Interests. .................................................... 2
    2.2    Initial Capital Contributions. ........................................................ 3
    2.3    Additional Capital Contributions. ................................................ 3
    2.4    Capital Accounts. .......................................................................... 4
    2.5    Interest on Capital Contributions; Return of Capital Contributions. ...................... 5
    2.6    Loans. ............................................................................................ 6
    2.7    No Preemptive Rights. .................................................................. 6
    2.8    Cash Distributions. ........................................................................ 6
    2.9    Allocation of Income, Gain, Loss and Deduction. ........................ 8
ARTICLE III MANAGEMENT AND RIGHTS OF MEMBERS ............................... 11
    3.1    Management by Managers; Rights of Members. .......................... 11
    3.2    Third Party Reliance. .................................................................... 13
    3.3    No Duty to Consult. ...................................................................... 13
    3.4    Outside Activities of Managers. .................................................. 13
    3.5    Annual Operating Budget. ............................................................ 14
    3.6    Reimbursement. ............................................................................ 14
    3.7    Managers and Affiliates Dealing with the Company. .................. 14
    3.8    Indemnification of Managers. ...................................................... 14
    3.9    Company Meetings. ...................................................................... 14
    3.10   Guarantees of Financing. ............................................................ 14
    3.11   Books and Records. ...................................................................... 15
    3.12   Bank Accounts. ............................................................................ 15
    3.13   Deadlock. ...................................................................................... 15
    3.14   Power of Attorney. ...................................................................... 16
    3.15   Services. ........................................................................................ 16
ARTICLE IV TRANSFER OF MEMBERSHIP INTERESTS ................................ 17
    4.1    Transfers; Treatment of Assignees; Substituted Members. ........ 17
    4.2    Death, Insanity or Incompetency, or Trust Termination of a Member. ............... 19
    4.3    Bankruptcy of a Member. ............................................................ 20
    4.4    Right to Effect Transfers. ............................................................ 21
ARTICLE V TERM; DISSOLUTION ...................................................................... 21
    5.1    Term. ............................................................................................ 21
    5.2    Events Resulting in Dissolution. .................................................. 21
    5.3    Conclusion of Affairs. .................................................................. 21

H:\CB\MONTEREY PRESIDIO\ORGDOCS\CLARK\PINN\MONTBYHOLD\OPERAGMT FINAL.DOC

| | | |
|---|---|---|
| 5.4 | Order of Priority in Liquidation. | 22 |
| 5.5 | Termination. | 22 |
| 5.6 | Transferring Member Obligations. | 22 |
| ARTICLE VI | DEFAULT; REMEDIES | 22 |
| 6.1 | Event of Default. | 22 |
| 6.2 | Remedy for Event of Default. | 23 |
| 6.3 | Obligations of Defaulting Member Continue | 25 |
| 6.4 | Setoff of Payments to Defaulting Member. | 25 |
| ARTICLE VII | MISCELLANEOUS | 26 |
| 7.1 | Amendment. | 26 |
| 7.2 | Notices. | 26 |
| 7.3 | Enforceability. | 26 |
| 7.4 | Binding Effect. | 26 |
| 7.5 | No Third Party Beneficiary Rights. | 26 |
| 7.6 | Limitation of Liability. | 26 |
| 7.7 | Further Assurances. | 27 |
| 7.8 | Prevailing Party. | 27 |
| 7.9 | MBMH Operating Agreement. | 27 |

LIST OF EXHIBITS
EXHIBIT A - Percentage Interests
EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2003, but for all purposes is made effective as of October 30, 2001 (the "**Effective Date**"), by and among the undersigned parties.  Defined terms shall have the meanings given them in this Agreement and are capitalized in the text.  Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

WITNESSETH

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle Monterey Bay LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2     Name.

The name of the Company is **Clark Pinnacle Monterey Bay LLC**.  The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined).  The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires.  The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

1.3     Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is:  c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention:  Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members.  The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate.  The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

1.4     Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

1.5     Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Land, LLC ("**MBL**"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Land, LLC (the "**MBL Operating Agreement**") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Military Housing, LLC ("**MBMH**"), whose members shall be the Company and Monterey Bay Housing Holdings, LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Military Housing, LLC (the "**MBMH Operating Agreement**") to be entered into between the members thereof. .  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement.  The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

2.1     Members; Percentage Interests.

(a)     The "**Members**" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof.  The Members are divided into ownership groups (each a "**Member Group**"), as more particularly set forth on Exhibit A.  For purposes hereof: (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "**Clark Member**," and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "**Clark Group**;" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "**Pinnacle Member**," and the Members designated under the heading "Pinnacle" shall be herein referred to collectively as the "**Pinnacle Group**."

2

(b)     Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on <u>Exhibit A</u>.

(c)     The Percentage Interest of each Member shall be personal property for all purposes.

(d)     All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2     <u>Initial Capital Contributions</u>.

Each Member shall make an initial contribution of capital to the Company in the amount specified on <u>Exhibit A</u> (the **"Initial Capital Contributions"**). The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

2.3     <u>Additional Capital Contributions</u>.

(a)     During the period from the Effective Date hereof through the consummation of the financial closing (the "Financial Closing") for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and MBL (the **"Ground Lease"**), and in the MBL Operating Agreement and MBMH Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on <u>Exhibit B</u> attached hereto and made a part hereof (the **"Pre-Closing Costs"**). Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**). The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor. It is anticipated that the Company shall endeavor to get MBMH and MBL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company. Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)     The Company anticipates that, contemporaneously with the Financial Closing for the Project, MBL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the MBL Operating Agreement and MBMH Operating Agreement. In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by MBMH to secure performance of each Member's obligation to pay its pro rata share of the equity required by the

3

MBMH Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

(c)     Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**"). Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions.**" For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index (hereinafter defined) from (a) the month of October in the second calendar year prior to the calendar year of adjustment to (b) the month of October in the calendar year prior to the calendar year of adjustment. The "**CPI Index**" shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager. If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor. If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below. The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

4

(b)      For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)      Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)      Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

(3)      Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members. "**Unrealized Gain**" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date. "**Unrealized Loss**" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)      Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5      <u>Interest on Capital Contributions; Return of Capital Contributions</u>.

(a)      No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)      No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property

5

other than cash.  Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6    Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**").  Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above.  Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s).  If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests. Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.   No Member shall be required to make any loans to the Company.

