# Exhibit A

Part 2

# EXHIBIT III

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

**OPERATING AGREEMENT**
**OF**
**CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC**

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

NGEDOCS :016600.0504 985953.3

TABLE OF CONTENTS

ARTICLE I      ORGANIZATIONAL MATTERS ......................................................... 1

    1.1      Formation of Company ............................................................ 1

    1.2      Name ........................................................................................ 1

    1.3      Principal Office and Registered Agent ................................. 1

    1.4      Certificate of Formation.......................................................... 2

    1.5      Purpose...................................................................................... 2

ARTICLE II     MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION
            OF PROFITS AND LOSSES ............................................... 2

    2.1      Members; Percentage Interests ............................................ 2

    2.2      Initial Capital Contributions ................................................ 3

    2.3      Additional Capital Contributions ........................................ 3

    2.4      Capital Accounts ..................................................................... 5

    2.5      Interest on Capital Contributions; Return of Capital Contributions .................... 6

    2.6      Loans ......................................................................................... 6

    2.7      No Preemptive Rights ............................................................ 7

    2.8      Cash Distributions .................................................................. 7

    2.9      Allocation of Income, Gain, Loss and Deduction.............. 9

ARTICLE III    MANAGEMENT AND RIGHTS OF MEMBERS ..................... 12

    3.1      Management by Managers; Rights of Members ................ 12

    3.2      Third Party Reliance .............................................................. 14

    3.3      No Duty to Consult ................................................................ 14

    3.4      Outside Activities of Managers ........................................... 14

    3.5      Intentionally Deleted.............................................................. 14

    3.6      Reimbursement ....................................................................... 14

    3.7      Managers and Affiliates Dealing with the Company ....... 15

    3.8      Indemnification of Managers ............................................... 15

    3.9      Company Meetings ................................................................. 15

    3.10     Guarantees of Financing. ...................................................... 15

    3.11     Books and Records ................................................................. 15

    3.12     Bank Accounts ........................................................................ 15

    3.13     Deadlock ................................................................................... 16

| | | |
|---|---|---|
| 3.14 | Power of Attorney | 16 |
| 3.15 | Services | 17 |
| ARTICLE IV | TRANSFER OF MEMBERSHIP INTERESTS | 18 |
| 4.1 | Transfers; Treatment of Assignees; Substituted Members | 18 |
| 4.2 | Death, Insanity or Incompetency, or Trust Termination of a Member | 20 |
| 4.3 | Bankruptcy of a Member | 21 |
| 4.4 | Right to Effect Transfers | 21 |
| ARTICLE V | TERM; DISSOLUTION | 22 |
| 5.1 | Term | 22 |
| 5.2 | Events Resulting in Dissolution | 22 |
| 5.3 | Conclusion of Affairs | 22 |
| 5.4 | Order of Priority in Liquidation | 22 |
| 5.5 | Termination | 23 |
| 5.6 | Transferring Member Obligations | 23 |
| ARTICLE VI | DEFAULT; REMEDIES | 23 |
| 6.1 | Event of Default | 23 |
| 6.2 | Remedy for Event of Default | 24 |
| 6.3 | Obligations of Defaulting Member Continue | 26 |
| 6.4 | Setoff of Payments to Defaulting Member | 26 |
| ARTICLE VII | MISCELLANEOUS | 26 |
| 7.1 | Amendment | 26 |
| 7.2 | Notices | 27 |
| 7.3 | Enforceability | 27 |
| 7.4 | Binding Effect | 27 |
| 7.5 | No Third Party Beneficiary Rights | 27 |
| 7.6 | Limitation of Liability | 27 |
| 7.7 | Further Assurances | 28 |
| 7.8 | Prevailing Party | 28 |
| 7.9 | CMC Operating Agreement and BL Operating Agreement | 28 |

LIST OF EXHIBITS
EXHIBIT A - Percentage Interests

EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC


THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the 21st day of May, 2003 (the "**Effective Date**"), by and among the undersigned parties. Defined terms shall have the meanings given them in this Agreement and are capitalized in the text. Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

<u>WITNESSETH</u>

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle California Military Communities LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2     <u>Name</u>.

The name of the Company is **Clark Pinnacle California Military Communities  LLC**. The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined). The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires. The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

1

1.3     Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is:  c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention:  Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members.  The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate.  The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

1.4     Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

1.5     Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort Irwin Land LLC ("IL"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Fort Irwin Land LLC (the "BL Operating Agreement") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort California Military Communities LLC ("CMC"), whose members shall be the Company and CMC Holdings LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of  California Military Communities LLC (the "CMC Operating Agreement") to be entered into between the members thereof.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement.  The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

2.1     Members; Percentage Interests.

(a)     The "Members" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof.  The Members are divided into ownership groups (each a "Member Group"), as more particularly set forth on Exhibit A.  For purposes hereof:  (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "Clark Member," and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "Clark Group;" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "Pinnacle Member," and the

2

Members designated under the heading "Pinnacle" shall be herein referred to collectively as the "**Pinnacle Group.**"

(b)     Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a "**Percentage Interest**") shall be as set forth on Exhibit A.

(c)     The Percentage Interest of each Member shall be personal property for all purposes.

(d)     All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2     Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the "**Initial Capital Contributions**"). The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the "**Capital Contributions.**"

2.3     Additional Capital Contributions.

(a)     During the period from the Effective Date hereof through the consummation of the financial closing (the "**Financial Closing**") for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the "**RFQ**"), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and IL (the "**Ground Lease**"), and in the IL Operating Agreement and CMC Operating Agreement (the "**Project**"), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the "**Pre-Closing Costs**"). Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the "**Pre-Closing Cost Contributions**"). The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor. It is anticipated that the Company shall endeavor to get CMC and IL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company. Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)     The Company anticipates that, contemporaneously with the Financial Closing for the Project, IL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the IL Operating

3

Agreement and CMC Operating Agreement. In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by CMC to secure performance of each Member's obligation to pay its pro rata share of the equity required by the CMC Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

        (c)     Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**"). Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "Required Contributions." For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number by a percentage equal to the sum of (a) 60% of the percentage change in the Irwin CPI Index and (b) 40% of the percentage change in the Moffett/Parks CPI Index, in each case from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. Any number which is to be Adjusted by CPI in accordance with this Operating Agreement will be so adjusted effective on January 1, 2005, and on each January 1 thereafter based upon the adjusted number from the immediately preceding January 1. **Irwin CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, Los Angeles, Riverside, Orange County Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member using such other index as is then generally recognized and accepted for similar determinations of purchasing power. **Moffett/Parks CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, San Francisco, Oakland, San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member

4

using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager.   If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor.   If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below. The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of Section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

(b)     For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)     Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)     Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

5

(3)     Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members.  "**Unrealized Gain**" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date.  "**Unrealized Loss**" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)     Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5     Interest on Capital Contributions; Return of Capital Contributions.

(a)     No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)     No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property other than cash.  Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6     Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**").  Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above.  Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s).  If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests.  Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.   No Member shall be required to make any loans to the Company.

6

2.7     No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8     Cash Distributions.

(a)     Net Cash Flow.

(1)     "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by:  (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2)     The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A)     First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds.  The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B)     Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests.  The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

7

(C)     Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members.  Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests.  The **"Interest Rate"** is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D)     Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E)     Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

(F)     Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)     Capital Proceeds.

(1)     **"Capital Proceeds"** are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the IL Operating Agreement or the CMC Operating Agreement.

(2)     Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)     First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)     Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is

8

insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9     Allocation of Income, Gain, Loss and Deduction.

(a)     Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof.  The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain.  "**Minimum Gain**" means (a) with respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations.  "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)     Income Tax Elections.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)     Income Tax Allocations.

(1)     For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with

9

section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution. In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

        (2)      If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

        (d)      <u>Transfers during Fiscal Year</u>. In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer. The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items. Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale. Similarly, extraordinary or nonrecurring items shall be allocated in accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

        (e)      <u>Amortization and Allocation of Organization and Start-up Expenses</u>. The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

        (f)      <u>Special Capital Account "Book" Allocations to Comply with Section 704 Regulations</u>. The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder. Such special allocations shall be made before any allocations under Section 2.9(a) above.

        (g)      <u>Tax Matters Member</u>.

        (1)      The Clark Member is hereby appointed to act as the tax matters member (the "**TMM**"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "**IRS**") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

<div align="center">10</div>

(2)     The TMM is authorized, but not required:

(A)     To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in Section 6231 of the Code) or a member of a "notice group" (as defined in Section 6223(b)(2) of the Code).

