# Exhibit B
## Part 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

William J. Goines, 61290; Karen Rosenthal 209419; Alice Chu 264990
Greenberg Traurig, LLP
1900 University Ave., Fifth Floor
East Palo Alto, CA 94303

TELEPHONE NO.: (650) 328-8500        FAX NO.:

ATTORNEY FOR *(Name):* Plaintiffs Pinnacle Irwin LLC and Pinnacle Monterey LLC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **Santa Clara**
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME:

CASE NAME: Pinnacle Irwin LLC, et al. v. Clark Realty Capital, LLC et al.

**(ENDORSED) FILED**

JUN 15 2011

**DAVID H. YAMASAKI**
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY
J. Cao-Nguyen

CASE NUMBER:
**1 1 1 C V 2 0 3 1 5 5**

JUDGE:

DEPT:

| CIVIL CASE COVER SHEET | Complex Case Designation | |
|---|---|---|
| ☒ Unlimited ☐ Limited | ☐ Counter ☐ Joinder | |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☒ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties        d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve                in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence            f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive

4. Number of causes of action *(specify):* One

5. This case ☐ is ☒ is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 15, 2011

Alice Chu
_____
(TYPE OR PRINT NAME)        ► _____
                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 *www.courtinfo.ca.gov* |
|---|---|---|

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36) Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non- domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non- harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

American LegalNet, Inc.
www.FormsWorkflow.com

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CLARK REALTY CAPITAL, LLC, AND DOES 1-25, INCLUSIVE

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PINNACLE IRWIN LLC AND PINNACLE MONTEREY LLC

<div style="border:1px solid">

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*



**(ENDORSED)**
# FILED
JUN 15 2011

**DAVID H. YAMASAKI**
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ J. Cao-Nguyen DEPUTY

</div>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

   *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California, County of Santa Clara<br>191 N. First Street<br>San Jose, CA  95113 | CASE NUMBER:<br>*(Número del Caso):* **1 1 C V 2 0 3 1 5 5** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
William J. Goines/Karen Rosenthal/Alice Chu          Tel: (650) 328-8500
Greenberg Traurig, LLP, 1900 University Ave., Fifth Floor
East Palo Alto, CA 94303

| DATE: JUN 15 2011 | **DAVID H. YAMASAKI** Chief Executive Officer, Clerk | J. Cao-Nguyen | |
|---|---|---|---|
| *(Fecha)* | Clerk, by *(Secretario)* | , Deputy *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1  WILLIAM J. GOINES (SBN: 61290)
   KAREN ROSENTHAL (SBN: 209419)
2  CINDY HAMILTON (SBN 217951)
   ALICE CHU  (SBN 264990)
3  GREENBERG TRAURIG, LLP
   1900 University Avenue, Fifth Floor
4  East Palo Alto, California  94303
   Telephone: (650) 328-8500
5  Facsimile: (650) 328-8508

6  Attorneys for Plaintiffs
   PINNACLE IRWIN LLC and
7  PINNACLE MONTEREY LLC

**(ENDORSED)**
**F I L E D**
JUN 15 2011
DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY_____ DEPUTY
J. Cao-Nguyen

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    FOR THE COUNTY OF SANTA CLARA

11

12  PINNACLE IRWIN LLC AND PINNACLE
    MONTEREY LLC,                          Case No. **111CV203155**
13
                                           **COMPLAINT**
14              Plaintiffs;
                                           JURY TRIAL DEMANDED
15  v.

16  CLARK REALTY CAPITAL, LLC, AND
    DOES 1-25, INCLUSIVE
17
                Defendant.
18

19                          **COMPLAINT**

20       Plaintiffs Pinnacle Irwin LLC and Pinnacle Monterey LLC (collectively, "Pinnacle"), for their

21  complaint against Defendant Clark Realty Capital, L.L.C.,  ("Clark or "Clark Realty"), allege as

22  follows:

23                          **SUMMARY**

24       1.       American Management Services LLC, which does business under the name

25  "Pinnacle" is Clark Realty Capital LLC's partner in a joint venture that bid for and was awarded the

26  right to own, develop, construct, renovate and manage several large privatized housing projects at

27  United States military installations.  At each of the projects awarded to the Clark Pinnacle joint

28  venture, the parties formed a separate limited liability company in which Pinnacle affiliates are

                                      1
                                 COMPLAINT
CHI 61,249,498v2

1    minority partners and Clark affiliates are majority partners.  The rights, duties and obligations of the

2    members and managers of each limited liability company are set forth in written operating

3    agreements.  The operating agreements create a 50-year, long-term partnership between Clark and

4    Pinnacle to own and operate privatized housing projects at several U.S. military installations in

5    California.

6         2.        The parties agreed that, through their limited liability companies, they would share

7    equity and ownership interests in the California military housing projects.  They also agreed to

8    provide services to the projects jointly owned by their limited liability companies.  Clark affiliates

9    would provide development, construction and asset management services for the projects.  Pinnacle

10   affiliates would provide property management services -- primarily leasing and maintenance services

11   -- to the projects.

12        3.        At issue in this action are the parties' projects at Moffett Field in Santa Clara County;

13   Parks Reserve Forces Training Area in Alameda County; the Presidio of Monterey, Fort Ord, the

14   Naval Postgraduate School and La Mesa Village in Monterey County; and Fort Irwin National

15   Training Center in San Bernardino County.  Pinnacle's affiliates provide property management

16   services to approximately 5,675 military housing units at these installations.

17        4.        Sometime before 2009, Clark determined it no longer wished to partner with Pinnacle

18   on future privatized residential housing projects.  During 2009, Clark also decided that it no longer

19   wanted to be Pinnacle's partner at the privatized residential housing projects previously awarded to

20   the Clark Pinnacle joint venture.  Since approximately October 2009, Clark has engaged in a hostile

21   campaign of audits and compliance investigations aimed in part at developing grounds to extinguish

22   Pinnacle's interests in the California military housing projects through litigation.  Pinnacle brings this

23   lawsuit to protect its rights as a minority partner in the parties' California projects and to stop Clark's

24   abusive and disloyal conduct.

## PARTIES AND INTERESTED NON-PARTIES

### *Monterey Bay Military Housing Entities*

27        5.        Non-party Monterey Bay Military Housing, LLC ("MBMH") is a limited liability

28   company the parties formed to own and operate their military housing projects at the Presidio of

1   Monterey, Fort Ord, Naval Postgraduate School and La Mesa Village in Monterey County.  MBMH

2   is a joint venture between Clark, Pinnacle and the Army.  Clark and Pinnacle, together, own 51% of

3   MBMH.  The Army owns 49% of MBMH.

4         6.     Non-party Clark Pinnacle Monterey Bay, LLC ("Clark Pinnacle Monterey") is a

5   Delaware limited liability company with its registered office in Bethesda, Maryland.  Clark Pinnacle

6   Monterey is a joint venture between Clark and Pinnacle set up to manage and operate the parties'

7   MBMH project.  Clark Pinnacle Monterey is the "Manager" and 51% majority member of the

8   parties' MBMH project.  Clark Pinnacle Monterey is 70% owned by a Clark affiliate and 30% owned

9   by a Pinnacle affiliate.

