# Exhibit K

Part 1

1    WILLIAM J. GOINES (SBN: 61290)
    CINDY HAMILTON (SBN: 217951)
2    LINDSAY E. HUTNER (SBN: 238988)
    ALICE Y. CHU (SBN: 264990)
3    GREENBERG TRAURIG, LLP
    1900 University Avenue, Fifth Floor
4    East Palo Alto, California 94303
    Telephone: (650) 328-8500
5    Facsimile: (650) 328-8508

6    THOMAS E. DUTTON (Admitted *Pro Hac Vice*)
    DANIEL G. HILDEBRAND (Admitted *Pro Hac Vice*)
7    GREENBERG TRAURIG, LLP
    77 West Wacker Drive, Suite 3100
8    Chicago, IL 60601
    Telephone: 312-456-8400
9    Facsimile: 312-456-8435

10    Attorneys for Plaintiffs in M115143 / Defendants in M112710

11

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA

13             FOR THE COUNTY OF MONTEREY

14    MONTEREY BAY MILITARY HOUSING    Case No. M112710 (M115143)
    LLC, et al.,
15

16           Plaintiffs;

17    v.

18    PINNACLE MONTEREY LLC, et al.,

19           Defendants.

20    AMERICAN MANAGEMENT SERVICES
    CALIFORNIA INC. and AMERICAN
21    MANAGEMENT SERVICES LLC (d/b/a
    PINNACLE) ,
22

23           Cross-Complainants,
    v.
24

25    MONTEREY BAY MILITARY HOUSING
    LLC, CALIFORNIA MILITARY
26    COMMUNITIES LLC, and ROES 1-25,

27           Cross-Defendants.

28

**SECOND AMENDED CROSS-COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

FILED
OCT 2 4 2013
CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
_____ DEPUTY
CARMEN B. OROZCO

FILED BY FACSIMILE

---

SECOND AMENDED CROSS-COMPLAINT

Defendants and Cross-Complainants American Management Services California Inc. ("AMSC") and American Management Services LLC (d/b/a Pinnacle) ("AMS") file their Second Amended Cross-Complaint against Plaintiffs Monterey Bay Military Housing LLC ("MBMH") and California Military Communities LLC ("CMC") (collectively, "Plaintiffs") as follows:

## SUMMARY

1.    In 2001, AMS and Clark Realty Capital ("Clark Realty") formed a joint venture to pursue contracts to earn fees at privatized housing projects for the United States Armed Services. AMS is a nationwide property management company. Clark Realty is a nationwide real estate development company. AMS and Clark Realty named their military housing joint venture Clark Pinnacle Family Communities LLC, or "Clark Pinnacle" for short.

2.    Military privatized housing projects are not like traditional real estate projects. The partners cannot earn a return by selling the project when it is complete, because the underlying property belongs to the military. The economic motivation of the private firms who pursue such projects is to earn the fees that will be paid to them as developers, builders and managers under long-term service contracts. In the case of Clark Pinnacle Family Communities, the partners' shares in the venture – 70% Clark Realty and 30% AMS – were determined by estimating the fees each partner would earn in the event Clark Pinnacle won a military housing privatization project.

3.    At the outset of their joint venture, Clark Realty and AMS entered into an October 2001 term sheet that memorialized this arrangement. It provided that Clark Realty would supply development, construction and asset management services to the prospective projects, and that development fees "shall be paid entirely to Clark." It provided that AMS would supply property management services, and those fees "shall be paid entirely to Pinnacle." And it provided that equity, cash flow and working capital would be shared 70% by Clark Realty and 30% by AMS.

4.    Pursuant to the term sheet, and working together as Clark Pinnacle Family Communities, Clark Realty and AMS made over a dozen proposals to obtain long-term privatization contracts with the military. In their presentations to the military, Clark Realty and AMS explained their economic interests: "because this project is not a traditional real estate investment, and we do

not intend to profit from a disposition of the property, the ability to retain fees from both asset management and related third party service providers [is] Clark Pinnacle's most valuable asset."

5. In May 2003, Clark Pinnacle won approval of a large military housing privatization project at Monterey Presidio and Fort Ord in Monterey, California ("Monterey"). In October 2003, Clark Pinnacle won approval of a similar project at Fort Irwin, Moffett Field and Parks Training Area in California ("Irwin"). Clark Realty and AMS created plaintiffs MBMH and CMC to act as the owners of these military housing projects. Clark Realty and AMS created Clark Pinnacle Monterey and Clark Pinnacle California Military Communities to act as the managers of MBMH and CMC.

6. Consistent with the October 2001 term sheet, the Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle California Military Communities assigned the right to earn fees for development, construction and asset management services at the Monterey and Irwin projects to affiliates of Clark Realty. Likewise, the Operating Agreements assigned the right to earn property management fees to AMSC, an affiliate of AMS. The Operating Agreements gave AMS's managers, Pinnacle Monterey and Pinnacle Irwin, control over the property management agreements. Clark Realty could not transfer those agreements or adjust their terms and conditions without the Pinnacle managers' vote and consent. In the event of a dispute about such matters, as to the property management agreements, the Pinnacle managers had the deciding vote. The Operating Agreements also prohibited Clark Realty from attempting to obtain AMS's property management fees for itself.

7. In or about 2005, Clark Realty decided it no longer wanted to do business with AMS on the terms of the October 2001 term sheet. Going forward, Clark Realty wanted AMS to continue to help bid for new military projects. But Clark Realty wanted to be able to fire AMS without cause at any time, and to exclude AMS from any ownership interest in military housing projects that the parties obtained. AMS made clear that it was not interested in doing further projects on these terms.

8. Clark Realty then began to search for ways to get out of its 50-year agreements with AMS. Clark decided that it was in its financial interest to remove AMSC as property manager and take over its affiliates' share of the projects. Since approximately June 2010, Clark Realty has engaged in a hostile campaign of audits and compliance investigations aimed at developing grounds to extinguish AMS's interests in the Monterey and Irwin housing projects through litigation.

9.      In May 2011, Pinnacle Monterey and Pinnacle Irwin took steps to protect their interests in the Monterey and Irwin projects. Exercising their rights as "Pinnacle Manager" under the projects' Operating Agreements, they proposed adjustments to the terms of the property management agreements at both projects. The adjustments required Clark Realty to acknowledge AMSC's rights to notice and cure, concerning alleged acts of theft, fraud or other misconduct by AMSC's employees. Clark Realty opposed the adjustments. Pinnacle Monterey and Pinnacle Irwin declared a "deadlock" and then exercised their "sole" power to break the deadlock and enact the adjustments.

10.     In January 2012, Clark Realty escalated its campaign by causing MBMH and CMC to file an amended complaint in this matter. Plaintiffs claimed that as a result of unproven misconduct by a few Pinnacle employees, AMSC's property management agreements at Monterey and Irwin had automatically terminated. Plaintiffs sought this Court's approval to act unilaterally to terminate the project management agreements and revoke AMSC's agency pursuant to Civil Code section 2356. On December 26, 2012, this Court enjoined Plaintiffs from taking such action, and Plaintiffs appealed this order. Since 2011, Plaintiffs have also deprived AMSC of contractually earned compensation by refusing to process and authorize incentive fees mandated by the property management agreements.

11.     Clark Realty has acted out of greed and disloyalty in seeking to terminate AMSC as property manager and capture Pinnacle Monterey and Pinnacle Irwin's share of the projects. AMSC and its employees are loyal, hard-working and devoted to the success of the California privatization projects. But even if the Clark plaintiffs' allegations are true, the conduct did not cause material financial harm to the projects. AMSC is entitled to notice of the wrongdoing, and a chance to cure any defaults. AMS in turn stands ready and willing to refund any damages caused by its employees.

12.     Plaintiffs' attempted termination of AMSC violates the property management agreements as well as the joint venture and project Operating Agreements. It is wrongful, unfair and invalid. Pinnacle therefore seeks affirmation of AMSC's right to continue as property manager; damages for attempted wrongful termination; damages for refusing to process and authorize Pinnacle's incentive fees; and other claims and remedies as set forth below.

## PARTIES AND INTERESTED NON-PARTIES

13.   Clark Realty Capital LLC ("Clark Realty") is a Delaware limited liability company with its principal office in Arlington, Virginia.  Clark Realty is a defendant in the consolidated action filed by Pinnacle Monterey and Pinnacle Irwin.  It is a large nationwide real estate development company.  At all times, the Clark parties herein acted at the direction and control of Clark Realty.

14.   Plaintiff Monterey Bay Military Housing, LLC ("MBMH") is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture between Clark Realty, Pinnacle and the U.S. Army.

15.   Plaintiff Clark Pinnacle Monterey Bay LLC is a California limited liability company. On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture company that acts as manager and owner of plaintiff MBMH.

16.   Plaintiff Clark Monterey Presidio LLC is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia. It holds a 70% membership interest in plaintiff Clark Pinnacle Monterey Bay LLC.

17.   Plaintiff California Military Communities LLC ("CMC") is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture between Clark Realty, Pinnacle and the U.S. Army.

18.   Plaintiff Clark Pinnacle California Military Communities LLC is a California limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia. It is a joint venture company that acts as manager and owner of plaintiff CMC.

19.   Plaintiff Clark Irwin LLC is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It holds a 70% membership interest in plaintiff Clark Pinnacle California Military Communities LLC.

20.   Defendant American Management Services LLC, d/b/a Pinnacle, is a Washington limited liability company with its main office in Seattle, Washington.  Pinnacle is a national property management firm. It is a joint venture partner with Clark Realty in the Monterey and Fort Irwin projects, and it performs property management services at both projects.

21.     Defendant American Management Services California Inc. ("AMSC") is a Washington corporation with its main office in Seattle, Washington. It holds the property management agreements at the parties' military housing projects at Monterey and Fort Irwin.

22.     Defendant Pinnacle Monterey LLC is a Washington limited liability company with its main office in Seattle, Washington.  It holds a 30% membership interest in plaintiff Clark Pinnacle Monterey Bay LLC.

23.     Defendant Pinnacle Irwin LLC is a Washington limited liability company with its main office in Seattle, Washington. It holds a 30% membership interest in plaintiff Clark Pinnacle California Military Communities LLC.

24.     The true names and/or capacities, whether individual, corporate, associate or otherwise of Cross-Defendants ROES 1 through 25 are unknown to Cross-Complainants at this time, who therefore sue said Cross-Defendants by such fictitious names under Code Civ. Proc. Section 474. When the true names and capacities of said ROES are ascertained, Cross-Complainants will amend this pleading to insert such information.  Cross-Complainants allege on information and belief that each fictitiously named Cross-Defendant is legally responsible in some manner for the occurrences alleged herein and directly and proximately caused the harm alleged herein.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over these claims, and venue is appropriate in this Court, pursuant to Code Civ. Proc. Section 428.10.

