# Exhibit K

Part 2

be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

(g)     In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

4.2     Death, Insanity or Incompetency, or Trust Termination of a Member.

(a)     In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

(b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests. Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company. The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the

20

Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

4.3     Bankruptcy of a Member.

(a)     In the event of the Bankruptcy (as herein defined) of a Member (the "**Bankrupt Member**"), then the Members other than the Bankrupt Member (the "**Continuing Members**"), pro rata, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

(b)     As used herein, the term "**Bankruptcy**" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "**Bankruptcy Code**"), an assignment for the benefit of creditors and/or an adjudication of insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

4.4     Right to Effect Transfers.

(a)     The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

(b)     In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

21

## ARTICLE V
## TERM; DISSOLUTION

5.1     Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

5.2     Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an "**Event of Dissolution**") (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):  (a) the unanimous written consent of the Managers; or (b) the dissolution of CMC or IL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or (d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the Commonwealth of California.

5.3     Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

5.4     Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

(a)     First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

(b)     Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

22

(c)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

## 5.5     Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.   Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

## 5.6     Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

## ARTICLE VI
## DEFAULT; REMEDIES

## 6.1     Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default"**:

(a)     A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

(b)     A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

(c)     A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

23

(d)     A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)     The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)     If an Event of Default occurs with respect to a Member (a "**Defaulting Member**"), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the "**Non-Defaulting Manager**"):

(1)     If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)     Each Member who is not in default (a "**Non-Defaulting Member**") shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the "**Default Payment**"). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the "**Defaulting Manager**") within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a "**Default Loan**") and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A "**Default Interest Rate**" is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

24

(i)     To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the "**Dilution Fraction**"), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member. In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)     In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)     If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)     If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

25

(b)     In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(c)     During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager.  In such event, the vote of the remaining Manager(s) shall be sufficient to make all decisions of the Company, including, without limitation, Major Decisions.

6.3     <u>Obligations of Defaulting Member Continue.</u>

Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

6.4     <u>Setoff of Payments to Defaulting Member.</u>

From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation, payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII<br>MISCELLANEOUS

7.1     <u>Amendment.</u>

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it

26

NGEDOCS :016600.0504 985953.3

to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

### 7.2    Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

### 7.3    Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

### 7.4    Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of California.  This Agreement may be executed in counterparts.

### 7.5    No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

### 7.6    Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

NOEDOCS :016600.0504 985953.3

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:     Clark Realty Capital, L.L.C., Manager

      By:     _____
              W. Cleveland Johnson,
              Authorized Representative

By:     CEI Realty, Inc., Manager

      By:     _____
              Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:     _____
        Stanley J. Harrelson, Manager

28

7.7    Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8    Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9    CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:    Clark Realty Capital, L.L.C., Manager

    By:    _____
          W. Cleveland Johnson,
          Authorized Representative

By:    CEI Realty, Inc., Manager

    By:    _____
          Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:    _____
          Stanley I. Harrelson, Manager

28

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| CLARK MEMBER: | | |
| Clark Irwin LLC 7500 Old Georgetown Road, 15th Floor Bethesda, MD 20814 | $700.00 | 70% |
| PINNACLE MEMBER: | | |
| Pinnacle Irwin LLC 2801 Alaskan Way, Suite 200 Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

# EXHIBIT 3

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of March, 2004, by and between CALIFORNIA MILITARY COMMUNITIES LLC, a Delaware limited liability company (hereinafter referred to as "OWNER"), and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

## PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Fort Irwin, Moffett Community Housing Area and Parks Reserve Forces Training Area and is located in San Bernardino County, California, Santa Clara County, California, and Alameda County, California, consisting of (i) the land (the "Land"), as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (the "Secretary"), as lessor, and Fort Irwin Land LLC, as lessee (the "Ground Lease"), as subleased pursuant to that certain Sublease and Lease of even date herewith by and between Fort Irwin Land LLC (as sublessor) and Owner (as sublessee) (the "Sublease"); and (ii) improvements ("Improvements") located on the Project and leased by Owner pursuant to the Sublease.

## SECTION 1

## APPOINTMENT OF MANAGING AGENT

1.1    APPOINTMENT AND ACCEPTANCE: Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the Project and improvements thereon owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, or Limited Liability Company Agreement of Owner or (b) any action which would cause Owner to be in default under the Sublease.

1.2    TERM: The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of March, 2004, subject to the other provisions of this Agreement.

1.3    MANAGEMENT OFFICE: Owner shall pay all reasonable expenses related to the management office maintained by the Manager, exclusively for the use of Manager to conduct the business of the management of the Project, as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services. All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Owner shall give Manager prior written notice of any changes in such policies.

1.4    OMITTED

1.5    BUDGET AND BUSINESS PLAN: Owner and Manager will establish a budget and business plan for operation and management of the Project (the "Plan"). The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation. Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require Owner's advance approval, except as provided in Section 4.2 hereof. Owner agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance. The Plan shall include, at a minimum, the following:

A.        Minimum Leasing Guidelines established by Owner setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.        Capital Improvement Plan: Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed

1

NGEDOCS:016600.0504 973807.8

during Owner's and Manager's pre-acquisition inspection of the property (if applicable). Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property. A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

## BANK ACCOUNTS

2.1     BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project. Operating trust accounts are hereinafter referred to as "operating accounts". All other accounts are hereinafter referred to as "trust accounts". Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by Owner. All other funds shall be placed in an operating account for Owner. All trust accounts shall be operated in conformance with state law. Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager. All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government. All such depository banks shall be selected by Manager and shall be satisfactory to Owner. Manager shall not be liable to Owner in the event of bankruptcy or failure of a depository institution. Manager shall open the above-described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by Owner. Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2     REMITTANCES. Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated March 1, 2004 ("Deed of Trust") between Owner and Fort Irwin Land LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income (defined below), casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3     INITIAL DEPOSIT FOR RESERVES: Immediately upon commencement of this Agreement, Owner shall remit to Manager a sum to be deposited in Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve. Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of Owner under this Agreement as they become due. Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4     MANAGER'S OBLIGATION TO ADVANCE PAYMENTS: All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner. All such purchases shall be made by Manager solely on behalf of Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation. In the event that there are insufficient funds in Owner's operating account, Manager may, after notifying Owner, advance its own funds for such purpose, in which event Owner shall promptly repay to Manager all such sums expended.

2.5     INTEREST ON TRUST ACCOUNTS: Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at Owner's request. All interest earned on such funds shall belong to Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2.6     OTHER. Notwithstanding anything herein to the contrary, Manager shall not (i) commingle funds of Owner with its funds or the funds of any third party, (ii) hold itself out as Owner of the Project, (iii) guaranty or hold itself out as liable for any debts or obligations of Owner, (iv) hold Owner out as liable for Manager's debts or the debts of any third party, or (v) pay the Manager's non-reimbursable expenses or the expenses of any third party from Owner's funds.

## SECTION 3

## COLLECTION OF RENTS AND OTHER RECEIPTS

2

3.1    <u>AUTHORITY OF MANAGER:</u> Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by Section 11.5 herein.

3.2    <u>SPECIAL CHARGES:</u> Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

**SECTION 4**

<u>**DISBURSEMENT FROM OPERATING ACCOUNTS**</u>

4.1    <u>OPERATING EXPENSES:</u> From Owner's operating account, and subject to <u>Exhibit A</u>, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Owner has sole responsibility for the timely payment of all authorized expenses of the Project, including all payments of fees to Manager consistent with the schedule of fees set forth on <u>Exhibit A</u>.

4.2    <u>EXTRAORDINARY EXPENSES:</u>  Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of Owner.  Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify Owner in detail, concerning such expenditures.

4.3    <u>AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES:</u> Manager shall pay from Owner's operating account, in accordance with the Plan or as otherwise directed by Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges:  all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees.

4.4    <u>EXPENSES TO BE PAID DIRECTLY BY OWNER:</u>  In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

4.5    <u>FEES FOR LEGAL ADVICE:</u>  Owner shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owner, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this Section shall obligate Owner to pay Manager's legal fees in the event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.

4.6    <u>NET PROCEEDS:</u> To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to the Project to Owner at least monthly at a time specified by Owner.  Such periodic cash payments shall be remitted to J.P. Morgan Trust Company, National Association, as escrow agent.

4.7    <u>PRIORITY OF PAYMENT:</u>  Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall

be paid in the following order: Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts.  Where the terms of any loan security agreement with Owner conflict with the terms of this Section, the terms of such loan security agreement shall control, provided, Owner has notified Manager of the existence of any such condition.

## SECTION 5

### FINANCIAL AND OTHER REPORTS

5.1     REPORTS:  By the 10th business day of each month, Manager shall furnish to Owner a statement of receipts and disbursements from the operation of the Project during the prior calendar or fiscal month.  In addition, Manager shall, on a mutually acceptable schedule and at Owner's request, prepare and submit to Owner such other reports as Owner shall specify, including, but not limited to the following:

a.)     Weekly occupancy, leasing status and traffic reports.
b.)     Monthly market comparable rent survey.
c.)     Monthly bank reconciliation.

In addition, Manager will furnish to Owner:

Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Owner for that fiscal year, a statement of changes in financial position of Owner for that fiscal year and, when requested by Owner's mortgagee, a balance sheet showing all assets and liabilities of Owner relating to the Project as of the end of that fiscal year, all audited at Owner's expense by an independent certified public accountant reasonably acceptable to Owner's mortgagee.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Owner.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Owner and any Controlling Entity and the interest held by each, and if Owner or a Controlling Entity is a corporation, all officers and directors of Owner's mortgagee and the Controlling Entity, as applicable, and if Owner or a Controlling Entity is a limited liability company, all managers who are not members.

Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Net Operating Income (as defined in the Loan Agreement) and operating expenses for such month and a calculation of the Debt Service Coverage Ratio (as defined in the Loan Agreement).

Without limitation to the foregoing, all income and expense reports shall provide separate accounting for the senior unaccompanied housing (SUH) units from all other Improvements within the Project, with such operating expense reports relating to the SUH units excluding reference to debt service payments and payments of rent under the Sublease.  Where practicable, expenses incurred with respect to the entire Project may be reasonably allocated between the SUH  units and the remainder of the Project.

For purposes hereof, **"Loan Agreement"** means that certain Construction Loan Agreement of even date herewith between Fort Irwin Land LLC, as lender, and Owner, as borrower.

**"Controlling Entity"** means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Owner (if Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Owner or more than 50% of ownership or membership interests in Owner (if Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Owner (if Owner is a corporation).

5.2     OWNER'S RIGHT TO AUDIT:  Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by Owner, as an expense of Owner. Such audits may be made during normal business hours posted at the Project.

4

NGEDOC'S :016600.0504 973807.8

## SECTION 6

### ADVERTISING

6.1     ADVERTISING:   The cost of advertising shall be paid out of Owner's operating account, in accordance with the advertising budget or as approved by Owner. All advertising shall make clear that Manager is the manager and is not Owner of the Project.

## SECTION 7

### LEASING AND RENTING

7.1     MANAGER'S AUTHORITY TO LEASE PROJECT: Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Sublease, and the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for Owner. All costs of leasing shall be paid out of Owner's operating account, in accordance with the leasing budget or as approved by Owner. No rental agreement shall be for a period in excess of one (1) year without the written approval of Owner. The form of the rental agreement shall be provided by Owner.

Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Owner's mortgagee (or without Owner's written certification that such consent is deemed received under the applicable loan documents). Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder; terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgagee. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

Manager will not permit Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

7.2     NO OTHER RENTAL AGENT:   During the term of this Agreement, Owner shall not authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project. Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3     RENTAL RATES:   In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with respect to the Project. As authorized in writing by Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4     ENFORCEMENT OF RENTAL AGREEMENTS: Subject to any conditions or limitations imposed by Owner, Manager is authorized to institute and defend, in Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Manager is authorized to sign and serve such notices as Manager and Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income. Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less. Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of Owner before entering into any compromise, settlement, or release of such legal action. Any moneys for such settlements paid out by Manager shall be an operating expense of the Project. Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or

5

shall be reimbursed directly to Manager by Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against Owner or Manager as the agent of Owner.

## SECTION 8

## EMPLOYEES

8.1     MANAGER'S AUTHORITY TO HIRE: Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2     OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working for the Project (both on-site and off-site) including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owner's funds, from the Project operating accounts subject to the Plan and allocated equitably between Owner. In addition, Manager shall accrue for all vacation pay due employees working for the Project (both on-site and off-site) and provide a quarterly reconciliation to Owner of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed for or in connection with the Project.

