# Exhibit L

## Part 1



1   WILLIAM J. GOINES (SBN: 61290)
    CINDY HAMILTON (SBN: 217951)
2   KAREN ROSENTHAL (SBN: 209419)
    ALICE CHU (SBN: 264990)
3   GREENBERG TRAURIG, LLP
    1900 University Avenue, Fifth Floor
4   East Palo Alto, California 94303
    Telephone: (650) 328-8500
5   Facsimile: (650) 328-8508

6   THOMAS E. DUTTON (Admitted Pro Hac Vice)
    DANIEL G. HILDEBRAND (Admitted Pro Hac Vice)
7   GREENBERG TRAURIG, LLP
    77 West Wacker Drive, Suite 3100
8   Chicago, IL 60601
    Telephone: 312-456-8400
9   Facsimile: 312-456-8435

10  Attorneys for Plaintiffs in M115143 / Defendants in M112710

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                    FOR THE COUNTY OF MONTEREY

13

14  MONTEREY BAY MILITARY HOUSING,        Case No. M112710 (M115143)
15  LLC, et al.,

            Plaintiffs;
16
    v.                                    PINNACLE IRWIN AND PINNACLE
17                                         MONTEREY'S FIRST AMENDED
    PINNACLE MONTEREY LLC, et al.,         COMPLAINT FOR DECLARATORY
18          Defendants.                    JUDGMENT, BREACH OF FIDUCIARY
                                           DUTY AND ACCOUNTING
19
20  AND RELATED CROSS-COMPLAINT.          JURY TRIAL DEMANDED

21  PINNACLE IRWIN LLC and PINNACLE
    MONTEREY LLC,
22
            Plaintiffs;
23
    v.
24
    CLARK REALTY CAPITAL L.L.C., CLARK
25  PINNACLE MONTEREY BAY LLC, CLARK
    PINNACLE CALIFORNIA MILITARY
26  COMMUNITIES LLC, and DOES 1-25,
    INCLUSIVE,
27
            Defendants.
28

                          FIRST AMENDED COMPLAINT

FILED
MAY 31 2012
CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
J. NICHOLSON   DEPUTY

FILED BY FACSIMILE

Plaintiffs Pinnacle Irwin LLC ("Pinnacle Irwin") and Pinnacle Monterey LLC ("Pinnacle Monterey"), for their First Amended Complaint against Defendants Clark Realty Capital, L.L.C., ("Clark or "Clark Realty"), Clark Pinnacle Monterey Bay LLC ("Clark Pinnacle Monterey"), and Clark Pinnacle California Military Communities LLC ("Clark Pinnacle CMC") allege as follows:

## SUMMARY

1.      The plaintiffs in this action, Pinnacle Monterey and Pinnacle Irwin, are two limited liability companies created by American Management Services LLC ("Pinnacle"). Pinnacle is a large nationwide property management company. Defendant Clark Realty is a large nationwide real estate development company. In 2001, Pinnacle and Clark Realty formed a joint venture to develop and manage large privatized housing projects at United States military facilities. The name of the joint venture was Clark Pinnacle Family Communities LLC ("Clark Pinnacle"). Together, the partners submitted bids to branches of the military for potential projects across the country.

2.      In May 2003, Clark Pinnacle won a large Army housing privatization project at Monterey Presidio and Fort Ord in Monterey, California. In October 2003, Clark Pinnacle won approval of a similar project at Fort Irwin, Moffett Field and Parks Training Area in California. Clark and Pinnacle, together, acted as both owners and managers of the Monterey and Fort Irwin projects. Clark's role was to provide development, construction and asset management services to the projects. Pinnacle's role was to provide property management services to the projects. Pinnacle Monterey is the "Pinnacle Manager" and 30% equity owner of Defendant Clark Pinnacle Monterey. Pinnacle Irwin is the "Pinnacle Manager" and 30% equity owner of Defendant Clark Pinnacle CMC. Those two companies in turn act as "Managing Members" of the Monterey and Fort Irwin projects.

3.      Sometime before 2009, Clark decided that it no longer wanted to be Pinnacle's partner at the privatized residential housing projects that parties' joint venture had obtained. Clark decided that it was in its financial interest to remove Pinnacle as property manager and take over Pinnacle's ownership share of the projects. Since approximately June 2010, Clark has engaged in a hostile campaign of audits and compliance investigations aimed at developing grounds to extinguish Pinnacle's interests in the Monterey and Fort Irwin housing projects through litigation.

4.      In May 2011, Pinnacle Monterey and Pinnacle Irwin took steps to protect their voting rights and minority equity interests in the Monterey and Fort Irwin projects.  Exercising their rights as "Pinnacle Manager" under the Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle CMC, they proposed adjustments to the terms of the property management agreements at the Monterey and Fort Irwin projects.  The adjustments required Clark to acknowledge Pinnacle's rights to notice and cure, concerning alleged acts of theft, fraud or other misconduct by Pinnacle's employees.  Clark opposed the adjustments.  Pinnacle Monterey and Pinnacle Irwin then declared a "deadlock" and exercised their "sole" power to break the deadlock and enact the adjustments.

5.      In January 2012, Clark escalated its campaign by filing an amended complaint in the consolidated action in this matter.  Clark's affiliated plaintiffs claimed that as a result of unproven misconduct by a few Pinnacle employees, Pinnacle's property management agreements at Monterey and Fort Irwin had automatically terminated.  These claims attack Pinnacle Monterey and Pinnacle Irwin's interests in the projects because termination of the property management agreements works as an "event of default" under the Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle Irwin.  That, in turn, deprives Pinnacle Monterey and Pinnacle Irwin of their voting rights in the projects, and exposes them to a forced buy-out of their minority equity interests.

6.      Clark has acted out of greed and disloyalty in seeking to terminate Pinnacle as property manager and capture Pinnacle Monterey and Pinnacle Irwin's ownership share of the projects.  The truth is that Pinnacle and its employees were loyal, hard-working and devoted to the success of the California privatization projects.  Pinnacle does not credit the charges of misconduct in the consolidated complaint.  But even if the allegations are true, the conduct did not cause material financial harm to the projects, and Pinnacle is entitled notice of the wrongdoing, and a chance to cure any defaults.  Pinnacle stands ready and willing to refund any damages caused by its employees.

7.      Clark Realty's campaign against Pinnacle is a breach of fiduciary duty and an unlawful "minority freeze out" that is prohibited under California law.  Plaintiffs have filed this lawsuit to obtain a declaration validating their adjustments of the property management agreements; to remedy Clark's multiple breaches of fiduciary duty; to obtain an audit and accounting of Clark's mismanagement of the joint venture companies; and for other relief as set forth herein.

**PARTIES AND INTERESTED NON-PARTIES**

8.     Plaintiff Pinnacle Irwin LLC is a Washington limited liability company with its main office in Seattle, Washington. It is the "Pinnacle Manager" of, and holds a 30% membership interest in, Clark Pinnacle California Military Communities LLC.

9.     Plaintiff Pinnacle Monterey LLC is a Washington limited liability company with its main office in Seattle, Washington.  It is the "Pinnacle Manager" of, and holds a 30% membership interest in, Clark Pinnacle Monterey Bay LLC.

10.     Non-party American Management Services LLC, d/b/a Pinnacle, is a Washington limited liability company with its main office in Seattle, Washington.  Pinnacle is a national property management firm. It is an affiliate of the Plaintiffs, and a joint venture partner with Clark Realty in the Monterey and Fort Irwin projects.  It performs the property management services at both projects.

11.     Non-party American Management Services California Inc. ("AMS California") is a Washington corporation with its main office in Seattle, Washington.  It is an affiliate of the Plaintiffs. It holds the property management agreements at the parties' the Monterey and Fort Irwin projects.

12.     Defendant Clark Realty Capital LLC is a Delaware limited liability company with its principal office in Arlington, Virginia.  It is a large nationwide real estate development company, and a joint venture partner with Pinnacle in the Monterey and Fort Irwin projects. At all times, the non-parties listed below acted at the direction and control of Clark Realty.

13.     Defendant Clark Pinnacle Monterey Bay LLC is a California limited liability company. On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture company that acts as manager and owner of MBMH.

14.     Defendant Clark Pinnacle California Military Communities LLC is a California limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture company that acts as manager and owner of CMC.

15.     Non-party Monterey Bay Military Housing, LLC ("MBMH") is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture company that acts as "Owner" of the Monterey project.

16.     Non-party California Military Communities LLC ("CMC") is a Delaware limited liability company. On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It is a joint venture company that acts as "Owner" of the Fort Irwin project.

17.     Non-party Clark Monterey Presidio LLC is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia. It holds a 70% membership interest in Clark Pinnacle Monterey Bay LLC.

18.     Non-party Clark Irwin LLC is a Delaware limited liability company.  On information and belief, its principal place of business is Clark Realty's offices in Arlington, Virginia.  It holds a 70% membership interest in Clark Pinnacle California Military Communities LLC.

19.     The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendants DOES 1 through 25 are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names under Cal. Civ. Proc. Code §474.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over defendants Clark Realty, Clark Pinnacle Monterey and Clark Pinnacle CMC.  Those companies are engaged in business in California, and breached duties and obligations under the parties' Operating Agreements in this state, as alleged herein.

21.     Venue is proper in this Court pursuant to Cal. Civ. Proc. Code §395(a) because the Operating Agreements at issue herein were to be performed in Monterey and Santa Clara Counties.

## FACTS

### The Clark Pinnacle Joint Venture for Privatization of U.S. Military Housing

22.     In the 1990s, the U.S. Department of Defense ("DOD") determined that much of the nation's military housing was inadequate.  DOD determined that it would take 30 or more years and cost over $20 billion dollars if the military attempted to fix these problems itself.  As a result, Congress passed the National Defense Authorization Act of 1996, P.L. 104-106, §2801, to privatize U.S. military housing.  Congress found that private contractors could achieve better living conditions for the men and women of the armed services at a lower cost than the military.

23.     In 2001, Clark Realty and Pinnacle formed a joint venture to bid for military housing privatization projects.  Clark Realty is affiliated with Clark Construction, one of the nation's largest

4

privately held general building contractors.   Pinnacle is one of the nation's largest property management firms.   Clark Realty and Pinnacle called their joint venture Clark Pinnacle Family Communities LLC, or "Clark Pinnacle" for short.   The joint venture had its own "Clark Pinnacle" website, which touted the joint venture's capabilities and projects.

24.   Clark Pinnacle went through an intensive and expensive submission process for each potential military privatization opportunity.   The process required assembling a team to visit the installation; preparing a proposal and written statement of qualifications; and making a day-long oral presentation to advocate the plan.   Pinnacle was an integral part of this process.   Regardless of whether Clark Pinnacle won or lost an opportunity, the portions of the qualifications for which Pinnacle was responsible often scored higher than those for which Clark was responsible.

25.   Between 2001 and 2004, Clark Pinnacle won the right to prepare Community Development and Management Plans, or "CDMPs," for large privatization projects at Monterey Presidio and Fort Ord in California; at Fort Belvoir, Virginia; at Fort Irwin, Moffett and Parks in California; at Fort Benning, Georgia; and at Navy Pacific Beacon in California.   Clark Pinnacle competed for numerous other military privatization projects, but was not awarded those projects.

26.   The Army awarded Clark Pinnacle the right to prepare a CDMP for the Monterey project in mid 2002.   The Army awarded Clark Pinnacle the right to prepare a CDMP for the Fort Irwin project in September of 2002.   The CDMPs included site surveys; design, engineering and construction plans; and budgets and property management plans.   The CDMPs were the blueprint for each party's jobs and responsibilities.   Clark and Pinnacle each invested significant time and money preparing the CDMPs.   The CDMPs were intensely negotiated with the Army, and had to be fully approved by the Army and Congress before the projects could begin.

27.   Congress approved the CDMP for the Monterey project in May 2003.   Congress approved the CDMP for the Fort Irwin project in October 2003.   Afterwards, Clark Pinnacle and their bankers went out on a "road show" to obtain financing to fund the projects.   Clark Pinnacle formally took over management of housing at the Monterey project on October 1, 2003.   Clark Pinnacle formally took over management of housing at the Fort Irwin project on March 1, 2004.

FIRST AMENDED COMPLAINT

28.     Clark Realty used and relied on Pinnacle's experience and reputation to bid for, and win, the Monterey and Fort Irwin Projects.  The military relied on the inclusion of Pinnacle as the property manager in selecting Clark Pinnacle.  Likewise, institutional investors who financed the projects relied on the fact that a nationally reputable, institutional quality property manager, Pinnacle, was both the property manager and an owner.

29.     The Monterey and Fort Irwin Projects were 50-year projects.  At both projects, the United States Army leased land to the joint venture under a 50-year ground lease.  The joint venture then took responsibility for managing the housing on that land for 50 years.

***Pinnacle Monterey and Pinnacle Irwin's Rights Under the Operating Agreements***

30.     When Clark Pinnacle won the Monterey and Fort Irwin projects, they formed two limited liability companies:  Clark Pinnacle Monterey, and Clark Pinnacle CMC.  The Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle CMC ("Operating Agreements") established the parties' rights and interests at the Monterey and Fort Irwin projects. Ex. 2-3.  Charts of the joint venture entities at the Monterey and Irwin projects are attached as Ex. 1.

31.     The Operating Agreement for Clark Pinnacle Monterey states that the company's "business and purpose" is to be a "member" and to "act as managing member" of MBMH. Ex. 2, §1.5.  It also provides that Clark Realty's affiliate Clark Monterey Presidio owns 70% of Clark Pinnacle Monterey, and Pinnacle Monterey owns 30% of the company. Id., §2.1(b), Ex. A.

32.     Likewise, the Operating Agreement for Clark Pinnacle CMC states that the company's "business and purpose" is to be a "member" and to "act as managing member" of CMC. Ex. 3, §1.5. It provides that Clark Realty's affiliate Clark Irwin owns 70% of Clark Pinnacle CMC, and Pinnacle Irwin owns 30% of the company. Id., §2.1(b), Ex. A.

33.     The Operating Agreements also set forth each of the joint venture partners' jobs at the Monterey and Fort Irwin projects.  Clark's affiliates were granted the right to perform development, construction and asset management services for MBMH and CMC.  Pinnacle's affiliates were granted the right to perform property management services for MBMH and CMC.  The Operating Agreements for both projects stated that MBMH and CMC "shall" enter into development, construction, and asset management service agreements with Clark affiliates. Ex. 2-3, §3.15(a)(1),

(2), (4).  The Operating Agreements likewise stated that MBMH and CMC "shall" enter into a property management agreement with Plaintiffs' affiliate AMS California.  Id., §3.15(a)(3).  The property management agreements granted to Plaintiffs' affiliate AMS California under the Operating Agreements at the Monterey and Fort Irwin projects are attached hereto as Ex. 4-5.

34.    The Operating Agreements at both projects appointed Clark Realty as the "Clark Manager" of Clark Pinnacle Monterey and Clark Pinnacle CMC. Ex. 2-3, §3.1(a).  As Clark Manager, Clark Realty had "acting authority to make all decisions regarding the management of the Company's business and affairs."  Id., §3.1(b)(2).  Because the "business and purpose" of Clark Pinnacle Monterey and Clark Pinnacle CMC was to "act as managing member" of MBMH and CMC, Clark's role as "Clark Manager" gives it management and control over those companies.

35.    As the "Pinnacle Managers" of Clark Pinnacle Monterey and Clark Pinnacle CMC, Pinnacle Monterey and Pinnacle Irwin had much more limited rights.  They had the right to vote on "Major Decisions" defined in the Operating Agreements. Ex. 2, §3.1(b)(3); Ex. 3, §3.1(b)(2).  They had the right to inspect and audit each company's books and records.  Id., §3.11.  They also had the right to break any deadlock in voting, between the Clark and Pinnacle Managers, over adjustments to the terms of Pinnacle's property management agreements with MBMH and CMC.  Id., §3.13(c).

36.    The Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle CMC both state that termination of the property management agreement "for failure to perform" shall be an "Event of Default." Ex. 2-3, §6.1(e).  If this occurs, then Clark Realty, as Clark Manager, "shall have the option" to cause Pinnacle Monterey or Pinnacle Irwin, respectively, "to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company."  Id., §6.2(a)(3).

37.    The Operating Agreements of Clark Pinnacle Monterey and Clark Pinnacle CMC also provide that during an "Event of Default," "the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager.  In such event, the vote of the remaining Manager(s) shall be sufficient to make all decisions of the company, including, without limitation, Major Decisions." Ex. 2-3, §6.2(c).

38.     The Operating Agreement of Clark Pinnacle Monterey and Clark Pinnacle CMC also granted the parties a right to receive "Cash Distributions" from the company's business of operating MBMH and CMC. Ex. 2-3, §2.8. The Operating Agreements stated that that "Net Cash Flows" were defined as "all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company." Id., §2.8(a)(1). Under these provisions, Clark Pinnacle Monterey and Clark Pinnacle CMC's operations of MBMH and CMC, respectively, impacts Pinnacle Monterey and Pinnacle Irwin's economic benefits under each of the Operating Agreements.

