# Exhibit L

Part 2

"Controlling Entity" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Development Owner (if Development Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Development Owner or more than 50% of the ownership or membership interests in Development Owner (if Development Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Development Owner (if Development Owner is a corporation).

5.2    OWNER'S RIGHT TO AUDIT: Each Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by such Owner, as an expense of such Owner. Such audits may be made during normal business hours posted at the Project.

## SECTION 6

## ADVERTISING

6.1    ADVERTISING: The cost of advertising shall be paid out of the Developer Owner's operating account, in accordance with the advertising budget or as approved by Developer Owner. All advertising shall make clear that Manager is the manager and is not the owner of the Project.

## SECTION 7

## LEASING AND RENTING

7.1    MANAGER'S AUTHORITY TO LEASE PROJECT: Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Sublease, the Building Lease and the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for the Owners. All costs of leasing shall be paid out of the applicable Owner's operating account, in accordance with the leasing budget or as approved by the applicable Owner. No rental agreement shall be for a period in excess of one (1) year without the written approval of the applicable Owner. The form of the rental agreement shall be provided by the applicable Owner.

Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Development Owner's mortgagee (or without Development Owner's written certification that such consent is deemed received under the applicable loan documents). Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder, terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgagee. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

Manager will not permit an Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

7.2    NO OTHER RENTAL AGENT: During the term of this Agreement, no Owner shall authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project. Each Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3    RENTAL RATES: In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with

5

respect to each Owner's portion of the Project. As authorized in writing by an Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4    ENFORCEMENT OF RENTAL AGREEMENTS: Subject to any conditions or limitations imposed by an Owner, Manager is authorized to institute and defend, in an Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto. Manager is authorized to sign and serve such notices as Manager and an Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income. Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of an Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less. Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of an Owner before entering into any compromise, settlement, or release of such legal action. Any moneys for such settlements paid out by Manager shall be an operating expense of the Project. Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or shall be reimbursed directly to Manager by such Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by an Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, an Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against such Owner or Manager as the agent of such Owner.

### SECTION 8

### EMPLOYEES

8.1    MANAGER'S AUTHORITY TO HIRE: Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2    OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working at the Project including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owners' funds, from the Project operating accounts subject to the Plan and allocated equitable between the Owners. In addition, Manager shall accrue for all vacation pay due site employees and provide a quarterly reconciliation to Owners of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed at the Project.

8.3    MANAGER'S RESPONSIBILITY TO FILE RETURNS: Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, each Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Each Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

6

## SECTION 9

### OPERATIONS, MAINTENANCE AND REPAIR

9.1     PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Development Owner under the Sublease and any loan documents affecting the Project and by Subsidiary Owner under the Building Lease for the operating efficiency of the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by an Owner, Manager is also authorized to decorate the Owner's portion of the Project and the individual apartment units and to purchase or rent, on such Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Owner's portion of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of the Owners. If an Owner selects a vendor for use on the Project, such Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2     FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES: With an Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Manager. Such Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3     CONTRACTS, UTILITIES AND SERVICES: Manager is authorized to negotiate contracts for non-recurring items of expense, not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services, and make contracts on each Owner's behalf for electricity, gas, telephone, fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be the applicable Owner's responsibility, except that Manager may pay the same from the operating accounts if directed to do so.

9.4     LIMITATIONS ON CONTRACTS: Each such contract or agreement shall: (a) be in the name of the applicable Owner, (b) be assignable, at such Owner's option, to such Owner or such Owner's nominee, (c) include a provision of cancellation thereof by such Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance. If this agreement is terminated pursuant to Section 18, Manager shall, at such Owner's option, assign to such Owner or such Owner's nominee all contracts and agreements pertaining to the Project. Manager shall then notify such Owner if any such contracting entity is either a subsidiary, affiliate, or has any other relationship whatsoever to Manager.

9.5     MAINTAINING HISTORIC STATUS: Manager shall implement each Owner's responsibilities to comply with the covenants of such Owner set forth in Section 27.b. of the Sublease and Section 27 of the Building Lease relating to ordinary repair and maintenance of "Historic Property", provided that such Owner shall provide the necessary funds for compliance with such obligations.

9.6     ENVIRONMENTAL. Manager shall be responsible for performing on behalf of each Owner such ordinary, non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

### RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with the ownership or operation of the Project. Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owners. Owners agree to assume all financial risks of operating their respective portion of the Project including any claims made against Manager while acting as such Owner's agent within the scope of its authority as provided herein. Except as provided herein, neither

NGEDOCS :016600.0501 810886.13
FINAL

party shall have the power to bind or obligate the other party. Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owners; and, except as provided in this Agreement, no Owner shall act as the principal of Manager.

## SECTION 11

### INDEMNIFICATION AND BONDING

11.1    INDEMNIFICATION BY OWNER

    A.    Indemnification for Injuries to Person and Property: To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees), for injuries or damages including economic losses, to persons, or property including, but not limited to, those relating to or arising out of the premises of such Owner's portion of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

    B.    Indemnification for Vendor and Tenant Claims: Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), each Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of such Owner's portion of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager. Such Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

    C.    General Provisions: Except as expressly set forth herein, nothing contained in Section 12 shall relieve an Owner of its obligation under Section 11 of this Agreement.

11.2    INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS: Subject to Paragraph 11.1, Manager shall indemnify, defend and save each Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws. Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of such Owner or if such Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3    WAIVER OF CLAIMS: Other than as provided in Section 11.2, each Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4    SCOPE OF INDEMNITY: Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action. All reasonable costs and expenses of such defense shall be borne by the indemnitor. In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor. The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

8

11.5    BONDING: Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owners to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6    TERM OF INDEMNIFICATION: The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

## SECTION 12

## INSURANCE

12.1    INSURANCE BY PROPERTY MANAGER: At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owners and Manager and such additional insured as may be necessary from time to time. Owners shall be included as named insureds on Manager's policy. Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of the applicable Owner; provided the amount of the deductible or SIR is pre-approved by such Owner.

      A.    Property Insurance: Property Insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief. The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of each Owner and Manager.

      B.    General Liability Insurance: Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate.

      C.    Excess/Umbrella Liability: Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence. Such coverage shall be excess to the automobile liability and employer's liability coverage.

      D.    Automobile Liability Insurance: Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit.

      E.    Named Insured: Each Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement. The members and managers of Owners and such others as may be designated from time to time by Owners shall be named as additional insured. It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owners. Manager will secure endorsements to this effect from all appropriate insurers of such policies.

      F.    General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to each Owner and shall require a minimum of thirty (30) days written notice to each Owner prior to any cancellation of or changes to said policies. Manager agrees to provide each Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2    PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions): Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

9

12.3   WORKER'S COMPENSATON /EMPLOYER LIABILITY . Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4   RENTER'S INSURANCE. Manager shall procure and maintain at the cost and expense of each Owner, such renter's insurance (property and/or liability) for the benefit of residents of such Owner's portion of the Project, as such Owner shall request from time to time.

# SECTION 13

## MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owners or any previous owners of the Project, or any previous property managers or other agents of either Owners or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due an Owner or in the performance of any obligations owed by any tenant to an Owner pursuant to any rental agreement or otherwise unless caused by gross negligence or willful misconduct of Manager.  Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect.   Any environmental violations or hazards discovered by Manager shall be brought to the attention of the applicable Owner in writing and such Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owners shall be solely liable for all vendor claims and tenant claims, whether made against such Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

# SECTION 14

## ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1   ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owners, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement. Each Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of such Owner's rights under the Sublease or Building Lease, respectively.

# SECTION 15

## MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"Effective Gross Income" shall mean, as to the Property for a given period of time, all rents and other income and charges from the normal operation of the Property, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units in the Property, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Property and concessionaires (if any) in respect of the Property, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Property or the improvements thereon. Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

NGEDOCS :016600.0501 810886.13 .
FINAL

"Adjusted by CPI" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. For example, the adjustment to be made on January 1, 2005 would be based upon the change in the CPI Index from October 2003 to October 2004.

"Base Year" shall mean the first full calendar year of operation of the Project, unless adjusted below.

CPI Index shall mean the "Consumer Price Index for All Urban Consumers, San Francisco-Oakland-San Jose Index, subgroup "All Items" (1982-1984=100)," issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency, or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area; provided, however, if the CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published, then by using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

CPI Effective Gross Income per Door for any calendar year shall mean actual Effective Gross Income for the applicable Base Year, divided by the number of units occupied during such Base Year, then Adjusted by CPI to January 1 of such subsequent calendar year. At the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Development Owner's operating agreement) occurs, and every five years thereafter, (x) the most recent annual Effective Gross Income will be compared to (y) the then calculated CPI Effective Gross Income per Door multiplied by the number of units then occupied. If the result in clause (x) is 10% greater than the result in clause (y), then the CPI Effective Gross Income per Door shall become the most recent annual Effective Gross Income divided by the number of units then occupied and the Base Year (and Effective Gross Income for the Base Year) shall become the then most recent year (and Effective Gross Income for such then most recent year), otherwise the CPI Effective Gross Income Per Door for such year and Base Year shall remain the same as then existing. For purposes of this Section only, Effective Gross Income will be determined based on both the Improvements and the Additional Improvements, as if all "Doors" were leased by Development Owner.

    15.1    COMPENSATION: As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), each Owner shall pay Manager the following compensation:

    (a)    Base Fee:

    (i)    For the first full calendar year of operation (and any portion of a calendar year prior thereto), 1.500% of Effective Gross Income generated from such Owner's portion of the Project, to be determined and paid on a monthly basis, with payment due on the 10th day after the end of the applicable month.

    (ii)    For each month thereafter, the lesser of

    (A)    1.500% of Effective Gross Income generated from such Owner's portion of the Project for the applicable calendar month, or

    (B)    an amount equal to (x) 1.500% of (y) CPI Effective Gross Income per Door for such year divided by 12 multiplied by (z) the number of units occupied during such month.

    (b)    Incentive Fee: The annual Incentive Fee is calculated as the earned portion (per the IPMP attached as Exhibit B) of the lesser of (A) 2.75% of Effective Gross Income for the applicable year, or (B) an amount equal to (x) 2.75% of (y) the CPI Effective Gross Income per Door for such year multiplied by (z) the number of units occupied during such year, and will be payable during the year earned as follows:

    (i)    Base Year: Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of 2.75% of Effective Gross Income generated from such Owner's portion of the Project for such quarter; provided, that after the full Base Year has occurred, the actual fee earned for the Base Year shall be determined in accordance with Exhibit B and if Manager has

11

NGEDOCS :016600.0501 810886.13
FINAL

been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

(ii)     Subsequent Years:  The same procedure shall be used as in the Base Year, except that the prior year's actual earned portion of the potential 2.75% incentive fee shall be substituted for 75% of 2.75% in the formula described in (i) above.  For example, if in 2006, Manager earns an incentive fee of 78% of 2.75% (i.e., 2.15%), then estimated payments for 2007 shall be based upon 2.15% of Effective Gross Income in lieu of 75% of 2.75% of Effective Gross Income.

15.2     ACTS OF GOD:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if an Owner engages Manager to oversee such restoration work under a separate written agreement, such Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of such Owner's insurance policy.

15.3     CONSTRUCTION MANAGEMENT SERVICES:  If an Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement.  Such Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion

15.4     FOR OTHER ITEMS OF MUTUAL AGREEMENT:  Should an Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by such Owner to Manager for such additional services.

15.5     FOR REIMBURSEMENT OF EXPENSES:  In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan (the "Reimbursable Expenses"), including, without limitation, the following:  (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; (b) third-party consulting services approved by an Owner (where an Owner requests and Manager, in its sole discretion, agrees to contract with a third party), (c) out-of-pocket travel expenses for travel related to the provisions of services (incurred at a rate not in excess of a coach or coach equivalent public rate); (d) expense of long-distance communications, and (e) expense of reproductions, postage and handling.  All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.  To the extent an expense cannot be solely attributed to the property of only one Owner, the Owners shall share such costs on an equitable basis.

SECTION 16

STRUCTURAL CHANGES

Owners expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owners other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of such Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to section 4.2 of this Agreement, and Manager shall notify such Owner appropriately.

SECTION 17

BUILDING COMPLIANCE

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or

12

NGEDOCS :016600.0501 810886.13
FINAL

regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owners promptly or forward to Owners promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Building Lease. Owners authorize Manager to disclose the ownership of the Project(s) to any such officials and agrees to indemnify and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owners, as provided under the terms and provisions of this Agreement.

## SECTION 18

## TERMINATION

18.1    TERMINATION FOR CAUSE:  Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

A.    Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable;  or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured. However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.    Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.    Default:  Each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1.    the failure of a party to pay any amounts required to be paid by it hereunder or to perform any of its obligations hereunder for a period of ten (10) days after the date on which notice of the failure has been given to the defaulting party by the other parties;

2.    the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

3.    the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

4.    the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

5.    the failure to fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of any such default for a period of ten (10) days after written notice of said failure; and

6.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

13

D.     Termination of Sublease.   By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.     Sale.   By any party, upon written notice to the others, upon the sale of all or substantially all of Owners' interest in the Project to a third party unaffiliated with Owners.

18.2     TERMINATION COMPENSATION:   Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) an Owner from Manager, if any, as a result of such termination). To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to an Owner, such sums shall be payable from the operating accounts. Any amounts due in excess of the funds available from an operating account shall be paid by the applicable Owner to Manager upon demand.

18.3     OWNER RESPONSIBLE FOR PAYMENTS:   Upon termination of or withdrawal from this Agreement, each Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of such Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by such Owner. In addition, such Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on such Owner's behalf under this Agreement.

18.4     ACCOUNTS; UNPAID BILLS:   Manager shall deliver to each Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due such Owner and tenant security deposits which were held by Manager with respect to the Owner's portion of the Project, as well as a final accounting reflecting the balance of income and expenses with respect to such Owner's portion of the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers and documents which pertain to the Project. Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to the applicable Owner.

18.5     FINAL ACCOUNTING:   Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Owner's portion of the Project are deemed to be the property of the Owner, they are to be delivered to such Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager. Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law. Each Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to such Owner's portion of the Project.

18.6     NON-INTERFERENCE WITH MANAGER'S BUSINESS:   Each Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, such Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business. Each Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement. Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from such Owner.

18.7     WRITTEN DIRECTION.   A direction or consent of Clark Manager Monterey Bay LLC (the Managing member of Development Owner) on behalf of Development Owner shall be deemed the direction or consent of Development Owner hereunder and Agent may rely on such direction or consent as the act of Owner.

SECTION 19

REPRESENTATIONS

19.1     OWNER'S REPRESENTATIONS AND WARRANTIES:   Each Owner represents and warrants as follows: (a) such Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so; (b) there are no written or oral agreements affecting the occupancy of such Owner's portion of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager; (c) all permits for the operation of such Owner's portion of the Project has been secured and are current; and (d) such Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will

14

affect the operation of such Owner's portion of the Project; (e) if such Owner requests Manager to enter any agreements for the benefit of third parties such Owner hereby agrees to fully indemnify Manager for all claims arising from such Agreements.

19.2 MANAGER'S REPRESENTATIONS AND WARRANTIES: Manager represents and warrants as follows: (a) the officers of Manager have the full power and authority to enter into this Agreement; (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

19.3 ESTOPPEL CERTIFICATE. Manager and each Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

## SECTION 20

## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

## FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

## SECTION 22

## COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owners and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owners and Manager relating to the Project covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owners and Manager. Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owners and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

## SECTION 23

## RIGHTS CUMULATIVE; NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such

15

right or remedy with respect to subsequent defaults.  Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

## SECTION 24

## APPLICABLE LAW AND LITIGATION

24.1     INTERPRETATION:  The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project.  If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owners.

24.2     LITIGATION:  In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

## SECTION 25

## NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as each Owner and Manager individually may specify hereafter in writing:

MANAGER:                       AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.
                               Pier 70
                               2801 Alaskan Way, Suite 200
                               Seattle, Washington 98121

DEVELOPMENT OWNER: MONTEREY BAY MILITARY COMMUNITIES, LLC
                               Attention:  Douglas R. Sandor
                               Two Bethesda Metro Center
                               Suite 250
                               Bethesda, Maryland  20814

WITH A COPY TO:                CLARK ENTERPRISES, INC.
                               Rebecca Owen, Esq.
                               General Counsel
                               7500 Old Georgetown Road
                               15th Floor
                               Bethesda, Maryland  20814

SUBSIDIARY OWNER:              MBMH SUBSIDIARY, LLC
                               Attention:  Douglas R. Sandor
                               Two Bethesda Metro Center
                               Suite 250
                               Bethesda, Maryland  20814

WITH A COPY TO:                CLARK ENTERPRISES, INC.
                               Rebecca Owen, Esq.
                               General Counsel
                               7500 Old Georgetown Road
                               15th Floor
                               Bethesda, Maryland  20814

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office.  Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law.  For purposes of this Agreement, notices shall be deemed to

16

NGEDOCS :016600.0501 810886.13
FINAL

have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

### SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

### SECTION 27

### LIABILITY

The obligations of Development Owner and Subsidiary Owner hereunder shall be several and not joint. administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**MONTEREY BAY MILITARY HOUSING, LLC,** a Delaware limited liability company

By:     Clark Pinnacle Monterey Bay LLC, a California limited liability company, Manager

    By:     Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

        By:

        Name:

        Title:     Manager

    By:     CEI Realty, Inc., a D.C. corporation, Manager

        By:

        Lawrence C. Nussdorf, President

    By:     Pinnacle Monterey LLC, a Washington limited liability company, Manager

        By:

        Name:

        Title:

**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington limited liability company

By:

Stan Harrelson
President and CEO

**MBMH SUBSIDIARY, LLC**, a Delaware limited liability company

By:    Clark Pinnacle Monterey Bay LLC, a California limited liability
company, Manager

        By:    Clark Realty Capital, L.L.C., a Delaware limited liability
company, Manager

                By:   _____

                Name: _____

                Title:   Manager

        By:    CEI Realty, Inc., a D.C. corporation, Manager

                By:   _____
                         Lawrence C. Nussdorf, President

        By:    Pinnacle Monterey LLC, a Washington limited liability
company, Manager

                By:   _____
                     Stan Harrelson
                     Managing Member

18

## Exhibit A

To the extent approved herein and authorized by Owner in the Approved Budget.  The following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

Benefits Administration for site staff:                                                    2% of related payroll

      Insurance Premiums (medical, dental, vision, LTD, Life)
      Broker's Fees
      Claims handling expenses
      COBRA administration
      401K Plan administration

Copies                                                                                      As incurred

Long Distance Charges                                                                       As incurred

Management Fee:                                                                             See Section 15

Postage/Overnight:                                                                          As incurred

Worker's Compensation Insurance:                                                            Fees rolled into budgeted rate
                                                                                            per Plan

      Insurance Premiums
      Broker's Fees
      Claims handling expense

19

**Exhibit B**

INCENTIVE PERFORMANCE MANAGEMENT PLAN

**A. Objectives**

The focus is always on the importance of quality family housing. The Performance Incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement. The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings are rewarded with an increased performance pay schedule. The rewards will be quantified through written feedback from the residents.

**B. Measurement Criteria**

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Gross Rental Collections for the managed assignment. Achievement of the management incentive fee is to be based on Customer Satisfaction. The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

**Subjective Survey**

Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs.

