1

2

3                     UNITED STATES DISTRICT COURT

4                     NORTHERN DISTRICT OF CALIFORNIA

5                            SAN JOSE DIVISION

6

7   MONTEREY BAY MILITARY HOUSING,        Case No.  14-cv-03953-BLF
    LLC, et al.,

8                    Plaintiffs,

9         v.                              ORDER DENYING MOTION TO
                                          DISSOLVE PRELIMINARY
10  PINNACLE MONTEREY LLC, et al.,         INJUNCTION

11                   Defendants.           [Re:  ECF 36]

12

13        This action involves a deteriorating relationship between two companies that joined

14  together to pursue military housing contracts.  The parties initiated their dispute in the Superior

15  Court for the County of Monterey and litigated the case there for two years before the defendants

16  removed the action to federal court.  Before the Court is Plaintiffs' Motion to Dissolve

17  Preliminary Injunction.  Pl.'s Mot., ECF 36.  Plaintiffs seek to lift a preliminary injunction entered

18  by the state court in 2012 before this action was removed to federal court.  The Court heard oral

19  argument on January 15, 2015 and ordered supplemental briefing on January 27, 2015 following a

20  flurry of activity that both parties undertook based on their impressions of the oral argument.  *See*

21  ECF 108.  For the reasons stated herein, Plaintiffs' motion is DENIED.

22  **I.    BACKGROUND**

23       **A.    Factual Overview**

24        In 2001, Clark Realty Capital and American Management Services LLC ("AMS"), doing

25  business as "Pinnacle," joined together to bid for privatization projects in U.S. military housing.[1]

26  _____

27  [1] Defendants aver in their opposition brief that the two companies "formed Clark Pinnacle Family
    Communities LLC" to pursue these projects.  Def.'s Opp. 2, ECF 61.  The record before this Court
28  contains no evidence of the formation of this limited liability company or of its operating
    agreement.

United States District Court
Northern District of California

1    Decl. of Alice Y. Chu, ECF 61-1 Exh. 1 ¶ 3 (Decl. of Stanley Harrelson).  The companies drew up

2    a Term Sheet in 2001 memorializing their arrangement.  Chu Decl. Exh. 2.  After numerous

3    rejected bids, Clark Realty and AMS eventually won contracts to develop and manage residential

4    properties at Monterey Presidio and Fort Ord in California; Fort Belvoir Virginia; Fort Irwin,

5    Moffett Field and Parks Reserve Training Grounds in California; and Fort Benning Georgia.

6    Harrelson Decl. ¶ 6.  At each property, or "project," Clark Realty and AMS set up a series of

7    "interrelated limited liability companies to manage, own and operate the projects." *Id.* ¶ 11.

8    When the relationship fell apart, the entities sued one another.  This lawsuit concerns the

9    residential housing projects at Monterey Presidio and Fort Irwin and the various entities that

10   developed and manage those projects.  The parties' related entities are also embroiled in litigation

11   in Georgia concerning the Fort Belvoir and Fort Benning projects.

12        Plaintiffs in this action are entities affiliated with Clark Realty:[2] (1) Monterey Bay Military

13   Housing, LLC ("MBMH"), a Delaware limited liability company; (2) Clark Pinnacle Monterey

14   Bay LLC ("CPMB"), a California limited liability company; (3) Clark Monterey Presidio LLC, a

15   Delaware limited liability company; (4) California Military Communities LLC ("CMC"), a

16   Delaware limited liability company; (5) Clark Pinnacle California Military Communities LLC

17   ("CPCMC"), a California limited liability company; and (6) Clark Irwin LLC, a Delaware limited

18   liability company (collectively, "Plaintiffs").  Fourth Amended Complaint ("FAC") ¶¶ 7-12, ECF

19   1-24.  Defendants are: (1) AMS, a Washington State limited liability company that does business

20   as Pinnacle, as well as entities affiliated with AMS including (2) American Management Services

21   California Inc. ("AMSC"), a California corporation; (3) Pinnacle Monterey LLC, a Washington

22   State limited liability company; (4) Pinnacle Irwin LLC, a Washington State limited liability

23   company; (5) Goodman Real Estate, Inc., a Washington corporation (previously doing business as

24   Goodman Financial Services, Inc.); (6) Stanley Harrelson, the former Chief Executive Officer for

25   AMS; and (7) John Goodman, the founder and Chairman of the Board for AMS (collectively,

26   "Defendants").  *Id.* ¶¶ 13-20.  AMS does business as Pinnacle and is the parent company of a

27

28   [2] Clark Realty is a counterclaim defendant, *see* Counterclaims ¶ 13, ECF 12, but is not identified
     as a plaintiff in the FAC.

United States District Court
Northern District of California

1   variety of Pinnacle entities, including the Pinnacle Irwin and Pinnacle Monterey defendants.

2       At the heart of this case are Property Management Agreements ("PMAs") appointing

3   defendant AMSC as the property manager at the Monterey and Irwin projects. *See* Decl. of Daniel

4   C. Moore, ECF 36-1 Exh. 7 (Monterey PMA), Exh. 8 (CMC PMA).  Plaintiffs allege that since the

5   inception of those projects, AMSC has engaged in "widespread falsification of work order data,

6   and other project data" at the Monterey and Irwin projects.  FAC ¶ 49; *see generally id.* ¶¶ 64-91.

7   Moreover, AMSC is alleged to have entered into insurance agreements that improperly benefited

8   AMSC in contravention of its obligations under the PMAs.  *Id.* ¶¶ 92-127.  Based on these

9   allegations of intentional fraud, Plaintiffs seek to remove AMSC as the property manager for the

10  projects and seek, among other claims for relief, a declaration that the PMAs have automatically

11  terminated pursuant to a default provision in the agreements.  *Id.* ¶¶ 173-84.  Plaintiffs also filed

12  suit in Georgia based on similar allegations of fraud at Fort Benning and Fort Belvoir.  They

13  allege that the Army supports this and the litigation in Georgia, as well as the removal of AMSC

14  from its position as property manager for the Monterey and Irwin projects.  *Id.* ¶ 47.

