**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, et al., | Case No.  14-cv-03953-BLF |
| Plaintiffs, | |
| v. | **CORRECTED ORDER DENYING MOTION TO DISSOLVE PRELIMINARY INJUNCTION** |
| PINNACLE MONTEREY LLC, et al., | [Re:  ECF 36] |
| Defendants. | |

This action involves a deteriorating relationship between two companies that joined together to pursue military housing contracts.  The parties initiated their dispute in the Superior Court for the County of Monterey and litigated the case there for two years before the defendants removed the action to federal court.  Before the Court is Plaintiffs' Motion to Dissolve Preliminary Injunction.  Pl.'s Mot., ECF 36.  Plaintiffs seek to lift a preliminary injunction entered by the state court in 2012 before this action was removed to federal court.  The Court heard oral argument on January 15, 2015 and ordered supplemental briefing on January 27, 2015 following a flurry of activity that both parties undertook based on their impressions of the oral argument.  *See* ECF 108.  For the reasons stated herein, Plaintiffs' motion is DENIED.

I.    **BACKGROUND**

    A.    **Factual Overview**

In 2001, Clark Realty Capital and American Management Services LLC ("AMS"), doing business as "Pinnacle," joined together to bid for privatization projects in U.S. military housing.[1]

---

[1] Defendants aver in their opposition brief that the two companies "formed Clark Pinnacle Family Communities LLC" to pursue these projects.  Def.'s Opp. 2, ECF 61.  The record before this Court contains no evidence of the formation of this limited liability company or of its operating agreement.

1   Decl. of Alice Y. Chu, ECF 61-1 Exh. 1 ¶ 3 (Decl. of Stanley Harrelson).  The companies drew up

2   a Term Sheet in 2001 memorializing their arrangement.  Chu Decl. Exh. 2.  After numerous

3   rejected bids, Clark Realty and AMS eventually won contracts to develop and manage residential

4   properties at Monterey Presidio and Fort Ord in California; Fort Belvoir Virginia; Fort Irwin,

5   Moffett Field and Parks Reserve Training Grounds in California; and Fort Benning Georgia.

6   Harrelson Decl. ¶ 6.  At each property, or "project," Clark Realty and AMS set up a series of

7   "interrelated limited liability companies to manage, own and operate the projects." *Id.* ¶ 11.

8   When the relationship fell apart, the entities sued one another.  This lawsuit concerns the

9   residential housing projects at Monterey Presidio and Fort Irwin and the various entities that

10  developed and manage those projects.  The parties' related entities are also embroiled in litigation

11  in Georgia concerning the Fort Belvoir and Fort Benning projects.

12          Plaintiffs in this action are entities affiliated with Clark Realty: (1) Monterey Bay Military

13  Housing, LLC ("MBMH"), a Delaware limited liability company; (2) Clark Pinnacle Monterey

14  Bay LLC ("CPMB"), a California limited liability company; (3) Clark Monterey Presidio LLC, a

15  Delaware limited liability company; (4) California Military Communities LLC ("CMC"), a

16  Delaware limited liability company; (5) Clark Pinnacle California Military Communities LLC

17  ("CPCMC"), a California limited liability company; and (6) Clark Irwin LLC, a Delaware limited

18  liability company (collectively, "Plaintiffs").  Fourth Amended Complaint ("FAC") ¶¶ 7-12, ECF

19  1-24.  Defendants are: (1) AMS, a Washington State limited liability company that does business

20  as Pinnacle, as well as entities affiliated with AMS including (2) American Management Services

21  California Inc. ("AMSC"), a California corporation; (3) Pinnacle Monterey LLC, a Washington

22  State limited liability company; (4) Pinnacle Irwin LLC, a Washington State limited liability

23  company; (5) Goodman Real Estate, Inc., a Washington corporation (previously doing business as

24  Goodman Financial Services, Inc.); (6) Stanley Harrelson, the former Chief Executive Officer for

25  AMS; and (7) John Goodman, the founder and Chairman of the Board for AMS (collectively,

26  "Defendants").[2]  *Id.* ¶¶ 13-20.  AMS does business as Pinnacle and is the parent company of a

27

28  ────────────────
    [2] Defendants AMS and AMSC have asserted counterclaims against plaintiffs MBMH and CMC.
    *See* Answer to FAC and Counterclaims, ECF 12.  Moreover, defendants Pinnacle Irwin and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    variety of Pinnacle entities, including the Pinnacle Irwin and Pinnacle Monterey defendants.

2         At the heart of this case are Property Management Agreements ("PMAs") appointing

3    defendant AMSC as the property manager at the Monterey and Irwin projects.  *See* Decl. of Daniel

4    C. Moore, ECF 36-1 Exh. 7 (Monterey PMA), Exh. 8 (CMC PMA).  Plaintiffs allege that since the

5    inception of those projects, AMSC has engaged in "widespread falsification of work order data,

6    and other project data" at the Monterey and Irwin projects.  FAC ¶ 49; *see generally id.* ¶¶ 64-91.

7    Moreover, AMSC is alleged to have entered into insurance agreements that improperly benefited

8    AMSC in contravention of its obligations under the PMAs.  *Id.* ¶¶ 92-127.  Based on these

9    allegations of intentional fraud, Plaintiffs seek to remove AMSC as the property manager for the

10   projects and seek, among other claims for relief, a declaration that the PMAs have automatically

11   terminated pursuant to a default provision in the agreements.  *Id.* ¶¶ 173-84.  Plaintiffs also filed

12   suit in Georgia based on similar allegations of fraud at Fort Benning and Fort Belvoir.  They

13   allege that the Army supports this and the litigation in Georgia, as well as the removal of AMSC

14   from its position as property manager for the Monterey and Irwin projects.  *Id.* ¶ 47.

15        It is not clear when Plaintiffs discovered the fraudulent conduct at the Monterey and Irwin

16   projects or whether they notified AMSC of the discovery and invoked the default provision of the

17   PMAs.[3]  The Court observes only that at Fort Benning, the property manager walked off the

18   project after being notified in June 2010 that the PMA for that project was terminated due to fraud

19   and intentional misconduct.  *Id.* ¶ 45.  In late 2011, following initiation of the Georgia action and

20   an audit at the Monterey and Irwin projects, defendants Pinnacle Monterey and Pinnacle Irwin

21   sought to "adjust" the default provision of the PMAs pursuant to a contractual right under a set of

22   limited liability operating agreements that govern plaintiffs CPMB and CPCMC, of which

23   defendants Pinnacle Monterey and Pinnacle Irwin are respective minority members.  *Id.* ¶¶ 48-49,

24   53-63; *see* Moore Decl. Exh. 13 (CPMB Op. Ag.), Exh. 14 (CPCMC Op. Ag.).  The Pinnacle

25   _____

26   Pinnacle Monterey are "plaintiffs" seeking relief against Clark Realty and plaintiffs CPMB, and
     CPCMC in what the parties have designated as a "cross-complaint" filed October 24, 2013.  *See*
27   Notice of Removal Exh. M (Pinnacle Second Amended Complaint "SAC" and Answer), ECF 1.