2.7    No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8    Cash Distributions.

(a)    Net Cash Flow.

(1)    "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by:  (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter

6

defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

        (2)    The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

        (A)    First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds. The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

        (B)    Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests. The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

        (C)    Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members. Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests. The "**Interest Rate**" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

        (D)    Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

        (E)    Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

<div align="center">7</div>

(F)     Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)     Capital Proceeds.

(1)     "**Capital Proceeds**" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the MBL Operating Agreement or the MBMH Operating Agreement.

(2)     Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)     First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)     Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9     Allocation of Income, Gain, Loss and Deduction.

(a)     Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof.  The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain.  "**Minimum Gain**" means (a) with

8

respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations. "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

   (b) <u>Income Tax Elections</u>.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

   (c) <u>Income Tax Allocations</u>.

    (1) For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution.  In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

    (2) If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

   (d) <u>Transfers during Fiscal Year</u>.  In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer.  The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items.  Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale.  Similarly, extraordinary or nonrecurring items shall be allocated in

accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

(e)     Amortization and Allocation of Organization and Start-up Expenses.  The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

(f)     Special Capital Account "Book" Allocations to Comply with Section 704 Regulations.  The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder.  Such special allocations shall be made before any allocations under Section 2.9(a) above.

(g)     Tax Matters Member.

(1)     The Clark Member is hereby appointed to act as the tax matters member (the "**TMM**"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code.  Pursuant to section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "**IRS**") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(2)     The TMM is authorized, but not required:

(A)     To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in section 6231 of the Code) or a member of a "notice group" (as defined in section 6223(b)(2) of the Code).

(B)     In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)     To intervene in any action brought by any other Member for judicial review of a final adjustment.

10

(D)     To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)     To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)     To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)     The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)     The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)     The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

ARTICLE III
MANAGEMENT AND RIGHTS OF MEMBERS

3.1     Management by Managers; Rights of Members.

(a)     Manager Designation. The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member. The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**"). The initial Manager appointed by the Pinnacle Group is Pinnacle Monterey LLC (the "**Pinnacle Manager**"). Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent

11

jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

(b)     Power and Authority of the Managers.

(1)     The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs. The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

(2)     The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

(3)     The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions. The term "**Major Decisions**" shall mean any of the following:

(A)     Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

(B)     The Financial Closing and the terms and conditions thereof.

(C)     Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

(D)     Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

(E)     Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

(F)     Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

(G)     Amendment to the MBMH Operating Agreement or the MBL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

(H)     Termination or dissolution of the Company.

(c)     <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

(d)     <u>Rights and Votes of Members</u>.

(1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

(2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

3.2     <u>Third Party Reliance</u>.

Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

3.3     <u>No Duty to Consult</u>.

Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

3.4     <u>Outside Activities of Managers</u>.

The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor

13

any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5     Intentionally Deleted.

3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

3.7     Managers and Affiliates Dealing with the Company.

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8     Indemnification of Managers.

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9     Company Meetings.

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them.  Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10    Guarantees of Financing.

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the

granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

    3.11   Books and Records.

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

    3.12   Bank Accounts.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

    3.13   Deadlock.

    (a)    If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply. A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

    (b)    Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or

<div align="center">15</div>

obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)     Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

3.14     Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the MBMH Operating Agreement and the MBL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record:  (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the MBMH Operating Agreement or the MBL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement. Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15     Services.

(a)     The Members acknowledge and consent to the following:

(1)     MBMH shall enter into one or more developer services agreements (the "**Developer Services Agreements**") with CRC Planned Communities LLC ("**Developer**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the MBMH Operating Agreement) (the "**Development Period**"). MBMH may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the MBMH Operating Agreement (the "**Out-Year Developer Services Agreements**").

16

(2)      MBMH shall enter into one or more a construction contracts (the **"Construction Contracts"**) with Clark Realty Builders, Inc. (**"CRB"**), an Affiliate of the Clark Group, on or before the Effective Date for the provision of general contractor services.  MBMH may also enter into one or more construction management agreements with CRB on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the MBMH **Operating** Agreement (the **"Out-Year Construction Management Agreements"**).

(3)      MBMH shall enter into one or more property management agreements (the **"Property Management Agreements"** or the **"Pinnacle Member Service Contracts"**) with Pinnacle Realty Management Company (**"Pinnacle Management"**), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)      MBMH shall enter into one or more asset management agreements (the **"Asset Management Agreements"**) with an Affiliate of the Clark Group  (the **"Asset Manager"**), on or before the Effective Date for the provision of asset management services.  For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the **"Clark Member Service Contracts."**  The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the **"Service Contracts"** and, individually, as a **"Service Contract."**

(b)      In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, (i)  the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc., and (ii) the Pinnacle Member shall be permitted without the consent of the Clark Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Property Management Agreement to American Management Services California Inc.  The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

<div align="center">

ARTICLE IV
TRANSFER OF MEMBERSHIP INTERESTS

</div>

4.1      <u>Transfers; Treatment of Assignees; Substituted Members</u>.

(a)      No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as

<div align="center">

17

</div>

hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager. A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)     A **"Permitted Transferee"** is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined). In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee." For purposes of this Agreement, **"Affiliate"** shall mean, as to any individual, partnership, corporation, trust or other entity (**"Person"**), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person. **"Control"** means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below. The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted. An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company. The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage

18

Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest. All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

(g)     In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

4.2     Death, Insanity or Incompetency, or Trust Termination of a Member.

(a)     In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's

19

admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

        (b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests. Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company. The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

    4.3     <u>Bankruptcy of a Member</u>.

        (a)     In the event of the Bankruptcy (as herein defined) of a Member (the "**Bankrupt Member**"), then the Members other than the Bankrupt Member (the "**Continuing Members**"), <u>pro rata</u>, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

        (b)     As used herein, the term "**Bankruptcy**" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "**Bankruptcy Code**"), an assignment for the benefit of creditors and/or an adjudication of

insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

4.4     Right to Effect Transfers.

(a)     The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

(b)     In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

ARTICLE V
TERM; DISSOLUTION

5.1     Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

5.2     Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an **"Event of Dissolution"**) (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):(a) the unanimous written consent of the Managers; or (b) the dissolution of MBMH or MBL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or(d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the State of California.