(B)     In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)     To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)     To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)     To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)     To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)     The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)     The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)     The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in

11

serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

ARTICLE III
MANAGEMENT AND RIGHTS OF MEMBERS

3.1     Management by Managers; Rights of Members.

(a)     Manager Designation.  The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member.  The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**").  The initial Manager appointed by the Pinnacle Group is Pinnacle Irwin LLC (the "**Pinnacle Manager**").  Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

(b)     Power and Authority of the Managers.

(1)     The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs.  The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

(2)     The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions.  The term "**Major Decisions**" shall mean any of the following:

12

(A)     Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

(B)     The Financial Closing and the terms and conditions thereof.

(C)     Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

(D)     Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

(E)     Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

(F)     Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

(G)     Amendment to the CMC Operating Agreement or the IL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

(H)     Termination or dissolution of the Company.

(c)     <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

(d)     <u>Rights and Votes of Members</u>.

(1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

(2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new

<div align="center">13</div>

Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

3.2   Third Party Reliance.

Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

3.3   No Duty to Consult.

Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

3.4   Outside Activities of Managers.

The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5   Intentionally Deleted

3.6   Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

14

3.7     Managers and Affiliates Dealing with the Company.

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8     Indemnification of Managers.

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9     Company Meetings.

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them. Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10    Guarantees of Financing.

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

3.11    Books and Records.

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

15

3.12    Bank Accounts.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

3.13    Deadlock.

(a)    If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply. A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

(b)    Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)    Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

16

3.14    Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the CMC Operating Agreement and the IL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record:  (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the CMC Operating Agreement or the IL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement.  Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15    Services.

(a)     The Members acknowledge and consent to the following:

(1)     CMC shall enter into one or more developer services agreements (the "**Developer Services Agreements**") with CRC Irwin Planned Communities LLC ("**Developer**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the CMC Operating Agreement) (the "**Development Period**").  CMC may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "**Out-Year Developer Services Agreements**").

(2)     CMC shall enter into one or more a construction contracts (the "**Construction Contracts**") with Clark Realty Builders, Inc. and The Clark Construction Group ("**Clark Contractors**"), Affiliates of he Clark Group, on or before the Effective Date for the provision of general contractor services.  CMC may also enter into one or more construction management agreements with Clark Contractors on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the CMC **Operating** Agreement (the "**Out-Year Construction Management Agreements**").

(3)     CMC shall enter into one or more property management agreements (the "**Property Management Agreements**" or the "**Pinnacle Member Service**

17

Contracts") with American Management Services California Inc. ("**Pinnacle Management**"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)     CMC shall enter into one or more asset management agreements (the "**Asset Management Agreements**") with Irwin Asset Manager LLC (the "**Asset Manager**") an Affiliate of the Clark Group, on or before the Effective Date for the provision of asset management services.  For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "**Clark Member Service Contracts**."  The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "**Service Contracts**" and, individually, as a "**Service Contract**."

(b)     In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc.  The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

## ARTICLE IV
## TRANSFER OF MEMBERSHIP INTERESTS

4.1     Transfers; Treatment of Assignees; Substituted Members.

(a)     No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager.  A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)     A "**Permitted Transferee**" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined).  In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee."  For purposes of this Agreement, "**Affiliate**" shall mean, as to any individual, partnership, corporation, trust or other entity ("**Person**"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person.

18

"**Control**" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below. The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted. An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company. The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest. All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall

19

be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

      (g)    In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

    4.2    <u>Death, Insanity or Incompetency, or Trust Termination of a Member</u>.

      (a)    In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

      (b)    Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests. Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company. The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the

<div align="center">20</div>

Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

    4.3    <u>Bankruptcy of a Member</u>.

        (a)    In the event of the Bankruptcy (as herein defined) of a Member (the "**Bankrupt Member**"), then the Members other than the Bankrupt Member (the "**Continuing Members**"), <u>pro rata</u>, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

        (b)    As used herein, the term "**Bankruptcy**" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "**Bankruptcy Code**"), an assignment for the benefit of creditors and/or an adjudication of insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

    4.4    <u>Right to Effect Transfers</u>.

        (a)    The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

        (b)    In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

<div align="center">21</div>

## ARTICLE V
## TERM; DISSOLUTION

5.1     Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

5.2     Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an "**Event of Dissolution**") (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):   (a) the unanimous written consent of the Managers; or (b) the dissolution of CMC or IL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or (d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the Commonwealth of California.

5.3     Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

5.4     Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

        (a)     First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

        (b)     Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

NGEDOCS :016600.0504 985953.3

    (c)    Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

    (d)    Fourth, in accordance with the priorities described in Section 2.8(a)(2).

### 5.5 Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.  Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

### 5.6 Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

## ARTICLE VI
## DEFAULT; REMEDIES

### 6.1 Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default"**:

    (a)    A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

    (b)    A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

    (c)    A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

NGEDOCS :016600.0504 985953.3

(d)     A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)     The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)     If an Event of Default occurs with respect to a Member (a "**Defaulting Member**"), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the "**Non-Defaulting Manager**"):

(1)     If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)     Each Member who is not in default (a "**Non-Defaulting Member**") shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the "**Default Payment**"). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the "**Defaulting Manager**") within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a "**Default Loan**") and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A "**Default Interest Rate**" is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

24

(i)    To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the "**Dilution Fraction**"), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member.  In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)    In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)    If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)    If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

25

(b)     In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(c)     During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager. In such event, the vote of the remaining Manager(s) shall be sufficient to make all decisions of the Company, including, without limitation, Major Decisions.

6.3     Obligations of Defaulting Member Continue.

Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

6.4     Setoff of Payments to Defaulting Member.

From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation, payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII
MISCELLANEOUS

7.1     Amendment.

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it

26

to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

7.2     Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

7.3     Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

7.4     Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of California.  This Agreement may be executed in counterparts.

7.5     No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

7.6     Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

NGEDOCS :016600.0504 985953.3

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:     Clark Realty Capital, L.L.C., Manager

      By:     _____
                 W. Cleveland Johnson,
                 Authorized Representative

By:     CEI Realty, Inc., Manager

      By:     _____
                 Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:     _____
              Stanley J. Harrelson, Manager

28

7.7    Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8    Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9    CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:    Clark Realty Capital, L.L.C., Manager

      By:    _____
           W. Cleveland Johnson,
           Authorized Representative

      By:    CEI Realty, Inc., Manager

           By:    _____
               Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:    _____
      Stanley J. Harrelson, Manager

28

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| CLARK MEMBER: | | |
| Clark Irwin LLC 7500 Old Georgetown Road, 15th Floor Bethesda, MD 20814 | $700.00 | 70% |
| PINNACLE MEMBER: | | |
| Pinnacle Irwin LLC 2801 Alaskan Way, Suite 200 Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

# EXHIBIT IV

# PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of March, 2004, by and between CALIFORNIA MILITARY COMMUNITIES LLC, a Delaware limited liability company (hereinafter referred to as "**OWNER**"), and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "**Manager**" or "**Property Manager**").

## PREAMBLE

The property to be managed under this Agreement (the "**Project**") is known as portions of Fort Irwin, Moffett Community Housing Area and Parks Reserve Forces Training Area and is located in San Bernardino County, California, Santa Clara County, California, and Alameda County, California, consisting of (i) the land (the "**Land**"), as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (the "**Secretary**"), as lessor, and Fort Irwin Land LLC, as lessee (the "**Ground Lease**"), as subleased pursuant to that certain Sublease and Lease of even date herewith by and between Fort Irwin Land LLC (as sublessor) and Owner (as sublessee) (the "**Sublease**"); and (ii) improvements ("**Improvements**") located on the Project and leased by Owner pursuant to the Sublease.

## SECTION 1

## APPOINTMENT OF MANAGING AGENT

1.1     APPOINTMENT AND ACCEPTANCE:  Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the Project and improvements thereon owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein.  Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, or Limited Liability Company Agreement of Owner or (b) any action which would cause Owner to be in default under the Sublease.

1.2     TERM:  The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of March, 2004, subject to the other provisions of this Agreement.

1.3     MANAGEMENT OFFICE:  Owner shall pay all reasonable expenses related to the management office maintained by the Manager, exclusively for the use of Manager to conduct the business of the management of the Project, as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services.  All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Owner shall give Manager prior written notice of any changes in such policies.