10         7.     Plaintiff Pinnacle Monterey, LLC ("Pinnacle Monterey") is a Washington limited

11   liability company with its principal office in Seattle, Washington.  Pinnacle Monterey is the

12   "Pinnacle Manager" and a 30% member of Clark Pinnacle Monterey.  Through its 30% interest in

13   Clark Pinnacle Monterey, Pinnacle Monterey owns 15.3% of the parties' MBMH project.

14         8.     Non-party Clark Monterey Presidio, LLC ("Clark Monterey") is a Delaware limited

15   liability company with its principal office in Bethesda, Maryland.  Clark Monterey is the 70%

16   member of Clark Pinnacle Monterey.  Through its 70% interest in Clark Pinnacle Monterey, Clark

17   Monterey owns 35.7% of the parties' MBMH project.

18         9.     The true names and/or capacities, whether individual, corporate, associate or otherwise

19   of Defendants DOES 1 through 25 are unknown to Plaintiff at this time, who therefore sue said

20   Defendants by such fictitious names under Code Civ. Proc. Section 474.  When the true name and

21   capacities of these Defendants have been ascertained, Plaintiff will seek leave of this Court to amend

22   this Complaint accordingly.  Plaintiff is informed and believes and thereon alleges that at all times

23   mentioned herein Defendants, and each of them, are the agents, servants, employees and/or joint

24   venturers of their co-cross-defendants, and were acting within the scope, course and authority of that

25   agency, employment, corporate capacity and/or joint venture and that each and every Defendant

26   aforesaid, when acting as a principal, was negligent and reckless in selection and hiring of each and

27   every other Defendant as an agent, servant, employee, corporate officer, and/or joint venturer, and

28   that each and every Defendant ratified the acts of  their co-defendants

CHI 61,249,498v2

*California Military Communities Entities*

10.     Non-party California Military Communities, LLC ("CMC") is a limited liability company the parties formed to own and operate their military housing projects at Moffett Field in Santa Clara County, Fort Irwin in San Bernadino County, and Parks Reserve Forces Training Area in Alameda County.  CMC is a joint venture between Clark, Pinnacle and the Army.   Clark and Pinnacle, together, own 51% of CMC.  The Army owns 49% of CMC.

11.     Non-party Clark Pinnacle California Military Communities, LLC ("Clark Pinnacle CMC") is a Delaware limited liability company with its registered office in Bethesda, Maryland. Clark Pinnacle CMC is a joint venture between Clark and Pinnacle set up to manage and operate the parties' CMC project.  Clark Pinnacle CMC is the "Manager" and 51% majority member of CMC. Clark Pinnacle CMC is 70% owned by a Clark affiliate and 30% owned by a Pinnacle affiliate.

12.     Plaintiff Pinnacle Irwin, LLC ("Pinnacle Irwin") is a Washington limited liability company with its principal office in Seattle, Washington.  Pinnacle Irwin is the "Pinnacle Manager" and a 30% member of Clark Pinnacle CMC.  Through its 30% interest in Clark Pinnacle CMC, Pinnacle Irwin owns 15.3% of the parties' CMC project.

13.     Non-party Clark Irwin, LLC ("Clark Irwin") is a Delaware limited liability company with its principal office in Bethesda, Maryland.  Clark Irwin is a 70% member of Clark Pinnacle CMC.  Through its 70% interest in Clark Pinnacle CMC, Clark Irwin owns 35.7% of the parties' CMC project.

*Entities Common to All California Military Housing Projects*

14.     Non-party American Management Services, LLC ("AMS"), d/b/a Pinnacle, is a Washington limited liability company with its principal office in Seattle, Washington.  AMS is one of the largest residential property managers in the United States.  It performs property management services for the parties' MBMH and CMC military housing projects.

15.     Non-party American Management Services California, Inc. ("AMS West") is a Washington corporation with its principal office in Seattle, Washington.  It is a signatory to property management agreements with the parties' MBMH and CMC military housing projects.

16.     Defendant Clark Realty Capital, L.L.C. ("Clark Realty") is a Delaware limited liability company with its principal office in Bethesda Maryland.  Clark Realty is the "Clark Manager" of Clark Pinnacle CMC and Clark Pinnacle Monterey.  As such, at all times, Clark Realty exercised functional control over Clark Pinnacle CMC and Clark Pinnacle Monterey.  By virtue of those entities' roles as managers and 51% owners of CMC and MBMH, respectively, Clark Realty also exercised functional control over MBMH and CMC as well.

### JURISDICTION AND VENUE

17.     This Court has jurisdiction over the defendant, Clark Realty Capital.  Clark Realty is engaged in business in California, and has breached its duties and obligation under the parties' Operating Agreements in this state, as alleged herein.

18.     Venue is proper in this Court pursuant to Cal. Civ. Pro. Code §395(a) because the Operating Agreement between the parties was to be performed in Santa Clara County.

### FACTS

#### *Privatization of U.S. Military Housing*

19.     In the 1990s, the U.S. Department of Defense ("DOD") determined that much of the nation's military housing was inadequate.  DOD determined that it would take 30 or more years and cost over $20 billion dollars if the military attempted to fix these problems itself.  As a result, Congress passed the National Defense Authorization Act of 1996, P.L. 104-106, §2801, to privatize U.S. military housing.  Congress found that private contractors could achieve better living conditions for the men and women of the armed services at a lower cost than the military.

20.     Over the following decade, branches of the U.S. armed services slated numerous military housing projects around the country for privatization.  Qualified firms were allowed to respond to "requests for proposal."  The winning bidder was awarded contracts for development, construction, asset management, property management and other services necessary to operate a large-scale housing development.  Typically, the military retained title to the land, and the project owners held rights to own and operate the housing projects under a 50-year ground lease.

21.     Against this backdrop, in 2001, Clark Realty and AMS, d/b/a Pinnacle, formed a joint venture to bid for military housing privatization projects.  Clark Realty is affiliated with Clark

1 | Construction, the nation's largest privately held general building contractor.  Pinnacle is one of the
2 | nation's largest property management firms.

3 | 22. Clark and Pinnacle called their joint venture "Clark Pinnacle" and used this name in
4 | their presentations to the military and in the marketplace.  The joint venture had its own "Clark
5 | Pinnacle" website, which touted the joint venture's capabilities and projects.

6 | 23. Between 2001 and 2004, Clark Pinnacle submitted proposals and won several large
7 | privatization projects at U.S. Army installations.  The parties' projects in California are at Fort Irwin,
8 | Parks Reserve Training Grounds and Moffett Field; and at the Presidio of Monterey, Fort Ord, the
9 | Naval Postgraduate School and La Mesa Village in Monterey County.  Clark Pinnacle also won
10 | privatization projects at Fort Belvoir, Virginia and Fort Benning, Georgia.

11 | *Pinnacle's Financial Interests in the Parties' California Projects*

12 | 24. When Clark and Pinnacle won the California Military Communities project (Fort
13 | Irwin, Moffett Field and Parks), they formed Clark Pinnacle CMC.  Clark Irwin owns 70% and
14 | Pinnacle Irwin owns 30% of Clark Pinnacle CMC.  Clark Realty is the Clark Manager and Pinnacle
15 | Irwin is the Pinnacle Manager of Clark Pinnacle CMC.  In turn, Clark Pinnacle CMC is the manager
16 | of Fort Irwin Land LLC, which is the Lessee of 50-year ground leases for Fort Irwin, Moffett Field
17 | and Parks. Clark Pinnacle CMC is also the manager of CMC, which is the "owner" entity (i.e., the
18 | sub-lessee under the ground lease) the parties set up to own and operate their military housing
19 | projects at Fort Irwin, Moffett Field and Parks.