## FACTS COMMON TO ALL COUNTS

### *The Clark-Pinnacle Joint Venture for Privatization of U.S. Military Housing*

26.     In the 1990s, the U.S. Department of Defense ("DOD") determined that much of the nation's military housing was inadequate.  DOD determined that it would take 30 or more years and cost over $20 billion dollars if the military attempted to fix these problems itself.  As a result, Congress passed the National Defense Authorization Act of 1996, P.L. 104-106, §2801, to privatize U.S. military housing.  Congress found that private contractors could achieve better living conditions for the men and women of the armed services at a lower cost than the military.

27.     In 2001, Clark Realty and AMS formed a joint venture to bid for long term contracts managing large military housing privatization projects.  The name of the joint venture was Clark Pinnacle Family Communities LLC, or "Clark Pinnacle" for short. The joint venture had its own "Clark Pinnacle" website, which touted the joint venture's capabilities and projects.

28.     The terms of the joint venture were memorialized in a term sheet dated October 22, 2001, described above.  The term sheet provided that Clark Realty would supply development, construction and asset management services to the prospective projects, and that development fees "shall be paid entirely to Clark."  It provided that AMS would supply property management services, and those fees "shall be paid entirely to Pinnacle."  Clark Realty's managing director has admitted that the parties agreed to share equity, cash flow and working capital 70-30 because they estimated that the fees for Clark Realty's portion of the projects (development, construction and asset management) would be approximately 70% of the total fees; and the fees for Pinnacle's portion (property management) would be approximately 30% of the total fees.

29.     Working together as Clark Pinnacle Family Communities LLC, Clark Realty and AMS went through an intensive and expensive submission process for each military privatization opportunity.   They assembled teams to visit the installation; prepared proposals and written statements of qualifications; and made day-long oral presentations to advocate their plan.  AMS was an integral part of this process.  Because the Army expressly required substantial experience in managing large residential projects, Clark Realty was not qualified to propose on its own.  It needed AMS as a partner in Clark Pinnacle Family Communities to submit qualifications and be considered for the projects.  Consistent with the October 2001 term sheet, AMS paid 30% and Clark paid 70% of all consulting fees and other costs associated with the pursuit of military privatization projects.

30.     The second stage proposals prepared by Clark Pinnacle for the Army made clear that the economic purpose of bidding for the projects was to earn fees under long term management services contracts:  "because this project is not a traditional real estate investment, and we do not intend to profit from the sale of property, the ability to retain fees from both asset management and related third party service providers is Clark Pinnacle's most valuable asset."

31.     Between 2001 and 2004, Clark Pinnacle Family Communities won the right to prepare Community Development and Management Plans, or "CDMPs," for large privatization projects at Monterey Bay in California ("Monterey"); at Fort Belvoir, Virginia; at Fort Irwin, Moffett and Parks in California ("Irwin"); and at Fort Benning, Georgia.   At each of these projects, the partners proceeded to implement what they agreed to in the term sheet. Clark Pinnacle Family Communities competed for over a dozen other military privatization projects, but was not awarded those projects.

32.     The CDMPs included site surveys; design, engineering and construction plans; and budgets and property management plans.   The CDMPs were the blueprint for each party's jobs and responsibilities.   Clark Realty and AMS invested significant time and money in the CDMPs.   The CDMPs were extensively negotiated with the Army, and had to be fully approved by the Army and Congress before the projects could begin.

33.     The CDMPs for the Monterey and Irwin projects included proposed operating and service agreements for multiple special purpose entities that would manage and operate the project. Consistent with the term sheet, these agreements provided that entities created by Clark Realty and Pinnacle would share equity ownership and cash flow 70%-30%; that Clark Realty's affiliates would be assigned the right to earn all fees for development, construction, and asset management services; and that Pinnacle's affiliate would be assigned the right to earn all the property management fees.

34.     Congress approved the CDMP for Monterey in May 2003, and for Irwin in October 2003.   Afterwards, Clark Realty, AMS and their bankers went out on "road shows" to obtain financing.   The project companies formed by Clark Pinnacle Family Communities formally took over management of housing at Monterey on October 1, 2003, and housing at Irwin on March 1, 2004.

35.     The Monterey and Irwin projects were 50-year projects.   At both projects, the United States Army leased land to joint venture companies under a 50-year ground lease.   AMS's primary interest at both projects was the right for its affiliate AMSC to earn fees for the 50-year project term.

### Pinnacle's Control Over the Property Management Agreements

36.     When Clark Realty and AMS won the Monterey and Irwin projects, they formed two limited liability companies to act as managing members of the projects:   Clark Pinnacle Monterey, and Clark Pinnacle CMC.   The Operating Agreements of Clark Pinnacle Monterey and Clark

Pinnacle CMC ("Operating Agreements"), Exs. 1-2 hereto, enacted the parties' October 2001 term sheet agreement and established the parties' rights and interests at the Monterey and Irwin projects.

37.     Clark Realty and AMS's affiliates act as co-owners and co-managers of Clark Pinnacle Monterey and Clark Pinnacle CMC.   Clark Realty is the "Clark Manager."   Pinnacle Monterey and Pinnacle Irwin are the "Pinnacle Managers."   Exs. 1-2, §3.1(a).   The Operating Agreements state that the "business and purpose" of each company is to be a "member" and to "act as managing member" of MBMH or CMC.   *Id.*, §1.5.   MBMH and CMC, in turn, are special purpose entities created by Clark Realty and AMS to act as owners of the housing units at the two projects.

38.     Implementing the parties' term sheet, the Operating Agreements at both projects divided the right to earn fees at Monterey and Irwin between Clark's and AMS's affiliates.   The projects' Operating Agreements required that MBMH and CMC "shall" enter into development, construction, and asset management service agreements with Clark Realty's affiliates.   Exs. 1-2, §3.15(a)(1), (2), (4).   The Operating Agreements likewise required that MBMH and CMC "shall" enter into a property management agreement with Pinnacle affiliate AMSC.   Exs. 1-2, §3.15(a)(3).

39.     Implementing the parties' intent that property management fees be "entirely" to AMS, and that development fees be paid "entirely" to Clark, the Operating Agreements also dictated that the service agreements assigned to affiliates of Clark Realty and AMS were the exclusive property of the partner to whom they were assigned: "neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group." Exs. 1-2, §3.15(b).

40.     Each of the "Member Service Contracts" was a substantial asset of the company. Indeed, as Clark Pinnacle Family Communities represented in its step two submissions to the Army, "the ability to retain fees from both asset management and related third party service providers is Clark Pinnacle's *most valuable asset*." (Emphasis added).   Thus, the power granted to Clark Pinnacle Monterey and Clark Pinnacle CMC under Section 3.15 of the Operating Agreements to assign the Service Contracts with MBMH and CMC to its "Member Groups" was its "most valuable asset."

41.     The Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle CMC stated that any "sale, pledge, transfer, conveyance or other disposition of any substantial asset of the

Company" was a "Major Decision" that requires the "vote or signature" of both managers. Ex. 1, §3.1(b)(3)(A); Ex. 2, §3.1(b)(2)(A). As a result of this clause, when Clark Pinnacle Monterey and Clark Pinnacle CMC assigned the developer, construction and asset management agreements at Monterey and Irwin to Clark Realty's affiliates, and the property management agreement to Pinnacle's affiliate, this action required the signature of both managers.

42.     When MBMH and CMC entered into the developer, construction, asset management and property management agreements at Monterey and Irwin with Clark Realty's and AMS's affiliates, all of these agreements were treated as a "Major Decision" to convey a substantial asset of Clark Pinnacle Monterey and Clark Pinnacle CMC. When Clark Pinnacle Monterey and Clark Pinnacle CMC signed each of the service agreements on behalf of MBMH and CMC, *both* the company's managers signed: Cleve Johnson signed for Clark Realty, the Clark Manager; and Stan Harrelson signed for Pinnacle Monterey and Pinnacle Irwin, the Pinnacle Managers.

43.     Consistent with the term sheet's directive that property management fees "shall be paid entirely" to Pinnacle, the Operating Agreements granted Pinnacle Monterey and Pinnacle Irwin effective ownership over the property management agreements at Monterey and Irwin. This was accomplished in two provisions. First, under Section 3.1(b)(3)(E) of the Operating Agreement for Monterey and Section 3.1(b)(2)(E) of the Operating Agreement for Irwin, "adjustments to the terms and conditions of the Property Management Agreement" were a "Major Decision" that required the vote or signature of both managers. Second, the Operating Agreements provided that if "deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to or affecting the terms and conditions of the Property Management Agreement," and if the deadlock could not be resolved by mutual agreement, then "any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion." Exs. 1-2, §3.13(c).

44.     The only way Pinnacle Monterey and Pinnacle Irwin could lose their voting rights on Major Decisions, and their right to resolve deadlocks "affecting the terms and conditions of the Property Management Agreement," was if the property management agreements are terminated for "failure to perform." The Operating Agreements state that termination of the property management agreements "for failure to perform" shall be an "Event of Default." Exs. 1-2, §6.1(e). During an

SECOND AMENDED CROSS-COMPLAINT

"Event of Default," "the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager." Exs. 1-2, §6.2(c).

45.     If the property management agreements at Monterey and Irwin are terminated for any reason other than "failure to perform" – including for fraud, misconduct, excessive damage or bankruptcy – then Pinnacle Monterey and Pinnacle Irwin as "Pinnacle Managers" retain full right and power to vote on Major Decisions; to break deadlocks in voting between the managers related to or affecting the property management agreement; to vote on any assignment of the property management agreement to a party unaffiliated with AMS; and to vote on and decide the merits of any adjustments to the terms and conditions of the property management agreement.

### Clark Pinnacle's Performance at the California Military Housing Projects

46.     After formal transfer of authority from the Army to Clark Pinnacle, the housing projects at Monterey and Irwin entered an Initial Development Phase, or "IDP," in which Clark Realty's affiliates began major development and construction work.  At the Monterey project, the IDP phase was slated to last 10 years.  At the Irwin project, the IDP phase was slated to last 8 years.

47.     AMSC's job as property manager was to market the projects to potential tenants and their families, lease homes, and work with the tenants to keep them happy.  At the simplest level, this involved collecting rent; moving residents in and out of the houses as soldiers were reassigned; keeping the houses well maintained; and responding to residents' complaints and service calls.

48.     Not surprisingly, AMSC's job was much harder during the IDP phase.  The homes Clark Pinnacle inherited from the Army had been neglected for years.  Most were in poor condition. Many were old and ridden with mold or structural problems and had to be torn down and replaced. Clark could not immediately construct new or renovated homes for an entire military base.  This left many soldiers and their families living in run-down housing.  Meanwhile, residents had to put up with constant construction.  In general, residents were less satisfied living in old, unrenovated homes than in new ones, and they were less satisfied when there was construction in the neighborhood.