8.3     MANAGER'S RESPONSIBILITY TO FILE RETURNS: Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

## SECTION 9

## OPERATIONS, MAINTENANCE AND REPAIR

9.1     PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Owner under the Sublease and any loan documents affecting the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by Owner, Manager is also authorized to decorate the Project and the individual apartment units and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of Owner. If Owner selects a vendor for use on the Project, Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2     FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES: With Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager. Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be

6

more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3    CONTRACTS, UTILITIES AND SERVICES:  Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00.  Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan.  All utility deposits shall be Owner's responsibility, except that Manager may pay the same from the operating accounts if directed to do so.

9.4    LIMITATIONS ON CONTRACTS:  Each such contract or agreement shall: (a) be in the name of Owner, (b) be assignable, at Owner's option, to Owner or Owner's nominee, (c) include a provision of cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance.  If this agreement is terminated pursuant to Section 18, Manager shall, at Owner's option, assign to Owner or Owner's nominee all contracts and agreements pertaining to the Project.  Manager shall then notify Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

9.5    MAINTAINING HISTORIC STATUS:  Manager shall implement Owner's responsibilities to comply with the covenants of Owner set forth in Section 27.b. of the Sublease relating to ordinary repair and maintenance of "Historic Property", provided that Owner shall provide the necessary funds for compliance with such obligations.

9.6    ENVIRONMENTAL.  Manager shall be responsible for performing on behalf of Owner such ordinary, non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

## RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor.  Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with ownership or operation of the Project.  Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owner.  Owner agrees to assume all financial risks of operating the Project including any claims made against Manager while acting as Owner's agent within the scope of its authority as provided herein.  Except as provided herein, neither party shall have the power to bind or obligate the other party.  Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owner; and, except as provided in this Agreement, Owner shall not act as the principal of Manager.  Owner, in dealing with Manager hereunder, agrees (i) to act in conformity with the restrictions, limitations, and covenants set forth in its operating agreement and (ii) not to consent to any action by Manager which would violate the restrictions, limitations, and covenants set forth in its operating agreement.

## SECTION 11

## INDEMNIFICATION AND BONDING

11.1    INDEMNIFICATION BY OWNER

A.    Indemnification for Injuries to Person and Property:  To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons, or property including, but not limited to, those relating to or arising out of the premises of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

B.     Indemnification for Vendor and Tenant Claims:  Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager.  Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

C.     General Provisions:  Except as expressly set forth herein, nothing contained in Section 12 shall relieve Owner of its obligation under Section 11 of this Agreement.

11.2     INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS:  Subject to Paragraph 11.1, Manager shall indemnify, protect, defend and save Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws.  Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of Owner or if Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3     WAIVER OF CLAIMS:  Other than as provided in Section 11.2, Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4     SCOPE OF INDEMNITY:  Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action.  All reasonable costs and expenses of such defense shall be borne by the indemnitor.  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor.  The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

11.5     BONDING:  Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owner to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6     TERM OF INDEMNIFICATION:  The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

## SECTION 12

## INSURANCE

12.1     INSURANCE BY PROPERTY MANAGER:  At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owner and Manager and such additional insured as may be necessary from time to time.  Owner shall be included as named insureds on Manager's policy.  Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of Owner; provided the amount of the deductible or SIR is pre-approved by Owner.

A.     Property Insurance:  Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.  The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of Owner and Manager.

8

B.     General Liability Insurance: Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

C.     Excess/Umbrella Liability: Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence. Such coverage shall be excess to the automobile liability and employer's liability coverage.

D.     Automobile Liability Insurance: Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit.

E.     Named Insured: Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement. The members and managers of Owner and such others as may be designated from time to time by Owner shall be named as additional insured. It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owner. Manager will secure endorsements to this effect from all appropriate insurers of such policies.

F.     General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to Owner and shall require a minimum of thirty (30) days written notice to Owner prior to any cancellation of or changes to said policies. Manager agrees to provide Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2    PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions): Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

12.3    WORKER'S COMPENSATION /EMPLOYER LIABILITY . Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4    RENTER'S INSURANCE  Manager shall procure and maintain at the cost and expense of Owner, such renter's insurance (property and/or liability) for the benefit of residents of the Project, as Owner shall request from time to time.

### SECTION 13

### MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owner or any previous owners of the Project, or any previous property managers or other agents of Owner or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any rental agreement or otherwise unless caused by gross negligence or willful misconduct of Manager. Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any environmental violations or hazards discovered by Manager shall be brought to the attention of Owner in writing and Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owner shall be solely liable for all vendor claims and tenant claims, whether made against Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

9

## SECTION 14

## ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1    ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owner, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement.  Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of Owner's rights under the Sublease or Building Lease, respectively.

## SECTION 15

## MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"Applicable Project" shall mean, as appropriate, the Irwin Project, Moffett Project or Parks Project.

"Irwin Project" shall mean the portion of the Project located within Fort Irwin, San Bernardino County, California.

"Moffett Project" shall mean the portion of the Project located within Moffett Field, Santa Clara County, California.

"Parks Project" shall mean the portion of the Project located within Parks RFTA, Alameda County, California.

"Effective Gross Income" shall mean, as to each Applicable Project for a given period of time, all rents and other income and charges from the normal operation of the Applicable Project, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units located within the Applicable Project, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Applicable Project and concessionaires (if any) in respect of the Applicable Project, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Applicable Project or the improvements thereon.  Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

"Initial Scope" shall mean scope of development of the Applicable Project as contemplated by that certain Construction Agreement of even date herewith by and between Owner and Clark Realty Builders, Inc., a California corporation (with respect to the Moffett Project and Parks Project) and by that certain Construction Agreement of even date herewith between Owner and The Clark Construction Group, Inc., a Maryland corporation (with respect to the Irwin Project).

"Increased Scope" shall mean any increase over the Initial Scope in the number of new residential units to be developed as part of the Applicable Project.

"Adjusted by CPI" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the Applicable CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment.  For example, the adjustment to be made on January 1, 2005 would be based upon the change in the Applicable CPI Index from October 2003 to October 2004.

"Applicable CPI Index" shall mean (a) the Irwin CPI Index with respect to the Irwin Project, and (b) the Moffett/Parks CPI Index with respect to the Moffett Project and the Parks Project.

10

NGEDOCS:016600.0504 973807.8

"<u>Irwin CPI Index</u>" shall mean the "Consumer Price Index for All Urban Consumers, Los Angeles, Riverside, Orange County Index, Subgroup All Items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"<u>Moffett/Parks CPI Index</u>" shall mean the "Consumer Price Index for All Urban Consumers, San Francisco, Oakland, San Jose Index, Subgroup All Items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"<u>Base Year</u>" shall mean with respect to each Applicable Project the then most recently completed calendar year preceding an Adjustment Date whenever an adjustment is made to the calculation of the applicable CPI Effective Gross Income per Door.

"<u>Unit Days Occupied</u>" shall mean with respect to any period and any Applicable Project the sum total of the number of housing units within such Applicable Project which are occupied each day within such period. By way of example, if the Irwin Project has 2028 units in any given 30-day month, and 1900 of such units were occupied during each of the first 15 days of such month and 2000 of such units were occupied during each of the final 15 days of such month, then the total Unit Days Occupied with respect to such month would be calculated as follows: (1900 x 15) + (2000 x 15) = 58,500 Unit Days Occupied.

"<u>Occupied Units</u>" shall mean with respect to any period and any Applicable Project the quotient of (i) the total Unit Days Occupied with respect to such Applicable Project within such period, divided by (ii) the number of days in such period. The portion of Occupied Units attributable to the Initial Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above multiplied by a fraction, the numerator of which is the lesser of (i) the total number of housing units within the Applicable Project as of the end of such period, or (ii) the total number of housing units within the Initial Scope, and the denominator of which is the total number of housing units within the Applicable Project as of the end of such period. The portion of Occupied Units attributable to the Increased Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above less the portion of such Occupied Units attributed to the Initial Scope as determined above, if any.

"<u>CPI Effective Gross Income per Door</u>" shall mean as follows: (a) for calendar year 2004, CPI Effective Gross Income per Door shall mean (i) $10,512 with respect to the Irwin Project, (ii) $31,464 with respect to the Moffett Project, and (iii) $25,104 with respect to the Parks Project (in each case, the "Initial Base Year CPI Effective Gross Income per Door"); (b) for each calendar year after 2004 through the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Owner's operating agreement), CPI Effective Gross Income per Door shall mean, with respect to each Applicable Project, the applicable Initial Base Year CPI Effective Gross Income per Door then Adjusted by CPI to January 1 of such subsequent calendar year; (c) at the end of the calendar year in which delivery of the last unit in the Initial Development Phase occurs, and every five years thereafter (each, an "<u>Adjustment Date</u>"), (x) the most recent annual Effective Gross Income with respect to each Applicable Project will be compared to (y) the then calculated CPI Effective Gross Income per Door with respect to such Applicable Project, multiplied by the number of Occupied Units within such Applicable Project during such year. If the result in clause (x) is 10% or more greater than the result in clause (y) with respect to any Applicable Project, then (A) the CPI Effective Gross Income per Door with respect to such Applicable Project shall become the most recent annual Effective Gross Income with respect to such Applicable Project divided by the number of Occupied Units during such year within such Applicable Project, (B) the then most recent year shall become the "Base Year" from which CPI Effective Gross Income per Door will be calculated for subsequent years with respect to such Applicable Project, and (C) for subsequent years, CPI Effective Gross Income per Door shall mean the Effective Gross Income from the Applicable Project for the applicable Base Year, divided by the number of Occupied Units within such Applicable Project during such Base Year, then adjusted by CPI to January 1 of such subsequent calendar year. If the result in clause (x) above is less than 10% greater than the result in clause (y) above with respect to any Applicable Project on any such Adjustment

NGEDOCS:016600.0504 973807.8

Date, then there shall be no adjustment in the manner in which CPI Effective Gross Income per Door is calculated until the next Adjustment Date.  For purposes of this Section only, Effective Gross Income will be determined based on the Improvements, as if all "Doors" were leased by Owner.

    15.1    COMPENSATION:  As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), Owner shall pay Manager the following compensation with respect to each Applicable Project:

    (a)    Base Fee:  For each month of operation, the lesser of the following, with payment due on the 10th day after the end of the applicable month:

    (i)    2.75% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable to the Initial Scope, plus 1.50% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable solely to the Increased Scope (if applicable); or

    (ii)    an amount equal to the sum of (1) 2.75% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Initial Scope divided by 12 multiplied by (y) the number of units within the Initial Scope of such Applicable Project occupied during such month, plus (2) 1.50% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Increased Scope (if applicable) divided by 12 multiplied by (y) the number of units within the Increased Scope of such Applicable Project occupied during such month.

    (b)    Incentive Fee:  The annual Incentive Fee with respect to each Applicable Project is calculated as the earned portion (per the Incentive Performance Management Plan ("IPMP") attached as Exhibit B) of the lesser of (1) the sum of (A) 1.50% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Initial Scope plus (B) 2.75% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Increased Scope or (2) the sum of (A) the product of (i) 1.50% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Initial Scope, multiplied by (ii) the number of units within such Applicable Project within the Initial Scope occupied during such year, plus (B) the product of (i) 2.75% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Increased Scope multiplied by (ii) the number of units within such Applicable Project within the Increased Scope occupied during such year, and will be payable during the year earned as follows:

    (i)    Calendar Year 2004:  Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of the maximum potential Incentive Fee with respect to the Applicable Project for such quarter; provided, that after the completion of calendar year 2004, the actual fee earned for calendar year 2004 shall be determined in accordance with Exhibit B and if Manager has been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

    (ii)    Subsequent Years:  The same procedure shall be used as in calendar year 2004, except that the prior year's actual earned portion of the Incentive Fee with respect to the Applicable Project shall be substituted for 75% of the maximum potential incentive fee in the formula described in (i) above. For example, if in 2006, Manager earns an incentive fee with respect to any Applicable Project of 78% of 1.50% (i.e., 1.17%) with respect to the units in the Initial Scope and 78% of 2.75% (i.e. 2.145%) with respect to units in the Increased Scope, then estimated payments for 2007 with respect to such Applicable Project shall be based upon 1.17% of Effective Gross Income with respect to units in the Initial Scope (in lieu of 75% of 1.50% of Effective Gross Income with respect to such units) and 2.145% of Effective Gross Income with respect to units in the Increased Scope (in lieu of 75% of 2.75% of Effective Gross Income with respective to such units).