39.     To sum up Pinnacle Monterey and Pinnacle Irwin's interests under the Operating Agreements, they are the Pinnacle Managers of Clark Pinnacle Monterey and Clark Pinnacle CMC. They have a 30% equity ownership interest in those companies; they have the right to receive Cash Distributions from those companies' businesses of operating MBMH and CMC; their affiliate AMS California was granted the right to hold property management agreements with MBMH and CMC; and they have "sole discretion" to resolve deadlocks in voting concerning adjustments to the property management agreements.   Termination of the property management agreements is an "event of default" under the Operating Agreements.   This, in turn, causes Pinnacle Monterey and Pinnacle Irwin to lose their voting rights under the Operating Agreements, and exposes them to a forced buy-out of their minority equity interests in Clark Pinnacle Monterey and Clark Pinnacle CMC.

### Clark Pinnacle's Performance at the California Military Housing Projects

40.     After formal transfer of authority from the Army to Clark Pinnacle, the housing projects at Monterey and Fort Irwin entered an Initial Development Phase, or "IDP," in which Clark affiliates began major development and construction work. At the Monterey project, the IDP phase was slated to last 10 years. At the Fort Irwin project, the IDP phase was slated to last 8 years.

41.     Pinnacle's job as property manager was to lease homes to potential tenants and work with the tenants of the housing projects to keep them happy. At the simplest level, this involved collecting rent; moving residents in and out of the houses as soldiers were assigned to other postings; keeping the houses well maintained; and responding to residents' complaints and service calls.

42.     Not surprisingly, Pinnacle's job was much harder during the IDP phase. The homes Clark Pinnacle inherited from the Army had been neglected for years. Most were in poor condition.

1    Many were old and ridden with mold or structural problems and had to be torn down and replaced.

2    Clark could not immediately construct new or renovated homes for an entire military base. This left

3    many soldiers and their families living in run-down housing. Meanwhile, residents had to put up

4    with constant construction. In general, residents were less satisfied living in old, unrenovated homes

5    than in new ones, and they were less satisfied when there was construction in the neighborhood.

6        43.    Old, unrenovated homes required more frequent maintenance work, and cost more to

7    make ready for new tenants. The CDMPs and financing documents submitted to bondholders put

8    Pinnacle on very tight budgets for per-housing unit maintenance costs. Pinnacle was under constant

9    pressure to do "more" with "less," trying to keep the housing units well-maintained, while at the

10   same time doing its best to keep the residents of the housing communities happy.

11       44.    As reflected in the CDMPs and the Operating Agreements of Clark Pinnacle Monterey

12   and Clark Pinnacle CMC, the Owners of the housing projects (MBMH and CMC) were under day-to-

13   day control of Clark Realty. In performing its duties as property manager at Monterey and Fort

14   Irwin, Pinnacle was directed by, and subordinate to, Clark Realty. Clark Realty was in substance

15   Pinnacle's "boss" at each of the projects.

16       45.    Every month, Pinnacle submitted occupancy reports, capital budgets, expense reports

17   and other project financial information to Clark Realty for review and approval. Pinnacle's on-site

18   managers discussed the projects' physical and financial condition with Clark Realty's on-site project

19   executives in regular meetings, covering everything from hiring contractors to per-unit maintenance

20   costs. Pinnacle was in daily contact with Clark Realty about virtually every aspect of its job duties.

21                  ***Financial Pressures at the California Military Housing Projects***

22       46.    In real estate development projects, income is largely a function of revenue (here, a

23   service member's Basic Allowance for Housing (or "BAH"), multiplied by the number of occupied

24   units) and expenses. To convince lenders to finance the construction projects at Monterey and Fort

25   Irwin, Clark Realty prepared detailed projections for each project. These contained assumptions

26   about revenue; the expenses necessary to manage and operate the projects; and therefore the income

27   that would be available to service and pay off the debt.

28

FIRST AMENDED COMPLAINT

47.     At both projects, the existing housing was in worse shape than Clark Pinnacle realized, making it more expensive to maintain than the parties had budgeted, and less attractive as a rental option for soldiers and their families.  Soldiers were free to move off-post and use their Army housing allowances to rent from private landlords if they wished.  Thus, occupancy levels, and hence revenue, was below what Clark Pinnacle had budgeted in its financial plans, and maintenance and improvement expenses were higher than the parties had budgeted.  These variances caused the projects to have trouble making enough income to service their debt.

48.     At Monterey, there were additional adverse variances.  The mix of soldiers assigned to the post resulted in lower average BAH than the parties had anticipated.  Construction cost escalation was much higher than Clark Realty had forecast.  Property management expenses were higher as well, due to the need to pay Davis-Bacon Act wages, which had not been anticipated at the time of the financial closings.  Finally, the percentage of homes occupied by military families was lower than expected, and the partners had to rent a significant number of units to civilian residential tenants, who paid lower, local market rents than the BAH allotments granted to soldiers to pay their rent.

49.     In addition to income from renting the homes at Monterey and Fort Irwin, the CDMPs also projected that the projects would earn interest income from the portion of the loan proceeds that were not immediately used for project construction.  In 2008, as a result of the crisis in world credit markets, and the failure of the financial institution holding the bond proceeds (AIG), Clark had to withdraw hundreds of millions of dollars from accounts at AIG (which had been expected to earn 3% interest) and place them in money market accounts earning interest at less than 1%.  The failure of AIG, therefore, and the loss of interest income, contributed to the financial pressures at both projects.

50.     As a result of these and other pressures, on December 16, 2008, Clark Pinnacle submitted a Modified Scope Plan ("MSP") to the Army for approval at Monterey.  The MSP was directed and controlled by Clark Realty, in its role as the Asset Manager of MBMH and manager of Clark Pinnacle Monterey Bay LLC.  The MSP at Monterey reduced the development budget by an estimated $133 million, reduced construction of new units, and increased renovation of existing units.

1

***Clark's Campaign to Terminate Pinnacle's Minority Interests***

2          51.     In response to these financial pressures, in 2009 Clark Realty decided it no longer
3   wished to be a joint venture partner with Pinnacle.  Clark Realty determined it could make more
4   money from the projects if it could find a way to fire Pinnacle as the property manager.  That way,
5   Clark Realty would be able to eliminate Pinnacle's fees and ownership interests at both projects,
6   capture Pinnacle's share of the joint venture for itself, and reduce project costs by using a contract
7   property manager who did not have an ownership stake in the projects, and who could be paid a
8   smaller management fee than Pinnacle receives for its contribution to the joint venture.  Or, Clark
9   could take over the role of property manager and capture Pinnacle's management fees for itself.

10         52.     Clark Realty hired a national litigation firm, Kirkland & Ellis, to build a case for
11  terminating Pinnacle.  In November 2009, Kirkland hired Alix Partners to conduct a "forensic
12  investigation" of Pinnacle's performance at the parties' Fort Benning Project.  Alix is a national
13  consulting firm that provides forensic accounting and litigation support services.  Alix worked under
14  the control and direction of the litigation lawyers at Kirkland, and its job was to look for evidence
15  that would support terminating Pinnacle's property management agreements.

16         53.     In May 2010, Kirkland hired Alix to perform a forensic investigation of the Monterey
17  and Irwin projects.  Alix began making frequent requests for information about Pinnacle's operations.
18  Alix held itself out to Pinnacle as a "third party auditor" working to complete an "internal audit."
19  Clark Realty personnel had conducted internal audits of Pinnacle in previous years, working with
20  Pinnacle to improve the success of the parties' projects.  As a result, Pinnacle gave Alix its full
21  cooperation, believing that it was working in good faith with its joint venture partner, Clark Realty.

22         54.     In reality, however, Alix was not conducting a normal internal audit at all, but
23  gathering evidence for a lawsuit against Pinnacle.  Alix never told Pinnacle it was working for, and at
24  the direction of, Kirkland.  Alix never told Pinnacle it was conducting a "forensic investigation."  In
25  the guise of its third party "audit", Alix made broad demands for electronic and other information,
26  including personal emails and Pinnacle corporate information.  Alix interviewed many Pinnacle
27  employees, including senior officers.  If Alix or Kirkland had told Pinnacle the truth about their

28

investigation, Pinnacle would have retained counsel and focused on preparing to defend itself in court. Instead, Pinnacle unknowingly cooperated in Clark Realty's secret campaign to fire Pinnacle.

55.     In January 2012, Clark Realty caused CMC and MBMH to file an amended complaint against Pinnacle in the Superior Court of Monterey County, California. That complaint, among other things, sought a declaratory judgment that Pinnacle's property management agreements at the Monterey and Fort Irwin housing projects could be terminated. MBMH and CMC's Monterey County action has been consolidated with the instant action, originally filed by Pinnacle Monterey and Pinnacle Irwin in Santa Clara County.

56.     Clark Realty never acted to communicate with Pinnacle and give Pinnacle the chance to fix, or "cure," the alleged problems noted in Clark's internal audits and Alix' forensic investigation, even though both of the California projects' property management agreements give Pinnacle the right to cure any conditions that could give rise to Pinnacle's termination. Clark Realty's view was that, as manager of Clark Pinnacle Monterey and Clark Pinnacle CMC, it had full power to fire Pinnacle without giving Pinnacle a chance to remedy any of the claimed misconduct.

57.     Pinnacle materially and properly performed its property management agreements at the Monterey and Fort Irwin housing projects. Pinnacle is entitled to be the property manager at both facilities and continue performing for the remainder of those agreements' 50-year terms. Pinnacle is also entitled to cure any alleged defaults before being subject to termination.

58.     There is no legitimate business reason for Clark Realty to cause CMC and MBMH to pay expensive litigation and consulting fees attempting to terminate the Monterey and Fort Irwin property management agreement based on curable defaults. Pinnacle has repeatedly made clear that it stands ready, willing and able to remedy any actual harm to the projects that may have occurred. Under these circumstances, it is wrong and unfair to terminate Pinnacle as the property manager.

59.     Because of Clark Realty's actions set forth above, Clark Realty demonstrated its belief that it does not owe Pinnacle Monterey or Pinnacle Irwin any fiduciary duties or even basic duties of loyalty, good faith and fair dealing at the parties' joint venture projects in California.

*Pinnacle Irwin and Pinnacle Monterey's Exercise of Adjustment Rights*

60.    Pinnacle Monterey and Pinnacle Irwin, as the "Pinnacle Managers" of Clark Pinnacle Monterey and Clark Pinnacle CMC, have the right to propose and vote on adjustments to the property management agreements between AMS California and MBMH and CMC.  Ex. 2-3, §3.1(b)(2)-(b)(3)(E).  In the event of a deadlock in voting about such adjustments with Clark, Pinnacle Monterey and Pinnacle Irwin are empowered to resolve the deadlock in their "sole discretion." Id., §3.13(c).

61.    These adjustment rights protect Pinnacle Monterey and Pinnacle Irwin's financial interests in the Monterey and Fort Irwin projects.  The Operating Agreements assigned the property management agreements to Pinnacle's affiliate AMS California.  Those property management agreements represented the primary revenue stream by which Pinnacle earned a return for its contributions and investments in Clark Pinnacle's California joint venture projects.  Further, any termination of AMS California's property management agreements would work to deprive Pinnacle Monterey and Pinnacle Benning of their voting rights and minority equity interest in Clark Pinnacle Monterey and Clark Pinnacle CMC.  The Operating Agreements therefore granted Pinnacle Monterey and Pinnacle Irwin the "final say" over adjustments to the property management agreements.

62.    On May 13, 2011, Pinnacle Monterey and Pinnacle Irwin informed Clark Realty that they were voting to adjust Section 18.1.(C)(6) of the Property Management Agreement for the MBMH project and Section 18.1(C)(4) of the Property Management Agreement for the CMC project.  Ex. 6.  Those were the provisions in the Monterey and Fort Irwin property management agreements that provided that acts of "theft, fraud or other knowing or intentional misconduct by Manager [Pinnacle] or its employees" shall be an "event of default."  See Ex. 4-5, pp. 13-14.

63.    The adjustments voted on by Pinnacle Irwin and Pinnacle Monterey clarified that Pinnacle would have notice and cure rights, prior to any termination of the property management agreements for default arising from "theft, fraud or other knowing or intentional misconduct by Manager or its employees."  Ex. 6.  The adjustments also clarified that Pinnacle could only be subject to termination for uncured acts of employee misconduct that caused material harm to the projects.  Id.

64.    Pinnacle Monterey and Pinnacle Irwin believed their proposed adjustments were "consistent with the language and intent of the unadjusted PMA," and explained that the adjustments

13

1   "will ensure that the Operating Agreement partners can continue to work together in the best interests

2   of the [projects] for the remainder of the [property management agreements'] 50 year terms. Ex. 6.

3       65.   Clark Realty did not vote or give its consent.  Instead, on May 19, 2011, Clark

4   responded by demanding that Pinnacle Irwin and Pinnacle Monterey describe in detail "any potential

5   fraud, theft or intentional misconduct" by a Pinnacle employee, as well as what steps Pinnacle had

6   taken "to remedy any instances of fraud, theft or intentional misconduct at the Project." Ex. 7.

7       66.   Pinnacle Monterey and Pinnacle Irwin replied by assuring Clark that they had "no

8   information about any events of fraud, theft or misconduct at Irwin or Monterey."  Ex. 8.  Rather,

9   Pinnacle Monterey and Pinnacle Irwin explained that the adjustments "will enable Pinnacle to

10  participate, as a partner of both Clark and the Army, in responding to acts of fraud, theft and

11  misconduct, either alleged or confirmed, committed by Pinnacle employees."  The letter concluded

12  by proposing a "face-to-face meeting to discuss these matters at your earliest convenience." Id.

13      67.   On June 3, 2011, Clark sent a letter refusing to have a face-to-face meeting, and said it

14  was only willing to have a meeting about the California projects if certain claims were dismissed

15  from pending litigation involving Clark Pinnacle's eastern projects. Ex. 9.

16      68.   Pinnacle Monterey and Pinnacle Irwin responded in a June 8, 2011 letter stating that

17  Clark had "refused to vote on the proposed adjustments, and refused to even meet to discuss them."

18  Ex. 10.  The letter therefore "declared a 'Deadlock' regarding the adjustments proposed in [the]

19  letters dated May 13, 2011." Id.  The letter again requested a meeting, and concluded that "absent a

20  meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011." Id.

21      69.   On June 14, 2011, Clark responded in a letter which asserted that Pinnacle could not

22  declare a "deadlock" because the Managers had not voted. Ex. 11.  Clark did not agree to a meeting

23  or take any other steps to resolve the deadlock declared by Pinnacle Monterey and Pinnacle Irwin.

24      70.   On June 15, 2011, Pinnacle responded by reiterating its position that, pursuant to

25  Section 3.13(c) of the Operating Agreements, there remained a "deadlock," and rejecting the

26  assertions made by Clark Realty.  Ex. 12.  Later that day, the parties filed rival declaratory judgment

27  actions in Monterey and Santa Clara Counties, which have been consolidated in Monterey County.

28

71.     Pinnacle Monterey and Pinnacle Irwin exercised their rights under the Operating Agreements to adjust the terms of the property management agreements at Monterey and Fort Irwin. As Pinnacle Managers, they voted in favor of the adjustments and sought the vote or signed consent of the Clark Manager, Clark.  Because Clark refused to vote or give consent, or even meet to discuss the matter, Pinnacle Monterey and Pinnacle Irwin properly declared a deadlock.  Seven days after declaring a deadlock, Pinnacle Monterey and Pinnacle Irwin were authorized to, and did, determine the deadlock or dispute in their "sole discretion."  The adjustments became effective June 16, 2011.

### *Pinnacle Irwin and Pinnacle Monterey's Demand To Exercise Audit Rights*

72.     In addition to the foregoing efforts to protect Pinnacle Monterey and Pinnacle Irwin's equity and voting rights, the Pinnacle Managers took steps to investigate whether Clark Realty, acting as Clark Manager of Clark Pinnacle Monterey and Clark Pinnacle CMC, had engaged in waste, self-dealing or other breaches of duty in directing those companies as the Managers of MBMH and CMC.

73.     The Operating Agreements at both projects provide that "The Pinnacle Manager shall have the right ... to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager."  Ex. 2-3, §3.11.

74.     On July 2, 2010, Pinnacle Irwin and Pinnacle Monterey wrote a letter to Clark Realty stating that they "intend[ed] to review and inspect the records of" Clark Pinnacle CMC and Clark Pinnacle Monterey.  The letter advised that "we will commence this review at approximately 10:00 a.m. on July 7, 2010 at the offices of Clark Realty Capital in Arlington, Virginia." Ex. 13.

75.     Clark Realty responded to these letters by emailing a limited set of documents consisting of the operating agreements, the LLC formation agreements and the LLC tax returns.  Ex. 14. Clark refused to grant Pinnacle Monterey and Pinnacle Irwin any broader access to the books and records of Clark Pinnacle CMC or Clark Pinnacle Monterey.  In particular, Clark denied Pinnacle Monterey and Pinnacle Irwin access to any books and records that would document those companies' "business and purpose" of managing MBMH and CMC.  Clark Realty's position violated Pinnacle's rights under the Operating Agreements, and was a breach of Clark's duties as Manager.

# FIRST CAUSE OF ACTION

### Declaratory Judgment - Pinnacle Monterey's Adjustment of the Property Management Agreement at the Monterey Project

### [By Pinnacle Monterey Against Clark Realty and Clark Pinnacle Monterey]

76.     The allegations of paragraphs 1 through 75 are incorporated herein by reference.

77.     Pursuant to Cal. Civ. Pro. Code § 1060, any person interested under a under a contract, or who desires a declaration of his or her rights or duties with respect to another, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint for a declaration of his or her rights and duties, including a determination of any question of construction or validity arising under the instrument or contract.