The Monterey Bay Military Housing, LLC, (MBMH) on behalf of the partnership, will retain a third-party firm to evaluate the performance of the Property Manager. The RCI Deputy Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix. The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below. As an example: if 100 persons were surveyed and the results were as indicated in the table below the average would be 69.5.

| Grade | # Responses | Value | Total |
|---|---|---|---|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 20 | 5 | 100 |
| | 15 | 4 | 60 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 110 | | 69.50 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Deputy Director prior to dissemination. The firm will attempt to elicit survey participation by all of the current residents. The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm. The results will be provided to the MBMH, LLC and the RCI Office who will compare them to benchmarked objectives. These results will account

20

for thirty-five percent (35%) of the incentive determination. The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | |
|---|---|---|---|---|
| | | | | Superior |
| During IDP | 0 – 14<br>0% | 15 – 49<br>25% | 50 – 74<br>30% | 75 +<br>35% |
| Post-IDP | 0 – 24<br>0% | 25 – 49<br>25% | 50 – 84<br>30% | 85 +<br>35% |

### Objective Reports

Property Management goals for effective and timely maintenance, turning vacated homes and limiting moves are critical to the success of the Property Management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall Objective component will account for thirty-five percent (35%) of the total potential incentive. Property Management reporting systems will generate results based upon the following individual components:

I). Maintenance Response Time by level of urgency (15% of total incentive during IDP; 20% post IDP; each of the three service request areas will be weighted as follows; Routine = 5% of total incentive during IDP; 5% post IDP – Urgent = 5% of total incentive during IDP; 5% post IDP – Emergency = 5% of total incentive during IDP; 10% post IDP – Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine", "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour. Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours. Routine request will be responded to within 72 hours. See below chart for measurement criteria. Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan. The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| Routine | | | | |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 3% | 4% | 5% |
| Routine Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
| Urgent | | | | |

|  |  |  |  |  |
|---|---|---|---|---|
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0%0% | 3% | 4% | 5% |
| Urgent Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |
|  |  |  |  |  |
| Emergency |  |  |  |  |
| During IDP | 0% | 3% | 4% | 5% |
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-62% | 63-89% | 90% + |

2) Resident Satisfaction Cards (5% of Total Incentive ) – Cards left by maintenance personnel after completion of work orders indicate level of satisfaction by the customer. The survey card will use a numerical value of 1 (being the lowest) and 10 (being the highest) as indicated in the example under the Subjective Report section of the Incentive Plan. Those results will be averaged in similar fashion to the Subjective Survey responses and applied to the following scale. The format and content of satisfaction cards will receive prior approval from the RCI Deputy Director.

| Resident Satisfaction Cards | Poor 0 – 14% | Average 15 – 49% | Above Average 50 – 74% | Superior 75% + |
|---|---|---|---|---|
|  | 0% | 3% | 4% | 5% |

3) Unit Turn Report (5% of Total Incentive during IDP; 10% post IDP) – Tracked time from the last date of occupancy to the date ready for occupancy. Standard turn time for a unit to be made ready to rent is 3 to 5 business days (business days are Monday through Saturday). The determination of awards under this portion of the Incentive Plan shall be based upon unit turn performance of each individual unit as a fractional interest of the potential incentive. As an example if there were one hundred units turned in a given year each unit would represent $1/100^{th}$ of the total potential incentive. The amount of the fractional interest earned would be subject to the Unit Turn Chart below. Standard turn time measures the elapsed time within which the interior of a housing unit can be moderately repaired and cleaned for occupancy. The Manager reserves the right, subject to concurrence by the RCI Director, to determine a housing unit to be "off line" or in some other way to be so damaged that it will not be included in the unit turn measurement outlined under this Incentive Plan. Additionally no Historic units will be included in the measurement of this portion of the Incentive Plan

| Unit Turn Chart | <=5     Business Days | 6 Business Days | 7 Business Days | >7 Business Days |
|---|---|---|---|---|
| During IDP | 100% | 75% | 50% | 0% |
| Post-IDP | 100% | 75% | 50% | 0% |

4) Frequency of Moves (10% of Total Incentive during IDP; 0% post IDP) – This component will track the frequency of cases where households are required to move more than one time during the IDP. Nothing

22

in this section of the Incentive Plan shall include households for whom relocation is voluntary or for whom relocation is forced due to the habitability of a housing unit.

For those households who are required to relocate two times, that/those incident(s) will be multiplied by four (4) and divided by the total number of non-voluntary or non-forced relocations during the year to arrive at the appropriate reduction in Frequency of Moves Incentive Fee. As an example, if three households are required to relocate twice out of one hundred households the resultant Incentive Fee for Frequency of Moves will be reduced by 12%, (3 x 4 +100 = .12).

Also, for each household required to relocate more than two times, that/those incident(s) will result in a 3.3% reduction in the calculation of the Incentive Fee for Frequency of Moves. As an example, if two households are required to relocate three times, the available Incentive for Frequency of Moves would be reduced from 10% to 3.4%, (.10 - (2 x .03.3)).

Nothing herein shall prevent the Manager from soliciting an exception from the RCI Deputy Director based upon special circumstances and (if agreed to in writing) the RCI Deputy Director from allowing multiple moves in special circumstances and from having those moves excluded from this measurement. Additionally and to the extent required, major phasing plans which might have an adverse effect on our ability to eliminate additional household movement will be excluded from this Incentive Plan to the extent the RCI Deputy Director so approves and authorizes the proposed phasing plan.

The tabulated results represented in these year-end reports will be compared to the benchmark standard established herein as well as the results of the prior year.

Reporting and Operations

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of total incentive and will be further broken down as follows:

1.  Monthly Reporting - (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. . With each monthly report counting, as 1/12th of the award payment of this incentive will only be allowed if the monthly report to the venture is on time. As an example: if eleven months out of twelve were delivered on time the incentive award would be 9.17 (11/12=.917 x 10% = 9.17%.

    In the event the venture asks that reporting be held open for any reason that particular monthly reporting would be counted as on time.

2.  Annual Budgets (10% of Total Incentive) – Realization of this component of the Incentive Plan will be assessed by the timelines of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year,. This is a "pass/fail" Incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

    In the event the venture asks that the Annual Plan and Budget be delayed for any reason that reporting requirement would be counted as on time.

3.  Operations (10% of Total Incentive) – The Clark Manager Asset Manager will prepare an Annual Assessment of management operations which will include administrative and maintenance criteria's as well as conformance to budget and plan. This in depth analysis will be formulated in the same manner as the Resident Survey in that each area/item will be graded on a sliding scale of 1 (being the lowest) to 10 (being the highest). The overall score on the analysis will result in a percentage, which will be applied to the total possible incentive for this category. As an example: if the resultant score of the Asset Managers Annual Analysis were to be a seventy five percent grade then the Manager would be paid seventy-five percent (75%) of ten percent (10%) or seven and one half percent (7,5%).

    The results of this analysis will be shared between the Asset Manager and the Manager and used as a basis for refining the Manager's response to areas in need of improvement.

23

NGEDOCS :016600.0501 810886.13
FINAL

### C. Quality Assurance Plan and Reporting Requirements

#### Base Year Benchmarks

Monterey Bay Military Housing, LLC and the Property Management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective and reporting and operations reports maintained by Manager and reviewed by the RCI Staff and Deputy Director.

#### Determining the Incentive

At the end of the initial twelve month anniversary of Property Management contract commencement and at the end of each year thereafter through the end of the management assignment, the MBMH, LLC managing member will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the subjective surveys and objective reports will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the two criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by the MBMH, LLC no later than thirty days following the end of the anniversary date. Once approved, the MBMH, LLC managing member will authorize payment of the incentive to Manager within fifteen days or no later than forty-five days following the anniversary date of the management contract.

The Incentive Plan amount is to be assessed against Gross Rent Collections for the twelve-month period ending on the anniversary date of the management contract commencement.

#### Unsatisfactory Results

It is Manager's goal to provide "Quality Service" and while achievement of a 100% rating may be difficult, it will guide Manager's planning. Where results indicate a need for improvement, we will formally address with the staff and create an Action Plan as needed. Manager will establish a contingency plan for improving unsatisfactory customer service responses. The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Manager.

#### Aligned Objectives

It is planned that site level staff incentives will be tied to the same criteria as the management company. While the Community Director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal Management Plan and Objective Meeting at the beginning of the year. Results will be discussed throughout the year so that corrective action can be made where needed.

NGEDOCS :016600.0501 810886.13
FINAL

# EXHIBIT 5

## PROPERTY MANAGEMENT AGREEMENT

THIS AGREEMENT is made and entered into this 1st day of March, 2004, by and between CALIFORNIA MILITARY COMMUNITIES LLC, a Delaware limited liability company (hereinafter referred to as "OWNER"), and AMERICAN MANAGEMENT SERVICES CALIFORNIA INC., a Washington corporation (hereinafter referred to as "Manager" or "Property Manager").

### PREAMBLE

The property to be managed under this Agreement (the "Project") is known as portions of Fort Irwin, Moffett Community Housing Area and Parks Reserve Forces Training Area and is located in San Bernardino County, California, Santa Clara County, California, and Alameda County, California, consisting of (i) the land (the "Land"), as further described in that certain Ground Lease of even date herewith by and between the United States of America, acting by and through the Secretary of the Army (the "Secretary"), as lessor, and Fort Irwin Land LLC, as lessee (the "Ground Lease"), as subleased pursuant to that certain Sublease and Lease of even date herewith by and between Fort Irwin Land LLC (as sublessor) and Owner (as sublessee) (the "Sublease"); and (ii) improvements ("Improvements") located on the Project and leased by Owner pursuant to the Sublease.

### SECTION 1

### APPOINTMENT OF MANAGING AGENT

1.1    APPOINTMENT AND ACCEPTANCE: Owner hereby engages Manager as its sole and exclusive property manager to lease and manage the Project and improvements thereon owned or leased by it from time to time described in the preamble upon the terms and conditions provided herein. Manager accepts the engagement and agrees to furnish the services of its organization in accordance with the terms and provisions contained herein. Notwithstanding the foregoing, Manager shall not (a) take any action which is a "Major Decision" as defined in any of the Sublease, or Limited Liability Company Agreement of Owner or (b) any action which would cause Owner to be in default under the Sublease.

1.2    TERM: The initial term of this Agreement shall be for the period of the Ground Lease commencing on the 1st day of March, 2004, subject to the other provisions of this Agreement.

1.3    MANAGEMENT OFFICE: Owner shall pay all reasonable expenses related to the management office maintained by the Manager, exclusively for the use of Manager to conduct the business of the management of the Project, as provided in the Plan (defined below), including, but not limited to, furnishings, equipment, postage, office supplies, electricity, other utilities and telephone services. All vehicles used by Manager and its employees, agents and contractors shall comply with policies promulgated by the Secretary of the Army from time to time, provided Owner shall give Manager prior written notice of any changes in such policies.

1.4    OMITTED

1.5    BUDGET AND BUSINESS PLAN: Owner and Manager will establish a budget and business plan for operation and management of the Project (the "Plan"). The Plan shall act as a general guide for the management of the Project by Manager, and shall be updated and revised from time to time to reflect changes in conditions and actual Project operation. Any expenditure in excess of $25,000.00 not specifically set forth in the Plan shall require Owner's advance approval, except as provided in Section 4.2 hereof. Owner agrees that the Plan is a budgeting tool only and does not constitute a guarantee of actual operating performance. The Plan shall include, at a minimum, the following:

A.    Minimum Leasing Guidelines established by Owner setting forth target rental rates and premiums for each unit type and amenity package, together with maximum leasing incentive allowances for promotional purposes. Manager acknowledges that rental rates to certain occupants will be subject to the then applicable Basic Allowance for Housing rates.

B.    Capital Improvement Plan: Owner and Manager may set forth a plan for implementing initial capital improvements to upgrade the rental units and correct maintenance items addressed

NGEDOCS :016600.0504 973807.8

during Owner's and Manager's pre-acquisition inspection of the property (if applicable). Manager shall be responsible for obtaining bids, coordinating and scheduling the work at the property. A minimum of three (3) complete bids will be obtained for each capital improvement plan line item of more than $25,000.

## SECTION 2

### BANK ACCOUNTS

2.1    BANK ACCOUNTS: Manager is authorized to establish one or more operating trust accounts and security deposit trust accounts for the Project. Operating trust accounts are hereinafter referred to as "operating accounts". All other accounts are hereinafter referred to as "trust accounts". Manager shall deposit into the trust accounts all security and other deposits made by tenants, unless directed otherwise by Owner. All other funds shall be placed in an operating account for Owner. All trust accounts shall be operated in conformance with state law. Manager shall designate one or more bonded Manager employees who shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Manager. All bank accounts shall be established at such banks or other institutions whose deposits are insured by the federal government. All such depository banks shall be selected by Manager and shall be satisfactory to Owner. Manager shall not be liable to Owner in the event of bankruptcy or failure of a depository institution. Manager shall open the above-described accounts in a nation-wide bank used by the majority of Manager's clients unless directed otherwise by Owner. Notwithstanding the foregoing, Manager shall comply with any cash management procedure required by any loan documents affecting the Project.

2.2    REMITTANCES. Notwithstanding Section 2.1 above, during any period that the Project is subject to that certain Deed of Trust dated March 1, 2004 ("Deed of Trust") between Owner and Fort Irwin Land LLC, the Manager shall deposit with the "Servicer," as defined in the Loan Agreement (defined below), all Effective Gross Income (defined below), casualty and condemnation proceeds in excess of $2,000,000 per event, tax refunds and other receipts from the portion of the Project subject to the Deed of Trust, except for any amounts delivered by such Servicer to Manager for use on behalf of Owner.

2.3    INITIAL DEPOSIT FOR RESERVES: Immediately upon commencement of this Agreement, Owner shall remit to Manager a sum to be deposited in Owner's operating account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement, plus an adequate contingency reserve. Owner agrees to maintain such contingency reserve at all times in the operating account so as to enable Manager to pay the obligations of Owner under this Agreement as they become due. Owner and Manager shall review the amount of the contingency reserve from time to time and shall agree in writing upon a new contingency reserve when such is required.

2.4    MANAGER'S OBLIGATION TO ADVANCE PAYMENTS: All purchases and other obligations incurred in connection with the operation of the Project shall be the sole cost and expense of Owner. All such purchases shall be made by Manager solely on behalf of Owner and not as a principal. Manager shall be under no duty to utilize or apply Manager's own funds for the payment of any such debt or obligation. In the event that there are insufficient funds in Owner's operating account, Manager may, after notifying Owner, advance its own funds for such purpose, in which event Owner shall promptly repay to Manager all such sums expended.

2.5    INTEREST ON TRUST ACCOUNTS: Where permitted by law, and where feasible, Manager shall deposit trust funds into interest-bearing accounts at Owner's request. All interest earned on such funds shall belong to Owner, except where state law requires interest earned on security deposits to be paid to a tenant and shall not be considered part of "gross receipts" of the property as hereinafter defined.

2.6    OTHER. Notwithstanding anything herein to the contrary, Manager shall not (i) commingle funds of Owner with its funds or the funds of any third party, (ii) hold itself out as Owner of the Project, (iii) guaranty or hold itself out as liable for any debts or obligations of Owner, (iv) hold Owner out as liable for Manager's debts or the debts of any third party, or (v) pay the Manager's non-reimbursable expenses or the expenses of any third party from Owner's funds.

## SECTION 3

### COLLECTION OF RENTS AND OTHER RECEIPTS

2

3.1     AUTHORITY OF MANAGER: Manager shall collect (and give receipts for, if necessary) all rents, charges and other amounts received in connection with the management and operation of the Project. All security deposits (excluding non-reimbursable cleaning fees and the like) shall be deposited into the trust accounts described in Section 2.1 above. All other receipts shall be deposited into the applicable operating account. Under no circumstances shall Manager be liable to Owner for any uncollected rents, other income or bad debt resulting from operations, except those matters covered by Section 11.5 herein.

3.2     SPECIAL CHARGES: Manager shall deposit into the operating account charges paid by tenants for the late payment of rent, returned or non-negotiable checks, and other similar payments.

## SECTION 4

### DISBURSEMENT FROM OPERATING ACCOUNTS

4.1     OPERATING EXPENSES: From Owner's operating account, and subject to Exhibit A, Manager is authorized to pay or to reimburse Manager for all expenses and costs of operating the Project in the Plan and for all other sums due Manager under this Agreement, including Manager's compensation which is described and set forth in Section 15 hereof, in accordance with the Plan. Owner has sole responsibility for the timely payment of all authorized expenses of the Project, including all payments of fees to Manager consistent with the schedule of fees set forth on Exhibit A.

4.2     EXTRAORDINARY EXPENSES:   Unless specifically provided for in the Plan, no single expenditure made for general maintenance or one-time contract service in excess of $25,000.00 shall be allowable without prior written approval of Owner.  Owner may request written bids for any expenditures over $10,000.00. Manager is required to submit a minimum of three (3) written bids for all expenditures over $25,000.00. However, in the event of an emergency, Owner authorizes Manager to authorize any reasonable expenditure which is necessary or required because of danger to life or property, or which is immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or if required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal, state, or local laws, regulations, or ordinances. Manager shall, however, before the end of the next business day, notify Owner in detail, concerning such expenditures.

4.3     AUTHORITY OF OWNER FOR MANAGER TO PAY CERTAIN EXPENSES: Manager shall pay from Owner's operating account, in accordance with the Plan or as otherwise directed by Owner, and to the extent not paid pursuant to any account established pursuant to a loan affecting the Project, all utility and maintenance charges;  all premiums for liability and casualty insurance; all other operating and rental expenses set forth herein; postage, copying, long distance charges and other expenses that are directly associated with the property (whether incurred on-site or otherwise); the costs and expense of uniforms for employees (where applicable) and the costs and expenses directly associated with the training of Project employees.

4.4     EXPENSES TO BE PAID DIRECTLY BY OWNER:  In addition to income taxes and gross receipt taxes (if any) incurred as a result of the operation of the Project, Owner shall pay directly the following: all real property taxes and assessments, all payments upon underlying secured real property debt, and Manager's fees relating to its property.

4.5     FEES FOR LEGAL ADVICE:  Owner shall pay reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Project, including the defense of vendor suits or other claims made against the Project or Manager relating to its activities as agent for Owner, or activities related to the operation of the Project within the budget established in the Plan except in the event of a successful claim by Owner against Manager.  Manager shall notify Owner if legal services are anticipated to exceed the amounts set forth in the Plan.  If any expenditure for legal services also benefits others for whom Manager acts as a property manager, Owner's obligation shall be limited to Owner's pro rata portion of such expense for legal services.  Provided, however, that nothing contained in this Section shall obligate Owner to pay Manager's legal fees in the event Manager is adjudged to have engaged in fraud or misconduct relating to the allegations of the dispute.

4.6     NET PROCEEDS:  To the extent that funds are available, and after maintaining a cash contingency reserve amount as specified in Section 2.3, Manager shall transmit net cash proceeds relating to the Project to Owner at least monthly at a time specified by Owner.  Such periodic cash payments shall be remitted to J.P. Morgan Trust Company, National Association, as escrow agent.

4.7     PRIORITY OF PAYMENT:  Should collected funds (excluding security deposits deposited into trust accounts) be insufficient to satisfy the current debts and obligations of the Project, such debts and obligations shall

3

be paid in the following order: Project payroll, including all related administrative charges and expenses; expenses due Manager; charges by utility companies (including, but not limited to, gas electric, water, sewer, garbage and cable television); other required payments, including payments to reserve accounts. Where the terms of any loan security agreement with Owner conflict with the terms of this Section, the terms of such loan security agreement shall control, provided, Owner has notified Manager of the existence of any such condition.

## SECTION 5

## FINANCIAL AND OTHER REPORTS

5.1    REPORTS:  By the 10th business day of each month, Manager shall furnish to Owner a statement of receipts and disbursements from the operation of the Project during the prior calendar or fiscal month.  In addition, Manager shall, on a mutually acceptable schedule and at Owner's request, prepare and submit to Owner such other reports as Owner shall specify, including, but not limited to the following:

           a.)    Weekly occupancy, leasing status and traffic reports.
           b.)    Monthly market comparable rent survey.
           c.)    Monthly bank reconciliation.