15      It is not clear when Plaintiffs discovered the fraudulent conduct at the Monterey and Irwin

16  projects or whether they notified AMSC of the discovery and invoked the default provision of the

17  PMAs.[3]  The Court observes only that at Fort Benning, the property manager walked off the

18  project after being notified in June 2010 that the PMA for that project was terminated due to fraud

19  and intentional misconduct.  *Id.* ¶ 45.  In late 2011, following initiation of the Georgia action and

20  an audit at the Monterey and Irwin projects, defendants Pinnacle Monterey and Pinnacle Irwin

21  sought to "adjust" the default provision of the PMAs pursuant to a contractual right under a set of

22  limited liability operating agreements that govern plaintiffs CPMB and CPCMC, of which

23  defendants Pinnacle Monterey and Pinnacle Irwin are respective minority members.  *Id.* ¶¶ 48-49,

24  53-63; *see* Moore Decl. Exh. 13 (CPMB Op. Ag.), Exh. 14 (CPCMC Op. Ag.).  The Pinnacle

25  entities invoked a contractual right to vote on and resolve deadlocks with respect to adjustments to

26  the terms of the PMAs.  It is Defendants' position that the vote was successful and that the PMAs

27

28  [3] Clearly such termination for default had not been invoked at the time of the first motion for
    preliminary injunction, *see infra* at 7, whereupon Clark was enjoined from doing so.

were amended to require that intentional fraud must have a "material adverse effect" on the projects and must go uncured for 15 days before the default for fraud provision of the PMAs is triggered.  *See* FAC ¶ 58; Answer to FAC and Counterclaims at Counterclaims ¶¶ 70-75, ECF 12. Plaintiffs predictably dispute the validity of these adjustments, and both parties seek declaratory relief regarding such.  FAC ¶¶ 155-72; Counterclaims ¶¶ 84-105.

### B.    The Agreements at Issue

Untangling the underpinnings of the present preliminary injunction against Plaintiffs requires an understanding of the many layers of contracts and limited liability companies that make up the parties' relationship.

### i.    The Property Management Agreements (PMAs)

The underlying claims revolve around AMSC's conduct as property manager and how that conduct affects the continued validity of the PMAs.  The Monterey PMA was entered in 2003 between plaintiff MBMH—the "Owner" of the property—and defendant AMSC as "Manager." At Fort Irwin, the PMA was entered in 2004 between plaintiff CMC—the "Owner"—and AMSC as "Manager."[4]  Section 10 of the PMA describes the relationship between MBMH and AMSC, with AMSC acting as an independent contractor and agent within the scope of the authority set forth in the agreement.  Monterey PMA at p. 7.[5]  Section 22 provides that the PMA "constitutes the entire agreement between Owners and Manager with respect to the management and operation of the Project and supersedes and replaces any and all previous management agreements entered into and/or negotiated between Owners and Manager relating to the Project covered by this Agreement."  *Id.* at p. 15.  As previously stated, Plaintiffs contend that the PMAs terminated automatically following their discovery of AMSC's intentional fraud.  Section 18 of the PMAs governs termination and provides that the agreement shall terminate "upon the occurrence of"

---

[4] Although MBMH and CMC are identified as "Owners," they actually lease the project real property from special purpose entities that are 49% owned by the United States of America.  FAC ¶ 28 n.2.

[5] The PMAs for both the Monterey and Irwin projects are substantially similar.  Unless otherwise noted, exemplary references to the Monterey PMA hold true for the Irwin PMA as well.

United States District Court
Northern District of California

certain events, including breach of the agreement and specific events of default.[6]  *Id.* ¶ 18.1.  One such event of default is "theft, fraud, or other knowing or intentional misconduct by [AMSC] or its employees or agents."  *Id.* ¶ 18.1(C)(6).  The PMAs are silent as to notification to the Manager of the Owner's election to terminate the PMAs under this default provision.

### ii. The Monterey Bay Military Housing, LLC (MBMH) and California Military Communities LLC (CMC) Operating Agreements

One layer above the PMAs are the operating agreements for plaintiffs MBMH and CMC, which are limited liability companies with other limited liability companies as members.  Moore Decl. Exh. 11 (MBMH Op. Ag.), Exh. 12 (CMC Op. Ag.).  Most importantly, "Clark Pinnacle Monterey" (plaintiff CPMB) is the Managing Member for MBMH and "Clark Pinnacle California" (plaintiff CPCMC) is the Managing Member for CMC.  MBMH Op. Ag. at p. 8.[7]  The Managing Member has the principle responsibility for "managing the business and affairs of the Company," which includes entering into the PMAs with AMSC.  MBMH Op. Ag. ¶ 4.1(a) and pp. 11-12.  This leads to the third layer of limited liability company operating agreements, which is where the parties' other disputes lie.

### iii. The Clark Pinnacle Monterey Bay LLC (CPMB) and Clark Pinnacle California Military Communities (CPCMC) Operating Agreements

Plaintiffs CPMB and CPCMC are both limited liability companies comprised of groups of member entities affiliated with Clark Realty and AMS.  *See* CPMB Op. Ag. ¶ 2.1(a).[8]  Each member group, acting collectively, appoints one Manager—the "Clark Manager" for the members affiliated with Clark Realty and the "Pinnacle Manager" for the members affiliated with AMS.  *Id.* ¶ 3.1(a).  For CPMB, the appointed Clark Manager is Clark Realty, and the Pinnacle Manager is defendant Pinnacle Monterey.  *Id.*  For CPCMC, the appointed Clark Manager is also Clark

---

[6] Termination for breach occurs after notice of a material breach and failure to cure the breach within the specified time.  Monterey PMA ¶ 18.1(A).

[7] As with the PMAs, the MBMH and CMC operating agreements are substantially similar.

[8] The CPMB and CPCMC operating agreements are also substantially similar, and exemplary references are made to the CPMB agreement.

United States District Court
Northern District of California

1    Realty, but the Pinnacle Manager is defendant Pinnacle Irwin.  *Id.*

2        Each operating agreement provides that the members consent to MBMH and CMC

3    entering into service contracts with Clark Realty and AMS affiliates.  The CPMB operating

4    agreement requires MBMH to enter "into one or more property management agreements . . . with

5    Pinnacle Realty Management Company, an Affiliate of the Pinnacle Group," *id.* ¶ 3.15(a)(3),

6    which agreement could be freely transferred, assigned, or subcontracted to AMSC without consent

7    of the Clark Manager, *id.* ¶ 3.15(b).  The CPCMC operating agreement simply requires CMC to

8    "enter into one or more property management agreements . . . with [AMSC]."  CPCMC Op. Ag. ¶

9    3.15(a)(3).  Both provisions require that the property management agreements be entered "on or

10   before the Effective Date" of each agreement, *see id.*, and there is some dispute as to whether this

11   makes the requirement a one-time condition precedent or a lasting requirement that the property

12   management agreements always be assigned to some AMS affiliate.

13       More relevant to the present motion, the CPMB and CPCMC operating agreements

14   delineate what actions each Manager can take without the approval of the other.  Notably, the

15   Clark Manager has "acting authority to make all decisions regarding the management of the

16   Company's business and affairs" except with respect to "Major Decisions."  CPMB Op. Ag. ¶

17   3.1(b)(2).  The Pinnacle Manager, as the representative for the minority members, has no authority

18   to "make decisions regarding the management of the Company's business and affairs or to act on,

19   consent to or approve matters of the Company without the vote or signature of the Clark

20   Manager."  *Id.*  The Pinnacle Manager does have the power, however, to vote on Major Decisions,

21   which require the consent of both Managers.  *Id.* ¶ 3.1(b)(3).