28   [3] Clearly such termination for default had not been invoked at the time of the first motion for
     preliminary injunction, *see infra* at 7, whereupon Clark was enjoined from doing so.

United States District Court
Northern District of California

1    entities invoked a contractual right to vote on and resolve deadlocks with respect to adjustments to

2    the terms of the PMAs.  It is Defendants' position that the vote was successful and that the PMAs

3    were amended to require that intentional fraud must have a "material adverse effect" on the

4    projects and must go uncured for 15 days before the default for fraud provision of the PMAs is

5    triggered.  *See* FAC ¶ 58; Answer to FAC and Counterclaims at Counterclaims ¶¶ 70-75, ECF 12.

6    Plaintiffs predictably dispute the validity of these adjustments, and both parties seek declaratory

7    relief regarding such.  FAC ¶¶ 155-72; Counterclaims ¶¶ 84-105; Notice of Removal Exh. M

8    (Pinnacle Second Amended Complaint "SAC") ¶¶ 83-92, ECF 1.

9    **B.    The Agreements at Issue**

10   Untangling the underpinnings of the present preliminary injunction against Plaintiffs

11   requires an understanding of the many layers of contracts and limited liability companies that

12   make up the parties' relationship.

13   **i.    The Property Management Agreements (PMAs)**

14   The underlying claims revolve around AMSC's conduct as property manager and how that

15   conduct affects the continued validity of the PMAs.  The Monterey PMA was entered in 2003

16   between plaintiff MBMH—the "Owner" of the property—and defendant AMSC as "Manager."

17   At Fort Irwin, the PMA was entered in 2004 between plaintiff CMC—the "Owner"—and AMSC

18   as "Manager."[4]  Section 10 of the PMA describes the relationship between MBMH and AMSC,

19   with AMSC acting as an independent contractor and agent within the scope of the authority set

20   forth in the agreement.  Monterey PMA at p. 7.[5]  Section 22 provides that the PMA "constitutes

21   the entire agreement between Owners and Manager with respect to the management and operation

22   of the Project and supersedes and replaces any and all previous management agreements entered

23   into and/or negotiated between Owners and Manager relating to the Project covered by this

24

25   [4] Although MBMH and CMC are identified as "Owners," they actually lease the project real
26   property from special purpose entities that are 49% owned by the United States of America.  FAC
     ¶ 28 n.2.

27   [5] The PMAs for both the Monterey and Irwin projects are substantially similar.  Unless otherwise
28   noted, exemplary references to the Monterey PMA hold true for the Irwin PMA as well.

Agreement." *Id.* at p. 15.  As previously stated, Plaintiffs contend that the PMAs terminated automatically following their discovery of AMSC's intentional fraud.  Section 18 of the PMAs governs termination and provides that the agreement shall terminate "upon the occurrence of" certain events, including breach of the agreement and specific events of default.[6]  *Id.* ¶ 18.1.  One such event of default is "theft, fraud, or other knowing or intentional misconduct by [AMSC] or its employees or agents."  *Id.* ¶ 18.1(C)(6).  The PMAs are silent as to notification to the Manager of the Owner's election to terminate the PMAs under this default provision.

### ii.  The Monterey Bay Military Housing, LLC (MBMH) and California Military Communities LLC (CMC) Operating Agreements

One layer above the PMAs are the operating agreements for plaintiffs MBMH and CMC, which are limited liability companies with other limited liability companies as members.  Moore Decl. Exh. 11 (MBMH Op. Ag.), Exh. 12 (CMC Op. Ag.).  Most importantly, "Clark Pinnacle Monterey" (plaintiff CPMB) is the Managing Member for MBMH and "Clark Pinnacle California" (plaintiff CPCMC) is the Managing Member for CMC.  MBMH Op. Ag. at p. 8.[7]  The Managing Member has the principle responsibility for "managing the business and affairs of the Company," which includes entering into the PMAs with AMSC.  MBMH Op. Ag. ¶ 4.1(a) and pp. 11-12.  This leads to the third layer of limited liability company operating agreements, which is where the parties' other disputes lie.

### iii.  The Clark Pinnacle Monterey Bay LLC (CPMB) and Clark Pinnacle California Military Communities (CPCMC) Operating Agreements

Plaintiffs CPMB and CPCMC are both limited liability companies comprised of groups of member entities affiliated with Clark Realty and AMS.  *See* CPMB Op. Ag. ¶ 2.1(a).[8]  Each member group, acting collectively, appoints one Manager—the "Clark Manager" for the members

---

[6] Termination for breach occurs after notice of a material breach and failure to cure the breach within the specified time.  Monterey PMA ¶ 18.1(A).

[7] As with the PMAs, the MBMH and CMC operating agreements are substantially similar.

[8] The CPMB and CPCMC operating agreements are also substantially similar, and exemplary references are made to the CPMB agreement.

United States District Court
Northern District of California

affiliated with Clark Realty and the "Pinnacle Manager" for the members affiliated with AMS. *Id.* ¶ 3.1(a). For CPMB, the appointed Clark Manager is Clark Realty, and the Pinnacle Manager is defendant Pinnacle Monterey. *Id.* For CPCMC, the appointed Clark Manager is also Clark Realty, but the Pinnacle Manager is defendant Pinnacle Irwin. *Id.*

Each operating agreement provides that the members consent to MBMH and CMC entering into service contracts with Clark Realty and AMS affiliates. The CPMB operating agreement requires MBMH to enter "into one or more property management agreements . . . with Pinnacle Realty Management Company, an Affiliate of the Pinnacle Group," *id.* ¶ 3.15(a)(3), which agreement could be freely transferred, assigned, or subcontracted to AMSC without consent of the Clark Manager, *id.* ¶ 3.15(b). The CPCMC operating agreement simply requires CMC to "enter into one or more property management agreements . . . with [AMSC]." CPCMC Op. Ag. ¶ 3.15(a)(3). Both provisions require that the property management agreements be entered "on or before the Effective Date" of each agreement, *see id.*, and there is some dispute as to whether this makes the requirement a one-time condition precedent or a lasting requirement that the property management agreements always be assigned to some AMS affiliate.

More relevant to the present motion, the CPMB and CPCMC operating agreements delineate what actions each Manager can take without the approval of the other. Notably, the Clark Manager has "acting authority to make all decisions regarding the management of the Company's business and affairs" except with respect to "Major Decisions." CPMB Op. Ag. ¶ 3.1(b)(2). The Pinnacle Manager, as the representative for the minority members, has no authority to "make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager." *Id.* The Pinnacle Manager does have the power, however, to vote on Major Decisions, which require the consent of both Managers. *Id.* ¶ 3.1(b)(3).