5.3     Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

5.4    Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

(a)    First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

(b)    Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(c)    Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)    Fourth, in accordance with the priorities described in Section 2.8(a)(2).

5.5    Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.  Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

5.6    Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

<div align="center">ARTICLE VI<br>DEFAULT; REMEDIES</div>

6.1    Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default"**:

(a)     A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

(b)     A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

(c)     A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

(d)     A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)     The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)     If an Event of Default occurs with respect to a Member (a "**Defaulting Member**"), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the "**Non-Defaulting Manager**"):

(1)     If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)     Each Member who is not in default (a "**Non-Defaulting Member**") shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the "**Default Payment**"). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the "**Defaulting Manager**") within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a "**Default Loan**") and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or

23

distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A "**Default Interest Rate**" is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

(i)     To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the "**Dilution Fraction**"), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member. In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)     In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)     If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)     If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to

cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

      (b)    In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

      (c)    During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager. In such event, the vote of the remaining Manager(s) shall be sufficient to make all decision of the Company, including, without limitation, Major Decisions.

      6.3    <u>Obligations of Defaulting Member Continue</u>.

      Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

      6.4    <u>Setoff of Payments to Defaulting Member</u>.

      From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation,

payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

## ARTICLE VII
## MISCELLANEOUS

### 7.1    Amendment.

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

### 7.2    Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

### 7.3    Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

### 7.4    Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of Maryland.  This Agreement may be executed in counterparts.

### 7.5    No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

### 7.6    Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer,

employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     MBMH Operating Agreement and MBL Operating Agreement.

In the event of a conflict between specific provisions of the MBMH Operating Agreement or the MBL Operating Agreement and specific provisions of this Agreement, the provisions of the MBMH Operating Agreement or the MBL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the MBMH Operating Agreement, the MBL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK MONTEREY PRESIDIO LLC

By:    Clark Realty Capital, L.L.C., Manager

        By: _____
            Douglas R. Sandor, Manager

        By:    CEI Realty, Inc., Manager

           By: _____
               Lawrence C. Nussdorf, President

PINNACLE MONTEREY LLC

By: _____
Name: _____
Title: _____

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| **CLARK MEMBER:** | | |
| Clark Monterey Presidio LLC<br>7500 Old Georgetown Road, 15th Floor<br>Bethesda, MD 20814 | $700.00 | 70% |
| **PINNACLE MEMBER:** | | |
| Pinnacle Monterey LLC<br>2801 Alaskan Way, Suite 200<br>Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

# EXHIBIT II

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of October, 2003, by and between Monterey Bay Military Housing, LLC (hereinafter referred to as the "OWNER"), MBMH Subsidiary, LLC (hereinafter referred to as "SUBSIDIARY OWNER" and together with Development Owner, "OWNERS") and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

### PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Presidio of Monterey, Ord Military Community, La Mesa Village and the Naval Post Graduate School, and is located at Monterey, California, consisting of (i) the land (the "Land"),as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (as lessor) and Monterey Bay Land, LLC (as lessee) (the "Ground Lease"), as subleased pursuant to that certain Sublease of even date herewith by and between Monterey Bay Land, LLC (as sublessor) and Development Owner (as sublessee); (ii) improvements ("Improvements") located on the Project and leased by Development Owner and (iii) improvements ("Additional Improvements") located on the Project and leased development by Subsidiary Owner under that certain Building Lease of even date herewith by and between MBL Subsidiary, LLC (as lessor) and Subsidiary Owner (as lessee) (the "Building Lease").

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1    APPOINTMENT AND ACCEPTANCE:  Each Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the portion of the Project owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, Building Lease or Limited Liability Company Agreement of Development Owner or (b) any action which would cause either Owner to be in default under the Sublease or Building Lease.  In the event and at such time as any of the Additional Improvements are no longer leased by Subsidiary Owner but are instead leased by Development Owner in accordance with the terms of the Sublease, this Agreement shall terminate with respect to Subsidiary Owner but shall remain in full force and effect to Development Owner with respect to such Additional Improvements.

1.2    TERM:  The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of October, subject to the other provisions of this Agreement.

1.3    MANAGEMENT OFFICE:  Development Owner shall provide adequate space on the Project for a management office, exclusively for the use of Manager to conduct the business of the management of the Project. Owners shall pay all reasonable expenses related to such office as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services in proportion to the respective Base Fee payable by each.  All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Development Owner shall give Manager prior written notice of any changes in such policies.

1.4    OMITTED

1.5    BUDGET AND BUSINESS PLAN:  Owners and Manager will establish a budget and business plan for operation and management of the Project (the "Plan").  The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation.  Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require the applicable Owner's advance approval, except as provided in Section 4.2 hereof.  Owners agree that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance.  The Plan shall include, at a minimum, the following:

A.        Minimum Leasing Guidelines established by each Owner for its portion of the Project, setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.        Capital Improvement Plan:  Each Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed during such Owner's and Manager's pre-acquisition inspection of the property (if applicable). Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property.  A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

## BANK ACCOUNTS

2.1      BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project provided funds of Development Owner and Subsidiary Owner shall be segregated from each other.  Operating trust accounts are hereinafter referred to as "operating accounts". All other accounts are hereinafter referred to as "trust accounts". Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by the applicable Owner.  All other funds shall be place in respective operating accounts for Development Owner and Subsidiary Owner, as appropriate.  All trust accounts shall be operated in conformance with state law. Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts.  No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager.  All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government.  All such depository banks shall be selected by Manager and shall be satisfactory to Owners.  Manager shall not be liable to an Owner in the event of bankruptcy or failure of a depository institution.  Manager shall open the above described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by an Owner. Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2      REMITTANCES .  Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated October 1, 2003 ("Deed of Trust") between Owner and Monterey Bay Land, LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income, casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3      INITIAL DEPOSIT FOR RESERVES:  Immediately upon commencement of this Agreement, each Owner shall remit to Manager a sum to be deposited in such Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve.  Each Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of such Owner under this Agreement as they become due.  Each Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4      MANAGER'S OBLIGATION TO ADVANCE PAYMENTS:  All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of the applicable Owner.  All such purchases shall be made by Manager solely on behalf of the applicable Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation.  In the event that there are insufficient funds in an Owner's operating account, Manager may, after notifying the Owner, advance its own funds for such purpose, in which event such Owner shall promptly repay to Manager all such sums expended.