1.4     OMITTED

1.5     BUDGET AND BUSINESS PLAN:  Owner and Manager will establish a budget and business plan for operation and management of the Project (the "**Plan**").  The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation.  Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require Owner's advance approval, except as provided in Section 4.2 hereof.  Owner agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance.  The Plan shall include, at a minimum, the following:

A.          Minimum Leasing Guidelines established by Owner setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes.  Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.          Capital Improvement Plan:  Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed

1

during Owner's and Manager's pre-acquisition inspection of the property (if applicable).  Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property.  A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

## BANK ACCOUNTS

2.1    BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project.  Operating trust accounts are hereinafter referred to as "operating accounts".  All other accounts are hereinafter referred to as "trust accounts".  Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by Owner.  All other funds shall be placed in an operating account for Owner.  All trust accounts shall be operated in conformance with state law.  Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts.  No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager.  All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government.  All such depository banks shall be selected by Manager and shall be satisfactory to Owner.  Manager shall not be liable to Owner in the event of bankruptcy or failure of a depository institution.  Manager shall open the above-described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by Owner.  Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2    REMITTANCES.  Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated March 1, 2004 ("**Deed of Trust**") between Owner and Fort Irwin Land LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income (defined below), casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3    INITIAL DEPOSIT FOR RESERVES:  Immediately upon commencement of this Agreement, Owner shall remit to Manager a sum to be deposited in Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve.  Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of Owner under this Agreement as they become due.  Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4    MANAGER'S OBLIGATION TO ADVANCE PAYMENTS:  All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner.  All such purchases shall be made by Manager solely on behalf of Owner and not as a principal.  Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation.  In the event that there are insufficient funds in Owner's operating account, Manager may, after notifying Owner, advance its own funds for such purpose, in which event Owner shall promptly repay to Manager all such sums expended.

2.5    INTEREST ON TRUST ACCOUNTS:  Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at Owner's request.  All interest earned on such funds shall belong to Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2.6    OTHER.  Notwithstanding anything herein to the contrary, Manager shall not (i) commingle funds of Owner with its funds or the funds of any third party, (ii) hold itself out as Owner of the Project, (iii) guaranty or hold itself out as liable for any debts or obligations of Owner, (iv) hold Owner out as liable for Manager's debts or the debts of any third party, or (v) pay the Manager's non-reimbursable expenses or the expenses of any third party from Owner's funds.

## SECTION 3

## COLLECTION OF RENTS AND OTHER RECEIPTS

2

3.1   AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by Section 11.5 herein.

3.2   SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

## DISBURSEMENT FROM OPERATING ACCOUNTS

4.1   OPERATING EXPENSES: From Owner's operating account, and subject to Exhibit A, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Owner has sole responsibility for the timely payment of all authorized expenses of the Project, including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

4.2   EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of Owner. Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify Owner in detail, concerning such expenditures.

4.3   AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from Owner's operating account, in accordance with the Plan or as otherwise directed by Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges; all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees.

4.4   EXPENSES TO BE PAID DIRECTLY BY OWNER: In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

4.5   FEES FOR LEGAL ADVICE: Owner shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owner, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this Section shall obligate Owner to pay Manager's legal fees in the event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.

4.6   NET PROCEEDS: To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to the Project to Owner at least monthly at a time specified by Owner. Such periodic cash payments shall be remitted to J.P. Morgan Trust Company, National Association, as escrow agent.

4.7   PRIORITY OF PAYMENT: Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall

3

be paid in the following order: Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts. Where the terms of any loan security agreement with Owner conflict with the terms of this Section, the terms of such loan security agreement shall control, provided, Owner has notified Manager of the existence of any such condition.

<div align="center">

## SECTION 5

## <u>FINANCIAL AND OTHER REPORTS</u>

</div>

5.1    <u>REPORTS:</u>  By the 10th business day of each month, Manager shall furnish to Owner a statement of receipts and disbursements from the operation of the Project during the prior calendar or fiscal month.  In addition, Manager shall, on a mutually acceptable schedule and at Owner's request, prepare and submit to Owner such other reports as Owner shall specify, including, but not limited to the following:

        a.)     Weekly occupancy, leasing status and traffic reports.
        b.)     Monthly market comparable rent survey.
        c.)     Monthly bank reconciliation.

In addition, Manager will furnish to Owner:

Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Owner for that fiscal year, a statement of changes in financial position of Owner for that fiscal year and, when requested by Owner's mortgagee, a balance sheet showing all assets and liabilities of Owner relating to the Project as of the end of that fiscal year, all audited at Owner's expense by an independent certified public accountant reasonably acceptable to Owner's mortgagee.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Owner.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Owner and any Controlling Entity and the interest held by each, and if Owner or a Controlling Entity is a corporation, all officers and directors of Owner's mortgagee and the Controlling Entity, as applicable, and if Owner or a Controlling Entity is a limited liability company, all managers who are not members.

Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Net Operating Income (as defined in the Loan Agreement) and operating expenses for such month and a calculation of the Debt Service Coverage Ratio (as defined in the Loan Agreement).

Without limitation to the foregoing, all income and expense reports shall provide separate accounting for the senior unaccompanied housing (SUH) units from all other Improvements within the Project, with such operating expense reports relating to the SUH units excluding reference to debt service payments and payments of rent under the Sublease.  Where practicable, expenses incurred with respect to the entire Project may be reasonably allocated between the SUH units and the remainder of the Project.

For purposes hereof, "**Loan Agreement**" means that certain Construction Loan Agreement of even date herewith between Fort Irwin Land LLC, as lender, and Owner, as borrower.

"**Controlling Entity**" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Owner (if Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Owner or more than 50% of ownership or membership interests in Owner (if Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Owner (if Owner is a corporation).

5.2    <u>OWNER'S RIGHT TO AUDIT:</u>  Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by Owner, as an expense of Owner. Such audits may be made during normal business hours posted at the Project.

<div align="center">4</div>

## SECTION 6

## ADVERTISING

6.1     ADVERTISING:   The cost of advertising shall be paid out of Owner's operating account, in accordance with the advertising budget or as approved by Owner.  All advertising shall make clear that Manager is the manager and is not Owner of the Project.

## SECTION 7

## LEASING AND RENTING

7.1     MANAGER'S AUTHORITY TO LEASE PROJECT:  Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan.  Manager shall execute all rental agreements as agent for Owner.  All costs of leasing shall be paid out of Owner's operating account, in accordance with the leasing budget or as approved by Owner.  No rental agreement shall be for a period in excess of one (1) year without the written approval of Owner.  The form of the rental agreement shall be provided by Owner.

Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Owner's mortgagee (or without Owner's written certification that such consent is deemed received under the applicable loan documents).  Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder, terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgagee. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

Manager will not permit Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

7.2     NO OTHER RENTAL AGENT:  During the term of this Agreement, Owner shall not authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project.  Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3     RENTAL RATES:   In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with respect to the Project.  As authorized in writing by Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4     ENFORCEMENT OF RENTAL AGREEMENTS:  Subject to any conditions or limitations imposed by Owner, Manager is authorized to institute and defend, in Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto.  Manager is authorized to sign and serve such notices as Manager and Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income.  Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less.  Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of Owner before entering into any compromise, settlement, or release of such legal action.  Any moneys for such settlements paid out by Manager shall be an operating expense of the Project.  Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or

5

shall be reimbursed directly to Manager by Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against Owner or Manager as the agent of Owner.

<div align="center">

**SECTION 8**

**EMPLOYEES**

</div>

8.1     <u>MANAGER'S AUTHORITY TO HIRE:</u> Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2     <u>OWNER TO REIMBURSE EMPLOYEE EXPENSES:</u> All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working for the Project (both on-site and off-site) including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owner's funds, from the Project operating accounts subject to the Plan and allocated equitably between Owner. In addition, Manager shall accrue for all vacation pay due employees working for the Project (both on-site and off-site) and provide a quarterly reconciliation to Owner of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed for or in connection with the Project.

8.3     <u>MANAGER'S RESPONSIBILITY TO FILE RETURNS:</u> Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

<div align="center">

**SECTION 9**

**OPERATIONS, MAINTENANCE AND REPAIR**

</div>

9.1     <u>PERFORMANCE OF REPAIRS:</u> Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Owner under the Sublease and any loan documents affecting the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by Owner, Manager is also authorized to decorate the Project and the individual apartment units and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of Owner. If Owner selects a vendor for use on the Project, Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2     <u>FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES:</u> With Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager. Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be

<div align="center">

6

</div>

more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

    9.3    <u>CONTRACTS, UTILITIES AND SERVICES:</u>  Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be Owner's responsibility, except that Manager may pay the same from the operating accounts if directed to do so.