20 | 25. Similarly, when Clark and Pinnacle won the Monterey Bay Military Communities
21 | project (Presidio of Monterey, Fort Ord, Naval Postgraduate School and La Mesa Village), they
22 | formed Clark Pinnacle Monterey.  Clark Monterey owns 70% and Pinnacle Monterey owns 30% of
23 | Clark Pinnacle Monterey.  Clark Realty is the Clark Manager and Pinnacle Irwin is the Pinnacle
24 | Manager of Clark Pinnacle Monterey.  In turn, Clark Pinnacle CMC is the manager of Monterey Bay
25 | Land LLC, which is the Lessee of the 50-year ground leases for Presidio, Ord, Naval Postgraduate
26 | and La Mesa.  Clark Pinnacle Monterey is also the manager of MBMH, which is the "owner" entity
27 | (i.e., the sub-lessee under the ground lease) the parties set up to own and operate their military
28 | housing projects at Presidio, Ord, Naval Postgraduate and La Mesa.

COMPLAINT

26.     To sum up Pinnacle's equity interests in the California military housing projects, Pinnacle Irwin owns 30% of Clark Pinnacle CMC and, derivatively through Clark Pinnacle CMC, has a 15.3% interest in CMC (i.e. 30% of 51% of CMC).  Pinnacle Monterey owns 30% of Clark Pinnacle Monterey and, derivatively through Clark Pinnacle Monterey, has a 15.3% interest in MBMH (i.e. 30% of 51% of MBMH).

27.     Pinnacle and Clark expected to earn a return on their California joint venture projects in several ways.  First, as holders of an equity interest in CMC and MBMH, to the extent that CMC and MBMH generate "Distributable Cash Flows" as defined under the projects' operating agreements, Clark Pinnacle CMC and Clark Pinnacle Monterey may receive cash distributions, and Pinnacle and Clark will receive their proportionate shares.

28.     In addition, Clark earned returns through fees to its affiliates under development, construction and asset management service agreements with MBMH and CMC.  Likewise, Pinnacle earned returns through fees to its affiliate under 50-year property management contracts with MBMH and CMC.  Pinnacle's fees under its property management agreements were an important part of the consideration agreed to under the parties' joint venture.

29.     Organizational charts of the parties' joint venture projects for the California Military Communities projects (CMC) and the Monterey Bay Military Communities projects (MBMH) are attached as Exhibit 1 and incorporated by reference.

### Clark's Duties As Manager and Majority Partner

30.     The corporate structure just described places heightened duties on Clark Realty.  Clark Realty acts as the Clark Manager of Clark Pinnacle CMC and Clark Pinnacle Monterey under the Operating Agreements for those entities.  The Operating Agreements for CMC and MBMH, in turn, appoint Clark Pinnacle CMC and Clark Pinnacle Monterey, respectively, as managers of CMC and MBMH, and vests them with "complete and exclusive control of the management of the [owner LLC's] business and affairs."  Thus, at all relevant times, Clark Realty controlled both the Clark Pinnacle LLCs and the owner LLCs at the California projects.

31.     As the Clark Manager of Clark Pinnacle CMC and Clark Pinnacle Monterey, Clark Realty must exercise unbiased, good faith business judgment on behalf of the Clark Pinnacle LLCs as

7
COMPLAINT

1    entities.  Thus, any exercise of business judgment by the Clark Manager should benefit equally all the

2    Clark Pinnacle LLC stakeholders, and cannot be exercised to disadvantage Pinnacle, who is the

3    minority member of the Clark Pinnacle LLCs.

4        32.    Similarly, in directing Clark Pinnacle CMC's and Clark Pinnacle Monterey's actions

5    as managers of CMC and MBMH, Clark Realty must exercise unbiased, good faith business

6    judgment on behalf of CMC and MBMH as entities.  Thus, any exercise of business judgment by

7    Clark Realty as manager of CMC and MBMH should benefit equally all the CMC or MBMH

8    stakeholders - including the U.S. military and the Clark Pinnacle LLCs - and cannot be exercised to

9    disadvantage one of the stakeholders.

10              ***Clark's Campaign to Terminate Pinnacle's Minority Interests***

11       33.    Sometime after 2006, Clark determined it no longer wished to be a joint venture

12   partner with Pinnacle on new military privatization projects, and the parties began competing with

13   each other in responding to new requests for proposals from the military.  From Pinnacle's point of

14   view, this had no effect on the parties' partnership in their existing projects, including the parties'

15   MBMH and CMC projects in California.

16       34.    Clark, however, took a different view.  In summer of 2009, the parties' project at

17   Fort Benning, Georgia experienced a tragedy and scandal involving the alleged murder/suicide of a

18   high-level Clark employee and his wife.  Thereafter, various persons alleged that the work

19   environment at Fort Benning was hostile; that Pinnacle, Clark, and Army personnel had engaged in

20   inappropriate sexual relationships; and that Pinnacle employees violated its Code of Conduct.  In

21   August and September 2009, Pinnacle terminated its three senior managers at Fort Benning.

22       35.    Clark decided that these events created a pretext to attempt to terminate Pinnacle's

23   property management agreement at Fort Benning, and perhaps elsewhere.  At Clark's direction, the

24   "owner" entities of the parties' projects at Fort Benning and Fort Belvoir (known as "FBFC" and

25   "FBRC") engaged an independent consulting firm, Alix Partners ("Alix"), purportedly to audit

26   Pinnacle's performance of its property management agreements.  Alix is a national consulting firm

27   that provides forensic accounting, compliance investigation and litigation support services.  Clark

28

<div align="center">8</div>
<div align="center">COMPLAINT</div>

1    also caused FBFC and FBRC to retain an aggressive, nationally prominent litigation firm, Kirkland &

2    Ellis, to assist Alix in its investigation.

3            36.     In December 2009, Alix began making frequent, burdensome demands for information

4    about Pinnacle's operations at Fort Benning and Fort Belvoir.  In January 2010, Alix expanded its

5    requests to demand information about the parties' projects in California.  Although FBFC's and

6    FBRC's contractual audit rights were limited to seeking information about "accounts" managed by

7    Pinnacle during "normal business hours," Alix made broad, litigation-style demands for electronic

8    and other information unrelated to the projects' accounts, such as personal employee emails and

9    Pinnacle corporate information.  Alix also demanded interviews of Pinnacle employees, including

10   persons managing the parties' California projects.

11           37.     On May 20, 2010, Clark caused FBFC and FBRC to file a lawsuit against Pinnacle in

12   the Superior Court of Muscogee County, Georgia (the "Georgia litigation").  The Georgia litigation,

13   among other things, sought a declaratory judgment that Pinnacle's property management agreements

14   at Fort Benning and Fort Belvoir could be terminated for cause.

15           38.     Despite obvious conflicts of interest, Clark did not obtain the advice or opinion of an

16   independent advisor before hiring Alix and Kirkland to build a case for terminating Pinnacle's

17   property management agreements at the parties' joint venture projects.

18           39.     Clark, through the Alix partners audit, is continuing to gather information related to

19   the parties' joint venture projects in California.  Clark's goal is to build a pretextual case for

20   terminating Pinnacle's 50-year property management agreements in California, and to misappropriate

21   Pinnacle's equity interests in the California joint venture projects.

22           40.     Because of Clark's actions directing the Georgia litigation and the Alix audit, Clark

23   has demonstrated its belief that it does not owe Pinnacle any fiduciary duties or even basic duties of

24   loyalty, good faith and fair dealing at the parties' joint venture projects in California.