49.     Old, unrenovated homes required more frequent maintenance work, and cost more to make ready for new tenants.  The CDMPs and financing documents submitted to bondholders put Pinnacle on very tight budgets for per-housing unit maintenance costs.  AMSC was under constant

pressure to do "more" with "less," trying to keep the housing units well-maintained, while at the same time doing its best to keep the residents of the housing communities happy.

50.     As reflected in the CDMPs and the Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle California Military Communities, the owners of the housing projects (Plaintiffs MBMH and CMC) were under day-to-day control of Clark Realty.  In performing its duties as property manager at Monterey and Irwin, AMSC was directed by, and subordinate to, Clark Realty.

51.     Every month, AMSC submitted occupancy reports, capital budgets, expense reports and other project financial information to Clark Realty for review and approval.  AMSC's on-site managers discussed the projects' physical and financial condition with Clark Realty's on-site project executives in regular meetings, covering everything from hiring contractors to per-unit maintenance costs.  AMSC was in daily contact with Clark Realty about virtually every aspect of its job duties.

### Financial Pressures at the California Military Housing Projects

52.     In real estate development projects, income is largely a function of revenue (here, a service member's Basic Allowance for Housing, or BAH, multiplied by number of occupied units) and expenses.  To convince lenders to finance the California projects, Clark Realty prepared detailed projections about revenue, expenses and hence income available to service and pay off the debt.

53.     At both projects, the existing housing was in worse shape than the parties realized, making it more expensive to maintain than the parties had budgeted, and less attractive as a rental option for soldiers.  Soldiers were free to move off-post and use their Army housing allowances with private landlords if they wished.  Increased levels of deployments could also result in more turnover and higher vacancies than expected.  Occupancy, and hence revenue, was below what the parties had budgeted in their financial plans, and maintenance and improvement expenses were higher.

54.     At Monterey, there were additional adverse variances.  The mix of soldiers assigned to the post resulted in lower average BAH than the parties had anticipated.  Construction cost escalation was much higher than Clark Realty had forecast.  Property management expenses were higher as well, due to the need to pay Davis-Bacon Act wages, which had not been anticipated at the time of the financial closings.  Finally, the percentage of homes occupied by military families was lower than

expected, and the partners had to rent a significant number of units to civilian residential tenants, who paid lower, local market rents than the BAH allotments granted to soldiers to pay their rent.

55.     In addition to income from renting homes, the CDMPs projected that the projects would earn interest income from the portion of the loan proceeds that were not immediately used for project construction.  In 2008, as a result of the failure of the financial institution holding the bond proceeds (AIG), Clark had to withdraw hundreds of millions of dollars from accounts at AIG (expected to earn 3% interest) and place the funds in accounts earning interest at less than 1%.

56.     As a result of these and other pressures, on December 16, 2008, Clark Realty submitted a Modified Scope Plan ("MSP") to the Army for approval at Monterey.  The MSP was directed and controlled by Clark Realty, in its role as the Asset Manager of MBMH and manager of Clark Pinnacle Monterey Bay LLC.  The MSP at Monterey reduced the development budget by an estimated $133 million, reduced construction of new units, and increased renovation of existing units.

### Clark Realty's Campaign to Terminate Pinnacle's Interest in the Military Projects

57.     In tandem with the financial pressures recounted above, after winning a project with AMS at Fort Benning, Georgia, Clark Realty decided it did not wish to continue doing business with AMS on the terms of the parties' October 2001 term sheet.  Between 2005 and 2009, Clark Realty took numerous actions that demonstrated it had become hostile and adverse to its partner AMS. Throughout this time, Clark Realty owed Pinnacle Monterey and Pinnacle Irwin a fiduciary duty as manager of Clark Pinnacle Monterey and Clark Pinnacle California Military Communities.

58.     In 2005, the Clark Pinnacle joint venture was pursuing a privatization opportunity with the Navy for an apartment tower project called "Pacific Beacon" in San Diego, California.  As the majority member of the joint venture, Clark Realty led the pursuit efforts and controlled most of the communications with the military.  At the oral presentation to the Navy, however, Stan Harrelson of AMS learned that Clark Realty had changed the proposed role of the property manager without telling him.  The terms Clark Realty proposed for Pacific Beacon provided that AMS's contract could be terminated for convenience, and they excluded AMS from any equity stake in the project.  Mr. Harrelson was upset and disappointed not to have been consulted about the changed terms in advance, and saw that Clark Realty had failed to uphold the October 2001 term sheet.

59.     In August 2005, Cleve Johnson of Clark Realty told Stan Harrelson of AMS that Clark Realty and the military saw value in not having a 50-year partnership with the property manager.  In January 2006, Mr. Johnson asked Mr. Harrelson to pursue Air Force privatization projects under terms where (as imposed at Pacific Beacon) AMS's role would be limited to a short term contract, with the right to be removed for convenience, and where AMS's affiliates would no longer hold an ownership stake.  Mr. Harrelson rejected Mr. Johnson's proposal.

60.     After Clark Realty indicated it no longer wished to do projects under the terms of the October 2001 term sheet, AMS decided to pursue military privatization projects on its own.  Several people from Clark Realty who were experienced in pursing military privatization projects moved to AMS in order to continue that business.  AMS partnered with a development company led by Chris Hunt, and succeeded in winning additional military privatization projects.  Clark Realty, in contrast, mostly failed to obtain new privatization projects now that it was no longer pursuing them with AMS.

61.     AMS had a large national insurance program that provided property and general liability coverage to military and non-military properties, including the Monterey and Irwin projects.  In addition to the fees AMSC earned for property management services at Monterey and Irwin, AMS earned a separate fee as a third party provider managing claims and aggregate funding on its national insurance program.  Clark Realty was aware of these fees, and earned similar fees for insurance related to construction at Monterey and Irwin.  In May 2006, Clark Realty investigated a plan to get rid of AMS's insurance program.  An internal analysis proposed that Clark Realty could create its own "captive" insurer to provide coverage at Monterey and Irwin, thereby capturing those fees for itself.  Clark Realty never disclosed its captive analysis to Pinnacle Monterey or Pinnacle Irwin.

62.     In March of 2007, Clark Realty directed that all "Clark Pinnacle" co-branding at the projects would stop.  AMSC's employees at the projects were directed to remove any "Clark Pinnacle" logos on their offices and uniforms.  An internal email from Clark Realty's director A.J. Caputo from this time referred to AMS's personnel as "floating turds."

63.     In May 2007, Mr. Caputo proposed that Clark Realty make a competing bid for insurance coverage to replace AMS's program, but abandoned the effort when he was told it could not be done without AMS finding out.  He investigated whether failure to provide adequate coverage

would allow Clark Realty to terminate the property management agreements.  He was advised by counsel, however, that AMS had notice and cure rights for any failure to provide adequate insurance, and could continue performing as the property manager as long as it fixed the problem.

64.   In January 2008, Clark Realty again tried to take over AMS's management of the insurance program.  Clark Realty asked its insurance broker, RCM&D, to prepare a rival bid for insurance at Monterey, Irwin and the other military projects.  However, RCM&D was not able to beat the price or terms provided by AMS's broker Lockton.  Clark Realty never disclosed its multiple efforts to replace AMS's insurance program to Pinnacle Monterey or Pinnacle Irwin.

65.   In April 2009, Clark Realty hired a national litigation firm, Kirkland & Ellis, to build a case for terminating the property management agreements.  Clark Realty never informed Pinnacle Monterey or Pinnacle Irwin that it retained Kirkland and wished to terminate AMSC.

66.   In November 2009, Kirkland hired Alix Partners, an accounting and litigation support firm, to conduct a forensic investigation of Pinnacle's performance at the parties' project in Fort Benning, Georgia.  In May 2010, Kirkland hired Alix to perform a forensic investigation of the Monterey and Irwin projects.  Clark Realty never informed Pinnacle Monterey or Pinnacle Irwin that it has approved the hiring of Alix to build a case for terminating AMSC as the property manager.

67.   In May 2010, Clark Realty caused the owner entities of the Fort Belvoir and Fort Benning projects to file a lawsuit in Muscogee County Georgia.  The suit alleged that the property management agreements at those projects were terminable for acts of fraud by AMS's employees.

68.   In June 2010, Clark Realty, aided by Alix and Kirkland, physically occupied and took control of Pinnacle's property management offices at Fort Benning in Georgia.  Clark Realty removed Pinnacle's affiliate AMSE as the property manager and installed the Benning Asset Manager, an affiliate of Clark Realty, to assume its duties.  The Benning Asset Manager in turn retained Michaels, a property management firm, who began performing services at Fort Benning.

### Pinnacle Irwin and Pinnacle Monterey's Exercise of Adjustment Rights

69.   Pinnacle Monterey and Pinnacle Irwin, as the "Pinnacle Managers" of Clark Pinnacle Monterey and Clark Pinnacle CMC, have the right to propose and vote on adjustments to the property management agreements between AMSC and MBMH and CMC.  Exs. 1-2, §3.1(b)(2)-(b)(3)(E).  In

14

the event of a deadlock in voting about such adjustments with Clark Realty, Pinnacle Monterey and Pinnacle Irwin are empowered to resolve the deadlock in their "sole discretion." *Id.*, §3.13(c).

70.    In light of Clark Realty's hostile actions at the parties' eastern projects, on May 13, 2011, Pinnacle Monterey and Pinnacle Irwin informed Clark Realty that they were voting to adjust Section 18.1(C)(6) of the Property Management Agreement for the Monterey project and Section 18.1(C)(4) of the Property Management Agreement for the Irwin project. Ex. 5.  Those were the provisions providing that acts of "theft, fraud or other knowing or intentional misconduct by Manager [Pinnacle] or its employees" shall be an "event of default."  *See* Exs. 3-4, pp. 13-14.

71.    The adjustments voted on by Pinnacle Irwin and Pinnacle Monterey clarified that AMSC would have notice and cure rights, prior to any termination of the property management agreements for default arising from "theft, fraud or other knowing or intentional misconduct by Manager or its employees." Ex. 5.  The adjustments also clarified that AMSC could only be subject to termination for uncured acts of employee misconduct that caused material harm to the projects. *Id.*

72.    Clark Realty did not vote or give its consent.  Instead, on May 19, 2011, Clark Realty demanded that Pinnacle Irwin and Pinnacle Monterey describe in detail "any potential fraud, theft or intentional misconduct" by a Pinnacle employee.  Ex. 6.  In a further exchange of letters, Pinnacle denied awareness of any fraud and explained that notice and cure rights would allow the parties to resolve problems from employee misconduct cooperatively.  Clark Realty refused Pinnacle Monterey and Pinnacle Irwin's request to have a face-to-face meeting to discuss the adjustments. Exs. 7, 8.