    15.2    ACTS OF GOD:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if Owner engages Manager to oversee such restoration work under a separate written agreement, Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of Owner's insurance policy.

12

15.3     CONSTRUCTION MANAGEMENT SERVICES: If Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement. Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion.

15.4     FOR OTHER ITEMS OF MUTUAL AGREEMENT:  Should Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by Owner to Manager for such additional services.

15.5     FOR REIMBURSEMENT OF EXPENSES:  In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan and to the extent not already directly paid from the operating account (collectively, the "Reimbursable Expenses"), including, without limitation, the following:  (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc. and any expenses set forth in Section 8.2 hereof; (b) third-party consulting services approved by Owner (where Owner requests and Manager, in its sole discretion, agrees to contract with a third party); (c) out-of-pocket travel expenses for travel related to the provisions of services (air transportation incurred at a rate not in excess of a coach or coach equivalent public rate), including lodging and ground transportation to and from the Project (including, but not limited to temporary lodging for on-site personnel not residing at or near the Project gas or mileage reimbursement, taxi fares and parking or meter charges); (d) expense of long-distance communications; and (e) expense of reproductions, postage and handling.  All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.

SECTION 16

**STRUCTURAL CHANGES**

Owner expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to Section 4.2 of this Agreement, and Manager shall notify Owner appropriately.

SECTION 17

**BUILDING COMPLIANCE**

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Ground Lease.  Owner authorizes Manager to disclose ownership of the Project(s) to any such officials and agrees to indemnify, protect, defend and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, this indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owner, as provided under the terms and provisions of this Agreement.

SECTION 18

**TERMINATION**

18.1     TERMINATION FOR CAUSE:  Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

13

A.    Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable; or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured.  However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.    Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.    Default:  In addition to the default set forth in Section 18.1.A, each of the following events shall constitute an event of default by the party in respect of which such event occurs:

      1.    the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

      2.    the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

      3.    the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days; or

      4.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

D.    Termination of Sublease.  By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.    Sale.  By any party, upon written notice to the others, upon the sale of all or substantially all of Owner's interest in the Project to a third party unaffiliated with Owner.

    18.2    TERMINATION COMPENSATION:  Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) Owner from Manager, if any, as a result of such termination).  To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to Owner, such sums shall be payable from the operating accounts.  Any amounts due in excess of the funds available from an operating account shall be paid by Owner to Manager upon demand.

    18.3    OWNER RESPONSIBLE FOR PAYMENTS:  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by Owner.  In addition, Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on Owner's behalf under this Agreement.

    18.4    ACCOUNTS; UNPAID BILLS:  Manager shall deliver to Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due Owner and tenant security deposits which were held by Manager with respect to the Project, as well as a final accounting reflecting the balance of income and expenses with respect to the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to Owner.

14

18.5    FINAL ACCOUNTING:   Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Project are deemed to be the property of Owner, they are to be delivered to Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager.  Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.  Each Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to the Project.

18.6    NON-INTERFERENCE WITH MANAGER'S BUSINESS:   Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business.  Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement.  Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from Owner.

18.7    WRITTEN DIRECTION.   A direction or consent of Clark Pinnacle California Military Communities LLC (the managing member of Owner on behalf of Owner shall be deemed the direction or consent of Owner hereunder and Manager may rely on such direction or consent as the act of Owner).

## SECTION 19

## REPRESENTATIONS

19.1    OWNER'S REPRESENTATIONS AND WARRANTIES:   Owner represents and warrants as follows:  (a) Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so;  (b) there are no written or oral agreements affecting the occupancy of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager;  (c) all permits for the operation of the Project has been secured and are current; (d) Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will affect the operation of the Project; and (e) if Owner requests Manager to enter any agreements for the benefit of third parties, Owner hereby agrees to fully indemnify Manager for all claims arising from such agreements.

19.2    MANAGER'S REPRESENTATIONS AND WARRANTIES:  Manager represents and warrants as follows:  (a) the officers of Manager have the full power and authority to enter into this Agreement;  (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

19.3    ESTOPPEL CERTIFICATE.  Manager and Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

## SECTION 20

## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

## FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

15

NGEDOCS :016600.0504 973807.8

## SECTION 22

### COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owner and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owner and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

## SECTION 23

### RIGHTS CUMULATIVE; NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

### APPLICABLE LAW AND LITIGATION

24.1    INTERPRETATION: The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project. If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owner.

24.2    LITIGATION: In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

## SECTION 25

### NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Owner and Manager individually may specify hereafter in writing:

MANAGER:    AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.
4200 Rocklin Road, Suite 1
Rocklin, California 95677

OWNER:    CALIFORNIA MILITARY COMMUNITIES LLC
Attention: Douglas R. Sandor
Two Bethesda Metro Center
Suite 250
Bethesda, Maryland 20814

16

WITH A COPY TO:          CLARK ENTERPRISES, INC.
                         Rebecca Owen, Esq.
                         General Counsel
                         7500 Old Georgetown Road
                         15th Floor
                         Bethesda, Maryland  20814

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

17

NGEDOC'S :016600.0504 973807.8

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**CALIFORNIA MILITARY COMMUNITIES LLC** a Delaware limited liability company

By:    Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

        By:    Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:
            Name:  W. Cleveland Johnson
            Title:   Authorized Representative

        By:    CEI Realty, Inc., a D.C. corporation, Manager

            By:
                Lawrence C. Nussdorf, President

By:    Pinnacle Irwin LLC, a Washington limited liability company, Manager

        By:
        Name:  Stan Harrelson
        Title:   Manager

**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington corporation

By:
Name:  Stan Harrelson
Title:   President

18

NGEDOCS :016600.0504 973807.8

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

CALIFORNIA MILITARY COMMUNITIES LLC a Delaware limited liability company

By:    Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

        By:    Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:   _____
            Name:  W. Cleveland Johnson
            Title:  Authorized Representative

        By:    CEI Realty, Inc., a D.C. corporation, Manager

            By:   _____
               Lawrence C. Nussdorf, President

By:    Pinnacle Irwin LLC, a Washington limited liability company, Manager

        By:   _____
        Name:  Stan Harrelson
        Title:  Manager

AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation

By:   _____
Name:  Stan Harrelson
Title:  President

18

**Exhibit A**

To the extent approved herein and authorized by Owner in the Approved Budget, the following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

Benefits Administration for site staff:                                3% charge on-site payroll in
                                                                       addition to premiums per
                                                                       Plan

    Insurance Premiums (medical, dental, vision, LTD, Life)
    Broker's Fees
    Claims handling expenses
    COBRA administration
    401K Plan administration

Copies                                                                 As incurred

Long Distance Charges                                                  As incurred

Management Fee:                                                        See Section 15

Postage/Overnight:                                                     As incurred

Worker's Compensation Insurance:                                       Fees rolled into budgeted rate per Plan

    Insurance Premiums
    Broker's Fees
    Claims handling expense

19

NGEDOCS :016600.0504 973807.8

**Exhibit B**

**PROPERTY MANAGEMENT INCENTIVE PERFORMANCE MANAGEMENT PLAN**

**Objectives**

The focus is always on the importance of quality family housing.  The performance incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement.  The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings will be rewarded with increased a performance pay schedule.  The rewards will be quantified through written feedback from the residents.

**Measurement Criteria**

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Effective Gross Income for Owner.  Achievement of the management incentive fee is to be based on customer satisfaction.  The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

**Subjective Survey**

Customer satisfaction will be measured in two parts:

The first part, Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs.  This portion will account for twenty five percent (25%) of the total incentive available.

The second portion is named Government Satisfaction and will be based upon the contractor ability to successfully work with its military counterparts.  This portion will account for ten percent (10%) of the total incentive available.

**Resident Satisfaction**

Owner will retain a third-party firm to evaluate the performance or the Property Manager.  The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix to the CDMP Legal and Governance Plan.  The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest.  The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below.  As an example:  if 100 persons were surveyed and the results were as indicated in the table below the average grade would be 6.50.

| Grade | #Response | Value | Total |
|-------|-----------|-------|-------|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 15 | 5 | 75 |
| | 10 | 4 | 40 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 100 | 6.50 | 650 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination.  The firm will attempt to elicit survey participation by all of the

NGEDOCS :016600.0504 973807.8

current residents. The RCI Office will compose a letter with the Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third-party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm. The results will be provided to Owner and the RCI Office who will compare them to benchmarked objectives. These results will account for twenty-five percent (25%) of the incentive determination. The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| During IDP | 1 - 2.0 | 2.1 – 4.9 | 5.0 – 8.4 | 8.5+ |
| | 0% | 15% | 20% | 25% |
| Post-IDP | 1 – 2.9 | 3.0 – 6.9 | 7.0 – 8.9 | 9.0 + |
| | 0% | 15% | 20% | 25% |

**Government Satisfaction**

Owner will retain a third-party firm to evaluate the performance of the Property Manager. The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a survey form that will be provided to the following key government representatives:

- Garrison Commander
- RCI Director
- RCI Deputy Director
- Chief of Staff
- Base Commander

The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The survey for each participant identified above will equal two percent (2%) of the total potential incentive available. The total of all five responses will be averaged and multiplied times the overall incentive available. As an example, if the five surveys came back with numerical scores of 6.0, 7.0, 8.0, 9.0 and 10.0 the total would be 40.0 which when divided by five would average a score of 8.0. That score of 8.0 would be considered as 80% of the total potential of ten (10%) percent available (or 8%). In this instance 8% of the incentive would be paid. In the event the average equals 5.0 or less, no incentive will be deemed earned. Below is the scale for each individual response.

| Grade | Response | Value |
|---|---|---|
| Superior (10) | 10 | 100% |
| | 9 | 90% |
| | 8 | 80% |
| | 7 | 70% |
| | 6 | 60% |
| Average (5) | 5 | 50% |
| | 4 | 40% |
| | 3 | 30% |
| | 2 | 20% |
| Poor (1) | 1 | 10% |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination. The firm will attempt to elicit survey from the participants identified above. The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the participants, and after completing the survey, the participants return the survey directly to the third-party firm. The results will be provided to Owner and the RCI Office

21

who will compare them to benchmarked objectives. These results will account for ten percent (10%) of the incentive determination.

### Objective Reports

Property management goals for effective and timely maintenance are critical to the success of the property management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall objective component will account for thirty-five percent (35%) of the total potential incentive. Property management reporting systems will generate results based upon the following individual components:

Maintenance Response Time by level of urgency (35% of total incentive; each of the three service request areas will be weighted as follows: Routine = 15% of total incentive — Urgent = 10% of total incentive — Emergency = 10% of total incentive) during — Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine", "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour. Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours. A routine request will be responded to within 72 hours. See the chart below for measurement criteria. Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan. The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| **Routine** | | | | |
| During IDP | 0% | 5% | 7.5% | 15% |
| Post-IDP | 0% | 5% | 7.5% | 15% |
| Routine Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Urgent** | | | | |
| During IDP | 0% | 4% | 6% | 10% |
| Post-IDP | 0% | 4% | 6% | 10% |
| Urgent Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Emergency** | | | | |

NGEDOCS :016600.0504 973807.8

| During IDP | 0% | 4% | 6% | 10% |
|---|---|---|---|---|
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |

**Reporting and Operations**

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of the total incentive and will be further broken down as follows:

1.   Monthly Reporting - (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. With each monthly report counting as 1/12th of the award, payment of this incentive will only be allowed if the monthly report to Owner is on time. As an example: if eleven months out of twelve were delivered on time, the incentive award would be 9.17% (11/12=.917 x 10% =9.17%).

In the event Owner asks that reporting be held open for any reason, that particular monthly report would be counted as on time.

2.   Annual Budgets (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the timeliness of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year. This is a "pass/fail" incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

In the event Owner asks that the Annual Plan and Budget be delayed for any reason, that reporting requirement would be counted as on time.