78.     Pinnacle Monterey seeks declaratory relief herein regarding the meaning of, and obligations under, the Operating Agreement of Clark Pinnacle Monterey.  Such a declaration impacts the conduct and obligations of Pinnacle Monterey, Clark Realty and Clark Pinnacle Monterey.

79.     Specifically, the parties dispute the Pinnacle Manager's right, under the Operating Agreement of Clark Pinnacle Monterey, to declare a deadlock and adjust the property management agreement between MBMH and AMS California, as set forth in paragraphs 60-71 above.

80.     Pinnacle Monterey seeks a declaration and order that (i) Section 3.1(b) affords it the right to propose, and vote on, adjustments to the terms and conditions of the property management agreement; (ii) the Clark Manager's refusal to vote on or consent to the proposed adjustments constitutes "a deadlock in voting between the Managers"; (iii) Section 3.13(c) grants to Pinnacle Monterey, as Pinnacle Manager, the sole discretion to determine such any deadlock or dispute; and that (iv) Section 18.1(C)(6) of the property management agreement for the Monterey project has in fact been adjusted, effective June 16, 2011, to read as follows:

> "theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse effect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse effect and the Property Management Agreement shall not be terminated."

## SECOND CAUSE OF ACTION

### Declaratory Judgment - Pinnacle Irwin's Adjustment of
### the Property Management Agreement at the Fort Irwin Project

### [By Pinnacle Irwin Against Clark Realty and Clark Pinnacle CMC]

81.     The allegations of paragraphs 1 through 80 are incorporated herein by reference.

82.     Pursuant to Cal. Civ. Pro. Code § 1060, any person interested under a under a contract, or who desires a declaration of his or her rights or duties with respect to another, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint for a declaration of his or her rights and duties, including a determination of any question of construction or validity arising under the instrument or contract.

83.     Pinnacle Irwin seeks declaratory relief herein regarding the meaning of, and obligations under, the Operating Agreement of Clark Pinnacle CMC.  Such a declaration impacts the conduct and obligations of Pinnacle Irwin, Clark Realty and Clark Pinnacle CMC.

84.     Specifically, the parties dispute the Pinnacle Manager's right, under the Operating Agreement of Clark Pinnacle CMC, to declare a deadlock and adjust the property management agreement between CMC and AMS California, as set forth in paragraphs 60-71 above.

85.     Pinnacle Irwin seeks a declaration and order that (i) Section 3.1(b) affords it the right to propose, and vote on, adjustments to the terms and conditions of the property management agreement; (ii) the Clark Manager's refusal to vote on or consent to the proposed adjustments constitutes "a deadlock in voting between the Managers"; (iii) Section 3.13(c) grants to Pinnacle Irwin, as Pinnacle Manager, the sole discretion to determine any such deadlock or dispute; and that (iv) Section 18.1(C)(4) of the property management agreement for the Fort Irwin project has in fact been adjusted, effective June 16, 2011, to read as follows:

> "theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse effect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

17

### THIRD CAUSE OF ACTION

#### Breach of Fiduciary Duty

#### [By Pinnacle Monterey Against Clark Realty]

86.    The allegations of paragraphs 1 through 85 are incorporated herein by reference.

87.    Clark Realty, as Clark Manager of Clark Pinnacle Monterey, owes fiduciary duties as well as duties of loyalty, good faith and due care, to Pinnacle Monterey as a minority member of Clark Pinnacle Monterey.

88.    Clark Realty breached its fiduciary duty by acting solely in its own interest and to the detriment of Pinnacle Monterey as a minority member of Clark Pinnacle Monterey through its actions and refusals to act set forth more particularly herein.

89.    Clark Realty breached its fiduciary duty by attempting to terminate the property management agreement of AMS California at Monterey, without notice and cure rights, for alleged misconduct that was not material to the financial performance of the project, thereby attempting to strip Pinnacle Monterey of its voting rights and equity interest in Clark Pinnacle Monterey.

90.    Clark Realty breached its fiduciary duty by causing Kirkland to retain Alix to conduct a forensic investigation of Pinnacle Monterey, and by concealing the true facts of Alix's retention and the scope and purpose of Alix's investigation.

91.    Clark Realty breached its fiduciary duty by refusing requests to meet with Pinnacle Monterey; by refusing to disclose the results of Alix's work to Pinnacle Monterey; and by disclosing the results of Alix's investigations to the Army, but not Pinnacle Monterey.

92.    Clark Realty breached its fiduciary duty by causing substantial professional fees to be paid to Kirkland and Alix to the detriment of Pinnacle Monterey; by causing Clark Pinnacle Monterey to take actions that could effect a termination of Pinnacle Monterey's equity and voting interests in Clark Pinnacle Monterey; and by failing to evaluate whether Pinnacle would compensate the Monterey project for any alleged losses without the need for expensive audits or litigation.

93.    Clark Realty breached its fiduciary duty by exercising its discretion to conclude that a theft of a single pencil, by a single Pinnacle employee, would constitute an act of theft or fraud that resulted in the automatic termination of the property management agreement at the Monterey project.

94.     Clark Realty engaged in self dealing by the conduct set forth above, acting in its own selfish financial interests, and at the expense and to the detriment of Pinnacle Monterey, thereby breaching its fiduciary duty to Pinnacle Monterey.

95.     Clark Realty engaged in a waste of corporate assets by the conduct set forth above, thereby breaching its fiduciary duty to Pinnacle Monterey.

96.     Clark Realty engaged in an unlawful "minority freeze out" of Pinnacle Monterey by the conduct set forth above, thereby breaching its fiduciary duty to Pinnacle Monterey.

97.     Pinnacle Monterey has been damaged by Clark Realty's breaches of fiduciary duty in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### [By Pinnacle Irwin Against Clark Realty]

98.     The allegations of paragraphs 1 through 97 are incorporated herein by reference.

99.     Clark Realty, as Clark Manager of Clark Pinnacle Irwin, owes fiduciary duties as well as duties of loyalty, good faith and due care, to Pinnacle Irwin as a minority member of Clark Pinnacle CMC.

100.    Clark Realty breached its fiduciary duty by acting solely in its own interest and to the detriment of Pinnacle Irwin as a minority member of Clark Pinnacle CMC through its actions and refusals to act set forth more particularly herein.

101.    Clark Realty breached its fiduciary duty by attempting to terminate the property management agreement of AMS California at the Fort Irwin project, without notice and cure rights, for alleged misconduct that was not material to the financial performance of the project, thereby attempting to strip Pinnacle Irwin of its voting rights and equity interest in Clark Pinnacle CMC.

102.    Clark Realty breached its fiduciary duty by causing Kirkland to retain Alix to conduct a forensic investigation of Pinnacle Irwin, and by concealing the true facts of Alix's retention and the scope and purpose of Alix's investigation.

FIRST AMENDED COMPLAINT

103.   Clark Realty breached its fiduciary duty by refusing requests to meet with Pinnacle Irwin; by refusing to disclose the results of Alix's work to Pinnacle Irwin; and by disclosing the results of Alix's investigations to the Army, but not Pinnacle Irwin.

104.   Clark Realty breached its fiduciary duty by causing substantial professional fees to be paid to Kirkland and Alix to the detriment of Pinnacle Irwin; by causing Clark Pinnacle CMC to take actions that could effect a termination of Pinnacle Irwin's equity and voting interests in Clark Pinnacle CMC; and by failing to evaluate whether Pinnacle would compensate the Fort Irwin project for any alleged losses without the need for expensive audits or litigation.

105.   Clark Realty breached its fiduciary duty by exercising its discretion to conclude that a theft of a single pencil, by a single Pinnacle employee, would constitute an act of theft or fraud that resulted in the automatic termination of the property management agreement at the Irwin project.

106.   Clark Realty engaged in self dealing by the conduct set forth above, acting in its own selfish financial interests, and at the expense and to the detriment of Pinnacle Irwin, thereby breaching its fiduciary duty to Pinnacle Irwin.

107.   Clark Realty engaged in a waste of corporate assets by the conduct set forth above, thereby breaching its fiduciary duty to Pinnacle Irwin.

108.   Clark Realty engaged in an unlawful "minority freeze out" of Pinnacle Irwin by the conduct set forth above, thereby breaching its fiduciary duty to Pinnacle Irwin.

109.   Pinnacle Irwin has been damaged by Clark Realty's breaches of fiduciary duty in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

#### Accounting

#### [By Pinnacle Monterey Against Clark Realty and Clark Pinnacle Monterey]

110.   The allegations of paragraphs 1 through 109 are incorporated herein by reference.

111.   Pinnacle Monterey is a member and 30% owner of Clark Pinnacle Monterey.

112.   Pinnacle Monterey seeks an equitable accounting from Clark Pinnacle Monterey and Clark Realty of Clark Realty's actions as Clark Manager of Clark Pinnacle Monterey, including its actions directing Clark Pinnacle Monterey as managing member of MBMH.  This shall include a

review of all books, records, accounts and other information necessary to calculation of the value of the following terms used in the Operating Agreement of Clark Pinnacle Monterey:

- "Percentage Interests" in the Company pursuant to Section 2.1(b)

- "Equity Contributions" pursuant to Section 2.3(b)

- "Annual Operating Costs" pursuant to Section 2.3(c)

- "Capital Accounts" pursuant Section 2.4

- "Carrying Value" pursuant to Section 2.4(b)(1)

- "Cash Distributions" pursuant to Section 2.8

- "Net Cash Flow" pursuant to Section 2.8(a)(1)

113.    Pinnacle Monterey also demands information sufficient to calculate or value all other rights and interests granted under Article II of the Operating Agreement of Clark Pinnacle Monterey.

## SIXTH CAUSE OF ACTION

### Accounting

### [By Pinnacle Irwin Against Clark Realty and Clark Pinnacle CMC]

114.    The allegations of paragraphs 1 through 113 are incorporated herein by reference.

115.    Pinnacle Irwin is a member and 30% owner of Clark Pinnacle CMC.

116.    Pinnacle Irwin seeks an equitable accounting from Clark Pinnacle CMC and Clark Realty of Clark Realty's actions as Clark Manager of Clark Pinnacle CMC, including its actions directing Clark Pinnacle CMC as managing member of CMC.  This shall include a review of all books, records, accounts and other information necessary to calculation of the value of the following terms used in the Operating Agreement of Clark Pinnacle CMC:

- "Percentage Interests" in the Company pursuant to Section 2.1(b)

- "Equity Contributions" pursuant to Section 2.3(b)

- "Annual Operating Costs" pursuant to Section 2.3(c)

- "Capital Accounts" pursuant Section 2.4

- "Carrying Value" pursuant to Section 2.4(b)(1)

- "Cash Distributions" pursuant to Section 2.8

- "Net Cash Flow" pursuant to Section 2.8(a)(1)

117.    Pinnacle Irwin also demands information sufficient to calculate or value all other rights and interests granted under Article II of the Operating Agreement of Clark Pinnacle CMC.

### SEVENTH CAUSE OF ACTION

#### Declaratory Judgment - Pinnacle Monterey's Right to Audit

#### [By Pinnacle Monterey Against Clark Realty and Clark Pinnacle Monterey]

118.    The allegations of paragraphs 1 through 117 are incorporated herein by reference.

119.    Pursuant to Cal. Civ. Pro. Code § 1060, any person interested under a under a contract, or who desires a declaration of his or her rights or duties with respect to another, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint for a declaration of his or her rights and duties, including a determination of any question of construction or validity arising under the instrument or contract.

120.    Pinnacle Monterey seeks declaratory relief herein regarding the meaning of, and obligations under, the Operating Agreement of Clark Pinnacle Monterey.  Such a declaration impacts the conduct and obligations of Pinnacle Monterey, Clark Realty and Clark Pinnacle Monterey.

121.    Section 3.11 of the Operating Agreement of Clark Pinnacle Monterey provides Pinnacle Monterey with the right to inspect and audit the books and records of Clark Pinnacle Monterey.

122.    Clark Pinnacle Monterey and Clark Realty have disagreed with Pinnacle Monterey about the scope of those audit rights, and have blocked and prevented Pinnacle Monterey from enforcing the full scope of audit rights granted under the Operating Agreement, in breach of the Operating Agreement and in violation of Pinnacle Monterey's rights thereunder.

123.    Pinnacle Monterey therefore requests a declaration and order that its inspection and audit rights under Section 3.11 of the Operating Agreement of Clark Pinnacle Monterey extend to and include access to all books and records of Clark Pinnacle Monterey documenting that company's business and purpose of acting as Manager of MBMH.

//

//

1

**EIGHTH CAUSE OF ACTION**

2

**Declaratory Judgment - Pinnacle Irwin's Right to Audit**

3

**[By Pinnacle Irwin Against Clark Realty and Clark Pinnacle CMC]**

4

124.    The allegations of paragraphs 1 through 123 are incorporated herein by reference.

5

125.    Pursuant to Cal. Civ. Pro. Code § 1060, any person interested under a under a contract,

6

or who desires a declaration of his or her rights or duties with respect to another, may, in cases of

7

actual controversy relating to the legal rights and duties of the respective parties, bring an original

8

action or cross-complaint for a declaration of his or her rights and duties, including a determination of

9

any question of construction or validity arising under the instrument or contract.

10

126.    Pinnacle Irwin seeks declaratory relief herein regarding the meaning of, and

11

obligations under, the Operating Agreement of Clark Pinnacle CMC.  Such a declaration impacts the

12

conduct and obligations of Pinnacle Irwin, Clark Realty and Clark Pinnacle CMC.

13

127.    Section 3.11 of the Operating Agreement of Clark Pinnacle CMC provides Pinnacle

14

Irwin with the right to inspect and audit the books and records of Clark Pinnacle CMC.

15

128.    Clark Pinnacle CMC and Clark Realty have disagreed with Pinnacle Irwin about the

16

scope of those audit rights, and have blocked and prevented Pinnacle Irwin from enforcing the full

17

scope of audit rights granted under the Operating Agreement, in breach of the Operating Agreement

18

and in violation of Pinnacle Irwin's rights thereunder.

19

129.    Pinnacle Irwin therefore requests a declaration and order that its inspection and audit

20

rights under Section 3.11 of the Operating Agreement of Clark Pinnacle CMC extend to and include

21

access to all books and records of Clark Pinnacle CMC documenting that company's business and

22

purpose of acting as Manager of CMC.

23

WHEREFORE,

24

Plaintiffs request that this Court:

25

(a)    declare the rights and obligations of the parties pursuant to the first cause of action;

26

(b)    declare the rights and obligations of the parties pursuant to the second cause of action;

27

(c)    enter judgment on the breach of fiduciary duty pursuant to the third cause of action;

28

(d)    enter judgment on the breach of fiduciary duty pursuant to the forth cause of action;

23

1   (e)    order an accounting of Clark Pinnacle Monterey pursuant to the fifth cause of action;

2   (f)    order an accounting Clark Pinnacle CMC pursuant to the sixth cause of action;

3   (g)    declare the rights and obligations of the parties pursuant to the seventh cause of action;

4   (h)    declare the rights and obligations of the parties pursuant to the eighth cause of action.;

5   (i)    award Plaintiffs their attorneys fees pursuant to contract or applicable law;

6   (j)    award Plaintiffs their costs and expenses of this action; and

7   (k)    grant Plaintiffs other and further relief as the Court deems just and proper.