In addition, Manager will furnish to Owner:

Within one hundred twenty (120) days after the end of each fiscal year, a statement of income and expenses for operation of the Project by Owner for that fiscal year, a statement of changes in financial position of Owner for that fiscal year and, when requested by Owner's mortgagee, a balance sheet showing all assets and liabilities of Owner relating to the Project as of the end of that fiscal year, all audited at Owner's expense by an independent certified public accountant reasonably acceptable to Owner's mortgagee.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a rent schedule for the Project showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information reasonably requested by Owner.

Within one hundred twenty (120) days after the end of each fiscal year, and at any other time upon Owner's mortgagee's request no more frequently than quarterly, a statement that identifies all owners of any interest in Owner and any Controlling Entity and the interest held by each, and if Owner or a Controlling Entity is a corporation, all officers and directors of Owner's mortgagee and the Controlling Entity, as applicable, and if Owner or a Controlling Entity is a limited liability company, all managers who are not members.

Within one hundred twenty (120) days after the end of each month, unaudited monthly statements setting forth all Net Operating Income (as defined in the Loan Agreement) and operating expenses for such month and a calculation of the Debt Service Coverage Ratio (as defined in the Loan Agreement).

Without limitation to the foregoing, all income and expense reports shall provide separate accounting for the senior unaccompanied housing (SUH) units from all other Improvements within the Project, with such operating expense reports relating to the SUH units excluding reference to debt service payments and payments of rent under the Sublease.  Where practicable, expenses incurred with respect to the entire Project may be reasonably allocated between the SUH units and the remainder of the Project.

For purposes hereof, "**Loan Agreement**" means that certain Construction Loan Agreement of even date herewith between Fort Irwin Land LLC, as lender, and Owner, as borrower.

"**Controlling Entity**" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or more than 50% of the limited partnership interests in Owner (if Owner is a partnership or joint venture), (B) a managing member's or manager's interest in Owner or more than 50% of ownership or membership interests in Owner (if Owner is a limited liability company), or (C) more than 50% of any class of voting stock of Owner (if Owner is a corporation).

5.2    OWNER'S RIGHT TO AUDIT:  Owner shall have the right to perform periodic audits of all applicable accounts managed by Manager and the cost of such audits shall be paid by Owner, as an expense of Owner. Such audits may be made during normal business hours posted at the Project.

4

NGEDOC'S:016600.0504 973807.8

## SECTION 6

### ADVERTISING

6.1     ADVERTISING:  The cost of advertising shall be paid out of Owner's operating account, in accordance with the advertising budget or as approved by Owner.  All advertising shall make clear that Manager is the manager and is not Owner of the Project.

## SECTION 7

### LEASING AND RENTING

7.1     MANAGER'S AUTHORITY TO LEASE PROJECT: Manager shall use its best efforts to keep the Project rented by procuring tenants for the Project in accordance with the provisions of the Sublease, and the Plan. Manager is authorized to negotiate, prepare and execute all rental agreements, including all renewals and extensions of rental agreements, and to cancel and modify existing rental agreements subject to the Plan. Manager shall execute all rental agreements as agent for Owner.  All costs of leasing shall be paid out of Owner's operating account, in accordance with the leasing budget or as approved by Owner.  No rental agreement shall be for a period in excess of one (1) year without the written approval of Owner. The form of the rental agreement shall be provided by Owner.

Manager shall not execute any lease for any material portion of the Project for non-residential use except with the written consent of Owner's mortgagee (or without Owner's written certification that such consent is deemed received under the applicable loan documents).  Unless otherwise required by the Ground Lease or the Sublease, Manager will not execute any instrument which shall modify in any material respect the terms of, or extend or, except as the result of default by the tenant thereunder, terminate, any Lease for non-residential use as to which such mortgagee's consent thereto is required by the preceding sentence without the prior written consent of such mortgagee. Manager shall not execute any non-residential Leases, including extensions or renewals of existing Leases, entered into after the date hereof, unless such Lease shall specifically provide that (1) such Lease is subordinate to the lien of the deed of trust then encumbering the Project, (2) the tenant shall (subject to appropriate terms for non-disturbance) attorn to the mortgagee and any purchaser at a foreclosure sale, such attornment to be self-executing and effective upon acquisition of title to the Project by any purchaser at a foreclosure sale or by such mortgagee in any manner; (3) the tenant agrees to execute such further evidences of attornment as such mortgagee or any purchaser at a foreclosure sale reasonably may from time to time request; (4) the Lease shall not be terminated by foreclosure or any other transfer of the Project; and (5) the tenant shall, upon receipt after the occurrence and during the continuance of an event of default under the deed of trust of a written request from the mortgagee, pay all rents payable under the Lease to the mortgagee.

Manager will not permit Owner to receive or accept rent under any Lease (whether residential or non-residential) for more than one month in advance.

7.2     NO OTHER RENTAL AGENT:  During the term of this Agreement, Owner shall not authorize any other person, firm or corporation to negotiate or act as leasing or rental agent with respect to any leases for commercial or residential space in the Project.  Owner agrees to promptly forward all inquiries about leases or rental agreements to Manager.

7.3     RENTAL RATES:  In accordance with the provisions of the Plan or as otherwise directed by Owner, Manager shall establish and set or revise all rents, fees or other deposits, and all other charges chargeable with respect to the Project.  As authorized in writing by Owner, Manager may promote the occupancy of the Project by granting rental concessions and other promotional bonuses to prospective and current tenants.

7.4     ENFORCEMENT OF RENTAL AGREEMENTS: Subject to any conditions or limitations imposed by Owner, Manager is authorized to institute and defend, in Owner's name, all legal actions or proceedings for the enforcement of any rental term, for the collection of rent or other income due to the Project, or for the eviction or dispossession of tenants or other persons from the Project and matters relating thereto.  Manager is authorized to sign and serve such notices as Manager and Owner deem necessary for the enforcement of rental agreements, including the collection of rent and other income.  Manager may settle, compromise and release such legal actions or suits or to reinstate such tenancies without the prior consent of Owner, if such settlement, compromise, or release shall involve an amount in controversy of One Thousand Dollars ($1,000), or less.  Where the amount in controversy is in excess of One Thousand Dollars ($1,000), Manager shall first obtain the written authorization of Owner before entering into any compromise, settlement, or release of such legal action.  Any moneys for such settlements paid out by Manager shall be an operating expense of the Project.  Reasonable attorney's fees, filing fees, court costs and other necessary expenditures incurred in the connection with such action shall be paid out of the applicable Project operating account or

5

NGEDOCS:016600.0504 973807.8

shall be reimbursed directly to Manager by Owner. All funds recovered by tenants shall be deposited into a Project operating account. Unless otherwise directed by Owner, Manager may select the attorney or attorneys to handle any and all such litigation. Absent a finding of gross negligence or misconduct by Manager employees, Owner shall be responsible for all claims, damages and legal expenses relating to the lease or other housing statutes, whether brought against Owner or Manager as the agent of Owner.

## SECTION 8

## EMPLOYEES

8.1   MANAGER'S AUTHORITY TO HIRE: Manager is authorized to hire, supervise, discharge and pay all personnel reasonably necessary to be employed in the management, maintenance and operation of the Project so long as all payroll and related expenditures for such personnel are within the Plan guidelines. All Manager employees performing services either directly or indirectly for the Project shall be deemed to be employees of Manager and not the Project.

8.2   OWNER TO REIMBURSE EMPLOYEE EXPENSES: All wages, fringe benefits, and all other forms of compensation payable to, or for the benefit of, Manager employees working for the Project (both on-site and off-site) including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc.; and all local, state and federal taxes and assessments (including, but not limited to, payments to and administration of fringe benefits, employee benefits insurance program, Worker's Compensation, Social Security taxes and Unemployment Insurance) incident to the employment of all such personnel and their direct training, shall be treated as an operating expense of the Project and shall be paid by Manager from Owner's funds, from the Project operating accounts subject to the Plan and allocated equitably between Owner. In addition, Manager shall accrue for all vacation pay due employees working for the Project (both on-site and off-site) and provide a quarterly reconciliation to Owner of all such payments. Such payments shall also include all awards of back pay and overtime compensation that may be awarded to any employee in any legal proceeding, or in settlement of any action or claim that has been asserted by any such employee for worked performed for or in connection with the Project.

8.3   MANAGER'S RESPONSIBILITY TO FILE RETURNS: Manager shall do and perform all acts required of an employer and shall execute and file all tax and other returns required under the applicable federal, state and local laws, regulations and/or ordinances governing employment, and all other statements and reports pertaining to labor employed in connection with the Project and under any similar federal or state law now or hereafter in force. The costs for any preparing such filings shall be a Project expense. In connection with such filings, Owner shall, upon request, promptly execute and deliver to Manager all necessary powers of attorney, notices of appointment and the like. Owner shall be responsible for all amounts required to be paid under the foregoing laws, and Manager shall pay the same from the operating account.

## SECTION 9

## OPERATIONS, MAINTENANCE AND REPAIR

9.1   PERFORMANCE OF REPAIRS: Manager is authorized to make or cause to be made, and shall cause to be made, through Manager's employees, or through contracted services, all ordinary repairs and replacements required to be made by Owner under the Sublease and any loan documents affecting the Project, and all alterations required to comply with rental agreement requirements, government regulations or insurance requirements. In accordance with the Plan or as otherwise directed by Owner, Manager is also authorized to decorate the Project and the individual apartment units and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms and other items necessary for the management, maintenance or operation of the Project. Such maintenance and decorating expenses shall be paid out of the operating accounts. Manager has national contracts with certain vendors to provide goods and services to projects such as the one covered by this Agreement. Manager selects these national vendors in order to receive volume-pricing discounts for the benefit of Owner. If Owner selects a vendor for use on the Project, Owner shall indemnify and hold Manager harmless from any and all damages that arise from the use of such vendor.

9.2   FEES FOR WORK PERFORMED BY MANAGER'S EMPLOYEES: With Owner's prior approval, Manager may cause repairs and replacement work to be performed by employees for Owner. Owner shall pay to Manager a reasonable fee for such services based upon the then current hourly charges made and assessed by Manager for the performance of such services. Such charges shall be approximately equal to Manager's direct and indirect expenses associated with the employment of such person. Such charges shall be reasonable and shall not be

6

more than charges made by qualified independent contractors performing similar work, under similar circumstances, in the same geographical area as the Project.

9.3     CONTRACTS, UTILITIES AND SERVICES:  Manager is authorized to negotiate contracts for non-recurring items of expense. not to exceed $5,000.00. Manager shall enter into agreements for all necessary repairs. maintenance. minor alterations, and utility services. and make contracts on Owner's behalf for electricity. gas. telephone. fuel, water and such other services required for the operation of the Project, in accordance with the Plan. All utility deposits shall be Owner's responsibility. except that Manager may pay the same from the operating accounts if directed to do so.

9.4     LIMITATIONS ON CONTRACTS:  Each such contract or agreement shall: (a) be in the name of Owner. (b) be assignable, at Owner's option, to Owner or Owner's nominee, (c) include a provision of cancellation thereof by Owner or Manager upon not more than thirty (30) days written notice (if available), and (d) shall require that all contractors provide evidence of sufficient insurance.   If this agreement is terminated pursuant to Section 18, Manager shall. at Owner's option. assign to Owner or Owner's nominee all contracts and agreements pertaining to the Project.  Manager shall then notify Owner if any such contracting entity is either a subsidiary, affiliate. or has any other relationship whatsoever to Manager.

9.5     MAINTAINING HISTORIC STATUS:  Manager shall implement Owner's responsibilities to comply with the covenants of Owner set forth in Section 27.b. of the Sublease relating to ordinary repair and maintenance of "Historic Property", provided that Owner shall provide the necessary funds for compliance with such obligations.

9.6     ENVIRONMENTAL.  Manager shall be responsible for performing on behalf of Owner such ordinary. non-capital environmental maintenance obligations as may be set forth in the Plan.

## SECTION 10

### RELATIONSHIP OF MANAGER TO OWNER

Manager is engaged independently in the business of property management and acts hereunder as an independent contractor.   Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement, or as requiring Manager to bear any portion of losses arising out of or connected with ownership or operation of the Project.  Manager shall not, at any time during the term of this Agreement, be considered to be a direct or indirect employee of Owner.  Owner agrees to assume all financial risks of operating the Project including any claims made against Manager while acting as Owner's agent within the scope of its authority as provided herein.  Except as provided herein, neither party shall have the power to bind or obligate the other party.  Except as specifically set forth in this Agreement, Manager shall not act as the agent of Owner; and, except as provided in this Agreement, Owner shall not act as the principal of Manager.  Owner, in dealing with Manager hereunder, agrees (i) to act in conformity with the restrictions, limitations. and covenants set forth in its operating agreement and (ii) not to consent to any action by Manager which would violate the restrictions, limitations, and covenants set forth in its operating agreement.

## SECTION 11

### INDEMNIFICATION AND BONDING

11.1    INDEMNIFICATION BY OWNER

A.      Indemnification for Injuries to Person and Property:  To the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liability (excluding any punitive or consequential damages) including but not limited to pollution or environmental, and all reasonable costs and expenses thereof (including, but not limited to. fines. penalties and reasonable attorney fees). for injuries or damages including economic losses. to persons. or property including, but not limited to, those relating to or arising out of the premises of the Project, or in any manner resulting from or arising out of the performance by Manager of its services under this Agreement, except for that which is caused by the fraudulent conduct, gross negligence or willful misconduct of Manager.

7

B.    Indemnification for Vendor and Tenant Claims:   Except as provided in section 11.2, to the extent not covered by insurance proceeds payable to Manager (or, in the event Manager does not provide the insurance required by Section 12 below, to the extent not covered by the proceeds which would have been payable had Manager complied with Section 12 below), Owner shall indemnify, defend and save Manager harmless from any and all claims, proceedings or liabilities, as well as all costs and expenses thereof (including reasonable attorney fees) involving an alleged or actual violation of a landlord/tenant act or an action to collect a debt by a vendor of the Project, except to the extent that such a claim, proceeding or liability resulted from the fraudulent conduct, gross negligence or willful misconduct of Manager.  Owner will immediately assume the duty to defend if any of the allegations potentially fall within this indemnity obligation.

C.    General Provisions:   Except as expressly set forth herein, nothing contained in Section 12 shall relieve Owner of its obligation under Section 11 of this Agreement.

11.2    INDEMNIFICATION BY MANAGER FOR EMPLOYMENT CLAIMS:   Subject to Paragraph 11.1, Manager shall indemnify, protect, defend and save Owner harmless from any and all claims, proceedings or liabilities relating to Manager employees, and all costs and expenses thereof (including, but not limited to, fines, penalties and reasonable attorney fees) arising out of the alleged or actual violation by Manager of labor, employment or discrimination laws.  Provided, however, this indemnity shall not be applicable where such claim, proceeding or liability resulted from the willful misconduct of Owner or if Owner has not furnished Manager with sufficient funds to perform Manager's obligations under this Agreement.

11.3    WAIVER OF CLAIMS:  Other than as provided in Section 11.2, Owner hereby waives any and all claims against Manager, including Manager's employees, agents, general partners and affiliates, for damage or injury to any property in, upon, or about the Project, including but not limited to, the premises of the Project, whether caused by peril, accident, theft or from any other cause whatsoever, other than that caused by the gross negligence or willful misconduct of Manager.

11.4    SCOPE OF INDEMNITY:   Any party's duty to indemnify any other party, as provided for in Section 11 hereof, shall include the obligation to defend the indemnified party in any such action.  All reasonable costs and expenses of such defense shall be borne by the indemnitor.  In the event the indemnitee deems it necessary or expedient to procure legal representation in such proceeding in order to protect the indemnitee's rights therein, all reasonable costs and expenses of such defense (including but not limited to reasonable attorney's fees) shall be borne by the indemnitor.  The indemnitor and its insurance carriers shall each waive any rights of subrogation which each may have.

11.5    BONDING:  Manager shall cause all personnel who handle or are responsible for the safe keeping of money or other property of Owner to be covered by a fidelity bond or applicable insurance in the minimum amount of Five Hundred Thousand Dollars ($500,000.00) with a company determined by Manager.

11.6    TERM OF INDEMNIFICATION:  The indemnification made by any party to this Agreement, for and on behalf of any other party to this Agreement, shall survive the termination of this Agreement.

## SECTION 12

## INSURANCE

12.1    INSURANCE BY PROPERTY MANAGER:  At all times during the term of this Agreement, Manager, as an expense of the Project and within the approved Plan, shall obtain and keep in force the following coverage through a Master Insurance Program, for the benefit of Owner and Manager and such additional insured as may be necessary from time to time.  Owner shall be included as named insureds on Manager's policy.  Any deductible or SIR under such insurance policy(ies) shall be the sole responsibility of Owner; provided the amount of the deductible or SIR is pre-approved by Owner.

A.    Property Insurance:  Property insurance on an "all-risk basis" (open perils), including but not limited to, full coverage for boiler machinery and pressure vessel insurance, vandalism and malicious mischief.  The amount of such insurance shall be 100% of the actual replacement cost of the building and improvements, including the costs of demolition and debris removal, all as reasonably determined by agreement of Owner and Manager.

8

B.    General Liability Insurance: Commercial General Liability Insurance through one or more primary and/or umbrella liability polices against claims for bodily injury, property damage, advertising injury and personal injury, and such policies shall provide contractual liability coverage as well. The policies shall be written on an occurrence basis with limits of not less then $1,000,000 per occurrence and $2,000,000 in the aggregate.

C.    Excess/Umbrella Liability: Excess/Umbrella liability policy, against claims for bodily injury, property damage, advertising injury, and personal injury liability with a limit of not less than $75,000,000 per occurrence. Such coverage shall be excess to the automobile liability and employer's liability coverage.

D.    Automobile Liability Insurance: Business Automobile Liability Insurance covering all vehicles used in connection with this Agreement, to insure owned and non-owned and hired automobiles, trucks and other vehicles. The policy limits shall not be less than $1,000,000 combined single limit.

E.    Named Insured: Owner shall be included named as a named insured, together with Manager, on all of the above policies for all purposes connected to this Agreement. The members and managers of Owner and such others as may be designated from time to time by Owner shall be named as additional insured. It is the intent of the parties that insurance referenced above and procured by Manager shall be primary to any, if any, insurance procured by Owner. Manager will secure endorsements to this effect from all appropriate insurers of such policies.

F.    General Provisions: All insurance shall be written with insurance companies with an A.M. Best's rating of a A:VIII or higher. All liability and auto insurance shall contain a severability of interest clause. All insurance shall provide that notice of default or cancellation shall be sent to Owner and shall require a minimum of thirty (30) days written notice to Owner prior to any cancellation of or changes to said policies. Manager agrees to provide Owner with certificates evidencing such insurance, including the additional insured endorsement, or with duplicate copies of such policies, including all endorsements, within ten (10) days of the execution of this Agreement.

12.2   PROFESSIONAL LIABILITY INSURANCE (Real Estate Errors and Omissions): Manager shall procure and maintain insurance against the misfeasance, malfeasance or nonfeasance (errors and omissions) of Manager relating to the management of the Project, with limits of not less than One Million Dollars ($1,000,000).

12.3   WORKER'S COMPENSATION /EMPLOYER LIABILITY . Manager shall procure and maintain at its sole cost and expense, all workers' compensation, employers' liability or similar insurance required by the Worker's Compensation Act (or any similar law) of the State of California with respect to its employees who are employed in connection with this Agreement and to comply with any Federal or state withholding tax, social security or unemployment laws existing or enacted in the future.

12.4   RENTER'S INSURANCE Manager shall procure and maintain at the cost and expense of Owner, such renter's insurance (property and/or liability) for the benefit of residents of the Project, as Owner shall request from time to time.