22       The key Major Decision in dispute here is defined in the section titled "Management and

23   Rights of Members" at paragraph 3.1(b)(2)(E):  "Adjustments to the terms or conditions of the

24   Property Management Agreement (as herein defined), but the decision to enforce or take any other

25   action with respect to any of the terms or conditions thereof shall not be deemed a Major

26   Decision."  The agreement also provides that should there be a deadlock in the voting on Major

27   Decisions, the Pinnacle Manager shall have the sole discretion to resolve deadlocks in voting

28   "with respect to any matter arising under, relating to, or affecting the terms or conditions of the

United States District Court
Northern District of California

6

1    Property Management Agreement."  CPMB Op. Ag. ¶ 3.13(c).  Obviously, the Pinnacle Managers

2    cannot exercise this power to resolve deadlocks unless there is a Major Decision that requires a

3    vote between the Managers.

4           Clark Realty, as the Clark Manager, seeks to "enforce" the default provision of the existing

5    PMAs against AMSC and argues that the alleged intentional fraud by AMSC has automatically

6    terminated the PMAs.  As already described, the Pinnacle Managers invoked the Major Decision

7    and deadlock resolution provisions in 2011 to "adjust" the default provision of the PMAs so that

8    termination for intentional fraud may only occur if the fraud is material and goes uncured.

9    Plaintiffs assert that these adjustments were invalid because the PMAs had already terminated

10   automatically due to intentional fraud, the changes were not set forth in writing signed by both

11   Managers, the Pinnacle Managers could not exercise their deadlock powers because the Clark

12   Managers refused to vote, and in any event the proposed changes violate the Pinnacle Managers'

13   fiduciary duties and are against public policy.  *See* FAC ¶¶ 135-154.  The Court notes, however,

14   that there is no evidence as to when or whether MBMH and CMC invoked the termination for

15   default provision in the PMAs, only allegations that termination was allowed or "automatic" based

16   upon AMSC's fraud.  Defendants contend that the disputed adjustments are valid and that MBMH

17   and CMC accordingly cannot revoke AMSC's agency without breaching the PMAs because no

18   default has occurred under the adjusted terms.  *See* Counterclaims ¶¶ 84-119.  It is against this

19   backdrop that the Court considers the state court's preliminary injunction restraining Plaintiffs

20   from revoking the PMAs.

21          **C.    Procedural History**

22          This case began in 2011, with both sides rushing to different courthouses to file declaratory

23   relief complaints on the same day.  *See* Notice of Removal ¶¶ 1-2, ECF 1.  Eventually, the claims

24   were consolidated in the Superior Court for the County of Monterey.  *Id.* ¶¶ 3-5.  Plaintiffs sought

25   and obtained a preliminary injunction pursuant to California Code of Civil Procedure § 526(a)(3)

26   to maintain the status quo.  The state court, in its December 28, 2011 injunction, ordered that

27   "Defendants may not take actions that are based on their contention that the disputed provisions of

28   [the PMAs] have already been adjusted.  Plaintiffs may not take actions that are based on their

United States District Court
Northern District of California

7

1    contention that the disputed provisions of [the PMAs] have not been adjusted."  Moore Decl. Exh.

2    41 at 1-2 (Status Quo Inj.).

3         Plaintiffs later sought clarification of the status quo injunction, querying whether it

4    prevented them from removing AMSC as the property manager at Monterey and Fort Irwin

5    pursuant to a statutory power under California Civil Code § 2356 (and general principles of

6    agency law) that permits a principal to remove an agent at any time unless the "power of an agent

7    is coupled with an interest in the subject of the agency."  Cal. Civ. Code § 2356(a).  The state

8    court indicated that the status quo injunction did not enjoin the exercise of any statutory powers.

9    Chu Decl. Exh. 12 at 28:25-28 (Sept. 27, 2012 Hr'g Tr.) ("The Court simply said that plaintiffs

10   can't assume fraud, can't assume that the contract is over, defendants can't assume that the

11   contract has been modified.").  Defendants then sought a preliminary injunction preventing

12   Plaintiffs from exercising a purported statutory power to remove AMSC from the projects, which

13   the state court granted.  Chu Decl. Exh. 17 (Nov. 15, 2012 Hr'g Tr.).

14        On December 26, 2012, the state court entered the preliminary injunction that is the subject

15   of the present motion.  The injunction provides that MBMH, CPMB, Clark Monterey Presidio,

16   CMC, CPCMC, Clark Irwin, and Clark Realty Capital LLC, collectively referred to as "Clark," do

17   not have the statutory power pursuant to California Civil Code § 2356 to revoke the PMAs

18   because defendants Pinnacle Monterey, Pinnacle Irwin, AMS, and AMSC, collectively referred to

19   as "Pinnacle," have an "agency coupled with an interest."  Consequently, "Clark, and all persons

20   or entities in active concert or participation with Clark, is enjoined from revoking the PMAs."

21   Moore Decl. Exh. 43 at 2 (Prelim. Inj.).  The injunction order further states that "even if Pinnacle

22   does not have an agency coupled with an interest in the PMAs, Clark, and all persons or entities in

23   active concert or participation with Clark, is enjoined from revoking the PMAs because Clark

24   owes Pinnacle a fiduciary duty."  *Id.*; *see also* Nov. 15, 2012 Hr'g Tr. 79:25-81:4.  The court

25   found that "Pinnacle will be irreparably harmed if Clark revokes the PMAs" and noted that Clark

26   had waived the posting of a bond to sustain the injunction.  Prelim. Inj. at 2.

27        Plaintiffs appealed that preliminary injunction order to the California Court of Appeal.

28   The appeal was fully briefed by November 1, 2013, and on August 27, 2014 Plaintiffs requested

United States District Court
Northern District of California

1   oral argument.  *See* Pl.'s Mot. 10.  On August 11, 2014, however, the state court granted Plaintiffs

2   leave to file an amended pleading.  When Plaintiffs filed the presently operative Fourth Amended

3   Complaint ("FAC") on August 18, 2014, it recited a new claim against Defendants for violations

4   of 18 U.S.C. § 1962 ("civil RICO").  With that, Defendants on September 2, 2014 removed the

5   entire action to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

6   *See* Notice of Removal.  Thereafter, Plaintiffs filed the instant motion to dissolve the state court's

7   preliminary injunction, noting that its appeal in the California Court of Appeal had been mooted

8   by removal to federal court.  Pl.'s Mot. 10.  Following removal, the parties also asked to proceed

9   to trial expeditiously, and a lengthy jury trial is presently set to begin on August 3, 2015.

10  ## II.   LEGAL STANDARDS

11  ### A.   Federal Rule of Civil Procedure 59(e) Motions for Reconsideration

12          Plaintiffs' motion, though styled as a motion to "dissolve" the preliminary injunction, is in

13  essence seeking reconsideration of the state court's order granting preliminary injunction.  As

14  such, Plaintiffs' motion is properly brought pursuant to Federal Rule of Civil Procedure 59(e).[9]

15  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124-25 (9th Cir. 2005).