The key Major Decision in dispute here is defined in the section titled "Management and Rights of Members" at paragraph 3.1(b)(2)(E): "Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major

1   Decision."  The agreement also provides that should there be a deadlock in the voting on Major

2   Decisions, the Pinnacle Manager shall have the sole discretion to resolve deadlocks in voting

3   "with respect to any matter arising under, relating to, or affecting the terms or conditions of the

4   Property Management Agreement."  CPMB Op. Ag. ¶ 3.13(c).  Obviously, the Pinnacle Managers

5   cannot exercise this power to resolve deadlocks unless there is a Major Decision that requires a

6   vote between the Managers.

7          Clark Realty, as the Clark Manager, seeks to "enforce" the default provision of the existing

8   PMAs against AMSC and argues that the alleged intentional fraud by AMSC has automatically

9   terminated the PMAs.  As already described, the Pinnacle Managers invoked the Major Decision

10   and deadlock resolution provisions in 2011 to "adjust" the default provision of the PMAs so that

11   termination for intentional fraud may only occur if the fraud is material and goes uncured.

12   Plaintiffs assert that these adjustments were invalid because the PMAs had already terminated

13   automatically due to intentional fraud, the changes were not set forth in writing signed by both

14   Managers, the Pinnacle Managers could not exercise their deadlock powers because the Clark

15   Managers refused to vote, and in any event the proposed changes violate the Pinnacle Managers'

16   fiduciary duties and are against public policy.  *See* FAC ¶¶ 135-154.  The Court notes, however,

17   that there is no evidence as to when or whether MBMH and CMC invoked the termination for

18   default provision in the PMAs, only allegations that termination was allowed or "automatic" based

19   upon AMSC's fraud.  Defendants contend that the disputed adjustments are valid and that MBMH

20   and CMC accordingly cannot revoke AMSC's agency without breaching the PMAs because no

21   default has occurred under the adjusted terms.  *See* Counterclaims ¶¶ 84-119.  It is against this

22   backdrop that the Court considers the state court's preliminary injunction restraining Plaintiffs

23   from revoking the PMAs.

24          **C.    Procedural History**

25          This case began in 2011, with both sides rushing to different courthouses to file declaratory

26   relief complaints on the same day.  *See* Notice of Removal ¶¶ 1-2.  Eventually, the claims were

27   consolidated in the Superior Court for the County of Monterey.  *Id.* ¶¶ 3-5.  Plaintiffs sought and

28   obtained a preliminary injunction pursuant to California Code of Civil Procedure § 526(a)(3) to

United States District Court
Northern District of California

1   maintain the status quo.  The state court, in its December 28, 2011 injunction, ordered that

2   "Defendants may not take actions that are based on their contention that the disputed provisions of

3   [the PMAs] have already been adjusted.  Plaintiffs may not take actions that are based on their

4   contention that the disputed provisions of [the PMAs] have not been adjusted."  Moore Decl. Exh.

5   41 at 1-2 (Status Quo Inj.).

6          Plaintiffs later sought clarification of the status quo injunction, querying whether it

7   prevented them from removing AMSC as the property manager at Monterey and Fort Irwin

8   pursuant to a statutory power under California Civil Code § 2356 (and general principles of

9   agency law) that permits a principal to remove an agent at any time unless the "power of an agent

10  is coupled with an interest in the subject of the agency."  Cal. Civ. Code § 2356(a).  The state

11  court indicated that the status quo injunction did not enjoin the exercise of any statutory powers.

12  Chu Decl. Exh. 12 at 28:25-28 (Sept. 27, 2012 Hr'g Tr.) ("The Court simply said that plaintiffs

13  can't assume fraud, can't assume that the contract is over, defendants can't assume that the

14  contract has been modified.").  Defendants then sought a preliminary injunction preventing

15  Plaintiffs from exercising a purported statutory power to remove AMSC from the projects, which

16  the state court granted.  Chu Decl. Exh. 17 (Nov. 15, 2012 Hr'g Tr.).

17         On December 26, 2012, the state court entered the preliminary injunction that is the subject

18  of the present motion.  The injunction provides that MBMH, CPMB, Clark Monterey Presidio,

19  CMC, CPCMC, Clark Irwin, and Clark Realty Capital LLC, collectively referred to as "Clark," do

20  not have the statutory power pursuant to California Civil Code § 2356 to revoke the PMAs

21  because defendants Pinnacle Monterey, Pinnacle Irwin, AMS, and AMSC, collectively referred to

22  as "Pinnacle," have an "agency coupled with an interest."  Consequently, "Clark, and all persons

23  or entities in active concert or participation with Clark, is enjoined from revoking the PMAs."

24  Moore Decl. Exh. 43 at 2 (Prelim. Inj.).  The injunction order further states that "even if Pinnacle

25  does not have an agency coupled with an interest in the PMAs, Clark, and all persons or entities in

26  active concert or participation with Clark, is enjoined from revoking the PMAs because Clark

27  owes Pinnacle a fiduciary duty."  *Id.*; *see also* Nov. 15, 2012 Hr'g Tr. 79:25-81:4.  The court

28  found that "Pinnacle will be irreparably harmed if Clark revokes the PMAs" and noted that Clark

United States District Court
Northern District of California

8

1    had waived the posting of a bond to sustain the injunction.  Prelim. Inj. at 2.

2          Plaintiffs appealed that preliminary injunction order to the California Court of Appeal.

3    The appeal was fully briefed by November 1, 2013, and on August 27, 2014 Plaintiffs requested

4    oral argument.  *See* Pl.'s Mot. 10.  On August 11, 2014, however, the state court granted Plaintiffs

5    leave to file an amended pleading.  When Plaintiffs filed the presently operative Fourth Amended

6    Complaint ("FAC") on August 18, 2014, it recited a new claim against Defendants for violations

7    of 18 U.S.C. § 1962 ("civil RICO").  With that, Defendants on September 2, 2014 removed the

8    entire action to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

9    *See* Notice of Removal.  Thereafter, Plaintiffs filed the instant motion to dissolve the state court's

10   preliminary injunction, noting that its appeal in the California Court of Appeal had been mooted

11   by removal to federal court.  Pl.'s Mot. 10.  Following removal, the parties also asked to proceed

12   to trial expeditiously, and a lengthy jury trial is presently set to begin on August 3, 2015.

13   **II.     LEGAL STANDARDS**

14         **A.     Federal Rule of Civil Procedure 59(e) Motions for Reconsideration**

15         Plaintiffs' motion, though styled as a motion to "dissolve" the preliminary injunction, is in

16   essence seeking reconsideration of the state court's order granting preliminary injunction.  As

17   such, Plaintiffs' motion is properly brought pursuant to Federal Rule of Civil Procedure 59(e).[9]

18   *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124-25 (9th Cir. 2005).