2.5      INTEREST ON TRUST ACCOUNTS:  Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at an Owner's request.  All interest earned on such funds shall belong to the applicable Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2

## SECTION 3

## COLLECTION OF RENTS AND OTHER RECEIPTS

3.1     AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to either Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by section 11.5 herein.

3.2     SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

## DISBURSEMENT FROM OPERATING ACCOUNTS

4.1     OPERATING EXPENSES: From each Owner's operating account, and subject to Exhibit B, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating such Owner's portion of the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Each Owner has sole responsibility for the timely payment of all authorized expenses of each Owner's portion of the Project. including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

4.2     EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of the applicable Owner. An Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, each Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify the applicable Owner in detail, concerning such expenditures.

4.3     AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from an Owner's operating account, in accordance with the Plan or as otherwise directed by an Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges; all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees. To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

4.4     EXPENSES TO BE PAID DIRECTLY BY OWNER: In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, each Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

4.5     FEES FOR LEGAL ADVICE: Owners shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owners, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify the applicable Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this section shall obligate an Owner to pay Manager's legal fees in the

3

event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute. To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

    4.6    NET PROCEEDS: To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to an Owner's portion of the Project to each Owner at least monthly at a time specified by Owner. Such periodic cash payments shall be remitted to _____.

    4.7    PRIORITY OF PAYMENT: Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall be paid in the following order: Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts. Where the terms of any loan security agreement with an Owner conflict with the terms of this section, the terms of such loan security agreement shall control, provided, such Owner has notified Manager of the existence of any such condition. To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

## SECTION 5

## FINANCIAL AND OTHER REPORTS

    5.1    REPORTS: By the 10th business day of each month, Manager shall furnish to each Owner a statement of receipts and disbursements from the operation of its portion of the Project during the prior calendar or fiscal month. In addition, Manager shall, on a mutually acceptable schedule and at an Owner's request, prepare and submit to such Owner such other reports as such Owner shall specify, including, but not limited to the following:

        a.)    Weekly occupancy, leasing status and traffic reports.
        b.)    Monthly market comparable rent survey.
        c.)    Monthly bank reconciliation.

In addition, Manager will furnish to Development Owner:

    Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Development Owner for that fiscal year, a statement of changes in financial position of Development Owner for that fiscal year and, when requested by Development Owner's mortgagee, a balance sheet showing all assets and liabilities of Development Owner relating to the Project as of the end of that fiscal year, all audited at Development Owner's expense by an independent certified public accountant reasonably acceptable to Development Owner's mortgagee.

    Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Development Owner.

    Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Development Owner and any Controlling Entity and the interest held by each, and if Development Owner or a Controlling Entity is a corporation, all officers and directors of Development Owner's mortgagee and the Controlling Entity, as applicable, and if Development Owner or a Controlling Entity is a limited liability company, all managers who are not members.

    Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Operating Income (as defined in the Loan Agreement) and Operating Expenses (as defined in the Loan Agreement) for such month and a calculation of the DSC Ratio (as defined in the Loan Agreement).

    For purposes hereof, "Loan Agreement" means that certain Loan Agreement between Development Owner, Monterey Bay Land, LLC of even date herewith.

<div align="center">4</div>

"Controlling Entity" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Development Owner (if Development Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Development Owner or more than 50% of the ownership or membership interests in Development Owner (if Development Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Development Owner (if Development Owner is a corporation).

5.2   OWNER'S RIGHT TO AUDIT:  Each Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by such Owner, as an expense of such Owner. Such audits may be made during normal business hours posted at the Project.

## SECTION 6

## ADVERTISING

6.1   ADVERTISING:  The cost of advertising shall be paid out of the Developer Owner's operating account, in accordance with the advertising budget or as approved by Developer Owner. All advertising shall make clear that Manager is the manager and is not the owner of the Project.

## SECTION 7

## LEASING AND RENTING

7.1   MANAGER'S AUTHORITY TO LEASE PROJECT:  Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Sublease, the Building Lease and the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for the Owners. All costs of leasing shall be paid out of the applicable Owner's operating account, in accordance with the leasing budget or as approved by the applicable Owner. No rental agreement shall be for a period in excess of one (1) year without the written approval of the applicable Owner. The form of the rental agreement shall be provided by the applicable Owner.

Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Development Owner's mortgagee (or without Development Owner's written certification that such consent is deemed received under the applicable loan documents). Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder, terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgagee. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

Manager will not permit an Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

7.2   NO OTHER RENTAL AGENT:  During the term of this Agreement, no Owner shall authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project. Each Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3   RENTAL RATES:  In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with

5

respect to each Owner's portion of the Project. As authorized in writing by an Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4     ENFORCEMENT OF RENTAL AGREEMENTS: Subject to any conditions or limitations imposed by an Owner, Manager is authorized to institute and defend, in an Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Manager is authorized to sign and serve such notices as Manager and an Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income. Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of an Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less. Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of an Owner before entering into any compromise, settlement, or release of such legal action. Any moneys for such settlements paid out by Manager shall be an operating expense of the Project. Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or shall be reimbursed directly to Manager by such Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by an Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, an Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against such Owner or Manager as the agent of such Owner.

## SECTION 8

## EMPLOYEES

8.1     MANAGER'S AUTHORITY TO HIRE: Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2     OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working at the Project including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owners' funds, from the Project operating accounts subject to the Plan and allocated equitable between the Owners. In addition, Manager shall accrue for all vacation pay due site employees and provide a quarterly reconciliation to Owners of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed at the Project.

8.3     MANAGER'S RESPONSIBILITY TO FILE RETURNS: Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, each Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Each Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

NGEDOCS :016600.0501 810886.13
FINAL

## SECTION 9

## OPERATIONS, MAINTENANCE AND REPAIR

9.1     PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Development Owner under the Sublease and any loan documents affecting the Project and by Subsidiary Owner under the Building Lease for the operating efficiency of the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements.  In accordance with the Plan or as otherwise directed by an Owner, Manager is also authorized to decorate the Owner's portion of the Project and the individual apartment units and to purchase or rent, on such Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Owner's portion of the Project.   Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of the Owners.  If an Owner selects a vendor for use on the Project, such Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2     FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES:   With an Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager.  Such Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services.  Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person.  Such charges shall be reasonable and shall not be more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3     CONTRACTS, UTILITIES AND SERVICES: Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on each Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be the applicable Owner's responsibility, except that Manager may pay the same from the operating accounts if directed to do so.