    9.4    <u>LIMITATIONS ON CONTRACTS:</u>  Each such contract or agreement shall: (a) be in the name of Owner, (b) be assignable, at Owner's option, to Owner or Owner's nominee, (c) include a provision of cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance. If this agreement is terminated pursuant to Section 18, Manager shall, at Owner's option, assign to Owner or Owner's nominee all contracts and agreements pertaining to the Project. Manager shall then notify Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

    9.5    <u>MAINTAINING HISTORIC STATUS:</u>  Manager shall implement Owner's responsibilities to comply with the covenants of Owner set forth in Section 27.b. of the Sublease relating to ordinary repair and maintenance of "Historic Property", provided that Owner shall provide the necessary funds for compliance with such obligations.

    9.6    <u>ENVIRONMENTAL.</u>  Manager shall be responsible for performing on behalf of Owner such ordinary, non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

## RELATIONSHIP OF MANAGER TO OWNER

    Manager is engaged independently in the business of property management and acts hereunder as an independent contractor. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with ownership or operation of the Project. Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owner. Owner agrees to assume all financial risks of operating the Project including any claims made against Manager while acting as Owner's agent within the scope of its authority as provided herein. Except as provided herein, neither party shall have the power to bind or obligate the other party. Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owner; and, except as provided in this Agreement, Owner shall not act as the principal of Manager. Owner, in dealing with Manager hereunder, agrees (i) to act in conformity with the restrictions, limitations, and covenants set forth in its operating agreement and (ii) not to consent to any action by Manager which would violate the restrictions, limitations, and covenants set forth in its operating agreement.

## SECTION 11

## INDEMNIFICATION AND BONDING

11.1    INDEMNIFICATION BY OWNER

    A.    <u>Indemnification for Injuries to Person and Property</u>: To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons, or property including, but not limited to, those relating to or arising out of the premises of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

7

B.      Indemnification for Vendor and Tenant Claims:  Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager.  Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

C.      General Provisions:  Except as expressly set forth herein, nothing contained in Section 12 shall relieve Owner of its obligation under Section 11 of this Agreement.

11.2    INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS:  Subject to Paragraph 11.1, Manager shall indemnify, protect, defend and save Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws.  Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of Owner or if Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3    WAIVER OF CLAIMS:  Other than as provided in Section 11.2, Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4    SCOPE OF INDEMNITY:  Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action.  All reasonable costs and expenses of such defense shall be borne by the indemnitor.  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor.  The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

11.5    BONDING: Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owner to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6    TERM OF INDEMNIFICATION:  The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

## SECTION 12

## INSURANCE

12.1    INSURANCE BY PROPERTY MANAGER:  At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owner and Manager and such additional insured as may be necessary from time to time.  Owner shall be included as named insureds on Manager's policy.  Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of Owner; provided the amount of the deductible or SIR is pre-approved by Owner.

A.      Property Insurance:  Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.  The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of Owner and Manager.

8

B.   General Liability Insurance: Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate.

C.   Excess/Umbrella Liability: Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence. Such coverage shall be excess to the automobile liability and employer's liability coverage.

D.   Automobile Liability Insurance: Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit.

E.   Named Insured: Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement. The members and managers of Owner and such others as may be designated from time to time by Owner shall be named as additional insured. It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owner. Manager will secure endorsements to this effect from all appropriate insurers of such policies.

F.   General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to Owner and shall require a minimum of thirty (30) days written notice to Owner prior to any cancellation of or changes to said policies. Manager agrees to provide Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2   PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions):   Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

12.3   WORKER'S COMPENSATION /EMPLOYER LIABILITY .   Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4   RENTER'S INSURANCE   Manager shall procure and maintain at the cost and expense of Owner, such renter's insurance (property and/or liability) for the benefit of residents of the Project, as Owner shall request from time to time.

## SECTION 13

## MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owner or any previous owners of the Project, or any previous property managers or other agents of Owner or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any rental agreement or otherwise unless  caused by gross negligence or willful misconduct of Manager. Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any environmental violations or hazards discovered by Manager shall be brought to the attention of Owner in writing and Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owner shall be solely liable for all vendor claims and tenant claims, whether made against Owner or Manager, for all acts or omissions of Manager within the scope of its agency: provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

## SECTION 14

## ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1     ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owner, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement. Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of Owner's rights under the Sublease or Building Lease, respectively.

## SECTION 15

## MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"**Applicable Project**" shall mean, as appropriate, the Irwin Project, Moffett Project or Parks Project.

"**Irwin Project**" shall mean the portion of the Project located within Fort Irwin, San Bernardino County, California.

"**Moffett Project**" shall mean the portion of the Project located within Moffett Field, Santa Clara County, California.

"**Parks Project**" shall mean the portion of the Project located within Parks RFTA, Alameda County, California.

"**Effective Gross Income**" shall mean, as to each Applicable Project for a given period of time, all rents and other income and charges from the normal operation of the Applicable Project, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units located within the Applicable Project, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Applicable Project and concessionaires (if any) in respect of the Applicable Project, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Applicable Project or the improvements thereon. Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

"**Initial Scope**" shall mean scope of development of the Applicable Project as contemplated by that certain Construction Agreement of even date herewith by and between Owner and Clark Realty Builders, Inc., a California corporation (with respect to the Moffett Project and Parks Project) and by that certain Construction Agreement of even date herewith between Owner and The Clark Construction Group, Inc., a Maryland corporation (with respect to the Irwin Project).

"**Increased Scope**" shall mean any increase over the Initial Scope in the number of new residential units to be developed as part of the Applicable Project.

"**Adjusted by CPI**" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the Applicable CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. For example, the adjustment to be made on January 1, 2005 would be based upon the change in the Applicable CPI Index from October 2003 to October 2004.

"**Applicable CPI Index**" shall mean (a) the Irwin CPI Index with respect to the Irwin Project, and (b) the Moffett/Parks CPI Index with respect to the Moffett Project and the Parks Project.

10

"**Irwin CPI Index**" shall mean the "Consumer Price Index for All Urban Consumers. Los Angeles. Riverside. Orange County Index, Subgroup All items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency. or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area: provided. however. if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised. the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor. formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or. in the event that no such conversion factor. formula or table is published. then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"**Moffett/Parks CPI Index**" shall mean the "Consumer Price Index for All Urban Consumers. San Francisco. Oakland. San Jose Index, Subgroup All items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency. or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area: provided. however. if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised. the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor. formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or. in the event that no such conversion factor, formula or table is published. then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"**Base Year**" shall mean with respect to each Applicable Project the then most recently completed calendar year preceding an Adjustment Date whenever an adjustment is made to the calculation of the applicable CPI Effective Gross Income per Door.

"**Unit Days Occupied**" shall mean with respect to any period and any Applicable Project the sum total of the number of housing units within such Applicable Project which are occupied each day within such period. By way of example. if the Irwin Project has 2028 units in any given 30-day month. and 1900 of such units were occupied during each of the first 15 days of such month and 2000 of such units were occupied during each of the final 15 days of such month. then the total Unit Days Occupied with respect to such month would be calculated as follows: (1900 x 15) + (2000 x 15) = 58,500 Unit Days Occupied.

"**Occupied Units**" shall mean with respect to any period and any Applicable Project the quotient of (i) the total Unit Days Occupied with respect to such Applicable Project within such period, divided by (ii) the number of days in such period. The portion of Occupied Units attributable to the Initial Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above multiplied by a fraction, the numerator of which is the lesser of (i) the total number of housing units within the Applicable Project as of the end of such period, or (ii) the total number of housing units within the Initial Scope, and the denominator of which is the total number of housing units within the Applicable Project as of the end of such period. The portion of Occupied Units attributable to the Increased Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above less the portion of such Occupied Units attributed to the Initial Scope as determined above, if any.