25                          ***Pinnacle's Rights As Minority Partner***

26           41.     On account of Clark's hostile actions towards Pinnacle in conducting the Alix audit

27   and the Georgia litigation, Pinnacle has tried to take steps to protect its minority interests in the

28   parties' California projects.  These steps involved two kinds of rights granted to Pinnacle under the

CHI 61,249,498v2

projects' operating agreements:  (i) the right to audit the books and records of the projects; and (ii) the right to "adjust" the terms of the property management agreements under which Pinnacle's affiliates perform property management services at the California projects.

42.     Under the projects' operating agreements, Pinnacle has the right to inspect the books and records of Clark Pinnacle CMC and Clark Pinnacle Monterey, and to appoint an independent auditor to review those entities' actions as Managers of CMC and MBMH.  Specifically, Section 3.11 of the Operating Agreements for Clark Pinnacle CMC and Clark Pinnacle Monterey provides: "The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager."  Copies of the Operating Agreements for Clark Pinnacle CMC and Clark Pinnacle Monterey are attached as Exhibits 2 and 3, respectively, and incorporated by reference.

43.     The operating agreements define "the Company" as Clark Pinnacle CMC and Clark Pinnacle Monterey, respectively.  The operating agreements further provide that the "business and purpose" of each "Company" is to act as the "Managing Member" of CMC and MBMH, respectively. Thus, the operating agreements for Clark Pinnacle CMC and Clark Pinnacle Monterey allow Pinnacle the right to inspect the books and records of, and appoint an independent auditor to review, Clark's actions as the Managing Member of CMC and MBMH.

44.     On July 2, 2010, Pinnacle Irwin and Pinnacle Monterey wrote a letter to Clark stating that they "intend[ed] to review and inspect the records of" Clark Pinnacle CMC and Clark Pinnacle Monterey.  The letter advised that "we will commence this review at approximately 10:00 a.m on July 7, 2010 at the offices of Clark Realty Capital in Arlington, Virginia."

45.     Clark responded to these letters by emailing a limited set of documents for each project consisting of the operating agreements, the LLC formation agreements and the LLC tax returns.  Clark refused to grant Pinnacle any broader, on-site access to the books and records of Clark Pinnacle CMC or Clark Pinnacle Monterey.  Clark's response was insufficient to satisfy Pinnacle's rights under the operating agreements, and a breach of Clark's duties as Manager.

46.     The operating agreements for Clark Pinnacle CMC and Clark Pinnacle Monterey also grant to Pinnacle the right to "adjust" the property management agreements at each project.  Section 3.1(b)(2) of the operating agreements explains that, for all matters save "Major Decisions," the Clark Manager has sole authority.  However, for "Major Decisions," "the vote or signature of all the Managers" is required.  The agreement defines "Major Decisions" to include "Adjustments to the terms or conditions of the Property Management Agreement[.]"  Section 3.13(c) of the operating agreements further provides that "if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreement … any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion."

47.     The foregoing clause provides that if a dispute arises between Clark and Pinnacle over proposed adjustments to the property management agreements at the California projects, and the parties cannot resolve that dispute, then Pinnacle may adjust the terms of the property management agreements without Clark's consent.

### *Pinnacle Exercises Its Right to Adjust the Property Management Agreements*

48.     On or about May 13, 2011, Pinnacle Monterey and Pinnacle Irwin both informed Clark Realty that they were voting to adjust Section 18.1(C)(4) of the Property Management Agreement for the CMC project and Section 18.1(C)(6) of the Property Management Agreement for the MBMH project as to read as follows:

> [(4) or (6)]     "theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Copies of the May 13, 2011 letters from Pinnacle Irwin to Clark Realty and from Pinnacle Monterey to Clark Realty are attached as Exhibits 4 and 5, respectively, and are incorporated by reference.

49.     Instead of casting its vote or giving its consent, as the May 13, 2011 letters had requested, on or about May 19, 2011, Clark responded by questioning Pinnacle's motives for proposing adjustments to the property management agreements, demanding "full and detailed response[s]" to ten questions within four days, or May 23, 2011.  While some of Clark's questions concerned the actual proposed adjustments, approximately half of the questions were designed to elicit information regarding presumed misconduct conduct by Pinnacle, asking Pinnacle to, for example, "[d]escribe in detail (including names and dates) any potential fraud, theft or intentional misconduct" by a Pinnacle employee or person acting on behalf of Pinnacle at either the Irwin or Monterey Projects and "[f]or any such instance of potential fraud, theft or intentional misconduct, how [it may] have harmed the Project," as well as what steps Pinnacle had taken or intended to take "to remedy any instances of fraud, theft or intentional misconduct at the Project."  A copy of the May 19, 2011 letter from Clark Realty to Pinnacle is attached as Exhibit 6 and is incorporated by reference.

50.     In response, Pinnacle Monterey and Pinnacle Irwin explained that they had "no information about any events of fraud, theft or misconduct at Irwin or Monterey that would be cause to terminate the PMAs [Property Management Agreements] at those projects."  Rather, the proposed adjustments were focused on "keep[ing] Monterey and Irwin focused on the goal of our partnership at those projects - providing excellent housing communities for the members of the Armed Services who live at our California projects" instead of being "drawn into a conflict like that involving our partnership's eastern military housing projects (Belvoir and Benning)."  Specifically, Pinnacle explained that Pinnacle, Clark and the Army are partners who "owe each other the duties and obligations of partners in connection with the Irwin and Monterey projects" under California law, and the proposed adjustments "will enable [] Pinnacle to participate, as a partner of both Clark and the Army, in responding to acts of fraud, theft and misconduct, either alleged or confirmed, committed by Pinnacle employees" while "eliminat[ing] an ambiguity in the PMAs and prevent[ing] Clark form using that ambiguity to deploy an audit and litigation strategy designed to eliminate Pinnacle's ownership interests in the projects."  A copy of the response letter from Pinnacle Monterey and Pinnacle Irwin to Clark Realty is attached as Exhibit 7 and is incorporated by reference.

CHI 61,249,498v2

51.     In an attempt to further discussions between the parties, Pinnacle closed its correspondence by proposing a face-to-face meeting with Clark that would include the Army, since the Army is also Clark and Pinnacle's partner.

52.     On June 3, 2011, dissatisfied with Pinnacle's May 23, 2011 response, Clark rejected Pinnacle's request for a face-to-face meeting on the grounds that it would not "be productive until we have received written responses to our questions." In addition, Clark conditioned meeting with Pinnacle regarding the California issues on Pinnacle's "withdrawal, with prejudice, [of] the claims made in Virginia against" certain Clark executives, including W. Cleveland Johnson, Clark's Manager and the author of all of Clark's correspondence regarding Pinnacle's attempt to exercise its rights to adjust the California PMAs. A copy of the June 3, 2011 letter from Clark Realty to Pinnacle is attached as Exhibit 8 and is incorporated by reference.