73.    On June 8, 2011, Pinnacle Monterey and Pinnacle Irwin wrote a letter stating that Clark Realty had "refused to vote on the proposed adjustments, and refused to even meet to discuss them." Ex. 9.  The letter therefore "declared a 'Deadlock' regarding the adjustments proposed in [the] letters dated May 13, 2011." *Id.*  The letter again requested a meeting, and concluded that "absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011." *Id.* After a further exchange of letters, on June 15, 2011, the parties filed rival declaratory judgment actions in Monterey and Santa Clara Counties, which have been consolidated in Monterey County.

74.    Because Clark Realty refused to vote or give consent, or even meet to discuss the matter, Pinnacle Monterey and Pinnacle Irwin properly declared a deadlock.  Seven days after

declaring a deadlock, Pinnacle Monterey and Pinnacle Irwin were authorized to, and did, determine the deadlock or dispute in their "sole discretion." The adjustments became effective June 16, 2011.

### *Clark Realty's Unlawful Assertion of Termination Rights*

75.     On December 28, 2011, this Court issued an injunction "to preserve the status quo pending determination of the parties' declaratory relief causes of action." The Court determined that "actions by either side might tend to render ineffectual the Court's ultimate determination of the status of the Agreements." The Court further ruled that Plaintiffs "may not take actions that are based on their contention that the disputed provisions of Agreements have not been adjusted."

76.     In January 2012, Clark Realty caused CMC and MBMH to file an amended complaint in the Superior Court of Monterey County, California. Plaintiffs alleged that AMSC's employees had engaged in a fraudulent scheme to update work orders and thereby enhance AMSC's incentive fees. A subsequent complaint added allegations that AMS engaged in an insurance fraud scheme. Plaintiffs contended that the property management agreements at the Monterey and Irwin housing projects are subject to automatic termination as a result of these allegations, both under the terms of the property management agreements themselves, and under Civil Code section 2356.

77.     Clark Realty never acted, through its control of Plaintiffs MBMH and CMC, to communicate with Pinnacle Monterey, Pinnacle Irwin, AMS or AMSC to give them the chance to fix, or "cure," the problems alleged in the complaints in this matter, even though both of the property management agreements give AMSC the right to cure defaults that could give rise to its termination. Clark Realty's view was that, as Plaintiffs' manager, it had the power to fire AMSC without giving it the chance to remedy any of the claimed misconduct, and without putting the matter to a vote by the managers of Clark Pinnacle Monterey and Clark Pinnacle California Military Communities.

78.     On March 28, 2012, Plaintiffs moved to partially dissolve the December 28, 2011 Injunction, and sought the Court's approval to terminate the property management agreements. Plaintiffs also indicated its desire to revoke AMSC's agency pursuant to Civil Code section 2356. The Court held a hearing on September 27, 2012, and indicated that if Defendants wished to enjoin Plaintiffs from exercising their purported statutory power, Pinnacle should seek relief to that effect.

79.     On October 2, 2012, the Pinnacle parties asked the Court to issue a temporary restraining order enjoining Plaintiffs and Clark Realty, and all persons or entities in active concert or participation with these entities, from exercising their purported statutory power under Civil Code section 2356 to revoke the property management agreements at the Monterey and Irwin projects.

80.     On December 26, 2012, this Court issued a preliminary injunction, enjoining Plaintiffs and Clark Realty, and all persons or entities in active concert or participation with these entities, from revoking the property management agreements at the Monterey and Irwin projects.  The Court held that Pinnacle held an agency coupled with an interest, such that the right of statutory revocation did not apply; and that in any event, Clark Realty and Plaintiffs owed Pinnacle a fiduciary duty.  On January 24, 2013, Plaintiffs and Clark Realty filed a Notice of Appeal of this injunction.

81.     AMSC has materially and properly performed its property management agreements at the Monterey and Irwin housing projects.  AMSC is entitled to be the property manager at both facilities and continue performing for the remainder of those agreements' 50-year terms.  AMSC is also entitled to cure any alleged defaults before being subject to termination.  Pinnacle Monterey and Pinnacle Irwin, for their part, have the right to vote on any adjustment to the terms of the property management agreements; to vote on any transfer of those assets to another provider; and to resolve any deadlocks between the Clark and Pinnacle managers about such matters in their sole discretion.

82.     There is no legitimate business reason for Clark Realty to cause CMC and MBMH to pay expensive litigation and consulting fees attempting to terminate the Monterey and Irwin property management agreement based on curable defaults.  The Pinnacle parties have repeatedly made clear that they stand ready and able to remedy any actual harm to the projects that may have occurred.  Under these circumstances, it is wrong and unfair to terminate AMSC as the property manager.

## FIRST CAUSE OF ACTION

### Declaratory Judgment – AMSC's Termination Rights at Monterey

83.     The allegations of the preceding paragraphs are incorporated herein by reference.

84.     There is an actual controversy between the parties regarding under what circumstances the Property Management Agreement may be terminated for cause, as further described below.

85.    MBMH contends that the Property Management Agreement has been terminated "for cause" under Section 18.1(C)(6), which states that "theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents" shall be an "event of default." MBMH contends that alleged misconduct has automatically terminated the agreement under this clause.

86.    Section 18.1(A) of the Property Management Agreement states that a termination "for cause" may occur only after a party fails to cure any "non-monetary default" within thirty (30) days "after receipt of notice … specifying in detail a material breach of this Agreement."

87.    MBMH believes it is entitled to terminate the Property Management Agreement for cause even though AMSC and its employees have not, in fact, committed "theft, fraud, or other knowing or intentional misconduct" as those terms are used in the Property Management Agreement.

88.    MBMH believes it is entitled to terminate the Property Management Agreement for cause related to non-monetary defaults, without giving 30 days' notice and opportunity to cure.

89.    MBMH believes it is entitled to terminate the Property Management Agreement for cause related to non-monetary defaults that were not material.

90.    MBMH believes it is entitled to terminate the Property Management Agreement for cause prior to a Court's finding that AMSC or its employees committed theft, fraud or misconduct.

91.    Defendants dispute MBMH's position about automatic termination, and dispute the truth of MBMH's allegations. Defendants dispute whether those facts, even if true, constitute a basis to terminate the Property Management Agreement. Defendants further dispute whether that agreement can be terminated for cause for immaterial misconduct, and without notice or cure rights.

92.    Defendants seek a declaration that there has not been an event of default from "theft, fraud, or other knowing or intentional misconduct;" that prior to any termination, AMSC is entitled to notice and opportunity to cure; that no such termination can occur unless the alleged misconduct causes material injury; that no termination can occur unless a Court makes a supporting finding; and that the Property Management Agreement remains in full force and effect.

93.    This cause of action represents an actual controversy appropriate for declarative relief pursuant to Section 1060 of the California Code of Civil Procedure.

## SECOND CAUSE OF ACTION

### Declaratory Judgment – AMSC's Termination Rights at Irwin

94.     The allegations of the preceding paragraphs are incorporated herein by reference.

95.     There is an actual controversy between the parties regarding under what circumstances the Property Management Agreement may be terminated for cause, as further described below.

96.     CMC contends that the Property Management Agreement has been terminated "for cause" under Section 18.1(C)(4), which states that "theft, fraud, or other knowing or intentional misconduct by Manager [Pinnacle] or its employees or agents" shall be an "event of default." CMC contends that alleged misconduct has automatically terminated the agreement under this clause.

97.     Section 18.1(A) of the Property Management Agreement states that a termination "for cause" may occur only after a party fails to cure any "non-monetary default" within thirty (30) days "after receipt of notice … specifying in detail a material breach of this Agreement."

98.     CMC believes it is entitled to terminate the Property Management Agreement for cause even though AMSC and its employees have not, in fact, committed "theft, fraud, or other knowing or intentional misconduct" as those terms are used in the Property Management Agreement.

99.     CMC believes it is entitled to terminate the Property Management Agreement for cause related to non-monetary defaults, without first giving 30 days' notice and opportunity to cure.

100.    CMC believes it is entitled to terminate the Property Management Agreement for cause related to non-monetary defaults that were not material.

101.    CMC believes it is entitled to terminate the Property Management Agreement for cause prior to a Court's finding that AMSC or its employees committed theft, fraud or misconduct.

102.    Defendants dispute CMC's position about automatic termination and dispute the truth of CMC's allegations.  Defendants dispute whether those facts, even if true, constitute a basis to terminate the Property Management Agreement.  Defendants further dispute whether that agreement can be terminated for cause for immaterial misconduct, and without notice or cure rights.

103.    Defendants seek a declaration that there has not been an event of default from "theft, fraud, or other knowing or intentional misconduct;" that prior to any termination, AMSC is entitled to notice and opportunity to cure; that no such termination can occur unless the alleged misconduct

19

causes material injury; that no termination can occur unless a Court makes a supporting finding; and that the Property Management Agreement remains in full force and effect.

104.     This cause of action represents an actual controversy appropriate for declaratory relief pursuant to Section 1060 of the California Code of Civil Procedure.

### THIRD CAUSE OF ACTION

**Declaratory Judgment – AMSC's Revocation Rights at Monterey**

105.     The allegations of the preceding paragraphs are incorporated herein by reference.

106.     There is an actual controversy between the parties regarding whether MBMH has the right to act unilaterally to terminate the Property Management Agreement at Monterey.

107.     Specifically, the parties dispute whether MBMH has the right to unilaterally terminate the Property Management Agreement at Monterey, revoke AMSC's agency pursuant to Civil Code section 2356, and engage a non-Pinnacle affiliate as property manager at Monterey before the expiration of the 50-year term of the Property Management Agreement.

108.     Section 1.1 of the Property Management Agreement provides that MBMH "hereby engages Manager [AMSC] as its sole and exclusive property manager."

109.     Section 1.2 of the Property Management Agreement states that "[t]he initial term of this Agreement shall be for the period of the Ground Lease." The term of the Property Management Agreement at Monterey is 50 years, consistent with the project's 50-year ground lease with the Army.

110.     AMSC's affiliate Pinnacle Monterey, Pinnacle Manager of Clark Pinnacle Monterey, has not given its vote or consent to the removal of AMSC of property manager, to the revocation of AMSC's agency at Monterey, or to the appointment of a replacement property manager.

111.     Defendants seek a declaration that MBMH does not have the right to (i) unilaterally terminate the Property Management Agreement at Monterey; (ii) revoke AMSC's agency pursuant to Civil Code section 2356; or (iii) engage a non-Pinnacle affiliate as property manager at Monterey. Defendants seek a further declaration that if MBMH takes the foregoing actions, CMC has breached Sections 1.1 and 1.2 of the Property Management Agreement.

**FOURTH CAUSE OF ACTION**

**Declaratory Judgment – AMSC's Revocation Rights at Irwin**

112. The allegations of the preceding paragraphs are incorporated herein by reference.

113. There is an actual controversy between the parties regarding whether CMC has the right to act unilaterally to terminate the Property Management Agreement at Irwin.

114. Specifically, the parties dispute whether CMC has the right to unilaterally terminate the Property Management Agreement at Fort Irwin, revoke AMSC's agency pursuant to Civil Code section 2356, and engage a non-Pinnacle affiliate as property manager at Fort Irwin before the expiration of the 50-year term of the Property Management Agreement.