Occupancy (10% of Total Incentive) — Each point in occupancy from 95% to 99% shall earn an additional 2% in incentives. Occupancy is based upon physical occupancy of eligible premises.

| Occupancy | | Incentive Award |
|---|---|---|
| **From** | **To** | |
| 94.5% | 95.4% | 2% |
| 95.5% | 96.4% | 2% |
| 96.5% | 97.4% | 2% |
| 97.5% | 98.4% | 2% |
| 98.5% | 100.0% | 2% |

Eligible premises shall include only those homes available for immediate occupancy. Eligible premises will specifically not include homes that are off line with major repairs or construction scheduled, on hold for incoming military families, the subject of mass or major changes in deployment of military members, structurally or environmentally damaged, or any other such home as the contractor and the RCI Director may mutually agree to be uninhabitable.

During the IDP, the occupancy rate for incentive purposes will be determined by taking the number of available units and deducting the number units in the immediate path of demolition, renovation or in a condition the Secretary considers uninhabitable for financial, health or safety reasons. The remaining units will be considered available to military for housing. In the event there are no military personnel on the waiting list, the Owner will request from the Secretary if the units could be made available for occupancy by other tenants (non-military) on the waiting list. In the

23

event there are no military personnel on the waiting list and the Secretary does not allow non-military tenants to occupy the units, the occupancy rate shall be deemed 100%.

Example:

420 units on Moffett and Parks.
120 units to be demolished within the first 12 months.
100 units to be renovated within the first 12 months.
200 units available for rent

If 100 of the units are military occupied and 0 military are on the waiting list, and if the Secretary does not allow non-military to occupy the remaining units, the occupancy rate would be considered to be 100% occupied.

<u>Quality Assurance Plan and Reporting Requirements</u>

**Base Year Benchmarks**

Owner and the Property management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective, and reporting and operations reports maintained by Pinnacle and reviewed by the RCI Staff and Deputy Director.

**Determining the Incentive**

For incentive calculation purposes, the Moffett Project and the Parks Project shall be considered separate from the Irwin Project.

At the end of the initial twelve month anniversary of Property management contract commencement and at the end of each year thereafter through the end of the management assignment, Owner will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the Subjective Surveys, and Objective Reports, and Reporting and Operations components will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the three criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by Owner no later than thirty days following the end of the anniversary date. Once approved, Owner will authorize payment of the incentive to Pinnacle within fifteen days or no later than forty-five days following the anniversary date of the management contract.

**Unsatisfactory Results**

It is Pinnacle's goal to provide "Quality Service." While achievement of a 100% rating may be difficult, it will guide Pinnacle's planning. Where results indicate a need for improvement, we will formally address it with the staff and create an action plan as needed. Pinnacle will establish a contingency plan for improving unsatisfactory customer service responses. The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Pinnacle.

**Aligned Objectives**

It is planned that site level staff incentives will be tied to the same criteria as trust for the management company.  While the community director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal management plan and objective meeting at the beginning of the year.  Results will be discussed throughout the year so that corrective action can be made where needed.

25

**EXHIBIT 3**

**EXHIBIT 4**

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of October, 2003, by and between Monterey Bay Military Housing, LLC (hereinafter referred to as the "OWNER"), MBMH Subsidiary, LLC (hereinafter referred to as "SUBSIDIARY OWNER" and together with Development Owner, "OWNERS") and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

### PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Presidio of Monterey, Ord Military Community, La Mesa Village and the Naval Post Graduate School, and is located at Monterey, California, consisting of (i) the land (the "Land"),as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (as lessor) and Monterey Bay Land, LLC (as lessee) (the "Ground Lease"), as subleased pursuant to that certain Sublease of even date herewith by and between Monterey Bay Land, LLC (as sublessor) and Development Owner (as sublessee); (ii) improvements ("Improvements") located on the Project and leased by Development Owner and (iii) improvements ("Additional Improvements") located on the Project and leased development by Subsidiary Owner under that certain Building Lease of even date herewith by and between MBL Subsidiary, LLC (as lessor) and Subsidiary Owner (as lessee) (the "Building Lease").

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1     APPOINTMENT AND ACCEPTANCE:  Each Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the portion of the Project owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, Building Lease or Limited Liability Company Agreement of Development Owner or (b) any action which would cause either Owner to be in default under the Sublease or Building Lease.  In the event and at such time as any of the Additional Improvements are no longer leased by Subsidiary Owner but are instead leased by Development Owner in accordance with the terms of the Sublease, this Agreement shall terminate with respect to Subsidiary Owner but shall remain in full force and effect to Development Owner with respect to such Additional Improvements.

1.2     TERM:  The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of October, subject to the other provisions of this Agreement.

1.3     MANAGEMENT OFFICE:  Development Owner shall provide adequate space on the Project for a management office, exclusively for the use of Manager to conduct the business of the management of the Project. Owners shall pay all reasonable expenses related to such office as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services in proportion to the respective Base Fee payable by each.  All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Development Owner shall give Manager prior written notice of any changes in such policies.

1.4     OMITTED

1.5     BUDGET AND BUSINESS PLAN:  Owners and Manager will establish a budget and business plan for operation and management of the Project (the "Plan").   The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation.  Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require the applicable Owner's advance approval, except as provided in Section 4.2 hereof.  Owners agree that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance.  The Plan shall include, at a minimum, the following:

NGEDOCS :016600.0501 810886.13
FINAL

A.       Minimum Leasing Guidelines established by each Owner for its portion of the Project, setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.       Capital Improvement Plan: Each Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed during such Owner's and Manager's pre-acquisition inspection of the property (if applicable). Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property. A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

## BANK ACCOUNTS

2.1       BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project provided funds of Development Owner and Subsidiary Owner shall be segregated from each other. Operating trust accounts are hereinafter referred to as "operating accounts". All other accounts are hereinafter referred to as "trust accounts". Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by the applicable Owner. All other funds shall be place in respective operating accounts for Development Owner and Subsidiary Owner, as appropriate. All trust accounts shall be operated in conformance with state law. Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager. All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government. All such depository banks shall be selected by Manager and shall be satisfactory to Owners. Manager shall not be liable to an Owner in the event of bankruptcy or failure of a depository institution. Manager shall open the above described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by an Owner. Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2       REMITTANCES . Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated October 1, 2003 ("Deed of Trust") between Owner and Monterey Bay Land, LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income, casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3       INITIAL DEPOSIT FOR RESERVES: Immediately upon commencement of this Agreement, each Owner shall remit to Manager a sum to be deposited in such Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve. Each Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of such Owner under this Agreement as they become due. Each Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4       MANAGER'S OBLIGATION TO ADVANCE PAYMENTS: All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of the applicable Owner. All such purchases shall be made by Manager solely on behalf of the applicable Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation. In the event that there are insufficient funds in an Owner's operating account, Manager may, after notifying the Owner, advance its own funds for such purpose, in which event such Owner shall promptly repay to Manager all such sums expended.

2.5       INTEREST ON TRUST ACCOUNTS: Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at an Owner's request. All interest earned on such funds shall belong to the applicable Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2

## SECTION 3

### COLLECTION OF RENTS AND OTHER RECEIPTS

    3.1    AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to either Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by section 11.5 herein.

    3.2    SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

### DISBURSEMENT FROM OPERATING ACCOUNTS

    4.1    OPERATING EXPENSES: From each Owner's operating account, and subject to Exhibit B, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating such Owner's portion of the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Each Owner has sole responsibility for the timely payment of all authorized expenses of each Owner's portion of the Project, including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

    4.2    EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of the applicable Owner. An Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, each Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify the applicable Owner in detail, concerning such expenditures.

    4.3    AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from an Owner's operating account, in accordance with the Plan or as otherwise directed by an Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges; all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees. To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

    4.4    EXPENSES TO BE PAID DIRECTLY BY OWNER: In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, each Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

    4.5    FEES FOR LEGAL ADVICE: Owners shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owners, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify the applicable Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this section shall obligate an Owner to pay Manager's legal fees in the

3

event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

    4.6    NET PROCEEDS:  To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to an Owner's portion of the Project to each Owner at least monthly at a time specified by Owner.  Such periodic cash payments shall be remitted to _____

    4.7    PRIORITY OF PAYMENT:  Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall be paid in the following order:  Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts.  Where the terms of any loan security agreement with an Owner conflict with the terms of this section, the terms of such loan security agreement shall control, provided, such Owner has notified Manager of the existence of any such condition.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

## SECTION 5

## FINANCIAL AND OTHER REPORTS

    5.1    REPORTS:  By the 10th business day of each month, Manager shall furnish to each Owner a statement of receipts and disbursements from the operation of its portion of the Project during the prior calendar or fiscal month.  In addition, Manager shall, on a mutually acceptable schedule and at an Owner's request, prepare and submit to such Owner such other reports as such Owner shall specify, including, but not limited to the following:

        a.)    Weekly occupancy, leasing status and traffic reports.
        b.)    Monthly market comparable rent survey.
        c.)    Monthly bank reconciliation.

In addition, Manager will furnish to Development Owner:

Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Development Owner for that fiscal year, a statement of changes in financial position of Development Owner for that fiscal year and, when requested by Development Owner's mortgagee, a balance sheet showing all assets and liabilities of Development Owner relating to the Project as of the end of that fiscal year, all audited at Development Owner's expense by an independent certified public accountant reasonably acceptable to Development Owner's mortgagee.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Development Owner.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Development Owner and any Controlling Entity and the interest held by each, and if Development Owner or a Controlling Entity is a corporation, all officers and directors of Development Owner's mortgagee and the Controlling Entity, as applicable, and if Development Owner or a Controlling Entity is a limited liability company, all managers who are not members.

Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Operating Income (as defined in the Loan Agreement) and Operating Expenses (as defined in the Loan Agreement) for such month and a calculation of the DSC Ratio (as defined in the Loan Agreement).

For purposes hereof, "Loan Agreement" means that certain Loan Agreement between Development Owner, Monterey Bay Land, LLC of even date herewith.

NGEDOCS :016600.0501 810886.13
FINAL

4

"Controlling Entity" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Development Owner (if Development Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Development Owner or more than 50% of the ownership or membership interests in Development Owner (if Development Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Development Owner (if Development Owner is a corporation).

     5.2    OWNER'S RIGHT TO AUDIT: Each Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by such Owner, as an expense of such Owner. Such audits may be made during normal business hours posted at the Project.

## SECTION 6

## ADVERTISING

     6.1    ADVERTISING: The cost of advertising shall be paid out of the Developer Owner's operating account, in accordance with the advertising budget or as approved by Developer Owner. All advertising shall make clear that Manager is the manager and is not the owner of the Project.

## SECTION 7

## LEASING AND RENTING

     7.1    MANAGER'S AUTHORITY TO LEASE PROJECT: Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Sublease, the Building Lease and the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for the Owners. All costs of leasing shall be paid out of the applicable Owner's operating account, in accordance with the leasing budget or as approved by the applicable Owner. No rental agreement shall be for a period in excess of one (1) year without the written approval of the applicable Owner. The form of the rental agreement shall be provided by the applicable Owner.

     Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Development Owner's mortgagee (or without Development Owner's written certification that such consent is deemed received under the applicable loan documents). Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder, terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgage. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

     Manager will not permit an Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

     7.2    NO OTHER RENTAL AGENT: During the term of this Agreement, no Owner shall authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project. Each Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

     7.3    RENTAL RATES: In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with

5

respect to each Owner's portion of the Project. As authorized in writing by an Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4    ENFORCEMENT OF RENTAL AGREEMENTS: Subject to any conditions or limitations imposed by an Owner, Manager is authorized to institute and defend, in an Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Manager is authorized to sign and serve such notices as Manager and an Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income. Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of an Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less. Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of an Owner before entering into any compromise, settlement, or release of such legal action. Any moneys for such settlements paid out by Manager shall be an operating expense of the Project. Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or shall be reimbursed directly to Manager by such Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by an Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, an Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against such Owner or Manager as the agent of such Owner.

*SECTION 8*

**EMPLOYEES**

8.1    MANAGER'S AUTHORITY TO HIRE: Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2    OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working at the Project including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owners' funds, from the Project operating accounts subject to the Plan and allocated equitable between the Owners. In addition, Manager shall accrue for all vacation pay due site employees and provide a quarterly reconciliation to Owners of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed at the Project.