8

9   Dated: May 31, 2012                         GREENBERG TRAURIG, LLP

10

11                                              By:

12                                                 William J. Goines
                                                   Karen Rosenthal
13
                                                Attorneys for Plaintiffs in M115143 / Defendants
14                                              in M112710

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1



Monterey Bay Project Structure



Fort Irwin, Moffett Field and Parks Project Structure

Clark Pinnacle California Military Communities LLC

**Members**
70% - Clark Irwin LLC
30% - Pinnacle Irwin LLC

**Managers**
Clark Realty Capital
Pinnacle Irwin LLC

California Military Communities LLC

**Members**
Clark Pinnacle California Military Communities LLC
California Military Communities Holdings LLC

**Managing Member**
Clark Pinnacle CMC LLC

USA Department of Army

Fort Irwin Land LLC

**Members**
51% - Clark Pinnacle California Military Communities LLC
49% - US Army

**Managing Member**
Clark Pinnacle California Military Communities LLC

50 Year Ground Lease

50 Year Sublease

Property Management Agreement (Pinnacle/AMS West)

Asset Manager Agreements (Clark Affiliate)

Construction Contracts (Clark Affiliate)

Developer Services Agreement (Clark Affiliate)

EXHIBIT 2

<u>THE PRESIDIO OF MONTEREY/NAVAL POSTGRADUATE
SCHOOL MILITARY HOUSING</u>

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

TABLE OF CONTENTS

ARTICLE I ORGANIZATIONAL MATTERS ........................................................... 1
    1.1    Formation of Company. ................................................................ 1
    1.2    Name. .......................................................................................... 1
    1.3    Principal Office and Registered Agent. ...................................... 2
    1.4    Certificate of Formation. ............................................................ 2
    1.5    Purpose. ...................................................................................... 2

ARTICLE II MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION OF PROFITS
    AND LOSSES ..................................................................................................... 2
    2.1    Members; Percentage Interests. .................................................. 2
    2.2    Initial Capital Contributions. ...................................................... 3
    2.3    Additional Capital Contributions. ............................................... 3
    2.4    Capital Accounts. ........................................................................ 4
    2.5    Interest on Capital Contributions; Return of Capital Contributions. ....... 5
    2.6    Loans. ......................................................................................... 6
    2.7    No Preemptive Rights. ................................................................ 6
    2.8    Cash Distributions. ..................................................................... 6
    2.9    Allocation of Income, Gain, Loss and Deduction. ...................... 8

ARTICLE III MANAGEMENT AND RIGHTS OF MEMBERS ............................... 11
    3.1    Management by Managers; Rights of Members. ......................... 11
    3.2    Third Party Reliance. .................................................................. 13
    3.3    No Duty to Consult. .................................................................... 13
    3.4    Outside Activities of Managers. ................................................. 13
    3.5    Annual Operating Budget. .......................................................... 14
    3.6    Reimbursement. .......................................................................... 14
    3.7    Managers and Affiliates Dealing with the Company. ................. 14
    3.8    Indemnification of Managers. .................................................... 14
    3.9    Company Meetings. ..................................................................... 14
    3.10   Guarantees of Financing. ............................................................ 14
    3.11   Books and Records. .................................................................... 15
    3.12   Bank Accounts. ........................................................................... 15
    3.13   Deadlock. .................................................................................... 15
    3.14   Power of Attorney. ...................................................................... 16
    3.15   Services. ...................................................................................... 16

ARTICLE IV TRANSFER OF MEMBERSHIP INTERESTS ................................. 17
    4.1    Transfers; Treatment of Assignees; Substituted Members. ....... 17
    4.2    Death, Insanity or Incompetency, or Trust Termination of a Member. .... 19
    4.3    Bankruptcy of a Member. ........................................................... 20
    4.4    Right to Effect Transfers. ........................................................... 21

ARTICLE V TERM; DISSOLUTION .................................................................... 21
    5.1    Term. .......................................................................................... 21
    5.2    Events Resulting in Dissolution. ................................................ 21
    5.3    Conclusion of Affairs. ................................................................ 21

i

5.4     Order of Priority in Liquidation. .................................................................... 22
5.5     Termination. ................................................................................................... 22
5.6     Transferring Member Obligations .................................................................. 22
ARTICLE VI DEFAULT; REMEDIES ....................................................................... 22
6.1     Event of Default. ............................................................................................ 22
6.2     Remedy for Event of Default. ........................................................................ 23
6.3     Obligations of Defaulting Member Continue ................................................. 25
6.4     Setoff of Payments to Defaulting Member. ................................................... 25
ARTICLE VII MISCELLANEOUS .............................................................................. 26
7.1     Amendment. ................................................................................................... 26
7.2     Notices. .......................................................................................................... 26
7.3     Enforceability. ............................................................................................... 26
7.4     Binding Effect. ............................................................................................... 26
7.5     No Third Party Beneficiary Rights. ............................................................... 26
7.6     Limitation of Liability. .................................................................................. 26
7.7     Further Assurances. ....................................................................................... 27
7.8     Prevailing Party. ............................................................................................ 27
7.9     MBMH Operating Agreement. ...................................................................... 27

LIST OF EXHIBITS
EXHIBIT A - Percentage Interests
EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE MONTEREY BAY LLC


THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2003, but for all purposes is made effective as of October 30, 2001 (the "**Effective Date**"), by and among the undersigned parties. Defined terms shall have the meanings given them in this Agreement and are capitalized in the text. Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).


WITNESSETH

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle Monterey Bay LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I
ORGANIZATIONAL MATTERS

1.1     Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2     Name.

The name of the Company is **Clark Pinnacle Monterey Bay LLC**. The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined). The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires. The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

1

1.3     Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is: c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention: Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members. The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate. The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

1.4     Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

1.5     Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Land, LLC ("**MBL**"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Land, LLC (the "**MBL Operating Agreement**") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Monterey Bay Military Housing, LLC ("**MBMH**"), whose members shall be the Company and Monterey Bay Housing Holdings, LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of Monterey Bay Military Housing, LLC (the "**MBMH Operating Agreement**") to be entered into between the members thereof. . The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement. The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

2.1     Members; Percentage Interests.

(a)     The "**Members**" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof. The Members are divided into ownership groups (each a "**Member Group**"), as more particularly set forth on Exhibit A. For purposes hereof: (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "**Clark Member,**" and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "**Clark Group;**" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "**Pinnacle Member,**" and the Members designated under the heading "Pinnacle" shall be herein referred to collectively as the "**Pinnacle Group.**"

2

(b)     Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on Exhibit A.

(c)     The Percentage Interest of each Member shall be personal property for all purposes.

(d)     All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2     Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the **"Initial Capital Contributions"**).  The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

2.3     Additional Capital Contributions.

(a)     During the period from the Effective Date hereof through the consummation of the financial closing (the **"Financial Closing"**) for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and MBL (the **"Ground Lease"**), and in the MBL Operating Agreement and MBMH Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the **"Pre-Closing Costs"**).  Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**).  The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor.  It is anticipated that the Company shall endeavor to get MBMH and MBL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company.  Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)     The Company anticipates that, contemporaneously with the Financial Closing for the Project, MBL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the MBL Operating Agreement and MBMH Operating Agreement.   In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by MBMH to secure performance of each Member's obligation to pay its pro rata share of the equity required by the

3

MBMH Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

(c)     Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**"). Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions.**" For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index (hereinafter defined) from (a) the month of October in the second calendar year prior to the calendar year of adjustment to (b) the month of October in the calendar year prior to the calendar year of adjustment. The "**CPI Index**" shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index.

(d)     If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager. If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor. If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below. The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)     The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

4

  (b) For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

  (1) Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the **"Carrying Value"** of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

  (2) Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

  (3) Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members. **"Unrealized Gain"** is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date. **"Unrealized Loss"** is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

  (c) Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

  2.5 <u>Interest on Capital Contributions; Return of Capital Contributions</u>.

  (a) No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

  (b) No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property

other than cash.  Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6    Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**").  Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above.  Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s).  If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests.  Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.   No Member shall be required to make any loans to the Company.

2.7    No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8    Cash Distributions.

(a)    Net Cash Flow.

(1)    "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by:  (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter

6

defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2)      The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A)      First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds.  The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B)      Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests.  The distributions under this subsection are made until the Members' Capital Accounts are pro rata based upon Percentage Interests.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

(C)      Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members.  Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests.  The "**Interest Rate**" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D)      Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E)      Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

(F)     Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)     Capital Proceeds.

(1)     "**Capital Proceeds**" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company. In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the MBL Operating Agreement or the MBMH Operating Agreement.

(2)     Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)     First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)     Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9     Allocation of Income, Gain, Loss and Deduction.

(a)     Capital Accounts. For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof. The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain. "**Minimum Gain**" means (a) with

8

respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations. "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)     <u>Income Tax Elections</u>.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)     <u>Income Tax Allocations</u>.

(1)     For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution.  In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

(2)     If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

(d)     <u>Transfers during Fiscal Year</u>.  In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer.  The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items.  Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale.  Similarly, extraordinary or nonrecurring items shall be allocated in

9

accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

      (e)    Amortization and Allocation of Organization and Start-up Expenses. The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

      (f)    Special Capital Account "Book" Allocations to Comply with Section 704 Regulations. The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder. Such special allocations shall be made before any allocations under Section 2.9(a) above.

      (g)    Tax Matters Member.

      (1)    The Clark Member is hereby appointed to act as the tax matters member (the "**TMM**"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code. Pursuant to section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "**IRS**") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

      (2)    The TMM is authorized, but not required:

      (A)    To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in section 6231 of the Code) or a member of a "notice group" (as defined in section 6223(b)(2) of the Code).

      (B)    In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

      (C)    To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)    To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)    To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)    To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)    The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)    The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)    The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

### ARTICLE III
### MANAGEMENT AND RIGHTS OF MEMBERS

3.1    <u>Management by Managers; Rights of Members</u>.

(a)    <u>Manager Designation</u>.  The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member.  The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**").  The initial Manager appointed by the Pinnacle Group is Pinnacle Monterey LLC (the "**Pinnacle Manager**").  Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent

11

jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

    (b)    <u>Power and Authority of the Managers.</u>

    (1)    The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs.  The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

    (2)    The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined). The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

    (3)    The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions.  The term **"Major Decisions"** shall mean any of the following:

    (A)    Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

    (B)    The Financial Closing and the terms and conditions thereof.

    (C)    Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

    (D)    Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

    (E)    Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

    (F)    Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

12

        (G)     Amendment to the MBMH Operating Agreement or the MBL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

        (H)     Termination or dissolution of the Company.

       (c)    <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

       (d)    <u>Rights and Votes of Members</u>.

        (1)     Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

        (2)     The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

    3.2    <u>Third Party Reliance</u>.

       Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

    3.3    <u>No Duty to Consult</u>.

       Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

    3.4    <u>Outside Activities of Managers</u>.

       The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor

13

any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

3.5     Intentionally Deleted.

3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

3.7     Managers and Affiliates Dealing with the Company.

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8     Indemnification of Managers.

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9     Company Meetings.

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them.  Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10    Guarantees of Financing.

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the

14

granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation. If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

      3.11   <u>Books and Records</u>.

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager. The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

      3.12   <u>Bank Accounts</u>.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

      3.13   <u>Deadlock</u>.

          (a)    If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply. A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

          (b)    Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or

15

obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)     Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

3.14     Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the MBMH Operating Agreement and the MBL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record: (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the MBMH Operating Agreement or the MBL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement. Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15     Services.

(a)     The Members acknowledge and consent to the following:

(1)     MBMH shall enter into one or more developer services agreements (the "**Developer Services Agreements**") with CRC Planned Communities LLC ("**Developer**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the MBMH Operating Agreement) (the "**Development Period**"). MBMH may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the MBMH Operating Agreement (the "**Out-Year Developer Services Agreements**").

16

(2)    MBMH shall enter into one or more a construction contracts (the "**Construction Contracts**") with Clark Realty Builders, Inc. ("**CRB**"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of general contractor services. MBMH may also enter into one or more construction management agreements with CRB on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the MBMH **Operating** Agreement (the "**Out-Year Construction Management Agreements**").

(3)    MBMH shall enter into one or more property management agreements (the "**Property Management Agreements**" or the "**Pinnacle Member Service Contracts**") with Pinnacle Realty Management Company ("**Pinnacle Management**"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)    MBMH shall enter into one or more asset management agreements (the "**Asset Management Agreements**") with an Affiliate of the Clark Group (the "**Asset Manager**"), on or before the Effective Date for the provision of asset management services. For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "**Clark Member Service Contracts**." The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "**Service Contracts**" and, individually, as a "**Service Contract**."

(b)    In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, (i) the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc., and (ii) the Pinnacle Member shall be permitted without the consent of the Clark Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Property Management Agreement to American Management Services California Inc. The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

## ARTICLE IV
## TRANSFER OF MEMBERSHIP INTERESTS

4.1    Transfers; Treatment of Assignees; Substituted Members.

(a)    No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as

17

hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager. A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)     A "**Permitted Transferee**" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined). In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee." For purposes of this Agreement, "**Affiliate**" shall mean, as to any individual, partnership, corporation, trust or other entity ("**Person**"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person. "**Control**" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below. The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted. An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company. The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage

18

Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest. All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "**Transferring Member Obligation**").

(g)     In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

4.2     Death, Insanity or Incompetency, or Trust Termination of a Member.

(a)     In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's

19

admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

(b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests.  Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company.  The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

4.3     Bankruptcy of a Member.

(a)     In the event of the Bankruptcy (as herein defined) of a Member (the **"Bankrupt Member"**), then the Members other than the Bankrupt Member (the **"Continuing Members"**), pro rata, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

(b)     As used herein, the term **"Bankruptcy"** shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the **"Bankruptcy Code"**), an assignment for the benefit of creditors and/or an adjudication of

20

insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

    4.4    <u>Right to Effect Transfers</u>.

    (a)    The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

    (b)    In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

ARTICLE V
TERM; DISSOLUTION

    5.1    <u>Term</u>.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

    5.2    <u>Events Resulting in Dissolution</u>.

The Company shall be dissolved upon the earliest to occur of any of the following events (an **"Event of Dissolution"**) (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):(a) the unanimous written consent of the Managers; or (b) the dissolution of MBMH or MBL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or(d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the State of California.

    5.3    <u>Conclusion of Affairs</u>.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company. Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution. The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

21

5.4    Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

(a)    First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

(b)    Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(c)    Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)    Fourth, in accordance with the priorities described in Section 2.8(a)(2).

5.5    Termination.

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.  Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

5.6    Transferring Member Obligations.

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

ARTICLE VI<br>DEFAULT; REMEDIES

6.1    Event of Default.

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default"**:

22

     (a)    A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

     (b)    A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

     (c)    A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

     (d)    A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

     (e)    The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

    6.2    <u>Remedy for Event of Default</u>.

     (a)    If an Event of Default occurs with respect to a Member (a **"Defaulting Member"**), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the **"Non-Defaulting Manager"**):

     (1)    If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

     (A)    Each Member who is not in default (a **"Non-Defaulting Member"**) shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the **"Default Payment"**). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the **"Defaulting Manager"**) within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a **"Default Loan"**) and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or

23

distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A **"Default Interest Rate"** is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

(i)     To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the **"Dilution Fraction"**), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member. In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)     In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)     If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)     If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to

24

cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

      (b)    In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

      (c)    During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager.  In such event, the vote of the remaining Manager(s) shall be sufficient to make all decision of the Company, including, without limitation, Major Decisions.

      6.3    <u>Obligations of Defaulting Member Continue.</u>

      Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

      6.4    <u>Setoff of Payments to Defaulting Member.</u>

      From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation,

payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII

MISCELLANEOUS

**7.1      Amendment.**

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

**7.2      Notices.**

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

**7.3      Enforceability.**

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

**7.4      Binding Effect.**

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of Maryland.  This Agreement may be executed in counterparts.

**7.5      No Third Party Beneficiary Rights.**

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

**7.6      Limitation of Liability.**

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer,

26

employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     MBMH Operating Agreement and MBL Operating Agreement.

In the event of a conflict between specific provisions of the MBMH Operating Agreement or the MBL Operating Agreement and specific provisions of this Agreement, the provisions of the MBMH Operating Agreement or the MBL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the MBMH Operating Agreement, the MBL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK MONTEREY PRESIDIO LLC

By:   Clark Realty Capital, L.L.C., Manager

     By:   _____
           Douglas R. Sandor, Manager

     By:   CEI Realty, Inc., Manager

         By:   _____
           Lawrence C. Nussdorf, President

PINNACLE MONTEREY LLC

By:   _____
Name:   Stan Harrelson
Title:   Manager

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| CLARK MEMBER: | | |
| Clark Monterey Presidio LLC<br>7500 Old Georgetown Road, 15th Floor<br>Bethesda, MD 20814 | $700.00 | 70% |
| PINNACLE MEMBER: | | |
| Pinnacle Monterey LLC<br>2801 Alaskan Way, Suite 200<br>Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

EXHIBIT 3

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

# OPERATING AGREEMENT
## OF
## CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞∞

NGEDOCS :016600.0504 985953.3

# TABLE OF CONTENTS

ARTICLE I    ORGANIZATIONAL MATTERS .................................................. 1
  1.1    Formation of Company .................................................. 1
  1.2    Name .................................................. 1
  1.3    Principal Office and Registered Agent .................................................. 1
  1.4    Certificate of Formation .................................................. 2
  1.5    Purpose .................................................. 2
ARTICLE II    MEMBERS; CAPITAL CONTRIBUTIONS; AND ALLOCATION OF PROFITS AND LOSSES .................................................. 2
  2.1    Members; Percentage Interests .................................................. 2
  2.2    Initial Capital Contributions .................................................. 3
  2.3    Additional Capital Contributions .................................................. 3
  2.4    Capital Accounts .................................................. 5
  2.5    Interest on Capital Contributions; Return of Capital Contributions .................................................. 6
  2.6    Loans .................................................. 6
  2.7    No Preemptive Rights .................................................. 7
  2.8    Cash Distributions .................................................. 7
  2.9    Allocation of Income, Gain, Loss and Deduction .................................................. 9
ARTICLE III    MANAGEMENT AND RIGHTS OF MEMBERS .................................................. 12
  3.1    Management by Managers; Rights of Members .................................................. 12
  3.2    Third Party Reliance .................................................. 14
  3.3    No Duty to Consult .................................................. 14
  3.4    Outside Activities of Managers .................................................. 14
  3.5    Intentionally Deleted .................................................. 14
  3.6    Reimbursement .................................................. 14
  3.7    Managers and Affiliates Dealing with the Company .................................................. 15
  3.8    Indemnification of Managers .................................................. 15
  3.9    Company Meetings .................................................. 15
  3.10    Guarantees of Financing .................................................. 15
  3.11    Books and Records .................................................. 15
  3.12    Bank Accounts .................................................. 15
  3.13    Deadlock .................................................. 16

| | | |
|---|---|---|
| 3.14 | Power of Attorney | 16 |
| 3.15 | Services | 17 |
| ARTICLE IV | TRANSFER OF MEMBERSHIP INTERESTS | 18 |
| 4.1 | Transfers; Treatment of Assignees; Substituted Members | 18 |
| 4.2 | Death, Insanity or Incompetency, or Trust Termination of a Member | 20 |
| 4.3 | Bankruptcy of a Member | 21 |
| 4.4 | Right to Effect Transfers | 21 |
| ARTICLE V | TERM; DISSOLUTION | 22 |
| 5.1 | Term | 22 |
| 5.2 | Events Resulting in Dissolution | 22 |
| 5.3 | Conclusion of Affairs | 22 |
| 5.4 | Order of Priority in Liquidation | 22 |
| 5.5 | Termination | 22 |
| 5.6 | Transferring Member Obligations | 23 |
| ARTICLE VI | DEFAULT; REMEDIES | 23 |
| 6.1 | Event of Default | 23 |
| 6.2 | Remedy for Event of Default | 24 |
| 6.3 | Obligations of Defaulting Member Continue | 26 |
| 6.4 | Setoff of Payments to Defaulting Member | 26 |
| ARTICLE VII | MISCELLANEOUS | 26 |
| 7.1 | Amendment | 26 |
| 7.2 | Notices | 26 |
| 7.3 | Enforceability | 27 |
| 7.4 | Binding Effect | 27 |
| 7.5 | No Third Party Beneficiary Rights | 27 |
| 7.6 | Limitation of Liability | 27 |
| 7.7 | Further Assurances | 27 |
| 7.8 | Prevailing Party | 28 |
| 7.9 | CMC Operating Agreement and BL Operating Agreement | 28 |

LIST OF EXHIBITS

EXHIBIT A - Percentage Interests

EXHIBIT B – Development Budget

OPERATING AGREEMENT
OF
CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES LLC

THIS OPERATING AGREEMENT (this "**Agreement**") is made and entered into as of the 21ˢᵗ day of May, 2003 (the "**Effective Date**"), by and among the undersigned parties. Defined terms shall have the meanings given them in this Agreement and are capitalized in the text. Any term not defined herein has the meaning ascribed to it in the Act (as hereinafter defined).