## SECTION 13

### MANAGER ASSUMES NO LIABILITY

Manager assumes no liability whatsoever for any acts or omissions of Owner or any previous owners of the Project, or any previous property managers or other agents of Owner or Manager. Manager assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any rental agreement or otherwise unless caused by gross negligence or willful misconduct of Manager. Nor does Manager assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any environmental violations or hazards discovered by Manager shall be brought to the attention of Owner in writing and Owner shall be solely responsible for such violations, hazards or claims arising from such conditions. Owner shall be solely liable for all vendor claims and tenant claims, whether made against Owner or Manager, for all acts or omissions of Manager within the scope of its agency; provided however, that Manager shall remain liable for the gross negligence or willful misconduct of its employees.

NGEDOCS :016600.0504 973807.8

## SECTION 14

### ASSIGNMENT OF RIGHTS AND OBLIGATIONS

14.1     ASSIGNMENT: Manager may, from time to time, with the prior written consent of Owner, assign its rights and obligations under the terms and provision of this Agreement to a subsidiary of Manager, which shall be duly licensed and otherwise capable of performing the services of Manager under the terms and provisions of this Agreement. Owner shall have the right to assign its rights and obligations under the terms and provisions of this Agreement at any time, without the prior written consent of the Manager, in connection with any assignment of Owner's rights under the Sublease or Building Lease, respectively.

### SECTION 15

### MANAGER'S COMPENSATION AND EXPENSES

For purposes of this Agreement, the following defined terms have the following meanings.

"Applicable Project" shall mean, as appropriate, the Irwin Project, Moffett Project or Parks Project.

"Irwin Project" shall mean the portion of the Project located within Fort Irwin, San Bernardino County, California.

"Moffett Project" shall mean the portion of the Project located within Moffett Field, Santa Clara County, California.

"Parks Project" shall mean the portion of the Project located within Parks RFTA, Alameda County, California.

"Effective Gross Income" shall mean, as to each Applicable Project for a given period of time, all rents and other income and charges from the normal operation of the Applicable Project, and any improvements thereon including, but not limited to, amounts actually collected as rents or other charges for the use and occupancy of housing units located within the Applicable Project, either received from the Basic Allowance for Housing (37 U.S.C. §403) or from a unit occupant, and from users of garage spaces (if any), leases of other non-dwelling facilities in the Applicable Project and concessionaires (if any) in respect of the Applicable Project, including, to the extent applicable, but not limited to, furniture rentals, parking fees, net laundry income, forfeited security deposits, pet deposits, application fees, lease termination fees, late charges, income from coin-operating machines, proceeds from rental interruption insurance, other fees and deposits and other miscellaneous income collected at or from the Applicable Project or the improvements thereon. Effective Gross Income shall not be deemed to include income arising out of the sale of real property or the settlement of fire or other casualty losses and items of a similar nature; provided, however, any portion of an insurance settlement that provides for loss of rents shall be considered part of Effective Gross Income.

"Initial Scope" shall mean scope of development of the Applicable Project as contemplated by that certain Construction Agreement of even date herewith by and between Owner and Clark Realty Builders, Inc., a California corporation (with respect to the Moffett Project and Parks Project) and by that certain Construction Agreement of even date herewith between Owner and The Clark Construction Group, Inc., a Maryland corporation (with respect to the Irwin Project).

"Increased Scope" shall mean any increase over the Initial Scope in the number of new residential units to be developed as part of the Applicable Project.

"Adjusted by CPI" shall mean, when modifying any number, adjusting the applicable number on January 1 of each calendar year by the change in the Applicable CPI Index from (x) the month of October in the second calendar year prior to the calendar year of adjustment to (y) the month of October in the calendar year prior to the calendar year of adjustment. For example, the adjustment to be made on January 1, 2005 would be based upon the change in the Applicable CPI Index from October 2003 to October 2004.

"Applicable CPI Index" shall mean (a) the Irwin CPI Index with respect to the Irwin Project, and (b) the Moffett/Parks CPI Index with respect to the Moffett Project and the Parks Project.

10

NGEDOCS :016600.0504 973807.8

"Irwin CPI Index" shall mean the "Consumer Price Index for All Urban Consumers. Los Angeles. Riverside. Orange County Index. Subgroup All items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency. or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area: provided, however, if the Irwin CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor, formula or table converting the Irwin CPI Index as may be published by said Bureau or agency or. in the event that no such conversion factor, formula or table is published. then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"Moffett/Parks CPI Index" shall mean the "Consumer Price Index for All Urban Consumers. San Francisco. Oakland. San Jose Index. Subgroup All items (1982-1984-100) issued by the Bureau of Labor Statistics of the United States Department of Labor or any successor agency. or any other measure thereafter employed by said Bureau or agency in lieu of such index that measures the cost of living in such metropolitan area: provided, however, if the Moffett/Parks CPI Index is hereafter converted to a different standard reference base or is otherwise revised, the determination of the percentage adjustment hereunder shall be made either with the use of such conversion factor. formula or table converting the Moffett/Parks CPI Index as may be published by said Bureau or agency or, in the event that no such conversion factor, formula or table is published. then by Owner using such other index as is then generally recognized and accepted for similar determinations of purchasing power.

"Base Year" shall mean with respect to each Applicable Project the then most recently completed calendar year preceding an Adjustment Date whenever an adjustment is made to the calculation of the applicable CPI Effective Gross Income per Door.

"Unit Days Occupied" shall mean with respect to any period and any Applicable Project the sum total of the number of housing units within such Applicable Project which are occupied each day within such period.  By way of example. if the Irwin Project has 2028 units in any given 30-day month. and 1900 of such units were occupied during each of the first 15 days of such month and 2000 of such units were occupied during each of the final 15 days of such month. then the total Unit Days Occupied with respect to such month would be calculated as follows: (1900 x 15) + (2000 x 15) = 58,500 Unit Days Occupied.

"Occupied Units" shall mean with respect to any period and any Applicable Project the quotient of (i) the total Unit Days Occupied with respect to such Applicable Project within such period, divided by (ii) the number of days in such period.  The portion of Occupied Units attributable to the Initial Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above multiplied by a fraction, the numerator of which is the lesser of (i) the total number of housing units within the Applicable Project as of the end of such period, or (ii) the total number of housing units within the Initial Scope, and the denominator of which is the total number of housing units within the Applicable Project as of the end of such period.  The portion of Occupied Units attributable to the Increased Scope of any Applicable Project for any period shall be the total number of Occupied Units as determined above less the portion of such Occupied Units attributed to the Initial Scope as determined above, if any.

"CPI Effective Gross Income per Door" shall mean as follows: (a) for calendar year 2004, CPI Effective Gross Income per Door shall mean (i) $10,512 with respect to the Irwin Project, (ii) $31,464 with respect to the Moffett Project. and (iii) $25,104 with respect to the Parks Project (in each case, the "Initial Base Year CPI Effective Gross Income per Door"); (b) for each calendar year after 2004 through the end of the calendar year in which delivery of the last unit in the Initial Development Phase (as defined in Owner's operating agreement), CPI Effective Gross Income per Door shall mean. with respect to each Applicable Project, the applicable Initial Base Year CPI Effective Gross Income per Door then Adjusted by CPI to January 1 of such subsequent calendar year; (c) at the end of the calendar year in which delivery of the last unit in the Initial Development Phase occurs, and every five years thereafter (each. an "Adjustment Date"). (x) the most recent annual Effective Gross Income with respect to each Applicable Project will be compared to (y) the then calculated CPI Effective Gross Income per Door with respect to such Applicable Project, multiplied by the number of Occupied Units within such Applicable Project during such year. If the result in clause (x) is 10% or more greater than the result in clause (y) with respect to any Applicable Project, then (A) the CPI Effective Gross Income per Door with respect to such Applicable Project shall become the most recent annual Effective Gross Income with respect to such Applicable Project divided by the number of Occupied Units during such year within such Applicable Project. (B) the then most recent year shall become the "Base Year" from which CPI Effective Gross Income per Door will be calculated for subsequent years with respect to such Applicable Project, and (C) for subsequent years. CPI Effective Gross Income per Door shall mean the Effective Gross Income from the Applicable Project for the applicable Base Year. divided by the number of Occupied Units within such Applicable Project during such Base Year, then adjusted by CPI to January 1 of such subsequent calendar year. If the result in clause (x) above is less than 10% greater than the result in clause (y) above with respect to any Applicable Project on any such Adjustment

NGEDOCS :016600.0504 973807.8

Date, then there shall be no adjustment in the manner in which CPI Effective Gross Income per Door is calculated until the next Adjustment Date.  For purposes of this Section only, Effective Gross Income will be determined based on the Improvements, as if all "Doors" were leased by Owner.

15.1    COMPENSATION:  As compensation for the services provided by Manager under this Agreement (and exclusive of reimbursement of expense to which Manager is entitled hereunder), Owner shall pay Manager the following compensation with respect to each Applicable Project:

(a)    Base Fee:  For each month of operation, the lesser of the following, with payment due on the 10th day after the end of the applicable month:

(i)    2.75% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable to the Initial Scope, plus 1.50% of Effective Gross Income from such Applicable Project for the applicable calendar month attributable solely to the Increased Scope (if applicable); or

(ii)    an amount equal to the sum of (1) 2.75% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Initial Scope divided by 12 multiplied by (y) the number of units within the Initial Scope of such Applicable Project occupied during such month, plus (2) 1.50% of (x) CPI Effective Gross Income per Door with respect to such Applicable Project for such year attributable to the Increased Scope (if applicable) divided by 12 multiplied by (y) the number of units within the Increased Scope of such Applicable Project occupied during such month.

(b)    Incentive Fee:  The annual Incentive Fee with respect to each Applicable Project is calculated as the earned portion (per the Incentive Performance Management Plan ("IPMP") attached as Exhibit B) of the lesser of (1) the sum of (A) 1.50% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Initial Scope plus (B) 2.75% of the annual Effective Gross Income for the applicable year with respect to such Applicable Project attributable to the Increased Scope or (2) the sum of (A) the product of (i) 1.50% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Initial Scope, multiplied by (ii) the number of units within such Applicable Project within the Initial Scope occupied during such year, plus (B) the product of (i) 2.75% of the CPI Effective Gross Income per Door for the applicable year with respect to such Applicable Project attributable to the Increased Scope multiplied by (ii) the number of units within such Applicable Project within the Increased Scope occupied during such year, and will be payable during the year earned as follows:

(i)    Calendar Year 2004:  Payments will be made quarterly on the 10th day after the end of each calendar quarter in an amount equal to 75% of the maximum potential Incentive Fee with respect to the Applicable Project for such quarter; provided, that after the completion of calendar year 2004, the actual fee earned for calendar year 2004 shall be determined in accordance with Exhibit B and if Manager has been underpaid, the parties shall make such adjustment in cash as is necessary to reconcile the estimated payments with the actual amount due and if Manager has been overpaid, then the difference shall be deducted from the next payment due Manager.

(ii)    Subsequent Years:  The same procedure shall be used as in calendar year 2004, except that the prior year's actual earned portion of the Incentive Fee with respect to the Applicable Project shall be substituted for 75% of the maximum potential Incentive fee in the formula described in (i) above. For example, if in 2006, Manager earns an Incentive fee with respect to any Applicable Project of 78% of 1.50% (i.e., 1.17%) with respect to the units in the Initial Scope and 78% of 2.75% (i.e., 2.145%) with respect to units in the Increased Scope, then estimated payments for 2007 with respect to such Applicable Project shall be based upon 1.17% of Effective Gross Income with respect to units in the Initial Scope (in lieu of 75% of 1.50% of Effective Gross Income with respect to such units) and 2.145% of Effective Gross Income with respect to units in the Increased Scope (in lieu of 75% of 2.75% of Effective Gross Income with respective to such units).

15.2    ACTS OF GOD:  In the event of a casualty loss due to Acts of God and/or other insurance claims such as, without limitation, hurricanes, tornadoes, earthquakes, fires or floods, where the Project lender allows restoration of damage to the Project, if Owner engages Manager to oversee such restoration work under a separate written agreement, Owner agrees to reimburse Manager five percent (5%) of the total cost of the reconstruction project for overseeing the project to completion provided that said fee is reimbursed in its entirety under the provisions of Owner's insurance policy.

12

15.3    CONSTRUCTION MANAGEMENT SERVICES: If Owner engages Manager to oversee Project improvements, over and above routine maintenance, such improvements shall be performed under a separate written agreement. Owner agrees to pay Manager four and one half percent (4.5%) of the total cost of the improvements for overseeing the improvement project to completion.

15.4    FOR OTHER ITEMS OF MUTUAL AGREEMENT: Should Owner wish Manager to perform services which are not otherwise governed by the terms and provisions of this Agreement, the parties shall meet to discuss and to agree upon the additional compensation to be paid by Owner to Manager for such additional services.

15.5    FOR REIMBURSEMENT OF EXPENSES: In addition, Manager shall be entitled to monthly reimbursements for all expenses reasonably and necessarily incurred by Manager in executing its services, to the extent set forth in an approved Plan and to the extent not already directly paid from the operating account (collectively, the "Reimbursable Expenses"), including, without limitation, the following: (a) salaries, payments or other compensation of Manager's direct personnel working in the performance of the Agreement including a burden rate of 45% of the actual salary for payroll expenses, including payroll taxes, health insurance, etc. and any expenses set forth in Section 8.2 hereof; (b) third-party consulting services approved by Owner (where Owner requests and Manager, in its sole discretion, agrees to contract with a third party); (c) out-of-pocket travel expenses for travel related to the provisions of services (air transportation incurred at a rate not in excess of a coach or coach equivalent public rate), including lodging and ground transportation to and from the Project (including, but not limited to temporary lodging for on-site personnel not residing at or near the Project gas or mileage reimbursement, taxi fares and parking or meter charges); (d) expense of long-distance communications; and (e) expense of reproductions, postage and handling. All requests for payment of Reimbursable Expenses shall be accompanied by invoices or other reasonably satisfactory documentation.

## SECTION 16

## STRUCTURAL CHANGES

Owner expressly withhold from Manager any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in Manager through this Agreement, without the prior written consent of Owner. However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Project or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Project, or to comply with any applicable federal state or local laws, regulations or ordinances, shall be authorized pursuant to Section 4.2 of this Agreement, and Manager shall notify Owner appropriately.

## SECTION 17

## BUILDING COMPLIANCE

Manager does not assume and is given no responsibility for compliance of the Project or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices or summons received by Manager relating to such matters, except that Manager shall not violate the provisions of the Sublease or Ground Lease. Owner authorizes Manager to disclose ownership of the Project(s) to any such officials and agrees to indemnify, protect, defend and hold Manager its representative, servants, and employees harmless of and from all loss, cost, expense and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes or regulations; provided, this indemnity shall not be applicable if Manager has actual knowledge of any such violation or alleged violation or reasonably should have known of such violation but fails to give notice to Owner, as provided under the terms and provisions of this Agreement.

## SECTION 18

## TERMINATION

18.1    TERMINATION FOR CAUSE: Notwithstanding the foregoing, this Agreement shall terminate in any event, and all obligations of the parties hereunder shall cease (except as to liabilities or obligations which have accrued or arisen prior to such termination, or which accrue pursuant to Section 18.2 as a result of such termination, and obligations to insure and indemnify), upon the occurrence of any of the following events:

13

NGEDOCS:016600.0504 973807.8

A.     Breach of Agreement:  Ten (10) days (in connection with a monetary default) and/or thirty (30) days (in connection with a non-monetary default) after the receipt of notice by any party to the others specifying in detail a material breach of this Agreement, if such breach has not been cured within said ten (10) day or thirty (30) day period, as applicable; or if, in the case of a non-monetary default, such breach is of a nature that it cannot be cured within said thirty (30) day period but can be cured within a reasonable time thereafter, if efforts to cure such breach has not commenced and/or such efforts are not proceeding and being continued diligently both during and after such thirty (30) day period prior to the breach being cured.  However, the breach of any obligation of a party hereunder to pay any moneys to another party under the terms of this Agreement shall be deemed to be curable within ten (10) days.

B.     Excessive Damage:  Upon the destruction of or substantial damage to the Project by any cause, or the taking of all or a substantial portion of the Project by eminent domain, in either case making it impossible or impracticable to continue operation of the Project.

C.     Default:  In addition to the default set forth in Section 18.1.A, each of the following events shall constitute an event of default by the party in respect of which such event occurs:

1.     the filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy or similar creditor relief law;

2.     the consent to an involuntary petition in bankruptcy or the failure by such party to vacate, within sixty (60) days from the date of entry thereof, any order approving an involuntary petition;

3.     the entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating such party as bankrupt or involvement or approving a petition seeking reorganization or appointing a receiver, trustee, conservator or liquidator of all or a substantial part of such party's assets, if such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days; or

4.     theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents.

D.     Termination of Sublease.  By any party, upon written notice to the other, upon termination of the Sublease at any time, and further provided, if the Sublease terminates as to a portion of the Project only, then this Agreement may be terminated as to such portion only.

E.     Sale.  By any party, upon written notice to the others, upon the sale of all or substantially all of Owner's interest in the Project to a third party unaffiliated with Owner.

18.2    TERMINATION COMPENSATION:  Any amounts accruing to Manager prior to such termination shall be due and payable upon termination of this Agreement (subject, however, to offset for amounts due (or charges incurred by) Owner from Manager, if any, as a result of such termination).  To the extent that funds are available, and in any event prior to the disbursement of payments on underlying mortgage obligations and payments to Owner, such sums shall be payable from the operating accounts.  Any amounts due in excess of the funds available from an operating account shall be paid by Owner to Manager upon demand.

18.3    OWNER RESPONSIBLE FOR PAYMENTS:  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of Owner, if such bill was incurred by Manager in accordance with the Plan or as otherwise approved by Owner.  In addition, Owner shall indemnify Manager against any obligations or liabilities which Manager may have properly incurred on Owner's behalf under this Agreement.

18.4    ACCOUNTS; UNPAID BILLS:  Manager shall deliver to Owner, within forty-five (45) days (or sooner if required by law) after this Agreement is terminated, any balance of moneys due Owner and tenant security deposits which were held by Manager with respect to the Project, as well as a final accounting reflecting the balance of income and expenses with respect to the Project, as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Project.  Bills previously incurred but not yet invoiced shall be the responsibility of and sent directly to Owner.

14

18.5    FINAL ACCOUNTING:  Since all records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other papers and documents which pertain to the Project are deemed to be the property of Owner, they are to be delivered to Owner, upon the effective date of such termination, after payment of all payroll and fees due Manager.  Manager may retain temporary possession of such records, not to exceed 60 days, as may be necessary in order to comply with the provisions of Section 18.5 and/or state law.  Each  Owner shall have access to all Project records, contracts, leases, rental agreements, receipts for deposits, unpaid bills, and other Project papers and documents during such time has Manager retains them that relate to the Project.

18.6    NON-INTERFERENCE WITH MANAGER'S BUSINESS:  Owner agrees that during the term of this Agreement and for a period of twelve (12) months after termination of this Agreement, Owner will under no circumstances hire any of Manager's employees of special talent, or privy to Manager's confidential business information, or who have contributed notably to the good will of Manager's business.  Owner further agrees to limit its contact with Manager employees to the Investment Manager or such other designated Manager management personnel during the term of this Agreement.  Nothing herein stated shall be construed as prohibiting Manager from pursuing all other remedies available to Manager for such breach and threatened breach, including recovery of damages from Owner.

18.7    WRITTEN DIRECTION.  A direction or consent of Clark Pinnacle California Military Communities LLC (the managing member of Owner on behalf of Owner shall be deemed the direction or consent of Owner hereunder and Manager may rely on such direction or consent as the act of Owner).