16          The standards governing reconsideration pursuant to Rule 59(e) are well known to the

17  parties: "a motion for reconsideration should not be granted, absent highly unusual circumstances,

18  unless the district court is presented with [1] newly discovered evidence, [2] committed clear

19  error, or [3] if there is an intervening change in the controlling law."  *389 Orange St. Partners v.*

20  *Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) (citing *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d

21  1255, 1263 (9th Cir. 1993)).  Moreover, a Rule 59(e) motion "'may not be used to relitigate old

22  matters, or to raise arguments or present evidence that could have been raised prior to the entry of

23  judgment.'"  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *accord Kona Enters. v.*

24

---

25  [9] Plaintiffs timely filed the present motion on September 21, 2014, within 28 days of removal of
    the action to this Court. Fed. R. Civ. P. 59(e).  Although Defendants argue that Plaintiffs should
26  have sought leave to file a motion for reconsideration pursuant to Civil Local Rule 7-9, that rule
    imposes no time limits on filing and applies only to interlocutory orders that can be reconsidered
27  at any time before the entry of final judgment.  *See* Civ. L.R. 7-9(a); Fed. R. Civ. P. 54(b).  In any
    event, the standards for reconsideration under Rule 59(e) and Civil Local Rule 7-9 are nearly
28  identical, particularly as to the grounds upon which Plaintiffs seek reconsideration here.

1    *Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

2          Here, Plaintiffs seek reconsideration of the state court's injunction order based upon clear

3    error of law "as well as the development of new evidence of ongoing fraud." Pl.'s Mot. 12.

4    "Clear error occurs when 'the reviewing court on the entire record is left with the definite and firm

5    conviction that a mistake has been committed.'" *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950,

6    955 (9th Cir. 2013) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

7    However, "[a] district court does not commit clear error warranting reconsideration when the

8    question before it is a debatable one." *Bailey v. Diaz*, No. C 12-1414 CRB (PR), 2013 WL

9    6189183, at *1 (N.D. Cal. Nov. 25, 2013) (citing *McDowell v. Calderon*, 197 F.3d 1253, 1256

10   (9th Cir. 1999)).

11         The fact that Plaintiffs seek reconsideration of an order entered by a state court before

12   removal does not significantly alter the analysis.  After removal, "[t]he federal court takes the case

13   as it finds it on removal and treats everything that occurred in the state court as if it had taken

14   place in federal court." *Butner v. Neustadter*, 324 F.2d 783, 785 (9th Cir. 1963).  "Consequently,

15   an order entered by a state court 'should be treated as though it had been validly rendered in the

16   federal proceeding.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 887 (9th Cir. 2010)

17   (quoting *Butner*, 324 F.2d at 786).  Once removed, "federal rather than state law governs the

18   future course of proceedings, notwithstanding state court orders issued prior to removal." *Granny*

19   *Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415

20   U.S. 423, 437 (1974).  Indeed, 28 U.S.C. § 1450 recognizes a district court's authority, after

21   removal, to dissolve or modify orders entered by a state court before removal.  28 U.S.C. § 1450.

22   As such, in reconsidering an order previously entered by a state court, this Court assesses the order

23   through the lens of applicable federal law and rules of civil procedure.  Though it has

24   "considerable discretion" in considering the present motion, the Court is nevertheless bound by

25   the requirements of Rule 59(e).  *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063

26   (9th Cir. 2003).

27         **B.    Preliminary Injunctions**

28         A preliminary injunction is a matter of equitable discretion and is "an extraordinary

10

United States District Court
Northern District of California

1  remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

2  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A preliminary

3  injunction "is not a preliminary adjudication on the merits but rather a device for preserving the

4  status quo and preventing the irreparable loss of rights before judgment."  *Sierra On-Line, Inc. v.*

5  *Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  As such, the basic function of a

6  preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits

7  can be held," and "the findings of fact and conclusions of law made by a court granting a

8  preliminary injunction are not binding at trial on the merits."  *Univ. of Texas v. Camenisch*, 451

9  U.S. 390, 395 (1981); *see also Dep't of Parks & Recreation for State of California v. Bazaar Del*

10  *Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

11      A party seeking preliminary injunctive relief must establish "[1] that he is likely to succeed

12  on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

13  [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

14  *Winter*, 555 U.S. at 20.  Alternatively, an injunction can issue where "the likelihood of success is

15  such that serious questions going to the merits were raised and the balance of hardships tips

16  sharply in [the moving party's] favor," provided that the movant can also demonstrate the other

17  *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)

18  (citation and internal quotation marks omitted).  Showing "serious questions going to the merits"

19  requires more than establishing that "success is more likely than not;" rather, it requires a moving

20  party to demonstrate a "substantial case for relief on the merits."  *Leiva–Perez v. Holder*, 640 F.3d

21  962, 967 (9th Cir. 2011).

22  **III.     DISCUSSION**

23      Plaintiffs urge that the state court's preliminary injunction was clearly erroneous in two

24  respects.  First, Plaintiffs argue that the state court erroneously applied controlling California law

25  to the relationship among the parties to improperly conclude that AMSC's agency cannot be

26  revoked because it has an agency coupled with an interest.  Pl.'s Mot. 12-18.  Second, Plaintiffs

27  contend the state court further erred in finding that "Clark" owed a fiduciary duty to "Pinnacle"

28  based on an oversimplification of the parties' relationship.  *Id.* 22-23.  Plaintiffs moreover argue

11

1   that Defendants cannot satisfy the other requirements for preliminary injunctive relief because

2   they have an adequate remedy at law for the revocation of the PMAs—contract damages should it

3   be determined that AMSC was erroneously terminated—and because the balance of hardships and

4   public interest favor Plaintiffs.  *Id.* 19-21.

5          Defendants understandably urge that the state court's ruling was correct and that

6   reconsideration of the preliminary injunction should be denied.  *See generally* Def.'s Opp., ECF

7   61.  After hearing the Court's thoughts on the statutory power of revocation at the January 15,

8   2015 hearing on Plaintiffs' motion, Defendants filed a new motion for yet another preliminary

9   injunction in anticipation of this Court dissolving the present one.  At the January 27, 2015

10  hearing on Defendants' application for a temporary restraining order in connection with its "belt

11  and suspenders" motion for another preliminary injunction, the Court noted that the ground upon

12  which Defendants were seeking to enjoin revocation of the PMAs in their new motion were

13  intertwined with the corporate governance arguments already made and submitted to the Court in

14  the extant injunction.  As such, the Court terminated Defendants' new motion and permitted both

15  parties to submit supplemental briefing regarding additional arguments in favor of and against

16  reconsidering the preliminary injunction.  The Court accordingly considered all arguments in

17  reaching the conclusions in this order.

18          **A.    AMSC Does Not Have an Agency Coupled With an Interest**

19          Plaintiffs argue that the state court fundamentally misapplied the controlling case of

20  *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.*, 19 Cal. App. 4th 615 (1993), *as modified on*

21  *denial of reh'g* (Nov. 5, 1993), to the facts of this case.  Pl.'s Mot. 12-16.  The Court agrees.