19         The standards governing reconsideration pursuant to Rule 59(e) are well known to the

20   parties: "a motion for reconsideration should not be granted, absent highly unusual circumstances,

21   unless the district court is presented with [1] newly discovered evidence, [2] committed clear

22   error, or [3] if there is an intervening change in the controlling law."  *389 Orange St. Partners v.*

23   *Arnold*, 179 F.3d 656, 665 (9th Cir. 1999) (citing *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d

24

25   ───────────────────

     [9] Plaintiffs timely filed the present motion on September 21, 2014, within 28 days of removal of
26   the action to this Court.  Fed. R. Civ. P. 59(e).  Although Defendants argue that Plaintiffs should
     have sought leave to file a motion for reconsideration pursuant to Civil Local Rule 7-9, that rule
27   imposes no time limits on filing and applies only to interlocutory orders that can be reconsidered
     at any time before the entry of final judgment.  *See* Civ. L.R. 7-9(a); Fed. R. Civ. P. 54(b).  In any
28   event, the standards for reconsideration under Rule 59(e) and Civil Local Rule 7-9 are nearly
     identical, particularly as to the grounds upon which Plaintiffs seek reconsideration here.

United States District Court
Northern District of California

1    1255, 1263 (9th Cir. 1993)).  Moreover, a Rule 59(e) motion "'may not be used to relitigate old

2    matters, or to raise arguments or present evidence that could have been raised prior to the entry of

3    judgment.'"  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *accord Kona Enters. v.*

4    *Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

5            Here, Plaintiffs seek reconsideration of the state court's injunction order based upon clear

6    error of law "as well as the development of new evidence of ongoing fraud."  Pl.'s Mot. 12.

7    "Clear error occurs when 'the reviewing court on the entire record is left with the definite and firm

8    conviction that a mistake has been committed.'"  *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950,

9    955 (9th Cir. 2013) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

10   However, "[a] district court does not commit clear error warranting reconsideration when the

11   question before it is a debatable one."  *Bailey v. Diaz*, No. C 12-1414 CRB (PR), 2013 WL

12   6189183, at *1 (N.D. Cal. Nov. 25, 2013) (citing *McDowell v. Calderon*, 197 F.3d 1253, 1256

13   (9th Cir. 1999)).

14           The fact that Plaintiffs seek reconsideration of an order entered by a state court before

15   removal does not significantly alter the analysis.  After removal, "[t]he federal court takes the case

16   as it finds it on removal and treats everything that occurred in the state court as if it had taken

17   place in federal court."  *Butner v. Neustadter*, 324 F.2d 783, 785 (9th Cir. 1963).  "Consequently,

18   an order entered by a state court 'should be treated as though it had been validly rendered in the

19   federal proceeding.'"  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 887 (9th Cir. 2010)

20   (quoting *Butner*, 324 F.2d at 786).  Once removed, "federal rather than state law governs the

21   future course of proceedings, notwithstanding state court orders issued prior to removal."  *Granny*

22   *Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415

23   U.S. 423, 437 (1974).  Indeed, 28 U.S.C. § 1450 recognizes a district court's authority, after

24   removal, to dissolve or modify orders entered by a state court before removal.  28 U.S.C. § 1450.

25   As such, in reconsidering an order previously entered by a state court, this Court assesses the order

26   through the lens of applicable federal law and rules of civil procedure.  Though it has

27   "considerable discretion" in considering the present motion, the Court is nevertheless bound by

28   the requirements of Rule 59(e).  *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063

United States District Court
Northern District of California

10

1    (9th Cir. 2003).

2        **B.    Preliminary Injunctions**

3        A preliminary injunction is a matter of equitable discretion and is "an extraordinary

4    remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

5    *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008).  A preliminary

6    injunction "is not a preliminary adjudication on the merits but rather a device for preserving the

7    status quo and preventing the irreparable loss of rights before judgment."  *Sierra On-Line, Inc. v.*

8    *Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  As such, the basic function of a

9    preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits

10   can be held," and "the findings of fact and conclusions of law made by a court granting a

11   preliminary injunction are not binding at trial on the merits."  *Univ. of Texas v. Camenisch*, 451

12   U.S. 390, 395 (1981); *see also Dep't of Parks & Recreation for State of California v. Bazaar Del*

13   *Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006).

14       A party seeking preliminary injunctive relief must establish "[1] that he is likely to succeed

15   on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

16   [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

17   *Winter*, 555 U.S. at 20.  Alternatively, an injunction can issue where "the likelihood of success is

18   such that serious questions going to the merits were raised and the balance of hardships tips

19   sharply in [the moving party's] favor," provided that the movant can also demonstrate the other

20   *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)

21   (citation and internal quotation marks omitted).  Showing "serious questions going to the merits"

22   requires more than establishing that "success is more likely than not;" rather, it requires a moving

23   party to demonstrate a "substantial case for relief on the merits."  *Leiva–Perez v. Holder*, 640 F.3d

24   962, 967 (9th Cir. 2011).

25   **III.   DISCUSSION**

26       Plaintiffs urge that the state court's preliminary injunction was clearly erroneous in two

27   respects.  First, Plaintiffs argue that the state court erroneously applied controlling California law

28   to the relationship among the parties to improperly conclude that AMSC's agency cannot be

United States District Court
Northern District of California

11

1   revoked because it has an agency coupled with an interest.  Pl.'s Mot. 12-18.  Second, Plaintiffs

2   contend the state court further erred in finding that "Clark" owed a fiduciary duty to "Pinnacle"

3   based on an oversimplification of the parties' relationship.  *Id.* 22-23.  Plaintiffs moreover argue

4   that Defendants cannot satisfy the other requirements for preliminary injunctive relief because

5   they have an adequate remedy at law for the revocation of the PMAs—contract damages should it

6   be determined that AMSC was erroneously terminated—and because the balance of hardships and

7   public interest favor Plaintiffs.  *Id.* 19-21.

8          Defendants understandably urge that the state court's ruling was correct and that

9   reconsideration of the preliminary injunction should be denied.  *See generally* Def.'s Opp., ECF

10  61.  After hearing the Court's thoughts on the statutory power of revocation at the January 15,

11  2015 hearing on Plaintiffs' motion, Defendants filed a new motion for yet another preliminary

12  injunction in anticipation of this Court dissolving the present one.  At the January 27, 2015

13  hearing on Defendants' application for a temporary restraining order in connection with its "belt

14  and suspenders" motion for another preliminary injunction, the Court noted that the ground upon

15  which Defendants were seeking to enjoin revocation of the PMAs in their new motion were

16  intertwined with the corporate governance arguments already made and submitted to the Court in

17  the extant injunction.  As such, the Court terminated Defendants' new motion and permitted both

18  parties to submit supplemental briefing regarding additional arguments in favor of and against

19  reconsidering the preliminary injunction.  The Court accordingly considered all arguments in

20  reaching the conclusions in this order.