9.4     LIMITATIONS ON CONTRACTS:  Each such contract or agreement shall: (a) be in the name of the applicable Owner, (b) be assignable, at such Owner's option, to such Owner or such Owner's nominee, (c) include a provision of cancellation thereof by such Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance.  If this agreement is terminated pursuant to Section 18, Manager shall, at such Owner's option, assign to such Owner or such Owner's nominee all contracts and agreements pertaining to the Project. Manager shall then notify such Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

9.5     MAINTAINING HISTORIC STATUS: Manager shall implement each Owner's responsibilities to comply with the covenants of such Owner set forth in Section 27.b. of the Sublease and Section 27 of the Building Lease relating to ordinary repair and maintenance of "Historic Property", provided that such Owner shall provide the necessary funds for compliance with such obligations.

9.6     ENVIRONMENTAL. Manager shall be responsible for performing on behalf of each Owner such ordinary, non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

## RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor.  Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with the ownership or operation of the Project. Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owners.  Owners agree to assume all financial risks of operating their respective portion of the Project including any claims made against Manager while acting as such Owner's agent within the scope of its authority as provided herein.  Except as provided herein, neither

7

party shall have the power to bind or obligate the other party. Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owners; and, except as provided in this Agreement, no Owner shall act as the principal of Manager.

## SECTION 11

## INDEMNIFICATION AND BONDING

11.1    INDEMNIFICATION BY OWNER

A.    Indemnification for Injuries to Person and Property: To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons, or property including, but not limited to, those relating to or arising out of the premises of such Owner's portion of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

B.    Indemnification for Vendor and Tenant Claims: Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of such Owner's portion of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager. Such Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

C.    General Provisions: Except as expressly set forth herein, nothing contained in Section 12 shall relieve an Owner of its obligation under Section 11 of this Agreement.

11.2    INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS: Subject to Paragraph 11.1, Manager shall indemnify, defend and save each Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws. Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of such Owner or if such Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3    WAIVER OF CLAIMS: Other than as provided in Section 11.2, each Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4    SCOPE OF INDEMNITY: Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action. All reasonable costs and expenses of such defense shall be borne by the indemnitor  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor. The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

8

11.5    BONDING: Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owners to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6    TERM OF INDEMNIFICATION:  The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

### SECTION 12

### INSURANCE

12.1    INSURANCE BY PROPERTY MANAGER:  At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owners and Manager and such additional insured as may be necessary from time to time.  Owners shall be included as named insureds on Manager's policy.  Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of the applicable Owner; provided the amount of the deductible or SIR is pre-approved by such Owner.

A.    Property Insurance:  Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.  The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of each Owner and Manager.

B.    General Liability Insurance:  Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well.  The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate.

C.    Excess/Umbrella Liability:  Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence.  Such coverage shall be excess to the automobile liability and employer's liability coverage.

D.    Automobile Liability Insurance:  Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles.  The policy limits shall not be less than $1,000,000 combined single limit.

E.    Named Insured:  Each Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement.  The members and managers of Owners and such others as may be designated from time to time by Owners shall be named as additional insured.  It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owners.  Manager will secure endorsements to this effect from all appropriate insurers of such policies.

F.    General Provisions:  All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher.  All liability and auto insurance shall contain a severability of interest clause.  All insurance shall provide that notice of default or cancellation shall be sent to each Owner and shall require a minimum of thirty (30) days written notice to each Owner prior to any cancellation of or changes to said policies.  Manager agrees to provide each Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2    PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions):  Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

NGEDOCS :016600.0501 810886.13
FINAL

12.3     WORKER'S COMPENSATON /EMPLOYER LIABILITY . Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4     RENTER'S INSURANCE   Manager shall procure and maintain at the cost and expense of each Owner, such renter's insurance (property and/or liability) for the benefit of residents of such Owner's portion of the Project, as such Owner shall request from time to time.

## SECTION 13

### MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owners or any previous owners of the Project, or any previous property managers or other agents of either Owners or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due an Owner or in the performance of any obligations owed by any tenant to an Owner pursuant to any rental agreement or otherwise unless  caused by gross negligence or willful misconduct of Manager.  Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect.   Any environmental violations or hazards discovered by Manager shall be brought to the attention of the applicable Owner in writing and such Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owners shall be solely liable for all vendor claims and tenant claims, whether made against such Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

## SECTION 14

### ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1     ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owners, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement. Each Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of such Owner's rights under the Sublease or Building Lease, respectively.

## SECTION 15

### MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"Effective Gross Income" shall mean, as to the Property for a given period of time, all rents and other income and charges from the normal operation of the Property, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units in the Property, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Property and concessionaires (if any) in respect of the Property, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Property or the improvements thereon.  Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

NGEDOCS :016600.0501 810886.13
FINAL

"Adjusted by CPI" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment.  For example, the adjustment to be made on January 1, 2005 would be based upon the change in the CPI Index from October 2003 to October 2004.

"Base Year" shall mean the first full calendar year of operation of the Project, unless adjusted below.

CPI Index shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

CPI Effective Gross Income per Door for any calendar year shall mean actual Effective Gross Income for the applicable Base Year, divided by the number of units occupied during such Base Year, then Adjusted by CPI to January 1 of such subsequent calendar year.  At the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Development Owner's operating agreement) occurs, and every five years thereafter, (x) the most recent annual Effective Gross Income will be compared to (y) the then calculated CPI Effective Gross Income per Door multiplied by the number of units then occupied.  If the result in clause (x) is 10% greater than the result in clause (y), then the CPI Effective Gross Income per Door shall become the most recent annual Effective Gross Income divided by the number of units then occupied and the Base Year (and Effective Gross Income for the Base Year) shall become the then most recent year (and Effective Gross Income for such then most recent year), otherwise the CPI Effective Gross Income Per Door for such year and Base Year shall remain the same as then existing. For purposes of this Section only, Effective Gross Income will be determined based on both the Improvements and the Additional Improvements, as if all "Doors" were leased by Development Owner.