"**CPI Effective Gross Income per Door**" shall mean as follows: (a) for calendar year 2004. CPI Effective Gross Income per Door shall mean (i) $10.512 with respect to the Irwin Project, (ii) $31.464 with respect to the Moffett Project. and (iii) $25,104 with respect to the Parks Project (in each case, the "**Initial Base Year CPI Effective Gross Income per Door**"): (b) for each calendar year after 2004 through the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Owner's operating agreement). CPI Effective Gross Income per Door shall mean. with respect to each Applicable Project, the applicable Initial Base Year CPI Effective Gross Income per Door then Adjusted by CPI to January 1 of such subsequent calendar year; (c) at the end of the calendar year in which delivery of the last unit in the Initial Development Phase occurs. and every five years thereafter (each. an "**Adjustment Date**"). (x) the most recent annual Effective Gross Income with respect to each Applicable Project will be compared to (y) the then calculated CPI Effective Gross Income per Door with respect to such Applicable Project, multiplied by the number of Occupied Units within such Applicable Project during such year. If the result in clause (x) is 10% or more greater than the result in clause (y) with respect to any Applicable Project, then (A) the CPI Effective Gross Income per Door with respect to such Applicable Project shall become the most recent annual Effective Gross Income with respect to such Applicable Project divided by the number of Occupied Units during such year within such Applicable Project. (B) the then most recent year shall become the "Base Year" from which CPI Effective Gross Income per Door will be calculated for subsequent years with respect to such Applicable Project. and (C) for subsequent years. CPI Effective Gross Income per Door shall mean the Effective Gross Income from the Applicable Project for the applicable Base Year. divided by the number of Occupied Units within such Applicable Project during such Base Year. then adjusted by CPI to January 1 of such subsequent calendar year. If the result in clause (x) above is less than 10% greater than the result in clause (y) above with respect to any Applicable Project on any such Adjustment

NGEDOCS :016600.0504 973807.8

Date, then there shall be no adjustment in the manner in which CPI Effective Gross Income per Door is calculated until the next Adjustment Date. For purposes of this Section only, Effective Gross Income will be determined based on the Improvements, as if all "Doors" were leased by Owner.

15.1    COMPENSATION: As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), Owner shall pay Manager the following compensation with respect to each Applicable Project:

(a)    Base Fee: For each month of operation, the lesser of the following, with payment due on the 10th day after the end of the applicable month:

(i)    2.75% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable to the Initial Scope, plus 1.50% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable solely to the Increased Scope (if applicable); or

(ii)    an amount equal to the sum of (1) 2.75% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Initial Scope divided by 12 multiplied by (y) the number of units within the Initial Scope of such Applicable Project occupied during such month, plus (2) 1.50% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Increased Scope (if applicable) divided by 12 multiplied by (y) the number of units within the Increased Scope of such Applicable Project occupied during such month.

(b)    Incentive Fee: The annual Incentive Fee with respect to each Applicable Project is calculated as the earned portion (per the Incentive Performance Management Plan ("IPMP") attached as Exhibit B) of the lesser of (1) the sum of (A) 1.50% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Initial Scope plus (B) 2.75% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Increased Scope or (2) the sum of (A) the product of (i) 1.50% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Initial Scope, multiplied by (ii) the number of units within such Applicable Project within the Initial Scope occupied during such year, plus (B) the product of (i) 2.75% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Increased Scope multiplied by (ii) the number of units within such Applicable Project within the Increased Scope occupied during such year, and will be payable during the year earned as follows:

(i)    Calendar Year 2004: Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of the maximum potential Incentive Fee with respect to the Applicable Project for such quarter; provided, that after the completion of calendar year 2004, the actual fee earned for calendar year 2004 shall be determined in accordance with Exhibit B and if Manager has been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

(ii)    Subsequent Years: The same procedure shall be used as in calendar year 2004, except that the prior year's actual earned portion of the Incentive Fee with respect to the Applicable Project shall be substituted for 75% of the maximum potential incentive fee in the formula described in (i) above. For example, if in 2006, Manager earns an incentive fee with respect to any Applicable Project of 78% of 1.50% (i.e., 1.17%) with respect to the units in the Initial Scope and 78% of 2.75% (i.e. 2.145%) with respect to units in the Increased Scope, then estimated payments for 2007 with respect to such Applicable Project shall be based upon 1.17% of Effective Gross Income with respect to units in the Initial Scope (in lieu of 75% of 1.50% of Effective Gross Income with respect to such units) and 2.145% of Effective Gross Income with respect to units in the Increased Scope (in lieu of 75% of 2.75% of Effective Gross Income with respective to such units).

15.2    ACTS OF GOD: In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if Owner engages Manager to oversee such restoration work under a separate written agreement, Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of Owner's insurance policy.

12

15.3    CONSTRUCTION MANAGEMENT SERVICES: If Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement. Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion.

15.4    FOR OTHER ITEMS OF MUTUAL AGREEMENT: Should Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by Owner to Manager for such additional services.

15.5    FOR REIMBURSEMENT OF EXPENSES: In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan and to the extent not already directly paid from the operating account (collectively, the "Reimbursable Expenses"), including, without limitation, the following: (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc. and any expenses set forth in Section 8.2 hereof; (b) third-party consulting services approved by Owner (where Owner requests and Manager, in its sole discretion, agrees to contract with a third party); (c) out-of-pocket travel expenses for travel related to the provisions of services (air transportation incurred at a rate not in excess of a coach or coach equivalent public rate), including lodging and ground transportation to and from the Project (including, but not limited to temporary lodging for on-site personnel not residing at or near the Project gas or mileage reimbursement, taxi fares and parking or meter charges); (d) expense of long-distance communications; and (e) expense of reproductions, postage and handling. All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.

## SECTION 16

## STRUCTURAL CHANGES

Owner expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of Owner. However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to Section 4.2 of this Agreement, and Manager shall notify Owner appropriately.

## SECTION 17

## BUILDING COMPLIANCE

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Ground Lease. Owner authorizes Manager to disclose ownership of the Project(s) to any such officials and agrees to indemnify, protect, defend and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, this indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owner, as provided under the terms and provisions of this Agreement.

## SECTION 18

## TERMINATION

18.1    TERMINATION FOR CAUSE: Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

13

A.      Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable; or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured.  However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.      Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.      Default:  In addition to the default set forth in Section 18.1.A, each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1.      the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

2.      the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

3.      the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days; or

4.      theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

D.      Termination of Sublease.  By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.      Sale.  By any party, upon written notice to the others, upon the sale of all or substantially all of Owner's interest in the Project to a third party unaffiliated with Owner.

18.2      TERMINATION COMPENSATION:  Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) Owner from Manager, if any, as a result of such termination).  To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to Owner, such sums shall be payable from the operating accounts.  Any amounts due in excess of the funds available from an operating account shall be paid by Owner to Manager upon demand.

18.3      OWNER RESPONSIBLE FOR PAYMENTS:  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by Owner.  In addition, Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on Owner's behalf under this Agreement.

18.4      ACCOUNTS:  UNPAID BILLS: Manager shall deliver to Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due Owner and tenant security deposits which were held by Manager with respect to the Project, as well as a final accounting reflecting the balance of income and expenses with respect to the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to Owner.

14

18.5    FINAL ACCOUNTING: Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Project are deemed to be the property of Owner, they are to be delivered to Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager. Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law. Each Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to the Project.

18.6    NON-INTERFERENCE WITH MANAGER'S BUSINESS: Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business. Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement. Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from Owner.

18.7    WRITTEN DIRECTION. A direction or consent of Clark Pinnacle California Military Communities LLC (the managing member of Owner on behalf of Owner shall be deemed the direction or consent of Owner hereunder and Manager may rely on such direction or consent as the act of Owner).

## SECTION 19

## REPRESENTATIONS

19.1    OWNER'S REPRESENTATIONS AND WARRANTIES: Owner represents and warrants as follows: (a) Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so; (b) there are no written or oral agreements affecting the occupancy of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager; (c) all permits for the operation of the Project has been secured and are current; (d) Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will affect the operation of the Project; and (e) if Owner requests Manager to enter any agreements for the benefit of third parties, Owner hereby agrees to fully indemnify Manager for all claims arising from such agreements.

19.2    MANAGER'S REPRESENTATIONS AND WARRANTIES: Manager represents and warrants as follows: (a) the officers of Manager have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

19.3    ESTOPPEL CERTIFICATE. Manager and Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

## SECTION 20

## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

## FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

15

## SECTION 22

### COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owner and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owner and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

## SECTION 23

### RIGHTS CUMULATIVE; NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

### APPLICABLE LAW AND LITIGATION

24.1    INTERPRETATION: The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project. If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owner.