53.     Pinnacle's June 8, 2011, response reiterated that "Pinnacle is not aware of incidents of fraud, theft or intentional misconduct at" the Monterey or CMC projects and that Clark's preconditioning a meeting about the California projects on obtaining personal benefits to Clark executives was improper given that Clark's job as Manager is to look out for the best interests of the projects, not its own. Pinnacle further noted that "[v]oting on adjustments to the terms and conditions of the PMAs is one of the few powers granted to the Pinnacle Manager under the Clark Pinnacle Monterey LLC and Clark Pinnacle California Military Communities Operating Agreements" and that "a 'deadlock' in 'voting between the Managers with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreements' is the only situation under the Operating Agreements where the Pinnacle Manager has the power, in its 'sole discretion,' to determine a deadlock or dispute." A copy of the June 8, 2011 letter from Pinnacle to Clark Realty is attached as Exhibit 9 and is incorporated by reference.

54.     Given that Pinnacle had proposed adjustments to the Monterey and CMC PMA's over three weeks prior, "explain[ing], candidly and clearly, why we thought the adjustments were necessary and in the best interests of the project," but Clark still "refused to vote on the proposed adjustments, and refused to even meet to discuss them," pursuant to Section 3.13(c) of the Operating Agreements of Clark Pinnacle CMC and Clark Pinnacle Monterey, Pinnacle declared a "Deadlock"

regarding the adjustments proposed in its May 13, 2011 letters.  Notwithstanding its declaration of a deadlock, Pinnacle once again invited Clark's managers to a face to face meeting where the parties could attempt to resolve the deadlock.  Pinnacle notified Clark that "[a]bsent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011, pursuant to the terms of the Operating Agreement."

55.     On June 14, 2011, Clark asserted that Pinnacle could not declare a "deadlock" because the Managers had not voted on the adjustments and demanded that "Pinnacle immediately retract its statement that 'absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011' and confirm that Pinnacle will take no steps to alter the provisions of the Irwin and Monterey PMAs until you have responded in full to our questions in writing and until a vote has occurred."  Clark threatened "to take all necessary actions to protect the Projects" if it did not "have this assurance by 12:00 Eastern Standard Time on Wednesday, June 15."  A copy of the June 14, 2011 letter from Clark Realty to Pinnacle is attached as Exhibit 10 and is incorporated by reference.

56.     On June 15, 2011, Pinnacle responded by reiterating its position that, pursuant to Section 3.13(c) of the Operating Agreements, there remains a "deadlock," rejecting the assertions made by Clark Realty.   A copy of the June 15, 2011 letter from Pinnacle to Clark Realty is attached as Exhibit 11 and is incorporated by reference.

57.     As set forth above, Pinnacle Monterey and Pinnacle Irwin have exercised their rights under the Operating Agreements to propose adjustments to the terms and conditions of the property management agreements at Irwin and Monterey.  Pinnacle Monterey and Pinnacle Irwin, as the Pinnacle Managers under the Operating Agreements have cast their vote in favor of the proposed adjustments and have sought the vote or signed consent of the Clark Manager, Clark Realty.  Further, as a result of Clark's refusal to either vote or give its consent despite reasonable efforts to meet to discuss the proposed adjustments, Pinnacle Monterey and Pinnacle Irwin have properly declared a deadlock under the terms of the parties Operating Agreements. Finally, because 7 days have elapsed since Pinnacle Monterey and Pinnacle Irwin declared the deadlocks, Pinnacle Monterey and Pinnacle Irwin are authorized to determine the deadlock or dispute in their "sole discretion."

58.     In light of the clear controversy between Clark and Pinnacle, Pinnacle has filed the instant lawsuit to force Clark to allow Pinnacle to exercise its rights under the projects' operating agreements, and to protect Pinnacle's interests as a minority partner and member in the parties' California projects.

<div align="center">

**FIRST CAUSE OF ACTION**

**Declaratory Judgment - Pinnacle's Right to Adjust
Property Management Agreements at California Projects**

</div>

59.     The allegations of paragraphs 1 through 58 hereof are incorporated herein by reference.

60.     Pursuant to Cal. Civ. Pro. Code § 1060, any person interested under a under a contract, or who desires a declaration of his or her rights or duties with respect to another, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties, including a determination of any question of construction or validity arising under the instrument or contract.

61.     Plaintiffs seek declaratory relief herein regarding the meaning of, and obligations under, the Operating Agreements of Clark Pinnacle CMC and Clark Pinnacle Monterey, and such a declaration impacts the conduct and obligations of all Plaintiffs and the Defendant.

62.     Section 3.1(b) of the Operating Agreements of Clark Pinnacle CMC and Clark Pinnacle Monterey provides that Pinnacle Irwin and Pinnacle Monterey, as Pinnacle Managers, have the right to vote on "Major Decisions." Such "Major Decisions" include, but are not limited to, "Adjustments to the terms or conditions of the Property Management Agreement" under which Pinnacle's affiliates provide property management services to the California Military Communities (CMC) and Monterey Bay Military Housing (MBMH) projects.

63.     Section 3.13(c) of the Operating Agreements of Clark Pinnacle CMC and Clark Pinnacle Monterey further provides that "if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreement … any such deadlock or dispute shall be determined by the

1    Pinnacle Manager in its sole discretion."

2         64.    On or about May 13, 2011, Pinnacle informed Clark that it was voting to adjust

3    Section 18.1(C)(4) of the Property Management Agreement for the CMC project and Section

4    18.1(C)(6) of the Property Management Agreement for the MBMH project as to read as follows:

5         [(4) or (6)]    "theft, fraud, or other knowing or intentional misconduct by
              Manager or its employees or agents having a material adverse affect on the
6             Owners; provided, however, (1) if the Manager takes appropriate measures to
              correct, and otherwise prevent the recurrence of any such events of default and
7             (2) the Manager remedies any confirmed event of default within 15 days of
              learning of such default (to the extent that such default is susceptible of being
8             cured), then such acts shall be deemed not to have a material adverse affect and
              the Property Management Agreement shall not be terminated."
9

10        65.    On or about June 8 , 2011, given that over three weeks had passed since Pinnacle first

11   proposed the May 13, 2011 adjustments and Clark still refused to vote on the proposed adjustments

12   or even to meet to discuss them, pursuant to Section 3.13(c) of the Operating Agreements of Clark

13   Pinnacle CMC and Clark Pinnacle Monterey, Pinnacle Irwin and Pinnacle Monterey declared a

14   "Deadlock" regarding the May 13, 2011 proposed adjustments.

15        66.    On or about June 14, 2011, Clark asserted that Pinnacle could not declare a

16   "deadlock" because the Managers had not voted on the adjustments and demanded that "Pinnacle

17   immediately retract its statement that 'absent a meeting, Pinnacle's proposed adjustments shall

18   become effective on June 16, 2011' and confirm that Pinnacle will take no steps to alter the

19   provisions of the Irwin and Monterey PMAs until you have responded in full to our questions in

20   writing and until a vote has occurred."  Clark threatened "to take all necessary actions to protect the

21   Projects" if it did not "have this assurance by 12:00 Eastern Standard Time on Wednesday, June 15."

22        67.    As set forth above, Defendant has refused to acknowledge Pinnacle's adjustment

23   rights at the parties projects at Fort Belvoir, and dispute Pinnacle's adjustment rights as to the

24   California projects as well.

25        68.    By this cause of action, Plaintiffs seek a declaration and order that (i) Section 3.1(b)

26   affords Pinnacle Irwin and Pinnacle Monterey the right to propose, and vote on, adjustments to the

27   terms and conditions of the property management agreements at the California projects; (ii) that