115. Section 1.1 of the Property Management Agreement provides that CMC "hereby engages Manager [AMSC] as its sole and exclusive property manager."

116. Section 1.2 of the Property Management Agreement states that "[t]he initial term of this Agreement shall be for the period of the Ground Lease." The term of the Property Management Agreement at Irwin is 50 years, consistent with the project's 50-year ground lease with the Army.

117. AMSC's affiliate Pinnacle Irwin, Pinnacle Manager of Clark Pinnacle California Military Communities, has not given its vote or consent to the removal of AMSC of property manager, to the revocation of AMSC's agency, or to the appointment of a replacement manager.

118. Defendants seek a declaration that CMC does not have the right to (i) unilaterally terminate the Property Management Agreement at Irwin; (ii) revoke AMSC's agency pursuant to Civil Code section 2356; or (iii) engage a non-Pinnacle affiliate as property manager at Irwin. Defendants seek a further declaration that if CMC takes the actions set forth in the preceding paragraph, CMC has breached Sections 1.1 and 1.2 of the Property Management Agreement.

**FIFTH CAUSE OF ACTION**

**Breach of Contract – AMSC's Reimbursable Expenses at Monterey**

119. The allegations of the preceding paragraphs are incorporated herein by reference.

120. Sections 8.2 and 15.5 of the Property Management Agreement at Monterey state that AMSC, as Manager, "shall be entitled to monthly reimbursements" for all "Reimbursable Expenses" including, without limitation, "a burden rate of 45% of the actual salary for payroll expenses."

121.   On November 14, 2011, Pinnacle's CFO John Carrosino sent a letter to Doug La Rosa, CFO of Clark Realty Capital, who shares responsibility for the budget and expenses of the MBMH project with the Clark Asset Manager.  Mr. Carrosino's letter stated that review of Property Management Agreements indicated that AMSC had undercharged the Monterey project for reimbursable employee expenses.  Mr. Carrosino's letter had an attachment providing calculations related to "total employee gross payroll 2003 through November 2011" and "property management agreement burden rate 8.2."  The amount of unclaimed fees at Monterey was $3,119,618.70.

122.   MBMH has not paid the amounts demanded in Mr. Carrosino's letter, and has thereby breached Sections 8.2 and 15.5 by failing to pay AMSC the 45% burden rate.   The Property Management Agreement provides that AMSC is entitled to this compensation.   Even if the burden rate amounts were not submitted annually, there was no waiver of AMSC's right to receive them.

123.   AMSC suffered damages as a result of MBMH's breach of Section 15.5 in an amount to be proven at trial.  The estimated value of the unpaid 45% burden is over $3,119,000.

## SIXTH CAUSE OF ACTION

### Breach of Contract – AMSC's Reimbursable Expenses at Irwin

124.   The allegations of the preceding paragraphs are incorporated herein by reference.

125.   Sections 8.2 and 15.5 of the Property Management Agreement at Irwin states that AMSC, as Manager, "shall be entitled to monthly reimbursements" for all "Reimbursable Expenses" including, without limitation, "a burden rate of 45% of the actual salary for payroll expenses."

126.   On November 14, 2011, Pinnacle's CFO John Carrosino sent a letter to Doug La Rosa, CFO of Clark Realty Capital, who shares responsibility for the budget and expenses of the Irwin project with the Clark Asset Manager.  Mr. Carrosino's letter stated that review of Property Management Agreements indicated that AMSC had undercharged the Irwin project for reimbursable employee expenses.  Mr. Carrosino's letter had an attachment providing calculations related to "total employee gross payroll 2003 through November 2011" and "property management agreement burden rate 8.2."  The amount of unclaimed fees at Irwin was $3,888,125.45.

127.   CMC has not paid the amounts demanded in Mr. Carrosino's letter, and has thereby breached Sections 8.2 and 15.5 by failing to pay AMSC the 45% burden rate.   The Property

Management Agreement provides that AMSC is entitled to this compensation.  Even if the burden rate amounts were not submitted annually, there was no waiver of AMSC's right to receive them.

128.    AMSC suffered damages as a result of CMC's breach of Section 15.5 in an amount to be proven at trial.  The estimated value of the unpaid 45% burden is over $3,888,000.

## SEVENTH CAUSE OF ACTION

### Breach of Contract – AMSC's Incentive Fees at Monterey

129.    The allegations of the preceding paragraphs are incorporated herein by reference.

130.    Section 15.1 of the property management agreement requires MBMH to pay AMSC a "Base Fee" and an "Incentive Fee" as compensation for property management services.  The actual incentive fee depends on criteria listed in Exhibit B, the Incentive Performance Management Plan.

131.    Under Section 15.1(b) of the Property Management Agreement, MBMH is required to make estimated incentive fee payments to AMSC throughout the year.

132.    Exhibit B to the Property Management Agreement requires MBMH to conduct an "incentive plan review process" at the end of each year to determine the actual incentive fee earned.

133.    Exhibit B to the Property Management Agreement also requires MBMH to authorize payment of the incentive fee after it has determined the actual incentive fee earned by AMSC.

134.    In 2010, the Army approved an amendment to the Incentive Performance Management Plan, revising the criteria upon which AMSC's incentive fee is based.  Under the amended plan, MBMH is still required to conduct an "incentive plan review process" at the end of each year.

135.    MBMH has breached Section 15.1 and Exhibit B of the Property Management Agreement by refusing to authorize AMSC's estimated incentive fee payments since 2011, and by refusing to calculate the actual incentive fees earned by AMSC for 2010 through 2012.

136.    AMSC has suffered damages as a result of the foregoing breaches, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### Breach of Contract – AMSC's Incentive Fees at Irwin

137.    The allegations of the preceding paragraphs are incorporated herein by reference.

138.    Section 15.1 of the property management agreement requires CMC to pay AMSC a "Base Fee" and an "Incentive Fee" as compensation for property management services.  The actual incentive fee depends on criteria listed in Exhibit B, the Incentive Performance Management Plan.

139.    Under Section 15.1(b) of the Property Management Agreement, CMC is required to make estimated incentive fee payments to AMSC throughout the year.

140.    Exhibit B to the Property Management Agreement requires CMC to conduct an "incentive plan review process" at the end of each year to determine the actual incentive fee earned.

141.    Exhibit B to the Property Management Agreement also requires CMC to authorize payment of the incentive fee after it has determined the actual incentive fee earned by AMSC.

142.    In 2008, the Army approved an amendment to the Incentive Performance Management Plan, revising the criteria upon which AMSC's incentive fee is based.  Under the amended plan, CMC is still required to conduct an "incentive plan review process" at the end of each year.

143.    CMC breached Section 15.1 and Exhibit B of the Property Management Agreement by refusing to authorize AMSC's estimated incentive fee payments since 2011, and refusing to conduct the incentive plan review process to determine the actual incentive fees for 2009 through 2012.

144.    AMSC has suffered damages as a result of the foregoing breaches, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### Declaratory Judgment – Amendment of Monterey Incentive Plan

145.    The allegations of the preceding paragraphs are incorporated herein by reference.

146.    At the outset of the project, AMSC's incentive fee was determined by the Monterey Incentive Performance Management Plan attached as Exhibit B to the Property Management Agreement.  In 2008, the Army expressed its desire to amend AMSC's incentive fee structure, in part because AMSC was doing an exemplary job on maintenance.  Accordingly, representatives of AMS, Clark Realty and the Army began a process of revising the metrics by which AMSC's maintenance performance was judged and compensated in the Incentive Performance Management Plan.

147.    That process culminated in MBMH proposing a Major Decision which sought the Army's approval to amend the incentive plan, as follows.  In late 2009, the Clark and Pinnacle

Managers of Clark Pinnacle Monterey agreed upon the amendment's terms.   In a written memorandum dated November 17, 2009, executed by Fran Coen on behalf of Clark Pinnacle Monterey (the managing member of MBMH) and Colonel Darcy Brewer (the Garrison Commander at Presido of Monterey and Fort Ord), MBMH presented its revisions to the incentive plan.   These revisions removed maintenance response times as a metric used to calculate AMSC's incentive fee.

148.   Having been accepted in writing by MBMH and local Army leadership at Monterey, the November 17, 2009 memorandum was submitted to the Department of the Army, Office of the Assistant Secretary of the Army for Installations and Environment.   On March 9, 2010, in a written memorandum signed by Joseph Calcara, Deputy Assistant Secretary of the Army, the Army formally approved MBMH's Major Decision to amend AMSC's Incentive Performance Management Plan at Monterey.   Upon the Army's approval of the Major Decision, the amendment became fully effective.

149.   There is an actual controversy between the parties regarding whether the Incentive Performance Management Plan for Monterey has been effectively amended as alleged above.

150.   Defendants seek a declaration that the Monterey Incentive Performance Management Plan was effectively amended when the Army approved the proposed amendment in March 2010.

### TENTH CAUSE OF ACTION

### Declaratory Judgment – Amendment of Irwin Incentive Plan

151.   The allegations of the preceding paragraphs are incorporated herein by reference.

152.   At the outset of the project, AMSC's incentive fee was determined by the Irwin Incentive Performance Management Plan attached as Exhibit B to the Property Management Agreement.   In 2007, the Army expressed its desire to amend AMSC's incentive fee structure, in part because AMSC was doing an exemplary job on maintenance.   Accordingly, representatives of AMS, Clark Realty and the Army began a process of revising the metrics by which AMSC's maintenance performance was judged and compensated in the Incentive Performance Management Plan.

153.   That process culminated in CMC proposing a Major Decision which sought the Army's approval to amend the incentive plan, as follows.   In early 2008, the Clark and Pinnacle Managers of Clark Pinnacle California Military Communities agreed upon the amendment's terms. In a written memorandum dated February 5, 2008, executed by Jodi Winters on behalf of Clark

Pinnacle California Military Communities (the managing member of CMC) and Colonel Philbrick (the Garrison Commander at Irwin), CMC presented its revisions to the incentive plan. These revisions removed maintenance response times as a metric used to calculate AMSC's incentive fee.

154.    Having been accepted in writing by CMC and local Army leadership at Fort Irwin, the February 5, 2008 memorandum was submitted to the Department of the Army, Office of the Assistant Secretary of the Army for Installations and Environment. In a subsequent written memorandum signed by Paul P. Bollinger Jr., Deputy Assistant Secretary of the Army, the Army formally approved CMC's Major Decision to amend AMSC's Incentive Performance Management Plan at Irwin. Upon the Army's approval of the Major Decision, the amendment became fully effective.

155.    There is an actual controversy between the parties regarding whether the Incentive Performance Management Plan for Irwin has been effectively amended as alleged above.