8.3    MANAGER'S RESPONSIBILITY TO FILE RETURNS: Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, each Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Each Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

6

## SECTION 9

## OPERATIONS, MAINTENANCE AND REPAIR

9.1     PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Development Owner under the Sublease and any loan documents affecting the Project and by Subsidiary Owner under the Building Lease for the operating efficiency of the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by an Owner, Manager is also authorized to decorate the Owner's portion of the Project and the individual apartment units and to purchase or rent, on such Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Owner's portion of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of the Owners. If an Owner selects a vendor for use on the Project, such Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2     FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES:  With an Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager. Such Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3     CONTRACTS, UTILITIES AND SERVICES: Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on each Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be the applicable Owner's responsibility, except that Manager may pay the same from the operating accounts if directed to do so.

9.4     LIMITATIONS ON CONTRACTS:  Each such contract or agreement shall: (a) be in the name of the applicable Owner, (b) be assignable, at such Owner's option, to such Owner or such Owner's nominee, (c) include a provision of cancellation thereof by such Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance.  If this agreement is terminated pursuant to Section 18, Manager shall, at such Owner's option, assign to such Owner or such Owner's nominee all contracts and agreements pertaining to the Project. Manager shall then notify such Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

9.5     MAINTAINING HISTORIC STATUS:  Manager shall implement each Owner's responsibilities to comply with the covenants of such Owner set forth in Section 27.b. of the Sublease and Section 27 of the Building Lease relating to ordinary repair and maintenance of "Historic Property", provided that such Owner shall provide the necessary funds for compliance with such obligations.

9.6     ENVIRONMENTAL.  Manager shall be responsible for performing on behalf of each Owner such ordinary, non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

## RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor.  Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with the ownership or operation of the Project. Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owners. Owners agree to assume all financial risks of operating their respective portion of the Project including any claims made against Manager while acting as such Owner's agent within the scope of its authority as provided herein.  Except as provided herein, neither

7

party shall have the power to bind or obligate the other party.  Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owners; and, except as provided in this Agreement, no Owner shall act as the principal of Manager.

## SECTION 11

## INDEMNIFICATION AND BONDING

11.1   <u>INDEMNIFICATION BY OWNER</u>

      A.      <u>Indemnification for Injuries to Person and Property</u>:  To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons, or property including, but not limited to, those relating to or arising out of the premises of such Owner's portion of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

      B.      <u>Indemnification for Vendor and Tenant Claims</u>:  Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of such Owner's portion of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager.  Such Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

      C.      <u>General Provisions</u>:  Except as expressly set forth herein, nothing contained in Section 12 shall relieve an Owner of its obligation under Section 11 of this Agreement.

11.2   <u>INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS</u>:  Subject to Paragraph 11.1, Manager shall indemnify, defend and save each Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws.  Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of such Owner or if such Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3   <u>WAIVER OF CLAIMS</u>:  Other than as provided in Section 11.2, each Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4   <u>SCOPE OF INDEMNITY</u>:  Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action.  All reasonable costs and expenses of such defense shall be borne by the indemnitor  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor.  The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

NGEDOCS :016600.0501 810886.13
FINAL

11.5    BONDING: Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owners to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6    TERM OF INDEMNIFICATION: The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

## SECTION 12

## INSURANCE

12.1    INSURANCE BY PROPERTY MANAGER: At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owners and Manager and such additional insured as may be necessary from time to time. Owners shall be included as named insureds on Manager's policy. Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of the applicable Owner; provided the amount of the deductible or SIR is pre-approved by such Owner.

A.    Property Insurance: Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief. The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of each Owner and Manager.

B.    General Liability Insurance: Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate.

C.    Excess/Umbrella Liability: Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence. Such coverage shall be excess to the automobile liability and employer's liability coverage.

D.    Automobile Liability Insurance: Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit.

E.    Named Insured: Each Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement. The members and managers of Owners and such others as may be designated from time to time by Owners shall be named as additional insured. It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owners. Manager will secure endorsements to this effect from all appropriate insurers of such policies.

F.    General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to each Owner and shall require a minimum of thirty (30) days written notice to each Owner prior to any cancellation of or changes to said policies. Manager agrees to provide each Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2    PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions): Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

9

12.3   WORKER'S COMPENSATON /EMPLOYER LIABILITY .  Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4   RENTER'S INSURANCE   Manager shall procure and maintain at the cost and expense of each Owner, such renter's insurance (property and/or liability) for the benefit of residents of such Owner's portion of the Project, as such Owner shall request from time to time.

## SECTION 13

### MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owners or any previous owners of the Project, or any previous property managers or other agents of either Owners or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due an Owner or in the performance of any obligations owed by any tenant to an Owner pursuant to any rental agreement or otherwise unless caused by gross negligence or willful misconduct of Manager.  Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect.   Any environmental violations or hazards discovered by Manager shall be brought to the attention of the applicable Owner in writing and such Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owners shall be solely liable for all vendor claims and tenant claims, whether made against such Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

## SECTION 14

### ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1   ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owners, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement. Each Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of such Owner's rights under the Sublease or Building Lease, respectively.

## SECTION 15

### MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"Effective Gross Income" shall mean, as to the Property for a given period of time, all rents and other income and charges from the normal operation of the Property, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units in the Property, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Property and concessionaires (if any) in respect of the Property, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Property or the improvements thereon. Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

NGEDOCS :016600.0501 810886.13 .
FINAL

"Adjusted by CPI" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. For example, the adjustment to be made on January 1, 2005 would be based upon the change in the CPI Index from October 2003 to October 2004.

"Base Year" shall mean the first full calendar year of operation of the Project, unless adjusted below.

CPI Index shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

CPI Effective Gross Income per Door for any calendar year shall mean actual Effective Gross Income for the applicable Base Year, divided by the number of units occupied during such Base Year, then Adjusted by CPI to January 1 of such subsequent calendar year. At the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Development Owner's operating agreement) occurs, and every five years thereafter, (x) the most recent annual Effective Gross Income will be compared to (y) the then calculated CPI Effective Gross Income per Door multiplied by the number of units then occupied. If the result in clause (x) is 10% greater than the result in clause (y), then the CPI Effective Gross Income per Door shall become the most recent annual Effective Gross Income divided by the number of units then occupied and the Base Year (and Effective Gross Income for the Base Year) shall become the then most recent year (and Effective Gross Income for such then most recent year), otherwise the CPI Effective Gross Income Per Door for such year and Base Year shall remain the same as then existing. For purposes of this Section only, Effective Gross Income will be determined based on both the Improvements and the Additional Improvements, as if all "Doors" were leased by Development Owner.

15.1   COMPENSATION:   As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), each Owner shall pay Manager the following compensation:

(a)   Base Fee:

(i)   For the first full calendar year of operation (and any portion of a calendar year prior thereto), 1.500% of Effective Gross Income generated from such Owner's portion of the Project, to be determined and paid on a monthly basis, with payment due on the 10th day after the end of the applicable month.

(ii)   For each month thereafter, the lesser of

(A)   1.500% of Effective Gross Income generated from such Owner's portion of the Project for the applicable calendar month, or

(B)   an amount equal to (x) 1.500% of (y) CPI Effective Gross Income per Door for such year divided by 12 multiplied by (z) the number of units occupied during such month.

(b)   Incentive Fee:   The annual Incentive Fee is calculated as the earned portion (per the IPMP attached as Exhibit B) of the lesser of (A) 2.75% of Effective Gross Income for the applicable year, or (B) an amount equal to (x) 2.75% of (y) the CPI Effective Gross Income per Door for such year multiplied by (z) the number of units occupied during such year, and will be payable during the year earned as follows:

(i)   Base Year:   Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of 2.75% of Effective Gross Income generated from such Owner's portion of the Project for such quarter; provided, that after the full Base Year has occurred, the actual fee earned for the Base Year shall be determined in accordance with Exhibit B and if Manager has

11

been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

(ii)    Subsequent Years:  The same procedure shall be used as in the Base Year, except that the prior year's actual earned portion of the potential 2.75% incentive fee shall be substituted for 75% of 2.75% in the formula described in (i) above.  For example, if in 2006, Manager earns an incentive fee of 78% of 2.75% (i.e., 2.15%), then estimated payments for 2007 shall be based upon 2.15% of Effective Gross Income in lieu of 75% of 2.75% of Effective Gross Income.

15.2    ACTS OF GOD:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if an Owner engages Manager to oversee such restoration work under a separate written agreement, such Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of such Owner's insurance policy.

15.3    CONSTRUCTION MANAGEMENT SERVICES:  If an Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement.  Such Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion

15.4    FOR OTHER ITEMS OF MUTUAL AGREEMENT:  Should an Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by such Owner to Manager for such additional services.

15.5    FOR REIMBURSEMENT OF EXPENSES:  In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan (the "Reimbursable Expenses"), including, without limitation, the following:  (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; (b) third-party consulting services approved by an Owner (where an Owner requests and Manager, in its sole discretion, agrees to contract with a third party), (c) out-of-pocket travel expenses for travel related to the provisions of services (incurred at a rate not in excess of a coach or coach equivalent public rate); (d) expense of long-distance communications, and (e) expense of reproductions, postage and handling.  All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

## SECTION 16

## STRUCTURAL CHANGES

Owners expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owners other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of the applicable Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to section 4.2 of this Agreement, and Manager shall notify such Owner appropriately.

## SECTION 17

## BUILDING COMPLIANCE

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or

12

regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owners promptly or forward to Owners promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Building Lease. Owners authorize Manager to disclose the ownership of the Project(s) to any such officials and agrees to indemnify and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owners, as provided under the terms and provisions of this Agreement.

## SECTION 18

## TERMINATION

18.1    TERMINATION FOR CAUSE:  Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

A.    Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable; or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.    Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.    Default:  Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1.    the failure of a party to pay any amounts required to be paid by it hereunder or to perform any of its obligations hereunder for a period of ten (10) days after the date on which notice of the failure has been given to the defaulting party by the other parties;

2.    the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

3.    the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

4.    the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

5.    the failure to fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of any such default for a period of ten (10) days after written notice of said failure; and

6.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

13

D.    Termination of Sublease.   By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.    Sale.   By any party, upon written notice to the others, upon the sale of all or substantially all of Owners' interest in the Project to a third party unaffiliated with Owners.

18.2    TERMINATION COMPENSATION:   Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) an Owner from Manager, if any, as a result of such termination).   To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to an Owner, such sums shall be payable from the operating accounts.   Any amounts due in excess of the funds available from an operating account shall be paid by the applicable Owner to Manager upon demand.

18.3    OWNER RESPONSIBLE FOR PAYMENTS:   Upon termination of or withdrawal from this Agreement, each Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of such Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by such Owner.   In addition, such Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on such Owner's behalf under this Agreement.

18.4    ACCOUNTS:  UNPAID BILLS:   Manager shall deliver to each Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due such Owner and tenant security deposits which were held by Manager with respect to the Owner's portion of the Project, as well as a final accounting reflecting the balance of income and expenses with respect to such Owner's portion of the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to the applicable Owner.

18.5    FINAL ACCOUNTING:   Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Owner's portion of the Project are deemed to be the property of the Owner, they are to be delivered to such Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager.  Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.  Each Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to such Owner's portion of the Project.

18.6    NON-INTERFERENCE WITH MANAGER'S BUSINESS:   Each Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, such Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business.  Each Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement.  Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from such Owner.

18.7    WRITTEN DIRECTION.   A direction or consent of Clark Manager Monterey Bay LLC (the Managing member of Development Owner) on behalf of Development Owner shall be deemed the direction or consent of Development Owner hereunder and Agent may rely on such direction or consent as the act of Owner.

## SECTION 19

## REPRESENTATIONS

19.1    OWNER'S REPRESENTATIONS AND WARRANTIES:   Each Owner represents and warrants as follows:  (a) such Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so;  (b) there are no written or oral agreements affecting the occupancy of such Owner's portion of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager;  (c) all permits for the operation of such Owner's portion of the Project has been secured and are current; and (d) such Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will

14

affect the operation of such Owner's portion of the Project; (e) if such Owner requests Manager to enter any agreements for the benefit of third parties such Owner hereby agrees to fully indemnify Manager for all claims arising from such Agreements.

19.2    MANAGER'S REPRESENTATIONS AND WARRANTIES: Manager represents and warrants as follows: (a) the officers of Manager have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

19.3    ESTOPPEL CERTIFICATE. Manager and each Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

## SECTION 20

### HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

### FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

## SECTION 22

### COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owners and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owners and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owners and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owners and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

## SECTION 23

### RIGHTS CUMULATIVE: NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such

15

right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

### APPLICABLE LAW AND LITIGATION

24.1   <u>INTERPRETATION</u>:  The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project.  If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owners.