### WITNESSETH

WHEREAS, the undersigned parties desire to join together and form a limited liability company known as "**Clark Pinnacle California Military Communities LLC**" pursuant to the Act for the purposes and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

### ARTICLE I
### ORGANIZATIONAL MATTERS

1.1    Formation of Company.

The Members (as hereinafter defined) formed a limited liability company (the "**Company**") pursuant to the provisions of the California Limited Liability Company Act, as may be amended from time to time (the "**Act**"), and upon the terms and conditions set forth in this Agreement. Except as expressly provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

1.2    Name.

The name of the Company is **Clark Pinnacle California Military Communities LLC**. The Company's business may be conducted under any other name deemed advisable by the Clark Manager (as hereinafter defined). The words "Limited Liability Company," "LLC," or similar words or letters shall be included in the Company's name where necessary for purposes of complying with the laws of any jurisdiction that so requires. The Managers (as hereinafter defined) in their sole and absolute discretion may change the name of the Company at any time and from time to time and shall notify the Members of such change in the regular communication to the Members next succeeding the effectiveness of the change of name.

NGEDOCS :016600.0504 985953.3

1

1.3     Principal Office and Registered Agent.

The post office address of the principal office of the Company where the records shall be maintained pursuant to the Act is:  c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Bethesda, Maryland 20814, Attention:  Douglas R. Sandor, or at such other place as the Clark Manager (hereinafter defined) may designate by notice to the Members.  The registered agent of the Company is Corporation Service Company, or such other Person (as hereinafter defined) as the Clark Manager may from time to time designate.  The Company may maintain offices at such other place or places within or outside the State of Maryland as the Clark Manager may deem advisable.

1.4     Certificate of Formation.

On or about the date hereof a certificate of formation containing the provisions required by the Act and such other provisions as are appropriate shall be duly filed of record in the manner and place provided in the Act.

1.5     Purpose.

The Company's business and purpose shall be to be (i) a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort Irwin Land LLC ("IL"), whose members shall be the Company and the United States of America acting by and through the Secretary of the Army, pursuant to the terms of a Limited Liability Company Operating Agreement of Fort Irwin Land LLC (the "BL Operating Agreement") to be entered into between the members thereof and (ii) to be a member in and act as managing member of a to-be-formed Delaware limited liability company known as Fort California Military Communities LLC ("CMC"), whose members shall be the Company and CMC Holdings LLC, pursuant to the terms of a Limited Liability Company Operating Agreement of California Military Communities LLC (the "CMC Operating Agreement") to be entered into between the members thereof.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as contemplated in this Agreement.  The Company may not engage in any other activities.

ARTICLE II
MEMBERS; CAPITAL CONTRIBUTIONS;
AND ALLOCATION OF PROFITS AND LOSSES

2.1     Members; Percentage Interests.

(a)     The "Members" of the Company shall be as set forth on Exhibit A attached hereto and made a part hereof.  The Members are divided into ownership groups (each a "Member Group"), as more particularly set forth on Exhibit A.  For purposes hereof:  (i) a Member designated under the heading "Clark" on Exhibit A shall be herein referred to as a "Clark Member," and the Members designated under the heading "Clark" on Exhibit A shall be herein referred to collectively as the "Clark Group;" and (ii) a Member designated under the heading "Pinnacle" on Exhibit A shall be herein referred to as a "Pinnacle Member," and the

Members designated under the heading "Pinnacle" shall be herein referred to collectively as the **"Pinnacle Group."**

(b)    Each Member's percentage of ownership interest in the Company (hereinafter referred to generally as a **"Percentage Interest"**) shall be as set forth on Exhibit A.

(c)    The Percentage Interest of each Member shall be personal property for all purposes.

(d)    All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right.

2.2    Initial Capital Contributions.

Each Member shall make an initial contribution of capital to the Company in the amount specified on Exhibit A (the **"Initial Capital Contributions"**).  The Initial Capital Contributions, the Pre-Closing Cost Contributions (as hereinafter defined), the Financial Closing Contributions (as hereinafter defined), the Annual Cost Contributions (hereinafter defined), and any other capital contributions made by a Member to the Company shall be referred to herein collectively as the **"Capital Contributions."**

2.3    Additional Capital Contributions.

(a)    During the period from the Effective Date hereof through the consummation of the financial closing (the **"Financial Closing"**) for the project described in the Request for Qualification Number DACA 31-02-R-0001 (the **"RFQ"**), the Ground Lease between the United States of America, acting by and through the Secretary of the Army, and IL (the **"Ground Lease"**), and in the IL Operating Agreement and CMC Operating Agreement (the **"Project"**), the Company anticipates those operating costs and Project costs as set forth on Exhibit B attached hereto and made a part hereof (the **"Pre-Closing Costs"**).  Each Member shall be obligated to make an additional capital contribution to the Company to pay its pro rata share of such Pre-Closing Costs (the **"Pre-Closing Cost Contributions"**).  The Pre-Closing Cost Contributions, or such portion thereof as may be requested by the Clark Manager, shall be made by each Member within 20 days after written request from the Clark Manager therefor.  It is anticipated that the Company shall endeavor to get CMC and IL to permit each Member to obtain either (i) a return of some or all of such Member's Pre-Closing Cost Contribution from the proceeds of the Financial Closing or (ii) a credit against such Member's Financing Contributions (hereinafter defined) for all Pre-Closing Cost Contributions actually made by the Member and not otherwise reimbursed by the Company.    Any reimbursement of Pre-Closing Cost Contributions shall be made to the Members in proportion to Pre-Closing Cost Contributions actually made to date by each of the Members.

(b)    The Company anticipates that, contemporaneously with the Financial Closing for the Project, IL shall acquire a leasehold interest in the real property on which the Project shall be located and a fee ownership interest in the improvements on such real property, all as more particularly described in the RFQ, the Ground Lease, and in the IL Operating

3

Agreement and CMC Operating Agreement.   In connection with the Financial Closing, each Member shall provide and maintain the security or collateral required by CMC to secure performance of each Member's obligation to pay its pro rata share of the equity required by the CMC Operating Agreement (the "**Equity Contributions**"). Each Member shall make its pro rata share of the Equity Contribution as and when required by the Clark Manager.

(c)      Following the Financial Closing for the Project, the Company anticipates certain annual operating costs to be incurred by the Company, which operating costs for the first year following the Financial Closing are hereby agreed to be $30,000, and thereafter shall be deemed to be $30,000, Adjusted by CPI (hereinafter defined), unless the Managers mutually agree otherwise (the "**Annual Operating Costs**"). Each Member shall make an additional capital contribution to the Company to pay its pro rata share of such Annual Operating Costs no later than 30 days prior to the commencement of each calendar year (the "**Annual Cost Contributions**"); provided, however, in the event that the Company has positive Net Cash Flow (hereinafter defined) the Clark Manager may elect to waive or reduce the Members Annual Cost Contributions. The Initial Capital Contributions, the Pre-Closing Cost Contributions, the Equity Contributions, the Annual Cost Contributions, plus an annual contingency of $25,000 that can be unilaterally called by the Clark Manager at any time (the "**Contingency**") shall be referred to herein collectively as the "**Required Contributions**." For purposes hereof, "**Adjusted by CPI**" means, when modifying any number, adjusting the applicable number by a percentage equal to the sum of (a) 60% of the percentage change in the Irwin CPI Index and (b) 40% of the percentage change in the Moffett/Parks CPI Index, in each case from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. Any number which is to be Adjusted by CPI in accordance with this Operating Agreement will be so adjusted effective on January 1, 2005, and on each January 1 thereafter based upon the adjusted number from the immediately preceding January 1. **Irwin CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, Los Angeles, Riverside, Orange County Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member using such other index as is then generally recognized and accepted for similar determinations of purchasing power. **Moffett/Parks CPI Index** shall mean the "Consumer Price Index for All Urban Consumers, San Francisco, Oakland, San Jose Index, subgroup "All items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by Clark Member

4

using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

(d)      If the Clark Manager determines in its sole discretion that any funds or property, other than the Required Contributions, are required by the Company at any time prior to or after the Financial Closing to pay expenses or liabilities of the Company ("**Additional Required Funds**"), then the Clark Manager shall call a meeting of the Managers and present the issue to the Pinnacle Manager.  If the Managers agree that a capital call shall be made on the Members, then the Members shall be obligated to contribute such Additional Required Funds as a Capital Contribution to the Company pro rata within 20 days after written request from the Clark Manager therefor.  If the Managers do not agree that a capital call on the Members is required, then the Clark Manager is hereby authorized on behalf of the Company to unilaterally endeavor to borrow such funds from third parties on commercially reasonable terms, or to borrow such funds from one or more Members pursuant to the provisions of Section 2.6 below. The Clark Manager shall have no obligations to request Additional Required Funds be contributed by the Members.

2.4     Capital Accounts.

(a)      The Company shall establish and maintain a capital account (the "**Capital Account**") for each Member in accordance with the provisions of Section 704(b) of the United States Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder.

(b)      For purposes of computing the amount of any item of income, gain, deduction or loss to be reflected in the Members' Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes, subject to the following qualifications:

(1)      Any deductions for depreciation, cost recovery, amortization or expense in lieu of depreciation attributable to contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date it was acquired by the Company was equal to the "**Carrying Value**" of the contributed (or revalued) property on such date ("Carrying Value" being defined, as of the time of determination, as (i) in the case of contributed (or revalued) property, the fair market value of such property at the time of contribution, reduced (but not below zero) by all deductions for depreciation, amortization, cost recovery and expense in lieu of depreciation (determined as aforesaid) thereafter charged to the Capital Accounts of the Members in respect of such contributed (or revalued) property, and (ii) in the case of other Company property, the adjusted basis of such property for federal income tax purposes).

(2)      Any income, gain or loss attributable to a taxable disposition of contributed (or revalued) property shall be determined as if the adjusted basis of the contributed (or revalued) property on the date of disposition was equal to the Carrying Value of such contributed (or revalued) property on such date, and any such income, gain or loss shall be allocated in accordance with the provisions hereof.

5

NGEDOCS :016600.0504 985953.3

(3)     Immediately before the distribution of any property of the Company in liquidation of the Company pursuant to the terms of this Agreement or otherwise, any Unrealized Gain (hereinafter defined) or Unrealized Loss (hereinafter defined) attributable to such property shall, for purposes of this Agreement, be deemed to be gain or loss recognized by the Company and shall be allocated among the Members in accordance with the provisions of Section 2.9(a) below, as if such property were sold for its fair market value in connection with the liquidation of the Company instead of distributed to the Members.  "**Unrealized Gain**" is defined as the excess, if any, of the fair market value of any property of the Company on the date of determination over the Carrying Value of the property on the same date.  "**Unrealized Loss**" is defined as the excess, if any, of the Carrying Value of any property of the Company on the date of determination over the fair market value of the property on the same date.

(c)     Any transferee of a Percentage Interest permitted pursuant to this Agreement shall succeed to the Capital Account relating to the Percentage Interest transferred.

2.5     Interest on Capital Contributions; Return of Capital Contributions.

(a)     No Member shall be entitled to interest on its Capital Contribution, except for the return equal to the Interest Rate (hereinafter defined) as provided herein.

(b)     No Member shall be entitled to demand the return of its Capital Contribution at any particular time, except upon termination of the Company, and then only to the extent provided herein.  In no event shall a Member be entitled to demand or receive property other than cash.  Unless otherwise provided by law, no Member shall be personally liable for the return or repayment of all or any part of any other Member's Capital Account or Capital Contribution, it being expressly agreed that any such return of capital pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from a Member) of the Company.

2.6     Loans.

If approved by the Clark Manager, the Company may from time to time borrow all necessary funds, other than the Required Contributions, from banks or other lending institutions on commercially available terms (each a "**Third-Party Loan**") or from a Member or Members (each a "**Member Loan**").  Unless approved by the Clark Manager in writing, all sums received by the Company from a Member shall be deemed Member Loans other than the Capital Contributions made in accordance with Sections 2.2 and 2.3 above.  Member Loans that have been made in accordance with this Agreement, if any, shall be deemed demand loans, shall be repaid prior to any distributions to Members, shall bear interest at an annual rate equal to the Interest Rate, compounded quarterly, and shall be made upon such other terms and conditions as are acceptable to the Clark Manager and to the Member(s) making such loan(s).  If more than one Member wishes to make a Member Loan, then the total loan amount shall be allocated among the Members in proportion to such lending Members' respective Percentage Interests.  Member Loans shall not be considered Capital Contributions and shall not increase the Capital Account balance of the lending Member.   No Member shall be required to make any loans to the Company.

6

2.7     No Preemptive Rights.

No Member shall have any preemptive, preferential or other similar right with respect to additional contributions or loans to the Company (except as set forth in Section 2.6 above).

2.8     Cash Distributions.

(a)     Net Cash Flow.

(1)     "**Net Cash Flow**" is defined as all cash funds generated by the ownership, management, operation, sale or other disposition of the assets of the Company (including without limitation interest, dividends, rents, royalties, proceeds of loans to the Company, cash distributions received by the Company and amounts previously set aside as reserves to the extent the reserves are no longer necessary in the conduct of the business of the Company, but not including Capital Contributions or Capital Proceeds (as hereinafter defined)), reduced by: (A) cash expenditures for all costs and expenses in connection with the Company's business, including, without limitation, payments to service providers, except for cash expenditures funded from (i) cash reserves of the Company to the extent such cash reserves were deducted in determining Net Cash Flow for an earlier fiscal year, or (ii) Capital Contributions; (B) payments of principal of and interest on any loans or other obligations of the Company for borrowed money, including Member Loans (with Member Loans made by only one Member pursuant to Section 2.3(d) (i.e., only one Member elects to fund a specific call for Additional Required Funds) being paid prior to other Member Loans) and Default Loans (as hereinafter defined), but excluding Transferring Member Obligations (hereinafter defined); and (C) such reserves for and to meet anticipated expenses as the Clark Manager shall deem to be reasonably necessary in the efficient conduct of the Company's business.

(2)     The Net Cash Flow shall be distributed at least annually to the Members at the discretion of the Clark Manager applying commercially reasonable standards in accordance with the following order of priority:

(A)     First, to the Members, as applicable, to the extent that any Member has made a contribution of any Additional Required Funds. The distributions under this subsection shall be made pro rata (based upon the amount of Additional Required Funds contributed) until each Member's contribution of Additional Required Funds has been paid in full with interest at the Interest Rate. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Additional Required Funds were made (with the newest Additional Required Funds being repaid first).

(B)     Second, to the Members, as applicable, to the extent that any Member has made a Capital Contribution that exceeds the pro rata amount that such Member is required to make based upon such Member's Percentage Interests. The distributions under this subsection shall be made until the Members' Capital Accounts are pro rata based upon Percentage Interests. If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions that exceeded the pro rata amount were made (with the newest Capital Contributions being repaid first).

7

(C)     Third, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company in an amount equal to interest at the Interest Rate on any Capital Contributions other than the Required Contributions; provided, however, that, notwithstanding the foregoing, so long as the Capital Accounts of all Members remain pro rata based on Percentage Interests, this subsection shall not apply and there shall be no interest at the Interest Rate paid to the Members.  Interest at the Interest Rate set forth in this subsection shall be payable commencing with the first distribution of Net Cash Flow following an event that causes the Members' Capital Accounts to no longer remain pro rata based on the Percentage Interests.  The "Interest Rate" is defined as a cumulative return of 15%, compounded quarterly (prorated for periods of less than a whole quarter) on a daily average outstanding balance during each fiscal year of the applicable Member's aggregate unreturned Capital Contributions other than the Required Contributions.