## SECTION 19

## REPRESENTATIONS

19.1    OWNER'S REPRESENTATIONS AND WARRANTIES:  Owner represents and warrants as follows:  (a) Owner has the full power and authority to enter into this Agreement, and the person executing this Agreement is authorized to do so;  (b) there are no written or oral agreements affecting the occupancy of the Project other than the tenant leases or rental agreements, copies of which have been furnished to Manager;  (c) all permits for the operation of the Project has been secured and are current; (d) Owner is not aware of any violation of any building or construction statute, ordinance, or regulation that will affect the operation of the Project; and (e) if Owner requests Manager to enter any agreements for the benefit of third parties, Owner hereby agrees to fully indemnify Manager for all claims arising from such agreements.

19.2    MANAGER'S REPRESENTATIONS AND WARRANTIES:  Manager represents and warrants as follows:  (a) the officers of Manager have the full power and authority to enter into this Agreement;  (b) there are not written or oral agreements by Manager that will be breached by, or agreements in conflict with, Manager's performance under this Agreement; and (c) where necessary, Manager will be duly licensed and able to perform all of the duties under this Agreement at the effective date of this Agreement and shall comply with and abide by all laws, rules, regulations, and ordinances pertaining thereto.

19.3    ESTOPPEL CERTIFICATE.  Manager and Owner agree, at any time and from time to time, to execute and deliver within 15 days to the other party and any lender a statement in writing certifying as to the truth and accuracy of such reasonable statements regarding such party, this Agreement and performance hereunder as the other party may request.

## SECTION 20

## HEADINGS

All headings and subheadings employed within this Agreement are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

## SECTION 21

## FORCE MAJEURE

Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager, and any time periods required for performance shall be extended accordingly.

15

NGEDOC'S:016600.0504 973807.8

### SECTION 22

### COMPLETE AGREEMENT

This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owner and Manager relating to the Project covered by this Agreement.  No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Manager.  Except as otherwise provided herein, any and all amendments, additions or deletions to this Agreement shall be null and void unless approved by Owner and Manager in writing.  Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, entering into and executing this Agreement has relied upon no warranties, representations, covenants or agreements, express or implied, to such party, other than those expressly set forth herein, or as set forth in an exhibit or appendix to this Agreement.

### SECTION 23

### RIGHTS CUMULATIVE; NO WAIVER

No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement.  The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults.  Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

### SECTION 24

### APPLICABLE LAW AND LITIGATION

24.1  INTERPRETATION:  The execution, interpretation and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of the location of the Project.  If any part of this Agreement shall be declared invalid or unenforceable, Manager shall have the option to terminate this Agreement by notice to Owner.

24.2  LITIGATION:  In the event that any party shall bring an action to enforce or to interpret the terms and provisions of this Agreement, the substantially prevailing party in such action shall be entitled to receive court costs and the reasonable fees and expenses of attorneys and certified public accountants.

### SECTION 25

### NOTICES

Any notices, demands, consents and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Owner and Manager individually may specify hereafter in writing:

MANAGER:  AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.
4200 Rocklin Road, Suite 1
Rocklin, California 95677

OWNER:  CALIFORNIA MILITARY COMMUNITIES LLC
Attention:  Douglas R. Sandor
Two Bethesda Metro Center
Suite 250
Bethesda, Maryland  20814

16

WITH A COPY TO:     CLARK ENTERPRISES, INC.
Rebecca Owen, Esq.
General Counsel
7500 Old Georgetown Road
15th Floor
Bethesda, Maryland 20814

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office. Such notices, demands, consents and reports may also be delivered by hand or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or forty-eight (48) hours after having been deposited in the United States mails as provided herein.

## SECTION 26

### AGREEMENT BINDING UPON SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

17

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**CALIFORNIA MILITARY COMMUNITIES LLC** a Delaware limited liability company

By:    Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

        By:    Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

            By:
            Name:  W. Cleveland Johnson
            Title:   Authorized Representative

        By:    CEI Realty, Inc., a D.C. corporation, Manager

            By:
            Lawrence C. Nussdorf, President

By:    Pinnacle Irwin LLC, a Washington limited liability company, Manager

        By:
        Name:  Stan Harrelson
        Title:   Manager


**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington corporation

By:
Name:  Stan Harrelson
Title:   President

18

IN WITNESS WHEREOF, the parties hereto have affixed and caused to be affixed their respective signatures as of the day and year first written above.

**CALIFORNIA MILITARY COMMUNITIES LLC a** Delaware limited liability company

By:     Clark Pinnacle California Military Communities LLC, a California limited liability company, Managing Member

    By:     Clark Realty Capital, L.L.C., a Delaware limited liability company, Manager

        By:     _____
        Name:   W. Cleveland Johnson
        Title:    Authorized Representative

        By:     CEI Realty, Inc., a D.C. corporation, Manager

            By:     _____
                Lawrence C. Nussdorf, President

By:     Pinnacle Irwin LLC, a Washington limited liability company, Manager

    By:     _____
    Name:   Stan Harrelson
    Title:    Manager

**AMERICAN MANAGEMENT SERVICES CALIFORNIA INC.,** a Washington corporation

By:     _____
Name:   Stan Harrelson
Title:    President

NGEDOCS:016600.0504 973807.8

**Exhibit A**

To the extent approved herein and authorized by Owner in the Approved Budget, the following fees and charges may be paid from the Project's Operating Account.

Accounting Services – additional services approved in advance by Owner.

Benefits Administration for site staff:                      3% charge on-site payroll in addition to premiums per Plan

      Insurance Premiums (medical, dental, vision, LTD, Life)
      Broker's Fees
      Claims handling expenses
      COBRA administration
      401K Plan administration

| | |
|---|---|
| Copies | As incurred |
| Long Distance Charges | As incurred |
| Management Fee: | See Section 15 |
| Postage/Overnight: | As incurred |
| Worker's Compensation Insurance: | Fees rolled into budgeted rate per Plan |

      Insurance Premiums
      Broker's Fees
      Claims handling expense

19

### Exhibit B

#### PROPERTY MANAGEMENT INCENTIVE PERFORMANCE MANAGEMENT PLAN

**Objectives**

The focus is always on the importance of quality family housing. The performance incentive is a reward for achieving and exceeding benchmarks and an assurance that the Property Manager's eye is always on continuous service improvement. The ability of the Property Manager to exceed benchmarks and achieve above average or superior customer service ratings will be rewarded with increased a performance pay schedule. The rewards will be quantified through written feedback from the residents.

**Measurement Criteria**

The Maximum Potential Incentive Award is stated in the Property Management Agreement as a percentage of the Effective Gross Income for Owner. Achievement of the management incentive fee is to be based on customer satisfaction. The three primary measurements to be utilized are Subjective Surveys, Objective Reports and Reporting and Operations.

**Subjective Survey**

Customer satisfaction will be measured in two parts:

The first part, Resident (customer) satisfaction will be partially determined by their response to annual surveys administered by an independent third-party specializing in evaluating Property Management programs. This portion will account for twenty five percent (25%) of the total incentive available.

The second portion is named Government Satisfaction and will be based upon the contractor ability to successfully work with its military counterparts. This portion will account for ten percent (10%) of the total incentive available.

**Resident Satisfaction**

Owner will retain a third-party firm to evaluate the performance or the Property Manager. The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a resident survey form similar to the sample form provided in the Appendix to the CDMP Legal and Governance Plan. The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The total number of responses at each level will be multiplied times the number of total respondents which will then be added together and averaged for the purposes of using the scale below. As an example: if 100 persons were surveyed and the results were as indicated in the table below the average grade would be 6.50.

| Grade | #Response | Value | Total |
|-------|-----------|-------|-------|
| Superior (10) | 10 | 10 | 100 |
| | 10 | 9 | 90 |
| | 10 | 8 | 80 |
| | 20 | 7 | 140 |
| | 20 | 6 | 120 |
| Average (5) | 15 | 5 | 75 |
| | 10 | 4 | 40 |
| | 0 | 3 | 0 |
| | 0 | 2 | 0 |
| Poor (1) | 5 | 1 | 5 |
| Average | 100 | 6.50 | 650 |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination. The firm will attempt to elicit survey participation by all of the

20

NGEDOCS :016600.0504 973807.8

current residents. The RCI Office will compose a letter with the Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third-party firm or mailed directly from the third-party firm to the residents, and after completing the survey; residents return the survey directly to the third-party firm. The results will be provided to Owner and the RCI Office who will compare them to benchmarked objectives. These results will account for twenty-five percent (25%) of the incentive determination. The subjective portion of the Incentive Fee will be based on the following scale.

| Subjective Scale | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| During IDP | 1 - 2.0<br>0% | 2.1 – 4.9<br>15% | 5.0 – 8.4<br>20% | 8.5+<br>25% |
| Post-IDP | 1 – 2.9<br>0% | 3.0 – 6.9<br>15% | 7.0 – 8.9<br>20% | 9.0 +<br>25% |

**Government Satisfaction**

Owner will retain a third-party firm to evaluate the performance of the Property Manager. The RCI Director shall approve the selected firm.

The retained firm will work with the Property Manager and the RCI Office Staff to create a survey form that will be provided to the following key government representatives:

- Garrison Commander
- RCI Director
- RCI Deputy Director
- Chief of Staff
- Base Commander

The form will solicit a range of responses from one (1), being the lowest, to ten (10), being the highest. The survey for each participant identified above will equal two percent (2%) of the total potential incentive available. The total of all five responses will be averaged and multiplied times the overall incentive available. As an example, if the five surveys came back with numerical scores of 6.0, 7.0, 8.0, 9.0 and 10.0 the total would be 40.0 which when divided by five would average a score of 8.0. That score of 8.0 would be considered as 80% of the total potential of ten (10%) percent available (or 8%). In this instance 8% of the incentive would be paid. In the event the average equals 5.0 or less, no incentive will be deemed earned. Below is the scale for each individual response.

| Grade | Response | Value |
|---|---|---|
| Superior (10) | 10 | 100% |
| | 9 | 90% |
| | 8 | 80% |
| | 7 | 70% |
| | 6 | 60% |
| Average (5) | 5 | 50% |
| | 4 | 40% |
| | 3 | 30% |
| | 2 | 20% |
| Poor (1) | 1 | 10% |

The form will be tailored to the specific goals and desires of the assignment and will be approved by the RCI Director prior to dissemination. The firm will attempt to elicit survey from the participants identified above. The RCI Office will compose a letter with the Garrison Commander's signature to accompany the survey.

To ensure the integrity of responses, surveys are either taken in person by a representative from the independent third party firm or mailed directly from the third-party firm to the participants, and after completing the survey, the participants return the survey directly to the third-party firm. The results will be provided to Owner and the RCI Office

21

who will compare them to benchmarked objectives. These results will account for ten percent (10%) of the incentive determination.

**Objective Reports**

Property management goals for effective and timely maintenance are critical to the success of the property management plan. These goals are measurable and can continually be compared to prior periods and the benchmarks stated herein to determine whether service is maintained at an acceptable level. The overall objective component will account for thirty-five percent (35%) of the total potential incentive. Property management reporting systems will generate results based upon the following individual components:

Maintenance Response Time by level of urgency (35% of total incentive; each of the three service request areas will be weighted as follows: Routine = 15% of total incentive — Urgent = 10% of total incentive —Emergency = 10% of total incentive) during — Tracked time from the service call to completion of the work order adjusted for whether the service calls is "Routine", "Urgent" or "Emergency." Response time by level of urgency is measured as follows: Emergency requests are situations, which threaten life, safety, or health, response time within 1 hour. Urgent requests are situations in which property damage could result or a resident would be negatively impacted if the condition continued for more than 8 hours, response time 4 hours during normal duty hours or 8 hours after duty hours. Routine requests are situations that do not qualify for emergency or urgent and that are generally completed during standard working hours. A routine request will be responded to within 72 hours. See the chart below for measurement criteria. Examples of the different types of service calls are located on page 64 of the Property Management Operation Plan. The response times will be measured by the percentage of work orders and the time limitations established above.

| Maintenance Request Times | Poor | Average | Above Average | Superior |
|---|---|---|---|---|
| **Routine** | | | | |
| During IDP | 0% | 5% | 7.5% | 15% |
| Post-IDP | 0% | 5% | 7.5% | 15% |
| Routine Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Urgent** | | | | |
| During IDP | 0% | 4% | 6% | 10% |
| Post-IDP | 0% | 4% | 6% | 10% |
| Urgent Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |
| **Emergency** | | | | |

NGEDOCS :016600.0504 973807.8

| During IDP | 0% | 4% | 6% | 10% |
|---|---|---|---|---|
| Post-IDP | 0% | 6% | 8% | 10% |
| Emergency Totals/Results | Below 25% | 25-74% | 75-89% | 90% + |

**Reporting and Operations**

A key to the success of this assignment will be timely reporting and consistent operations. This section will account for thirty percent (30%) of the total incentive and will be further broken down as follows:

1.   Monthly Reporting - (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the due date of monthly reporting as outlined in the Management Agreement and which is defined as being completed and provided to all noted parties of interest no later than ten (10) business days following the last day of the preceding month. With each monthly report counting as 1/12th of the award, payment of this incentive will only be allowed if the monthly report to Owner is on time. As an example: if eleven months out of twelve were delivered on time, the incentive award would be 9.17% (11/12=. 917 x 10% =9.17%).

In the event Owner asks that reporting be held open for any reason, that particular monthly report would be counted as on time.

2.   Annual Budgets (10% of Total Incentive) — Realization of this component of the Incentive Plan will be assessed by the timeliness of submission of the Annual Operating Plan and Budget as defined in the Management Agreement and which is further defined as being due no later than the last business day of October if reporting occurs on a calendar year basis or the last business day of the tenth (10th) month of the fiscal year. This is a "pass/fail" incentive, which will be 100% earned if the Annual Plan and Budget are delivered on time and 0% if not delivered on time.

In the event Owner asks that the Annual Plan and Budget be delayed for any reason, that reporting requirement would be counted as on time.

Occupancy (10% of Total Incentive) — Each point in occupancy from 95% to 99% shall earn an additional 2% in incentives. Occupancy is based upon physical occupancy of eligible premises.

| Occupancy | | Incentive Award |
|---|---|---|
| **From** | **To** | |
| 94.5% | 95.4% | 2% |
| 95.5% | 96.4% | 2% |
| 96.5% | 97.4% | 2% |
| 97.5% | 98.4% | 2% |
| 98.5% | 100.0% | 2% |

Eligible premises shall include only those homes available for immediate occupancy. Eligible premises will specifically not include homes that are off line with major repairs or construction scheduled, on hold for incoming military families, the subject of mass or major changes in deployment of military members, structurally or environmentally damaged, or any other such home as the contractor and the RCI Director may mutually agree to be uninhabitable.

During the IDP, the occupancy rate for incentive purposes will be determined by taking the number of available units and deducting the number units in the immediate path of demolition, renovation or in a condition the Secretary considers uninhabitable for financial, health or safety reasons. The remaining units will be considered available to military for housing. In the event there are no military personnel on the waiting list, the Owner will request from the Secretary if the units could be made available for occupancy by other tenants (non-military) on the waiting list. In the

23

event there are no military personnel on the waiting list and the Secretary does not allow non-military tenants to occupy the units, the occupancy rate shall be deemed 100%.

Example:

420 units on Moffett and Parks.
120 units to be demolished within the first 12 months.
<u>100</u> units to be renovated within the first 12 months.
200 units available for rent

If 100 of the units are military occupied and 0 military are on the waiting list, and if the Secretary does not allow non-military to occupy the remaining units, the occupancy rate would be considered to be 100% occupied.

<u>Quality Assurance Plan and Reporting Requirements</u>

**Base Year Benchmarks**

Owner and the Property management personnel may propose subsequent benchmarks for both subjective and objective criteria to be approved by the RCI Director. This will be accomplished by reviewing resident responses and tabulating results from subjective, objective, and reporting and operations reports maintained by Pinnacle and reviewed by the RCI Staff and Deputy Director.

**Determining the Incentive**

For incentive calculation purposes, the Moffett Project and the Parks Project shall be considered separate from the Irwin Project.

At the end of the initial twelve month anniversary of Property management contract commencement and at the end of each year thereafter through the end of the management assignment, Owner will ask the third-party firm to complete its subjective survey and present the results. At the same time, the management firm will submit a year-end assessment on objective criteria including tabulated results for work order completions and unit turns.

Scores received on the Subjective Surveys, and Objective Reports, and Reporting and Operations components will determine the amount of incentive that the management firm is entitled to for a particular year. The actual results will be calculated to determine the amount of the actual award and validated by the RCI Director. This incentive fee is further described in the Property Management Agreement.

All results will be given a numerical equivalent as specified herein and the results will be summed to determine the actual incentive amount. The aggregate score of the three criteria will yield the percentage of bonus yielded.

The incentive plan review process is to be completed by Owner no later than thirty days following the end of the anniversary date. Once approved, Owner will authorize payment of the incentive to Pinnacle within fifteen days or no later than forty-five days following the anniversary date of the management contract.

**Unsatisfactory Results**

It is Pinnacle's goal to provide "Quality Service." While achievement of a 100% rating may be difficult, it will guide Pinnacle's planning. Where results indicate a need for improvement, we will formally address it with the staff and create an action plan as needed. Pinnacle will establish a contingency plan for improving unsatisfactory customer service responses. The plan will include a training plan for personnel and a measure to replace personnel who are not performing to conduct standards already established by Pinnacle.

24

**Aligned Objectives**

It is planned that site level staff incentives will be tied to the same criteria as trust for the management company.  While the community director will be tied to overall results, other staff will be given incentives based upon results in their area of work (i.e. maintenance incentives for maintenance results, etc.).

These objectives will be presented to all staff in a formal management plan and objective meeting at the beginning of the year.  Results will be discussed throughout the year so that corrective action can be made where needed.

25

EXHIBIT 6

Pinnacle Monterey LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121

May 13, 2011

Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention: W. Cleve Johnson

      Re:   Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle Monterey Bay LLC of October 30, 2001 ("Operating Agreement"), between Clark Monterey Presidio LLC and Pinnacle Monterey LLC. I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Monterey LLC ("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property Management Agreement" for the parties' Monterey Bay Military Housing ("MBMH") project a Major Decision requiring the vote of all the Managers. Operating Agreement § 3.1(b)(3)(E).

Pursuant to Section 3.1(b)(3)(E) of the Operating Agreement, Pinnacle hereby votes to adjust Section 18.1(C)(6) of the Property Management Agreement ("PMA") as follows:

> "6.    theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted PMA. Pinnacle also believes the adjustment will ensure that the Operating Agreement partners can continue to work together in the best interests of MBMH for the remainder of the PMA's 50-year term. If you agree with the proposed adjustments, please sign below and return to me. If we need to discuss or change these adjustments, I welcome your suggestions. If you are inclined to vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before May 20, 2011, Pinnacle shall deem your non-response a deadlock pursuant to Section 3.13(c). This will commence the seven-day period to

reach mutual agreement.  Failing mutual agreement within the seven day period, Pinnacle shall
resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Monterey LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

Pinnacle Irwin LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121

May 13, 2011

Clark Realty Capital, L.L.C.
4401 Wilson Boulevard, Suite 600
Arlington, VA 22203
Attention: W. Cleve Johnson

      Re:   Notice of Major Decision

Dear Cleve:

This letter concerns the Operating Agreement of Clark Pinnacle California Military Communities LLC of May 21, 2003 ("Operating Agreement"), between Clark Irwin LLC and Pinnacle Irwin LLC. I write to Clark Realty Capital, L.L.C. ("Clark") in its capacity as the Clark Manager under Operating Agreement Section 3.1(a), and on behalf of Pinnacle Irwin LLC ("Pinnacle") in its capacity as the Pinnacle Manager under Section 3.1(a).

The Operating Agreement makes "[a]djustments to the terms or conditions of the Property Management Agreement" for the parties' California Military Communities ("CMC") project a Major Decision requiring the vote of all the Managers. Operating Agreement § 3.1(b)(2)(E).