22          *Pacific Landmark* concerned a similar arrangement for investment and management of two

23  hotel properties.  Therein, Marriott Hotels entered into two sets of agreements with owners of two

24  hotel properties: property management agreements between Marriott affiliate MHI and the owners

25  and loan agreements between Marriott affiliate SDI and the owners.  *Pac. Landmark*, 19 Cal. App.

26  4th at 619-20.  When the relationship fell apart, the property owners sued all three Marriott entities

27  and sought a preliminary injunction to remove MHI from its position as property manager.  The

28  trial court denied the preliminary injunction, finding that the overall transaction—that is, all four

United States District Court
Northern District of California

1   agreements in conjunction—showed that MHI could not be removed because it had an agency

2   coupled with an interest.  *Id.* at 622-23.

3          The Court of Appeal reversed.  In doing so, the court held two things important to the

4   issues in this case.  First, because California Civil Code § 2356 codified the "cardinal rule of

5   agency law" that "a principal who employs an agent always retains the power to revoke the

6   agency," California law provides a "statutory power" that is "independent and distinguishable

7   from a contractual right to revoke an agency." *Id.* at 624-25 (internal quotations omitted).  "Thus,

8   even if there is no contractual right to revoke an agency, section 2356, subdivision (a)(1) gives the

9   principal the statutory power to do so where the agency is not coupled with an interest in the

10  subject of the agency." *Id.* at 625.  To be sure, if no contractual *right* to revoke exists, the

11  principal may be liable for contract damages.  However, the absence of contractual termination

12  rights does not prevent a principal from exercising its statutory power to revoke.  *Id.*; *see also*

13  *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1203 (S.D. Fla. 2011).  Second, the

14  *Pacific Landmark* court marked the importance of respecting separate corporate entities.  *Pac.*

15  *Landmark*, 19 Cal. App. 4th at 628 ("Since society recognizes the benefits of allowing persons and

16  organizations to limit their business risks through incorporation, sound public policy dictates that

17  disregard of those separate corporate entities be approached with caution.").  Thus, a corporate

18  entity should not be permitted to conveniently disregard its incorporation when convenient.  *Id.*

19  Pulling these two threads together, the Court of Appeal determined that it was error for the trial

20  court to "look[] at the forest and not the tree" when the narrow issue presented "concerned only

21  the tree MHI." *Id.*  Respecting MHI's separate corporate existence from SDI, the court concluded

22  that MHI did not have an agency coupled with an interest because *MHI* held no interest in the

23  property management agreements beyond compensation.  *Id.*

24          In this action, AMSC is the tree.  Yet, as Plaintiffs note, the state court acknowledged that

25  it focused on the forest when concluding that AMSC held an agency coupled with an interest.

26  Nov. 15, 2012 Hr'g Tr. 78:2-4 ("I find myself perhaps seduced, as a trial court in *Pacific*

27  *Landmark*, by the complexity of the arguments and the relationships").  Looking at the trees—and

28  not at the forest—as *Pacific Landmark* requires a court to do, it is beyond dispute that MBMC and

United States District Court
Northern District of California

1   CMC have the statutory power to revoke AMSC's agency.  Respecting the corporate entities that

2   the parties have set up to govern their complex relationship and recognizing AMSC's separate

3   entity status, this Court is left with the unmistakable conclusion that the PMAs confer *only* an

4   interest in compensation on AMSC.  *See* MBMH PMA ¶ 10 ("Nothing contained in this

5   Agreement shall be construed as creating a partnership, joint venture, or any other relationship

6   between the parties to this Agreement, or as requiring Manager to bear any portion of losses

7   arising out of or connected with the ownership or operation of the Project.").  Such an interest,

8   without more, "is not sufficient as a matter of law to prevent [MBMC and CMC] from exercising

9   their statutory power as principals under section 2356, subdivision (a)(1) to revoke [AMSC] as

10  their agent."  *Pac. Landmark*, 19 Cal. App. 4th at 628.

11      Defendants argue that *Pacific Landmark* does not control because AMSC's position is

12  more like that of the property manager in *Lane Mortgage Co. v. Crenshaw*, 93 Cal. App. 411

13  (1928).  Def.'s Opp. 13.  There, the court did find that a property management company had an

14  agency coupled with an interest because the company was engaged to manage a hotel in which the

15  company also held a lease for one of the floors.  The coupling of the lease with the agency

16  agreement placed in the company's hands "directly the means of preserving its said interest."  *Id.*

17  at 428-29; *see also id.* at 429 ("The power in the present case was expressly made irrevocable and

18  expressly tied to the entire transaction in the creation of the leasehold interest.").  *Lane*, however,

19  does not assist Defendants because the agency and the interest were held by the same entity, a

20  circumstance that is pointedly not present here.  *Pacific Landmark*, in considering *Lane* and other

21  predecessor cases, specifically noted the requirement in California law that "[t]he power and the

22  interest are united in the same person."  *Pac. Landmark*, 19 Cal. App. 4th at 624 (quoting *Hunt v.*

23  *Rousmanier's Adm'rs*, 21 U.S. 174, 204 (1823) and *O'Connell v. Superior Court of City & Cnty.*

24  *of San Francisco*, 2 Cal. 2d 418, 422 (1935)).  Thus, though it may be true that Pinnacle Monterey

25  and Pinnacle Irwin have interests in AMSC's agency under the terms of the CPMB and CPCMC

26  operating agreements, *see* Def.'s Opp. 14, and that MBMH and CMC cannot act unless at the

27  direction of their respective managers, which in turn must act according to the CPMB and

28  CPCMC operating agreements, *see* Def.'s Suppl. Br. 7, ECF 116, none of this is relevant to

United States District Court
Northern District of California

14

1    whether MBMH and CMC *qua* entities have the statutory power to revoke *AMSC*'s agency.

2    Pinnacle Monterey and Pinnacle Irwin's interests are not vested in AMSC.  Absent evidence that

3    Pinnacle Monterey and Pinnacle Irwin are alter egos of AMSC (and Defendants do not argue such

4    alter ego status), the interest granted to the Pinnacle Managers through the CPMB and CPCMC

5    operating agreements is decoupled from AMSC's agency, which was created in a separate

6    contract—the PMAs—between *different corporate entities*.[10]  As such, the Court agrees with

7    Plaintiffs that *Pacific Landmark* more appropriately governs the present situation because the

8    bottom line is that Defendants could not identify "any 'interest' of [AMSC] in the [projects] or

9    point to any document involved in the transaction which memorialized such an interest," other

10   than to assert that *Pinnacle* entities have an interest in maintaining the agency.  *See Pac.*

11   *Landmark* 19 Cal. App. 4th at 627; *accord Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d

12   1520, 1533 (1991); *FHR TB*, 865 F. Supp. 2d at 1198.