21          **A.    AMSC Does Not Have an Agency Coupled With an Interest**

22          Plaintiffs argue that the state court fundamentally misapplied the controlling case of

23  *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.*, 19 Cal. App. 4th 615 (1993), *as modified on*

24  *denial of reh'g* (Nov. 5, 1993), to the facts of this case.  Pl.'s Mot. 12-16.  The Court agrees.

25          *Pacific Landmark* concerned a similar arrangement for investment and management of two

26  hotel properties.  Therein, Marriott Hotels entered into two sets of agreements with owners of two

27  hotel properties: property management agreements between Marriott affiliate MHI and the owners

28  and loan agreements between Marriott affiliate SDI and the owners.  *Pac. Landmark*, 19 Cal. App.

1    4th at 619-20.  When the relationship fell apart, the property owners sued all three Marriott entities

2    and sought a preliminary injunction to remove MHI from its position as property manager.  The

3    trial court denied the preliminary injunction, finding that the overall transaction—that is, all four

4    agreements in conjunction—showed that MHI could not be removed because it had an agency

5    coupled with an interest.  *Id.* at 622-23.

6          The Court of Appeal reversed.  In doing so, the court held two things important to the

7    issues in this case.  First, because California Civil Code § 2356 codified the "cardinal rule of

8    agency law" that "a principal who employs an agent always retains the power to revoke the

9    agency," California law provides a "statutory power" that is "independent and distinguishable

10   from a contractual right to revoke an agency."  *Id.* at 624-25 (internal quotations omitted).  "Thus,

11   even if there is no contractual right to revoke an agency, section 2356, subdivision (a)(1) gives the

12   principal the statutory power to do so where the agency is not coupled with an interest in the

13   subject of the agency."  *Id.* at 625.  To be sure, if no contractual *right* to revoke exists, the

14   principal may be liable for contract damages.  However, the absence of contractual termination

15   rights does not prevent a principal from exercising its statutory power to revoke.  *Id.*; *see also*

16   *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1203 (S.D. Fla. 2011).  Second, the

17   *Pacific Landmark* court marked the importance of respecting separate corporate entities.  *Pac.*

18   *Landmark*, 19 Cal. App. 4th at 628 ("Since society recognizes the benefits of allowing persons and

19   organizations to limit their business risks through incorporation, sound public policy dictates that

20   disregard of those separate corporate entities be approached with caution.").  Thus, a corporate

21   entity should not be permitted to conveniently disregard its incorporation when convenient.  *Id.*

22   Pulling these two threads together, the Court of Appeal determined that it was error for the trial

23   court to "look[] at the forest and not the tree" when the narrow issue presented "concerned only

24   the tree MHI."  *Id.*  Respecting MHI's separate corporate existence from SDI, the court concluded

25   that MHI did not have an agency coupled with an interest because *MHI* held no interest in the

26   property management agreements beyond compensation.  *Id.*

27         In this action, AMSC is the tree.  Yet, as Plaintiffs note, the state court acknowledged that

28   it focused on the forest when concluding that AMSC held an agency coupled with an interest.

13

United States District Court
Northern District of California

1    Nov. 15, 2012 Hr'g Tr. 78:2-4 ("I find myself perhaps seduced, as a trial court in *Pacific*

2    *Landmark*, by the complexity of the arguments and the relationships").  Looking at the trees—and

3    not at the forest—as *Pacific Landmark* requires a court to do, it is beyond dispute that MBMC and

4    CMC have the statutory power to revoke AMSC's agency.  Respecting the corporate entities that

5    the parties have set up to govern their complex relationship and recognizing AMSC's separate

6    entity status, this Court is left with the unmistakable conclusion that the PMAs confer *only* an

7    interest in compensation on AMSC.  *See* MBMH PMA ¶ 10 ("Nothing contained in this

8    Agreement shall be construed as creating a partnership, joint venture, or any other relationship

9    between the parties to this Agreement, or as requiring Manager to bear any portion of losses

10   arising out of or connected with the ownership or operation of the Project.").  Such an interest,

11   without more, "is not sufficient as a matter of law to prevent [MBMC and CMC] from exercising

12   their statutory power as principals under section 2356, subdivision (a)(1) to revoke [AMSC] as

13   their agent."  *Pac. Landmark*, 19 Cal. App. 4th at 628.

14        Defendants argue that *Pacific Landmark* does not control because AMSC's position is

15   more like that of the property manager in *Lane Mortgage Co. v. Crenshaw*, 93 Cal. App. 411

16   (1928).  Def.'s Opp. 13.  There, the court did find that a property management company had an

17   agency coupled with an interest because the company was engaged to manage a hotel in which the

18   company also held a lease for one of the floors.  The coupling of the lease with the agency

19   agreement placed in the company's hands "directly the means of preserving its said interest."  *Id.*

20   at 428-29; *see also id.* at 429 ("The power in the present case was expressly made irrevocable and

21   expressly tied to the entire transaction in the creation of the leasehold interest.").  *Lane*, however,

22   does not assist Defendants because the agency and the interest were held by the same entity, a

23   circumstance that is pointedly not present here.  *Pacific Landmark*, in considering *Lane* and other

24   predecessor cases, specifically noted the requirement in California law that "[t]he power and the

25   interest are united in the same person."  *Pac. Landmark*, 19 Cal. App. 4th at 624 (quoting *Hunt v.*

26   *Rousmanier's Adm'rs*, 21 U.S. 174, 204 (1823) and *O'Connell v. Superior Court of City & Cnty.*

27   *of San Francisco*, 2 Cal. 2d 418, 422 (1935)).  Thus, though it may be true that Pinnacle Monterey

28   and Pinnacle Irwin have interests in AMSC's agency under the terms of the CPMB and CPCMC

operating agreements, *see* Def.'s Opp. 14, and that MBMH and CMC cannot act unless at the direction of their respective managers, which in turn must act according to the CPMB and CPCMC operating agreements, *see* Def.'s Suppl. Br. 7, ECF 116, none of this is relevant to whether MBMH and CMC *qua* entities have the statutory power to revoke *AMSC*'s agency. Pinnacle Monterey and Pinnacle Irwin's interests are not vested in AMSC.  Absent evidence that Pinnacle Monterey and Pinnacle Irwin are alter egos of AMSC (and Defendants do not argue such alter ego status), the interest granted to the Pinnacle Managers through the CPMB and CPCMC operating agreements is decoupled from AMSC's agency, which was created in a separate contract—the PMAs—between *different corporate entities*.[10]  As such, the Court agrees with Plaintiffs that *Pacific Landmark* more appropriately governs the present situation because the bottom line is that Defendants could not identify "any 'interest' of [AMSC] in the [projects] or point to any document involved in the transaction which memorialized such an interest," other than to assert that *Pinnacle* entities have an interest in maintaining the agency.  *See Pac. Landmark* 19 Cal. App. 4th at 627; *accord Woolley v. Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1533 (1991); *FHR TB*, 865 F. Supp. 2d at 1198.