15.1    COMPENSATION:  As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), each Owner shall pay Manager the following compensation:

(a)    Base Fee:

(i)    For the first full calendar year of operation (and any portion of a calendar year prior thereto), 1.500% of Effective Gross Income generated from such Owner's portion of the Project, to be determined and paid on a monthly basis, with payment due on the 10th day after the end of the applicable month.

(ii)    For each month thereafter, the lesser of

(A)    1.500% of Effective Gross Income generated from such Owner's portion of the Project for the applicable calendar month, or

(B)    an amount equal to (x) 1.500% of (y) CPI Effective Gross Income per Door for such year divided by 12 multiplied by (z) the number of units occupied during such month.

(b)    Incentive Fee:    The annual Incentive Fee is calculated as the earned portion (per the IPMP attached as Exhibit B) of the lesser of (A) 2.75% of Effective Gross Income for the applicable year, or (B) an amount equal to (x) 2.75% of (y) the CPI Effective Gross Income per Door for such year multiplied by (z) the number of units occupied during such year, and will be payable during the year earned as follows:

(i)    Base Year:  Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of 2.75% of Effective Gross Income generated from such Owner's portion of the Project for such quarter; provided, that after the full Base Year has occurred, the actual fee earned for the Base Year shall be determined in accordance with Exhibit B and if Manager has

11

been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

        (ii)     Subsequent Years:  The same procedure shall be used as in the Base Year, except that the prior year's actual earned portion of the potential 2.75% incentive fee shall be substituted for 75% of 2.75% in the formula described in (i) above.  For example, if in 2006, Manager earns an incentive fee of 78% of 2.75% (i.e., 2.15%), then estimated payments for 2007 shall be based upon 2.15% of Effective Gross Income in lieu of 75% of 2.75% of Effective Gross Income.

    15.2    <u>ACTS OF GOD</u>:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if an Owner engages Manager to oversee such restoration work under a separate written agreement, such Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of such Owner's insurance policy.

    15.3    <u>CONSTRUCTION MANAGEMENT SERVICES</u>:  If an Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement.  Such Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion

    15.4    <u>FOR OTHER ITEMS OF MUTUAL AGREEMENT</u>:  Should an Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by such Owner to Manager for such additional services.

    15.5    <u>FOR REIMBURSEMENT OF EXPENSES</u>:  In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan (the "<u>Reimbursable Expenses</u>"), including, without limitation, the following: (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; (b) third-party consulting services approved by an Owner (where an Owner requests and Manager, in its sole discretion, agrees to contract with a third party), (c) out-of-pocket travel expenses for travel related to the provisions of services (incurred at a rate not in excess of a coach or coach equivalent public rate); (d) expense of long-distance communications, and (e) expense of reproductions, postage and handling.  All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

<center>SECTION 16</center>

<center><u>STRUCTURAL CHANGES</u></center>

    Owners expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owners other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of the applicable Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to section 4.2 of this Agreement, and Manager shall notify such Owner appropriately.

<center>SECTION 17</center>

<center><u>BUILDING COMPLIANCE</u></center>

    Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or

<center>12</center>

regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owners promptly or forward to Owners promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Building Lease. Owners authorize Manager to disclose the ownership of the Project(s) to any such officials and agrees to indemnify and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owners, as provided under the terms and provisions of this Agreement.

## SECTION 18

## TERMINATION

18.1    TERMINATION FOR CAUSE:  Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

A.    Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable;  or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.    Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.    Default:  Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1.    the failure of a party to pay any amounts required to be paid by it hereunder or to perform any of its obligations hereunder for a period of ten (10) days after the date on which notice of the failure has been given to the defaulting party by the other parties;

2.    the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

3.    the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

4.    the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

5.    the failure to fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of any such default for a period of ten (10) days after written notice of said failure; and

6.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

13

D.   Termination of Sublease.  By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.   Sale.  By any party, upon written notice to the others, upon the sale of all or substantially all of Owners' interest in the Project to a third party unaffiliated with Owners.

18.2   TERMINATION COMPENSATION:  Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) an Owner from Manager, if any, as a result of such termination).  To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to an Owner, such sums shall be payable from the operating accounts.  Any amounts due in excess of the funds available from an operating account shall be paid by the applicable Owner to Manager upon demand.

18.3   OWNER RESPONSIBLE FOR PAYMENTS:  Upon termination of or withdrawal from this Agreement, each Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of such Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by such Owner.  In addition, such Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on such Owner's behalf under this Agreement.

18.4   ACCOUNTS:  UNPAID BILLS:  Manager shall deliver to each Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due such Owner and tenant security deposits which were held by Manager with respect to the Owner's portion of the Project, as well as a final accounting reflecting the balance of income and expenses with respect to such Owner's portion of the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to the applicable Owner.

18.5   FINAL ACCOUNTING:  Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Owner's portion of the Project are deemed to be the property of the Owner, they are to be delivered to such Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager.  Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.  Each Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to such Owner's portion of the Project.

18.6   NON-INTERFERENCE WITH MANAGER'S BUSINESS:  Each Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, such Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business.  Each Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement.  Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from such Owner.

18.7   WRITTEN DIRECTION.  A direction or consent of Clark Manager Monterey Bay LLC (the Managing member of Development Owner) on behalf of Development Owner shall be deemed the direction or consent of Development Owner hereunder and Agent may rely on such direction or consent as the act of Owner.

## SECTION 19

## REPRESENTATIONS

19.1   OWNER'S REPRESENTATIONS AND WARRANTIES:  Each Owner represents and warrants as follows: (a) such Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so; (b) there are no written or oral agreements affecting the occupancy of such Owner's portion of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager; (c) all permits for the operation of such Owner's portion of the Project has been secured and are current; and (d) such Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will

14

affect the operation of such Owner's portion of the Project; (e) if such Owner requests Manager to enter any agreements for the benefit of third parties such Owner hereby agrees to fully indemnify Manager for all claims arising from such Agreements.