24.2    LITIGATION: In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

## SECTION 25

### NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Owner and Manager individually may specify hereafter in writing:

MANAGER:            AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.
                   4200 Rocklin Road, Suite 1
                   Rocklin, California 95677

OWNER:             CALIFORNIA MILITARY COMMUNITIES LLC
                   Attention: Douglas R. Sandor
                   Two Bethesda Metro Center
                   Suite 250
                   Bethesda, Maryland  20814

16

WITH A COPY TO:  CLARK ENTERPRISES. INC.
        Rebecca Owen. Esq.
        General Counsel
        7500 Old Georgetown Road
        15th Floor
        Bethesda, Maryland  20814

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested. postage prepaid. and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs. administrators. executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

<div style="margin-left:40%">

**CALIFORNIA MILITARY COMMUNITIES LLC** a Delaware limited liability company

By: Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

  By: Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

   By:
   Name: W. Cleveland Johnson
   Title: Authorized Representative

  By: CEI Realty, Inc., a D.C. corporation, Manager

   By:
   Lawrence C. Nussdorf, President

  By: Pinnacle Irwin LLC, a Washington limited liability company, Manager

   By:
   Name: Stan Harrelson
   Title: Manager


**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington corporation

By:
Name: Stan Harrelson
Title: President

</div>

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**CALIFORNIA MILITARY COMMUNITIES LLC** a Delaware limited liability company

By:      Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

         By:      Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

                 By:      _____

                 Name:    W. Cleveland Johnson

                 Title:     Authorized Representative

                 By:      CEI Realty, Inc., a D.C. corporation, Manager

                         By:      _____

                             Lawrence C. Nussdorf, President

         By:      Pinnacle Irwin LLC, a Washington limited liability company, Manager

                 By:      _____

                 Name:    Stan Harrelson

                 Title:     Manager

**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington corporation

By:      _____

Name:    Stan Harrelson

Title:     President

18

<u>**Exhibit A**</u>

To the extent approved herein and authorized by Owner in the Approved Budget, the following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

Benefits Administration for site staff:                                      3% charge on-site payroll in addition to premiums per Plan

      Insurance Premiums (medical, dental, vision, LTD, Life)
      Broker's Fees
      Claims handling expenses
      COBRA administration
      401K Plan administration

Copies                                                                   As incurred

Long Distance Charges                                                    As incurred

Management Fee:                                                          See Section 15

Postage/Overnight:                                                       As incurred

Worker's Compensation Insurance:                                         Fees rolled into budgeted rate per Plan

      Insurance Premiums
      Broker's Fees
      Claims handling expense

NGEDOCS :016600.0504 973807.8

<u>Exhibit B</u>

**PROPERTY MANAGEMENT INCENTIVE PERFORMANCE MANAGEMENT PLAN**

**Objectives**

The focus is always on the importance of quality family housing. The performance incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement. The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings will be rewarded with increased a performance pay schedule. The rewards will be quantified through written feedback from the residents.

**Measurement Criteria**

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Effective Gross Income for Owner. Achievement of the management incentive fee is to be based on customer satisfaction. The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

**Subjective Survey**

Customer satisfaction will be measured in two parts:

The first part, Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs. This portion will account for twenty five percent (25%) of the total incentive available.

The second portion is named Government Satisfaction and will be based upon the contractor ability to successfully work with its military counterparts. This portion will account for ten percent (10%) of the total incentive available.

**Resident Satisfaction**

Owner will retain a third-party firm to evaluate the performance or the Property Manager. The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix to the CDMP Legal and Governance Plan. The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below. As an example: if 100 persons were surveyed and the results were as indicated in the table below the average grade would be 6.50.

| Grade | #Response | Value | Total |
|---|---|---|---|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 15 | 5 | 75 |
| | 10 | 4 | 40 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 100 | 6.50 | 650 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination. The firm will attempt to elicit survey participation by all of the

20

current residents.  The RCI Office will compose a letter with the Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third-party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm.  The results will be provided to Owner and the RCI Office who will compare them to benchmarked objectives.  These results will account for twenty-five percent (25%) of the incentive determination.  The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| During IDP | 1 - 2.0<br>0% | 2.1 – 4.9<br>15% | 5.0 – 8.4<br>20% | 8.5+<br>25% |
| Post-IDP | 1 – 2.9<br>0% | 3.0 – 6.9<br>15% | 7.0 – 8.9<br>20% | 9.0 +<br>25% |

## Government Satisfaction

Owner will retain a third-party firm to evaluate the performance of the Property Manager.  The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a survey form that will be provided to the following key government representatives:

- Garrison Commander
- RCI Director
- RCI Deputy Director
- Chief of Staff
- Base Commander

The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest.  The survey for each participant identified above will equal two percent (2%) of the total potential incentive available.  The total of all five responses will be averaged and multiplied times the overall incentive available.  As an example, if the five surveys came back with numerical scores of 6.0, 7.0, 8.0, 9.0 and 10.0 the total would be 40.0 which when divided by five would average a score of 8.0.  That score of 8.0 would be considered as 80% of the total potential of ten (10%) percent available (or 8%).  In this instance 8% of the incentive would be paid.  In the event the average equals 5.0 or less, no incentive will be deemed earned.  Below is the scale for each individual response.

| Grade | Response | Value |
|---|---|---|
| Superior (10) | 10 | 100% |
| | 9 | 90% |
| | 8 | 80% |
| | 7 | 70% |
| | 6 | 60% |
| Average (5) | 5 | 50% |
| | 4 | 40% |
| | 3 | 30% |
| | 2 | 20% |
| Poor (1) | 1 | 10% |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination.  The firm will attempt to elicit survey from the participants identified above.  The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the participants, and after completing the survey, the participants return the survey directly to the third-party firm.  The results will be provided to Owner and the RCI Office

21

who will compare them to benchmarked objectives. These results will account for ten percent (10%) of the incentive determination.

**Objective Reports**

Property management goals for effective and timely maintenance are critical to the success of the property management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall objective component will account for thirty-five percent (35%) of the total potential incentive. Property management reporting systems will generate results based upon the following individual components:

Maintenance Response Time by level of urgency (35% of total incentive; each of the three service request areas will be weighted as follows: Routine = 15% of total incentive — Urgent = 10% of total incentive —Emergency = 10% of total incentive) during — Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine". "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour. Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours. A routine request will be responded to within 72 hours. See the chart below for measurement criteria. Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan. The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| **Routine** | | | | |
| During IDP | 0% | 5% | 7.5% | 15% |
| Post-IDP | 0% | 5% | 7.5% | 15% |
| Routine Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Urgent** | | | | |
| During IDP | 0% | 4% | 6% | 10% |
| Post-IDP | 0% | 4% | 6% | 10% |
| Urgent Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Emergency** | | | | |

22

| | | | | |
|---|---|---|---|---|
| During IDP | 0% | 4% | 6% | 10% |
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |

**Reporting and Operations**

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of the total incentive and will be further broken down as follows:

1.    Monthly Reporting - (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. With each monthly report counting as 1/12th of the award, payment of this incentive will only be allowed if the monthly report to Owner is on time. As an example: if eleven months out of twelve were delivered on time, the incentive award would be 9.17% (11/12=.917 x 10% =9.17%).

In the event Owner asks that reporting be held open for any reason, that particular monthly report would be counted as on time.

2.    Annual Budgets (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the timeliness of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year. This is a "pass/fail" incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

In the event Owner asks that the Annual Plan and Budget be delayed for any reason, that reporting requirement would be counted as on time.

Occupancy (10% of Total Incentive) — Each point in occupancy from 95% to 99% shall earn an additional 2% in incentives. Occupancy is based upon physical occupancy of eligible premises.

| Occupancy | | Incentive Award |
|---|---|---|
| **From** | **To** | |
| 94.5% | 95.4% | 2% |
| 95.5% | 96.4% | 2% |
| 96.5% | 97.4% | 2% |
| 97.5% | 98.4% | 2% |
| 98.5% | 100.0% | 2% |

Eligible premises shall include only those homes available for immediate occupancy. Eligible premises will specifically not include homes that are off line with major repairs or construction scheduled, on hold for incoming military families, the subject of mass or major changes in deployment of military members, structurally or environmentally damaged, or any other such home as the contractor and the RCI Director may mutually agree to be uninhabitable.

During the IDP, the occupancy rate for incentive purposes will be determined by taking the number of available units and deducting the number units in the immediate path of demolition, renovation or in a condition the Secretary considers uninhabitable for financial, health or safety reasons. The remaining units will be considered available to military for housing. In the event there are no military personnel on the waiting list, the Owner will request from the Secretary if the units could be made available for occupancy by other tenants (non-military) on the waiting list. In the

NGEDOCS :016600.0504 973807.8

event there are no military personnel on the waiting list and the Secretary does not allow non-military tenants to occupy the units, the occupancy rate shall be deemed 100%.