28   Clark Realty, as Clark Manager, must either vote on or consent to any such proposed adjustments;

1    (iii) the Clark Manager's refusal to either vote on or consent to the proposed adjustments constitutes

2    "a deadlock in voting between the Managers … with respect to any matter arising under, relating to,

3    or affecting the terms and conditions of the Property Management Agreement[s]"; (iv) that Section

4    3.13(c) grants to Pinnacle Irwin and Pinnacle Monterey, as the Pinnacle Managers, the sole discretion

5    to determine any deadlock or dispute between themselves and the Clark Manager regarding the

6    prospective terms and conditions of the property management agreements at the California military

7    communities; and that (v) Section 18.1(C)(4) of the Property Management Agreement for the CMC

8    project and Section 18.1(C)(6) of the Property Management Agreement for the MBMH project have

9    in fact been adjusted to read as follows:

10
11
12      [(4) or (6)]     "theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

13
14

15      WHEREFORE,

16      Plaintiffs request that this court:

17      (a)     declare the rights and obligations of the parties pursuant to the first cause of action;

18      (b)     to award Plaintiffs their attorneys fees pursuant to contract or applicable law;

19      (c)     to award Plaintiffs their costs and expenses of this action; and

20      (d)     to grant Plaintiffs other and further relief as the Court deems just and proper.

21

22   Dated: June 15, 2011            GREENBERG TRAURIG, LLP

23

24

25                      By: _____
                       Alice Chu

26                 Attorneys for Plaintiffs
                PINNACLE IRWIN LLC AND

27                 PINNACLE MONTEREY LLC

28

COMPLAINT

EXHIBIT 1



# Monterey Bay Project Structure

# Fort Irwin, Moffett Field and Parks Project Structure



**EXHIBIT 2**

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

## OPERATING AGREEMENT
### OF
## CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

NGEDOCS :016600.0504 985953.3

# TABLE OF CONTENTS

ARTICLE I      ORGANIZATIONAL MATTERS ................................................. 1

   1.1    Formation of Company ............................................................. 1

   1.2    Name .......................................................................................... 1

   1.3    Principal Office and Registered Agent ................................ 1

   1.4    Certificate of Formation ......................................................... 2

   1.5    Purpose ...................................................................................... 2

ARTICLE II     MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION
             OF PROFITS AND LOSSES ................................................... 2

   2.1    Members; Percentage Interests ............................................ 2

   2.2    Initial Capital Contributions ................................................. 3

   2.3    Additional Capital Contributions ....................................... 3

   2.4    Capital Accounts ..................................................................... 5

   2.5    Interest on Capital Contributions; Return of Capital Contributions .............. 6

   2.6    Loans .......................................................................................... 6

   2.7    No Preemptive Rights ............................................................ 7

   2.8    Cash Distributions .................................................................. 7

   2.9    Allocation of Income, Gain, Loss and Deduction ........... 9

ARTICLE III     MANAGEMENT AND RIGHTS OF MEMBERS ................. 12

   3.1    Management by Managers; Rights of Members ............... 12

   3.2    Third Party Reliance .............................................................. 14

   3.3    No Duty to Consult ............................................................... 14

   3.4    Outside Activities of Managers .......................................... 14

   3.5    Intentionally Deleted ............................................................ 14

   3.6    Reimbursement ....................................................................... 14

   3.7    Managers and Affiliates Dealing with the Company ...... 15

   3.8    Indemnification of Managers .............................................. 15

   3.9    Company Meetings ................................................................. 15

   3.10   Guarantees of Financing. ...................................................... 15

   3.11   Books and Records ................................................................. 15

   3.12   Bank Accounts ........................................................................ 15

   3.13   Deadlock .................................................................................. 16

3.14    Power of Attorney.................................................................................
3.15    Services........................................................................................... 16
ARTICLE IV       TRANSFER OF MEMBERSHIP INTERESTS............................ 17
4.1     Transfers; Treatment of Assignees; Substituted Members......................... 18
4.2     Death, Insanity or Incompetency, or Trust Termination of a Member............ 20
4.3     Bankruptcy of a Member ........................................................................ 21
4.4     Right to Effect Transfers....................................................................... 21
ARTICLE V       TERM; DISSOLUTION.................................................... 21
5.1     Term.................................................................................................. 22
5.2     Events Resulting in Dissolution............................................................. 22
5.3     Conclusion of Affairs............................................................................ 22
5.4     Order of Priority in Liquidation.............................................................. 22
5.5     Termination......................................................................................... 22
5.6     Transferring Member Obligations............................................................ 23
ARTICLE VI      DEFAULT; REMEDIES..................................................... 23
6.1     Event of Default.................................................................................... 23
6.2     Remedy for Event of Default.................................................................. 24
6.3     Obligations of Defaulting Member Continue............................................ 26
6.4     Setoff of Payments to Defaulting Member............................................... 26
ARTICLE VII     MISCELLANEOUS.......................................................... 26
7.1     Amendment.......................................................................................... 26
7.2     Notices............................................................................................... 26
7.3     Enforceability....................................................................................... 27
7.4     Binding Effect...................................................................................... 27
7.5     No Third Party Beneficiary Rights......................................................... 27
7.6     Limitation of Liability........................................................................... 27
7.7     Further Assurances............................................................................... 27
7.8     Prevailing Party.................................................................................... 28
7.9     CMC Operating Agreement and BL Operating Agreement ........................ 28
LIST OF EXHIBITS
EXHIBIT A - Percentage Interests

EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the 21st day of May, 2003 (the "**Effective Date**"), by and among the undersigned parties. Defined terms shall have the meanings given them in this Agreement and are capitalized in the text. Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

<u>WITNESSETH</u>

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle California Military Communities LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2     <u>Name</u>.

The name of the Company is **Clark Pinnacle California Military Communities LLC**. The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined). The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires. The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

### 1.3    Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is: c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention: Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members. The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate. The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

### 1.4    Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

### 1.5    Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort Irwin Land LLC ("IL"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Fort Irwin Land LLC (the "BL Operating Agreement") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort California Military Communities LLC ("CMC"), whose members shall be the Company and CMC Holdings LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of California Military Communities LLC (the "CMC Operating Agreement") to be entered into between the members thereof. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement. The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

### 2.1    Members; Percentage Interests.

(a)    The "Members" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof. The Members are divided into ownership groups (each a "Member Group"), as more particularly set forth on Exhibit A. For purposes hereof: (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "Clark Member," and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "Clark Group;" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "Pinnacle Member," and the

Members designated under the heading "Pinnacle" shall be herein referred to collectively as the **"Pinnacle Group."**

(b) Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on Exhibit A.

(c) The Percentage Interest of each Member shall be personal property for all purposes.