156.    Defendants seek a declaration that the Incentive Performance Management Plan for Irwin was effectively amended when the Army approved the proposed amendment in 2008.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Covenant Of Good Faith And Fair Dealing at Monterey

157.    The allegations of the preceding paragraphs are incorporated herein by reference.

158.    MBMH had a duty to act in good faith in connection with implementation of the project agreements at Monterey, including the Operating Agreement of Clark Pinnacle Monterey and the Property Management Agreement between AMSC and MBMH.

159.    MBMH breached its duty to act in good faith act by virtue of the acts described herein including, but not limited to: attempting to terminate AMSC without notice and cure; attempting to terminate AMSC for alleged misconduct that was not financially material to the project; attempting to terminate AMSC for unproven acts of misconduct; hiring Kirkland and Alix to construct a case for terminating AMSC and deceiving Pinnacle about their work; and by asserting a statutory right of revocation when Pinnacle has an agency coupled with interest, and when MBMH and its manager lack the corporate power to terminate AMSC without the Pinnacle manager's vote and consent.

160.    As a result of the acts described above, MBMH frustrated the plain terms of the contract, and unfairly deprived AMSC of its bargained-for right to receive the benefits of the

contract.  MBMH acted without goodwill, and in bad faith, to frustrate the intent of the parties that AMSC would perform property management services under a 50 year partnership agreement.

161.    Defendants suffered damages as a result of the breaches, including but not limited to the prospective loss of fees under the Property Management Agreement for the remainder of its 50-year term, damages for harm to reputation, and damages for lost business opportunities.

## TWELFTH CAUSE OF ACTION

### Breach of Implied Covenant Of Good Faith And Fair Dealing at Irwin

162.    The allegations of the preceding paragraphs are incorporated herein by reference.

163.    CMC had a duty to act in good faith in connection with implementation of the project agreements at Irwin, including the Operating Agreement of Clark Pinnacle California Military Communities and the Property Management Agreement between AMSC and CMC.

164.    CMC breached its duty to act in good faith act by virtue of the acts described herein including, but not limited to:  attempting to terminate AMSC without notice and cure; attempting to terminate AMSC for alleged misconduct that was not financially material to the project; attempting to terminate AMSC for unproven acts of misconduct; hiring Kirkland and Alix to construct a case for terminating AMSC and deceiving Pinnacle about their work; and by asserting a statutory right of revocation when Pinnacle has an agency coupled with in interest, and when CMC and its manager lack the corporate power to terminate AMSC without the Pinnacle manager's vote and consent.

165.    As a result of the acts described above, CMC frustrated the plain terms of the contract, and unfairly deprived AMSC of its bargained-for right to receive the benefits of the contract.  CMC acted without goodwill, and in bad faith, to frustrate the intent of the parties that AMSC would perform property management services at Irwin under a 50 year partnership agreement.

166.    Defendants suffered damages as a result of the breaches, including but not limited to the prospective loss of fees under the Property Management Agreement for the remainder of its 50-year term, damages for harm to reputation, and damages for lost business opportunities.

WHEREFORE, Defendants pray that this Court enter declaratory judgments and damages judgments in its favor and against MBMH and CMC and seeks the following relief:

(a)    Declaratory judgment that the Monterey Property Management Agreement remains in full force and effect and for further declarations set forth in the First Cause of Action;

(b)    Declaratory judgment that the Irwin Property Management Agreement remains in full force and effect and for further declarations set forth in the Second Cause of Action;

(c)    Declaratory judgment that MBMH does not have the right to revoke the Monterey Property Management Agreement and for further declarations as set forth in the Third Cause of Action;

(d)    Declaratory judgment that CMC does not have the right to revoke the Irwin Property Management Agreement and for further declarations as set forth in the Fourth Cause of Action;

(e)    Damages as a result of MBMH and CMC's breaches of contract under Section 15.5 of the Property Management Agreements, for recoupment of the 45% burden rate for employee overhead expenses, as set forth in the Fifth and Sixth Causes of Action;

(f)    Damages as a result of MBMH and CMC's breaches of contract under Section 15.1 and Exhibit B of the Property Management Agreements, for failure to process and authorize Pinnacle's incentive fees, as set forth in the Seventh and Eighth Causes of Action;

(g)    Declaratory judgment that the Incentive Performance Management Plan for Monterey was effectively amended when the Army approved the proposed amendment in 2010, as set forth in in the Ninth Cause of Action;

(h)    Declaratory judgment that the Incentive Performance Management Plan for Fort Irwin was effectively amended when the Army approved the proposed amendment in 2008, as set forth in the Tenth Cause of Action;

(i)    Damages for breach of the duty of good faith and fair dealing, as set forth in the Eleventh and Twelfth Causes of Action;

(j)    Court costs and reasonable fees and expenses under Section 24.2 of the Property Management Agreements, and

(k)    Such other relief as the Court deems just and appropriate.

1    Dated: September 3 °, 2013

2

3                                              GREENBERG TRAURIG, LLP

4                                              By:    _____
                                                      William J. Goines
5                                                     Thomas E. Dutton
                                                      Daniel G. Hildebrand
6

7                                              Attorneys for Pinnacle Monterey, Pinnacle Irwin,
                                               American Management Services and American
8                                              Management Services California – Plaintiffs in
                                               M115143 / Defendants in M112710
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CROSS-COMPLAINT

**EXHIBIT 1**

<u>THE PRESIDIO OF MONTEREY/NAVAL POSTGRADUATE
SCHOOL MILITARY HOUSING</u>

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

# TABLE OF CONTENTS

ARTICLE I ORGANIZATIONAL MATTERS ................................................................... 1
    1.1    Formation of Company. .................................................................. 1
    1.2    Name. ............................................................................................... 1
    1.3    Principal Office and Registered Agent. ...................................... 2
    1.4    Certificate of Formation. .............................................................. 2
    1.5    Purpose. .......................................................................................... 2
ARTICLE II MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION OF PROFITS
    AND LOSSES ............................................................................................ 2
    2.1    Members; Percentage Interests. .................................................... 2
    2.2    Initial Capital Contributions. ....................................................... 3
    2.3    Additional Capital Contributions. ............................................... 3
    2.4    Capital Accounts. .......................................................................... 4
    2.5    Interest on Capital Contributions; Return of Capital Contributions. ........ 5
    2.6    Loans. .............................................................................................. 6
    2.7    No Preemptive Rights. ................................................................... 6
    2.8    Cash Distributions. ........................................................................ 6
    2.9    Allocation of Income, Gain, Loss and Deduction. ..................... 8
ARTICLE III MANAGEMENT AND RIGHTS OF MEMBERS ................................... 11
    3.1    Management by Managers; Rights of Members. ........................ 11
    3.2    Third Party Reliance. ................................................................... 13
    3.3    No Duty to Consult. ..................................................................... 13
    3.4    Outside Activities of Managers. ................................................. 13
    3.5    Annual Operating Budget. ........................................................... 14
    3.6    Reimbursement. ............................................................................ 14
    3.7    Managers and Affiliates Dealing with the Company. ............... 14
    3.8    Indemnification of Managers. ..................................................... 14
    3.9    Company Meetings. ...................................................................... 14
    3.10   Guarantees of Financing. ............................................................. 14
    3.11   Books and Records. ...................................................................... 15
    3.12   Bank Accounts. ............................................................................ 15
    3.13   Deadlock. ...................................................................................... 15
    3.14   Power of Attorney. ....................................................................... 16
    3.15   Services. ........................................................................................ 16
ARTICLE IV TRANSFER OF MEMBERSHIP INTERESTS ....................................... 17
    4.1    Transfers; Treatment of Assignees; Substituted Members. ..... 17
    4.2    Death, Insanity or Incompetency, or Trust Termination of a Member. ....... 19
    4.3    Bankruptcy of a Member. ............................................................ 20
    4.4    Right to Effect Transfers. ............................................................ 21
ARTICLE V TERM; DISSOLUTION ............................................................................. 21
    5.1    Term. ............................................................................................. 21
    5.2    Events Resulting in Dissolution. ................................................ 21
    5.3    Conclusion of Affairs. ................................................................. 21

| | | | |
|---|---|---|---|
| 5.4 | Order of Priority in Liquidation. | ............................................................................ | 22 |
| 5.5 | Termination. | ............................................................................ | 22 |
| 5.6 | Transferring Member Obligations | ............................................................................ | 22 |

ARTICLE VI DEFAULT; REMEDIES ............................................................................ 22

| | | | |
|---|---|---|---|
| 6.1 | Event of Default. | ............................................................................ | 22 |
| 6.2 | Remedy for Event of Default. | ............................................................................ | 23 |
| 6.3 | Obligations of Defaulting Member Continue | ............................................................................ | 25 |
| 6.4 | Setoff of Payments to Defaulting Member. | ............................................................................ | 25 |

ARTICLE VII MISCELLANEOUS ............................................................................ 26

| | | | |
|---|---|---|---|
| 7.1 | Amendment. | ............................................................................ | 26 |
| 7.2 | Notices. | ............................................................................ | 26 |
| 7.3 | Enforceability. | ............................................................................ | 26 |
| 7.4 | Binding Effect. | ............................................................................ | 26 |
| 7.5 | No Third Party Beneficiary Rights. | ............................................................................ | 26 |
| 7.6 | Limitation of Liability. | ............................................................................ | 26 |
| 7.7 | Further Assurances. | ............................................................................ | 27 |
| 7.8 | Prevailing Party. | ............................................................................ | 27 |
| 7.9 | MBMH Operating Agreement. | ............................................................................ | 27 |

<u>LIST OF EXHIBITS</u>
EXHIBIT A - Percentage Interests
EXHIBIT B – Development Budget

ii

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2003, but for all purposes is made effective as of October 30, 2001 (the "**Effective Date**"), by and among the undersigned parties.  Defined terms shall have the meanings given them in this Agreement and are capitalized in the text.  Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

<u>WITNESSETH</u>

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle Monterey Bay LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     <u>Formation of Company</u>.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement.  Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2     <u>Name</u>.

The name of the Company is **Clark Pinnacle Monterey Bay LLC**.  The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined).  The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires.  The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

1

1.3     Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is: c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention: Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members. The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate. The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

1.4     Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

1.5     Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Land, LLC ("**MBL**"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Land, LLC (the "**MBL Operating Agreement**") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Military Housing, LLC ("**MBMH**"), whose members shall be the Company and Monterey Bay Housing Holdings, LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Military Housing, LLC (the "**MBMH Operating Agreement**") to be entered into between the members thereof. . The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement. The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

2.1     Members; Percentage Interests.

(a)     The "**Members**" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof. The Members are divided into ownership groups (each a "**Member Group**"), as more particularly set forth on Exhibit A. For purposes hereof: (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "**Clark Member,**" and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "**Clark Group;**" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "**Pinnacle Member,**" and the Members designated under the heading "Pinnacle" shall be herein referred to collectively as the "**Pinnacle Group.**"

2

(b)     Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on Exhibit A.