24.2   <u>LITIGATION</u>:  In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

## SECTION 25

### NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as each Owner and Manager individually may specify hereafter in writing:

| | |
|---|---|
| MANAGER: | AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.<br>Pier 70<br>2801 Alaskan Way, Suite 200<br>Seattle, Washington 98121 |
| DEVELOPMENT OWNER: | MONTEREY BAY MILITARY COMMUNITIES, LLC<br>Attention:  Douglas R. Sandor<br>Two Bethesda Metro Center<br>Suite 250<br>Bethesda, Maryland 20814 |
| WITH A COPY TO: | CLARK ENTERPRISES, INC.<br>Rebecca Owen, Esq.<br>General Counsel<br>7500 Old Georgetown Road<br>15th Floor<br>Bethesda, Maryland 20814 |
| SUBSIDIARY OWNER: | MBMH SUBSIDIARY, LLC<br>Attention:  Douglas R. Sandor<br>Two Bethesda Metro Center<br>Suite 250<br>Bethesda, Maryland 20814 |
| WITH A COPY TO: | CLARK ENTERPRISES, INC.<br>Rebecca Owen, Esq.<br>General Counsel<br>7500 Old Georgetown Road<br>15th Floor<br>Bethesda, Maryland 20814 |

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to

16

NGEDOCS :016600.0501 810886.13
FINAL

have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

## SECTION 27

### LIABILITY

The obligations of Development Owner and Subsidiary Owner hereunder shall be several and not joint. administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

MONTEREY BAY MILITARY HOUSING, LLC, a Delaware limited liability company

By:     Clark Pinnacle Monterey Bay LLC, a California limited liability company, Manager

By:     Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

By:
Name:
Title:     Manager

By:     CEI Realty, Inc., a D.C. corporation, Manager

By:
Lawrence C. Nussdorf, President

By:     Pinnacle Monterey LLC, a Washington limited liability company, Manager

By:
Name:
Title:

AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington limited liability company

By:
Stan Harrelson
President and CEO

17

NGEDOCS :016600.0501 810886.13
FINAL

**MBMH SUBSIDIARY, LLC**, a Delaware limited liability company

By:     Clark Pinnacle Monterey Bay LLC, a California limited liability company, Manager

       By:     Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:

            Name:

            Title:     Manager

       By:     CBI Realty, Inc., a D.C. corporation, Manager

            By:

               Lawrence C. Nussdorf, President

       By:     Pinnacle Monterey LLC, a Washington limited liability company, Manager

            By:

               Stan Harrelson

               Managing Member

18

**Exhibit A**

To the extent approved herein and authorized by Owner in the Approved Budget.  The following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

| | |
|---|---|
| Benefits Administration for site staff: | 2% of related payroll |

       Insurance Premiums (medical, dental, vision, LTD, Life)
       Broker's Fees
       Claims handling expenses
       COBRA administration
       401K Plan administration

| | |
|---|---|
| Copies | As incurred |
| Long Distance Charges | As incurred |
| Management Fee: | See Section 15 |
| Postage/Overnight: | As incurred |
| Worker's Compensation Insurance: | Fees rolled into budgeted rate per Plan |

       Insurance Premiums
       Broker's Fees
       Claims handling expense

19

**Exhibit B**

INCENTIVE PERFORMANCE MANAGEMENT PLAN

### A. Objectives

The focus is always on the importance of quality family housing. The Performance Incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement. The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings are rewarded with an increased performance pay schedule. The rewards will be quantified through written feedback from the residents.

### B. Measurement Criteria

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Gross Rental Collections for the managed assignment. Achievement of the management incentive fee is to be based on Customer Satisfaction. The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

### Subjective Survey

Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs.

The Monterey Bay Military Housing, LLC, (MBMH) on behalf of the partnership, will retain a third-party firm to evaluate the performance of the Property Manager. The RCI Deputy Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix. The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below. As an example: if 100 persons were surveyed and the results were as indicated in the table below the average would be 69.5.

| Grade | # Responses | Value | Total |
|---|---|---|---|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 20 | 5 | 100 |
| | 15 | 4 | 60 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 110 | | 69.50 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Deputy Director prior to dissemination. The firm will attempt to elicit survey participation by all of the current residents. The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm. The results will be provided to the MBMH, LLC and the RCI Office who will compare them to benchmarked objectives. These results will account

20

for thirty-five percent (35%) of the incentive determination. The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| During IDP | 0 – 14 0% | 15 – 49 25% | 50 – 74 30% | 75 + 35% |
| Post-IDP | 0 – 24 0% | 25 – 49 25% | 50 – 84 30% | 85 + 35% |

*Objective Reports*

Property Management goals for effective and timely maintenance, turning vacated homes and limiting moves are critical to the success of the Property Management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall Objective component will account for thirty-five percent (35%) of the total potential incentive. Property Management reporting systems will generate results based upon the following individual components:

I). Maintenance Response Time by level of urgency (15% of total incentive during IDP; 20% post IDP; each of the three service request areas will be weighted as follows; Routine = 5% of total incentive during IDP; 5% post IDP – Urgent = 5% of total incentive during IDP; 5% post IDP – Emergency = 5% of total incentive during IDP; 10% post IDP – Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine", "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour. Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours. Routine request will be responded to within 72 hours. See below chart for measurement criteria. Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan. The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| Routine | | | | |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 3% | 4% | 5% |
| Routine Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
| Urgent | | | | |

21

| During IDP | 0% | 3% | 4% | 5% |
|---|---|---|---|---|
| Post-IDP | 0%0% | 3% | 4% | 5% |
| Urgent Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
| Emergency | | | | |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |

2) Resident Satisfaction Cards (5% of Total Incentive ) – Cards left by maintenance personnel after completion of work orders indicate level of satisfaction by the customer. The survey card will use a numerical value of 1 (being the lowest) and 10 (being the highest) as indicated in the example under the Subjective Report section of the Incentive Plan. Those results will be averaged in similar fashion to the Subjective Survey responses and applied to the following scale. The format and content of satisfaction cards will receive prior approval from the RCI Deputy Director.

| Resident Satisfaction Cards | Poor 0 – 14% | Average 15 – 49% | Above Average 50 – 74% | Superior 75% + |
|---|---|---|---|---|
| | 0% | 3% | 4% | 5% |

3) Unit Turn Report (5% of Total Incentive during IDP; 10% post IDP) – Tracked time from the last date of occupancy to the date ready for occupancy. Standard turn time for a unit to be made ready to rent is 3 to 5 business days (business days are Monday through Saturday). The determination of awards under this portion of the Incentive Plan shall be based upon unit turn performance of each individual unit as a fractional interest of the potential incentive. As an example if there were one hundred units turned in a given year each unit would represent 1/100[th] of the total potential incentive. The amount of the fractional interest earned would be subject to the Unit Turn Chart below. Standard turn time measures the elapsed time within which the interior of a housing unit can be moderately repaired and cleaned for occupancy. The Manager reserves the right, subject to concurrence by the RCI Director, to determine a housing unit to be "off line" or in some other way to be so damaged that it will not be included in the unit turn measurement outlined under this Incentive Plan. Additionally no Historic units will be included in the measurement of this portion of the Incentive Plan

| Unit Turn Chart | <=5 Business Days | 6 Business Days | 7 Business Days | >7 Business Days |
|---|---|---|---|---|
| During IDP | 100% | 75% | 50% | 0% |
| Post-IDP | 100% | 75% | 50% | 0% |

4) Frequency of Moves (10% of Total Incentive during IDP; 0% post IDP) – This component will track the frequency of cases where households are required to move more than one time during the IDP. Nothing

22

in this section of the Incentive Plan shall include households for whom relocation is voluntary or for whom relocation is forced due to the habitability of a housing unit.

For those households who are required to relocate two times, that/those incident(s) will be multiplied by four (4) and divided by the total number of non-voluntary or non-forced relocations during the year to arrive at the appropriate reduction in Frequency of Moves Incentive Fee. As an example, if three households are required to relocate twice out of one hundred households the resultant Incentive Fee for Frequency of Moves will be reduced by 12%, (3 x 4 +100 ≈ .12).

Also, for each household required to relocate more than two times, that/those incident(s) will result in a 3.3% reduction in the calculation of the Incentive Fee for Frequency of Moves. As an example, if two households are required to relocate three times, the available Incentive for Frequency of Moves would be reduced from 10% to 3.4%, (.10 - (2 x .03.3)).

Nothing herein shall prevent the Manager from soliciting an exception from the RCI Deputy Director based upon special circumstances and (if agreed to in writing) the RCI Deputy Director from allowing multiple moves in special circumstances and from having those moves excluded from this measurement. Additionally and to the extent required, major phasing plans which might have an adverse effect on our ability to eliminate additional household movement will be excluded from this Incentive Plan to the extent the RCI Deputy Director so approves and authorizes the proposed phasing plan.

The tabulated results represented in these year-end reports will be compared to the benchmark standard established herein as well as the results of the prior year.

Reporting and Operations

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of the total incentive and will be further broken down as follows:

1. Monthly Reporting - (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. . With each monthly report counting, as 1/12th of the award payment of this incentive will only be allowed if the monthly report to the venture is on time. As an example: if eleven months out of twelve were delivered on time the incentive award would be 9.17 (11/12=.917 x 10% = 9.17%.

In the event the venture asks that reporting be held open for any reason that particular monthly reporting would be counted as on time.

2. Annual Budgets (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the timelines of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year.. This is a "pass/fail" incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

In the event the venture asks that the Annual Plan and Budget be delayed for any reason that reporting requirement would be counted as on time.

3. Operations (10% of Total Incentive) – The Clark Manager Asset Manager will prepare an Annual Assessment of management operations which will include administrative and maintenance criteria's as well as conformance to budget and plan. This in depth analysis will be formulated in the same manner as the Resident Survey in that each area/item will be graded on a sliding scale of 1 (being the lowest) to 10 (being the highest). The overall score on the analysis will result in a percentage, which will be applied to the total possible incentive for this category. As an example: if the resultant score of the Asset Managers Annual Analysis were to be a seventy five percent grade then the Manager would be paid seventy-five percent (75%) of ten percent (10%) or seven and one half percent (7,5%).

The results of this analysis will be shared between the Asset Manager and the Manager and used as a basis for refining the Manager's response to areas in need of improvement.

23

### C. Quality Assurance Plan and Reporting Requirements

#### Base Year Benchmarks

Monterey Bay Military Housing, LLC and the Property Management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective and reporting and operations reports maintained by Manager and reviewed by the RCI Staff and Deputy Director.

#### Determining the Incentive

At the end of the initial twelve month anniversary of Property Management contract commencement and at the end of each year thereafter through the end of the management assignment, the MBMH, LLC will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the subjective surveys and objective reports will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the two criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by the MBMH, LLC no later than thirty days following the end of the anniversary date. Once approved, the MBMH, LLC managing member will authorize payment of the incentive to Manager within fifteen days or no later than forty-five days following the anniversary date of the management contract.

The Incentive Plan amount is to be assessed against Gross Rent Collections for the twelve-month period ending on the anniversary date of the management contract commencement.

#### Unsatisfactory Results

It is Manager's goal to provide "Quality Service" and while achievement of a 100% rating may be difficult, it will guide Manager's planning. Where results indicate a need for improvement, we will formally address with the staff and create an Action Plan as needed.  Manager will establish a contingency plan for improving unsatisfactory customer service responses.  The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Manager.

#### Aligned Objectives

It is planned that site level staff incentives will be tied to the same criteria as the management company. While the Community Director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal Management Plan and Objective Meeting at the beginning of the year. Results will be discussed throughout the year so that corrective action can be made where needed.

NGEDOCS :016600.0501 810886.13
FINAL

# EXHIBIT 5

Pinnacle Irwin LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121

May 13, 2011


Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention: W. Cleve Johnson

   Re: Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle California Military Communities LLC of May 21, 2003 ("Operating Agreement"), between Clark Irwin LLC and Pinnacle Irwin LLC. I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Irwin LLC ("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property Management Agreement" for the parties' California Military Communities ("CMC") project a Major Decision requiring the vote of all the Managers. Operating Agreement § 3.1(b)(2)(E).