(D)     Fourth, to the Members in proportion to their Capital Contributions until each Member has received cumulative distributions from the Company equal to its unreturned Capital Contributions.  If the amount available for such distributions is insufficient, then distributions shall be made in the inverse order of when the Capital Contributions were made (with the newest Capital Contributions being repaid first).

(E)     Fifth, to the payment of any unpaid principal and interest on Transferring Member Obligations.

(F)     Sixth, to the Members in proportion to their applicable Percentage Interests.

(b)     Capital Proceeds.

(1)     "Capital Proceeds" are defined as the net proceeds (after payment of all expenses) received by the Company in a transaction involving the voluntary or involuntary sale or other disposition of all or substantially all of the Company's property or assets or the refinancing or borrowing by the Company.  In addition to the foregoing, Capital Proceeds shall include the net proceeds from any termination payments made to the Company under the terms of the IL Operating Agreement or the CMC Operating Agreement.

(2)     Capital Proceeds shall be applied and distributed at the discretion of the Clark Manager in the following order of priority:

(A)     First, to the payment of debts and liabilities of the Company, other than loans and advances that may have been made by the Members of the Company, and the expenses of liquidation.

(B)     Second, to establish reserves that all the Managers determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

(C)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is

insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(D)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

2.9     Allocation of Income, Gain, Loss and Deduction.

(a)     Capital Accounts.  For purposes of maintaining Capital Accounts, items of income, gain, loss and deduction of the Company for each year shall be allocated among the Members in a manner such that, to the extent possible, the Capital Account of each Member, immediately after making such allocation, is equal to the amount that would be distributable to such Member if an amount equal to the sum of (1) the positive Gain-Adjusted Capital Account balances (as hereinafter defined) of all Members, determined prior to any allocation under this Section 2.9(a) for such year (but after taking into account all distributions of Net Cash Flow made to the Members during such year), increased (or reduced, as applicable) by (2) the items of income, gain, loss and deduction of the Company for such year to be allocated among the Members under this Section 2.9(a) with respect to such year, were distributed among the Members in accordance with Section 2.8(b) hereof.  The "**Gain-Adjusted Capital Account**" balance of a Member means the Capital Account balance of such Member, provided that for any year prior to the year in which the Company is liquidated, such Capital Account balance shall be increased by such Member's share of any Minimum Gain.  "**Minimum Gain**" means (a) with respect to nonrecourse liabilities, as set forth in Regulations Section 1.752-1(a)(2) ("**Company Nonrecourse Liabilities**") the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) all Company properties that are subject to Company Nonrecourse Liabilities in full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations or (b) with respect to each Member Nonrecourse Debt (as herein defined), the amount of gain that would be realized by the Company if it disposed of (in a taxable transaction) the Company property that is subject to such Member Nonrecourse Debt in full satisfaction of such debt, computed in accordance with applicable Treasury Regulations.  "**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4).

(b)     Income Tax Elections.  In the event of a transfer of all or part of a Percentage Interest, the Company shall make the election described in section 754 of the Code.

(c)     Income Tax Allocations.

(1)     For purposes of sections 702 and 704 of the Code, or the corresponding sections of any future Federal internal revenue law, or any similar tax law of any state or other jurisdiction, Company profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall, except as provided in section 704(c) of the Code, be allocated as nearly as possible among the Members in the same proportions as the corresponding "book" items are located pursuant to the preceding portions of this Section 2.9 and 2.9(f) hereof.  Notwithstanding the foregoing, for federal income tax purposes, each item of income, gain, loss, and deduction with respect to property contributed by a Member to the Company shall be allocated in accordance with

9

section 704(c) of the Code so as to take into account any variation between the adjusted tax basis of the property and its fair market value at the time of contribution. In making such allocations the Company shall apply any method or convention required by section 704(c) and the regulations thereunder, or any reasonable method or convention permitted by section 704(c) and the regulations thereunder that the Clark Manager may select.

    (2) If any portion of any gain allocated among the Members pursuant to this Section 2.9 is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain from the sale of the Company property (to the extent possible) shall include a proportionate share of this recapture income, as determined in accordance with Treasury Regulations sections 1.1245-1(e) and 1.1250-1(f).

    (d) <u>Transfers during Fiscal Year</u>.  In the event of the transfer of all or any part of a Percentage Interest at any time other than at the end of a fiscal year, the share of profit or loss in respect of the Percentage Interest so transferred shall be allocated between the transferor and the transferee in the same ratio as the number of days in such fiscal year before and after such transfer.  The provisions of this subsection shall not apply to gain or loss or to extraordinary non-recurring items.  Gain and loss shall be allocated in accordance with the provisions of Section 2.9(a) above to those Members who own Percentage Interests on the date of the closing of the sale, computed by reference to those Members' Percentage Interests on the date of the closing of the sale.  Similarly, extraordinary or nonrecurring items shall be allocated in accordance with the provisions of Section 2.9(a) above, as the case may be, to those Members who are Members on the date the gain is realized or the loss incurred, as the case may be.

    (e) <u>Amortization and Allocation of Organization and Start-up Expenses</u>.  The Company shall elect to amortize over a period of 60 months: (1) all organization expenses in accordance with the provisions of section 709(b) of the Code; and (2) all start-up expenses in accordance with the provisions of section 195 of the Code.

    (f) <u>Special Capital Account "Book" Allocations to Comply with Section 704 Regulations</u>.  The Company shall make the special "book" allocations to the Capital Accounts of the Members as required under Code Sections 704(b) and 704(c) and the Regulations promulgated thereunder.  Such special allocations shall be made before any allocations under Section 2.9(a) above.

    (g) <u>Tax Matters Member</u>.

    (1) The Clark Member is hereby appointed to act as the tax matters member (the "TMM"), who shall act in the same capacity as a "tax matters partner" of a partnership as referred to in section 6231(a)(7)(A) of the Code. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the Internal Revenue Service (the "IRS") of the beginning of an administrative proceeding with respect to the Company, the TMM shall furnish the IRS with the name, address and profits interest of each of the Members, provided that such information is provided to the Company by the Members.

10

(2)     The TMM is authorized, but not required:

(A)     To enter into any settlement with the IRS with respect to any administrative or judicial proceedings for the adjustment of Company items required to be taken into account by a Member for income tax purposes (such administrative proceedings being referred to as a "tax audit" and such judicial proceedings being referred to as "judicial review"), and in the settlement agreement the TMM may expressly state that such agreement shall bind all Members, except that such settlement agreement shall not bind any Member (i) who (within the time prescribed pursuant to the Code and Treasury Regulations) files a statement with the IRS providing that the TMM shall not have the authority to enter into a settlement agreement on behalf of such Member or (ii) who is a "notice partner" (as defined in Section 6231 of the Code) or a member of a "notice group" (as defined in Section 6223(b)(2) of the Code).

(B)     In the event that a notice of a final administrative adjustment at the Company level of any item required to be taken into account by a Member for tax purposes (a "final adjustment") is mailed to the TMM, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court or the United States Claims Court, or the filing of a complaint for refund with the District Court of the United States for the district in which the Company's principal place of business is located.

(C)     To intervene in any action brought by any other Member for judicial review of a final adjustment.

(D)     To file a request for an administrative adjustment with the IRS at any time and, if any part of such request is not allowed by the IRS, to file an appropriate pleading (petition or complaint) for judicial review with respect to such request.

(E)     To enter into an agreement with the IRS to extend the period for assessing any tax that is attributable to any item required to be taken into account by a Member for tax purposes, or an item affected by such item.

(F)     To take any other action on behalf of the Members of the Company in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations.

(3)     The TMM shall prepare and deliver to each Member, on or before April 1st of each calendar year, the annual tax return for the Company and the K-1 report for each Member for the previous tax year.

(4)     The taking of any action and the incurring of any expense by the TMM in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the TMM and the provisions relating to indemnification of the Manager(s) set forth in Section 3.8 of this Agreement shall be fully applicable to the TMM in its capacity as such.

(5)     The Company shall reimburse the TMM for its reasonable costs and expenses of serving as the TMM (including, but not limited to, the reasonable costs of personnel employed by the TMM, or its affiliates, and directly involved in assisting the TMM in

11

serving as the TMM, provided that personnel providing services for the TMM and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities), and shall pay for the cost of any outside auditor or accountant hired by the TMM in connection with this Agreement. The TMM shall not be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts performed, or for any failure to act, in good faith, provided, however, that the TMM shall not be relieved of its fiduciary obligations to the Company and the Members for fraud, bad faith, gross negligence, willful misconduct, misrepresentation or breach of fiduciary duty.

ARTICLE III

MANAGEMENT AND RIGHTS OF MEMBERS

3.1     <u>Management by Managers; Rights of Members</u>.

(a)     <u>Manager Designation</u>.  The Clark Group, acting collectively, and the Pinnacle Group, acting collectively, shall each have the authority to appoint one "**Manager**" of the Company, which Manager may or may not be a Member.  The initial Manager appointed by the Clark Group is Clark Realty Capital, L.L.C. (the "**Clark Manager**").  The initial Manager appointed by the Pinnacle Group is Pinnacle Irwin LLC (the "**Pinnacle Manager**").  Each Manager shall serve and continue in office throughout the entire term of the Company unless sooner removed by (1) its appointing Member Group upon written notice to the other Members and Managers, (2) by operation of law, (3) by order or decree of any court of competent jurisdiction, (4) by voluntary resignation, (5) upon the death, incompetency or bankruptcy of the Manager, (6) upon termination of the respective Member Group's Service Contracts (hereinafter defined), or (7) as otherwise provided in this Agreement.

(b)     <u>Power and Authority of the Managers</u>.

(1)     The Managers, either individually or collectively as described in this Section, shall have the complete and exclusive control of the management of the Company's business and affairs.  The Members shall not have any power or authority to act for or on behalf of the Company in any respect whatsoever, except as otherwise specifically provided in this Agreement or the Act.

(2)     The Clark Manager shall have acting authority to make all decisions regarding the management of the Company's business and affairs and the vote or signature of the Clark Manager shall be required to act on, consent to or approve all matters of the Company, except for those decisions deemed to be Major Decisions (as hereinafter defined).  The Pinnacle Manager shall not have authority to make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager.

The vote or signature of all Managers shall be required for the Managers to act on, consent to or approve Major Decisions.  The term "**Major Decisions**" shall mean any of the following:

12

(A)    Sale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of the Company and the terms and conditions thereof, except as otherwise permitted in this Agreement.

(B)    The Financial Closing and the terms and conditions thereof.

(C)    Any guaranty of a Company loan, line of credit, or other Company obligation by any Manager, Member or an Affiliate of a Manager or a Member.

(D)    Whether to make a capital call on the Members for Additional Required Funds that the Clark Manager determines are required; provided, however, if the Managers do not agree to make a call on the Members, then the Clark Manager is authorized by the Company to unilaterally proceed to obtain the Additional Required Funds as a loan from a third-party lender or the Members in accordance with Section 2.3(d) and Section 2.6.

(E)    Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision.

(F)    Amendment to this Agreement (except in connection with a change in Manager pursuant to Section 3.1(a) above or with a dilution pursuant to Section 6.2).

(G)    Amendment to the CMC Operating Agreement or the IL Operating Agreement to the extent such an amendment would apply on other than an equal basis to the Clark Group and the Pinnacle Group or to the extent such amendment would cause an adjustment to the terms or conditions of the Property Management Agreement.

(H)    Termination or dissolution of the Company.

(c)    <u>Delegation of Authority by Manager(s)</u>.  From time to time, pursuant to a written authorization, a Manager may delegate authority to certain employees, representatives or agents of the delegating Manager, and the power and authority of any such designee shall be limited to that specified in writing and approved by the delegating Manager.

(d)    <u>Rights and Votes of Members</u>.

(1)    Except as set forth in Section 3.1(d)(2), each Member hereby delegates all authority to act on behalf of such Member to the Manager appointed by such Member's Member Group,

(2)    The Members, in their capacity as Members and not as Manager(s), shall not take part in the day-to-day management of the business or transact any business for the Company in their capacity as Members (and not as Managers), nor shall they have power to sign for or to bind the Company, except that one of them (as designated in Section 2.9 above) shall act as the TMM of the Company, and except as required by non-waiverable provisions of applicable law; provided, however, that the Managers may not, without the prior written approval of the Members, except as provided in Section 2.3 above, create any new class of Percentage Interest or issue any additional Percentage Interest to existing or new

13

NGEDOCS :016600.0504 985953.3

Members, to the extent that such action would dilute the Member's Percentage Interest or would have a material adverse impact on the timing or priority of such Member's distributions of Net Cash Flow, Capital Proceeds or other sums hereunder.

> 3.2     Third Party Reliance.

Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Manager(s) as set forth in this Agreement.

> 3.3     No Duty to Consult.

Except as otherwise provided in this Agreement, the Manager(s) shall have no duty or obligation to consult with or seek advice of the Members.

> 3.4     Outside Activities of Managers.

The Members expressly recognize that:  (a) a Manager may have substantial other business and real estate activities; (b) each Manager shall devote such time, effort and skill to the Company's business affairs as he, she, or it deems necessary and proper for the Company's welfare and success and shall not be bound to devote all of his, her, or its business time to the affairs of the Company; and (c) each Manager may engage for his, her, or its own account and for the accounts of others in other businesses or real estate activities, even if such businesses or activities compete directly with Company business or activities, and neither the Company nor any Member shall have any rights in or to any such independent business or activity or the income or profits derived therefrom.

> 3.5     Intentionally Deleted

> 3.6     Reimbursement.

All expenses incurred with respect to the operation and management of the Company shall be borne by the Company.  The Managers shall be entitled to reimbursement from the Company for reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company to the extent such expenses are approved by the Clark Manager. Additionally, the Managers shall be entitled to reimbursement from the Company for the reasonable cost of personnel employed by the Managers, or their affiliates, involved in the operation and management of the Company (including, but not limited to, the in-house accountants and legal counsel), involved in assisting the Managers in carrying out their duties hereunder, provided that personnel providing services for the Managers and other entities shall have only that portion of the costs of such personnel borne by the Company that is attributable to time spent on Company activities and provided that such cost is not in excess of prevailing competitive rates.  Except for the foregoing reimbursements, the Managers shall not be entitled to any compensation or other remuneration for services performed as Managers.

14

3.7     Managers and Affiliates Dealing with the Company.

A Manager may appoint, employ, contract or otherwise deal with any person, including individuals with whom the Manager is related, and with business entities in which the Manager has a financial interest, for transacting Company business, including any acts or services for the Company as the Clark Manager may approve; provided, however, that fees or other payments and terms of any contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

3.8     Indemnification of Managers.

The Managers shall be indemnified by the Company to the fullest extent permitted by the Act for any action taken by the Managers within the scope of the authority conferred on him, her, or it by this Agreement.

3.9     Company Meetings.

The Managers shall meet for the transaction of Company business at such places and times as are mutually convenient to them.  Nothing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent without a formal meeting.

3.10     Guarantees of Financing.

In the event that, at any time or from time to time, a Member or Manager is required to guaranty a Company loan, line of credit or other Company obligation, or is required to put up a letter of credit or other financial instrument or asset as security for Company obligations, and the granting of such guaranty was consented to jointly by the Managers, then each Member shall put up its pro rata share of such obligation.  If a Member or Manager is thereafter required to make a payment under such obligation, such payment shall be deemed to be a Member Loan until repayment without requiring the further consent of either Manager.

3.11     Books and Records.

The Pinnacle Manager shall have the right at the Pinnacle Manager's expense upon reasonable advance written notice to the Clark Manager to review and inspect the books and records of the Company or to cause the books and records of the Company to be audited by an independent third party auditor selected by the Pinnacle Manager and reasonably satisfactory to the Clark Manager.  The Pinnacle Manager shall be entitled to exercise the review and inspection right from time to time, and shall be entitled to exercise the audit right once a years during each fiscal year of the Company.

15

3.12   Bank Accounts.

The Clark Manager shall be responsible for establishing, maintaining and operating a bank checking account or accounts on behalf of the Company.

3.13   Deadlock.

(a)   If a deadlock or dispute occurs in voting between the Managers or the Members on those matters where the Managers or the Members are entitled to vote, and if that deadlock or dispute cannot be resolved by mutual agreement (a "**Deadlock Event**") within a period of 30 days after receipt of written request for resolution (the "**Resolution Period**"), then the provisions of this Section shall apply. A Manager (the "**Initiating Manager**"), on its behalf or on behalf of its Member Group, has the right to trigger the dispute resolution procedure set forth in this Section by written notice (the "**Deadlock Notice**") to the other Manager (the "**Non-Initiating Manager**"). Within 5 days after receipt of the Notice by the Non-Initiating Manager, each Manager shall appoint an attorney to represent it in connection with the Deadlock Event. Within 5 days thereafter, the two attorneys shall together appoint a third attorney (together, the "**Panel**"). All attorneys on the Panel shall be licensed in the jurisdiction where the Project is located and shall have at least 15 years of experience as a practicing attorney in the field related to the Deadlock Event. The fees and other costs of each of the first two attorneys shall be borne by the party appointing each such attorney, with the fees and other costs of the third attorney being shared equally by both such parties. Within 10 days after the appointment of the third member thereof, the Panel shall render its decision regarding the Deadlock Event. If the Panel is unable unanimously to agree as to the resolution of the Deadlock Event, then the majority decision thereof (2 out of 3) shall determine the resolution thereof. The decision of the Panel shall be final, binding and unappealable. Failure to comply with the decision of the Panel shall be deemed a breach of this Agreement, and the prevailing party may bring an action in the appropriate court in the jurisdiction where the Project is located to enforce the decision.