Pursuant to Section 3.1(b)(2)(E) of the Operating Agreement, Pinnacle hereby votes to adjust Section 18.1(C) of the Property Management Agreement ("PMA") by deleting the phrase "In addition to the default set forth in Section 18.1.A" and inserting under subsection (4):

> "4.     theft, fraud, or other knowing or intentional misconduct by Manager or its employees or agents having a material adverse affect on the Owners; provided, however, (1) if the Manager takes appropriate measures to correct, and otherwise prevent the recurrence of any such events of default and (2) the Manager remedies any confirmed event of default within 15 days of learning of such default (to the extent that such default is susceptible of being cured), then such acts shall be deemed not to have a material adverse affect and the Property Management Agreement shall not be terminated."

Pinnacle believes the foregoing is consistent with the language and intent of the unadjusted PMA. Pinnacle also believes the adjustments will ensure that the Operating Agreement partners can continue to work together in the best interests of CMC for the remainder of the PMA's 50-year term. If you agree with the proposed adjustments, please sign below and return to me. If we need to discuss or change these adjustments, I welcome your suggestions. If you are inclined to vote against any of the proposed adjustments, please share your analysis and rationale.

If you fail to respond to this letter on or before [date], Pinnacle shall deem your non-response a deadlock pursuant to Section 3.13(c). This will commence the seven-day period to reach mutual

agreement.   Failing mutual agreement within the seven day period, Pinnacle shall resolve the deadlock "in its sole discretion."

Sincerely,

Pinnacle Irwin LLC

By:

Stan Harrelson, Manager

AGREED AND ACCEPTED

Clark Realty Capital, L.L.C.

By:

_____

EXHIBIT 7



W. Cleveland Johnson                                        (703) 294-4520 DIRECT
Manager                                                     (703) 294-4670 FAX
                                                           cleve.johnson@clarkrealty.com

                                May 19, 2011

*VIA ELECTRONIC MAIL*
*AND OVERNIGHT MAIL*

American Management Services East LLC
Pier 70
2801 East Alaskan Way
Suite 200
Seattle, Washington  98121
Attn:  Mr. Stan Harrelson

        Re:    **Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision**

Dear Stan:

        We have received your letters on behalf of Pinnacle Irwin LLC and Pinnacle Monterey
LLC dated May 13, 2011.  The Pinnacle Monterey letter demands a response from Clark Realty
Capital LLC, acting it its capacity as Clark Manager under the Monterey Operating Agreement,
by May 20; the Pinnacle Irwin letter likewise demands a response but the "date" was left blank.

        We disagree with your interpretation of the Operating Agreement to require a "response"
to your letters within seven days of the date of your letters, and believe you have set an arbitrary
deadline for us to respond in order to create a deadlock.  We also believe there is no basis for you
to deem this response as creating a "deadlock" under the Operating Agreements.  In addition, we
have questions about the proposed amendments themselves, as well as what information
Pinnacle has discovered at either location that led to this proposal.  It is apparent that you have
spent significant time drafting the proposed amendments to the Property Management
Agreements at both Projects and putting forward your position.  We therefore request your full
and detailed response to the questions below, no later than Monday May 23, given the urgency
with which you have demanded a response from us:

        1.      What is meant by "material adverse affect" on the Owners?

        2.      What is meant by "appropriate measures to correct" fraud?

        3.      What is meant by a "confirmed event of default"?

        4.      What types of fraud do you contend are or are not "susceptible to being cured"?

American Management Services East LLC
Attn:  Mr. Stan Harrelson
May 19, 2011
Page 2

5.   Why do you contend the proposed amendment is consistent with the original
     intent of the parties?

6.   When did you begin to consider and draft the proposed amendment?

7.   Describe in detail (including names and dates) any potential fraud, theft or
     intentional misconduct (including any alleged or potential self-dealing) by a
     Pinnacle employee or person acting on behalf of Pinnacle that has occurred at
     either the Irwin or Monterey Projects.

8.   How and when did Pinnacle or anyone acting on its behalf become aware of such
     potential fraud, theft or intentional misconduct?

9.   For any such instance of potential fraud, theft or intentional misconduct, how may
     it have harmed the Project and what if anything have you done to investigate
     potential harm to the Project?

10.  What steps if any have you taken, or do you intend to take, to remedy any
     instances of fraud, theft or intentional misconduct at the Project?

We look forward to your prompt response.

Sincerely,

*Cleve Johnson* w

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC

EXHIBIT 8

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA 22203

RE: Your Letter(s) Dated May 19, 2011

Dear Cleve:

Thank you for your May 19 reply to my letter of May 13, 2011. A few preliminaries: we appreciate your questions, and we are not ready to declare a deadlock. Quite the contrary - we are happy to discuss with you the adjustments to the Property Management Agreements -- adjustments that Pinnacle Irwin and Pinnacle Monterey believe are truly in the best interests of the projects at Irwin and Monterey. As your partners, we are committed to a fair, open dialogue before we invoke our contractual right, under our partnerships' operating agreements, to declare a deadlock and make adjustments to the Property Management Agreements (PMAs) at each facility. As for why we set a seven-day reply time frame, it was because you never replied to a similar adjustment letter we sent at the Belvoir project. We did not want our present letters at Irwin and Monterey to be ignored.

By way of a general response to all your questions, we have no information about any events of fraud, theft or misconduct at Irwin or Monterey that would be cause to terminate the PMAs at those projects. Quite the contrary - those projects are performing well. The Clark and Pinnacle managers at those projects have a history of working together cooperatively. In broad terms, we have proposed the PMA adjustments in my May 19 letter because we want to keep Monterey and Irwin focused on the goal of our partnership at those projects - providing excellent housing communities for the members of the Armed Services who live at our California projects. We do not want Irwin and Monterey drawn into a conflict like that involving our partnership's eastern military housing projects (Belvoir and Benning).

More importantly, as a matter of both fact *and law* in California, Pinnacle, Clark and the Army are *partners*, and owe each other the duties and obligations of partners in connection with the Irwin and Monterey projects. The adjustments we have proposed will enable the Pinnacle to participate, as a partner of both Clark and the Army, in responding to acts of fraud, theft and misconduct, either alleged or confirmed, committed by Pinnacle employees. At the same time, the adjustment eliminates an ambiguity in the PMAs and prevents Clark from using that ambiguity to deploy an audit and litigation strategy designed to eliminate Pinnacle's ownership

interests in the projects.  In other words, the adjustments we have proposed to Section 18(C) of both agreements will get Clark and Pinnacle talking again and acting like partners.

Any issues the Owners have about Pinnacle's property management services should be resolved in the first instance by communication, negotiation and cooperation.  And in the second instance, by serving notices of default, with opportunity to cure, as required under the PMAs. Our partnership requires no less.

I propose a face-to-face meeting to discuss these matters at your earliest convenience - including the specific questions in your letter.  I think it would make sense to include representatives from the Army in such a meeting, since they are our partners in the projects. Please let me know when you are available.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

# EXHIBIT 9



W. Cleveland Johnson
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

June 3, 2011

### VIA ELECTRONIC MAIL AND OVERNIGHT MAIL

American Management Services East LLC
Pier 70
2801 East Alaskan Way, Suite 200
Seattle, Washington 98121
Attn: Mr. Stan Harrelson

> Re:   **Pinnacle Monterey LLC and Pinnacle Irwin LLC – Notices of Major Decision**

Dear Stan:

This is in response to your May 23, 2011 letter. We had asked you to respond to the specific questions we raised, particularly because Pinnacle has unique access to the necessary information to respond promptly. We are concerned by your comment that you have "no information about any events that would be cause to terminate the PMAs at those projects." This does not answer whether you are aware of *any* incidents or allegations of fraud, theft or intentional misconduct at either Fort Irwin or Monterey.

We again ask for prompt, written responses to our questions no later than June 8. We also need to know by that date whether you continue to insist upon the amendments to the Fort Irwin and Monterey PMAs as outlined in your earlier correspondence.

With respect to your request for a face-to-face meeting, we do not think such a meeting will be productive until we have received written responses to our questions. In addition, before we would agree to such a meeting, you need to withdraw, with prejudice, the claims made in Virginia against me, Doug Sandor and Larry Nussdorf personally. Those claims were brought despite the express terms of the Clark Pinnacle Belvoir Operating Agreement (¶ 7.6). And, while they are pending, we do not feel it appropriate to agree to a meeting to discuss these issues.

We look forward to your prompt response.

Sincerely,

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC

EXHIBIT 10

**Pinnacle Monterey LLC**
**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

June 8, 2011

Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA  22203

RE: Your Letter(s) Dated June 3, 2011

Dear Cleve:

In my letter of May 23, I offered to meet with you to discuss the questions in your May 19 letter.  I also told you, and reiterate, that Pinnacle is not aware of incidents of fraud, theft or intentional misconduct at our Monterey or California Military Communities (CMC) projects.

Instead of agreeing to a meeting, you waited two work weeks to respond.  And then, you simply insisted that I respond to your earlier questions in writing.  You also indicated that you would not agree to meet about adjustments to the PMAs at our California projects until Pinnacle withdrew claims it has filed in Virginia against you, Mr. Sandor and Mr. Nussdorf.

Without meaning to seem argumentative, it is a breach of Clark Realty's duties as Clark Manager of Clark Pinnacle Monterey LLC and Clark Pinnacle California Communities LLC to insist on obtaining a personal benefit for you, Mr. Sandor and Mr. Nussdorf - concerning a lawsuit in Virginia - as a precondition to meeting about our California projects.  I remind you that Clark Realty's job, at each project, is to look out for the best business interests of that project.  Clark Realty instead seems intent on elevating its own litigation interests -- and now that of its principals -- above the LLCs we formed together.

Voting on adjustments to the terms and conditions of the PMAs is one of the few powers granted to the Pinnacle Manager under the Clark Pinnacle Monterey LLC and Clark Pinnacle California Military Communities Operating Agreements.  A "deadlock" in "voting between the Managers with respect to any matter arising under, relating to or affecting the terms or conditions of the Property Management Agreements" is the only situation under the Operating Agreements where the Pinnacle Manager has the power, in its "sole discretion," to determine a deadlock or dispute.

Pinnacle proposed adjustments to the PMAs at Monterey and CMC over three weeks ago.  We explained, candidly and clearly, why we thought the adjustments were necessary and in the

best interests of the projects.  I believe you fully understand that the purpose of the adjustments is to help Clark and Pinnacle act like partners at the California projects, instead of adversaries.

You have refused to vote on the proposed adjustments, and refused to even meet to discuss them.  Therefore, pursuant to Section 3.13(c) of the Operating Agreements of Clark Pinnacle California Military Communities LLC and Clark Pinnacle Monterey LLC, Pinnacle declares a "Deadlock" regarding the adjustments proposed in my letters of May 13, 2011.  Your receipt of this letter shall begin the 7 day period for resolution set forth in the Operating Agreements.

I remain interested in a meeting to resolve our deadlock, joined by our project partners, the U.S. Army.  Please reconsider your position.  Absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011, pursuant to the terms of the Operating Agreements.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

EXHIBIT 11



**W. Cleveland Johnson**
Manager

*(703) 294-4520 DIRECT*
*(703) 294-4670 FAX*
*cleve.johnson@clarkrealty.com*

June 14, 2011

*VIA ELECTRONIC MAIL*
*AND OVERNIGHT MAIL*

American Management Services East LLC
Pier 70
2801 East Alaskan Way
Suite 200
Seattle, Washington  98121
Attn:  Mr. Stan Harrelson

Re:   **Pinnacle Monterey LLC and Pinnacle Irwin LLC**

Dear Stan:

This responds to your letter dated June 8, 2011.  As an initial matter, we disagree that a "deadlock" has occurred under Section 3.13 of the Irwin and Monterey Operating Agreements. Under Section 3.13, an actionable "deadlock" must occur "in voting." As you know, the Clark Managers have not voted, and Pinnacle has not called a vote, either by calling a meeting for that purpose pursuant to the California LLC Act (Section 17104(c)(i)) or by obtaining the Clark Managers' written consent to vote absent such a meeting.  Without a vote, Pinnacle cannot simply "declare" a deadlock as it has attempted here.

While you have requested a face to face meeting to discuss these issues, this is not the same as calling a meeting for purposes of a vote.  Indeed, as should be obvious from our correspondence, the Clark Managers do not believe they are in a position to vote until they have received written responses to their questions from Pinnacle.  Such a proposed amendment -- where Pinnacle as a fiduciary may actively commit fraud, yet the Owner is powerless to terminate Pinnacle if it "remedies" the fraud -- hardly strikes us as a balanced amendment that is in the best interest of the Projects or consistent with public policy.  The fact that Pinnacle refuses to disclose many basic facts about this one-sided amendment only heightens our concern about Pinnacle's conduct.

We disagree that it is a breach of "Clark Realty's duties" to request that Pinnacle dismiss the claims against Larry Nussdorf, Doug Sandor and myself.  As noted above, Pinnacle's failure to answer the most basic questions in writing about the proposed amendment strongly deters any need to act on Pinnacle's requested amendment.  However, in addition, Pinnacle has sued individuals personally for matters in connection with the Operating Agreements of the respective projects between the parties including Monterey and Irwin.  Such claims are prohibited by,

American Management Services East LLC
Attn:  Mr. Stan Harrelson
June 14, 2011
Page 2

among other things, the express terms of the Operating Agreements. We fail to see any breach of duty where the basic request is that Pinnacle comply with the relevant agreements.

In short, we ask that Pinnacle immediately retract its statement that "absent a meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011" and confirm that Pinnacle will take no steps to alter the provisions of the Irwin and Monterey PMAs until you have responded in full to our questions in writing and until a vote has occurred.  If we do not have this assurance by 12:00 Eastern Standard Time on Wednesday, June 15, we intend to take all necessary actions to protect the Projects.

Sincerely,

*W. Cleveland Johnson*

W. Cleveland Johnson
Manager, Clark Realty Capital, L.L.C.
Manager, Clark Monterey Presidio LLC and
Clark Pinnacle California Military Communities LLC

EXHIBIT 12

Pinnacle Monterey LLC
Pinnacle Irwin LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121


June 15, 2011


Mr. Cleve Johnson
Clark Realty Capital, LLC
4401 Wilson Boulevard
Arlington, VA 22203

Dear Cleve:

  I am in receipt of your letter dated June 14, 2011. I write to reiterate Pinnacle's position that, pursuant to Section 3.13(c) of the Operating Agreements of Clark Pinnacle California Military Communities LLC and Clark Pinnacle Monterey LLC (the "Operating Agreements"), there remains a "Deadlock" between the Managers regarding the adjustments to the Project Management Agreements proposed in my letters dated May 13, 2011.

  First, your claim that this "deadlock" has not occurred because Pinnacle failed to call a vote by either calling a meeting under Cal. Corp. Code Section 17104(c)(1) or, in the alternative, obtaining the Clark Managers' written consent is factually and legally false. Section 17104(c)(1) sets forth the procedure and obligation of a member to call a meeting whenever "members are required or permitted to take any action a meeting." This statutory section is clearly inapplicable here, as no *member* vote is either called for or allowed under the terms of the Operating Agreements. To the contrary, the only parties allowed to vote or consent to major decisions under the Operating Agreements are the *Managers*, and, moreover, the parties to the Operating Agreements expressly agreed in Section 3.9 that "[n]othing in this Agreement shall be construed as limiting the ability of the Managers to transact Company business by written consent *without a meeting*." It is curious that your citation to the California Code is not only to an inapplicable provision, but also seeks to impose a requirement -- a formal meeting -- that Clark Realty Capital agreed was unnecessary in order to transact Company business.

  Second, pursuant to Section 3.1(b)(2) of the Operating Agreements, either a "vote or signature" is required to consent or approve a Major Decision. Under the Operating Agreements, the adjustment of a term and condition of the PMAs is an explicitly defined Major Decision. My letters dated May 13, 2011 informed you of the adjustments proposed by the Pinnacle Managers, informed you that the Pinnacle Managers voted in favor of the proposed adjustments, and asked for either the Clark Managers' votes or its consent and signature regarding the adjustments to the terms and conditions of the PMAs. Thus, in addition to citing a Code Section that is wholly inapplicable to this process, there is absolutely no factual support for the proposition that Pinnacle has not "called for a vote" or sought "the Clark Managers' written consent to vote." The Pinnacle Managers' very first letters expressly seek the Clark Managers' vote or consent.

Third, your argument that no deadlock can be declared because the Pinnacle Managers have not called "a meeting for purposes of a vote" is not only legally misguided and factually incorrect, it is completely disingenuous. I have asked you repeatedly to meet with me and discuss, like the business partners we are, the issues that are impacting our partnership. It is and has been my desire to reconcile our differences so that our promises to the Army that we would be "building on the legacy" can be fulfilled. Since April 2010, however, you have refused any meetings, just as you refused our offer to meet and discuss the proposed adjustments. Your past conduct, your recent conduct, and the legally inapplicable and factually incorrect arguments in your June 14, 2011 letter demonstrate that you are not interested in reasonableness or collaboration.

Finally, it is obvious that the Pinnacle Managers did not "simply declare a deadlock" as you contend. Pursuant to Section 3.13 of the Operating Agreements, if a deadlock occurs "in voting" between Managers with "respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement", and if that "deadlock or dispute" cannot be resolved within 7 days, sole discretion of the decision is granted to the Pinnacle Manager. Clark Realty Capital's refusal, since May 13, to either vote on or consent to the adjustments proposed by the Pinnacle Manager, its refusal to meet to discuss the proposed adjustments, and its attempt to prevent the adjustments by unjustified refusal to vote or consent demonstrates without question that a deadlock has occurred "in voting" between the Clark Manager and the Pinnacle Managers related to the proposed adjustments to the terms of the PMAs.

We are filing a Complaint for declaratory judgment in Santa Clara County today asking the Court to declare our rights to adjust the terms and conditions of the Property Management Agreements. I had hoped for a non-litigious resolution on this issue; however, your refusal to deal in good faith left the Pinnacle Managers with no other plausible alternative to protect their vested powers granted under the Operating Agreements. Notwithstanding the filing of this Complaint, however, we remain willing to meet with you and discuss the proposed adjustments. I hope that Clark Realty Capital will accept this offer and fulfill its promises to be Pinnacle's partner at these Projects for the next 50 years.

Sincerely,

Stan Harrelson
Manager
Pinnacle Monterey LLC
Pinnacle Irwin LLC

EXHIBIT 13

**Pinnacle Monterey LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

July 2, 2010

Clark Realty Capital LLC
4401 Wilson Boulevard, Suite 600
Arlington, Virginia 22203
Attention:  W. Cleveland Johnson

      Re:    Clark Pinnacle Monterey Bay LLC Records Review

Dear Cleve:

Pinnacle Monterey LLC intends to review and inspect the books and records of Clark Pinnacle Monterey Bay LLC in accordance with the rights afforded to Pinnacle Monterey LLC pursuant to Section 3.11 of the Operating Agreement of Clark Pinnacle Monterey Bay LLC dated October 30, 2001.

We will commence this review at approximately 10:00 a.m. on July 7, 2010 at the offices of Clark Realty Capital in Arlington, Virginia.

While we intend to review all of the books and records of Clark Pinnacle Monterey Bay LLC (including all of the books and records it holds as the manager of Monterey Bay Military Housing LLC and Monterey Bay Land LLC), we specifically would like you to make available for our review the materials set forth in Attachment A to this letter.

Sincerely,

Pinnacle Monterey LLC

By:                                
              Stan Harrelson, Manager

Attachment A to Letter

1.  Copies of audited financial statements for Monterey Bay Military Housing LLC (MBMH), Monterey Bay Land LLC (MBL) and Clark Pinnacle Monterey Bay LLC (JV) for 2006 to present, together with all narrative reports and materials provided by the auditors, management letters issued by the auditors, management representation letters provided to the auditors and also together with any certifications, disclosures, or written assurances provided by or on behalf of MBMH, MBL or JV related thereto.