13           As much as Defendants attempt to distinguish *Pacific Landmark* and analogize to *Lane*,

14   the simple fact of the matter is that to the extent any protectable interest exists in the continuation

15   of the PMAs, such interest does not reside with AMSC but rather with some other affiliated but

16   *separate* entity.  That MBMH and CMC are controlled by other entities that may prevent MBMH

17   and CMC from exercising the statutory power of revocation does not obviate the vesting of that

18   power in MBMH and CMC under California law.  The Court therefore concludes that AMSC does

19   not have an agency coupled with an interest and that MBMH and CMC have a statutory power

20   under California Civil Code § 2356 to revoke AMSC's agency at will.  The state court thus

21   committed a clear error of law on this portion of its order.  As discussed below, however, that

22   conclusion does not suffice to lift the state court's preliminary injunction.

23

24

25

26   _____

     [10] There is no evidence that AMS has an interest that is protected by way of the PMAs.
27   Defendants point only to the CPMB and CPCMC operating agreements, which confer the interest
     on Pinnacle Monterey and Pinnacle Irwin respectively, not AMS.  *See* Def.'s Opp. 13-15.  Thus,
28   Plaintiffs' allegation that AMS is the alter ego of AMSC is not relevant to this issue because
     neither AMS nor AMSC holds the interest.  *See* FAC ¶ 30.

United States District Court
Northern District of California

**B.      Clark Realty Was Properly Enjoined From Directing MBMH and CMC to Exercise the Statutory Power of Revocation**

In the alternative to its conclusion that AMSC has an agency coupled with an interest, the state court reasoned that "there has to be some kind of fiduciary duty here when you have a minority partner who is being threatened with being removed in such a way that its only access to compensation is going to end, that there's something much more going on here than just a simple contract." Nov. 15, 2012 Hr'g Tr. 80:22-81:3.  The court made no other findings with respect to the fiduciary duty issue, and it did not identify which Clark entity owed what fiduciary duty to which Pinnacle entity based on what relationship.  Plaintiffs contend that this vague conclusion was clearly erroneous.  Pl.'s Mot. 23; Pl.'s Reply 13-14, ECF 63.

While the Court agrees with Plaintiffs that, given the large number of distinct entities involved in this action, the fiduciary duty should have been more specifically defined by the state court, the Court does not understand the fiduciary duty finding to be based on the relationship between MBMH and CMC and AMSC, nor would any injunction be supportable based on duties owed among those entities.  *See* Pl.'s Mot. 22-23.  As a matter of law, a principal does not owe any fiduciary duty to its agent, nor do courts typically enjoin the breach of personal service agreements.  *See generally* Restatement (Third) Of Agency §§ 8.13-15 (2006) (describing principal's duties of contract, indemnification, and good faith and fair dealing); *see also Woolley*, 227 Cal. App. 3d at 1530 ("the agent's remedy for wrongful termination is damages, as in any other breach of contract action").

Defendants argue that there is a fiduciary duty between Clark Realty and AMS.  However, the Court observes as somewhat perplexing that for all their assertions that Clark Realty and AMS formed Clark Pinnacle Family Communities LLC to work together on their joint venture, Defendants have not introduced into the record the operating agreement for that entity.  *See* Counterclaims ¶¶ 29-30; Def.'s Opp. 2-3, 21.  Although the Court might divine that the mere existence of the joint venture makes Clark Realty a fiduciary of AMS, the Court cannot presume the scope or contours of that duty absent a written instrument.  Without an operating agreement or similar document, the Court cannot know with any confidence whether any joint venture

16

survived—or was dissolved—upon the Army's acceptance of Clark Realty and AMS's bid. Instead of a binding agreement, Defendants rely on a 2001 Term Sheet between Clark Realty and AMS to demonstrate the structure of the joint venture, which was implemented in the operating agreements of the limited liability companies created to manage the projects. *See* Def.'s Opp. 3-4 (explaining that the various agreement before the Court are "[c]onsistent with the Term Sheet"). Plaintiffs rightly contest whether such a joint venture relationship could be found in the Term Sheet which, by its own terms, creates no binding obligations upon the signatories. Pl.'s Reply 13 n.5; *see* Chu Decl. Exh. 2 ("This term sheet is not intended to set forth binding obligations and all rights and obligations of Clark and Pinnacle are subject to negotiation, execution, and delivery of definitive agreements."). Moreover, the Term Sheet addresses contracts relating to four bases, none of which is at issue in this lawsuit.[11] *Id.*

Certainly, the Term Sheet cannot be treated as a binding agreement. Defendants have, however, raised serious questions concerning whether the other agreements governing the parties' relationship must be interpreted in light of the Term Sheet and the unique nature of military housing contracts. *See* Def.'s Opp. 21; Harrelson Decl. ¶¶ 9-12; Chu Decl. Exh. 3 (June 6, 2002 submission to the Army wherein Clark Realty and AMS apparently represent themselves as "Clark Pinnacle Family Communities LLC"); *see also* Def.'s Suppl. Br. 6. As such, it would not have been clearly erroneous for the state court to conclude that there is a substantial claim that Clark Realty, as the Clark Manager for CPMB and CPCMC, owes a fiduciary duty to the minority Pinnacle Managers—Pinnacle Monterey and Pinnacle Irwin respectively. It is undisputed that as a manager of a limited liability company, Clark Realty owes some fiduciary duty to the other manager. Cal. Corp. Code § 17704.09(f); *see* Def.'s Opp. 21-22. Particularly as understood in the context of the initial joint venture between Clark Realty and AMS, there is a substantial claim that the Clark Managers of CPMB and CPCMC each owe a fiduciary duty to the respective Pinnacle Managers to not destroy the Pinnacle entities' sole means of realizing a return on their investment in the projects. *See BT-I v. Equitable Life Assurance Soc'y of the United States*, 75 Cal. App. 4th

---

[11] The four bases identified in the Term Sheet are Patrick Air Force Base, Fort Bragg, Fort Campbell, Fort Polk and Fort Stewart. Chu Decl. Exh. 2 at 2.

United States District Court
Northern District of California

1    1406, 1413-14 (1999), *as modified on denial of reh'g* (Nov. 29, 1999).  Permitting the Clark

2    Managers to direct the revocation of AMSC's agency under such circumstances would irreparably

3    injure Pinnacle Irwin's and Pinnacle Monterey's ability to protect their returns on investment, as

4    was contemplated by the complex structure of interrelated limited liability companies created by

5    the parties.