As much as Defendants attempt to distinguish *Pacific Landmark* and analogize to *Lane*, the simple fact of the matter is that to the extent any protectable interest exists in the continuation of the PMAs, such interest does not reside with AMSC but rather with some other affiliated but *separate* entity.  That MBMH and CMC are controlled by other entities that may prevent MBMH and CMC from exercising the statutory power of revocation does not obviate the vesting of that power in MBMH and CMC under California law.  The Court therefore concludes that AMSC does not have an agency coupled with an interest and that MBMH and CMC have a statutory power under California Civil Code § 2356 to revoke AMSC's agency at will.  The state court thus committed a clear error of law on this portion of its order.  As discussed below, however, that

---

[10] There is no evidence that AMS has an interest that is protected by way of the PMAs. Defendants point only to the CPMB and CPCMC operating agreements, which confer the interest on Pinnacle Monterey and Pinnacle Irwin respectively, not AMS.  *See* Def.'s Opp. 13-15.  Thus, Plaintiffs' allegation that AMS is the alter ego of AMSC is not relevant to this issue because neither AMS nor AMSC holds the interest.  *See* FAC ¶ 30.

1    conclusion does not suffice to lift the state court's preliminary injunction.

2         **B.    Clark Realty Was Properly Enjoined From Directing MBMH and CMC to
              Exercise the Statutory Power of Revocation**
3

4         In the alternative to its conclusion that AMSC has an agency coupled with an interest, the

5    state court reasoned that "there has to be some kind of fiduciary duty here when you have a

6    minority partner who is being threatened with being removed in such a way that its only access to

7    compensation is going to end, that there's something much more going on here than just a simple

8    contract."  Nov. 15, 2012 Hr'g Tr. 80:22-81:3.  The court made no other findings with respect to

9    the fiduciary duty issue, and it did not identify which Clark entity owed what fiduciary duty to

10   which Pinnacle entity based on what relationship.  Plaintiffs contend that this vague conclusion

11   was clearly erroneous.  Pl.'s Mot. 23; Pl.'s Reply 13-14, ECF 63.

12        While the Court agrees with Plaintiffs that, given the large number of distinct entities

13   involved in this action, the fiduciary duty should have been more specifically defined by the state

14   court, the Court does not understand the fiduciary duty finding to be based on the relationship

15   between MBMH and CMC and AMSC, nor would any injunction be supportable based on duties

16   owed among those entities.  *See* Pl.'s Mot. 22-23.  As a matter of law, a principal does not owe

17   any fiduciary duty to its agent, nor do courts typically enjoin the breach of personal service

18   agreements.  *See generally* Restatement (Third) Of Agency §§ 8.13-15 (2006) (describing

19   principal's duties of contract, indemnification, and good faith and fair dealing); *see also Woolley*,

20   227 Cal. App. 3d at 1530 ("the agent's remedy for wrongful termination is damages, as in any

21   other breach of contract action").

22        Defendants argue that there is a fiduciary duty between Clark Realty and AMS.  However,

23   the Court observes as somewhat perplexing that for all their assertions that Clark Realty and AMS

24   formed Clark Pinnacle Family Communities LLC to work together on their joint venture,

25   Defendants have not introduced into the record the operating agreement for that entity.  *See*

26   Counterclaims ¶¶ 29-30; Def.'s Opp. 2-3, 21.  Although the Court might divine that the mere

27   existence of the joint venture makes Clark Realty a fiduciary of AMS, the Court cannot presume

28   the scope or contours of that duty absent a written instrument.  Without an operating agreement or

United States District Court
Northern District of California

United States District Court
Northern District of California

1    similar document, the Court cannot know with any confidence whether any joint venture

2    survived—or was dissolved—upon the Army's acceptance of Clark Realty and AMS's bid.

3    Instead of a binding agreement, Defendants rely on a 2001 Term Sheet between Clark Realty

4    and AMS to demonstrate the structure of the joint venture, which was implemented in the operating

5    agreements of the limited liability companies created to manage the projects.  *See* Def.'s Opp. 3-4

6    (explaining that the various agreement before the Court are "[c]onsistent with the Term Sheet").

7    Plaintiffs rightly contest whether such a joint venture relationship could be found in the Term

8    Sheet which, by its own terms, creates no binding obligations upon the signatories.  Pl.'s Reply 13

9    n.5; *see* Chu Decl. Exh. 2 ("This term sheet is not intended to set forth binding obligations and all

10   rights and obligations of Clark and Pinnacle are subject to negotiation, execution, and delivery of

11   definitive agreements.").  Moreover, the Term Sheet addresses contracts relating to four bases,

12   none of which is at issue in this lawsuit.[11]  *Id.*

13       Certainly, the Term Sheet cannot be treated as a binding agreement.  Defendants have,

14   however, raised serious questions concerning whether the other agreements governing the parties'

15   relationship must be interpreted in light of the Term Sheet and the unique nature of military

16   housing contracts.  *See* Def.'s Opp. 21; Harrelson Decl. ¶¶ 9-12; Chu Decl. Exh. 3 (June 6, 2002

17   submission to the Army wherein Clark Realty and AMS apparently represent themselves as "Clark

18   Pinnacle Family Communities LLC"); *see also* Def.'s Suppl. Br. 6.  As such, it would not have

19   been clearly erroneous for the state court to conclude that there is a substantial claim that Clark

20   Realty, as the Clark Manager for CPMB and CPCMC, owes a fiduciary duty to the minority

21   Pinnacle Managers—Pinnacle Monterey and Pinnacle Irwin respectively.  *See* Pinnacle SAC ¶¶

22   93-116.  It is undisputed that as a manager of a limited liability company, Clark Realty owes some

23   fiduciary duty to the other manager.  Cal. Corp. Code § 17704.09(f); *see* Def.'s Opp. 21-22.

24   Particularly as understood in the context of the initial joint venture between Clark Realty and

25   AMS, there is a substantial claim that the Clark Managers of CPMB and CPCMC each owe a

26   fiduciary duty to the respective Pinnacle Managers to not destroy the Pinnacle entities' sole means

27

28   ———————————
     [11] The four bases identified in the Term Sheet are Patrick Air Force Base, Fort Bragg, Fort
     Campbell, Fort Polk and Fort Stewart.  Chu Decl. Exh. 2 at 2.