      19.2   <u>MANAGER'S REPRESENTATIONS AND WARRANTIES:</u> Manager represents and warrants as follows: (a) the officers of Manager have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

      19.3   <u>ESTOPPEL CERTIFICATE.</u> Manager and each Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

<div align="center">

**SECTION 20**

**HEADINGS**

</div>

      All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

<div align="center">

**SECTION 21**

**FORCE MAJEURE**

</div>

      Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

<div align="center">

**SECTION 22**

**COMPLETE AGREEMENT**

</div>

      This Agreement, including any specified attachments, constitutes the entire agreement between Owners and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owners and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owners and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owners and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

<div align="center">

**SECTION 23**

**RIGHTS CUMULATIVE: NO WAIVER**

</div>

      No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such

<div align="center">15</div>

right or remedy with respect to subsequent defaults.  Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

### APPLICABLE LAW AND LITIGATION

24.1    INTERPRETATION:  The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project.  If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owners.

24.2    LITIGATION:  In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

## SECTION 25

### NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as each Owner and Manager individually may specify hereafter in writing:

| | |
|---|---|
| MANAGER: | AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.<br>Pier 70<br>2801 Alaskan Way, Suite 200<br>Seattle, Washington 98121 |
| DEVELOPMENT OWNER: | MONTEREY BAY MILITARY COMMUNITIES, LLC<br>Attention:  Douglas R. Sandor<br>Two Bethesda Metro Center<br>Suite 250<br>Bethesda, Maryland  20814 |
| WITH A COPY TO: | CLARK ENTERPRISES, INC.<br>Rebecca Owen, Esq.<br>General Counsel<br>7500 Old Georgetown Road<br>15th Floor<br>Bethesda, Maryland  20814 |
| SUBSIDIARY OWNER: | MBMH SUBSIDIARY, LLC<br>Attention:  Douglas R. Sandor<br>Two Bethesda Metro Center<br>Suite 250<br>Bethesda, Maryland  20814 |
| WITH A COPY TO: | CLARK ENTERPRISES, INC.<br>Rebecca Owen, Esq.<br>General Counsel<br>7500 Old Georgetown Road<br>15th Floor<br>Bethesda, Maryland  20814 |

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to

16

have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

## SECTION 27

### LIABILITY

The obligations of Development Owner and Subsidiary Owner hereunder shall be several and not joint. administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**MONTEREY BAY MILITARY HOUSING, LLC**, a Delaware limited liability company

By:     Clark Pinnacle Monterey Bay LLC, a California limited liability company, Manager

        By:     Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:
            Name:
            Title:     Manager

        By:     CEI Realty, Inc., a D.C. corporation, Manager

            By:
            Lawrence C. Nussdorf, President

By:     Pinnacle Monterey LLC, a Washington limited liability company, Manager

        By:
        Name:
        Title:

**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.**, a Washington limited liability company

By:
        Stan Harrelson
        President and CEO

17

**MBMH SUBSIDIARY, LLC,** a Delaware limited liability company

By:    Clark Pinnacle Monterey Bay LLC, a California limited liability company, Manager

        By:    Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:   _____
            Name:  _____
            Title:   Manager

        By:    CEI Realty, Inc., a D.C. corporation, Manager

            By:   _____
                  Lawrence C. Nussdorf, President

        By:    Pinnacle Monterey LLC, a Washington limited liability company, Manager

            By:   _____
                  Stan Harrelson
                  Managing Member

18

## Exhibit A

To the extent approved herein and authorized by Owner in the Approved Budget. The following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

| | |
|---|---|
| Benefits Administration for site staff: | 2% of related payroll |

       Insurance Premiums (medical, dental, vision, LTD, Life)
       Broker's Fees
       Claims handling expenses
       COBRA administration
       401K Plan administration

| | |
|---|---|
| Copies | As incurred |
| Long Distance Charges | As incurred |
| Management Fee: | See Section 15 |
| Postage/Overnight: | As incurred |
| Worker's Compensation Insurance: | Fees rolled into budgeted rate per Plan |

       Insurance Premiums
       Broker's Fees
       Claims handling expense

NGEDOCS :016600.0501 810886.13
FINAL

**Exhibit B**

**INCENTIVE PERFORMANCE MANAGEMENT PLAN**

**A. Objectives**

The focus is always on the importance of quality family housing. The Performance Incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement. The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings are rewarded with an increased performance pay schedule. The rewards will be quantified through written feedback from the residents.

**B. Measurement Criteria**

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Gross Rental Collections for the managed assignment. Achievement of the management incentive fee is to be based on Customer Satisfaction. The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

**Subjective Survey**

Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs.

The Monterey Bay Military Housing, LLC, (MBMH) on behalf of the partnership, will retain a third-party firm to evaluate the performance of the Property Manager. The RCI Deputy Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix. The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below. As an example: if 100 persons were surveyed and the results were as indicated in the table below the average would be 69.5.

| Grade | # Responses | Value | Total |
|---|---|---|---|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 20 | 5 | 100 |
| | 15 | 4 | 60 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 110 | | 69.50 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Deputy Director prior to dissemination. The firm will attempt to elicit survey participation by all of the current residents. The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm. The results will be provided to the MBMH, LLC and the RCI Office who will compare them to benchmarked objectives. These results will account

20

for thirty-five percent (35%) of the incentive determination. The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| During IDP | 0 – 14 0% | 15 – 49 25% | 50 – 74 30% | 75 + 35% |
| Post-IDP | 0 – 24 0% | 25 – 49 25% | 50 – 84 30% | 85 + 35% |

### *Objective Reports*

Property Management goals for effective and timely maintenance, turning vacated homes and limiting moves are critical to the success of the Property Management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall Objective component will account for thirty-five percent (35%) of the total potential incentive. Property Management reporting systems will generate results based upon the following individual components:

  1)   Maintenance Response Time by level of urgency (15% of total incentive during IDP; 20% post IDP; each of the three service request areas will be weighted as follows; Routine = 5% of total incentive during IDP; 5% post IDP – Urgent = 5% of total incentive during IDP; 5% post IDP – Emergency = 5% of total incentive during IDP; 10% post IDP – Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine", "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour.   Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours.   Routine request will be responded to within 72 hours.   See below chart for measurement criteria.   Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan.   The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| **Routine** | | | | |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 3% | 4% | 5% |
| Routine Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
| | | | | |
| **Urgent** | | | | |

NGEDOCS :016600.0501 810886.13
FINAL

| During IDP | 0% | 3% | 4% | 5% |
|---|---|---|---|---|
| Post-IDP | 0%0% | 3% | 4% | 5% |
| Urgent Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
| **Emergency** | | | | |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |

2)    Resident Satisfaction Cards (5% of Total Incentive ) – Cards left by maintenance personnel after completion of work orders indicate level of satisfaction by the customer. The survey card will use a numerical value of 1 (being the lowest) and 10 (being the highest) as indicated in the example under the Subjective Report section of the Incentive Plan. Those results will be averaged in similar fashion to the Subjective Survey responses and applied to the following scale. The format and content of satisfaction cards will receive prior approval from the RCI Deputy Director.

| Resident        Satisfaction | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| Cards | 0 – 14% | 15 – 49% | 50 – 74% | 75% + |
| | 0% | 3% | 4% | 5% |

3)    Unit Turn Report (5% of Total Incentive during IDP; 10% post IDP) – Tracked time from the last date of occupancy to the date ready for occupancy.  Standard turn time for a unit to be made ready to rent is 3 to 5 business days (business days are Monday through Saturday).  The determination of awards under this portion of the Incentive Plan shall be based upon unit turn performance of each individual unit as a fractional interest of the potential incentive. As an example if there were one hundred units turned in a given year each unit would represent $1/100^{th}$ of the total potential incentive. The amount of the fractional interest earned would be subject to the Unit Turn Chart below. Standard turn time measures the elapsed time within which the interior of a housing unit can be moderately repaired and cleaned for occupancy. The Manager reserves the right, subject to concurrence by the RCI Director, to determine a housing unit to be "off line" or in some other way to be so damaged that it will not be included in the unit turn measurement outlined under this Incentive Plan. Additionally no Historic units will be included in the measurement of this portion of the Incentive Plan

| Unit Turn Chart | <=5         Business Days | 6 Business Days | 7 Business Days | >7 Business Days |
|---|---|---|---|---|
| During IDP | 100% | 75% | 50% | 0% |
| Post-IDP | 100% | 75% | 50% | 0% |

4)    Frequency of Moves (10% of Total Incentive during IDP; 0% post IDP) – This component will track the frequency of cases where households are required to move more than one time during the IDP.   Nothing

22

NGEDOCS :016600.0501 810886.13
FINAL

in this section of the Incentive Plan shall include households for whom relocation is voluntary or for whom relocation is forced due to the habitability of a housing unit.

For those households who are required to relocate two times, that/those incident(s) will be multiplied by four (4) and divided by the total number of non-voluntary or non-forced relocations during the year to arrive at the appropriate reduction in Frequency of Moves Incentive Fee. As an example, if three households are required to relocate twice out of one hundred households the resultant Incentive Fee for Frequency of Moves will be reduced by 12%, (3 x 4 ÷100 = .12).

Also, for each household required to relocate more than two times, that/those incident(s) will result in a 3.3% reduction in the calculation of the Incentive Fee for Frequency of Moves. As an example, if two households are required to relocate three times, the available Incentive for Frequency of Moves would be reduced from 10% to 3.4%, (.10 - (2 x .03.3)).

Nothing herein shall prevent the Manager from soliciting an exception from the RCI Deputy Director based upon special circumstances and (if agreed to in writing) the RCI Deputy Director from allowing multiple moves in special circumstances and from having those moves excluded from this measurement. Additionally and to the extent required, major phasing plans which might have an adverse effect on our ability to eliminate additional household movement will be excluded from this Incentive Plan to the extent the RCI Deputy Director so approves and authorizes the proposed phasing plan.

The tabulated results represented in these year-end reports will be compared to the benchmark standard established herein as well as the results of the prior year.

Reporting and Operations

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of the total incentive and will be further broken down as follows:

1. Monthly Reporting - (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. . With each monthly report counting, as $1/12^{th}$ of the award payment of this incentive will only be allowed if the monthly report to the venture is on time. As an example: if eleven months out of twelve were delivered on time the incentive award would be 9.17 (11/12=.917 x 10% = 9.17%.

   In the event the venture asks that reporting be held open for any reason that particular monthly reporting would be counted as on time.

2. Annual Budgets (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the timelines of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year.. This is a "pass/fail" incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

   In the event the venture asks that the Annual Plan and Budget be delayed for any reason that reporting requirement would be counted as on time.

3. Operations (10% of Total Incentive) – The Clark Manager Asset Manager will prepare an Annual Assessment of management operations which will include administrative and maintenance criteria's as well as conformance to budget and plan. This in depth analysis will be formulated in the same manner as the Resident Survey in that each area/item will be graded on a sliding scale of 1 (being the lowest) to 10 (being the highest). The overall score on the analysis will result in a percentage, which will be applied to the total possible incentive for this category. As an example: if the resultant score of the Asset Managers Annual Analysis were to be a seventy five percent grade then the Manager would be paid seventy-five percent (75%) of ten percent (10%) or seven and one half percent (7,5%).

   The results of this analysis will be shared between the Asset Manager and the Manager and used as a basis for refining the Manager's response to areas in need of improvement.

NGEDOCS :016600.0501 810886.13
FINAL

**C. Quality Assurance Plan and Reporting Requirements**

*Base Year Benchmarks*

Monterey Bay Military Housing, LLC and the Property Management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective and reporting and operations reports maintained by Manager and reviewed by the RCI Staff and Deputy Director.

*Determining the Incentive*

At the end of the initial twelve month anniversary of Property Management contract commencement and at the end of each year thereafter through the end of the management assignment, the MBMH, LLC managing member will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the subjective surveys and objective reports will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the two criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by the MBMH, LLC no later than thirty days following the end of the anniversary date. Once approved, the MBMH, LLC managing member will authorize payment of the incentive to Manager within fifteen days or no later than forty-five days following the anniversary date of the management contract.

The Incentive Plan amount is to be assessed against Gross Rent Collections for the twelve-month period ending on the anniversary date of the management contract commencement.

*Unsatisfactory Results*

It is Manager's goal to provide "Quality Service" and while achievement of a 100% rating may be difficult, it will guide Manager's planning. Where results indicate a need for improvement, we will formally address with the staff and create an Action Plan as needed.  Manager will establish a contingency plan for improving unsatisfactory customer service responses.  The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Manager.

*Aligned Objectives*

It is planned that site level staff incentives will be tied to the same criteria as the management company. While the Community Director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal Management Plan and Objective Meeting at the beginning of the year. Results will be discussed throughout the year so that corrective action can be made where needed.

24