Example:

420 units on Moffett and Parks.
120 units to be demolished within the first 12 months.
100 units to be renovated within the first 12 months.
200 units available for rent

If 100 of the units are military occupied and 0 military are on the waiting list, and if the Secretary does not allow non-military to occupy the remaining units, the occupancy rate would be considered to be 100% occupied.

### Quality Assurance Plan and Reporting Requirements

### Base Year Benchmarks

Owner and the Property management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective, and reporting and operations reports maintained by Pinnacle and reviewed by the RCI Staff and Deputy Director.

### Determining the Incentive

For incentive calculation purposes, the Moffett Project and the Parks Project shall be considered separate from the Irwin Project.

At the end of the initial twelve month anniversary of Property management contract commencement and at the end of each year thereafter through the end of the management assignment, Owner will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the Subjective Surveys, and Objective Reports, and Reporting and Operations components will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the three criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by Owner no later than thirty days following the end of the anniversary date. Once approved, Owner will authorize payment of the incentive to Pinnacle within fifteen days or no later than forty-five days following the anniversary date of the management contract.

### Unsatisfactory Results

It is Pinnacle's goal to provide "Quality Service." While achievement of a 100% rating may be difficult, it will guide Pinnacle's planning. Where results indicate a need for improvement, we will formally address it with the staff and create an action plan as needed. Pinnacle will establish a contingency plan for improving unsatisfactory customer service responses. The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Pinnacle.

24

**Aligned Objectives**

It is planned that site level staff incentives will be tied to the same criteria as trust for the management company.  While the community director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal management plan and objective meeting at the beginning of the year.  Results will be discussed throughout the year so that corrective action can be made where needed.

25

# EXHIBIT V

Pinnacle Monterey LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121

May 13, 2011

Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention: W. Cleve Johnson

      Re:   Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle Monterey Bay LLC of October 30, 2001 ("Operating Agreement"), between Clark Monterey Presidio LLC and Pinnacle Monterey LLC. I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Monterey LLC ("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property Management Agreement" for the parties' Monterey Bay Military Housing ("MBMH") project a Major Decision requiring the vote of all the Managers. Operating Agreement § 3.1(b)(3)(E).

Pursuant to Section 3.1(b)(3)(E) of the Operating Agreement, Pinnacle hereby votes to adjust Section 18.1(C)(6) of the Property Management Agreement ("PMA") as follows:

> "6.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted PMA. Pinnacle also believes the adjustment will ensure that the Operating Agreement partners can continue to work together in the best interests of MBMH for the remainder of the PMA's 50-year term. If you agree with the proposed adjustments, please sign below and return to me. If we need to discuss or change these adjustments, I welcome your suggestions. If you are inclined to vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before May 20, 2011, Pinnacle shall deem your non-response a deadlock pursuant to Section 3.13(c). This will commence the seven-day period to

reach mutual agreement.  Failing mutual agreement within the seven day period, Pinnacle shall resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Monterey LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

# EXHIBIT VI

Pinnacle Irwin LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121


May 13, 2011


Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention: W. Cleve Johnson

      Re:   Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle California Military
Communities LLC of May 21, 2003 ("Operating Agreement"), between Clark Irwin LLC and
Pinnacle Irwin LLC. I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark
Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Irwin LLC
("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property
Management Agreement" for the parties' California Military Communities ("CMC") project a
Major Decision requiring the vote of all the Managers. Operating Agreement § 3.1(b)(2)(E).

Pursuant to Section 3.1(b)(2)(E) of the Operating Agreement, Pinnacle hereby votes to adjust
Section 18.1(C) of the Property Management Agreement ("PMA") by deleting the phrase "In
addition to the default set forth in Section 18.1.A" and inserting under subsection (4):

      "4.     theft, fraud, or other knowing or intentional misconduct by Manager or its
      employees or agents having a material adverse affect on the Owners; provided,
      however, (1) if the Manager takes appropriate measures to correct, and otherwise
      prevent the recurrence of any such events of default and (2) the Manager remedies
      any confirmed event of default within 15 days of learning of such default (to the
      extent that such default is susceptible of being cured), then such acts shall be
      deemed not to have a material adverse affect and the Property Management
      Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted
PMA. Pinnacle also believes the adjustments will ensure that the Operating Agreement partners
can continue to work together in the best interests of CMC for the remainder of the PMA's 50-
year term. If you agree with the proposed adjustments, please sign below and return to me. If we
need to discuss or change these adjustments, I welcome your suggestions. If you are inclined to
vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before [date], Pinnacle shall deem your non-response a
deadlock pursuant to Section 3.13(c). This will commence the seven-day period to reach mutual

agreement.  Failing mutual agreement within the seven day period, Pinnacle shall resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Irwin LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

_____

# EXHIBIT VII



**W. Cleveland Johnson**
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

May 19, 2011

*VIA ELECTRONIC MAIL*
*AND OVERNIGHT MAIL*

American Management Services East LLC
Pier 70
2801 East Alaskan Way
Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

> **Re:   Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision**

Dear Stan:

We have received your letters on behalf of Pinnacle Irwin LLC and Pinnacle Monterey LLC dated May 13, 2011. The Pinnacle Monterey letter demands a response from Clark Realty Capital LLC, acting it its capacity as Clark Manager under the Monterey Operating Agreement, by May 20; the Pinnacle Irwin letter likewise demands a response but the "date" was left blank.

We disagree with your interpretation of the Operating Agreement to require a "response" to your letters within seven days of the date of your letters, and believe you have set an arbitrary deadline for us to respond in order to create a deadlock. We also believe there is no basis for you to deem this response as creating a "deadlock" under the Operating Agreements. In addition, we have questions about the proposed amendments themselves, as well as what information Pinnacle has discovered at either location that led to this proposal. It is apparent that you have spent significant time drafting the proposed amendments to the Property Management Agreements at both Projects and putting forward your position. We therefore request your full and detailed response to the questions below, no later than Monday May 23, given the urgency with which you have demanded a response from us:

1. What is meant by "material adverse affect" on the Owners?

2. What is meant by "appropriate measures to correct" fraud?

3. What is meant by a "confirmed event of default"?

4. What types of fraud do you contend are or are not "susceptible to being cured"?

American Management Services East LLC
Attn: Mr. Stan Harrelson
May 19, 2011
Page 2

5.      Why do you contend the proposed amendment is consistent with the original
        intent of the parties?

6.      When did you begin to consider and draft the proposed amendment?

7.      Describe in detail (including names and dates) any potential fraud, theft or
        intentional misconduct (including any alleged or potential self-dealing) by a
        Pinnacle employee or person acting on behalf of Pinnacle that has occurred at
        either the Irwin or Monterey Projects.

8.      How and when did Pinnacle or anyone acting on its behalf become aware of such
        potential fraud, theft or intentional misconduct?

9.      For any such instance of potential fraud, theft or intentional misconduct, how may
        it have harmed the Project and what if anything have you done to investigate
        potential harm to the Project?

10.     What steps if any have you taken, or do you intend to take, to remedy any
        instances of fraud, theft or intentional misconduct at the Project?

We look forward to your prompt response.

Sincerely,

*Cleve Johnson w*

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC

# EXHIBIT VIII

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA  22203

   **RE: Your Letter(s) Dated May 19, 2011**

Dear Cleve:

Thank you for your May 19 reply to my letter of May 13, 2011.  A few preliminaries:  we appreciate your questions, and we are not ready to declare a deadlock.  Quite the contrary - we are happy to discuss with you the adjustments to the Property Management Agreements -- adjustments that Pinnacle Irwin and Pinnacle Monterey believe are truly in the best interests of the projects at Irwin and Monterey.  As your partners, we are committed to a fair, open dialogue before we invoke our contractual right, under our partnerships' operating agreements, to declare a deadlock and make adjustments to the Property Management Agreements (PMAs) at each facility.  As for why we set a seven-day reply time frame, it was because you never replied to a similar adjustment letter we sent at the Belvoir project.  We did not want our present letters at Irwin and Monterey to be ignored.

By way of a general response to all your questions, we have no information about any events of fraud, theft or misconduct at Irwin or Monterey that would be cause to terminate the PMAs at those projects.  Quite the contrary - those projects are performing well.  The Clark and Pinnacle managers at those projects have a history of working together cooperatively.  In broad terms, we have proposed the PMA adjustments in my May 19 letter because we want to keep Monterey and Irwin focused on the goal of our partnership at those projects - providing excellent housing communities for the members of the Armed Services who live at our California projects.  We do not want Irwin and Monterey drawn into a conflict like that involving our partnership's eastern military housing projects (Belvoir and Benning).