(d) All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2     Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the **"Initial Capital Contributions"**). The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

2.3     Additional Capital Contributions.

(a) During the period from the Effective Date hereof through the consummation of the financial closing (the **"Financial Closing"**) for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and IL (the **"Ground Lease"**), and in the IL Operating Agreement and CMC Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the **"Pre-Closing Costs"**). Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**). The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor. It is anticipated that the Company shall endeavor to get CMC and IL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company. Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b) The Company anticipates that, contemporaneously with the Financial Closing for the Project, IL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the IL Operating

3

Agreement and CMC Operating Agreement.   In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by CMC to secure performance of each Member's obligation to pay its pro rata share of the equity required by the CMC Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

          (c)     Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**").   Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions**." For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number by a percentage equal to the sum of (a) 60% of the percentage change in the Irwin CPI Index and (b) 40% of the percentage change in the Moffett/Parks CPI Index, in each case from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment.   Any number which is to be Adjusted by CPI in accordance with this Operating Agreement will be so adjusted effective on January 1, 2005, and on each January 1 thereafter based upon the adjusted number from the immediately preceding January 1. **Irwin CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, Los Angeles, Riverside, Orange County Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member using such other index as is then generally recognized and accepted for similar determinations of purchasing power.  **Moffett/Parks CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, San Francisco, Oakland, San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member

<div align="center">4</div>

using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager.  If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor.  If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below.  The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of Section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

(b)     For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)     Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)     Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

(3)     Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members. "**Unrealized Gain**" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date. "**Unrealized Loss**" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)     Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5     Interest on Capital Contributions; Return of Capital Contributions.

(a)     No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)     No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein. In no event shall a Member be entitled to demand or receive property other than cash. Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6     Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**"). Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above. Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s). If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests. Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member. No Member shall be required to make any loans to the Company.

2.7    No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8    Cash Distributions.

(a)    Net Cash Flow.

(1)    "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by:  (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2)    The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A)    First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds.  The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B)    Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests.  The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

7

(C)    Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members.  Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests.  The "**Interest Rate**" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D)    Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E)    Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

(F)    Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)    <u>Capital Proceeds</u>.

(1)    "**Capital Proceeds**" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the IL Operating Agreement or the CMC Operating Agreement.

(2)    Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)    First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)    Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)    Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is

NGEDOCS :016600.0504 985953.3

insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)    Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9    Allocation of Income, Gain, Loss and Deduction.

(a)    Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof.  The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain.  "**Minimum Gain**" means (a) with respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations. "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)    Income Tax Elections.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)    Income Tax Allocations.

(1)    For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with

9

section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution. In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

(2)     If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

(d)     Transfers during Fiscal Year. In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer. The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items. Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale. Similarly, extraordinary or nonrecurring items shall be allocated in accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

(e)     Amortization and Allocation of Organization and Start-up Expenses. The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

(f)     Special Capital Account "Book" Allocations to Comply with Section 704 Regulations. The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder. Such special allocations shall be made before any allocations under Section 2.9(a) above.

(g)     Tax Matters Member.

(1)     The Clark Member is hereby appointed to act as the tax matters member (the "TMM"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "IRS") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(2)     The TMM is authorized, but not required:

(A)     To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in Section 6231 of the Code) or a member of a "notice group" (as defined in Section 6223(b)(2) of the Code).

(B)     In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)     To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)     To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)     To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)     To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)     The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)     The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)     The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in

11

serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

## ARTICLE III
## MANAGEMENT AND RIGHTS OF MEMBERS

3.1     <u>Management by Managers; Rights of Members</u>.

(a)     <u>Manager Designation</u>.  The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member.  The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**").  The initial Manager appointed by the Pinnacle Group is Pinnacle Irwin LLC (the "**Pinnacle Manager**").  Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

(b)     <u>Power and Authority of the Managers</u>.

(1)     The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs.  The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

(2)     The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions.  The term "**Major Decisions**" shall mean any of the following:

(A)     Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

(B)     The Financial Closing and the terms and conditions thereof.

(C)     Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

(D)     Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

(E)     Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

(F)     Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

(G)     Amendment to the CMC Operating Agreement or the IL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

(H)     Termination or dissolution of the Company.

(c)     <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

(d)     <u>Rights and Votes of Members</u>.

(1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

(2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new

13

Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

3.2     Third Party Reliance.

Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

3.3     No Duty to Consult.

Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

3.4     Outside Activities of Managers.

The Members expressly recognize that:   (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5     Intentionally Deleted

3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

14

NGEDOCS :016600.0504 985953.3

3.7   <u>Managers and Affiliates Dealing with the Company.</u>

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8   <u>Indemnification of Managers.</u>

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9   <u>Company Meetings.</u>

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them. Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10   <u>Guarantees of Financing.</u>

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

3.11   <u>Books and Records.</u>

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

3.12   Bank Accounts.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

3.13   Deadlock.

(a)   If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "Deadlock Event") within a period of 30 days after receipt of written request for resolution (the "Resolution Period"), then the provisions of this Section shall apply. A Manager (the "Initiating Manager"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "Deadlock Notice") to the other Manager (the "Non-Initiating Manager"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "Panel"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

(b)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

NGEDOCS :016600.0504 985953.3

3.14 Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the CMC Operating Agreement and the IL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record: (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the CMC Operating Agreement or the IL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement. Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15 Services.

(a) The Members acknowledge and consent to the following:

(1) CMC shall enter into one or more developer services agreements (the "**Developer Services Agreements**") with CRC Irwin Planned Communities LLC ("**Developer**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the CMC Operating Agreement) (the "**Development Period**"). CMC may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "**Out-Year Developer Services Agreements**").

(2) CMC shall enter into one or more a construction contracts (the "**Construction Contracts**") with Clark Realty Builders, Inc. and The Clark Construction Group ("**Clark Contractors**"), Affiliates of he Clark Group, on or before the Effective Date for the provision of general contractor services. CMC may also enter into one or more construction management agreements with Clark Contractors on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the CMC **Operating** Agreement (the "**Out-Year Construction Management Agreements**").

(3) CMC shall enter into one or more property management agreements (the "**Property Management Agreements**" or the "**Pinnacle Member Service**

17

Contracts") with American Management Services California Inc. ("**Pinnacle Management**"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)   CMC shall enter into one or more asset management agreements (the "**Asset Management Agreements**") with Irwin Asset Manager LLC (the "**Asset Manager**") an Affiliate of the Clark Group, on or before the Effective Date for the provision of asset management services. For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "**Clark Member Service Contracts**." The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "**Service Contracts**" and, individually, as a "**Service Contract**."

(b)   In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc. The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

## ARTICLE IV
## TRANSFER OF MEMBERSHIP INTERESTS

4.1   Transfers; Treatment of Assignees; Substituted Members.

(a)   No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager. A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)   A "**Permitted Transferee**" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined). In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee." For purposes of this Agreement, "**Affiliate**" shall mean, as to any individual, partnership, corporation, trust or other entity ("**Person**"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person.

18

"**Control**" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)    No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)    Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)    If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below.  The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted.  An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)    If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company.  The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest.  All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein.  The fees and other costs of each of the first two appraisers shall

be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

(g)     In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

4.2     <u>Death, Insanity or Incompetency, or Trust Termination of a Member.</u>

(a)     In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

(b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests. Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company. The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the

20

Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

4.3     Bankruptcy of a Member.

(a)     In the event of the Bankruptcy (as herein defined) of a Member (the "**Bankrupt Member**"), then the Members other than the Bankrupt Member (the "**Continuing Members**"), pro rata, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

(b)     As used herein, the term "**Bankruptcy**" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "**Bankruptcy Code**"), an assignment for the benefit of creditors and/or an adjudication of insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

4.4     Right to Effect Transfers.

(a)     The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

(b)     In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

NGEDOCS :016600.0504 985953.3

# ARTICLE V
## TERM; DISSOLUTION

### 5.1   Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

### 5.2   Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an **"Event of Dissolution"**) (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):   (a) the unanimous written consent of the Managers; or (b) the dissolution of CMC or IL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or (d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the Commonwealth of California.

### 5.3   Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

### 5.4   Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

(a)   First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

(b)   Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

22

(c)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

5.5     Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.   Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

5.6     Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

## ARTICLE VI
## DEFAULT; REMEDIES

6.1     Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an "**Event of Default**":

(a)     A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

(b)     A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

(c)     A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

NGEDOCS :016600.0504 985953.3

(d)     A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)     The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)     If an Event of Default occurs with respect to a Member (a "**Defaulting Member**"), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the "**Non-Defaulting Manager**"):

(1)     If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)     Each Member who is not in default (a "**Non-Defaulting Member**") shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the "**Default Payment**"). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the "**Defaulting Manager**") within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a "**Default Loan**") and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A "**Default Interest Rate**" is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

24

(i)    To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the "**Dilution Fraction**"), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member.  In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)    In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)    If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)    If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

25

(b)    In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(c)    During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager.  In such event, the vote of the remaining Manager(s) shall be sufficient to make all decisions of the Company, including, without limitation, Major Decisions.

6.3    <u>Obligations of Defaulting Member Continue.</u>

Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

6.4    <u>Setoff of Payments to Defaulting Member.</u>

From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation, payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII
MISCELLANEOUS

7.1    <u>Amendment.</u>

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it

to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

7.2    Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

7.3    Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

7.4    Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of California.  This Agreement may be executed in counterparts.

7.5    No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

7.6    Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

NOEDOCS :016600.0504 985953.3

7.7     <u>Further Assurances</u>.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     <u>Prevailing Party</u>.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     <u>CMC Operating Agreement and BL Operating Agreement</u>.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:     Clark Realty Capital, L.L.C., Manager

      By:     _____
            W. Cleveland Johnson,
            Authorized Representative

By:     CEI Realty, Inc., Manager

      By:     _____
            Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:     _____
          Stanley J. Harrelson, Manager

28

### 7.7  Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

### 7.8  Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

### 7.9  CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:   Clark Realty Capital, L.L.C., Manager

By: _____
    W. Cleveland Johnson,
    Authorized Representative

By:   CEI Realty, Inc., Manager

By: _____
    Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By: _____
    Stanley J. Harrelson, Manager

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| **CLARK MEMBER:** | | |
| Clark Irwin LLC<br>7500 Old Georgetown Road, 15th Floor<br>Bethesda, MD 20814 | $700.00 | 70% |
| **PINNACLE MEMBER:** | | |
| Pinnacle Irwin LLC<br>2801 Alaskan Way, Suite 200<br>Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1ˢᵗ day of March, 2004, by and between CALIFORNIA MILITARY COMMUNITIES LLC, a Delaware limited liability company (hereinafter referred to as "OWNER"), and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

### PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Fort Irwin, Moffett Community Housing Area and Parks Reserve Forces Training Area and is located in San Bernardino County, California, Santa Clara County, California, and Alameda County, California, consisting of (i) the land (the "Land"), as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (the "Secretary"), as lessor, and Fort Irwin Land LLC, as lessee (the "Ground Lease"), as subleased pursuant to that certain Sublease and Lease of even date herewith by and between Fort Irwin Land LLC (as sublessor) and Owner (as sublessee) (the "Sublease"); and (ii) improvements ("Improvements") located on the Project and leased by Owner pursuant to the Sublease.

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1    APPOINTMENT AND ACCEPTANCE: Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the Project and improvements thereon owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, or Limited Liability Company Agreement of Owner or (b) any action which would cause Owner to be in default under the Sublease.

1.2    TERM: The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of March, 2004, subject to the other provisions of this Agreement.

1.3    MANAGEMENT OFFICE: Owner shall pay all reasonable expenses related to the management office maintained by the Manager, exclusively for the use thereof to conduct the business of the management of the Project, as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services. All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Owner shall give Manager prior written notice of any changes in such policies.

1.4    OMITTED

1.5    BUDGET AND BUSINESS PLAN: Owner and Manager will establish a budget and business plan for operation and management of the Project (the "Plan"). The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation. Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require Owner's advance approval, except as provided in Section 4.2 hereof. Owner agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance. The Plan shall include, at a minimum, the following:

A.    Minimum Leasing Guidelines established by Owner setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.    Capital Improvement Plan: Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed

NGEDOCS :016600.0504 973807.8

during Owner's and Manager's pre-acquisition inspection of the property (if applicable).  Manager shall be responsible for obtaining bids. coordinating and scheduling the work at the property.  A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25.000.

## SECTION 2

### BANK ACCOUNTS

2.1     BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project.  Operating trust accounts are hereinafter referred to as "operating accounts".  All other accounts are hereinafter referred to as "trust accounts".  Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by Owner.  All other funds shall be placed in an operating account for Owner.  All trust accounts shall be operated in conformance with state law.  Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts.  No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager.  All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government.  All such depository banks shall be selected by Manager and shall be satisfactory to Owner.  Manager shall not be liable to Owner in the event of bankruptcy or failure of a depository institution.  Manager shall open the above-described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by Owner.  Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2     REMITTANCES.  Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated March 1, 2004 ("Deed of Trust") between Owner and Fort Irwin Land LLC. the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income (defined below). casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3     INITIAL DEPOSIT FOR RESERVES:  Immediately upon commencement of this Agreement. Owner shall remit to Manager a sum to be deposited in Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement. plus an adequate contingency reserve.  Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of Owner under this Agreement as they become due.  Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4     MANAGER'S OBLIGATION TO ADVANCE PAYMENTS:  All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner.  All such purchases shall be made by Manager solely on behalf of Owner and not as a principal.  Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation.  In the event that there are insufficient funds in Owner's operating account. Manager may. after notifying Owner, advance its own funds for such purpose. in which event Owner shall promptly repay to Manager all such sums expended.

2.5     INTEREST ON TRUST ACCOUNTS:  Where permitted by law, and where feasible. Manager shall deposit trust funds into interest-bearing accounts at Owner's request.  All interest earned on such funds shall belong to Owner. except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2.6     OTHER.  Notwithstanding anything herein to the contrary. Manager shall not (i) commingle funds of Owner with its funds or the funds of any third party, (ii) hold itself out as Owner of the Project, (iii) guaranty or hold itself out as liable for any debts or obligations of Owner. (iv) hold Owner out as liable for Manager's debts or the debts of any third party. or (v) pay the Manager's non-reimbursable expenses or the expenses of any third party from Owner's funds.

## SECTION 3

### COLLECTION OF RENTS AND OTHER RECEIPTS

2

3.1    AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by Section 11.5 herein.

3.2    SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

## DISBURSEMENT FROM OPERATING ACCOUNTS

4.1    OPERATING EXPENSES: From Owner's operating account, and subject to Exhibit A, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Owner has sole responsibility for the timely payment of all authorized expenses of the Project, including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

4.2    EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of Owner. Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify Owner in detail, concerning such expenditures.

4.3    AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from Owner's operating account, in accordance with the Plan or as otherwise directed by Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges;  all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees.

4.4    EXPENSES TO BE PAID DIRECTLY BY OWNER: In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

4.5    FEES FOR LEGAL ADVICE: Owner shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owner, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this Section shall obligate Owner to pay Manager's legal fees in the event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.

4.6    NET PROCEEDS: To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to the Project to Owner at least monthly at a time specified by Owner. Such periodic cash payments shall be remitted to J.P. Morgan Trust Company, National Association, as escrow agent.

4.7    PRIORITY OF PAYMENT: Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall

3

NGEDOCS:016600.0504 973807.8