(c)     The Percentage Interest of each Member shall be personal property for all purposes.

(d)     All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2     Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the **"Initial Capital Contributions"**). The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

2.3     Additional Capital Contributions.

(a)     During the period from the Effective Date hereof through the consummation of the financial closing (the **"Financial Closing"**) for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and MBL (the **"Ground Lease"**), and in the MBL Operating Agreement and MBMH Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the **"Pre-Closing Costs"**). Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**). The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor. It is anticipated that the Company shall endeavor to get MBMH and MBL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company. Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)     The Company anticipates that, contemporaneously with the Financial Closing for the Project, MBL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the MBL Operating Agreement and MBMH Operating Agreement. In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by MBMH to secure performance of each Member's obligation to pay its pro rata share of the equity required by the

3

MBMH Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

(c)     Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**"). Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions**." For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index (hereinafter defined) from (a) the month of October in the second calendar year prior to the calendar year of adjustment to (b) the month of October in the calendar year prior to the calendar year of adjustment. The "**CPI Index**" shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager. If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor. If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below. The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

4

(b)    For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)    Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)    Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

(3)    Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members. "**Unrealized Gain**" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date. "**Unrealized Loss**" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)    Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5    Interest on Capital Contributions; Return of Capital Contributions.

(a)    No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)    No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property

5

other than cash. Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6     Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**"). Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above. Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s). If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests. Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.   No Member shall be required to make any loans to the Company.

2.7     No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8     Cash Distributions.

(a)     Net Cash Flow.

(1)     "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by: (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter

6

defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2) The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A) First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds. The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B) Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests. The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

(C) Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members. Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests. The "**Interest Rate**" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D) Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E) Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

7

(F)      Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)      Capital Proceeds.

(1)      "**Capital Proceeds**" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the MBL Operating Agreement or the MBMH Operating Agreement.

(2)      Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)      First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)      Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)      Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)      Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9      Allocation of Income, Gain, Loss and Deduction.

(a)      Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof. The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain. "**Minimum Gain**" means (a) with

8

respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations. "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)     <u>Income Tax Elections</u>.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)     <u>Income Tax Allocations</u>.

(1)     For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution.  In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

(2)     If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

(d)     <u>Transfers during Fiscal Year</u>.  In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer.  The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items.  Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale.  Similarly, extraordinary or nonrecurring items shall be allocated in

9

accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

(e)  Amortization and Allocation of Organization and Start-up Expenses.  The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

(f)  Special Capital Account "Book" Allocations to Comply with Section 704 Regulations.  The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder.  Such special allocations shall be made before any allocations under Section 2.9(a) above.

(g)  Tax Matters Member.

(1)  The Clark Member is hereby appointed to act as the tax matters member (the "TMM"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code.  Pursuant to section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "IRS") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

(2)  The TMM is authorized, but not required:

(A)  To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in section 6231 of the Code) or a member of a "notice group" (as defined in section 6223(b)(2) of the Code).

(B)  In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)  To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)     To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)     To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)     To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)     The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)     The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)     The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

ARTICLE III
MANAGEMENT AND RIGHTS OF MEMBERS

3.1     Management by Managers; Rights of Members.

(a)     Manager Designation. The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member. The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**"). The initial Manager appointed by the Pinnacle Group is Pinnacle Monterey LLC (the "**Pinnacle Manager**"). Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent

11

jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

    (b)    <u>Power and Authority of the Managers</u>.

    (1)    The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs. The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

    (2)    The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

    (3)    The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions. The term **"Major Decisions"** shall mean any of the following:

    (A)    Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

    (B)    The Financial Closing and the terms and conditions thereof.

    (C)    Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

    (D)    Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

    (E)    Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

    (F)    Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

        (G)     Amendment to the MBMH Operating Agreement or the MBL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

        (H)     Termination or dissolution of the Company.

    (c)    <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

    (d)    <u>Rights and Votes of Members</u>.

        (1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

        (2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

    3.2    <u>Third Party Reliance</u>.

    Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

    3.3    <u>No Duty to Consult</u>.

    Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

    3.4    <u>Outside Activities of Managers</u>.

    The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor

13

any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5     Intentionally Deleted.

3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

3.7     Managers and Affiliates Dealing with the Company.

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8     Indemnification of Managers.

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9     Company Meetings.

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them.  Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10    Guarantees of Financing.

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the

14

granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

    3.11    <u>Books and Records</u>.

    The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

    3.12    <u>Bank Accounts</u>.

    The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

    3.13    <u>Deadlock</u>.

    (a)    If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply. A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

    (b)    Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or

15

obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)     Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

3.14    Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the MBMH Operating Agreement and the MBL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record: (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the MBMH Operating Agreement or the MBL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement. Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15    Services.

(a)     The Members acknowledge and consent to the following:

(1)     MBMH shall enter into one or more developer services agreements (the "Developer Services Agreements") with CRC Planned Communities LLC ("Developer"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the MBMH Operating Agreement) (the "Development Period"). MBMH may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the MBMH Operating Agreement (the "Out-Year Developer Services Agreements").

16

(2)    MBMH shall enter into one or more a construction contracts (the "**Construction Contracts**") with Clark Realty Builders, Inc. ("**CRB**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of general contractor services.  MBMH may also enter into one or more construction management agreements with CRB on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the MBMH **Operating** Agreement (the "**Out-Year Construction Management Agreements**").

(3)    MBMH shall enter into one or more property management agreements (the "**Property Management Agreements**" or the "**Pinnacle Member Service Contracts**") with Pinnacle Realty Management Company ("**Pinnacle Management**"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)    MBMH shall enter into one or more asset management agreements (the "**Asset Management Agreements**") with an Affiliate of the Clark Group  (the "**Asset Manager**"), on or before the Effective Date for the provision of asset management services.  For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "**Clark Member Service Contracts**."  The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "**Service Contracts**" and, individually, as a "**Service Contract**."

(b)    In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, (i)  the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc., and (ii) the Pinnacle Member shall be permitted without the consent of the Clark Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Property Management Agreement to American Management Services California Inc.  The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

## ARTICLE IV
## TRANSFER OF MEMBERSHIP INTERESTS

4.1    Transfers; Treatment of Assignees; Substituted Members.

(a)    No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as

17

hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager.  A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)     A "**Permitted Transferee**" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined).  In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee."  For purposes of this Agreement, "**Affiliate**" shall mean, as to any individual, partnership, corporation, trust or other entity ("**Person**"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person.  "**Control**" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below.  The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted.  An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company.  The value of such equity shall be mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage

Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest. All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

        (g)      In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

    4.2     <u>Death, Insanity or Incompetency, or Trust Termination of a Member.</u>

        (a)      In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's

19

admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

(b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests.  Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company.  The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

4.3     Bankruptcy of a Member.

(a)     In the event of the Bankruptcy (as herein defined) of a Member (the "Bankrupt Member"), then the Members other than the Bankrupt Member (the "Continuing Members"), pro rata, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

(b)     As used herein, the term "Bankruptcy" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "Bankruptcy Code"), an assignment for the benefit of creditors and/or an adjudication of

20

insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

4.4     Right to Effect Transfers.

(a)     The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

(b)     In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

ARTICLE V
TERM; DISSOLUTION

5.1     Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

5.2     Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an "**Event of Dissolution**") (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):(a) the unanimous written consent of the Managers; or (b) the dissolution of MBMH or MBL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or(d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the State of California.

5.3     Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

21

5.4     Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

(a)     First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

(b)     Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(c)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

5.5     Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement. Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

5.6     Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

ARTICLE VI
DEFAULT; REMEDIES

6.1     Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default"**:

22

(a)      A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

(b)      A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

(c)      A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

(d)      A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)      The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)      If an Event of Default occurs with respect to a Member (a **"Defaulting Member"**), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the **"Non-Defaulting Manager"**):

(1)      If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)      Each Member who is not in default (a **"Non-Defaulting Member"**) shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the **"Default Payment"**). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the **"Defaulting Manager"**) within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a **"Default Loan"**) and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or

23

distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A **"Default Interest Rate"** is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

(i)     To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the **"Dilution Fraction"**), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member. In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)     In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)     If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)     If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to

24

cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(b)     In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(c)     During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager. In such event, the vote of the remaining Manager(s) shall be sufficient to make all decision of the Company, including, without limitation, Major Decisions.

6.3     Obligations of Defaulting Member Continue.

Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

6.4     Setoff of Payments to Defaulting Member.

From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation,

25

payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII
MISCELLANEOUS

7.1      Amendment.

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

7.2      Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

7.3      Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

7.4      Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of Maryland. This Agreement may be executed in counterparts.

7.5      No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

7.6      Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith. No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer,

26

employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     MBMH Operating Agreement and MBL Operating Agreement.

In the event of a conflict between specific provisions of the MBMH Operating Agreement or the MBL Operating Agreement and specific provisions of this Agreement, the provisions of the MBMH Operating Agreement or the MBL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the MBMH Operating Agreement, the MBL Operating Agreement or this Agreement, respectively.

27

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK MONTEREY PRESIDIO LLC

By:    Clark Realty Capital, L.L.C., Manager

        By: _____
             Douglas R. Sandor, Manager

        By:    CEI Realty, Inc., Manager

             By: _____
             Lawrence C. Nussdorf, President

PINNACLE MONTEREY LLC

By: _____
Name: _____
Title: _____

## EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| **CLARK MEMBER:** | | |
| Clark Monterey Presidio LLC<br>7500 Old Georgetown Road, 15th Floor<br>Bethesda, MD 20814 | $700.00 | 70% |
| **PINNACLE MEMBER:** | | |
| Pinnacle Monterey LLC<br>2801 Alaskan Way, Suite 200<br>Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

**EXHIBIT 2**

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

OPERATING AGREEMENT
OF
CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

NGEDOCS :016600.0504 985953.3

TABLE OF CONTENTS

ARTICLE I          ORGANIZATIONAL MATTERS ........................................................ 1
    1.1          Formation of Company ............................................................................. 1
    1.2          Name .......................................................................................................... 1
    1.3          Principal Office and Registered Agent .................................................... 1
    1.4          Certificate of Formation ........................................................................... 2
    1.5          Purpose ...................................................................................................... 2
ARTICLE II         MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION
                    OF PROFITS AND LOSSES ...................................................... 2
    2.1          Members; Percentage Interests ................................................................ 2
    2.2          Initial Capital Contributions .................................................................... 3
    2.3          Additional Capital Contributions ............................................................ 3
    2.4          Capital Accounts ...................................................................................... 5
    2.5          Interest on Capital Contributions; Return of Capital Contributions .................... 6
    2.6          Loans ......................................................................................................... 6
    2.7          No Preemptive Rights .............................................................................. 7
    2.8          Cash Distributions .................................................................................... 7
    2.9          Allocation of Income, Gain, Loss and Deduction .................................... 9
ARTICLE III        MANAGEMENT AND RIGHTS OF MEMBERS ............................... 12
    3.1          Management by Managers; Rights of Members ...................................... 12
    3.2          Third Party Reliance ............................................................................... 14
    3.3          No Duty to Consult ................................................................................. 14
    3.4          Outside Activities of Managers .............................................................. 14
    3.5          Intentionally Deleted ............................................................................... 14
    3.6          Reimbursement ....................................................................................... 14
    3.7          Managers and Affiliates Dealing with the Company .............................. 15
    3.8          Indemnification of Managers .................................................................. 15
    3.9          Company Meetings .................................................................................. 15
    3.10         Guarantees of Financing ......................................................................... 15
    3.11         Books and Records .................................................................................. 15
    3.12         Bank Accounts ........................................................................................ 15
    3.13         Deadlock .................................................................................................. 16

3.14    Power of Attorney ............................................................................... 16
3.15    Services ................................................................................................ 17
ARTICLE IV       TRANSFER OF MEMBERSHIP INTERESTS ............................... 18
4.1    Transfers; Treatment of Assignees; Substituted Members ...................... 18
4.2    Death, Insanity or Incompetency, or Trust Termination of a Member ...... 20
4.3    Bankruptcy of a Member ..................................................................... 21
4.4    Right to Effect Transfers ..................................................................... 21
ARTICLE V       TERM; DISSOLUTION ................................................................. 21
5.1    Term .................................................................................................. 22
5.2    Events Resulting in Dissolution ........................................................... 22
5.3    Conclusion of Affairs .......................................................................... 22
5.4    Order of Priority in Liquidation ........................................................... 22
5.5    Termination ........................................................................................ 22
5.6    Transferring Member Obligations ......................................................... 23
ARTICLE VI       DEFAULT; REMEDIES ................................................................ 23
6.1    Event of Default ................................................................................. 23
6.2    Remedy for Event of Default ............................................................... 24
6.3    Obligations of Defaulting Member Continue ......................................... 26
6.4    Setoff of Payments to Defaulting Member ............................................ 26
ARTICLE VII       MISCELLANEOUS ..................................................................... 26
7.1    Amendment ........................................................................................ 26
7.2    Notices .............................................................................................. 26
7.3    Enforceability ..................................................................................... 27
7.4    Binding Effect .................................................................................... 27
7.5    No Third Party Beneficiary Rights ....................................................... 27
7.6    Limitation of Liability ......................................................................... 27
7.7    Further Assurances .............................................................................. 27
7.8    Prevailing Party .................................................................................. 28
7.9    CMC Operating Agreement and BL Operating Agreement ..................... 28

LIST OF EXHIBITS
EXHIBIT A - Percentage Interests

EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the 21st day of May, 2003 (the "**Effective Date**"), by and among the undersigned parties. Defined terms shall have the meanings given them in this Agreement and are capitalized in the text. Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

## WITNESSETH

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle California Military Communities LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

1.1   Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2   Name.

The name of the Company is **Clark Pinnacle California Military Communities LLC**. The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined). The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires. The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

### 1.3 Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is: c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention: Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members. The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate. The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

### 1.4 Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

### 1.5 Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort Irwin Land LLC ("IL"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Fort Irwin Land LLC (the "BL Operating Agreement") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort California Military Communities LLC ("CMC"), whose members shall be the Company and CMC Holdings LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of California Military Communities LLC (the "CMC Operating Agreement") to be entered into between the members thereof. The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement. The Company may not engage in any other activities.

## ARTICLE II
## MEMBERS; CAPITAL CONTRIBUTIONS;
## AND ALLOCATION OF PROFITS AND LOSSES

### 2.1 Members; Percentage Interests.

(a) The "Members" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof. The Members are divided into ownership groups (each a "Member Group"), as more particularly set forth on Exhibit A. For purposes hereof: (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "Clark Member," and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "Clark Group;" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "Pinnacle Member," and the

2

Members designated under the heading "Pinnacle" shall be herein referred to collectively as the **"Pinnacle Group."**

(b)    Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on Exhibit A.

(c)    The Percentage Interest of each Member shall be personal property for all purposes.

(d)    All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

## 2.2    Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the **"Initial Capital Contributions"**).  The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

## 2.3    Additional Capital Contributions.

(a)    During the period from the Effective Date hereof through the consummation of the financial closing (the **"Financial Closing"**) for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and IL (the **"Ground Lease"**), and in the IL Operating Agreement and CMC Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the **"Pre-Closing Costs"**).  Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**).  The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor.  It is anticipated that the Company shall endeavor to get CMC and IL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company.    Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)    The Company anticipates that, contemporaneously with the Financial Closing for the Project, IL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the IL Operating

3

Agreement and CMC Operating Agreement.   In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by CMC to secure performance of each Member's obligation to pay its pro rata share of the equity required by the CMC Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

(c)      Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**").   Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of  $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions.**" For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number by a percentage equal to the sum of (a) 60% of the percentage change in the Irwin CPI Index and (b) 40% of the percentage change in the Moffett/Parks CPI Index, in each case from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. Any number which is to be Adjusted by CPI in accordance with this Operating Agreement will be so adjusted effective on January 1, 2005, and on each January 1 thereafter based upon the adjusted number from the immediately preceding January 1.  **Irwin CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, Los Angeles, Riverside, Orange County Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member using such other index as is then generally recognized and accepted for similar determinations of purchasing power.  **Moffett/Parks CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, San Francisco, Oakland, San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member

4

using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager.  If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor.  If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below.  The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of Section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

(b)     For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)     Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)     Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

5

(3)     Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members.  "Unrealized Gain" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date.  "Unrealized Loss" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)     Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5     Interest on Capital Contributions; Return of Capital Contributions.

(a)     No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)     No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property other than cash.  Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6     Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**").  Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above.  Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s).  If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests.  Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.  No Member shall be required to make any loans to the Company.

6

2.7   No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8   Cash Distributions.

(a)   Net Cash Flow.

(1)   "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by:  (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2)   The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A)   First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds.  The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate.   If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B)   Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests.  The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

7

(C)     Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members.  Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests.  The "**Interest Rate**" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D)     Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E)     Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

(F)     Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)     <u>Capital Proceeds</u>.

(1)     "**Capital Proceeds**" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the IL Operating Agreement or the CMC Operating Agreement.

(2)     Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)     First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)     Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is

8

insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D) Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9     Allocation of Income, Gain, Loss and Deduction.

(a)     Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof.  The **"Gain-Adjusted Capital Account"** balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain.  **"Minimum Gain"** means (a) with respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) (**"Company Nonrecourse Liabilities"**) the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations.  **"Member Nonrecourse Debt"** means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)     Income Tax Elections.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)     Income Tax Allocations.

(1)     For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with

9

section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution. In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

(2)     If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

(d)     <u>Transfers during Fiscal Year</u>. In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer. The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items. Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale. Similarly, extraordinary or nonrecurring items shall be allocated in accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

(e)     <u>Amortization and Allocation of Organization and Start-up Expenses</u>. The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

(f)     <u>Special Capital Account "Book" Allocations to Comply with Section 704 Regulations</u>. The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder. Such special allocations shall be made before any allocations under Section 2.9(a) above.

(g)     <u>Tax Matters Member</u>.

(1)     The Clark Member is hereby appointed to act as the tax matters member (the "TMM"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "IRS") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

10

(2)    The TMM is authorized, but not required:

(A)    To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in Section 6231 of the Code) or a member of a "notice group" (as defined in Section 6223(b)(2) of the Code).

(B)    In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)    To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)    To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)    To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)    To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)    The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)    The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)    The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in

11

serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

## ARTICLE III
## MANAGEMENT AND RIGHTS OF MEMBERS

3.1 <u>Management by Managers; Rights of Members</u>.

(a) <u>Manager Designation</u>. The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member. The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**"). The initial Manager appointed by the Pinnacle Group is Pinnacle Irwin LLC (the "**Pinnacle Manager**"). Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

(b) <u>Power and Authority of the Managers</u>.

(1) The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs. The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

(2) The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions. The term "**Major Decisions**" shall mean any of the following:

(A)     Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

(B)     The Financial Closing and the terms and conditions thereof.

(C)     Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

(D)     Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

(E)     Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

(F)     Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

(G)     Amendment to the CMC Operating Agreement or the IL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

(H)     Termination or dissolution of the Company.

(c)     Delegation of Authority by Manager(s).  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

(d)     Rights and Votes of Members.

(1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

(2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new

13

Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

3.2     Third Party Reliance.

Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

3.3     No Duty to Consult.

Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

3.4     Outside Activities of Managers.

The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5     Intentionally Deleted

3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

14

NGEDOCS:016600.0504 985953.3

3.7 **Managers and Affiliates Dealing with the Company.**

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8 **Indemnification of Managers.**

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9 **Company Meetings.**

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them. Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10 **Guarantees of Financing.**

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

3.11 **Books and Records.**

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

15

3.12   Bank Accounts.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

3.13   Deadlock.

(a)   If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply.  A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**").  Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event.  Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**").  All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event.  The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties.  Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event.  If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof.  The decision of the Panel shall be final, binding and unappealable.  Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

(b)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

16

3.14    Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the CMC Operating Agreement and the IL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record:  (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the CMC Operating Agreement or the IL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement.  Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15    Services.

(a)     The Members acknowledge and consent to the following:

(1)     CMC shall enter into one or more developer services agreements (the "Developer Services Agreements") with CRC Irwin Planned Communities LLC ("Developer"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the CMC Operating Agreement) (the "Development Period").  CMC may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "Out-Year Developer Services Agreements").

(2)     CMC shall enter into one or more a construction contracts (the "Construction Contracts") with Clark Realty Builders, Inc. and The Clark Construction Group ("Clark Contractors"), Affiliates of he Clark Group, on or before the Effective Date for the provision of general contractor services.  CMC may also enter into one or more construction management agreements with Clark Contractors on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "Out-Year Construction Management Agreements").

(3)     CMC shall enter into one or more property management agreements (the "Property Management Agreements" or the "Pinnacle Member Service

17

NGEDOCS :016600.0504 985953.3

Contracts") with American Management Services California Inc. ("Pinnacle Management"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4) CMC shall enter into one or more asset management agreements (the "Asset Management Agreements") with Irwin Asset Manager LLC (the "Asset Manager") an Affiliate of the Clark Group, on or before the Effective Date for the provision of asset management services. For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "Clark Member Service Contracts." The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "Service Contracts" and, individually, as a "Service Contract."

(b) In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc. The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

ARTICLE IV
TRANSFER OF MEMBERSHIP INTERESTS

4.1     Transfers; Treatment of Assignees; Substituted Members.

(a) No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager. A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b) A "Permitted Transferee" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined). In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee." For purposes of this Agreement, "Affiliate" shall mean, as to any individual, partnership, corporation, trust or other entity ("Person"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person.

18

"Control" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below.  The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted.  An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company. The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage Interest (the "Agreement Period"), then the value shall be determined using the following appraisal method (the "Appraisal Method"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest.  All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall

19