Pursuant to Section 3.1(b)(2)(E) of the Operating Agreement, Pinnacle hereby votes to adjust Section 18.1(C) of the Property Management Agreement ("PMA") by deleting the phrase "In addition to the default set forth in Section 18.1.A" and inserting under subsection (4):

> "4. theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted PMA. Pinnacle also believes the adjustments will ensure that the Operating Agreement partners can continue to work together in the best interests of CMC for the remainder of the PMA's 50-year term. If you agree with the proposed adjustments, please sign below and return to me. If we need to discuss or change these adjustments, I welcome your suggestions. If you are inclined to vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before [date], Pinnacle shall deem your non-response a deadlock pursuant to Section 3.13(c). This will commence the seven-day period to reach mutual

agreement.  Failing mutual agreement within the seven day period, Pinnacle shall resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Irwin LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

_____

Pinnacle Monterey LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121

May 13, 2011

Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention:  W. Cleve Johnson

      Re:   Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle Monterey Bay LLC of October 30, 2001 ("Operating Agreement"), between Clark Monterey Presidio LLC and Pinnacle Monterey LLC.  I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Monterey LLC ("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property Management Agreement" for the parties' Monterey Bay Military Housing ("MBMH") project a Major Decision requiring the vote of all the Managers.  Operating Agreement § 3.1(b)(3)(E).

Pursuant to Section 3.1(b)(3)(E) of the Operating Agreement, Pinnacle hereby votes to adjust Section 18.1(C)(6) of the Property Management Agreement ("PMA") as follows:

> "6.     theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted PMA.  Pinnacle also believes the adjustment will ensure that the Operating Agreement partners can continue to work together in the best interests of MBMH for the remainder of the PMA's 50-year term. If you agree with the proposed adjustments, please sign below and return to me.  If we need to discuss or change these adjustments, I welcome your suggestions.  If you are inclined to vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before May 20, 2011, Pinnacle shall deem your non-response a deadlock pursuant to Section 3.13(c).  This will commence the seven-day period to

reach mutual agreement.  Failing mutual agreement within the seven day period, Pinnacle shall resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Monterey LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

_____

# EXHIBIT 6



W. Cleveland Johnson                                    *(703) 294-4520 DIRECT*
Manager                                                *(703) 294-4670 FAX*
                                                       *cleve.johnson@clarkrealty.com*

May 19, 2011

**VIA ELECTRONIC MAIL**
**AND OVERNIGHT MAIL**

American Management Services East LLC
Pier 70
2801 East Alaskan Way
Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

Re:     Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision

Dear Stan:

We have received your letters on behalf of Pinnacle Irwin LLC and Pinnacle Monterey LLC dated May 13, 2011. The Pinnacle Monterey letter demands a response from Clark Realty Capital LLC, acting it its capacity as Clark Manager under the Monterey Operating Agreement, by May 20; the Pinnacle Irwin letter likewise demands a response but the "date" was left blank.

We disagree with your interpretation of the Operating Agreement to require a "response" to your letters within seven days of the date of your letters, and believe you have set an arbitrary deadline for us to respond in order to create a deadlock. We also believe there is no basis for you to deem this response as creating a "deadlock" under the Operating Agreements. In addition, we have questions about the proposed amendments themselves, as well as what information Pinnacle has discovered at either location that led to this proposal. It is apparent that you have spent significant time drafting the proposed amendments to the Property Management Agreements at both Projects and putting forward your position. We therefore request your full and detailed response to the questions below, no later than Monday May 23, given the urgency with which you have demanded a response from us:

1.      What is meant by "material adverse affect" on the Owners?

2.      What is meant by "appropriate measures to correct" fraud?

3.      What is meant by a "confirmed event of default"?

4.      What types of fraud do you contend are or are not "susceptible to being cured"?

American Management Services East LLC
Attn: Mr. Stan Harrelson
May 19, 2011
Page 2

5.    Why do you contend the proposed amendment is consistent with the original
      intent of the parties?

6.    When did you begin to consider and draft the proposed amendment?

7.    Describe in detail (including names and dates) any potential fraud, theft or
      intentional misconduct (including any alleged or potential self-dealing) by a
      Pinnacle employee or person acting on behalf of Pinnacle that has occurred at
      either the Irwin or Monterey Projects.

8.    How and when did Pinnacle or anyone acting on its behalf become aware of such
      potential fraud, theft or intentional misconduct?

9.    For any such instance of potential fraud, theft or intentional misconduct, how may
      it have harmed the Project and what if anything have you done to investigate
      potential harm to the Project?

10.   What steps if any have you taken, or do you intend to take, to remedy any
      instances of fraud, theft or intentional misconduct at the Project?

We look forward to your prompt response.

Sincerely,

*W. Cleveland Johnson*

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC

**Clark Realty Capital, L.L.C.**
2 Bethesda Metro Center, Suite 250    Bethesda, Maryland 20814
(240) 497-6600                (240) 497-6700-Fax

**EXHIBIT 7**

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA 22203

RE: Your Letter(s) Dated May 19, 2011

Dear Cleve:

Thank you for your May 19 reply to my letter of May 13, 2011. A few preliminaries: we appreciate your questions, and we are not ready to declare a deadlock. Quite the contrary - we are happy to discuss with you the adjustments to the Property Management Agreements -- adjustments that Pinnacle Irwin and Pinnacle Monterey believe are truly in the best interests of the projects at Irwin and Monterey. As your partners, we are committed to a fair, open dialogue before we invoke our contractual right, under our partnerships' operating agreements, to declare a deadlock and make adjustments to the Property Management Agreements (PMAs) at each facility. As for why we set a seven-day reply time frame, it was because you never replied to a similar adjustment letter we sent at the Belvoir project. We did not want our present letters at Irwin and Monterey to be ignored.

By way of a general response to all your questions, we have no information about any events of fraud, theft or misconduct at Irwin or Monterey that would be cause to terminate the PMAs at those projects. Quite the contrary - those projects are performing well. The Clark and Pinnacle managers at those projects have a history of working together cooperatively. In broad terms, we have proposed the PMA adjustments in my May 19 letter because we want to keep Monterey and Irwin focused on the goal of our partnership at those projects - providing excellent housing communities for the members of the Armed Services who live at our California projects. We do not want Irwin and Monterey drawn into a conflict like that involving our partnership's eastern military housing projects (Belvoir and Benning).

More importantly, as a matter of both fact *and law* in California, Pinnacle, Clark and the Army are *partners*, and owe each other the duties and obligations of partners in connection with the Irwin and Monterey projects. The adjustments we have proposed will enable the Pinnacle to participate, as a partner of both Clark and the Army, in responding to acts of fraud, theft and misconduct, either alleged or confirmed, committed by Pinnacle employees. At the same time, the adjustment eliminates an ambiguity in the PMAs and prevents Clark from using that ambiguity to deploy an audit and litigation strategy designed to eliminate Pinnacle's ownership

interests in the projects.  In other words, the adjustments we have proposed to Section 18(C) of both agreements will get Clark and Pinnacle talking again and acting like partners.

Any issues the Owners have about Pinnacle's property management services should be resolved in the first instance by communication, negotiation and cooperation.  And in the second instance, by serving notices of default, with opportunity to cure, as required under the PMAs. Our partnership requires no less.

I propose a face-to-face meeting to discuss these matters at your earliest convenience - including the specific questions in your letter.  I think it would make sense to include representatives from the Army in such a meeting, since they are our partners in the projects. Please let me know when you are available.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

**EXHIBIT 8**



W. Cleveland Johnson
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

June 3, 2011

<u>*VIA ELECTRONIC MAIL AND OVERNIGHT MAIL*</u>

American Management Services East LLC
Pier 70
2801 East Alaskan Way, Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

       **Re:**    **Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision**

Dear Stan:

      This is in response to your May 23, 2011 letter. We had asked you to respond to the specific questions we raised, particularly because Pinnacle has unique access to the necessary information to respond promptly. We are concerned by your comment that you have "no information about any events that would be cause to terminate the PMAs at those projects." This does not answer whether you are aware of *any* incidents or allegations of fraud, theft or intentional misconduct at either Fort Irwin or Monterey.

      We again ask for prompt, written responses to our questions no later than June 8. We also need to know by that date whether you continue to insist upon the amendments to the Fort Irwin and Monterey PMAs as outlined in your earlier correspondence.

      With respect to your request for a face-to-face meeting, we do not think such a meeting will be productive until we have received written responses to our questions. In addition, before we would agree to such a meeting, you need to withdraw, with prejudice, the claims made in Virginia against me, Doug Sandor and Larry Nussdorf personally. Those claims were brought despite the express terms of the Clark Pinnacle Belvoir Operating Agreement (¶ 7.6). And, while they are pending, we do not feel it appropriate to agree to a meeting to discuss these issues.

      We look forward to your prompt response.

                      Sincerely,

                      W. Cleveland Johnson
                      Manager, Clark Realty Capital, L.L.C.
                      Manager, Clark Monterey Presidio LLC and
                      Clark Pinnacle California Military Communities LLC

Resp to Harrelson 5 23 11 letter(June 2 draft) (2) (2)   **Clark Realty Capital, L.L.C.**
4401 Wilson Blvd. Suite 600    Arlington, Virginia 22203
(703) 294-4500    (703) 294-4650-Fax

# EXHIBIT 9

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

June 8, 2011

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA  22203

RE: Your Letter(s) Dated June 3, 2011

Dear Cleve:

In my letter of May 23, I offered to meet with you to discuss the questions in your May 19 letter.  I also told you, and reiterate, that Pinnacle is not aware of incidents of fraud, theft or intentional misconduct at our Monterey or California Military Communities (CMC) projects.

Instead of agreeing to a meeting, you waited two work weeks to respond.  And then, you simply insisted that I respond to your earlier questions in writing.  You also indicated that you would not agree to meet about adjustments to the PMAs at our California projects until Pinnacle withdrew claims it has filed in Virginia against you, Mr. Sandor and Mr. Nussdorf.

Without meaning to seem argumentative, it is a breach of Clark Realty's duties as Clark Manager of Clark Pinnacle Monterey LLC and Clark Pinnacle California Communities LLC to insist on obtaining a personal benefit for you, Mr. Sandor and Mr. Nussdorf - concerning a lawsuit in Virginia - as a precondition to meeting about our California projects.  I remind you that Clark Realty's job, at each project, is to look out for the best business interests of that project.  Clark Realty instead seems intent on elevating its own litigation interests -- and now that of its principals -- above the LLCs we formed together.

Voting on adjustments to the terms and conditions of the PMAs is one of the few powers granted to the Pinnacle Manager under the Clark Pinnacle Monterey LLC and Clark Pinnacle California Military Communities Operating Agreements.  A "deadlock" in "voting between the Managers with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreements" is the only situation under the Operating Agreements where the Pinnacle Manager has the power, in its "sole discretion," to determine a deadlock or dispute.

Pinnacle proposed adjustments to the PMAs at Monterey and CMC over three weeks ago.  We explained, candidly and clearly, why we thought the adjustments were necessary and in the

best interests of the projects.  I believe you fully understand that the purpose of the adjustments is to help Clark and Pinnacle act like partners at the California projects, instead of adversaries.

You have refused to vote on the proposed adjustments, and refused to even meet to discuss them.  Therefore, pursuant to Section 3.13(c) of the Operating Agreements of Clark Pinnacle California Military Communities LLC and Clark Pinnacle Monterey LLC, Pinnacle declares a "Deadlock" regarding the adjustments proposed in my letters of May 13, 2011.  Your receipt of this letter shall begin the 7 day period for resolution set forth in the Operating Agreements.

I remain interested in a meeting to resolve our deadlock, joined by our project partners, the U.S. Army.  Please reconsider your position.  Absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011, pursuant to the terms of the Operating Agreements.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

1    Monterey Bay Military Housing, et al. v. Pinnacle Monterey LLC, et al.      Case No. M112710(M115143)

2                                    **PROOF OF SERVICE**

3        I, Cathy Sandifer, declare that I am a citizen of the United States, over the agent of eighteen
     years and not a party to the within action.  I am an employee of GREENBERG TRAURIG, LLP, and
4    my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303.  On the date
     set forth below, I served the following documents:
5
         **SECOND AMENDED CROSS-COMPLAINT FOR DECLARATORY JUDGMENT,**
6        **BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF**
         **GOOD FAITH AND FAIR DEALING**
7
     ☐   by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth
8        below, or as stated on the attached service list, on this date at approximately _____, from the
         sending facsimile machine telephone number of 650-289-7893.  The transmission was reported
9        as complete and without error by the machine.  Pursuant to California Rules of Court, Rule
         2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of
10       which is attached to the original of this declaration.  The transmission report was properly
         issued by the transmitting facsimile machine.
11
     ☐   by placing the document(s) listed above in a sealed envelope with postage thereon fully
12       prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth
         below.
13
     ☒   by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail
14       envelope with postage thereon fully prepaid, addressed as set forth below.

15   ☐   **(BY ELECTRONIC MAIL ("EMAIL") SERVICE.**  I caused such document(s) to be
         transmitted electronically to the email addresses as set forth below.
16
     ☐   **(BY MESSENGER PERSONAL SERVICE).**  I caused delivery of such envelope by hand
17       via courier service to the offices of the addressee.

18   ***Counsel for Plaintiffs***                    ***Counsel for Plaintiffs***
     Ronald S. Granberg, Esq.                   Donna M. Welch, Esq.
19   Justin O'Connell, Esq.                     Jeffrey L. Willian, Esq.
     Granberg Law Firm                          Daniel C. Moore, Esq.
20   134 Central Ave.                           Kirkland & Ellis LLP
     Salinas, CA  93901                         300 N. LaSalle
21   Fax No. (831) 422-5550                     Chicago, IL  60654
     Email: Justin@granberglaw.com;             Fax: (312) 862-2200
22       ron@granberg.com                       Email:  dwelch@kirkland.com;
                                                daniel.moore@kirkland.com;
23                                              jeffrey.willian@kirkland.com;
                                                amy.crawford@kirkland.com;
24                                              yfrench@kirkland.com

25   ***Counsel for Lockton Companies LLC, et al.***   ***Counsel for Lockton Companies, et al.***
     Linda Dakin-Grimm                          Scott A. Edelman
26   Delilah Vinzon                             Elizabeth M Virga
     Milbank, Tweed, Hadley & McCloy LLP        Milbank, Tweed, Hadley & McCloy LLP
27   601 S. Figueroa St., 30th Fl.              1 Chase Manhattan Plaza
     Los Angeles, CA  90017                     New York, NY  10005-1413
28   Fax: (213) 629-5063                        Fax: (212) 530-5219


                                     PROOF OF SERVICE

1  Email: ldakin-grimm@milbank.com;          Email:   sedelman@milbank.com;
   dvinzon@milbank.com                               evirga@milbank.co
2
   ***Counsel for John Goodman and Goodman***
3  ***Real Estate***
   Douglas R. Young
4  Karen Kimmey
   Jennifer A. Teaford
5  Farella Braun & Martel LLP
   235 Montgomery St.
6  San Francisco, CA  94104
   Fax: (415) 954-4480
7  Email:   dyoung@fbm.com;
   kkimmey@fbm.com; jteaford@fbm.com
8

9       I am readily familiar with the business practice of my place of employment in respect to the
   collection and processing of correspondence, pleadings and notices for mailing with United States
10 Postal Service/Express Mail, Federal Express and other overnight mail services.  The foregoing
   sealed envelope was placed for collection and mailing this date consistent with the ordinary business
11 practice of my place of employment, so that it will be picked up this date with postage thereon fully
   prepaid at East Palo Alto, California, in the ordinary course of such business.
12
        I declare under penalty of perjury under the laws of the State of California that the foregoing
13 is true and correct.  Executed on October 24, 2013, at East Palo Alto, California.

14
15                                           Cathy Sandifer
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **Ronald S. Granberg, Esq.  #80111**
   **Justin M. O'Connell, Esq. (Bar No. 232188)**
2    **Granberg Law Office**
   **134 Central Avenue**
3    **Salinas, California  93901**
   **telephone: (831) 422-6565**
4    **facsimile: (831) 422-5550**

5    **Jeffrey L. Willian, Esq. (*pro hac vice*)**
   **Donna M. Welch, Esq. (*pro hac vice*)**
6    **Daniel C. Moore, Esq. (*pro hac vice*)**
   **Kirkland & Ellis LLP**
7    **300 N. LaSalle**
   **Chicago, IL 60654**
8    **telephone: (312) 862-2425**
   **facsimile: (312) 862-2200**
9

10    Attorney for:  Plaintiffs/Cross-Defendants

11

12         SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                **COUNTY OF MONTEREY**

14    PINNACLE IRWIN LLC AND       Case No. M 112710
   PINNACLE MONTEREY LLC,
15                        **CORRECTED ANSWER TO**
         Plaintiffs,               **SECOND AMENDED CROSS-**
16                        **COMPLAINT**
      v.
17
   CLARK REALTY CAPITAL,
18    L.L.C., and DOES 1 through 25
   inclusive,
19
         Defendants.
20

21       Plaintiffs and Cross-Defendants Monterey Bay Military Housing LLC and

22    California Military Communities LLC (collectively "Cross-Defendants") hereby

23    answer the unverified Second Amended Cross-Complaint for Declaratory Judgment,

24    Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair

25    Dealing  of Cross-Complainants American Management Services California, Inc. and

26    American Management Services LLC (collectively "Cross-Complainants"), as follows:

27

28

1

## General Denial

2    Pursuant to California Code of Civil Procedure section 431.30(d), Cross-

3  Defendants generally deny each and every allegation of said Second Amended Cross-

4  Complaint, the whole thereof, including each and every alleged cause of action

5  contained therein, and further deny that Cross-Complainants are entitled to the relief

6  requested or any relief at all, that Cross-Complainants sustained or will sustain

7  damages in the sum or sums alleged, in any other sum, or at all, or are entitled to

8  attorneys' fees in the sum or sums alleged, or any other sum or sums, or at all.

9

## AFFIRMATIVE DEFENSES

10    As separate and distinct affirmative defenses, Cross-Defendants allege that:

11    1.    Cross-Complainants' claims are barred, in whole or in part, because the

12          Second Amended Cross-Complaint fails to state a claim upon which relief

13          can be granted.

14    2.    Cross-Complainants' claims of breach of contract and breach of the

15          implied covenant of good faith and fair dealing are barred, in whole or in

16          part, because the contracts alleged in the Second Amended Cross-

17          Complaint automatically terminated through Cross-Complainants' fraud

18          and/or misconduct prior to the breaches alleged in the Second Amended

19          Cross-Complaint.

20    3.    Cross-Complainants' claims of breach of contract and breach of the

21          implied covenant of good faith and fair dealing are barred, in whole or in

22          part, because Cross-Defendants' performance was prevented and/or

23          excused by termination of the contracts alleged in the Second Amended

24          Cross-Complaint prior to the breaches alleged in the Second Amended

25          Cross-Complaint.

26    4.    Cross-Complainants' claims are barred, in whole or in part, by Cross-

27          Complainants' default in the performance of their obligations, conditions,

28          covenants and promises required under the contracts alleged in the Second

Amended Cross-Complaint.

5.  Cross-Complainants' claims are barred, in whole or in part, by the doctrine of laches.

6.  Cross-Complainants' claims are barred, in whole or in part, by the doctrine of unclean hands.

7.  Cross-Complainants' claims are barred, in whole or in part, by the doctrine of estoppel.

8.  Cross-Complainants' claims are barred, in whole or in part, by the doctrine of waiver.

9.  Cross-Complainants' claims are barred, in whole or in part, by the applicable statute of limitations.

10.  Cross-Complainant American Management Services LLC's claims are barred, in whole or in part, for lack of standing.

11.  Cross-Complainant American Management Services LLC's claims are barred, in whole or in part, because it is not the real party in interest in this action.

12.  Cross-Complainants failed to mitigate the alleged damages, if any, which they claim to have sustained, and recovery should be barred or diminished accordingly.

13.  Cross-Complainant American Management Services California, Inc. has breached the Property Management Agreements and therefore Cross Defendants are entitled to set off any amounts due to Cross-Complainants by the amounts due to the Cross-Defendants.

14.  Cross-Complainants' claims are barred, in whole or in part, by the doctrine of unjust enrichment.

15.  Cross-Complainants' claims are barred, in whole or in part, by doctrines of issue preclusion, claim preclusion, and *res judicata*.

1

2

Respectfully submitted,

3

4   11-25-13

    DATE

Ronald S. Granberg, Esq.
*Granberg Law Office*

5

6   Jeffrey L. Willian, Esq. (*pro hac vice*)
    Donna M. Welch, Esq. (*pro hac vice*)

7   Daniel C. Moore, Esq. (*pro hac vice*)
    *Kirkland & Ellis LLP*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MONTEREY BAY HOUSING v. PINNACLE MONTEREY    CASE NO.  M 112710**
**(M115143)**

## PROOF OF SERVICE

I am employed in the County of Monterey, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 134 Central Avenue, Salinas, California.

On November 25, 2013, I caused the following documents entitled:

**CORRECTED ANSWER TO SECOND AMENDED CROSS-COMPLAINT**

to be served on the party(ies) or its (their) attorney(s) of record in this action listed below by the following means:

☒ BY MAIL. By placing a true copy thereof in a sealed envelope (with postage affixed thereto) in the U.S. Mail at the Law Office of Ronald S. Granberg, 134 Central Avenue, Salinas, CA 93901.  I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and, in the ordinary course of business, correspondence would be deposited with the U.S. Postal Service in the same day it was placed for collection and processing.

☐ BY PERSONAL DELIVERY. By causing a true copy thereof to be delivered by hand at the address(es) shown below.

☐ BY OVERNIGHT DELIVERY. By causing a true copy to be sent by overnight mail, UPS delivery, or Federal Express delivery, with delivery charges to be billed to the Law Office of Ronald S. Granberg.

☒ BY EMAIL SERVICE. By causing a true copy thereof to be transmitted electronically, by "email", to the email addresses set forth below.

☐ BY FACSIMILE TRANSMISSION. By transmitting a true copy thereof by facsimile transmission from facsimile number (831) 422-5550 to the facsimile number(s) shown below.

And addressed as follows:

| | | |
|---|---|---|
| William J. Goines, Esq. | Linda Dakin-Grimm, Esq. | Scott A. Edelman, Esq. |
| Cindy Hamilton, Esq. | Delilah Vinzon, Esq. | Elizabeth M. Virga, Esq. |
| *Greenberg Traurig, LLP* | *Milbank Tweed Hadley &* | *Milbank Tweed Hadley &* |
| 1900 University Ave., 5th Floor | *McCloy LLP* | *McCloy LLP* |
| East Palo Alto, CA  94303 | 601 S. Figueroa St., 30th Floor | 1 Chase Manhattan Plaza |
| Fax:  (650) 328-8508 | Los Angeles, CA 90017 | New York, NY 10005-1413 |
| Email: goinesw@gtlaw.com; | Fax: (213) 629-5063 | Fax:  (212) 530-5219 |
| hamiltonc@gtlaw.com | Email:  ldakin-grimm@milbank.com; | Email:sedelman@milbank.com; |
| | dvinzon@milbank.com | evirga@milbank.com |

*(Continued on following page.)*

1

2  Douglas R. Young, Esq.              Thomas Dutton, Esq.
   Karen Kimmey, Esq.                 Daniel Hildebrand, Esq.
3  *Farella Braun & Martel, LLP*      *Greenberg Traurig, LLP*
   235 Montgomery Street              77 West Wacker Drive
4  San Francisco, CA 94104            Chicago, IL  60601
   Fax: (415) 954-4480                Fax:  (312) 456-8435
5  Email:  dyoung@fbm.com;            Email:  duttont@gtlaw.com;
   kkimmey@fbm.com;                   hildebrandd@gtlaw.com
6  jteaford@fbm.com

7

8

9        I declare under penalty of perjury under the laws of the State of California that the
   foregoing is true and correct.

10
   Executed on November 25, 2013, at Salinas, California.
11

12                                              _____
                                                Steven M. Patterson
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ranberg Law Office
34 Central Avenue
alinas, CA 93901

DOCUMENT11

Monterey Bay Military Housing v. Pinnacle Monterey #M 112710
PROOF OF SERVICE