(b)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the ability to complete the Project in a timely and economic manner or any completion guaranty or obligations of the Clark Manager or its affiliates in connection with any financing obtained for the Project, as determined by the Clark Manager in its sole discretion, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Clark Manager in its sole discretion.

(c)   Notwithstanding the foregoing, if a deadlock occurs in voting between the Managers or the Members with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement, and if that deadlock or dispute cannot be resolved by mutual agreement within a period of 7 days, then, unless the parties to such deadlock or dispute mutually agree otherwise, any such deadlock or dispute shall be determined by the Pinnacle Manager in its sole discretion.

16

3.14    Power of Attorney.

Each of the Members hereby irrevocably constitutes and appoints the Manager for its Member Group with full power of substitution, to be its true and lawful attorney-in-fact, in its name, place and stead, to act on its behalf in accordance with this Agreement and with the CMC Operating Agreement and the IL Operating Agreement, including without limitation to make, execute, certify, acknowledge, deliver, file and record:  (a) any certificate or other instruments, or amendments or modifications thereof, which may be required to be filed by the Company under applicable law; (b) any documents, certificates or other instruments, including any and all modifications and amendments of this Agreement and the certificate of formation of the Company, that may be required or deemed desirable by the Clark Manager to effectuate (i) the provisions of any part of this Agreement or the CMC Operating Agreement or the IL Operating Agreement and (ii) any amendment of this Agreement made in accordance with the terms hereof (including, for example but not by way of limitation, to amend this Agreement to provide for the admission to the Company of substituted Members pursuant to the terms of Section 4.1 below); and (c) all documents, certificates or other instruments which may be required to effectuate the dissolution and termination of the Company; provided that the power of attorney granted herein shall be fully subject to all the terms and conditions of this Agreement.  Each of the Members hereby acknowledges that the power of attorney granted herein (1) is coupled with an interest, (2) is irrevocable, and (3) survives the death, incompetency, adjudication of insanity or bankruptcy of any such Member who is an individual.

3.15    Services.

(a)    The Members acknowledge and consent to the following:

(1)    CMC shall enter into one or more developer services agreements (the "Developer Services Agreements") with CRC Irwin Planned Communities LLC ("Developer"), an Affiliate of the Clark Group, on or before the Effective Date for the provision of development services for the IDP (as defined in the CMC Operating Agreement) (the "Development Period").  CMC may also enter into one or more developer services agreements with Developer on or before the Effective Date for the provision of development services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "Out-Year Developer Services Agreements").

(2)    CMC shall enter into one or more a construction contracts (the "Construction Contracts") with Clark Realty Builders, Inc. and The Clark Construction Group ("Clark Contractors"), Affiliates of he Clark Group, on or before the Effective Date for the provision of general contractor services.  CMC may also enter into one or more construction management agreements with Clark Contractors on or before the Effective Date for the provision of construction management services for the period from the conclusion of the Development Period through the end of the term of the CMC Operating Agreement (the "Out-Year Construction Management Agreements").

(3)    CMC shall enter into one or more property management agreements (the "Property Management Agreements" or the "Pinnacle Member Service

17

Contracts") with American Management Services California Inc. ("**Pinnacle Management**"), an Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property management services.

(4)     CMC shall enter into one or more asset management agreements (the "**Asset Management Agreements**") with Irwin Asset Manager LLC (the "**Asset Manager**") an Affiliate of the Clark Group, on or before the Effective Date for the provision of asset management services.  For purposes hereof, the Developer Services Agreements, the Out-Year Developer Services Agreements, the Construction Contracts, the Out-Year Construction Management Agreements, and the Asset Management Agreements shall be hereinafter referred to collectively as the "**Clark Member Service Contracts**."  The Pinnacle Member Service Contracts and the Clark Member Service Contracts shall be hereinafter referred to collectively as the "**Service Contracts**" and, individually, as a "**Service Contract.**"

(b)     In the event a Member desires to transfer, assign, or subcontract any services, duties, or obligations being performed or fulfilled by such Member or its above designated Affiliate under any of the Service Contracts to another of its Affiliates, such Member shall be required to obtain the prior written consent of the Manager representing the Member Group that is not making the transfer; provided, however, the Clark Member shall be permitted without the consent of the Pinnacle Manager to transfer, assign, and subcontract certain services, duties, and obligations under the Clark Service Contracts to Shirley Contracting Company, LLC, Clark Concrete Contractors, LLC, and The Clark Construction Group, Inc.  The Members agree that neither Member shall be entitled to bid on or endeavor to obtain service contracts for services not contained within such Members original Service Contracts without the consent of the Manager for the other Member Group.

## ARTICLE IV
## TRANSFER OF MEMBERSHIP INTERESTS

4.1     Transfers; Treatment of Assignees; Substituted Members.

(a)     No Member shall, directly or indirectly, transfer, sell, give, encumber, assign, pledge, or otherwise deal with or dispose of all or any part of the Percentage Interests now owned or subsequently acquired by him, her or it, other than to a Permitted Transferee (as hereinafter defined), and no assignee or transferee other than a Permitted Transferee shall be admitted as a Member, without first obtaining the consent of the Manager representing the other Member Group, which consent may be given or withheld in the sole and absolute discretion of the applicable Manager.  A Permitted Transferee of a Member shall be admitted as a Member without the consent of the Manager representing the other Member Group.

(b)     A "**Permitted Transferee**" is any existing Member or a member, partner, employee or shareholder of a Member or their respective Affiliates (as hereinafter defined).  In addition, a transferee of an indirect interest in the Company that is a spouse or other family member of an individual with such an indirect membership interest in the Company shall be deemed a "Permitted Transferee."  For purposes of this Agreement, "**Affiliate**" shall mean, as to any individual, partnership, corporation, trust or other entity ("**Person**"), any other Person that directly or indirectly controls, is under common control with, or is controlled by such Person.

18

"**Control**" means possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person.

(c)     No Member shall be permitted to resign, retire, or otherwise voluntarily withdraw from the Company, and any Member who attempts to do so in violation of this Agreement shall be liable to the other Members and to the Company for any loss or damage sustained as a result of such attempted resignation.

(d)     Any purported transfer, sale, gift, encumbrance, assignment, pledge, or other disposition of a Percentage Interest of a Member in violation of this Section 4.1 shall be deemed voidable ab initio at the option of the non-transferring Member, in its sole and absolute discretion.

(e)     If a Percentage Interest has been assigned or transferred in accordance with the provisions of this Agreement, as required by law or court order, or otherwise as consented to by the applicable Manager, then such assignee or transferee shall not be a Member and shall not be entitled to vote or participate in the affairs and management of the Company or to exercise any right of a Member, unless such assignee or transferee is a Permitted Transferee or admitted as a substituted Member, as set forth below. The Percentage Interest of such assignee shall be deemed to be voted on all matters in the same proportion as the remaining Percentage Interests are voted. An assignee or transferee is entitled, to the extent of the Percentage Interest assigned, only to allocations of tax items and distributions pursuant to this Agreement.

(f)     If a Percentage Interest has been assigned or transferred in contravention of this Agreement or as required by law or court order and such assignment or transfer has not been voided as provided in Section 4.1(d), then, for a period of 180 days after receipt of notice of such event by the Managers, the assignee or transferee shall, at the option of the Manager representing the non-transferring Member Group, in its sole and absolute discretion, be required to sell to the Company or its designate all of such assignee's or transferee's Percentage Interests for a price equal to the value of the such assignee's or transferee's equity in the Company. The value of such equity shall be as mutually agreed upon by the assignee or transferee and the Manager representing the other Member Group; provided, however, that, if the assignee or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement within 15 days of notice by such Manager of its intention to value the Percentage Interest (the "**Agreement Period**"), then the value shall be determined using the following appraisal method (the "**Appraisal Method**"): (i) each party shall appoint an appraiser within 10 days of expiration of the Agreement Period to determine the equity value of the Percentage Interest; (ii) if the two appraisers agree upon the equity value of such Percentage Interest, then they shall jointly render a single written report of their opinion; (iii) if the two appraisers cannot agree upon the equity value of the Percentage Interest within 20 days from the date the second appraiser was appointed, then they shall each render a separate written report and shall together appoint a third appraiser; (iv) the third appraiser shall select within 10 days of its appointment which of the 2 appraisals most accurately reflects the value of the Percentage Interest and shall render a written report of its opinion; and (v) the agreed appraised value or the appraised value selected by the third appraiser shall be the value of the Percentage Interest. All appraisers shall be licensed in the jurisdiction and shall have at least 15 years experience appraising businesses and the equity interest therein. The fees and other costs of each of the first two appraisers shall

19

be borne by the group appointing each such appraiser, and the fees and other costs of the third appraiser being shared equally by both such groups. Within 60 days after the aforesaid joint written report, or written report of the third appraiser, as the case may be, has been rendered, the Manager representing the non-transferring Member Group shall give notice to the assignee or transferee of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the non-transferring Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the non-transferring Member Group, with the remainder paid from time to time from available cash flow, in accordance with the priorities specified in Section 2.8, with interest accruing on such unpaid amount at an annual rate of 6% (a "Transferring Member Obligation").

(g)     In the event that the Manager representing the non-transferring Member Group consents in writing to the admission as a substitute Member of a successor-in-interest to a Percentage Interest or such successor-in-interest to a Percentage Interest is a Permitted Transferee, such admission shall be contingent upon: (i) the agreement of such successor-in-interest to be bound by the terms and conditions of this Agreement and the execution by such successor-in-interest of a written document or restatement of this Agreement evidencing the same; and (ii) the agreement of such successor-in-interest to become personally obligated to the same extent as any other Member with respect to obligations of the Company by executing such guarantees of the Company indebtedness as may have been executed previously by the Members, if any.

4.2     Death, Insanity or Incompetency, or Trust Termination of a Member.

(a)     In the event of the death, adjudication of insanity or incompetency, or, with respect to a Member which is a trust, termination of such Member, the estate, trustee or other legal representative of such withdrawing Member shall have the right to transfer the Percentage Interest of such withdrawing Member to the heirs, beneficiaries, distributees or other successor party of such withdrawing Member, subject to the provisions of Article IV hereof. Any transferee of the Percentage Interest of a withdrawing Member shall be deemed to be an assignee of the withdrawing Member's Percentage Interest but shall not be a Member hereunder unless the Manager for the other Member Group consents to such transferee's or assignee's admission as a Member and such transferee or assignee agrees to be bound by this Agreement, in accordance with Section 4.1(g).

(b)     Within 180 days after an event described in Section 4.2(a) with respect to a Member, the representatives of that Member or any person to whom the Member has transferred Percentage Interests pursuant to the provisions of this Agreement (i) may ask the Company to purchase all of such Member's Percentage Interests or (ii) at the option of the Manager for the other Member Group, shall be required to sell to the Company or its designate all of such Member's and such transferee's Percentage Interests. Within 90 days of receiving such request or exercise of such option, the Company shall purchase, and the Member or transferee shall sell, all such Percentage Interests for a price equal to the value of the such Member or transferee's equity in the Company. The value of the such Member or transferee's equity in the Company shall be mutually agreed upon by the Member or transferee and the

20

Manager representing the other Member Group; provided, however, that, if the Member or transferee and the Manager representing the other Member Group are unable to reach a mutual agreement, then the value shall be determined using the Appraisal Method. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Manager representing the other Member Group, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Manager representing the other Member Group, with the remainder paid as a Transferring Member Obligation.

4.3    Bankruptcy of a Member.

(a)    In the event of the Bankruptcy (as herein defined) of a Member (the "**Bankrupt Member**"), then the Members other than the Bankrupt Member (the "**Continuing Members**"), pro rata, in proportion to their respective Percentage Interests (unless they agree upon another proportion), shall have the option (commencing within 90 days after the adjudication of such Bankruptcy by written notice thereof to the Bankrupt Member or to its trustee in Bankruptcy, guardian, receiver or other legal representative) to purchase all (but not less than all) of the Bankrupt Member's Percentage Interest at a price equal to 90% of the value of the Bankrupt Member's equity in the Company, as mutually agreed upon by the Continuing Members and the legal representative of the Bankrupt Member, provided, however, that, if the Continuing Members and the legal representative of the Bankrupt Member are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Continuing Members shall give notice to the legal representative of the Bankrupt Member of their decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Continuing Members, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Continuing Members, with the remainder paid as a Transferring Member Obligation.

(b)    As used herein, the term "**Bankruptcy**" shall mean and refer to an adjudication of bankruptcy under Title II of the United States Code, as amended (the "**Bankruptcy Code**"), an assignment for the benefit of creditors and/or an adjudication of insolvency under any state or local insolvency statute or procedure or the occurrence of any other event of bankruptcy or insolvency set forth under the Act.

4.4    Right to Effect Transfers.

(a)    The Clark Manager shall have the right to effect the transfers contemplated in this Article without actually receiving a written assignment of a Member's Percentage Interest, and it is agreed that transfers of Percentage Interests may be made on the books of the Company for this purpose, which transfers shall be deemed effective upon payment in accordance with the terms of this Article.

(b)    In addition, the Clark Manager shall have the right to reflect the transfers contemplated in this Article by written amendment to this Agreement signed by the Clark Manager.

21

ARTICLE V
TERM; DISSOLUTION

5.1     Term.

The term of the Company shall be perpetual until the occurrence of an Event of Dissolution (hereinafter defined).

5.2     Events Resulting in Dissolution.

The Company shall be dissolved upon the earliest to occur of any of the following events (an "**Event of Dissolution**") (it being understood and agreed that the death, resignation, retirement, expulsion, Bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company under the Act, shall not constitute an Event of Dissolution):   (a) the unanimous written consent of the Managers; or (b) the dissolution of CMC or IL, unless in such event the Managers unanimously agree not to dissolve the Company; or(c) the entry of a decree of judicial dissolution under the Act; or (d) the occurrence of any other event causing the dissolution of a limited liability company under the laws of the Commonwealth of California.

5.3     Conclusion of Affairs.

In the event of the dissolution of the Company for any reason, the Clark Manager shall proceed promptly to wind up the affairs of and liquidate the Company.  Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution.  The Clark Manager shall have reasonable discretion to determine the time, manner and terms of any sale or sales or distributions of Company property pursuant to such liquidation having due regard to the activity and the condition and relevant market general financial and economic conditions consistent with its fiduciary obligations to the Members.

5.4     Order of Priority in Liquidation.

If the Company is terminated or dissolved, the Clark Manager shall proceed with the liquidation of the Company as provided in Section 5.3 above, and the proceeds from the liquidation shall be applied as follows:

        (a)     First, to the payment of debts and liabilities of the Company, other than loans and advances that the Members may have made to the Company and Transferring Member Obligations, and the expenses of liquidation.

        (b)     Second, to establish reserves that the Managers jointly determine to be reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Company.

22

NOEDOCS :016600.0504 985953.3

(c)     Third, to the payment of any loans or advances that may have been made by any Member to the Company, but if the amount available for repayment is insufficient, then payment shall be made in the inverse order of when the loans or advances were made (with the newest loans or advances being repaid first, both as to principal and interest).

(d)     Fourth, in accordance with the priorities described in Section 2.8(a)(2).

5.5     <u>Termination.</u>

Within a reasonable time following the completion of the liquidation of the Company, the Clark Manager shall supply to each of the Members a statement setting forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement.   Upon completion of the liquidation of the Company and the distributions of all Company assets, the Company shall terminate, and the Clark Manager shall have the authority to execute and record a Certificate of Cancellation of the Company, as well as any and all other documents required to effectuate the dissolution and termination of the Company.

5.6     <u>Transferring Member Obligations.</u>

The Members agree that the holder of a Transferring Member Obligation shall not be deemed a creditor of the Company for purposes of any provision of the Bankruptcy Code that would permit a creditor of the Company to file an involuntary Bankruptcy against the Company; provided, however, such holder shall have the right to file a claim in a Bankruptcy of the Company.

ARTICLE VI
DEFAULT; REMEDIES

6.1     <u>Event of Default.</u>

The following event(s) shall be deemed to be, and is referred to in this Agreement as, an **"Event of Default":**

(a)     A default by a Member in paying its Required Contributions on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager (hereinafter defined) of written notice specifying the default.

(b)     A default by a Member in paying its proportionate share of any Additional Required Funds approved as a capital call to be made on the Members by all the Managers within 20 days after receipt by the Member of a written request from the Non-Defaulting Manager for such contribution.

(c)     A default by a Member in paying its proportionate share of any other required payment hereunder on the day the payment is due that continues for more than 5 days after receipt by the Member from the Non-Defaulting Manager of a written notice specifying the default.

23

(d)     A default by a Member or the Manager appointed by such Member in performing any other obligation hereunder that continues for more than 20 days after receipt by such party from the Non-Defaulting Manager of written notice specifying such default; provided, however, that if the defaulting party commences to cure such default during such 20 day period and diligently pursues a cure of the default, then the defaulting party shall have an additional cure period not to exceed 60 days to cure the default.

(e)     The termination of all of the Clark Member Service Contracts or all of the Pinnacle Member Service Contracts, respectively, for failure to perform thereunder prior to expiration of such service contract.

6.2     Remedy for Event of Default.

(a)     If an Event of Default occurs with respect to a Member (a "**Defaulting Member**"), then the following remedies shall apply at the election of the Manager appointed by the Member Group in which the Defaulting Member is not a part (the "**Non-Defaulting Manager**"):

(1)     If the Event of Default is monetary as specified in Sections 6.1(a)-(c) (including without limitation a default of a Member's obligation to pay sums due under Section 2.3 "Additional Capital Contributions" and Section 3.10 "Guaranties of Financing"), then either of the following remedies shall apply, at the option of the Non-Defaulting Manager:

(A)     Each Member who is not in default (a "**Non-Defaulting Member**") shall have the option, but without imposing on it the obligation, to pay the portion of the payment that the Defaulting Member(s) was (were) obligated, but failed, to pay (the "**Default Payment**"). The option shall be exercised by giving written notice to the Manager for the Defaulting Member's Member Group (the "**Defaulting Manager**") within 30 days after the occurrence of the Event of Default. Upon the payment by the Non-Defaulting Member(s) of any portion of the Default Payment, the Default Payment and the corresponding portion of the payment that such Non-Defaulting Member(s) then paid as a payment by the participating Non-Defaulting Member(s) shall be deemed a loan (a "**Default Loan**") and shall be entitled to repayment prior to any fee payments or distributions (including, without limitation, payment or distribution of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contract, as applicable) or Net Cash Flow distribution to the Non-Defaulting Member(s), its appointed Manager, or its Affiliates, together with a Default Interest Rate (as hereinafter defined). A "**Default Interest Rate**" is defined as a cumulative return of 25% compounded quarterly (pro rated for periods of less than 1 year) on a daily average outstanding balance during each fiscal year of the Member's aggregate unreturned Default Payments. If more than one Non-Defaulting Member wishes to make a Default Loan, then the total loan amount shall be allocated among the Non-Defaulting Members in proportion to such lending Members' respective Percentage Interests; or

(B)     If the Non-Defaulting Manager does not exercise the option set forth in subsection (A) above, then the Non-Defaulting Manager shall have either of the following options:

24

(i)     To make the Default Payment and to reduce the Defaulting Member's Percentage Interest (but not to an amount below zero) by an amount equal to the product of (A) its Percentage Interest, multiplied by (B) a fraction (the "**Dilution Fraction**"), the numerator of which shall be the product of 1.5 times the amount of the Default Payment, and the denominator of which shall be the sum of (1) the total amount of the Default Payment and (2) the aggregate amount of any Required Contributions, Additional Required Funds or any other capital contributions actually made by such Member.  In the event of a dilution, the Percentage Interest of the Non-Defaulting Member(s) shall be increased (pro rata) by the amount by which the Percentage Interest of the Defaulting Member(s) is so reduced in accordance with the foregoing; or

(ii)    In the event the monetary Event of Default is the failure by a Member to timely make all or any portion of the Financing Contribution, to cause the Defaulting Member, upon 10 days written notice to the Defaulting Member, to convey its Percentage Interests to the Company in exchange for the return of any Required Contributions, Additional Required Funds, or other Capital Contributions actually made by the Defaulting Member.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(2)     If the Event of Default is non-monetary as specified in Section 6.1(d), then the Non-Defaulting Manager, on behalf of the Company, may avail the Company of any and all remedies available at law or equity (including specific performance) to seek damages or compel compliance, in which event the Defaulting Member shall reimburse the Company for all expenses (including reasonable attorneys' fees and costs) incurred by the Company in connection with the pursuit of such remedies; provided, however, that in no event shall the Company, a Manager or any Member be entitled to consequential or punitive damages in connection with this Agreement.

(3)     If the Event of Default is the result of the termination of all of a Member's respective Service Contracts as specified in Section 6.1(e), then the Non-Defaulting Manager shall have the option, in addition to any other remedies provided in this Section, to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager, provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method.  Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option.  If such option is exercised, settlement shall be held within 60 days from the date of such exercise.  Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

NGEDOCS :016600.0504 985953.3

(b)     In the event that prior to the Financial Closing, a Member Group's Percentage Interest is diluted below 10% of the aggregate Percentage Interests as a result of a monetary Event of Default, the Non-Defaulting Manager shall have the option to cause the Defaulting Member to convey its Percentage Interests to the Company in exchange for a payment equal to the fair market value of the Defaulting Member's equity in the Company, as mutually agreed upon by the Defaulting Member and the Non-Defaulting Manager; provided, however, that, if the Defaulting Member and the Non-Defaulting Manager are unable to reach such mutual agreement, then the value shall be determined using the Appraisal Method. Within 60 days after the joint written report of the first two appraisers or written report of the third appraiser (as the case may be) has been rendered, the Non-Defaulting Manager shall give notice to the Defaulting Member of its decision as to the exercise of the aforesaid option. If such option is exercised, settlement shall be held within 60 days from the date of such exercise. Unless otherwise agreed to by the parties, the terms of payment, at the election of the Non-Defaulting Manager, shall be (x) all cash or (y) cash to the extent that the Company has available cash, as determined by the Non-Defaulting Manager, with the remainder paid as a Transferring Member Obligation.

(c)     During the pendency of an Event of Default, the Defaulting Manager shall not be entitled to vote on Company matters, and its voting authority shall be granted to the Non-Defaulting Manager. In such event, the vote of the remaining Manager(s) shall be sufficient to make all decisions of the Company, including, without limitation, Major Decisions.

6.3     Obligations of Defaulting Member Continue.

Anything herein contained to the contrary notwithstanding, a Defaulting Member shall continue to be obligated to make any Required Contributions or Additional Required Funds payments required of it hereunder.

6.4     Setoff of Payments to Defaulting Member.

From and after the occurrence of any Event of Default, the Non-Defaulting Manager, on behalf of the Company and/or the Non-Defaulting Members, as applicable, shall be entitled to set off against payments otherwise due to a Defaulting Member, including, without limitation, payments or distributions of any fees earned by a Member under the Clark Member Service Contracts or the Pinnacle Member Service Contracts, as applicable, all amounts due and owing by the Defaulting Member to the Company and/or the Non-Defaulting Members.

ARTICLE VII
MISCELLANEOUS

7.1     Amendment.

Except as otherwise specifically set forth to the contrary herein, this Agreement may be amended, at any time, in whole or in part, only by written instrument signed by the appropriate parties pursuant to the terms of this Agreement. The parties agree to execute any amendment to this Agreement as may be considered necessary by legal counsel to the Company in order for it

26

NGEDOCS:016600.0504 985953.3

to be treated as a partnership for federal and state income tax purposes, or as may be required to carry out the interest and purpose of any specific provision of this Agreement.

### 7.2    Notices.

For purposes of this Agreement, notices, offers and acceptances must be in writing and will be deemed to be served and received at the time mailed by United States registered or certified mail to the address shown for each Member on Exhibit A or Manager, if different or not shown, to the last known address of the party involved or when delivered in person.

### 7.3    Enforceability.

The waiver by any party to this Agreement of a breach of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach by any party. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.

### 7.4    Binding Effect.

This Agreement will inure to the benefit of and be binding upon the parties to this Agreement, their successors, heirs, personal representatives and assigns, and will be construed in accordance with the laws of the State of California.   This Agreement may be executed in counterparts.

### 7.5    No Third Party Beneficiary Rights.

Except as expressly provided herein to the contrary, this Operating Agreement shall benefit only the Members and Managers and no other person or entity shall have any rights or remedies hereunder.

### 7.6    Limitation of Liability.

No Manager or Member shall be liable, responsible or accountable to the Company or to the Members in damages or otherwise for any acts or omissions in good faith.  No constituent member in or agent of a Member or Manager, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, participant, representative or agent of a Member or Manager, shall have any personal liability, directly or indirectly, under or in connection with this Operating Agreement or any agreement made or entered into under or pursuant to the provisions of this Operating Agreement or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter.

NOEDOCS :016600.0504 985953.3

7.7    Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8    Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9    CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:    Clark Realty Capital, L.L.C., Manager

      By:    _____
              W. Cleveland Johnson,
              Authorized Representative

By:    CEI Realty, Inc., Manager

      By:    _____
              Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:    _____
           Stanley J. Harrelson, Manager

28

7.7     Further Assurances.

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information, and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Operating Agreement and as are not inconsistent with the terms hereof.

7.8     Prevailing Party.

The prevailing party in any litigation between the parties hereto shall be entitled to an award of its actual costs, including reasonable attorneys' fees, expert witness fees and consultant fees.

7.9     CMC Operating Agreement and BL Operating Agreement.

In the event of a conflict between specific provisions of the CMC Operating Agreement or the BL Operating Agreement and specific provisions of this Agreement, the provisions of the CMC Operating Agreement or the IL Operating Agreement, respectively, shall govern; provided, however, that the foregoing shall not constitute a waiver with respect to any rights or remedies of the members or the managers under either the CMC Operating Agreement, the IL Operating Agreement or this Agreement, respectively.

IN WITNESS WHEREOF, the undersigned have executed this Agreement, or caused this Agreement to be executed by a duly authorized officer, as of the day and year above written.

MEMBERS:

CLARK IRWIN LLC

By:     Clark Realty Capital, L.L.C., Manager

> By:     _____
>         W. Cleveland Johnson,
>         Authorized Representative

By:     CEI Realty, Inc., Manager

> By:     _____
>         Lawrence C. Nussdorf, President

PINNACLE IRWIN LLC

By:     _____
        Stanley J. Harrelson, Manager

28

EXHIBIT A

| Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| CLARK MEMBER: | | |
| Clark Irwin LLC<br>7500 Old Georgetown Road, 15th Floor<br>Bethesda, MD 20814 | $700.00 | 70% |
| PINNACLE MEMBER: | | |
| Pinnacle Irwin LLC<br>2801 Alaskan Way, Suite 200<br>Seattle, WA 98121 | $300.00 | 30% |
| | $1,000.00 | 100% |

EXHIBIT 4

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of October, 2003, by and between Monterey Bay Military Housing, LLC (hereinafter referred to as the "OWNER"), MBMH Subsidiary, LLC (hereinafter referred to as "SUBSIDIARY OWNER" and together with Development Owner, "OWNERS") and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

### PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Presidio of Monterey, Ord Military Community, La Mesa Village and the Naval Post Graduate School, and is located at Monterey, California, consisting of (i) the land (the "Land"),as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (as lessor) and Monterey Bay Land, LLC (as lessee) (the "Ground Lease"), as subleased pursuant to that certain Sublease of even date herewith by and between Monterey Bay Land, LLC (as sublessor) and Development Owner (as sublessee); (ii) improvements ("Improvements") located on the Project and leased by Development Owner and (iii) improvements ("Additional Improvements") located on the Project and leased development by Subsidiary Owner under that certain Building Lease of even date herewith by and between MBL Subsidiary, LLC (as lessor) and Subsidiary Owner (as lessee) (the "Building Lease").

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1     APPOINTMENT AND ACCEPTANCE:  Each Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the portion of the Project owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, Building Lease or Limited Liability Company Agreement of Development Owner or (b) any action which would cause either Owner to be in default under the Sublease or Building Lease.  In the event and at such time as any of the Additional Improvements are no longer leased by Subsidiary Owner but are instead leased by Development Owner in accordance with the terms of the Sublease, this Agreement shall terminate with respect to Subsidiary Owner but shall remain in full force and effect to Development Owner with respect to such Additional Improvements.

1.2     TERM:  The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of October, subject to the other provisions of this Agreement.

1.3     MANAGEMENT OFFICE:  Development Owner shall provide adequate space on the Project for a management office, exclusively for the use of Manager to conduct the business of the management of the Project. Owners shall pay all reasonable expenses related to such office as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services in proportion to the respective Base Fee payable by each. All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Development Owner shall give Manager prior written notice of any changes in such policies.

1.4     OMITTED

1.5     BUDGET AND BUSINESS PLAN:  Owners and Manager will establish a budget and business plan for operation and management of the Project (the "Plan").  The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation. Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require the applicable Owner's advance approval, except as provided in Section 4.2 hereof. Owners agree that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance. The Plan shall include, at a minimum, the following:

A.        <u>Minimum Leasing Guidelines</u> established by each Owner for its portion of the Project, setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.        <u>Capital Improvement Plan</u>: Each Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed during such Owner's and Manager's pre-acquisition inspection of the property (if applicable). Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property. A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

## BANK ACCOUNTS

**2.1**    <u>BANK ACCOUNTS:</u> Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project provided funds of Development Owner and Subsidiary Owner shall be segregated from each other. Operating trust accounts are hereinafter referred to as "operating accounts". All other accounts are hereinafter referred to as "trust accounts". Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by the applicable Owner. All other funds shall be place in respective operating accounts for Development Owner and Subsidiary Owner, as appropriate. All trust accounts shall be operated in conformance with state law. Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager. All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government. All such depository banks shall be selected by Manager and shall be satisfactory to Owners. Manager shall not be liable to an Owner in the event of bankruptcy or failure of a depository institution. Manager shall open the above described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by an Owner. Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

**2.2**    <u>REMITTANCES</u> . Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated October 1, 2003 ("Deed of Trust") between Owner and Monterey Bay Land, LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income, casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

**2.3**    <u>INITIAL DEPOSIT FOR RESERVES:</u> Immediately upon commencement of this Agreement, each Owner shall remit to Manager a sum to be deposited in such Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve. Each Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of such Owner under this Agreement as they become due. Each Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

**2.4**    <u>MANAGER'S OBLIGATION TO ADVANCE PAYMENTS:</u> All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of the applicable Owner. All such purchases shall be made by Manager solely on behalf of the applicable Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation. In the event that there are insufficient funds in an Owner's operating account, Manager may, after notifying the Owner, advance its own funds for such purpose, in which event such Owner shall promptly repay to Manager all such sums expended.

**2.5**    <u>INTEREST ON TRUST ACCOUNTS:</u> Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at an Owner's request. All interest earned on such funds shall belong to the applicable Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

NGEDOCS :016600.0501 810886.13
FINAL

## SECTION 3

### COLLECTION OF RENTS AND OTHER RECEIPTS

    **3.1**    AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to either Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by section 11.5 herein.

    **3.2**    SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

### SECTION 4

### DISBURSEMENT FROM OPERATING ACCOUNTS

    **4.1**    OPERATING EXPENSES: From each Owner's operating account, and subject to Exhibit B, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating such Owner's portion of the Project set forth in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Each Owner has sole responsibility for the timely payment of all authorized expenses of each Owner's portion of the Project. including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

    **4.2**    EXTRAORDINARY EXPENSES: Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of the applicable Owner. An Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, each Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify the applicable Owner in detail, concerning such expenditures.

    **4.3**    AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from an Owner's operating account, in accordance with the Plan or as otherwise directed by an Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges; all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees. To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

    **4.4**    EXPENSES TO BE PAID DIRECTLY BY OWNER: In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, each Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

    **4.5**    FEES FOR LEGAL ADVICE: Owners shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owners, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager. Manager shall notify the applicable Owner if legal services are anticipated to exceed the amounts set forth in the Plan. If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services. Provided, however, that nothing contained in this section shall obligate an Owner to pay Manager's legal fees in the

3

event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

   4.6   NET PROCEEDS:  To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to an Owner's portion of the Project to each Owner at least monthly at a time specified by Owner.  Such periodic cash payments shall be remitted to _____

   4.7   PRIORITY OF PAYMENT:  Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall be paid in the following order:  Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts.  Where the terms of any loan security agreement with an Owner conflict with the terms of this section, the terms of such loan security agreement shall control, provided, such Owner has notified Manager of the existence of any such condition.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

### SECTION 5

### FINANCIAL AND OTHER REPORTS

   5.1   REPORTS:  By the 10th business day of each month, Manager shall furnish to each Owner a statement of receipts and disbursements from the operation of its portion of the Project during the prior calendar or fiscal month.  In addition, Manager shall, on a mutually acceptable schedule and at an Owner's request, prepare and submit to such Owner such other reports as such Owner shall specify, including, but not limited to the following:

   a.)   Weekly occupancy, leasing status and traffic reports.
   b.)   Monthly market comparable rent survey.
   c.)   Monthly bank reconciliation.

In addition, Manager will furnish to Development Owner:

   Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Development Owner for that fiscal year, a statement of changes in financial position of Development Owner for that fiscal year and, when requested by Development Owner's mortgagee, a balance sheet showing all assets and liabilities of Development Owner relating to the Project as of the end of that fiscal year, all audited at Development Owner's expense by an independent certified public accountant reasonably acceptable to Development Owner's mortgagee.

   Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Development Owner.

   Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Development Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Development Owner and any Controlling Entity and the interest held by each, and if Development Owner or a Controlling Entity is a corporation, all officers and directors of Development Owner's mortgagee and the Controlling Entity, as applicable, and if Development Owner or a Controlling Entity is a limited liability company, all managers who are not members.

   Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Operating Income (as defined in the Loan Agreement) and Operating Expenses (as defined in the Loan Agreement) for such month and a calculation of the DSC Ratio (as defined in the Loan Agreement).

   For purposes hereof, "Loan Agreement" means that certain Loan Agreement between Development Owner, Monterey Bay Land, LLC of even date herewith.

4

NGEDOCS :016600.0501 810886.13
FINAL