2.  Copies of all contracts and agreements entered into by or on behalf of MBMH, MBL or JV in 2009 or 2010 to date, including all contracts or agreements to provide property management or related services at Monterey Bay (provided that it is not necessary for you to provide us with the property management agreement with American Management Services LLC).

3.  Copies of all engagement letters or agreements entered into by or on behalf of MBMH, MBL or JV in 2009 or 2010 with auditors, accountants (financial and/or forensic) and attorneys representing or providing services for the benefit of MBMH, MBL or JV.

4.  Copies of all results (full, or partial, and in draft or final form) of any audits, investigations or analyses undertaken by any auditor, accountant or attorney related to MBMH, MBL, JV and/or the Monterey Bay project (and including the results of any audits, investigations or analyses prepared by Alix Partners).

5.  Copies of all reports in any form relating to analysis of or comments with respect to internal controls.

6. Monthly and annual financial statements, balance sheets and statements of cash flow for MBMH, MBL and JV for 2009 and 2010.

7.  A list/schedule of existing A/R for MBMH, MBL and JV, as well as an accounting of all costs and fees paid by MBMH, MBL and/or JV in 2009 and 2010 to date for auditing, accounting and/or legal services.

8.  The original 2010 budget for MBMH, MBL and JV, together with any updates or revisions to those budgets (and including any separate budgets whether prepared by MBMH, MBL, JV or any other party with respect to the estimated costs and fees of any pending or anticipated litigation, and any updates or revisions to those budget, and copies of any such budgets provided to the Army or its representatives).

9.  All written and email communications between MBMH, MBL and/or JV and the asset manager, and any written and email communications from the asset manager and in the possession of MBMH, MBL or JV with respect to MBMH, MBL, JV, and/or the Monterey Bay project (including written and email communications from the asset manager to the Army or representatives of the Army in the possession of MBMH, MBL or JV).

10. All written and email communications between MBMH , MBL and/or JV and the Army or representatives of the Army for 2009 and 2010.

11. Copies of all results (full or partial, and in draft or final form) of any audits, investigations, reviews or analyses obtained or prepared with respect to the services of Clark affiliated entities for MBMH, MBL, JV and/or Monterey Bay, including the services provided by the asset manager, design/builder and developer.

**Pinnacle Irwin LLC**
2801 Alaskan Way, Suite 200
Seattle, WA 98121

July 2, 2010

Clark Realty Capital LLC
4401 Wilson Boulevard, Suite 600
Arlington, Virginia 22203
Attention:  W. Cleveland Johnson

Re: Clark Pinnacle California Military Communities LLC Records Review

Dear Cleve:

Pinnacle Irwin LLC intends to review and inspect the books and records of Clark Pinnacle California Military Communities LLC in accordance with the rights afforded to Pinnacle Irwin LLC pursuant to Section 3.11 of the Operating Agreement of Clark Pinnacle California Military Communities LLC dated May 21, 2003.

We will commence this review at approximately 10:00 a.m. on July 7, 2010 at the offices of Clark Realty Capital in Arlington, Virginia.

While we intend to review all of the books and records of Clark Pinnacle California Military Communities LLC (including all of the books and records it holds as the manager of California Military Communities LLC and/or Irwin Land LLC), we specifically would like you to make available for our review the materials set forth in Attachment A to this letter.

Sincerely,

Pinnacle Irwin LLC

By:

Stan Harrelson, Manager

Attachment A to Letter

1.  Copies of audited financial statements for California Military Communities LLC (CMC) Irwin Land LLC (IL) and Clark Pinnacle California Military Communities LLC (JV) for 2006 to present, together with all narrative reports and materials provided by the auditors, management letters issued by the auditors, management representation letters provided to the auditors and also together with any certifications, disclosures, or written assurances provided by or on behalf of CMC, IL or JV related thereto.

2.  Copies of all contracts and agreements entered into by or on behalf of CMC, IL or JV in 2009 or 2010 to date, including all contracts or agreements to provide property management or related services at Fort Irwin (provided that it is not necessary for you to provide us with the property management agreement with American Management Services LLC).

3.  Copies of all engagement letters or agreements entered into by or on behalf of CMC, IL or JV in 2009 or 2010 with auditors, accountants (financial and/or forensic) and attorneys representing or providing services for the benefit of CMC, IL or JV.

4.  Copies of all results (full, or partial, and in draft or final form) of any audits, investigations or analyses undertaken by any auditor, accountant or attorney related to CMC, IL, JV and/or Fort Irwin (and including the results of any audits, investigations or analyses prepared by Alix Partners).

5.  Copies of all reports in any form relating to analysis of or comments with respect to internal controls.

6. Monthly and annual financial statements, balance sheets and statements of cash flow for CMC, IL and JV for 2009 and 2010.

7.  A list/schedule of existing A/R for CMC, IL and JV, as well as an accounting of all costs and fees paid by CMC, IL and/or JV in 2009 and 2010 to date for auditing, accounting and/or legal services.

8.  The original 2010 budget for CMC, IL and JV, together with any updates or revisions to those budgets (and including any separate budgets whether prepared by CMC, IL, JV or any other party with respect to the estimated costs and fees of any pending or anticipated litigation, and any updates or revisions to those budget, and copies of any such budgets provided to the Army or its representatives).

9.  All written and email communications between CMC, IL and/or JV and the asset manager, and any written and email communications from the asset manager and in the possession of CMC, IL or JV with respect to CMC, IL, JV, and/or Fort Irwin (including written and email communications from the asset manager to the Army or representatives of the Army in the possession of CMC, IL or JV).

10.  All written and email communications between CMC,, IL and/or JV and the Army or representatives of the Army for 2009 and 2010.

11.  Copies of all results (full or partial, and in draft or final form) of any audits, investigations, reviews or analyses obtained or prepared with respect to the services of Clark affiliated entities for CMC, IL or JV and/or Fort Irwin, including the services provided by the asset manager, design/builder and developer.

EXHIBIT 14

### *Clark Pinnacle Monterey Bay LLC*
4401 Wilson Boulevard
Suite 600
Arlington, VA  22203

July 16, 2010

*Via E-Mail*

Pinnacle Monterey LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121
Attention:  Stan Harrelson, Manager

**Re:  Clark Pinnacle Monterey Bay LLC Records Review**

Dear Stan:

We have reviewed the Clark Pinnacle agreements and have attached the books and records for the years you requested.  We do not agree with the scope of your original request.

If you have any specific concerns regarding aspects of your minority interest please let us know.

Sincerely,

Clark Pinnacle Monterey Bay LLC
By:    Clark Realty Capital, L.L.C., Manager

By: _____
David H. Brody
Corporate Counsel

Attachments

cc:    Mr. W. Cleveland Johnson (w/attach)
Thomas Dutton, Esq. (w/attach)
Michael Kuntz, Esq. (w/attach)
Jeffrey Willian, Esq. (w/attach)

### *Clark Pinnacle California Military Communities LLC*
4401 Wilson Boulevard
Suite 600
Arlington, VA 22203

July 16, 2010

<u>*Via E-Mail*</u>

Pinnacle Irwin LLC
2801 Alaskan Way, Suite 200
Seattle, WA 98121
Attention: Stan Harrelson, Manager

**Re: Clark Pinnacle California Military Communities LLC Records Review**

Dear Stan:

We have reviewed the Clark Pinnacle agreements and have attached the books and records for the years you requested. We do not agree with the scope of your original request.

If you have any specific concerns regarding aspects of your minority interest please let us know.

Sincerely,

Clark Pinnacle California Military Communities LLC
By:      Clark Realty Capital, L.L.C., Manager

By: _____
David H. Brody
Corporate Counsel

Attachments

cc:   Mr. W. Cleveland Johnson (w/attach)
Thomas Dutton, Esq. (w/attach)
Michael Kuntz, Esq. (w/attach)
Jeffrey Willian, Esq. (w/attach)

Monterey Bay Military Housing, et al. v. Pinnacle Monterey LLC, et al.   Case No. M112710 (M115143)

## PROOF OF SERVICE

I, Cathy Sandifer, declare that I am a citizen of the United States, over the age of eighteen years and not a party to the within action. I am an employee of GREENBERG TRAURIG, LLP, and my business address is 1900 University Avenue, Fifth Floor, East Palo Alto, CA 94303. On the date set forth below, I served the following documents:

**PINNACLE IRWIN AND PINNACLE MONTEREY'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF FIDUCIARY DUTY AND ACCOUNTING**

☐ by transmitting via **FACSIMILE** the document(s) listed above to the fax numbers) set forth below, or as stated on the attached service list, on this date at approximately _____, from the sending facsimile machine telephone number of 650-289-7893. The transmission was reported as complete and without error by the machine. Pursuant to California Rules of Court, Rule 2008(e)(4), I caused the machine to print a transmission record of the transmission, a copy of which is attached to the original of this declaration. The transmission report was properly issued by the transmitting facsimile machine.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the **UNITED STATES MAIL** at East Palo Alto, California, addressed as set forth below.

☒ by **OVERNIGHT MAIL** by placing the document(s) listed above in a sealed overnight mail envelope with postage thereon fully prepaid, addressed as set forth below.

☐ by **ELECTRONIC MAIL ("EMAIL") SERVICE** by electronically transmitting the document(s) listed above to the email addresses as set forth below.

☐ **(BY MESSENGER PERSONAL SERVICE).** I caused delivery of such envelope by hand via courier service to the offices of the addressee.

| | |
|---|---|
| Ronald S. Granberg, Esq. | Donna M. Welch, Esq. |
| Justin O'Connell, Esq. | Jeffrey L. Willian, Esq. |
| Granberg Law Firm | Daniel C. Moore, Esq. |
| 134 Central Ave. | Kirkland & Ellis LLP |
| Salinas, CA 93901 | 300 N. LaSalle |
| Fax No. (831) 422-5550 | Chicago, IL 60654 |
| Email: justin@granberglaw.com; | Fax: (312) 862-2200 |
| ron@granberglaw.com | Email: dwelch@kirkland.com |
| | daniel.moore@kirkland.com |
| | jeffrey.willian@kirkland.com |

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for mailing with United States Postal Service/Express Mail, Federal Express and other overnight mail services. The foregoing sealed envelope was placed for collection and mailing this date consistent with the ordinary business practice

1

of my place of employment, so that it will be picked up this date with postage thereon fully prepaid at East Palo Alto, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed on May 31, 2012, at East Palo Alto, California.

Cathy Sandifer

2

Proof of Service

FILED

JUN 2 0 2012

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
DEPUTY

LISA DALIA

1   Justin M. O'Connell, Esq. (Bar No. 232188)
    Granberg Law Office
2   134 Central Avenue
    Salinas, California 93901
3   telephone: (831) 422-6565
    facsimile: (831) 422-5550
4
5   Jeffrey L. Willian, Esq. (pro hac vice)
    Donna M. Welch, Esq. (pro hac vice)
6   Daniel C. Moore, Esq. (pro hac vice)
    Kirkland & Ellis LLP
7   300 N. LaSalle
    Chicago, IL 60654
8   telephone: (312) 862-2425
    facsimile: (312) 862-2200
9
    Attorneys for:  Plaintiffs
10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                        COUNTY OF MONTEREY

13   Monterey Bay Military Housing, LLC,       Case No. M 112710 (M115143)
14   et al.,
                                               **ANSWER TO FIRST**
15              Plaintiffs,                     **AMENDED COMPLAINT**

16        vs.

17   Pinnacle Monterey LLC, et al.,
18              Defendants.

19   And related consolidated action.

20        CLARK REALTY CAPITAL, L.L.C., CLARK PINNACLE MONTEREY

21   BAY LLC, and CLARK PINNACLE CALIFORNIA MILITARY COMMUNITIES

22   LLC (collectively "Defendants"), answers Plaintiffs' First Amended Complaint in

23   case number M115143 as follows; except as specifically admitted herein, all

24   allegations set forth in Plaintiffs' First Amended Complaint are denied:

25   Defendants show as follows:

26

27

28

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

FILED BY FACSIMILE

1

2                                                    1.

3   Responding to Paragraph 1, Defendants admit that Clark Realty is a large

4   nationwide real estate development company.  Defendants lack knowledge and

5   information sufficient to form a belief as to the allegations of the first and second

6   sentences of Paragraph 1, and these allegations stand denied.  Defendants deny the

7   remaining allegations set forth in Paragraph 1 as stated.

8                                                    2.

9   Defendants admit the allegations set forth in the sixth and seventh sentences of

10  Paragraph 2.  Defendants deny the remaining allegations set forth in Paragraph 2 as

11  stated.

12                                                   3.

13  Defendants deny the allegations set forth in Paragraph 3 as stated.

14                                                   4.

15  Responding to Paragraph 4, Defendants show that Pinnacle Monterey and Pinnacle

16  Irwin engaged in wrongful self-dealing, breaching their fiduciary duties in an

17  attempt to unilaterally amend the property management agreements in an attempt to

18  excuse Pinnacle's fraud.  Defendants further show that no amendment to either

19  property management agreement has ever been executed.  The remaining allegations

20  set forth in Paragraph 4 are denied as stated.

21                                                   5.

22  Responding to Paragraph 5, Defendants show that the subject matter of the

23  referenced Second Amended Complaint speaks for itself.  Defendants deny any

24  allegation or averment inconsistent with the terms of the Second Amended

25  Complaint.  The remaining allegations set forth in Paragraph 5 are denied as stated.

26                                                   6.

27  Defendants deny the allegations set forth in Paragraph 6.

28                                                   7.

1 | Defendants deny the allegations set forth in Paragraph 7.

2 | 8.

3 | Defendants lack knowledge and information sufficient to form a belief as to the

4 | allegations of the first sentence of Paragraph 8, and these allegations stand denied.

5 | Defendants admit the remaining allegations set forth in Paragraph 8.

6 | 9.

7 | Defendants lack knowledge and information sufficient to form a belief as to the

8 | allegations of the first sentence of Paragraph 9, and these allegations stand denied.

9 | Defendants admit the remaining allegations set forth in Paragraph 9.

10 | 10.

11 | Defendants lack knowledge and information sufficient to form a belief as to the

12 | allegations of the first and second sentences of Paragraph 10, and these allegations

13 | stand denied.  Defendants deny the remaining allegations set forth in Paragraph 10

14 | as stated.

15 | 11.

16 | Defendants lack knowledge and information sufficient to form a belief as to the

17 | allegations of the first and second sentences of Paragraph 11, and these allegations

18 | stand denied.  Defendants admit the remaining allegations set forth in Paragraph 11.

19 | 12.

20 | Defendants admit the allegations set forth in the first sentence of Paragraph 12.

21 | Defendants deny the remaining allegations set forth in Paragraph 12 as stated.

22 | 13.

23 | Defendants admit the allegations set forth in the first and second sentences of

24 | Paragraph 13.  Defendants deny the remaining allegations set forth in Paragraph 13

25 | as stated.

26 | 14.

27 | Defendants admit the allegations set forth in the first and second sentences of

28 | Paragraph 14.  Defendants deny the remaining allegations set forth in Paragraph 14

1   as stated.

2                                           15.

3   Defendants admit the allegations set forth in the first sentence of Paragraph 15.

4   Defendants deny the remaining allegations set forth in Paragraph 15 as stated.

5                                           16.

6   Defendants admit the allegations set forth in the first sentence of Paragraph 16.

7   Defendants deny the remaining allegations set forth in Paragraph 16 as stated.

8                                           17.

9   Defendants admit the allegations set forth in Paragraph 17.

10                                          18.

11  Defendants admit the allegations set forth in Paragraph 18.

12                                          19.

13  Defendants lack knowledge sufficient to form a belief as to the allegations set forth

14  in Paragraph 19, and the allegations therefore stand denied.

15                                          20.

16  Responding to Paragraph 20, Defendants admit that venue is proper in this court.

17  The remaining allegations set forth in Paragraph 20 are denied as stated.

18                                          21.

19  Responding to Paragraph 21, Defendants admit that venue is proper in this court.

20  The remaining allegations set forth in Paragraph 21 are denied as stated.

21                                          22.

22  Responding to Paragraph 22, Defendants admit that Congress passed the National

23  Defense Authorization Act of 1996, P.L. 104-106, § 2801, to privatize U.S. military

24  housing. Defendants lack knowledge or information sufficient to form a belief as to

25  the truth of the remaining allegations set forth in Paragraph 22, and these allegations

26  therefore stand denied.

27                                          23.

28  The allegations set forth in the second sentence of Paragraph 23 contain the vague

1   and imprecise term "affiliate" and are too vague to allow Defendants to know what

2   Plaintiffs intend by that term, and are therefore too vague to permit a response, and

3   are denied. Defendant lack knowledge or information sufficient to form a belief as

4   to the allegations set forth in the third sentence of Paragraph 23. The remaining

5   allegations set forth in Paragraph 16 are denied as stated.

6                                   24.

7   The allegations of Paragraph 24 are denied as stated. Further responding to

8   Paragraph 24, Defendants state that Clark Realty Capital, L.L.C. and American

9   Managements Services LLC (d/b/a "Pinnacle") participated in the RFP process at

10  certain projects and that written and oral presentations were made. The allegations

11  of paragraph 24 contain vague and imprecise terms such as "intensive",

12  "expensive", and "integral part" and are too vague to allow Defendants to know

13  what Plaintiffs intend by those terms, and are therefore too vague to permit a

14  response and are denied.

15                                  25.

16  The allegations of Paragraph 25 are denied as stated. Further responding to

17  Paragraph 25, Defendants admit that between 2001 and 2004, Clark Realty Capital,

18  L.L.C. and Pinnacle submitted proposals and won privatization projects at

19  Monterey, CA; Belvoir, VA; Irwin, CA; and Fort Benning, GA. It is further

20  admitted that Clark Realty and Pinnacle made other proposals that they did not win.

21                                  26.

22  Responding to Paragraph 26, Defendants admit that Clark Realty and Pinnacle were

23  awarded the right to prepare a CDMP for Monterey and Fort Irwin in 2002. It is

24  further admitted that the CDMP process involved the creation and negotiation of

25  many documents, the subject matter of which speak for themselves. The remaining

26  allegations of paragraph 26 contain vague and imprecise terms such as "blueprint,"

27  "significant," and "intensively" and are too vague to allow Defendants to know what

28  Plaintiffs intend by those terms, and are therefore too vague to permit a response.

1 | The remaining allegations of paragraph 26 are denied as stated.

2 | 27.

3 | Defendants admit the first two sentences of Paragraph 27.  Defendants deny the

4 | remaining allegations set forth in Paragraph 27 as stated.

5 | 28.

6 | Defendants lack knowledge or information sufficient to form a belief as to the truth

7 | of the allegations regarding other parties' reliance, and those allegations therefore

8 | stand denied.  It is admitted that the involvement of both Pinnacle and Clark Realty

9 | Capital, L.L.C. was disclosed in offering materials used at the financing of certain

10 | projects.  It is further admitted that Clark Realty Capital L.L.C. relied (to its ultimate

11 | detriment) on Pinnacle's representations as to its experience and honesty.  The

12 | remaining allegations set forth in Paragraph 28 are denied as stated.

13 | 29.

14 | Defendants deny the allegations set forth in Paragraph 29 as stated.  Further

15 | responding to Paragraph 29, Defendants show that the privatized housing

16 | developments at Monterey and Fort Irwin are governed by many legal documents,

17 | including, without limitations, a property management agreement, operating

18 | agreements and leases, the terms of which speak for themselves.

19 | 30.

20 | Responding to Paragraph 30, Defendants admit that Clark Pinnacle Monterey and

21 | Clark Pinnacle CMC were formed. These limited liability company and their

22 | relationship to any other entities are governed by discrete contract and formation

23 | documents, the terms of which speak for themselves. Defendants deny any

24 | allegation or averment inconsistent with the documents which govern the

25 | relationships of the parties.  All other allegations of Paragraph 30 not specifically

26 | admitted are hereby denied.

27 | 31.

28 | Responding to Paragraph 31, Defendants show that the Operating Agreement of

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

6

Monterey Bay Military Housing v. Pinnacle Monterey, M112710
ANSWER

1  Clark Pinnacle Monterey is a written document, the terms of which speak for

2  themselves.  Defendants deny any allegation, averment or characterization

3  inconsistent with that written document.

4                                        32.

5  Responding to Paragraph 32, Defendants show that the Operating Agreement of

6  Clark Pinnacle CMC is a written document, the terms of which speak for

7  themselves.  Defendants deny any allegation, averment or characterization

8  inconsistent with that written document.

9                                        33.

10  Responding to Paragraph 33, Defendants show that the Operating Agreement of

11  Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms

12  of which speak for themselves.  Defendants deny any allegation, averment or

13  characterization inconsistent with those written documents.

14                                       34.

15  Responding to Paragraph 34, Defendants show that the Operating Agreement of

16  Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms

17  of which speak for themselves.  Defendants deny any allegation, averment or

18  characterization inconsistent with those written documents.

19                                       35.

20  Responding to Paragraph 35, Defendants show that the Operating Agreement of

21  Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms

22  of which speak for themselves.  Defendants deny any allegation, averment or

23  characterization inconsistent with those written documents.

24                                       36.

25  Responding to Paragraph 36, Defendants show that the Operating Agreement of

26  Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms

27  of which speak for themselves.  Defendants deny any allegation, averment or

28  characterization inconsistent with those written documents.

37.

Responding to Paragraph 37, Defendants show that the Operating Agreement of Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms of which speak for themselves.  Defendants deny any allegation, averment or characterization inconsistent with those written documents.

38.

Responding to Paragraph 38, Defendants show that the Operating Agreement of Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms of which speak for themselves.  Defendants deny any allegation, averment or characterization inconsistent with those written documents.

39.

Responding to Paragraph 39, Defendants show that the Operating Agreement of Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms of which speak for themselves.  Defendants deny any allegation, averment or characterization inconsistent with those written documents.

40.

Responding to Paragraph 40, Defendants admit the Initial Development Phase was planned to last 10 years at the Monterey Project and 8 years at the Irwin Project. Defendants deny the remaining allegations set forth in Paragraph 40 as stated.

41.

Responding to Paragraph 41, Defendants admit that AMSC provide certain property management services at the Monterey and Irwin Projects.  These services were provided pursuant to a written Property Management Agreement, the terms of which speak for itself.  Defendants deny any allegation, averment or characterization inconsistent with the Property Management Agreement.

42.

Defendants show that the allegations set forth in Paragraph 42 contain vague and imprecise terms such as "not surprisingly," "much harder," "poor condition," "run-

1  down," and "less satisfied," and are too vague to allow Defendants to know what

2  Plaintiffs intends by those terms, and are therefore too vague to permit a response,

3  and are denied.

4                                    43.

5  Defendants show that the allegations set forth in Paragraph 43 contain vague and

6  imprecise terms such as "more frequent," "very tight," "constant pressure to do

7  more with less," and "doing its best" and are too vague to allow Defendants to know

8  what Plaintiffs intends by those terms, and are therefore too vague to permit a

9  response, and are denied.

10                                   44.

11  Responding to Paragraph 44, Defendants show that the relationship between the

12  referenced entities and AMSC is governed by discrete contract and formation

13  documents, the terms of which speak for themselves.  Defendants deny any

14  allegation, averment or characterization inconsistent with the documents which

15  govern the relationships of the parties.

16                                   45.

17  The allegations of Paragraph 45 are denied as stated.  Further responding to

18  Paragraph 45 Defendants state that MBMH and CMC's representatives and agents,

19  including Monterey Asset Manager LLC and Irwin Asset Manager LLC attempted

20  to work with AMSC pursuant to the property management agreements to provide

21  services at the Monterey and Irwin Projects.  Defendants further show that AMSC

22  had a great deal of discretion in how it provided certain management services.

23  MBMH and CMC ultimately learned that AMSC and its employees and agents were

24  engaged in fraud and knowing and intentional misconduct at Monterey, thereby

25  terminating both property management agreements.

26                                   46.

27  Responding to Paragraph 46, Defendants show that many factors affect the income

28  of a real estate development project, for example, MBMH suffered significant

1    financial harm attributable to AMSC's fraud and knowing and intentional

2    misconduct.  Defendants deny the remaining allegations set forth in Paragraph 46 as

3    stated.

4                                         47.

5    Responding to Paragraph 47, Defendants admit that military residents at military

6    bases have a variety of housing options.  Defendants deny the remaining allegations

7    set forth in Paragraph 47 as stated.

8                                         48.

9    Defendants deny the allegations set forth in Paragraph 48 as stated.

10                                        49.

11   Responding to Paragraph 49, Defendants show that the CDMP was governed by

12   legal written documents, the terms of which speak for themselves.  Defendants deny

13   any allegation, averment or characterization inconsistent with these written

14   documents.  The remaining allegations of Paragraph 49 are denied as stated.

15                                        50.

16   Responding to Paragraph 50, Defendants show that MBMH implemented a

17   Modified Scope Plan in December 2008.  The Modified Scope Plan was governed

18   by written documents, the terms of which speak for themselves.  Defendants deny

19   any allegation, averment or characterization inconsistent with these written

20   documents.  The remaining allegations of Paragraph 50 are denied as stated.

21                                        51.

22   The allegations of Paragraph 51 are denied.  Further responding to Paragraph 51,

23   Defendants show that AMSC has breached its fiduciary duties to MBMH and CMC

24   and has committed fraud and knowing and intentional misconduct at Monterey,

25   causing great harm to the project and automatically terminating both property

26   management agreements.

27                                        52.

28   The allegations set forth in Paragraph 52 are denied as stated.  Further responding to

1  Paragraph 52, Defendants state that Kirkland & Ellis and Alix Partners were

2  properly hired for lawful and proper purposes.

3                  53.

4  Responding to Paragraph 53, Defendants admit that Alix Partners was properly

5  retained to assist in the exercise of MBMH and CMC's contractual audit rights.

6  Defendants further state that in the performance of these audit rights, Alix Partners

7  did ask for information regarding AMSC's operations at Monterey and Fort Irwin.

8  In conducting the audit, Alix Partners was in fact a third party auditor and was

9  working to complete an internal audit.  The remaining allegations of Paragraph 53

10  are denied as stated.

11                  54.

12  The allegations set forth in Paragraph 54 are denied.  Further responding to

13  Paragraph 54, this is the same meritless position proffered by Plaintiffs' counsel in

14  related litigation pending before Judge Frank Jordan in the Superior Court of

15  Muscogee County in Georgia (Docket # SU10CV2025-F).  Judge Jordan rejected

16  this argument, ruling that "The Court finds it ridiculous to think that Pinnacle and its

17  employees did not know AlixPartners were engaged to find fraud."

18                  55.

19  The allegations set forth in Paragraph 55 are denied as stated.  Further responding to

20  Paragraph 55, Defendants show that the subject matter of MBMH and CMC's

21  complaint against Pinnacle speaks for itself.

22                  56.

23  The allegations set forth in Paragraph 56 are denied as stated.  Further responding to

24  Paragraph 56, Defendants show that the subject matter of MBMH and CMC's

25  complaint against Pinnacle speaks for itself.

26                  57.

27  The allegations in Paragraph 57 are denied.

28                  58.

1 | The allegations in Paragraph 58 are denied.

2 | 59.

3 | The allegations in Paragraph 59 are denied.

4 | 60.

5 | Responding to Paragraph 60, Defendants show that the operating agreements of

6 | Clark Pinnacle Monterey and Clark Pinnacle Irwin are written documents, the terms

7 | of which speak for themselves.  Defendants deny any allegation, averment or

8 | characterization inconsistent with those written documents.

9 | 61.

10 | Responding to Paragraph 61, Defendants show that the operating agreements of

11 | Clark Pinnacle Monterey and Clark Pinnacle Irwin, as well as the property

12 | management agreements, are written documents, the terms of which speak for

13 | themselves.  Defendants deny any allegation, averment or characterization

14 | inconsistent with those written documents.

15 | 62.

16 | Responding to Paragraph 62, Defendants show that the referenced correspondence

17 | speaks for itself, and deny the remaining allegations of Paragraph 62 as stated.

18 | 63.

19 | Responding to Paragraph 63, Defendants show that the referenced correspondence

20 | speaks for itself, and deny the remaining allegations of Paragraph 63 as stated.

21 | Defendants further deny that the Paragraph accurately describes the terms of the

22 | Proposed Amendment to the CMC Property Management Agreement.

23 | 64.

24 | Responding to Paragraph 64, Defendants show that the referenced correspondence

25 | speaks for itself and deny the remaining allegations of Paragraph 64 as stated.

26 | 65.

27 | Responding to Paragraph 65, Defendants state that Pinnacle has not properly called

28 | a meeting for a vote on the proposed amendments and admit that they have not

1 | attended any meetings of Clark Pinnacle CMC or Clark Pinnacle Monterey's
2 | managers at which the proposed amendments have been properly put to a vote.
3 | Defendants further state that the May 19 letter speaks for itself and deny the
4 | remaining allegations of Paragraph 65.
5 | 66.
6 | Responding to Paragraph 66, Defendants show that the referenced correspondence
7 | speaks for itself and deny the remaining allegations of Paragraph 66 as stated.
8 | 67.
9 | Responding to Paragraph 67, Defendants show that the referenced correspondence
10 | speaks for itself and deny the remaining allegations of Paragraph 67 as stated.
11 | 68.
12 | Responding to Paragraph 68, Defendants show that the referenced correspondence
13 | speaks for itself and deny the remaining allegations of Paragraph 68 as stated.
14 | 69.
15 | Responding to Paragraph 69, Defendants show that the referenced correspondence
16 | speaks for itself and deny the remaining allegations of Paragraph 69 as stated.
17 | 70.
18 | Responding to Paragraph 70, Defendants show that the referenced correspondence
19 | speaks for itself and deny the remaining allegations of Paragraph 70 as stated.
20 | 71.
21 | Defendants deny the allegations set forth in Paragraph 71.
22 | 72.
23 | Defendants deny the allegations set forth in Paragraph 72.
24 | 73.
25 | Responding to Paragraph 73, Defendants state that the operating agreements of
26 | Clark Pinnacle Monterey and Clark Pinnacle CMC are written documents, the terms
27 | of which speak for themselves.  Defendants deny any allegation, averment or
28 | characterization inconsistent with those written documents.

1 | 74.

2 | Responding to Paragraph 74, Defendants show that the referenced correspondence

3 | speaks for itself and deny the remaining allegations of Paragraph 74 as stated.

4 | 75.

5 | Responding to Paragraph 75, Defendants admit that, in response to an audit request,

6 | the manager of Clark Pinnacle CMC and the manager of Clark Pinnacle Monterey

7 | provided Plaintiffs with all books and records of Clark Pinnacle CMC and Clark

8 | Pinnacle Monterey.  The remaining allegations of Paragraph 75 are denied.

9 | 76.

10 | Responding to paragraph 76 Defendants incorporate by reference *in haec verba*,

11 | their responses to paragraphs numbered 1 through 75.

12 | 77.

13 | Responding to paragraph 77, Defendants state that Cal. Code Civ. Pro. §1060 speaks

14 | for itself.

15 | 78.

16 | Defendants admit the allegations set forth in Paragraph 78.

17 | 79.

18 | Defendants deny the allegations set forth in Paragraph 79.

19 | 80.

20 | Responding to paragraph 80, Defendants state that Plaintiffs are not entitled to the

21 | relief they seek, or any other relief.

22 | 81.

23 | Responding to paragraph 81, Defendants incorporate by reference *in haec verba*,

24 | their responses to paragraphs numbered 1 through 80.

25 | 82.

26 | Responding to paragraph 82, Defendants state that Cal. Code Civ. Pro. §1060

27 | speaks for itself.

28 | 83.

1 | Defendants admit the allegations set forth in Paragraph 83.

2 | 84.

3 | Defendants deny the allegations set forth in Paragraph 84.

4 | 85.

5 | Responding to paragraph 80, Defendants state that Plaintiffs are not entitled to the

6 | relief they seek, or any other relief.

7 | 86.

8 | Responding to paragraph 86, Defendants incorporate by reference *in haec verba,*

9 | their responses to paragraphs numbered 1 through 85.

10 | 87.

11 | Responding to paragraph 87, Defendants state that the relationship of Clark Realty

12 | Capital, L.L.C. to Plaintiffs, if any, is governed by written operating agreements and

13 | other written formation documents.  Defendants deny any allegation, averment or

14 | characterization inconsistent with those written documents.

15 | 88.

16 | Defendants deny the allegations set forth in Paragraph 88.

17 | 89.

18 | Defendants deny the allegations set forth in Paragraph 89.

19 | 90.

20 | Defendants deny the allegations set forth in Paragraph 90.

21 | 91.

22 | Defendants deny the allegations set forth in Paragraph 91.

23 | 92.

24 | Defendants deny the allegations set forth in Paragraph 92.

25 | 93.

26 | Defendants deny the allegations set forth in Paragraph 93.

27 | 94.

28 | Defendants deny the allegations set forth in Paragraph 94.

95.

Defendants deny the allegations set forth in Paragraph 95

96.

Defendants deny the allegations set forth in Paragraph 96.

97.

Defendants deny the allegations set forth in Paragraph 97

98.

Responding to paragraph 98, Defendants incorporate by reference *in haec verba*, their responses to paragraphs numbered 1 through 97

99.

Responding to paragraph 99, Defendants state that the relationship of Clark Realty Capital, L.L.C. to Plaintiffs, if any, is governed by written operating agreements and other written formation documents.  Defendants deny any deny any allegation, averment or characterization inconsistent with those written documents.

100.

Defendants deny the allegations set forth in Paragraph 100.

101.

Defendants deny the allegations set forth in Paragraph 101.

102.

Defendants deny the allegations set forth in Paragraph 102.

103.

Defendants deny the allegations set forth in Paragraph 103.

104.

Defendants deny the allegations set forth in Paragraph 104.

105.

Defendants deny the allegations set forth in Paragraph 105.

106.

Defendants deny the allegations set forth in Paragraph 106.

1   107.

2   Defendants deny the allegations set forth in Paragraph 107.

3   108.

4   Defendants deny the allegations set forth in Paragraph 108.

5   109.

6   Defendants deny the allegations set forth in Paragraph 109.

7   110.

8   Responding to paragraph 110, Defendants incorporate by reference *in haec verba*,

9   their responses to paragraphs numbered 1 through 109.

10   111.

11   Defendants admit the allegations set forth in Paragraph 111.

12   112.

13   Responding to paragraph 112, Defendants state that Plaintiffs are not entitled to the

14   relief they seek, or any other relief.

15   113.

16   Responding to paragraph 113, Defendants state that Plaintiffs are not entitled to the

17   relief they seek, or any other relief.

18   114.

19   Responding to paragraph 114, Defendants incorporate by reference *in haec verba*,

20   their responses to paragraphs numbered 1 through 113.

21   115.

22   Defendants admit the allegations set forth in Paragraph 115.

23   116.

24   Responding to paragraph 116, Defendants state that Plaintiffs are not entitled to the

25   relief they seek, or any other relief.

26   117.

27   Responding to paragraph 117, Defendants state that Plaintiffs are not entitled to the

28   relief they seek, or any other relief.

118.

Responding to paragraph 118, Defendants incorporate by reference *in haec verba*, their responses to paragraphs numbered 1 through 117.

119.

Responding to paragraph 119, Defendants state that Cal. Code Civ. Pro. §1060 speaks for itself.

120.

Defendants admit the allegations set forth in Paragraph 120.

121.

Responding to Paragraph 121, Defendants state that the terms of the operating agreement speak for themselves.

122.

Defendants deny the allegations set forth in Paragraph 122.

123.

Responding to Paragraph 123, Defendants state that Plaintiffs are not entitled to the relief they seek, or any other relief.

124.

Responding to paragraph 124, Defendants incorporate by reference *in haec verba*, their responses to paragraphs numbered 1 through 123.

125.

Responding to paragraph 125, Defendants state that Cal. Code Civ. Pro. §1060 speaks for itself.

126.

Defendants admit the allegations set forth in Paragraph 126.

127.

Responding to Paragraph 127, Defendants state that the terms of the operating

1  agreement speak for themselves.

2                                        128.

3  Defendants deny the allegations set forth in Paragraph 128.

4                                        129.

5  Responding to Paragraph 129, Defendants state that Plaintiffs are not entitled to the

6  relief they seek, or any other relief.

7

8  **AFFIRMATIVE DEFENSES**

9  As separate and distinct affirmative defenses, Defendants allege that:

10  1.            Cross-Complainants/Defendants defaulted in the performance of their

11  obligations under the contract alleged in the complaint on file herein.

12  2.            Cross-Complainants/Defendants are guilty of laches, and as a result

13  thereof their right to recover on the complaint on file herein is barred.

14  3.            Cross-Complainants/Defendants are guilty of unclean hands, and as a

15  result thereof their right to recover on the complaint on file herein is barred.

16  4.            Cross-Complainants/Defendants should be estopped from asserting any

17  right to recovery on the complaint on file herein.

18  5.            Cross-Complainants/Defendants have failed to state a claim.

19                              Respectfully submitted,

20

21  Date: 6/20/12

22

23                              Justin M. O'Connell, Esq.

24

25

26

27

28

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

19          Monterey Bay Military Housing v. Pinnacle Monterey, M112710
                                                        ANSWER

**MONTEREY BAY HOUSING v. PINNACLE MONTEREY**
**MONTEREY COUNTY SUPERIOR COURT CASE NO. M 112710**

## PROOF OF SERVICE

I am employed in the County of Monterey, State of California. I am over the age of eighteen years and not a party to the within action. My business address is 134 Central Avenue, Salinas, California.

On June 20, 2012, I caused the following documents entitled:

**ANSWER TO FIRST AMENDED COMPLAINT**

to be served on the party(ies) or its (their) attorney(s) of record in this action listed below by the following means:

☒ **BY MAIL.** By placing each sealed envelope (with postage affixed thereto) in the U.S. Mail at the Law Office of Ronald S. Granberg, 134 Central Avenue, Salinas, CA 93901. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the U.S. Postal Service, and, in the ordinary course of business, correspondence would be deposited with the U.S. Postal Service in the same day it was placed for collection and processing.

☐ **BY HAND-DELIVERY.** By causing a true copy thereof, enclosed in a sealed envelope, to be delivered by hand to the address(es) shown below.

☐ **BY OVERNIGHT DELIVERY.** By placing with United Parcel Service for delivery a true copy thereof, enclosed in a sealed envelope, to the address(es) shown below, with delivery charges to be billed to the Law Office of Ronald S. Granberg.

☒ **BY FACSIMILE TRANSMISSION.** By transmitting a true copy thereof by facsimile transmission from facsimile number (831) 422-5550 to the interested party(ies) or their attorney of record to said action at the facsimile number(s) shown below.

And addressed as follows:

*Via Email: goinesw@gtlaw.com*
*Via Facsimile: (650)328-8508*
William J. Goines, Esq.
Greenberg Traurig, LLP
1900 University Ave., 5th Floor
East Palo Alto, CA 94303

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June 20, 2012, at Salinas, California.

_____
Ramon Campos

Granberg Law Office
134 Central Avenue
Salinas, CA 93901

S:\00-data\02-client\mbmh 6784\pos\pos062012.doc

Monterey Bay Military Housing v. Pinnacle Monterey #M 112710
PROOF OF SERVICE