6         It would also not be clearly erroneous to conclude that Defendants have demonstrated a

7    serious question going to the merits of their claim that the PMAs were properly amended in 2011

8    by the Pinnacle Managers of CPMB and CPCMC before termination of those agreements.  *See*

9    Def.'s Opp. 17; Def.'s Suppl. Br. 4.  The plain language of the CPMB and CPCMC operating

10   agreements suggests, without reservation, that the Pinnacle Managers can force a vote and resolve

11   deadlocks with respect to adjustments of the terms and conditions of the PMAs.  *See, e.g.*, CPMB

12   Op. Ag. ¶¶ 3.1(b)(2)(E), 3.13(c).  This argument is made stronger by the absence of any evidence

13   in the record that Clark Realty, through MBMH and CMC, invoked its right to terminate the

14   PMAs for fraud under the default provision of the PMAs *prior to* Pinnacle's forced amendment of

15   those agreements.  Though Plaintiffs may contest the propriety of the adjusted terms or of the

16   manner in which the PMAs were amended, there is at least a substantial case, based on the clear

17   language of the operating agreements, for the relief that Defendants seek.[12]  As such, permitting

18   Clark Realty to direct CPMB and CPCMC to direct MBMH and CMC to *revoke* the PMAs at this

19   juncture would eviscerate the Pinnacle Managers' claims before a trial on the merits.  To be sure,

20   Plaintiffs would still be liable for contract damages for wrongful termination of the PMAs.  Such

21   damages, however, would not account for Pinnacle Monterey and Pinnacle Irwin's rights, validly

22   exercised, to amend the PMAs in a way that would prevent termination of the PMAs and permit

23   AMSC to cure deficiencies in its performance.

24        On the issue of the Pinnacle Managers' minority rights, the Court thus finds persuasive the

25   holding of the Second Circuit in *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101

26

27   _____

28   [12] The Court's consideration of the Pinnacle Managers' exercise of their minority rights to amend the PMAs, however, is in no way a determination of the validity or legality of the content of those amendments.

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   (2d Cir. 2003), wherein the court found that "the denial of bargained-for minority rights, standing

2   alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief

3   where such rights are central to preserving an agreed-upon balance of power (e.g., preserving the

4   management role of the minority directors) in corporate management." *Id.* at 114; *see also id.*at

5   115 ("a bargained-for minority right to participate in corporate management has value in and of

6   itself and a denial of that right, without more, can give rise to irreparable harm").  Even if the

7   Pinnacle Managers were to ultimately prevail on the merits and secure a declaration that the PMAs

8   were *validly* amended, it would be a pyrrhic victory, for immediate termination of AMSC would

9   deprive them of a meaningful remedy for the loss of their contractual right to vote on adjustments

10  to the PMAs.  The injury to the Pinnacle Managers from prematurely removing AMSC is

11  particularly acute because, once removed, it is highly unlikely that any court would order AMSC

12  reinstated, given the general prohibition against specific performance of personal service

13  contracts.  *See Woolley*, 227 Cal. App. 3d at 1533-35.  As such, a preliminary injunction may be

14  sustained to prevent irreparable injury to the Pinnacle Members' minority voting rights under the

15  CPMB and CPCMC operating agreements.  *Accord EIG Global Energy Partners, LLC v. TCW*

16  *Asset Mgmt. Co.*, No. CV 12-7173 CAS MANX, 2012 WL 5990113, at *9 (C.D. Cal. Nov. 30,

17  2012) (citing *Wisdom*); *Davoodi v. Imani*, No. C 11-0260 SBA, 2011 WL 250392, at *4 (N.D.

18  Cal. Jan. 26, 2011) (same).  The Court emphasizes here that any preliminary injunction would

19  narrowly pertain to the managers of CPMB and CPCMC and be justified based upon the duties

20  and obligations flowing from those operating agreements.  Although such an injunction would

21  have the effect of preventing AMSC's ouster, AMSC itself is not entitled to any injunctive relief

22  against MBMH's and CMC's exercise of their respective statutory powers as principals to revoke

23  AMSC's agency at will.  *See Woolley*, 227 Cal. App. 3d at 1530-35.

24          To be sure, the Court agrees with Plaintiffs that the CPCMC and CPMB operating

25  agreements appear to permit the Clark Managers to *enforce* the terms of the PMAs—including the

26  default provision—without triggering a Major Decision vote.  Pl.'s Reply 1; CPMB Op. Ag. ¶

27  3.1(b)(2)(E) ("the decision to enforce or take any other action with respect to any of the terms or

28  conditions [of the PMAs] shall not be deemed a Major Decision").  Defendants argue that such

United States District Court
Northern District of California

1  enforcement cannot occur without court process, Def.'s Opp. 12, which, if true, would be

2  consistent with the absence of record evidence that Clark Realty directed MBMH and CMC to

3  invoke the default provision of the PMAs upon an earlier detection of fraud.  Regardless, although

4  Plaintiffs are persuasive on the right under the PMAs of the Clark Managers to unilaterally direct

5  termination of the PMAs for fraud, Defendants have raised a substantial claim that statutory

6  *revocation* of the PMAs is a Major Decision requiring a vote by both managers.  Def.'s Opp. 10-

7  12; Def.'s Suppl. Br. 3-4.  The CPMB and CPCMC operating agreements are silent as to whether

8  the Clark Manager can unilaterally invoke MBMH's and CMC's *power* to revoke AMSC's

9  agency, as the removal of AMSC at will does not appear to be within the contemplation of the

10  power to "enforce or take any other action *with respect to any of the terms or conditions* [of the

11  PMAs]."[13]  CPMB Op. Ag. ¶ 3.1(b)(2)(E) (emphasis added).  Therefore, Defendants have raised at

12  least a serious question concerning their claim that revocation of the PMAs is a Major Decision on

13  which Pinnacle Monterey and Pinnacle Irwin have a contractual right to vote. [14]  As with the right

14  to resolve deadlocks on the terms and conditions of the PMAs, the Pinnacle Managers' voting

15  rights on revocation, to the extent they have such rights, would be irreparably lost if the Court

16  were to lift the preliminary injunction now.  Moreover, due to the Clark Managers' fiduciary duty

17

18  [13] Defendants attempt to shoehorn the revocation issue into one of three possible Major Decisions
defined in the CPMB and CPCMC operating agreements: the disposition of a substantial asset of
19  the company, CPMB Op. Ag. ¶ 3.1(b)(3)(A); the adjustment of the terms and conditions of the
PMAs, *id.* ¶ 3.1(b)(3)(E); and the amendment of the operating agreement itself, *id.* ¶ 3.1(b)(3)(f).
20  Def.'s Suppl. Br. 2.  None of these arguments is overwhelmingly convincing.  For example, it is
not clear from the terms of the operating agreements that the PMAs are "substantial assets" of
21  CPMB and CPCMC.  *See* Pl.'s Reply 6.  Likewise, revocation of the PMAs falls outside of the
ambit of "[a]djustments to the terms or conditions of the [PMAs]" just as equally as it falls outside
22  of the power to "enforce or take any other action with respect to" those terms.  On reconsideration
of the state court's ruling, it is sufficient for this Court, in light of the fiduciary duties owed
23  between the managers of CPMB and CPCMC, that the operating agreements are ambiguously
silent on the power of revocation.
24

25  [14] Although the underlying claims pertain more fully to the PMAs than to any actual or potential
breach of the CPMB and CPCMC operating agreements, the interpretation of the operating
26  agreements and the contractual rights conferred thereunder is inextricably intertwined with the
merits of the case.  See Def.'s Answer and Counterclaims re DJ of OP.  Thus, the injunctive relief
27  that would issue (and has been issued) is "of the same character as that which may be granted
finally," *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945), namely the
28  maintenance of the PMAs and maintenance of AMSC as the property manager at the Monterey
and Irwin projects.

1    to its minority managers, Pinnacle Monterey and Pinnacle Irwin, the Court is persuaded that

2    continuation of the preliminary injunction is necessary to protect the Pinnacle Managers from an

3    arbitrary or baseless decision to revoke AMSC's agency.

4         As to the balance of hardships, it is easy to see that they tip sharply in Defendants' favor,

5    particularly as the preliminary injunction has been in place for over two years.  The principle

6    hardships that Plaintiffs assert from the continuing injunction are the forced retention of an

7    untrustworthy agent and the Army's support for removal of AMSC based on its "zero tolerance for

8    fraud" and "sharp concern for the life-safety risk presented to its soldiers and their families" by the

9    alleged conduct of AMSC.  Pl.'s Mot. 20-21; Moore Decl. Exh. 1 ¶ 7 (Decl. of Paul D. Cramer,

10   Deputy Assistant Secretary of the Army for Installations, Housing & Partnerships).[15]  The

11   declaration that Plaintiffs offer in support identifies two specific incidents involving resident

12   safety but indicates that the declarant is "*not* suggesting that these incidents were the direct result

13   of conduct by Pinnacle," only that they "illustrate the significance of responding to work orders"

14   and the Army's ability to trust the work orders.  Cramer Decl. ¶ 7 (emphasis added).  While the

15   interests in removing an untrustworthy agent and in protecting resident safety are all important

16   concerns, they do not outweigh the hardship to the Pinnacle Managers that would result from

17   removing AMSC.  Moreover, as discussed below, there is no evidence before the Court that

18   resident safety at the Monterey and Irwin projects has been impacted by AMSC.  Nor is the

19   evidence of past and continuing fraud so overwhelming that the Court can conclude Plaintiffs are

20   likely to prevail on the merits.  Finally, Plaintiffs' "inability to fully discover and remedy the

21   apparently ongoing fraud," Pl.'s Reply 12, does not outweigh the hardship to Defendants as

22   Plaintiffs have had full access to liberal discovery in both this and the state court.

23        To the extent the Army's support of Plaintiffs' case represents the public interest, that

24

25   _____

     [15] Defendants object to and seek to strike a number of the declarations that Plaintiffs offer in
26   support of their motion.  Def.'s Opp. 19.  The only one relevant to the Court's consideration is the
     Cramer declaration, which Defendants contend contains inadmissible double hearsay and lacks
27   proper personal knowledge.  *Id.*  Defendants' objections to the Cramer declaration are
     OVERRULED, as this Court may consider even inadmissible evidence in determining whether to
28   issue a preliminary injunction.  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).
     Defendants' objections to Plaintiffs' other declarations are moot.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   support is entitled to due consideration and moderately tilts the public interest factor in Plaintiffs'

2   favor.  *See* Pl.'s Mot. 21-22; Moore Decl. Exhs. 6-7 (letter agreements between Plaintiffs and the

3   Army to remove AMSC at MBMH and CMC).  However, other than the Cramer declaration, there

4   is no evidence of actual resident complaints concerning AMSC's management at the two projects.

5   The Cramer declaration moreover identifies only two incidents involving resident safety, one of

6   which did not occur at either of the Monterey or Irwin projects at issue in this action, and does not

7   even establish that those incidents were caused by AMSC's alleged work order fraud.  Cramer

8   Decl. ¶ 7.  The Court thus cannot conclude that a risk to resident safety is a *likely* (as opposed to

9   speculative) consequence of continuing the injunction against AMSC's removal from its property

10  management role.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  Although

11  narrowly enjoining Clark Realty from directing MBMH and CMC to revoke AMSC's agency may

12  in some way affect non-parties to this action, it is not clear that the attenuated public consequences

13  justify dissolving the preliminary injunction entered by the state court.

14          Two going on three years is a long time to maintain a preliminary injunction.  Yet, the

15  parties are still hotly contesting the cross-allegations as this case marches inexorably closer to

16  trial.  That the Army has added its voice to the chorus calling for AMSC's removal adds fuel to

17  the fire, but is not enough to outweigh the severe hardship to the Pinnacle Managers of CPMB and

18  CPCMC if the injunction were to be lifted now and AMSC's agency revoked mere months before

19  trial.  Based on the foregoing, the Court sees no clear error on this aspect of the state court's

20  preliminary injunction.  Clark Realty as the Clark Manager of CPMB and CPCMC should be

21  preliminarily enjoined from directing MBMH and CMC to revoke their respective PMAs with

22  AMSC.  Appropriately narrowed as such, the Court DENIES Plaintiffs' motion for

23  reconsideration of the state court's preliminary injunction.

24          **C.      Plaintiffs Have Not Shown Circumstances Warranting the Dissolution of the
                       Preliminary Injunction**

25

26          In addition to reconsideration for clear error, Plaintiffs also contend that the "development

27  of new evidence of ongoing fraud" constitutes an independent ground for dissolving the

28  preliminary injunction entered by the state court.  Pl.'s Mot. 12.

1    "A district court has inherent authority to modify a preliminary injunction in consideration

2    of new facts." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *Sys.*

3    *Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("There is also no

4    dispute but that a sound judicial discretion may call for the modification of the terms of an

5    injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance

6    have changed, or new ones have since arisen.").

7        Here, the Court agrees with Defendants that Plaintiffs have presented little evidence in the

8    way of *changed* circumstances that would warrant dissolving the preliminary injunction now.  *See*

9    Def.'s Opp. 9.  The asserted discovery of additional evidence of continued fraud and the addition

10   of the Army's support for Plaintiffs' cause do not materially alter the factual predicates for the

11   injunction.  Nor has there been any legal determination that would undermine its legal predicate.

12   *See Donk v. Miller*, 365 F.3d 159, 165 (2d Cir. 2004).  There is thus no basis in the record for

13   dissolving the preliminary injunction at this time.

14       Had this Court had occasion to consider the issue *de novo* two years ago, the injunction

15   may never have been issued.  As it stands, the Court finds on reconsideration no clear error or

16   changed circumstances with respect to the injunction entered by the state court sufficient to justify

17   lifting it mere months before trial on the merits.  Plaintiffs' motion for reconsideration and to

18   dissolve the December 28, 2012 preliminary injunction of the state court is therefore DENIED.

## IV.    ORDER

20       For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion to Dissolve

21   Preliminary Injunction is DENIED.  In the interest of clarity, the Court modifies the preliminary

22   injunction to solely enjoin Clark Realty from exercising its purported managerial power over

23   CPMB and CPCMC to direct MBMH and CMC to revoke the Monterey and Irwin PMAs pursuant

24   to California Civil Code § 2356.

25       **IT IS SO ORDERED.**

26   Dated: April 7, 2015

27

28                                                      _____
                                                        BETH LABSON FREEMAN
                                                        United States District Judge