United States District Court
Northern District of California

1  of realizing a return on their investment in the projects.  *See BT-I v. Equitable Life Assurance*

2  *Soc'y of the United States*, 75 Cal. App. 4th 1406, 1413-14 (1999), *as modified on denial of reh'g*

3  (Nov. 29, 1999).  Permitting the Clark Managers to direct the revocation of AMSC's agency under

4  such circumstances would irreparably injure Pinnacle Irwin's and Pinnacle Monterey's ability to

5  protect their returns on investment, as was contemplated by the complex structure of interrelated

6  limited liability companies created by the parties.

7         It would also not be clearly erroneous to conclude that Defendants have demonstrated a

8  serious question going to the merits of their claim that the PMAs were properly amended in 2011

9  by the Pinnacle Managers of CPMB and CPCMC before termination of those agreements.  *See*

10  Def.'s Opp. 17; Def.'s Suppl. Br. 4.  The plain language of the CPMB and CPCMC operating

11  agreements suggests, without reservation, that the Pinnacle Managers can force a vote and resolve

12  deadlocks with respect to adjustments of the terms and conditions of the PMAs.  *See, e.g.*, CPMB

13  Op. Ag. ¶¶ 3.1(b)(2)(E), 3.13(c).  This argument is made stronger by the absence of any evidence

14  in the record that Clark Realty, through MBMH and CMC, invoked its right to terminate the

15  PMAs for fraud under the default provision of the PMAs *prior to* Pinnacle's forced amendment of

16  those agreements.  Though Plaintiffs may contest the propriety of the adjusted terms or of the

17  manner in which the PMAs were amended, there is at least a substantial case, based on the clear

18  language of the operating agreements, for the relief that Defendants seek.[12]  As such, permitting

19  Clark Realty to direct CPMB and CPCMC to direct MBMH and CMC to *revoke* the PMAs at this

20  juncture would eviscerate the Pinnacle Managers' claims before a trial on the merits.  To be sure,

21  Plaintiffs would still be liable for contract damages for wrongful termination of the PMAs.  Such

22  damages, however, would not account for Pinnacle Monterey and Pinnacle Irwin's rights, validly

23  exercised, to amend the PMAs in a way that would prevent termination of the PMAs and permit

24  AMSC to cure deficiencies in its performance.

25         On the issue of the Pinnacle Managers' minority rights, the Court thus finds persuasive the

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[12] The Court's consideration of the Pinnacle Managers' exercise of their minority rights to amend
28  the PMAs, however, is in no way a determination of the validity or legality of the content of those
amendments.

holding of the Second Circuit in *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir. 2003), wherein the court found that "the denial of bargained-for minority rights, standing alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power (e.g., preserving the management role of the minority directors) in corporate management." *Id.* at 114; *see also id.* at 115 ("a bargained-for minority right to participate in corporate management has value in and of itself and a denial of that right, without more, can give rise to irreparable harm"). Even if the Pinnacle Managers were to ultimately prevail on the merits and secure a declaration that the PMAs were *validly* amended, it would be a pyrrhic victory, for immediate termination of AMSC would deprive them of a meaningful remedy for the loss of their contractual right to vote on adjustments to the PMAs. The injury to the Pinnacle Managers from prematurely removing AMSC is particularly acute because, once removed, it is highly unlikely that any court would order AMSC reinstated, given the general prohibition against specific performance of personal service contracts. *See Woolley*, 227 Cal. App. 3d at 1533-35. As such, a preliminary injunction may be sustained to prevent irreparable injury to the Pinnacle Members' minority voting rights under the CPMB and CPCMC operating agreements. *Accord EIG Global Energy Partners, LLC v. TCW Asset Mgmt. Co.*, No. CV 12-7173 CAS MANX, 2012 WL 5990113, at *9 (C.D. Cal. Nov. 30, 2012) (citing *Wisdom*); *Davoodi v. Imani*, No. C 11-0260 SBA, 2011 WL 250392, at *4 (N.D. Cal. Jan. 26, 2011) (same). The Court emphasizes here that any preliminary injunction would narrowly pertain to the managers of CPMB and CPCMC and be justified based upon the duties and obligations flowing from those operating agreements. Although such an injunction would have the effect of preventing AMSC's ouster, AMSC itself is not entitled to any injunctive relief against MBMH's and CMC's exercise of their respective statutory powers as principals to revoke AMSC's agency at will. *See Woolley*, 227 Cal. App. 3d at 1530-35.

To be sure, the Court agrees with Plaintiffs that the CPCMC and CPMB operating agreements appear to permit the Clark Managers to *enforce* the terms of the PMAs—including the default provision—without triggering a Major Decision vote. Pl.'s Reply 1; CPMB Op. Ag. ¶ 3.1(b)(2)(E) ("the decision to enforce or take any other action with respect to any of the terms or

conditions [of the PMAs] shall not be deemed a Major Decision").  Defendants argue that such enforcement cannot occur without court process, Def.'s Opp. 12, which, if true, would be consistent with the absence of record evidence that Clark Realty directed MBMH and CMC to invoke the default provision of the PMAs upon an earlier detection of fraud.  Regardless, although Plaintiffs are persuasive on the right under the PMAs of the Clark Managers to unilaterally direct termination of the PMAs for fraud, Defendants have raised a substantial claim that statutory *revocation* of the PMAs is a Major Decision requiring a vote by both managers.  Def.'s Opp. 10-12; Def.'s Suppl. Br. 3-4.  The CPMB and CPCMC operating agreements are silent as to whether the Clark Manager can unilaterally invoke MBMH's and CMC's *power* to revoke AMSC's agency, as the removal of AMSC at will does not appear to be within the contemplation of the power to "enforce or take any other action *with respect to any of the terms or conditions* [of the PMAs]."[13]  CPMB Op. Ag. ¶ 3.1(b)(2)(E) (emphasis added).  Therefore, Defendants have raised at least a serious question concerning their claim that revocation of the PMAs is a Major Decision on which Pinnacle Monterey and Pinnacle Irwin have a contractual right to vote.  As with the right to resolve deadlocks on the terms and conditions of the PMAs, the Pinnacle Managers' voting rights on revocation, to the extent they have such rights, would be irreparably lost if the Court were to lift the preliminary injunction now.  Moreover, due to the Clark Managers' fiduciary duty to its minority managers, Pinnacle Monterey and Pinnacle Irwin, the Court is persuaded that continuation of the preliminary injunction is necessary to protect the Pinnacle Managers from an arbitrary or baseless decision to revoke AMSC's agency.

---

[13] Defendants attempt to shoehorn the revocation issue into one of three possible Major Decisions defined in the CPMB and CPCMC operating agreements: the disposition of a substantial asset of the company, CPMB Op. Ag. ¶ 3.1(b)(3)(A); the adjustment of the terms and conditions of the PMAs, *id.* ¶ 3.1(b)(3)(E); and the amendment of the operating agreement itself, *id.* ¶ 3.1(b)(3)(f). Def.'s Suppl. Br. 2.  None of these arguments is overwhelmingly convincing.  For example, it is not clear from the terms of the operating agreements that the PMAs are "substantial assets" of CPMB and CPCMC.  *See* Pl.'s Reply 6.  Likewise, revocation of the PMAs falls outside of the ambit of "[a]djustments to the terms or conditions of the [PMAs]" just as equally as it falls outside of the power to "enforce or take any other action with respect to" those terms.  On reconsideration of the state court's ruling, it is sufficient for this Court, in light of the fiduciary duties owed between the managers of CPMB and CPCMC, that the operating agreements are ambiguously silent on the power of revocation.

As to the balance of hardships, it is easy to see that they tip sharply in Defendants' favor, particularly as the preliminary injunction has been in place for over two years.  The principle hardships that Plaintiffs assert from the continuing injunction are the forced retention of an untrustworthy agent and the Army's support for removal of AMSC based on its "zero tolerance for fraud" and "sharp concern for the life-safety risk presented to its soldiers and their families" by the alleged conduct of AMSC.  Pl.'s Mot. 20-21; Moore Decl. Exh. 1 ¶ 7 (Decl. of Paul D. Cramer, Deputy Assistant Secretary of the Army for Installations, Housing & Partnerships).[14]  The declaration that Plaintiffs offer in support identifies two specific incidents involving resident safety but indicates that the declarant is "*not* suggesting that these incidents were the direct result of conduct by Pinnacle," only that they "illustrate the significance of responding to work orders" and the Army's ability to trust the work orders.  Cramer Decl. ¶ 7 (emphasis added).  While the interests in removing an untrustworthy agent and in protecting resident safety are all important concerns, they do not outweigh the hardship to the Pinnacle Managers that would result from removing AMSC.  Moreover, as discussed below, there is no evidence before the Court that resident safety at the Monterey and Irwin projects has been impacted by AMSC.  Nor is the evidence of past and continuing fraud so overwhelming that the Court can conclude Plaintiffs are likely to prevail on the merits.  Finally, Plaintiffs' "inability to fully discover and remedy the apparently ongoing fraud," Pl.'s Reply 12, does not outweigh the hardship to Defendants as Plaintiffs have had full access to liberal discovery in both this and the state court.

To the extent the Army's support of Plaintiffs' case represents the public interest, that support is entitled to due consideration and moderately tilts the public interest factor in Plaintiffs' favor.  *See* Pl.'s Mot. 21-22; Moore Decl. Exhs. 6-7 (letter agreements between Plaintiffs and the Army to remove AMSC at MBMH and CMC).  However, other than the Cramer declaration, there

---

[14] Defendants object to and seek to strike a number of the declarations that Plaintiffs offer in support of their motion.  Def.'s Opp. 19.  The only one relevant to the Court's consideration is the Cramer declaration, which Defendants contend contains inadmissible double hearsay and lacks proper personal knowledge.  *Id.*  Defendants' objections to the Cramer declaration are OVERRULED, as this Court may consider even inadmissible evidence in determining whether to issue a preliminary injunction.  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).  Defendants' objections to Plaintiffs' other declarations are moot.

United States District Court
Northern District of California

United States District Court
Northern District of California

is no evidence of actual resident complaints concerning AMSC's management at the two projects. The Cramer declaration moreover identifies only two incidents involving resident safety, one of which did not occur at either of the Monterey or Irwin projects at issue in this action, and does not even establish that those incidents were caused by AMSC's alleged work order fraud.  Cramer Decl. ¶ 7.  The Court thus cannot conclude that a risk to resident safety is a *likely* (as opposed to speculative) consequence of continuing the injunction against AMSC's removal from its property management role.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  Although narrowly enjoining Clark Realty from directing MBMH and CMC to revoke AMSC's agency may in some way affect non-parties to this action, it is not clear that the attenuated public consequences justify dissolving the preliminary injunction entered by the state court.

Two going on three years is a long time to maintain a preliminary injunction.  Yet, the parties are still hotly contesting the cross-allegations as this case marches inexorably closer to trial.  That the Army has added its voice to the chorus calling for AMSC's removal adds fuel to the fire, but is not enough to outweigh the severe hardship to the Pinnacle Managers of CPMB and CPCMC if the injunction were to be lifted now and AMSC's agency revoked mere months before trial.  Based on the foregoing, the Court sees no clear error on this aspect of the state court's preliminary injunction.  Clark Realty as the Clark Manager of CPMB and CPCMC should be preliminarily enjoined from directing MBMH and CMC to revoke their respective PMAs with AMSC.  Appropriately narrowed as such, the Court DENIES Plaintiffs' motion for reconsideration of the state court's preliminary injunction.

### C.   Plaintiffs Have Not Shown Circumstances Warranting the Dissolution of the Preliminary Injunction

In addition to reconsideration for clear error, Plaintiffs also contend that the "development of new evidence of ongoing fraud" constitutes an independent ground for dissolving the preliminary injunction entered by the state court.  Pl.'s Mot. 12.

"A district court has inherent authority to modify a preliminary injunction in consideration of new facts."  *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002); *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("There is also no

United States District Court
Northern District of California

1   dispute but that a sound judicial discretion may call for the modification of the terms of an

2   injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance

3   have changed, or new ones have since arisen.").

4          Here, the Court agrees with Defendants that Plaintiffs have presented little evidence in the

5   way of *changed* circumstances that would warrant dissolving the preliminary injunction now. *See*

6   Def.'s Opp. 9.  The asserted discovery of additional evidence of continued fraud and the addition

7   of the Army's support for Plaintiffs' cause do not materially alter the factual predicates for the

8   injunction.  Nor has there been any legal determination that would undermine its legal predicate.

9   *See Donk v. Miller*, 365 F.3d 159, 165 (2d Cir. 2004).  There is thus no basis in the record for

10  dissolving the preliminary injunction at this time.

11         Had this Court had occasion to consider the issue *de novo* two years ago, the injunction

12  may never have been issued.  As it stands, the Court finds on reconsideration no clear error or

13  changed circumstances with respect to the injunction entered by the state court sufficient to justify

14  lifting it mere months before trial on the merits.  Plaintiffs' motion for reconsideration and to

15  dissolve the December 28, 2012 preliminary injunction of the state court is therefore DENIED.

16  **IV.    ORDER**

17         For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion to Dissolve

18  Preliminary Injunction is DENIED.  In the interest of clarity, the Court modifies the preliminary

19  injunction to solely enjoin Clark Realty from exercising its purported managerial power over

20  CPMB and CPCMC to direct MBMH and CMC to revoke the Monterey and Irwin PMAs pursuant

21  to California Civil Code § 2356.

22         **IT IS SO ORDERED.**

23  Dated: April 7, 2015

24

25                                                  _____
                                                    BETH LABSON FREEMAN
26                                                  United States District Judge

27

28