More importantly, as a matter of both fact *and law* in California, Pinnacle, Clark and the Army are *partners*, and owe each other the duties and obligations of partners in connection with the Irwin and Monterey projects.  The adjustments we have proposed will enable the Pinnacle to participate, as a partner of both Clark and the Army, in responding to acts of fraud, theft and misconduct, either alleged or confirmed, committed by Pinnacle employees.  At the same time, the adjustment eliminates an ambiguity in the PMAs and prevents Clark from using that ambiguity to deploy an audit and litigation strategy designed to eliminate Pinnacle's ownership

interests in the projects.  In other words, the adjustments we have proposed to Section 18(C) of both agreements will get Clark and Pinnacle talking again and acting like partners.

Any issues the Owners have about Pinnacle's property management services should be resolved in the first instance by communication, negotiation and cooperation.  And in the second instance, by serving notices of default, with opportunity to cure, as required under the PMAs. Our partnership requires no less.

I propose a face-to-face meeting to discuss these matters at your earliest convenience - including the specific questions in your letter.  I think it would make sense to include representatives from the Army in such a meeting, since they are our partners in the projects. Please let me know when you are available.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

# EXHIBIT IX



W. Cleveland Johnson
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

June 3, 2011

***VIA ELECTRONIC MAIL AND OVERNIGHT MAIL***

American Management Services East LLC
Pier 70
2801 East Alaskan Way, Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

    **Re:    Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision**

Dear Stan:

    This is in response to your May 23, 2011 letter. We had asked you to respond to the specific questions we raised, particularly because Pinnacle has unique access to the necessary information to respond promptly. We are concerned by your comment that you have "no information about any events that would be cause to terminate the PMAs at those projects." This does not answer whether you are aware of *any* incidents or allegations of fraud, theft or intentional misconduct at either Fort Irwin or Monterey.

    We again ask for prompt, written responses to our questions no later than June 8. We also need to know by that date whether you continue to insist upon the amendments to the Fort Irwin and Monterey PMAs as outlined in your earlier correspondence.

    With respect to your request for a face-to-face meeting, we do not think such a meeting will be productive until we have received written responses to our questions. In addition, before we would agree to such a meeting, you need to withdraw, with prejudice, the claims made in Virginia against me, Doug Sandor and Larry Nussdorf personally. Those claims were brought despite the express terms of the Clark Pinnacle Belvoir Operating Agreement (¶ 7.6). And, while they are pending, we do not feel it appropriate to agree to a meeting to discuss these issues.

    We look forward to your prompt response.

            Sincerely,

            W. Cleveland Johnson
            Manager, Clark Realty Capital, L.L.C.
            Manager, Clark Monterey Presidio LLC and
            Clark Pinnacle California Military Communities LLC

Resp to Harrelson 5 23 11 letter(June 2 draft) (2) (2)    **Clark Realty Capital, L.L.C.**

        4401 Wilson Blvd. Suite 600    Arlington, Virginia 22203
        (703) 294-4500          (703) 294-4650-Fax

# EXHIBIT X

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

June 8, 2011

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA  22203

RE: Your Letter(s) Dated June 3, 2011

Dear Cleve:

In my letter of May 23, I offered to meet with you to discuss the questions in your May 19 letter.  I also told you, and reiterate, that Pinnacle is not aware of incidents of fraud, theft or intentional misconduct at our Monterey or California Military Communities (CMC) projects.

Instead of agreeing to a meeting, you waited two work weeks to respond.  And then, you simply insisted that I respond to your earlier questions in writing.  You also indicated that you would not agree to meet about adjustments to the PMAs at our California projects until Pinnacle withdrew claims it has filed in Virginia against you, Mr. Sandor and Mr. Nussdorf.

Without meaning to seem argumentative, it is a breach of Clark Realty's duties as Clark Manager of Clark Pinnacle Monterey LLC and Clark Pinnacle California Communities LLC to insist on obtaining a personal benefit for you, Mr. Sandor and Mr. Nussdorf - concerning a lawsuit in Virginia - as a precondition to meeting about our California projects.  I remind you that Clark Realty's job, at each project, is to look out for the best business interests of **that project**.  Clark Realty instead seems intent on elevating its own litigation interests -- and now that of its principals -- above the LLCs we formed together.

Voting on adjustments to the terms and conditions of the PMAs is one of the few powers granted to the Pinnacle Manager under the Clark Pinnacle Monterey LLC and Clark Pinnacle California Military Communities Operating Agreements.  A "deadlock" in "voting between the Managers with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreements" is the only situation under the Operating Agreements where the Pinnacle Manager has the power, in its "sole discretion," to determine a deadlock or dispute.

Pinnacle proposed adjustments to the PMAs at Monterey and CMC over three weeks ago.  We explained, candidly and clearly, why we thought the adjustments were necessary and in the

best interests of the projects.  I believe you fully understand that the purpose of the adjustments is to help Clark and Pinnacle act like partners at the California projects, instead of adversaries.

You have refused to vote on the proposed adjustments, and refused to even meet to discuss them.  Therefore, pursuant to Section 3.13(c) of the Operating Agreements of Clark Pinnacle California Military Communities LLC and Clark Pinnacle Monterey LLC, Pinnacle declares a "Deadlock" regarding the adjustments proposed in my letters of May 13, 2011.  Your receipt of this letter shall begin the 7 day period for resolution set forth in the Operating Agreements.

I remain interested in a meeting to resolve our deadlock, joined by our project partners, the U.S. Army.  Please reconsider your position.  Absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011, pursuant to the terms of the Operating Agreements.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

# EXHIBIT XI



**W. Cleveland Johnson**
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

June 14, 2011

*VIA ELECTRONIC MAIL*
*AND OVERNIGHT MAIL*

American Management Services East LLC
Pier 70
2801 East Alaskan Way
Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

      Re:    **Pinnacle Monterey LLC and Pinnacle Irwin LLC**

Dear Stan:

      This responds to your letter dated June 8, 2011. As an initial matter, we disagree that a "deadlock" has occurred under Section 3.13 of the Irwin and Monterey Operating Agreements. Under Section 3.13, an actionable "deadlock" must occur "in voting." As you know, the Clark Managers have not voted, and Pinnacle has not called a vote, either by calling a meeting for that purpose pursuant to the California LLC Act (Section 17104(c)(i)) or by obtaining the Clark Managers' written consent to vote absent such a meeting. Without a vote, Pinnacle cannot simply "declare" a deadlock as it has attempted here.

      While you have requested a face to face meeting to discuss these issues, this is not the same as calling a meeting for purposes of a vote. Indeed, as should be obvious from our correspondence, the Clark Managers do not believe they are in a position to vote until they have received written responses to their questions from Pinnacle. Such a proposed amendment -- where Pinnacle as a fiduciary may actively commit fraud, yet the Owner is powerless to terminate Pinnacle if it "remedies" the fraud -- hardly strikes us as a balanced amendment that is in the best interest of the Projects or consistent with public policy. The fact that Pinnacle refuses to disclose many basic facts about this one-sided amendment only heightens our concern about Pinnacle's conduct.

      We disagree that it is a breach of "Clark Realty's duties" to request that Pinnacle dismiss the claims against Larry Nussdorf, Doug Sandor and myself. As noted above, Pinnacle's failure to answer the most basic questions in writing about the proposed amendment strongly deters any need to act on Pinnacle's requested amendment. However, in addition, Pinnacle has sued individuals personally for matters in connection with the Operating Agreements of the respective projects between the parties including Monterey and Irwin. Such claims are prohibited by,

S:\Arlington\LEGAL\Fort Irwin\01 ORG DOCS\061411 SHarrelson.doc **Clark Realty Capital, L.L.C.**
4401 Wilson Blvd. Suite 600    Arlington, Virginia 22203
(703) 294-4500    (703) 294-4650-Fax

American Management Services East LLC
Attn:  Mr. Stan Harrelson
June 14, 2011
Page 2


among other things, the express terms of the Operating Agreements. We fail to see any breach of duty where the basic request is that Pinnacle comply with the relevant agreements.

In short, we ask that Pinnacle immediately retract its statement that "absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011" and confirm that Pinnacle will take no steps to alter the provisions of the Irwin and Monterey PMAs until you have responded in full to our questions in writing and until a vote has occurred.  If we do not have this assurance by 12:00 Eastern Standard Time on Wednesday, June 15, we intend to take all necessary actions to protect the Projects.

Sincerely,

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC