# EXHIBIT 5

# EXHIBIT 5

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3          SAN JOSE DIVISION
 4  MONTEREY BAY MILITARY    )
    HOUSING, LLC, CLARK      )
 5  PINNACLE MONTEREY BAY,   )
    LLC, CLARK MONTEREY      )
 6  PRESIDIO, LLC, CALIFORNIA )
    MILITARY COMMUNITIES,    )
 7  LLC, CLARK PINNACLE      )
    CALIFORNIA MILITARY      )
 8  COMMUNITIES, LLC and     )
    CLARK IRWIN LLC,         )
 9       Plaintiffs,  ) Case No.
    vs.          ) 5:14-CV-03953-BLF-HRL
10  PINNACLE MONTEREY, LLC,  )
    PINNACLE IRWIN, LLC,     )
11  AMERICAN MANAGEMENT      )
    SERVICES CALIFORNIA, INC., )
12  AMERICAN MANAGEMENT      )
    SERVICES, LLC, GOODMAN   )
13  REAL ESTATE, INC.,       )
    GOODMAN FINANCIAL        )
14  SERVICES, INC., STANLEY  )
    HARRELSON and JOHN       )
15  GOODMAN,                 )
        Defendants.      )
16  _____  )
    AND RELATED              )
17  CROSS-COMPLAINTS         )
    _____  )
18      The video deposition of LOUIS DUDNEY,
    called for examination pursuant to the Rules of
19  Civil Procedure for the United States District
    Courts pertaining to the taking of depositions,
20  taken before Shannon R. Roberts, a notary public
    within and for the County of Will and State of
21  Illinois, at 77 West Wacker Drive, Suite 3100,
    Chicago, Illinois, on June 16, 2015, at the hour
22  of 9:04 a.m.
23
    Reported by:  Shannon R. Roberts, CSR
24  License No.:  084-004669
```

**Page 2**

```
 1  APPEARANCES:
 2    KIRKLAND & ELLIS, LLP
 3    BY:  MS. DONNA M. WELCH
 4    300 North LaSalle Street
 5    Chicago, Illinois  60654
 6    (312) 862-2257
 7    donna.welch@kirkland.com
 8       Representing the Plaintiffs;
 9
10    GREENBERG TRAURIG, LLP
11    BY:  MR. THOMAS E. DUTTON
12    77 West Wacker Drive, Suite 3100
13    Chicago, Illinois  60601
14    (312) 456-8400
15    duttont@gtlaw.com
16       Representing AMS, AMS California,
17    Stan Harrelson, Pinnacle Monterey
18       and Pinnacle Irwin.
19
20
21
22
23
24
```

**Page 3**

```
 1  ALSO PRESENT:
 2    MR. ANDREW MATHEWS,
 3    Associate General Counsel,
 4    Compliance Officer for Military Projects,
 5    Pinnacle Family of Companies
 6
 7    MR. THOMAS F. GRISTINA,
 8    Page Scrantom Sprouse Tucker Ford, P.C.,
 9    American Management Services and American
10    Management Services East
11
12    MS. KIM ORTIZ, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1            I N D E X
 2  WITNESS              EXAMINATION
 3  LOUIS DUDNEY
 4    BY MR. DUTTON            6
 5
 6          E X H I B I T S
 7  NUMBER              MARKED FOR ID
 8  DUDNEY Deposition Exhibit
 9    No. 001            9
10    No. 002            58
11    Nos. 003-004       113
12    Nos. 005-006       119
13    No. 007            153
14    No. 008            150
15    No. 009            184
16    No. 010            199
17    No. 011            210
18    No. 012            224
19    No. 013            256
20    No. 014            267
21    No. 015            274
22    No. 016            278
23    No. 018            282
24      (Dudney Exhibit No. 017 omitted)
```

Page 5

1    THE VIDEOGRAPHER:  This is Tape No. 1 of the
2  videotaped deposition of Louis Dudney in the
3  matter of Monterey Bay Military Housing, LLC,
4  et al., versus Pinnacle Monterey, LLC, et al.,
5  being heard before the U.S. District Court for
6  the Northern District of California, San Jose
7  Division, Case No. 5:14-CV-03953-BLF-HRL.
8    This deposition is being held at
9  Greenberg Traurig, 77 West Wacker Drive,
10  Suite 3100, Chicago, Illinois, on Tuesday,
11  June 16, 2015, at 9:04 a.m.
12    My name is Kim Ortiz and I am the
13  videographer.  The court reporter is Shannon
14  Roberts.
15    Counsel, will you please introduce
16  yourselves and affiliations and the witness will
17  be sworn in.
18    MR. DUTTON:  Tom Dutton on behalf of American
19  Management Services, American Management
20  Services California, Pinnacle Monterey and
21  Pinnacle Irwin, and Stan Harrelson.
22    MR. MATHEWS:  Andy Mathews from American
23  Management Services.
24    MR. GRISTINA:  Thomas Gristina of Page

Page 6

1  Scrantom on behalf of American Management
2  Services and American Management Services East.
3    MS. WELCH:  Donna Welch with Kirkland & Ellis
4  for the plaintiffs.
5    THE REPORTER:  Shannon Roberts, court
6  reporter from Esquire.
7    (WHEREUPON, the witness was duly
8    sworn.)
9    LOUIS DUDNEY,
10  having been first duly sworn, was examined and
11  testified as follows:
12    EXAMINATION
13  BY MR. DUTTON:
14    Q.  Good morning, Mr. Dudney.  How are you?
15    A.  Good morning, Mr. Dutton.  I'm fine,
16  thanks.
17    Q.  You understand that you're here today
18  to testify in the matter of Monterey Bay
19  Military Housing versus Pinnacle Monterey,
20  et al.?
21    A.  Yes.
22    Q.  And to date, for the engagement with
23  AlixPartners, how much have the projects spent
24  on your firm?

Page 7

1    A.  I don't have the -- an exact figure for
2  what it is.
3    Q.  Over a million dollars?
4    A.  I'm sorry?
5    Q.  Over a million dollars?
6    A.  Yes.
7    Q.  Over $2 million?
8    A.  Are you asking for just this particular
9  case or are you including the Benning and
10  Belvoir?
11    Q.  Well, let me ask just for this
12  particular case.
13    A.  Okay.  And your question was if it's
14  over $2 million?
15    Q.  Yeah.
16    A.  It likely is.
17    Q.  How long have you been working on the
18  California case?
19    A.  For some time.  You deposed me a couple
20  of years ago in it, so my first affidavit that
21  I've got here I think is from 2012, so it's a
22  number of years that I've been working on it.
23    Q.  And were you involved in work at the
24  Fort Irwin and Monterey projects before 2012?

Page 8

1    A.  I might have been.  I don't recall the
2  first time that I went out there because
3  I visited both locations, so I -- I can't recall
4  what the exact -- but it certainly was prior to
5  my issuing the various, you know, my first
6  affidavit or other report in the matter.
7    Q.  Has your firm AlixPartners been
8  involved in work at the Monterey and Fort Irwin
9  projects prior to 2012?
10    A.  Again, subject to check, but I -- my
11  best recollection would be yes.
12    Q.  And has AlixPartners billed the
13  projects and have the projects paid AlixPartners
14  over $3 million for your work on the California
15  case?
16    A.  Again, I don't know what the billings
17  are.  I would have to refer to the bills to
18  determine whether it's over $3 million, it could
19  be, but I don't -- I don't recall.
20    Q.  And isn't it correct that you were
21  being paid directly by the two military housing
22  projects that are the plaintiffs in this case?
23    A.  I'm not sure I can testify precisely as
24  to where the payments come from.  I do know that

Page 9

1  I send the bills to representatives of the owner
2  along with Kirkland & Ellis, but I -- I don't
3  know that I've ever seen a check or a wire
4  transfer to see where the payments actually come
5  from.
6      Q.  It's your understanding, isn't it, that
7  you're being paid -- AlixPartners is being paid
8  out of the project money?
9      A.  That's my understanding.
10     Q.  Clark Realty Capital is not paying
11  AlixPartners' bills in this case, right?
12     A.  Not to my knowledge.
13     Q.  You prepared an expert report dated
14  March 27th, 2015, have you not?
15     A.  Yes.
16     Q.  And that report, I'll mark as Dudney
17  Exhibit 001.
18          (WHEREUPON, DUDNEY Deposition
19          Exhibit No. 001 was marked for
20          identification.)
21  BY MR. DUTTON:
22     Q.  And Mr. Dudney, I've just marked the
23  body of the report, I haven't marked the
24  exhibits.  I have the exhibits to the report

Page 10

1  separated out, and I thought I could refer to
2  them as we go.  I understand you brought your
3  own copy of that report today; is that right?
4      A.  Yes, and I would point out that what
5  you have handed me -- and I'll flip the pages
6  here to check on, make sure we've got it all
7  copied, but it appears to have some exhibits to
8  it, so for example, it's got Exhibit 1 which is
9  my CV that was current at the time, it has
10  Exhibit 2 which is a December 31st, 2013, report
11  from Benning and Belvoir, and I think that's it.
12         Whereas, there are -- as you can see,
13  there are many other exhibits.  It's got -- it
14  appears to have the first two exhibits and then
15  let me just check --
16     Q.  All right.
17     A.  -- to make sure we're complete here.
18         So yes, the text pages, which go from 1
19  to 95 appear to be complete and appear to be
20  that March 27th report and then as I mentioned
21  up front, it appears to have Exhibit 1 and 2 but
22  not the other exhibits.
23     Q.  All right.  And Exhibit 1 is your CV
24  and Exhibit 2 is your report in the Georgia

Page 11

1  action, correct?
2      A.  Correct.  It is a -- it is -- just to
3  be specific, it is my December 31st, 2013 report
4  in the Georgia matter.
5      Q.  All right.  Now, Mr. Dudney, when did
6  you begin working on the -- what I'll call the
7  first 95 pages which is the California report?
8      A.  Are you asking me about when was the
9  words actually started to be put down in the
10  form that they are in, or are you asking
11  substantively in terms of doing the analysis
12  that ultimately manifests themselves in the
13  report?
14     Q.  When did you start to work on the
15  report?
16     A.  Physically the report itself.
17     Q.  Do you understand the question?
18     A.  I'm trying to understand the
19  differentiation I asked about.
20     Q.  All right.  Well, why don't you tell me
21  when you -- when you began the report and then
22  when we talk about the analyses, I can ask you
23  when you started those analyses.
24     A.  Sure.  I don't -- I don't recall when

Page 12

1  the first time was, it was obviously in the
2  early part of the spring, late winter period of
3  this year that I began working on what is
4  culminated in the March 27th report here as
5  Exhibit 001.
6      Q.  So the first quarter of 2015, would
7  that be accurate?
8      A.  That's my best recollection as to when
9  the report started to be drafted.
10     Q.  Okay.  Now your -- your report contains
11  a summary that has four basic opinions; is that
12  correct?
13     A.  Yes.
14     Q.  And the first four -- the first opinion
15  involves identified deficiencies and processes
16  and improprieties and other issues -- and/or
17  other issues arising from Pinnacle's management
18  services at the Monterey and CMC projects?
19     A.  Yes.
20     Q.  What do you mean by identified
21  deficiencies and processes?
22     A.  One example would be the internal
23  control deficiencies that are noted in my
24  report.

LOUIS DUDNEY                                            June 16, 2015
MONTEREY BAY vs. PINNACLE                                      13–16

Page 13

1     Q.   Right.  But what do you mean by
2  deficiencies and processes?
3     A.   It was just a term to identify that
4  there were, for example, in the case of the
5  internal control deficiencies, that that's a
6  typical term that would be used when assessing
7  internal controls, whether they are deficient or
8  lacking from what the state that an entity would
9  prefer them to be in.
10    Q.   Well, okay.  So who is -- who is the
11 judge of whether or not the controls are
12 deficient?
13    MS. WELCH:  Objection, form.
14    THE WITNESS:  It depends on, you know, what
15 circumstance we're talking about, but in this
16 case, for purposes of the internal controls,
17 these were documents that I analyzed which were
18 based on contemporaneous assessments that were
19 made as part of the relationships that existed,
20 so I believe in -- in the case of the ones that
21 I'm referring to, these were auditors that were
22 affiliated or associated with the owner in some
23 form that was doing reviews of what the property
24 manager's controls looked like.

Page 14

1  BY MR. DUTTON:
2     Q.   So who reviewed -- who was responsible
3  for reviewing the internal controls that AMS had
4  at Pinnacle -- or sorry, at Irwin and Monterey?
5     MS. WELCH:  Objection to form.
6     THE WITNESS:  Well, I don't know that I can
7  state who is responsible for it other than to
8  say that I -- my understanding is that it was
9  done by representatives of the owner and that
10 the individuals were affiliated with Clark
11 Realty Capital in some shape -- way, shape or
12 form.
13 BY MR. DUTTON:
14    Q.   How many times did Clark Realty Capital
15 on behalf of the owner review the internal
16 controls that existed at Fort Irwin with respect
17 to property management?
18    A.   I don't know without going back through
19 the production that I can testify as to how many
20 times specifically they did.  I could point to
21 -- because I included, I believe, just either by
22 footnote or I may have some copies, let me just
23 check.
24        And I'm sorry, Mr. Dutton, your

Page 15

1  question was with respect to Fort Irwin?
2     Q.   Yes.
3     A.   I reference at least two times when
4  they did which was September 2007 and
5  December 2009.  Those are the dates of the
6  internal control reviews, not to suggest that
7  those are the only ones, but those are the two
8  at least that I've noted for purposes of my
9  report so I would point to those, at least, they
10 did it twice, but there may be other ones, I
11 didn't attempt to catalog them all.
12    Q.   Are you aware of a review that was done
13 in 2005 by a consulting firm that had been hired
14 by the owner to conduct a review?
15    A.   I'd have to look back.  Obviously,
16 there is a large volume of documents that have
17 been produced, so I don't -- I can't recall the
18 document on its face as I sit here today, but
19 that's not to say that I haven't seen it at some
20 point.
21    Q.   Are you aware that Navigant Consulting,
22 a national consulting firm, was hired by Clark
23 Realty Capital to conduct a review of the
24 internal controls at Fort Irwin, of the property

Page 16

1  manager at Fort Irwin?
2     A.   I don't know that again without going
3  back to the document that I could confirm it one
4  way or the other, if that took place.  I just
5  don't recall.
6     Q.   When -- well, you represent the owner.
7  You're testifying on behalf of the owner in this
8  case, right?
9     A.   I'm retained on behalf of the owner,
10 that's correct.
11    Q.   And I take it that part of your job is
12 to ask the owner for documents that represent
13 their reviews of Pinnacle's internal controls at
14 Fort Irwin?
15    MS. WELCH:  Objection to form.
16    THE WITNESS:  Part of my job certainly is to
17 gather information and review information that
18 is produced in the litigation.  We make various
19 requests and obviously, we go through counsel
20 and then they talk with, you know, the various
21 parties and the documents are then provided
22 depending on what's appropriate for production
23 given the rules, you know, that are taking place
24 in the litigation, so certainly, having said

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
17–20

Page 17

1  that, the issue around internal controls and the
2  reviews of those was one of the categories of
3  documents that we had inquired about.
4  BY MR. DUTTON:
5      Q.   And did you ask the owner or counsel
6  for the -- any internal control reviews that had
7  been done at Fort Irwin?
8      A.   My best recollection is that broadly
9  speaking, yes.  I don't know that we made
10  specific identification of individual ones that
11  we may have become aware about -- aware of, I
12  think we were just generally interested and it
13  was known that we were interested in looking at
14  internal control reviews.
15      Q.   Were you trying to be thorough and look
16  at all internal control reviews?
17      A.   Yes.
18      Q.   Is there any reason why you wouldn't
19  want to review the Navigant internal control
20  review from 2005?
21      A.   No.
22      Q.   Are you aware of any reason why that
23  wouldn't have been provided to you as part of
24  your work in this case?

Page 18

1      A.   I couldn't testify to that one way or
2  the other.
3      Q.   What was the -- did you look at any
4  other internal control reviews that had been
5  done?
6      A.   Again, I don't know that I have a
7  listing of all of them so I -- I attempted to in
8  working with my team to look at all of the ones
9  that were produced.  I then noted the ones that
10  I, you know, quoted in the report, so there may
11  be other ones but I'd have to go back through
12  the production to refresh my recollection to
13  determine whether there are, in fact, additional
14  ones beyond those that are cited.
15      Q.   During the course of this litigation,
16  you've become aware that Pinnacle had an
17  accounting, if you will, an accounting group
18  located in Maitland, Florida?
19      A.   Yes, I'm aware of that.
20      Q.   And you became aware that that
21  accounting group also looked at the internal
22  controls at Fort Irwin from time to time?
23      A.   I believe that's correct.
24      Q.   Have you seen those reports?

Page 19

1      A.   To the extent that they're produced.
2      Q.   Well, you are aware that they were
3  requested by counsel to be produced, right?
4      A.   Again, just broadly, Mr. Dutton, I'm
5  aware that those -- there were requests made for
6  those types of documents because that's
7  something that, you know, we were familiar with
8  as a concept prior to starting the Monterey case
9  and so we were interested in seeing those
10  things.
11      Q.   In your efforts to be thorough and look
12  at all of the reviews of internal controls of
13  the property manager, did you undertake to
14  review the internal controls that had been done
15  by Pinnacle's accounting staff out of Florida?
16      A.   Yes.  If they were produced.
17      Q.   And if you had reviewed them and cited
18  them for any purpose, they would be cited in
19  your report, right?
20      A.   Yes, if I cited them, of course, they
21  would be cited, that is correct.
22      Q.   Well, if you reviewed them and
23  considered them, they would be in your report,
24  right?

Page 20

1      A.   If I reviewed and considered them, they
2  would be listed -- it's not included on Dudney
3  Exhibit 001, but it is included there, I believe
4  it's Exhibit 14, has a listing of all the
5  documents that have been made available to us.
6      Q.   Did you take the Pinnacle internal
7  control reviews into consideration when reaching
8  your conclusions in this case about the
9  deficiencies and processes?
10      A.   Again, to the extent that they were
11  produced, I and my team would have endeavored to
12  review them and consider them in those lights, I
13  can't specifically recall as I sit here today to
14  what extent those documents were -- were
15  produced.
16      Q.   Are you aware of any other entities
17  that from time to time reviewed the internal
18  controls of the property manager at Fort Irwin?
19      A.   I don't know to what extent the Army
20  may have as part of their interfacing with
21  operations at Fort Irwin.  Again, I would have
22  to go back and look at the documents produced to
23  refresh my recollection on that.
24      Q.   You are aware that the Army had

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 8 of 90

LOUIS DUDNEY                                                June 16, 2015
MONTEREY BAY vs. PINNACLE                                        21–24

Page 21

1  representatives located at Fort Irwin, correct?
2      A.  Well, obviously, it's a military base
3  and so there's a number of people there.  When
4  you say representatives, do you mean, for
5  example, of RCI or something like that?  Is that
6  what you're referring to?
7      Q.  Yes.
8      A.  Yes, it's my understanding that there
9  were individuals there and that's just from my
10  having been there, I recall maybe being briefly
11  introduced to one or something when I was there.
12     Q.  And you understand that the
13  responsibility -- that the RCI personnel that
14  were on site at Fort Irwin had oversight
15  responsibility with respect to the property
16  manager?
17     MS. WELCH:  Objection, form.
18  BY MR. DUTTON:
19     Q.  Among other things?
20     A.  Speaking without -- as to what that
21  entity's legal duties might have been and
22  whether the contracts and various relationships
23  exist, having said that, as a practical matter
24  I understand that RCI had some responsibility or

Page 22

1  level of oversight and responsibility for, you
2  know, the conduct of the -- and provision of
3  military housing for the soldiers.
4      Q.  In your assessment of the internal
5  controls of the property manager at Fort Irwin,
6  did you consult with or review any documents or
7  interview any personnel from the RCI?
8      A.  I haven't interviewed anyone from RCI
9  that I recall and again, if the documents were
10  produced with respect to those issues and made
11  available to us as part of our general request
12  in this area, then we would have -- my team and
13  I would have reviewed them.
14     Q.  Did you request any documents from the
15  RCI or did you ask counsel to request any
16  documents from the RCI concerning their
17  oversight role at Fort Irwin?
18     A.  The only -- I don't recall a specific
19  request that would exactly match the way you
20  phrased your question.  The way I recall it more
21  was that we had a request that we had put out in
22  conversations with counsel about an interest in
23  obtaining reviews of the processes and so forth
24  of the provision of housing at Irwin and

Page 23

1  Monterey, and so I would have -- I would
2  anticipate that to the extent that those
3  documents were made available, they would fall
4  under that category in my view.
5      Q.  You are aware also, are you not, that
6  the Department of the Army from time to time did
7  operations review for the -- on behalf of -- or
8  of the property management activities at Fort
9  Irwin?
10     A.  Very broadly.  Again, not -- I have an
11  understanding that there is -- again, as part of
12  whether it's RCI or more broadly the Department
13  of the Army, that there were, you know, various
14  reviews that were done.
15     Q.  You are aware, aren't you, Mr. Dudney,
16  that the deputy assistant secretary of the Army
17  and the -- I'll just say the chief of staff of
18  the Army, both have parallel authority with
19  respect to military housing operations at Fort
20  Irwin?
21     A.  I can't speak to the military
22  hierarchal authority structure with respect to
23  Irwin knows and just very broadly, knowing that
24  RCI and the Department of the Army as I

Page 24

1  understand it have ultimate control of those
2  facilities, but I can't speak any more broad --
3  any more specifically than that.
4      Q.  And you are aware that the deputy
5  assistant secretary of the Army and the chief of
6  staff's -- the Army chief of staff's office had
7  retained a real estate consultant, Jones Lang
8  LaSalle, to -- that performed services for the
9  deputy assistant secretary of the Army and the
10  chief of staff's office?
11     A.  I am aware that Jones Lang LaSalle was
12  retained.  I don't know that I could
13  specifically cite the entities that you just
14  articulated as being the entities that retained
15  them, but I am aware that they were retained in
16  respect to the provision of military housing and
17  providing various services to the Army in that
18  regard.
19     Q.  And you are aware that the -- from time
20  to time, Jones Lang LaSalle on behalf of the
21  deputy assistant secretary of the Army and chief
22  -- Army chief of staff conducted reviews of
23  operations at Fort Irwin, correct?
24     A.  I believe that's correct.  Again,

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
25—28

Page 25

1  subject to check in the production of the
2  documents, but I've definitely seen and reviewed
3  Jones Lang LaSalle documents with respect to
4  this matter.
5      Q.  Now, Mr. Dudney, you are aware of how
6  the projects -- the Fort Irwin projects were
7  financed, correct?
8      A.  Generally speaking.
9      Q.  Okay.  What's your understanding of how
10  the Fort Irwin project was financed?
11     A.  The -- the articulation that I can give
12  is that as I understand it, there is a, you
13  know, a series of entities that were formed in
14  partnership with the Army to provide -- I'll
15  call it ownership and management, to provide
16  ownership as well as management demarcations
17  between the various entities that were involved
18  and that as I understand it, part of the
19  financing of the military facilities and the
20  reconstruction has to do with the securitization
21  of the income flow that comes out of the housing
22  with respect to bonds that were then floated in
23  that regard, and that there is a drawdown
24  mechanism by where -- under which the properties

Page 26

1  on a periodic basis draw down funds or make
2  requests for the provision of funds to meet
3  various budgets, et cetera, and so that's my
4  general understanding of it.
5      Q.  So basically, the owner entities took
6  out a loan, right?
7      A.  A bond is a form of a loan.
8      Q.  Okay.  And it was a fairly large loan?
9      A.  I don't know the amount, but I think it
10  is.
11     Q.  Three, $400 million?
12     A.  I don't -- I just don't know the
13  amount.
14     Q.  Okay.
15     A.  Yeah.
16     Q.  And the loan is secured by the income
17  from the project?
18     A.  There is some -- I -- I recall being
19  told at one point many years ago now at this
20  point, that there was some -- and whether it's
21  actually structured as a securitization which is
22  a specific type of loan indenture and agreement
23  in structure or whether it is structurally
24  different than what people would typically view

Page 27

1  a securitization, and it would be something else
2  but it's nonetheless the credit -- paying
3  ability of the owner is linked to the provision
4  of housing which is linked then to the
5  individual tenants or the soldiers paying
6  monthly rents, et cetera, and that some portion
7  of that floats back up to compensate the bond
8  holders with interest payments.
9      Q.  Well, you understand that the rents or
10  the income from the project doesn't go to the
11  property manager.
12     A.  I'm not sure I understand your
13  question.
14     Q.  Well, when -- when the soldiers and the
15  families that live at Fort Irwin pay rent, where
16  do they pay it?
17     A.  I don't know that I could testify as to
18  where they physically pay it.  It might differ
19  by tenant, I'm not sure.
20     Q.  Where does the money go, Mr. Dudney?
21     A.  I'm not sure I'm understanding your
22  question.  Go in what sense?
23     Q.  Do they pay the money to Pinnacle, the
24  property manager?

Page 28

1      A.  I'm not sure I can testify as to
2  physically where it goes.  There are a series of
3  accounts as I understand it, and I don't know
4  how the payment process -- I can't testify as to
5  how the payment process works from a tenant into
6  the various accounts that are then, you know,
7  capture that money and how it's then disbursed
8  with respect to meeting the budgets at a
9  particular site.
10     Q.  What's a lockbox account, Mr. Dudney?
11     A.  A lockbox account is an account most
12  typically at a bank, where -- oftentimes used in
13  real estate transactions, a tenant will mail
14  their check to a particular lockbox and then
15  that's a service that a bank provides to
16  essentially open the mail, deposit the checks
17  and report back on, you know, who has paid and
18  so forth, and so that's what a lockbox is very
19  generally.
20     Q.  And why would a lender, particularly in
21  a large real estate transaction like the one
22  that led to the formation of California military
23  communities, why would a lender want a lockbox
24  account?

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 10 of 90

LOUIS DUDNEY                                          June 16, 2015
MONTEREY BAY vs. PINNACLE                             29–32

Page 29

1    MS. WELCH:  Objection, foundation.
2    THE WITNESS:  A lender, as a general matter,
3  I can't speak to the specific one in this regard
4  but as a general matter, a lender typically will
5  ask for a lockbox because it's viewed as
6  providing them with enhanced control with
7  respect to the funds, and ultimately, it
8  decreases the risk that they take as a lender.
9  BY MR. DUTTON:
10    Q.   Now what's your understanding then of
11  how the property manager at Pinnacle, at Fort
12  Irwin, obtains funds to use in its operations?
13    A.   I believe that they submit a -- a
14  budget of some sort that then has to be reviewed
15  and -- but I believe that that's generally how
16  it works, that they submit budgets and then
17  subsequent -- subsequently incur actual expenses
18  working under a particular budget, but there is
19  a process around that, that I understand, is the
20  way that generally the project is funded
21  including expenses that are incurred by the
22  manager.
23    Q.   Well, for each -- for each year, do you
24  understand that there is a budget that is

Page 30

1  prepared by the property manager?
2    A.   I believe that's correct, yes.
3    Q.   And do you understand that there are
4  essentially two main budgets that the property
5  manager prepares, an operations budget and then
6  a capital expenditure budget?
7    A.   Yes.
8    Q.   And those budgets are submitted to the
9  owner?
10    A.   That's my understanding.
11    Q.   And those budgets are approved by the
12  owner, right?
13    A.   Well, they're reviewed and either
14  approved or something else happens to them, but
15  generally speaking, I think that the owner has
16  approval authority, if I understand it, with
17  respect to the various budgets.
18    Q.   And those -- those budgets were also
19  submitted to the Army?
20    A.   Again, it's not something that I
21  specifically analyzed that submission, but
22  that's my general understanding is that the Army
23  sees those.  How and what the submission process
24  is and how formal, that I can't speak to, but my

Page 31

1  understanding is that the Army also gets to see
2  those budgets.
3    Q.   And don't you understand that the Army
4  actually has a process called a major decision
5  process that it follows during the course of
6  budget reviews and approvals?
7    A.   I've heard the term but it wasn't part
8  of the sort of scope of my analysis so again,
9  I'm familiar with it, more from the periphery.
10    Q.   And every year, the operations budget
11  and the capital expenditures budget at Fort
12  Irwin was reviewed and approved in a major
13  decision process by the Army?
14    A.   I can't testify specifically to that
15  because it wasn't part of the scope of the
16  analysis that I did, but that's my understanding
17  is that there were a series of approvals, I
18  can't speak to individual years and if there was
19  ever something that happened that was different
20  than that generalized description.
21    Q.   And you understand that the owner also
22  had an asset manager at Fort Irwin, right?
23    A.   Yes, there is an asset manager as I
24  understand it.

Page 32

1    Q.   And the asset manager is an entity
2  affiliated with Clark Realty Capital?
3    A.   That is my understanding.
4    Q.   You understand that, you know, on many
5  occasions, the asset manager and the owner were
6  one and the same?
7    MS. WELCH:  Objection to form.
8    THE WITNESS:  I'm not sure what you mean by
9  when you say one and the same.
10  BY MR. DUTTON:
11    Q.   The same person functioned as the owner
12  and the asset manager?
13    A.   Oh, it may or may not be.  I don't --
14  again, not something that I attempted to analyze
15  as to whether or not that occurred.
16    Q.   You didn't look at the budget approval
17  process?
18    A.   I haven't done a specific analysis of
19  the budget approval process.
20    Q.   You didn't look at the process for
21  approving either the capital expenditure budget
22  or the operations budget?
23    A.   No.  Other than just as a general,
24  again, the context of the work that we were

LOUIS DUDNEY                                        June 16, 2015
MONTEREY BAY vs. PINNACLE                           33–36

Page 33

1  doing but there wasn't a specific analysis that
2  was done in that regard.
3     Q.  Now, what's your understanding of how
4  Pinnacle at Fort Irwin got money for the
5  operations budget -- or from -- sorry, let me
6  ask a better question.
7        What's your understanding of how
8  Pinnacle got money to fund its operations at
9  Fort Irwin?
10    A.  Through the process that we've been
11  discussing, that there was a budget that was
12  prepared and that funding was then provided
13  based on that and whatever process took place,
14  that was one part of it, and then there was a
15  separate part as I understand it, which was the
16  submission by Pinnacle, for example, of metrics
17  and other data with respect to its performance
18  during the year by then which payments would be
19  evaluated and made if appropriate with respect
20  to incentives or other aspects of how they got
21  compensated for doing their work.
22    Q.  I'm not talking about -- I'm not
23  talking about that -- I'm talking about the
24  budget for operations and how Pinnacle's

Page 34

1  operations budget was funded, okay?
2     A.  Uh-huh.
3     Q.  So let's try to stick with that.  What
4  was the process as far as you know?
5     A.  Again, just the process that we've been
6  discussing that they prepared a budget and that
7  there was then -- there was funding that was
8  provided on a periodic basis based on the budget
9  as well as where actual expenses were coming
10  out, and that that was a process that engaged,
11  as I understand it, Pinnacle, the owner, and
12  possibly at times, the asset manager.
13    Q.  Okay.  And where would Pinnacle submit
14  its request for operations funding?
15    A.  I don't know where they make their
16  specific request to or who they make it to.
17    Q.  And when as far as -- would Pinnacle's
18  -- would Pinnacle's operations be funded in
19  advance of the monthly expenditures for
20  operations?
21    A.  I'd have to go back and check.  I think
22  the answer is that they're -- that they're
23  funded up front, but I'd have to check that.
24    Q.  Now, was the process the same for the

Page 35

1  operations budget and the capital expenditures
2  budget?
3     A.  I -- I can't testify as to if there
4  were differences necessarily between the two
5  other than the fact that obviously, the nature
6  of the expenditures are different because of the
7  different types of budgets, but as to the
8  process, that wasn't something that I undertook
9  an analysis of.
10    Q.  Was -- so you -- you haven't done any
11  analysis of whether Pinnacle's operations were
12  over budget or under budget at Fort Irwin?
13    A.  I don't recall that I have put together
14  a specific analysis, Mr. Dutton, that would show
15  that.  There may be, in the work papers that
16  we've produced, some data around that, but
17  there's not an opinion, so it may be that we've
18  got, as part of the work that we've done, just a
19  factual comparison of when we pulled that
20  information together, ultimately though, that
21  wasn't a specific analysis that rose to the
22  level of inclusion in my report and therefore a
23  specific opinion with respect to that.
24    Q.  Now, are you aware that if at the end

Page 36

1  of a given budgetary period, the property
2  manager was under budget, the property manager
3  would then have excess funds in its operations
4  account.  Are you aware of that?
5     A.  Again, I didn't do an analysis as to,
6  you know, whether it actually did or didn't, but
7  conceptually, what you are describing to me
8  doesn't seem unreasonable, that if they -- if
9  they were funded ahead of time, for example, or
10  even for setting aside funding one way or the
11  other, just taking the budget whether it was
12  actually funded or not for a particular period,
13  and if actual expenses are less than the budget,
14  then there would be excess funds in the budget
15  regardless of whether it was funded or not.
16    Q.  And are you aware that at the end of
17  this budgetary period or this fiscal period
18  depending on -- or maybe at the end of a
19  calendar period, that there would be a
20  reconciliation or a true-up whereby if Pinnacle
21  was under budget, Pinnacle would give money back
22  to the owner?
23    A.  I understand that, and this is more
24  broadly, I don't know that my understanding is

Page 37

1  per se with Irwin, but it's just more broad as
2  part of the work that I've been doing in these
3  related cases for the last few years, that --
4  I understand that there is a true-up process
5  that has generally taken place, I can't specify
6  or testify specifically to what occurred
7  historically with Irwin in that regard.
8      Q.  And have you -- have you made any
9  effort to reconcile the various flow funds in
10  the true-ups that have occurred at Fort Irwin
11  for the period March 1, 2004, through I guess
12  the present?
13     A.  Again, I -- I'd need to check back in
14  the work papers that I have to see if there is a
15  factual, although mathematical recitation of
16  that, that we may have done just as part of the
17  sort of basic work that we engage in to
18  understand some of the issues, but ultimately,
19  even if we have that, and I'd have to check
20  that, that's not something that I ultimately
21  rendered an opinion on and nor was it included
22  in the report that is Dudney Exhibit 001.
23     Q.  Now, you understand, don't you, that
24  the property management agreement between

Page 38

1  Pinnacle and the owner allows the owner to have
2  audit rights?
3      THE WITNESS:  I'm sorry.  I got distracted
4  for a second.  Can I ask to have the question
5  read back, please?
6          (WHEREUPON, the record was read
7          by the reporter as requested.)
8      THE WITNESS:  Yes.
9  BY MR. DUTTON:
10     Q.  And you understand also that the
11  property management agreement between the owner
12  and the auditor requires that Pinnacle obtain
13  fidelity insurance or -- I think that's what
14  it's called, fidelity insurance on behalf of its
15  employees?
16     MS. WELCH:  Objection to form.
17     THE WITNESS:  I'm not -- I don't know that I
18  can testify about the insurance.  I just don't
19  have a recollection if there is an insurance
20  provision with respect to fidelity insurance in
21  the PMA.  I have to -- I'd have to go back and
22  look at the document itself.
23  BY MR. DUTTON:
24     Q.  You didn't -- you didn't look at the

Page 39

1  fidelity -- typically, what's a fidelity
2  insurance provision for?
3      A.  I'm not sure I can testify about it.
4      Q.  You don't know?
5      A.  I don't know that I've -- that I can
6  testify about it one way or the other, so no, I
7  don't have specific knowledge of it with that
8  terminology.
9      Q.  Are you aware that in the event of
10  theft of funds, for example, Pinnacle was
11  required to have insurance for the benefit of
12  the owner?
13     A.  I can't testify about the requirements
14  of the PMA with respect to that.
15     Q.  And you can't testify about -- as to
16  why that provision would be inserted into the
17  contract?
18     A.  Certainly not the specifics of this
19  contract, I mean, I've certainly seen other
20  situations where there are, for example,
21  bondings that are done with surety bonds or
22  other types of bonds to, you know, protect an
23  institution or whatever the -- whoever the
24  insured is from different acts that might occur

Page 40

1  by an employee, so I'm generally familiar with
2  the concept, I'm just not familiar with the term
3  fidelity insurance.
4      Q.  Well, you know what a fidelity bond is?
5      A.  Not -- I can't testify about it with
6  any more specificity or differentiate, for
7  example, from a surety bond and to what extent
8  those differ.  It's just not something I've
9  undertaken as part of this work.
10     Q.  Would deficiencies in internal controls
11  be a default under the property management
12  agreement, Mr. Dudney?
13     MS. WELCH:  Objection, form, calls for a
14  legal conclusion.
15     THE WITNESS:  I can't testify to that one way
16  or the other.  I think that's a legal judgment.
17  BY MR. DUTTON:
18     Q.  Are you aware of any provision in the
19  property management agreement that required
20  Pinnacle to have internal controls at Fort Irwin
21  that were not deficient?
22     MS. WELCH:  Same objection.
23     THE WITNESS:  Yeah, again, I don't think I
24  can testify what the property management

Page 41

1   agreement does or does not require with respect
2   to internal controls.
3   BY MR. DUTTON:
4       Q.   I don't think that was my question.  I
5   think my question was:  Are you aware of any
6   provision in the property management agreement
7   where Pinnacle agreed to have a certain level of
8   internal controls?
9       A.   So just to make sure I understand your
10  question, you're not asking me the
11  interpretation aspect of it, you're just saying
12  am I aware of any provision in there, could I
13  put my finger on it and point to it that would
14  arguably require that.  Is that the question?
15          Without going back through the PMA, I
16  can't think of one but again, I didn't look at
17  the PMA in that respect because that wasn't --
18  wasn't part of the work that I did.
19      Q.   Is your understanding -- is it your
20  understanding in this case that Pinnacle is
21  being sued for poor internal controls?
22      A.   I don't think that's the -- I think
23  there is a broader set of allegations that
24  relate to the internal control environment is my

Page 42

1   understanding, but I think the allegations are
2   more specific with respect to, you know, a
3   number of different issues including, you know,
4   work order manipulation, et cetera.
5       Q.   So my question was:  Is it your
6   understanding in this case that Pinnacle is
7   being sued for poor internal controls?
8       A.   Yeah, I don't know that there is a
9   specific claim in one of the -- in one of the
10  complaints, I'd have to go back and look at them
11  that says that one of the counts of action is a
12  failure to maintain internal controls at some
13  prescribed level, but my point with my -- is
14  simply that that -- I understand that those
15  internal controls though in the plaintiff's mind
16  relate to the environment that existed with
17  respect to the allegations at large that are
18  being made.
19      Q.   All right.  And is it your
20  understanding that -- or are you aware of any
21  provisions in the property management agreement
22  that make lack of internal controls a default?
23      MS. WELCH:  Objection, calls for a legal
24  conclusion.

Page 43

1       THE WITNESS:  Yeah, again, with sort of the
2   same proviso as earlier, and not rendering any
3   legal conclusion with it, I'd have to go back
4   and look at the PMA.  There's not a paragraph in
5   my mind's eye that I would point to and readily
6   direct you to that would have that exact
7   language but that, you know, I haven't reviewed
8   it with that in mind, certainly anytime
9   recently.
10  BY MR. DUTTON:
11      Q.   Now you call what you do with respect
12  to internal controls, making observations about
13  internal controls, right?
14      A.   Yes.  I have made certain observations
15  in my report as a result of reviewing those
16  documents.
17      Q.   And -- okay.  And in making those
18  observations, you cite to the property
19  management agreement, right?
20          Let's start at the beginning, No. 1,
21  internal control deficiencies.
22      A.   Yes.
23      Q.   A, lack of control over vendor
24  selection/bidding.

Page 44

1          Do you see that?
2       A.   Correct.
3       Q.   And the -- the first thing that you do
4   is you quote the property management agreement,
5   right?
6       A.   Yes, it provided context for me because
7   as you know, I -- I looked at that now years ago
8   and before I went out and interviewed some of
9   the folks at Monterey and CMC, with respect to
10  trying to understand the bid environment out
11  there, so yes, I do cite to the PMA there.
12      Q.   Okay.  And you -- the provision of the
13  property management agreement that you cite
14  states an owner may request written bids for any
15  expenditures over $10,000, right?
16      A.   Correct.
17      Q.   Manager is required to submit a minimum
18  of three written bids for all expenditures over
19  $25,000, right?
20      A.   Yes.
21      Q.   So one is -- one is an optional request
22  that the owner may make depending on whether or
23  not the owner wants to see all the bids for
24  expenditures up to $10,000, right?

Page 45

1    A.   That's the way I would interpret it.
2    Q.   And if it's over 25, then the manager
3  is required to submit a bid, right, or minimum
4  bids?
5    A.   Minimum of three written bids, that's
6  my understanding of it.
7    Q.   And what if the manager doesn't?
8  What's your understanding of what happens then?
9    A.   It failed to meet the -- this provision
10  of the PMA.
11    Q.   And what are the owner's options if
12  that's the case?
13    MS. WELCH:  Objection, calls for a legal
14  conclusion.
15    THE WITNESS:  Yeah, I don't know that I can
16  testify as to what their options are, other than
17  I suppose continue to ask them for the bids, but
18  I don't -- that's not something I specifically
19  analyzed.
20  BY MR. DUTTON:
21    Q.   Are you aware of whether the manager
22  was able to obtain three bids for all of the
23  contracts or expenditures over $25,000 at the
24  Fort Irwin project?

Page 46

1    A.   I know that they were not.
2    Q.   Okay.  And are you aware or did you
3  look for actions taken by the owner or the
4  owner's asset manager in response to defining
5  that there were not three written bids?
6    A.   Only to the extent that it was part of
7  the overall effort that we undertook to look for
8  bids, so we engaged in a process where we tried
9  to scour the production to identify bids and to
10  then -- as you know, I had the opportunity to
11  interview people that worked for the manager at
12  Fort Irwin for example and at Monterey, and so
13  I -- I interviewed a number of folks around the
14  bidding to understand that from their
15  perspective as well, so what the owner could do
16  may be part of the information that I gathered
17  as part of that review, would be reflected in
18  the various notes and things, but I didn't do a
19  separate analysis, for example, to analyze the
20  actions the owner did and didn't take in each of
21  these regards.  I was simply looking at whether
22  or not bids had been obtained or not.
23    Q.   Are you -- are you aware that under the
24  property manager agreement, the owner had

Page 47

1  reserved to itself all rights and remedies that
2  were available to it under the law for equity?
3    MS. WELCH:  Objection, calls for a legal
4  conclusion.
5    THE WITNESS:  Yeah, I don't know that I could
6  testify about that one way or the other what
7  their rights and remedies are.
8  BY MR. DUTTON:
9    Q.   I didn't ask you what their rights and
10  remedies are.  Are you aware that there is a
11  provision in the property management agreement
12  where the owner reserves to itself all rights
13  and remedies under the law of California in the
14  event of a failure to live up to the terms of
15  the contract?
16    MS. WELCH:  Objection, form.
17    THE WITNESS:  Without suggesting by my answer
18  that it reflects any interpretation from a legal
19  perspective, I think the answer is yes, that
20  there is a provision that talks about that
21  issue, I'd have to go back and look to be more
22  specific, but as a general matter, I think there
23  is a provision that is conceptually similar to
24  what your question was.

Page 48

1  BY MR. DUTTON:
2    Q.   Now, I think -- I think in your report
3  -- you would agree, based on your report, that
4  at the outset of the project, for the first year
5  of operations at Fort Irwin, Pinnacle entered
6  into a series of contracts with a vendor called
7  Mainscape.
8    A.   Correct.
9    Q.   And those contracts were for an
10  expenditure of funds that was greater than
11  $25,000?
12    A.   Correct.
13    Q.   And that meant that -- that three bids
14  would be required, right?
15    A.   That's my understanding.
16    Q.   And I -- I believe it's your testimony
17  that Pinnacle didn't get three bids?
18    A.   No.
19    Q.   No?
20    A.   Not with respect to Mainscape, if
21  that's what you're asking me.
22    Q.   So you are agreeing with me that
23  Pinnacle did not get three bids with respect to
24  the Mainscape contracts?

Page 49

1    A.  No.  I think we are somehow talking
2  past each other.  You asked me generally, did
3  they always -- if I understood your earlier
4  question, did they always get bids for amounts
5  over $25,000 and the answer is no, they did not
6  always get it.  There were times when they did
7  get it.
8       So for example, with respect to
9  Mainscape specifically, and I have a schedule in
10  my work papers that would show you this, my
11  recollection though is that for the first
12  contract that was -- the first longer term
13  contract that was engaged, I believe that there
14  is a -- there were a series of bids around that
15  particular contracting effort.
16    Q.  So with respect to the Mainscape
17  contracts, and I think there are three of them
18  that you focus on later on in your report, those
19  were five-year contracts and there were a
20  minimum of three bids for those contracts?
21    A.  For the initiation of -- again, I'd
22  have to look to see if it's for all three
23  contracts, but certainly for at least one of the
24  Mainscape contracts, there were multiple bids in

Page 50

1  the initiation of it, so it wasn't obviously in
2  Years 2, 3, 4 and 5, there weren't bids, but at
3  the outset of it, there were at least three bids
4  if my recollection is serving me correctly.
5    Q.  Right.  But those were five-year
6  contracts.  Is there a requirement that -- to
7  rebid and get a minimum three bids every year if
8  you have a five-year contract?
9    A.  I don't know that there's a
10  requirement.  I'm just simply pointing out that
11  there wasn't any bids other than the ones that
12  initiated the contract.
13    Q.  Wouldn't the expected -- wouldn't the
14  expected cost of the landscape or the garbage or
15  the painting contract be included in the budget
16  for every year?
17    A.  I -- think if I understand your
18  question correctly is that, yes, included in the
19  budget, there are provisions for landscaping and
20  -- I don't know that painting is broken out, but
21  as part of turns and cleaning and decorating
22  that there are funds that are expected to be
23  incurred with respect to that, so yes, I think
24  that there would be provisions within the budget

Page 51

1  for those types of costs.
2    Q.  Well, you do something on Pages 54
3  through 60 --
4    A.  Yes.
5    Q.  -- of your report, that's called --
6  actually, I think it starts on 55, something
7  called a Mainscape analysis.
8       Do you see that?
9    A.  Correct.
10    Q.  And the Mainscape analysis focuses on
11  three contracts:  Contract landscaping, contract
12  trash and contract cleaning, right?
13    A.  Yes.
14    Q.  And I take it that those were five year
15  -- each five-year contracts?
16    A.  Trash was.  Landscaping, I believe was.
17  And I think turns as well.  I'd have to check
18  that one, but I think that's right.
19    Q.  Let's call it contract cleaning, so we
20  can keep our terminology straight.  That's the
21  term -- terminology you use on Page 58.
22    A.  Happy to do that.  Happy to do that.
23    Q.  And if you look on Page 58, the period
24  of time that you have is from July 1, 2005,

Page 52

1  through November 30th, 2005, right?
2    A.  I'm sorry, what portion of 58 are you
3  looking at?  You're in contract cleaning?
4    Q.  Under contract cleaning.
5    A.  Let me just read that section really
6  quickly here.
7    Q.  2009 -- did I say -- okay.
8    A.  Okay.  And if I could have the last
9  question read back to me.
10    Q.  Well, I've been informed by my
11  colleagues that I misstated the date in my
12  question.
13    A.  Okay.
14    Q.  Your report states that Mainscape was
15  the contract cleaning vendor from July 1st,
16  2005, through November 30th, 2009, right?
17    A.  Yes.
18    Q.  All right.  Your report states that
19  Mainscape was the contract landscaping vendor
20  from March 1, 2004, through March 30 -- sorry,
21  December 31st, 2008?
22    A.  For landscaping, that's correct.
23    Q.  Okay.  And for trash, again the dates
24  are March 1, 2004, through December 1 -- 31,

Page 53

1    2008, right?
2       A.   Yes.
3       Q.   And contract landscaping and contract
4    trash were both five-year contracts from the
5    outset, right?
6       A.   That's my understanding.
7       Q.   And is it your testimony that for
8    contract landscaping and contract trash,
9    Pinnacle did get three -- a minimum of three
10   bids before hiring Mainscape to be the trash
11   vendor and the landscaping vendor?
12      A.   Yeah, let me just look at -- I just
13   want to look at one thing real quick.
14          Subject to -- to check of the summary
15   that I prepared of the bids, the answer is yes,
16   I believe that there were -- there were more
17   than -- there were at least three bids with
18   respect to the retention of Mainscape.  The
19   thing that I -- I would want to just
20   double-check on was to see if that related to
21   both trash and landscaping, but my recollection
22   is that it does, but that's subject to check
23   with the work paper that would show specifically
24   that, but there were at the onset -- and what I

Page 54

1    was referencing back here was -- just to
2    double-check, it's from my June 5 report in
3    Footnote 55 on Page 25 of that report, there is
4    a part of a discussion around that so I just
5    wanted to refresh on that, but that's my general
6    understanding is that there were three for these
7    initial five-year contracts.
8       Q.   Okay.  And I take it -- I take it that
9    the agreement between Pinnacle and Mainscape for
10   trash and landscaping actually occurred sometime
11   prior to March 1, 2004, right?
12      A.   I'd have to go back and look at it but
13   I think that's a fair conclusion to draw.
14      Q.   And based on -- based on that contract,
15   Pinnacle included expected costs for landscaping
16   and trash removal in its budget for 2004.
17      A.   I don't know that I could testify
18   exactly what was in Pinnacle's mind, but that
19   would be my expectation is that it would -- in
20   some way reflect the fact that there was a
21   contract that had been entered into.
22      Q.   And then in 2005 and 2006 and 2007 and
23   2008, each of the subsequent years, there would
24   be a budget for contract landscaping and

Page 55

1    contract trash removal that Pinnacle would
2    submit to the owner, to the asset manager and to
3    the Army for approval?
4       A.   That's my general understanding, yes.
5       Q.   And Pinnacle would be funded for those
6    operations according to the budget that was
7    approved, right?
8       A.   I think -- the general answer is yes,
9    the -- it's my understanding again is that it's
10   based on the budget that's approved as well as
11   the true-up discussion or the true-up function
12   that we talked about earlier.
13      Q.   With respect to the hiring and
14   budgetary approval process, with respect to each
15   of the contracts that were agreed to between
16   Pinnacle and Mainscape, have you identified any
17   area where Pinnacle did not comply with the
18   provisions of the property management agreement?
19      MS. WELCH:  Objection to form, calls for a
20   legal conclusion.
21      THE WITNESS:  Yeah, let me have -- let me ask
22   to have that one read back.  That was kind of a
23   long one.
24

Page 56

1          (WHEREUPON, the record was read
2           by the reporter as requested.)
3       THE WITNESS:  I -- I didn't do a specific
4    analysis to see if Pinnacle, with respect to
5    Mainscape individually, because I looked more
6    broadly at all the various contracts.  Again, my
7    best recollection subject to check with the
8    summary that we've prepared is that for trash
9    and landscaping, that the initial five-year
10   contracts had three bids or more.  The contract
11   cleaning and decorating, I would need to go back
12   and look to refresh on whether or not that has
13   in that or not, but I think it -- the answer is
14   that for the first two, landscaping and trash,
15   that there are, in fact, three bids which would
16   be again, based on my understanding, which would
17   be consistent with what the terms of the PMA
18   would require.
19          Whenever it's a good time, by the way,
20   for a break, I'm going to stretch my legs.
21   BY MR. DUTTON:
22      Q.   All right.  Well, let's try to finish
23   up with contract cleaning --
24      A.   Sure.

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 17 of 90

LOUIS DUDNEY                                              June 16, 2015
MONTEREY BAY vs. PINNACLE                                      57–60

Page 57

1    Q.  -- since that's the third main contract
2  between Pinnacle and Mainscape.
3    A.  Sure.
4    Q.  Is it your understanding that with
5  respect to hiring Mainscape as the contract
6  cleaning subcontractor, that Pinnacle obtained a
7  minimum of three bids before agreeing to hire
8  Mainscape as the contract cleaner?
9    A.  I don't recall.  That was sort of the
10  point of my last -- I'm not as sure on the
11  contract cleaning costs without going back to
12  the summary.
13    Q.  And where -- where is the summary?  Is
14  that Exhibit 9 of your report?
15    A.  No.  Well, it's --
16    Q.  Can you -- can you tell me which
17  exhibit it's in?
18    A.  I don't know that it's an exhibit.  It
19  might just be a simply work paper because --
20  that supports it.  It's a -- it's a very
21  particular looking schedule, so I would know
22  what it looks like, so I don't -- it's not
23  Exhibit 9, though.  It lists contracts on the
24  left-hand side and time periods across the top.

Page 58

1    Q.  So you can't -- you don't -- you don't
2  have it in your report, right?
3    A.  It's not -- it's not an exhibit to the
4  report, it's part of the work papers that was
5  given to you.
6    Q.  How about Exhibit 4?
7    A.  Yes.  This is the document that I was
8  referring to.
9    Q.  Why don't we mark this as Exhibit 002.
10       (WHEREUPON, DUDNEY Deposition
11        Exhibit No. 002 was marked for
12        identification.)
13  BY MR. DUTTON:
14    Q.  And I can just hand you a single sheet
15  of paper.  Let me show you what I've marked as
16  Exhibit 002, Mr. Dudney, and Exhibit 002 is a
17  two-sided version of Exhibit 4 from your report.
18    A.  Correct.
19    Q.  I'm sorry for the lack of symmetry in
20  exhibit numbers.
21    A.  No problem.
22    Q.  But the backside of Exhibit 4 is your
23  bids and contracts inventory summary for the
24  Irwin project, right?

Page 59

1    A.  Correct.
2    Q.  And under contract cleaning, do you see
3  that?
4    A.  And you're on Irwin?
5    Q.  Yeah.
6    A.  Contract cleaning, got it, yep.
7    Q.  There's contract cleaning, there's
8  contract refuse and contract yards and
9  maintenance.  I suppose that those are the three
10  we've been talking about, just using --
11    A.  Correct.
12    Q.  -- different language?
13    A.  That's correct.
14    Q.  And so for contract cleaning, you have
15  a yes, and then the number of bids located is
16  two, right?
17    A.  Correct.
18    Q.  For contract reference -- refuse, you
19  have a yes, and the number of bids located is
20  two, right?
21    A.  Correct.
22    Q.  And then for contract yards and
23  maintenance, the number of bids located, you
24  have yes, and then a seven, right?

Page 60

1    A.  Correct.
2    Q.  And each of those were the five-year
3  contracts --
4    A.  I -- I don't think contract cleaning is
5  a five-year contract.  I think the -- I think
6  it's refuse and yards and maintenance are.
7    Q.  Okay.  All right.  Are you aware of any
8  notice of default that was provided by the owner
9  to AMS with respect to its retention and
10  contracting with Mainscape?
11    A.  I'm not aware of any such notice of
12  default.
13    Q.  Are you aware of any discussion of any
14  remedies that the owner would avail itself of
15  with respect to Pinnacle's contracting with
16  Mainscape at Fort Irwin?
17    THE WITNESS:  I'm sorry, can I have the
18  question read back, please.
19       (WHEREUPON, the record was read
20        by the reporter as requested.)
21    THE WITNESS:  I don't think I can testify
22  that I'm aware of any particular discussions
23  with respect to remedies that they might avail
24  themselves of.

Page 61

1  BY MR. DUTTON:
2      Q.   And are you aware of any allegation
3  that has been made with respect to Pinnacle's
4  contracting with Mainscape at Fort Irwin that
5  Pinnacle was in default under the property
6  management agreement?
7      A.   There are allegations surrounding
8  Mainscape and in particular with respect to --
9  as I understand it, Mr. Wimer's relationship
10  with Mainscape.  I -- and so it's in that regard
11  that I would understand it, whether or not that
12  terminates the PMA, depending on what's proven
13  at trial, that, I can't speak to but that's --
14      Q.   I don't think I asked you that.  I
15  think I asked you with respect to entering into
16  the contracts, are you aware of any allegation
17  that's being made with respect to the contracts
18  that were entered into between Pinnacle and
19  Mainscape that Pinnacle was in default of the
20  contracts for not obtaining the minimum number
21  of three bids?
22      A.   Okay.  With that last proviso of your
23  question, I'm not aware of -- of such -- such
24  notice of or -- or allegation of default with

Page 62

1  respect to the obtaining the contracts other
2  than to say by giving that answer, I'm -- I
3  don't want to suggest that I have some opinion
4  or conclusion with respect to the plaintiff's
5  allegations surrounding Mr. Wimer's relationship
6  with -- with Mainscape, because I do understand
7  that that's the subject of some of the claims
8  and allegations being made by the plaintiffs.
9      MR. DUTTON:  All right.  Let's take a break.
10      THE WITNESS:  Thank you.
11      THE VIDEOGRAPHER:  This marks the end of DVD
12  No. 1.  We are off the record at 10:10 a.m.
13          (WHEREUPON, a short break was
14          taken.)
15      THE VIDEOGRAPHER:  Here begins DVD No. 2.  We
16  are on the record at 10:19 a.m.
17  BY MR. DUTTON:
18      Q.   So Mr. Dudney, we were talking about
19  internal control deficiencies, and I asked you
20  some questions about that, and then we started
21  down to Section 1A --
22      A.   I'm sorry, what page are you on now?
23      Q.   -- of Exhibit 002, which is on Page 10
24  of your report.

Page 63

1      A.   Okay.  Okay.
2      Q.   And you quote the Monterey PMA and the
3  CMC PMA.
4          Do you see that?
5      A.   Yes.
6      Q.   And then you say throughout --
7  throughout various declarations and depositions,
8  former and current Pinnacle employees testified
9  regarding vendor selection processes that were
10  inconsistent with the Monterey and CMC projects,
11  and then you have a colon, right?
12      A.   Yes.
13      Q.   And then you cite to the testimony of
14  four people.
15          Do you see that?
16      A.   Yes.
17      Q.   And the first one is Harold Hernandez,
18  and he is from the Fort Irwin project, right?
19      A.   Yes.
20      Q.   The second one is Jodi George, she's
21  from the Fort Irwin project, right?
22      A.   Correct.
23      Q.   Third one is Fernando Lopez, and he is
24  from the Moffett project?

Page 64

1      A.   Correct.
2      Q.   And the last is Stacia Schuster and you
3  specifically cite her in her role as investment
4  manager at the CMC project, which is Fort Irwin,
5  Moffett and Parks, right?
6      A.   Correct.
7      Q.   And you don't cite anybody or any
8  testimony from anyone at Monterey.
9      A.   That's correct.
10      Q.   And in selecting these four
11  individuals, despite the fact that you say
12  throughout various declarations and depositions,
13  former and current Pinnacle employees testified
14  regarding vendor selection processes that were
15  inconsistent.
16          Are these the only four people that you
17  could find that testified about vendor selection
18  processes that were inconsistent with the
19  Monterey and CMC projects?
20      A.   I don't -- I don't think so.  I think
21  these were just four that were cited, I'd have
22  to go back and look at the testimony or
23  declarations to answer your question if these
24  were the only four.  These were just four that

Page 65

1  I thought were important to -- to call out.
2      Q.  In presenting these four, were you
3  trying to give a balanced view of the statements
4  that Pinnacle employees, either current and
5  former, had made about the vendor selection
6  processes at Monterey and CMC?
7      A.  I wasn't trying to -- the answer is no
8  to your question.  I wasn't trying to present
9  the -- what was supposed to happen, because I've
10  described that in -- in A.  What I was looking
11  for, and this is really as part of the
12  investigations or forensic audit aspects of the
13  work that I did, that I was looking to see was
14  there -- were there indications that there were
15  either departures from or things that were
16  inconsistent with what I understood to be the
17  requirements, and so these were examples that
18  I identified.
19      Q.  Okay.  So -- so you were trying to
20  identify examples of statements or declarations
21  that showed or discussed vendor selection
22  processes that were inconsistent with the PMAs?
23      A.  Inconsistent with the -- and I think
24  that term inconsistent with the -- it should say

Page 66

1  I think, you know, Monterey and CMC projects,
2  PMAs or something to that effect, I think as
3  I look back at that, that's not included, that's
4  something that comes before the four bullets,
5  because that's clearly what I'm doing is just
6  simply identifying examples of things that
7  I noted in either testimony or declarations
8  which were inconsistent with what I understood
9  either the actual provision to read or what
10  I understood the spirit of the provision to
11  read, if you will.
12      Q.  Then you said -- you said you performed
13  a review of the Pinnacle document production to
14  evaluate these employee statements.
15      What do you mean by evaluate these
16  employee statements?
17      A.  It's similar to what I -- I used
18  throughout this, when I do the work order
19  analysis that I do as well, is that basically,
20  I gathered, summarized and otherwise compiled
21  data with respect to the underlying activity
22  that might be the subject, so these are
23  either -- you might view these as either
24  allegations made or statements made around how

Page 67

1  the bidding process was supposed to work and so
2  -- or did work in some cases, and in some of
3  these, identifying that three bids weren't
4  always obtained, and so I sought to determine
5  whether from a data perspective, I could
6  identify whether or not bids were obtained and
7  that's what you see then in part culminated in
8  Exhibit -- Exhibit 4 to my March 27th, 2015,
9  report which we've marked as Exhibit 002 to this
10  deposition, is a summary then of all of the
11  documents that were bid documents that I was
12  able to compile.
13      So I was trying to evaluate the data
14  with respect to the statements that were being
15  made and compile or analyze that depending on
16  what the data was.
17      Q.  Did you look at -- or did you ask
18  either of the owners for their documents with
19  respect to bids?
20      MS. WELCH:  Objection to form.
21      THE WITNESS:  Again, I asked more broadly
22  than that.  I asked regardless of the parties,
23  any -- I asked for any and all bid documents so
24  I did it a couple ways, one was I interviewed

Page 68

1  folks physically when I was doing the work and
2  asking about bids.  I then asked counsel to make
3  available or identify for me all bid documents
4  regardless of whether it came from the owner,
5  the asset manager or the manager.
6  BY MR. DUTTON:
7      Q.  Well, Mr. Dudney, I understand.  You've
8  interviewed a lot of people about the bid
9  process, right?
10      A.  Yes.
11      Q.  And you've interviewed people at both
12  Fort Irwin, Moffett, Parks and Monterey, right?
13      A.  Yes.
14      Q.  And you've presented testimony from
15  four people, okay, right?
16      A.  There are four examples that I have
17  included that are in the context that I
18  articulated in my report.
19      Q.  And those are the only four you refer
20  to in this report that goes for 94 pages?
21      MS. WELCH:  Objection to form.
22  BY MR. DUTTON:
23      Q.  With respect to lack of control over
24  vendor selection and bids, right?

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
69–72

Page 69

1    A.  Well, these are -- these are the four
2  that I put in this particular section.  I --
3  there are other quotes that I have in here, for
4  example with respect to Mainscape when I did the
5  analysis there, that arguably, I could have put
6  in here as well.
7       For example, you know, the -- some of
8  the issues surrounding Mr. Wimer's relationship
9  with Mainscape, but again, these were just four
10  examples that set to me the context then for my
11  review because these statements are what they
12  are, and my work centered around then analyzing
13  the data with respect to the bids themselves.
14    Q.  So you didn't have any similar
15  statements from people who worked at Monterey?
16    A.  I didn't call out any similar
17  statements for somebody at Monterey.  That's --
18  I'm not testifying that they don't exist some
19  within the -- you know, it's -- I mean, the
20  stack of declarations themselves has got to be,
21  you know, maybe three quarters of a foot high
22  and then there's deposition testimony on top of
23  that.
24       So I can't say that it was --

Page 70

1  throughout that document, set of documents, that
2  there aren't similar statements but these are
3  the four that I chose to put in my report.
4    Q.  So none of the other statements or
5  declarations met the criteria, whatever that is,
6  that you used to identify the selections that
7  were going to be in your report?
8    A.  Ultimately, I decided that these four
9  were sufficient in terms of setting the context
10  for what the analysis was that I was doing with
11  respect to the bids.
12    Q.  None of these three relate to Monterey
13  at all, do they?
14    A.  There are four, and no, these don't
15  relate to Monterey.  These relate to Irwin.  But
16  as you know, Exhibit 4 looked at both -- on the
17  front page of the two-page exhibit is Monterey
18  and on the back is Irwin.
19    Q.  Now you talk on Page 12 under the same
20  section, lack of control over vendor selection
21  and bidding, about the owner's internal audit
22  group performed a review of CMC projects in
23  September 2007, finding that required contracts
24  were not obtained for vendors, expenditures were

Page 71

1  well over the established $25,000 limit.
2    Q.  Do you see that?
3    A.  Yes.
4    Q.  And you don't include the owner's audit
5  with respect to Monterey, right?
6    A.  Let me just read that paragraph real
7  quick.  And could I have your last question read
8  back?
9       (WHEREUPON, the record was read
10       by the reporter as requested.)
11    THE WITNESS:  Well, I include it in the next
12  sentence, it's a different time period, but as
13  it relates to September, 2007, no, but the next
14  -- very next sentence is related to Monterey,
15  June 2007.
16  BY MR. DUTTON:
17    Q.  Consistent with our document review is
18  subsequent internal audit review in December of
19  2009.  You're saying that's the Monterey one or
20  is that --
21    A.  I am sorry.  Where are you reading
22  from?
23    Q.  I'm reading in the same paragraph on
24  the second -- actually, it's the first full

Page 72

1  paragraph of Page 12 of your report.
2    A.  Yes.
3    Q.  Okay?  CMC, right?  That means Fort
4  Irwin, Moffett and Parks, correct?
5    A.  Yes.
6    Q.  And you quote a September 2007 finding
7  that required contracts were not obtained,
8  correct?
9    A.  Yes, I'm sorry.  I was down at the last
10  paragraph on that page so that's where we were
11  disconnected.
12    Q.  That's what you quote, correct?  That
13  required contracts were not obtained for vendors
14  with expenditures well over $25,000, right?
15    A.  Correct.
16    Q.  That quote doesn't have to do with the
17  minimum bids.  The minimum bids is in the second
18  sentence, right?
19    MS. WELCH:  Objection to form.
20  BY MR. DUTTON:
21    Q.  Let me -- let me just ask:  Footnote 24
22  refers to a CMC internal control review, right?
23    A.  Correct.
24    Q.  Footnote 25 refers to a CMC internal

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
73–76

Page 73

1  control review, right?
2      A.   Correct.
3      Q.   None of them refer to the Monterey
4  internal control review, correct?
5      A.   Neither of those do, that's correct.
6      Q.   So for that paragraph and for this
7  section, lack of control over vendor selection
8  bidding, you don't cite to any specific examples
9  of audit findings or any specific statements
10 from any declarants or witnesses dealing with
11 lack of internal -- sorry, lack of internal
12 controls over vendor selection and bidding,
13 right?
14     A.   I haven't cited to any in that
15 particular set of paragraphs that you're
16 pointing to.
17     Q.   The next section, Section B, is lack of
18 controls over vendor contracts.
19         Do you see that?
20     A.   Yes.
21     Q.   And how is that different from
22 Section A?
23     A.   This part of the review that was done
24 by the auditor at the time relates to -- not in

Page 74

1  the bidding per se, but it's the actual looking
2  at the contract and the retention of the
3  contract itself, generally circulating around
4  the concept that -- trying to understand what
5  the provision of services was called -- that was
6  called for under the contract, what were the
7  rates and what the invoicing then consistent
8  with that, so that's a different way of
9  assessing controls with respect to contracts
10 that were supposed to be in place or were in
11 place.
12     Q.   Now, with respect to Mainscape, did you
13 find the Mainscape contracts?
14     A.   Yes.
15     Q.   So those existed?
16     A.   Yes.
17     Q.   So lack of controls over vendor
18 contracts, Section B, doesn't really refer
19 specifically to the Mainscape contracts?
20     A.   I don't know that they state in the
21 internal control reviews, Mr. Dutton, the --
22 they point to one contract, DMC, but I don't
23 know that there's a mention particularly of
24 Mainscape, I'd have to go back and look at it.

Page 75

1  Having said that, separate and apart from what
2  was in the internal control reviews, I know that
3  we have the Mainscape contracts so I can answer
4  that yes, they existed.
5      Q.   And you didn't look to see whether the
6  Navigant internal control review had found the
7  contracts or the minimum bids that the Clark
8  Realty Capital internal control review didn't
9  find?
10     A.   I just don't recall what conclusions
11 that particular review reached.
12     Q.   With respect to the next section, lack
13 of segregation of duties, the owners -- you say
14 the owners' internal audit team identified lack
15 of segregation of duties related to invoice
16 processing and payment at the CMC projects.
17     A.   Correct.
18     Q.   And tell us specifically what that lack
19 of segregation of duties was, Mr. Dudney.
20     A.   I think it's the next sentence.   In
21 September 2007, their internal audit findings
22 report stated individuals in accounting have
23 access to processed invoices, print and mail
24 checks, also vendor setup is logically

Page 76

1  restricted.  However, new vendor setup only
2  requires accounting staff to fill out and send
3  the form, and then it goes on to say, the
4  internal audit team concluded that this lack of
5  segregation of duties could result in, quote,
6  risk of lost duty, potential fraud, close quote,
7  and then it further obviously goes on and talks
8  about December 2009 internal audit review at CMC
9  where they, quote, determined that there was a
10 -- I should say quote, segregation of duties
11 problem exists, where several Pinnacle employees
12 have access to both Yardi policing module and AP
13 module.  Some of the AP and accounting staff
14 have access to create, print and post checks,
15 close quote.
16     Q.   With respect to individuals in
17 accounting, was there -- were there any
18 improprieties relating to individuals in
19 accounting that were found in any of these
20 audits?
21     A.   I don't recall that they identified
22 any -- any improprieties with a specific
23 identification of an individual.  I think
24 they're talking about the environment, that it

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 22 of 90

LOUIS DUDNEY                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                             77–80

Page 77

1  exists that there is a risk associated with the
2  way it's set up.
3      Q.  With respect -- with respect to the
4  allegations of this case, Mr. Dudney, are you
5  aware of any allegations of improprieties with
6  respect to the individuals in accounting?
7      A.  I would -- by that definition, I'm
8  going to exclude Mr. Wimer from that, because
9  I understand him to have more of an operational
10 role, and not play a part in the accounting
11 side, so setting that aside, I'm not aware of a
12 specific individual in accounting that is a
13 subject of a particular allegation.  That's not
14 to say it doesn't exist, but I'm not aware of it
15 if there is.
16     Q.  And there -- you agree with me that
17 with respect to lack of segregation of duties,
18 there's nothing in this one paragraph,
19 Section C, relating to Monterey, Moffett or
20 Parks?
21     A.  Well, I'd have to look back because
22 they are talking about the CMC projects.  It
23 certainly does not include Monterey.  Whether it
24 includes Moffett or not, I would have to look

Page 78

1  back at them.
2      Q.  So it doesn't include Monterey for
3  sure?
4      A.  That's correct.  Not -- the citations
5  that I make in the lack of segregation of duties
6  does not include Monterey.
7      Q.  Are you aware, Mr. Dudney, specifically
8  with respect to the Monterey project, whether
9  there are allegations in the lawsuit, in the
10 complaint, relating to improprieties or
11 deficiencies with respect to vendor contracting?
12     A.  I'd have to look back at the complaint.
13 Obviously, it says what it says, but I think
14 it's been amended now five times or something,
15 so there's a number of versions of it, but I
16 don't recall that there is a specific allegation
17 with respect to that, there may be again, but I
18 don't -- I'd have to look back at the complaint.
19     Q.  Sitting here today, you're not aware of
20 any allegations of improprieties or deficiencies
21 that are alleged to have occurred with respect
22 to vendors at the Monterey project?
23     A.  I believe that's correct to the best of
24 my recollection right now.

Page 79

1      Q.  With respect to the Monterey project,
2  how do your observations with respect to
3  internal control deficiencies relate to the
4  allegations of the complaint?
5      MS. WELCH:  Objection, calls for a legal
6  conclusion.
7  BY MR. DUTTON:
8      Q.  Specifically, with -- when I say
9  internal control deficiencies, I mean your
10 observations in Section 1 or Part 5A1 of your
11 report.
12     MS. WELCH:  Same objection.
13     THE WITNESS:  Can I ask to have that question
14 read back, please?
15         (WHEREUPON, the record was read
16          by the reporter as requested.)
17     THE WITNESS:  So that they -- they relate in
18 that there are -- as an example, I point to on
19 Page 12 under -- which is in the section that
20 you noted which is Roman 5A Arabic 1 in
21 Subsection B on Page 12 at the last paragraph
22 that's partial, I note that, for example, quote,
23 a June 2007 internal audit of the Monterey
24 project similarly noted that -- I'm sorry,

Page 80

1  quote, controls over vendor contracts should be
2  strengthened for two of three vendor contracts
3  requested.  We found that one could not be
4  located, DMC Construction and the other vendor
5  had an addendum which was not properly approved.
6         So I understood that there were
7  allegations generally with respect to the
8  provision of property management services in the
9  compliance with the PMA, and this informed me as
10 to -- as I did my interviews and other aspects
11 of the forensic audit that I conducted, one of
12 the things, as we've talked about I was looking
13 at and looking for, was the bid in contract
14 environment and so part of that helped to inform
15 and result in what is Exhibit 4 and the work
16 that I did there, so I understand that it
17 relates to the allegations, in that broadly, I
18 understand the allegations to include, with
19 respect to Monterey as well as CMC, that there
20 were deficiencies with respect to the property
21 management services that were provided there, so
22 that's my understanding of how they relate.
23 BY MR. DUTTON:
24     Q.  You're not aware of any allegations

Page 81

1  relating to the Monterey project with respect to
2  deficiencies in bidding or vendor selection, are
3  you?
4      MS. WELCH:  Same objection, calls for a legal
5  conclusion.
6      THE WITNESS:  I'd have to look back at the
7  complaint to say more clearly.
8  BY MR. DUTTON:
9      Q.  What allegations are you aware of,
10  Mr. Dudney, with respect to the Monterey project
11  of -- in allegations in the complaint of bidding
12  or vendor improprieties?
13      A.  Well, again, I'd have to look back at
14  the complaint, so I can't answer with what's in
15  the complaint.  I just have an understanding
16  that the allegations at least in part surround
17  the provision of the property management
18  services and with respect to whether or not
19  Pinnacle was complying with those for purposes
20  of determining whether the -- the contracts have
21  terminated or not, at least being one issue, as
22  I understand the case, and so I have prepared in
23  addition to the written report, Exhibit 4 to
24  that report, which lists out for each year, for

Page 82

1  the major contract categories, the bids that I
2  was able to find, and whether or not I was able
3  to find them, which I understand go to that
4  general set of allegations.
5      Q.  The next section of your report under
6  Section 5A, subparagraph -- or Subsection 2, you
7  entitle manipulation of work order response
8  data.
9          Do you see that?
10      A.  Yes.
11      Q.  What do you mean by manipulation,
12  Mr. Dudney?
13      A.  Changing data.  And this section of the
14  report generally talks about the findings that I
15  have reached with respect to my analysis of work
16  order data and work order documents, to see if
17  there was a demonstration of that data being
18  manipulated, meaning changed, and given various
19  statements that people have made in declarations
20  and/or in depositions with respect to the fact
21  that their view was that either it was going on
22  or that they themselves, in fact, engaged in
23  work order manipulation and changing data to --
24  to achieve a different result.

Page 83

1      Q.  Why did you use the word manipulation
2  instead of change?
3      A.  Because I think that the data was --
4  I thought that was a more descriptive term and
5  -- for the purposes of the section that I wrote.
6      Q.  So that choice was yours?
7      A.  I -- I mean, the choice ultimately is
8  mine in all of -- in all of this report.
9      Q.  So -- so choosing manipulated instead
10  of changed or updated is yours?
11      A.  Yes.
12      Q.  And manipulated implies that all of the
13  changes were improper, doesn't it?
14      A.  At the end of the day, what I would say
15  is that I've made observations with respect to
16  -- and identified those changes which I think
17  are improper.  I'm not suggesting anywhere in
18  the report that every time a change is made,
19  I mean, there's plenty of examples where a
20  change that can be made is not manipulative or
21  in my view improper, but there were --
22  obviously, it's articulated in my report, there
23  are substantial examples of where I think that
24  the data supports a conclusion that the data

Page 84

1  was, in fact, manipulated.
2      Q.  All right.  So I take it, you agree
3  with me that there are also substantial examples
4  where data was updated or changed, and such
5  updates or changes are not manipulation?
6      A.  I think there certainly can be and --
7  there certainly are situations that would result
8  in changes to the data, which I would not view
9  as manipulative.  They would be updates or they
10  would be other things that would be potentially
11  proper, so yes, I would agree that there are --
12  there are examples of that as well.
13      Q.  When you were -- when you were writing
14  this report, were you worried that you were
15  going to use the word manipulation too broadly?
16      MS. WELCH:  Objection to form.
17      THE WITNESS:  No.  I'm comfortable, as I sit
18  here today, that the -- the use of that word for
19  the purposes of title, I think if I -- I'm not
20  uncomfortable with it in light of the findings
21  and what I would say is that, you know, my
22  opinions are obviously detailed throughout this
23  report, both in this report as well as other --
24  the -- my rebuttal report with respect to this

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 24 of 90

LOUIS DUDNEY                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                       85–88

Page 85

1  subject matter, and so it's -- I'm comfortable
2  with the opinion and the conclusion that I
3  talked to earlier.
4  BY MR. DUTTON:
5      Q.  So is it your opinion that -- that what
6  was going on was manipulation?
7      A.  I think that there is evidence in the
8  work order data that I've summarized which is
9  consistent with the statements that I saw, that
10 would evidence manipulation.
11     Q.  Do you agree with me that with respect
12 to specific incidents where work orders or work
13 order information was changed in Yardi, that
14 there is room for a difference of opinion on
15 whether the change was manipulative or whether
16 it was proper?
17     MS. WELCH:  Objection to form.
18     THE WITNESS:  I -- I think in -- of course, I
19 think you could have different interpretations
20 of things as a concept, and so we would have to
21 look at specific situations as to whether or not
22 I would think or agree with you that a specific
23 situation, in fact, has a -- a circumstance that
24 reasonably -- two reasonable minds could differ

Page 86

1  with respect to that, so yes, I think there are
2  situations like that, we'd have to be more
3  specific if we'd want to, you know, talk about a
4  particular situation.  I would be happy to look
5  at that.
6  BY MR. DUTTON:
7      Q.  Well, isn't it ultimately a decision
8  for the jury and for the judge whether or not
9  the changes that were made to data in Yardi,
10 work order response time data, are manipulative
11 or proper?
12     A.  I think as to all the issues in the
13 case, it's ultimately up to the judge and the
14 jury to make a determination, and what I've done
15 is simply analyzed the data with respect to
16 statements that were made to determine if there
17 were -- if that data was consistent with that
18 and people -- what people describe in their
19 statements is -- I think would be fairly
20 characterized as manipulation of work order
21 data, and so that's why I titled the section
22 that, but I think it's pretty clear, as you read
23 my analysis, what I've done is analyzed the data
24 and demonstrate instances where I found, you

Page 87

1  know, whether or not I found consistencies with
2  respect to various allegations that were made in
3  -- or statements that were made in sworn
4  statements or deposition testimony.
5      Q.  Let me go back for a second to the
6  first section, a section over, internal control
7  deficiencies?
8      A.  Yes.
9      Q.  You said, I believe, that you
10 interviewed a bunch of people from Fort Irwin
11 and Fort -- sorry, and Monterey; is that
12 correct?
13     A.  I did.
14     Q.  None of the people -- none of the
15 examples that you cite in your report come from
16 interviews that you did?
17     MS. WELCH:  Objection to form.
18     THE WITNESS:  The four, if you're asking me
19 specifically about the four points that are
20 listed on Page 11, no, none of those are from
21 interviews that I took.
22 BY MR. DUTTON:
23     Q.  Those are from declarations taken by
24 plaintiff's counsel, right?

Page 88

1      A.  I'm not sure if -- I'd have to look
2  back to see if it even demarcs who took them,
3  but I do understand that plaintiff's counsel
4  obtained some statements.  I understand that you
5  and your firm obtained statements.  For example,
6  I don't know whether Stacia Schuster, for
7  example, in her statement, whether that's one
8  that was generated by interaction with your firm
9  or interaction with the Kirkland & Ellis firm.
10     Q.  Let's be specific.  The Harold
11 Hernandez statement was a declaration and a
12 deposition, right?
13     A.  Yes, that's -- I cite both of those.
14     Q.  Those are not interviews that you did?
15     A.  I'd have to look back.  I don't know
16 that I've met Mr. Hernandez or not.
17     Q.  And Jodi George is a declaration that
18 was taken by plaintiff's counsel in a
19 deposition, right?  No, you just cite her
20 declaration.
21     A.  I just cite the declaration.
22     Q.  You didn't cite her deposition?
23     A.  I -- not in this particular portion.
24     Q.  And you didn't cite any of the

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 25 of 90

LOUIS DUDNEY                                              June 16, 2015
MONTEREY BAY vs. PINNACLE                                      89—92

Page 89

1   documents that Harold Hernandez had written
2   during the time that he worked at Fort Irwin,
3   did you?
4        A.   Not in this section.  I think the only
5   two things I cite are his deposition and his
6   statement.
7        Q.   When you're trying to evaluate these
8   employee statements, were you -- did you ever
9   try to evaluate whether you could believe what
10  the employees were saying?
11       MS. WELCH:  Objection to form.
12       THE WITNESS:  Well, with respect to these
13  statements, these were -- with respect to these
14  four that you're pointing to now, these were
15  really -- they again provided context to me as
16  to what -- obviously, various allegations or
17  observations that people were making, where --
18  and then I did the analyses that I did.
19  Similarly, for the work order area of the report
20  in some ways, it's very consistent in that.  At
21  the end of the day, I'm not making a
22  determination as to whether or not somebody was
23  truthful or not.  I think that's for the judge
24  and the jury to opine on.  I'm simply analyzing

Page 90

1   and presenting data with respect to work orders
2   that was informed, in part, by statements and
3   allegations that people made, and then I went
4   and analyzed the data that surrounded some of
5   those allegations.
6   BY MR. DUTTON:
7        Q.   So you didn't care whether or not the
8   particular statements or declarations or
9   testimony was credible?
10       MS. WELCH:  Objection to form.
11       THE WITNESS:  No.  I didn't testify to that.
12  The -- I'm simply recognizing that whether or
13  not someone is being truthful in a deposition or
14  truthful in a -- in a statement that they sign,
15  it isn't what I'm being asked to do and nor what
16  I am doing.  I'm simply analyzing the data with
17  respect to the context of those statements.
18  That data relates to those statements and so I'm
19  analyzing the data and how and what weight a
20  jury puts on that or a judge puts on that is for
21  those individuals to determine, but there's -- I
22  was asked to do the data analysis surrounding
23  the Yardi data in recognition and in light of
24  understanding that there were allegations and

Page 91

1   statement made -- statements made, which I think
2   could be reasonably interpreted as people were
3   claiming that there was manipulation of work
4   order data.
5   BY MR. DUTTON:
6        Q.   Well, then -- why do you -- why -- if
7   what you're doing is analysis of data, why do
8   you entitle Section 2 on Page 13 manipulation of
9   work order response data?
10       A.   I wouldn't -- yes, just -- because that
11  was the general tone as I read it of the
12  statements that were made, but you can see in
13  the very first sentence, that my forensic
14  analysis of data and documents surrounding the
15  work order activity, you know, provides evidence
16  that corroborates assertions, they're consistent
17  with.
18       Q.   What do you mean by corroborates?
19       A.   That they were -- there were
20  allegations, for example, around -- just to take
21  an example, around that over -- overlap of
22  technicians occurred as a result of making
23  changes to work order data.
24       Q.   Well, who made that allegation?  Let's

Page 92

1   try to be specific, Mr. Dudney.  Who
2   specifically made an allegation that there was
3   overlap of technicians?
4        A.   Well, let's go to the overlap section.
5   I think it's -- Mr. Weber may have said that.
6        Q.   I want you to try to be specific,
7   Mr. Dudney.  Tell me the allegation that
8   Mr. Weber made.
9        A.   I'd have to look back.  I don't know
10  that I quote the exact testimony, but my
11  understanding is that -- well, what I have here
12  on Page 26 is that under Section D, it says,
13  quote -- and this is now my report, not quoting
14  his affidavit, is that Mr. Weber alleged that
15  the large number of changes made to work order
16  response times in the Yardi system resulted in
17  the anomalous situation in which the same
18  maintenance technician was recorded as having
19  done work in two different locations at the same
20  time.
21            And you can see that it's citing
22  declaration of Robert Weber dated October 15th,
23  2004, Page 3.  I think that's Page 3, maybe
24  Paragraph 3, but we could -- if you have that

Page 93

1  handy, we could pull that up, but that would be
2  the reference.
3      Q.  That was a declaration taken by
4  plaintiff's counsel, correct?
5      A.  It's a declaration, I can't say,
6  without looking at it, whether it's by
7  plaintiff's counsel or by defense counsel.
8      Q.  You don't know one way or the other?
9      A.  I don't recall without looking at it,
10  and I'm not even sure if looking at it, it would
11  tell me, but it might.
12      Q.  In your effort to corroborate the
13  statements or the assertions made by certain
14  former Pinnacle employees, did you attempt to
15  evaluate their credibility at all?
16      A.  The credibility of the statements?
17      Q.  Yeah.
18      A.  The way I think about it is that --
19  I wasn't looking at a particular person's
20  statement, and without having done analysis, I'm
21  not making some evaluation as to the credibility
22  of that individual one way or the other.  I just
23  understood and was provided a statement or a
24  series of statements, some of which identified

Page 94

1  circumstances which again, I think would
2  reasonably be described as -- that people
3  admitted, as an example, engaging in work order
4  manipulation, changing data to show results that
5  were different than what actually happened.  And
6  in some cases, being even more specific, that
7  that was done in -- with the motivation of
8  increasing pass/fail rates.
9      I didn't make a judgment with respect
10  to the credibility of that statement per se.  I
11  understood that that statement was made.  What
12  I did was simply analyze the, you know,
13  voluminous work order data to see if there were
14  indications in that data that were consistent
15  with what was being stated, and then I present
16  those findings in my -- in my report.
17      Q.  Well, you don't use the word
18  consistent.  You use the word corroborates, and
19  I understand that that means make more likely
20  true.
21      A.  Well, the -- and we could pull up the
22  definition if you would like of it, but I felt
23  that that fairly articulated what I did.  At the
24  end of the day, I'll -- I'll just tell you that

Page 95

1  my mindset with respect to all of this analysis
2  is that I've analyzed the data, I've presented
3  results with respect to that, and a judge or
4  jury will decide whether or not and to what
5  extent, along with everything else that's
6  presented in the case, whether or not, you know,
7  they find what they find with respect to work
8  order manipulation allegations.
9      Clearly, that's an allegation that's
10  been made in this case, and I was asked to do
11  forensic analysis around work order data and
12  I found the results that I did and I've
13  presented those results but...
14      Q.  You state:  My forensic analysis of
15  data and documents surrounding Pinnacle's
16  resident work order activity at the Monterey and
17  CMC projects provides evidence which
18  corroborates the assertions made by certain
19  former Pinnacle employees, who allege that
20  Pinnacle falsified work order data and related
21  reporting of Pinnacle's response and completion
22  times.
23      A.  Uh-huh.
24      Q.  And then you have parentheses,

Page 96

1  pass/fail reports on both of these projects.
2      A.  Correct.
3      Q.  What consideration did you give to
4  statements made by these former Pinnacle
5  employees or to documents authored by these
6  former Pinnacle employees, which makes their
7  assertions about work order changes incredible?
8      MS. WELCH:  Objection to form.
9      THE WITNESS:  Well, what I endeavored to do
10  was -- again, to determine whether or not the
11  data was -- let me say it this way.
12  I understood there were a series of allegations
13  that were being made in the case.  I understood
14  that part of those allegations are also made in
15  witness statements, declarations, depositions,
16  other forms, whereby -- whereby -- I was then
17  asked to analyze work order data with respect to
18  those allegations and that's what I've done.
19  There are then cases and circumstances and
20  I point to them, where there are e-mails, there
21  are other documents that involve the people that
22  are consistent with some or are germane, I would
23  say, to some of the analyses that I've done and
24  I've identified those.

Page 97

1     But I'm not -- I'm not separately
2  suggesting that every piece of e-mail or other
3  evidence that might be put forward in the case
4  with respect to these, was part of my analysis.
5  My analysis was of the work order data, and then
6  in some cases, there were e-mail or Excel files
7  or other things which were part of that, and
8  obviously, the hard copy work orders themselves
9  were again a prime and key document to the
10  analysis that we did in addition to the Yardi
11  data, but I've presented an analysis of the data
12  itself and what observations I made with respect
13  to that.  I don't think I say anywhere in here,
14  and if I leave the impression, I can clear it up
15  now, which is that I'm not suggesting that every
16  piece of evidence that might be germane to a
17  jury's or a judge's consideration of these
18  claims, it's contained within the four walls of
19  my report.  It's that the -- but I have done
20  data analysis around that which I believe is
21  germane to consideration and evaluation of those
22  statements ultimately.
23  BY MR. DUTTON:
24     Q.  Well, let's took at the first set of

Page 98

1  what you call data analysis which starts on
2  Page 17 under the section that you call work
3  order affidavit/deposition discussion.
4     A.  Yes.
5     Q.  Now, before we get into that,
6  Mr. Dudney, was it was your goal to present
7  fairly the work order affidavits and depositions
8  that were taken in this case that result --
9  related to work orders?
10  MS. WELCH:  Objection to form.
11  THE WITNESS:  Can I ask to have that read
12  back, please.
13         (WHEREUPON, the record was read
14         by the reporter as requested.)
15  THE WITNESS:  When you say fairly, I'm not
16  sure what you mean with respect to that, because
17  that makes it sounds like I'm making a judgment
18  on it one way or the other and I'm not.  What
19  I say in this section is that -- and I'll just
20  quote Page 17:  As stated, Table 1 was prepared
21  as part of the Monterey and CMC reviews to
22  provide a summary of our general observations
23  regarding certain aspects of the former employee
24  sworn statements.  I understand that the Court

Page 99

1  will ultimately determine the significance of
2  these statements.  Further, some of the
3  individuals have made sworn statements -- that
4  have made sworn statements have been deposed or
5  may be in the future, certain of the topics
6  covered in the sworn statements were covered
7  during the depositions that have taken place.
8  And I go on to say, as fact discovery is ongoing
9  and as the Court will ultimately interpret and
10  determine the significance of any testimony
11  given, I have not to date included any testimony
12  at depositions -- given at depositions unless
13  specifically noted in Table 1 below.
14         And so my point there is that this was
15  contextual and as part of the -- because I was
16  doing a -- again, a forensic audit into what --
17  what took place here, and I understood that
18  there were allegations.  This table is simply
19  contextual, where it, for me, identifies general
20  categories of, you know, allegedly improper
21  behavior that took place and sort of who said
22  what at which project around that subject.
23  Obviously, there are actual depositions and
24  statements and those are what they are.  So this

Page 100

1  table to me is nothing more than a summary for
2  the purposes of providing context with respect
3  to the actual work that I do.  I don't have
4  opinions with respect to the classification and
5  what these people said.  They said what they
6  said, and that's, you know, for the Court to
7  analyze, but this was really to set up and
8  provide the reader context with respect to the
9  analysis that I undertook.
10  BY MR. DUTTON:
11     Q.  Well, you certainly must have opinions
12  about them because you specifically selected
13  these statements for inclusion in your report,
14  right, Mr. Dudney?
15     A.  Yes.  I did select them and I thought
16  that they were -- they were ones that identified
17  potential improper behavior or people admitted
18  to doing things that they said, I did X, and
19  that, you know, what have you, and so I was
20  simply noting that here, and then doing analysis
21  with that context in mind.
22     Q.  And -- and there are other statements
23  and declarations and testimony that you have
24  excluded from this, right?

Page 101

1     A.   Certainly, this is not the entire body
2   of testimony that's been provided.
3     Q.   So the only thing that you have
4   presented here are the specific statements that
5   you have selected as part of your contextual
6   background for your analysis, right?
7     A.   Yes.  Because I was trying to
8   investigate and determine whether there was data
9   that was consistent with some of the
10  allegations.
11    Q.   And --
12    A.   Because there's obviously conflicting
13  -- there's people that say that this never
14  happened, I mean.
15    Q.   You have this table, where you -- you
16  have -- let's take Mr. Draper who is the first
17  example.  Mr. Draper -- did you read his
18  deposition?
19    A.   I have.
20    Q.   And did you -- did you learn from his
21  deposition that he was partnered with a Pinnacle
22  employee named Tim Spears?
23    A.   I don't.  That doesn't ring a bell with
24  me.  It's been awhile.

Page 102

1     Q.   Did you know that Mr. Spears was
2   also -- also gave a declaration in this case?
3     A.   Yes, because I've read every
4   declaration.
5     Q.   Okay.  And you're aware that Mr. Spears
6   then gave a subsequent declaration to defense
7   counsel where he disavowed everything he said
8   practically in the first declaration?
9     MS. WELCH:  Objection to form and
10  mischaracterization of the record.
11    THE WITNESS:  Mr. Spears' specific
12  declaration isn't at the forefront of my mind's
13  eye right now, but there were several people
14  that -- where there were two statements made,
15  one statement made and the second one which
16  either modified, changed or somehow impacted
17  what was said in the first one, so there was
18  several instances of that.
19  BY MR. DUTTON:
20    Q.   Did you -- did you read that Mr. Spears
21  said that Mr. Draper was his -- was his partner
22  while he worked at Pinnacle?
23    A.   I don't recall that specific testimony.
24    Q.   And did you see the testimony where he

Page 103

1   said Mr. Draper and Mr. Spears did turn work,
2   not maintenance work?
3     A.   I -- I don't remember that specific
4   testimony.
5     Q.   And you cite -- you cite Mr. Draper's
6   testimony where you say, he -- he -- Pinnacle
7   improperly changed work order response times
8   from fail to pass.
9         Do you see that?  That's the third
10  column over.
11    A.   Yes.
12    Q.   Top row, Mr. Draper.
13    A.   Correct.
14    Q.   And then you see the next column over,
15  he says he was instructed by management to
16  change work orders from fail to pass.
17        Do you see that?
18    A.   Yes, uh-huh.
19    Q.   And those -- those were things that --
20  and then you have -- what's interesting is you
21  have a footnote.
22    A.   Uh-huh.
23    Q.   On page -- Footnote 45.
24        Do you see that?

Page 104

1     A.   Yes.
2     Q.   And that cites to his deposition
3   testimony, right?
4     A.   Yes.
5     Q.   And he said at his deposition,
6   Mr. Draper testified that he did not personally
7   enter time into the Yardi system.
8         Do you see that?
9     A.   Yes.
10    Q.   Did you understand he didn't enter time
11  into the Yardi system is because he was a turn
12  worker, not a maintenance worker?
13    MS. WELCH:  Objection, form, mischaracterizes
14  the record.
15    THE WITNESS:  Yeah, I do -- without going
16  back and looking at the specific statements, I
17  don't know that I could provide any
18  clarification, let's put it that way.
19  BY MR. DUTTON:
20    Q.   How can you say his statement is a yes
21  under the first two columns when Footnote 45
22  says he did not personally enter time into the
23  Yardi system?
24    A.   Because you could be instructed by

Page 105

1 management, whether or not you actually do it or
2 not, is separate. If he understood or there was
3 testimony around that there were instructions
4 from management with respect to that, that would
5 be one way.
6    Q. Well, you know, you have the Yardi
7 data, right?
8    A. Yes.
9    Q. You have the Yardi backup tapes?
10   A. Yes.
11   Q. And if Mr. Draper had been somebody who
12 operated Yardi or entered time or data into
13 Yardi, he would have had a password, right?
14   A. Generally speaking, yes. There were
15 certainly instances of people where they did not
16 use their own user name and password. They used
17 someone else's, so I think as a general matter,
18 they were supposed to, but it didn't always work
19 that way.
20   Q. Did you see any indication from the
21 data that Mr. Draper was changing work order
22 data in Yardi?
23   A. I don't know that we have a specific
24 analysis with respect to Mr. Draper that I

Page 106

1 recall. I might have to go back and look.
2 There's a number of tabs in the different
3 reports I've produced, but I don't recall that
4 Mr. Draper is specifically called out. Just
5 give me one second though, and I'll take a look
6 at a couple of things.
7        Yeah, in the -- and I've just been
8 flipping through some of the exhibits to earlier
9 reports that were prepared in this matter, just
10 to see if any of those separately called out
11 Mr. Draper and I don't see that he's identified
12 there, so I would have to actually look at the
13 data itself, but in the analyses that we've
14 called out, we don't have a specific one that I
15 can see where -- that pointed to Mr. Draper.
16   Q. Mr. Draper didn't enter any time into
17 Yardi at least according to the Yardi database,
18 correct?
19   A. I'd have to check the Yardi database to
20 answer that.
21   Q. Sitting here today, you don't know one
22 way or the other?
23   A. Not without going back and looking, no.
24   Q. And, in fact, the Yardi database also

Page 107

1 indicates the maintenance employees who
2 performed the particular work orders in
3 question, right?
4    A. I'm sorry. I'm going to have to ask to
5 have that read back, please.
6    Q. I'll ask it again.
7    A. Okay.
8    Q. There is a field in the Yardi database
9 that allows people to identify the specific
10 maintenance tech that is responding to a work
11 order?
12   A. Correct. It -- it's not always filled
13 in, but it has the ability to have that,
14 correct.
15   Q. It's often filled in, is it not?
16   A. There's certainly a number of instances
17 where it is, yes.
18   Q. That's also indicated on the paper work
19 orders that you reviewed, right?
20   A. Correct.
21   Q. And you don't have any paper work
22 orders or any data in Yardi showing that
23 Mr. Draper actually was doing work orders, do
24 you?

Page 108

1    A. I'd have to -- sitting here today, I'd
2 have to -- I can't answer because I don't have
3 the data in front of me, I'd have to go back and
4 look at the data to see if Mr. Draper's
5 mentioned. It's obviously a tremendous volume
6 of data. It's over a hundred, you know, it's --
7 over a hundred thousand work orders, so...
8    Q. You didn't look at that data and
9 attempt to corroborate Mr. Draper's assertions
10 in this case?
11   A. I looked at the data that I did. The
12 inclusion of Mr. Draper, it was simply, you
13 know, part of, again, setting the context that
14 there were allegations around various issues
15 that took place. In certain instances, the
16 analyses lent themselves to focusing on specific
17 individuals because of the nature of the
18 allegation they made.
19       In the case of Mr. Draper, my
20 recollection is that it didn't, but it was still
21 just simply a background with respect to and
22 context -- providing that background and context
23 with respect to the analysis that I ultimately
24 did and that shows what it shows.

LOUIS DUDNEY                                          June 16, 2015
MONTEREY BAY vs. PINNACLE                                109–112

Page 109

1    Q.  So -- so -- did I hear you correctly?
2  Did you say that the data analysis that you did,
3  did not support Mr. Draper's assertions?
4    A.  No, you didn't, you didn't hear me
5  correctly.  The -- what I was answering was
6  simply that I list out, one, two, three, four,
7  five, six -- 13 different people in this table
8  and as I mentioned, this is just certain of the
9  statements that were made that highlight to me
10  various types of issues that were being raised
11  by people.  Obviously, some of these are more
12  specific and some are less.  It's the nature of
13  the statement, it speaks to itself and I point
14  out obviously the person and so forth.
15       This was simply to provide, as I said,
16  context and background because I understood that
17  there were these either admissions that were
18  made and there certainly were allegations around
19  this by the plaintiff, and I was then simply
20  informing myself about the nature of the
21  statements that people made and then
22  I ultimately conducted analysis of the actual
23  data itself.  Mr. Draper was one of the 12 or 13
24  people that I listed.

Page 110

1    Q.  You listed Mr. Draper, but there is
2  nothing in the Yardi database that corroborates
3  Mr. Draper's involvement with work orders or
4  with changing anything in Yardi, is there?
5    MS. WELCH:  Objection, form.
6    THE WITNESS:  Before I could answer that
7  question more specifically, I'd want to go back
8  and just -- given the nature of your question,
9  read the specific pieces of his deposition that
10  I cite and read his testimony or statements,
11  just to be able to be more specific with it.  I
12  haven't --
13  BY MR. DUTTON:
14    Q.  I didn't ask you about his deposition
15  or his statements.  I asked about the Yardi
16  database that you reviewed and the backup data
17  and the paper work orders.  Those are the three
18  pieces of data or three types of data that you
19  reviewed, right?
20    A.  But you asked me within the context of
21  the statements that I ascribed to him, and so
22  that's why I said what I said.
23    Q.  Why don't you just answer my question?
24  None of that data that you reviewed, the Yardi

Page 111

1  data in the database, the backup data or the
2  paper work orders indicates that Mr. Draper had
3  anything at all to do with work order response
4  times?
5    MS. WELCH:  Objection to form, asked and
6  answered.
7    THE WITNESS:  Yeah, the -- again, in order to
8  answer that, I would want to reread his
9  statements.  What I will -- what I will say is
10  that we don't have a specific analysis that I
11  have included in my report with respect to
12  Mr. Draper, and to the extent, though,
13  Mr. Draper made more broad ranging allegations,
14  it could be that some of the analyses that I've
15  done are consistent with that statement and
16  that's why I would want to go back and look at
17  that statement, when you're wanting to get
18  specific about Mr. Draper, but the way
19  I conducted the analysis, regardless of whether
20  it was Mr. Draper or anybody else, I was looking
21  for certain types of activity in light of
22  allegations that people had made and Mr. Draper
23  was one of the 12 or 13 that I cited here, just
24  again, as I said, the contextual background for

Page 112

1  understanding the types of allegations being
2  made.
3  BY MR. DUTTON:
4    Q.  Did you -- in your effort to
5  corroborate the assertions made by these people
6  with respect to Fort Irwin or Monterey,
7  Mr. Dudney, did you consider that declarations
8  taking -- taken of individuals outside of court
9  and without opposing counsel or counsel for the
10  declarant, might not be reliable?
11    A.  Not -- knowing that there are certain,
12  you know, rules in court as to what's admissible
13  and what's not, and my view and understanding of
14  it was that the Court would make its
15  determination as to what statement, you know,
16  whether it will or will not be allowed to be
17  part of the trial.  Having said that, because I
18  was -- had the understanding that I did, which
19  is that there were allegations that were made
20  writ large with respect to these issues, and I
21  was then asked to, if I could, analyze data
22  surrounding these allegations and that's what
23  I did, and so I didn't place any particular, you
24  know, weight or -- and I didn't reach any

Page 113

1  evaluation with respect to the credibility of
2  someone's statement other than as reflected in
3  the data and the conclusions of the data that I
4  analyzed.
5      Q.  Well, then, why did you select
6  Mr. Draper for inclusion in your table?
7      A.  Because he commented on, if I recall
8  and again, if you want to show me the citations
9  here, I've got them in my work papers as well,
10  that there were citations which were consistent
11  with the categories.
12     Q.  Why didn't you cite Mr. Spears?
13     A.  I'd have to look back at it to see if
14  I could answer that question as to why
15  Mr. Spears isn't.
16         (WHEREUPON, DUDNEY Deposition
17          Exhibit Nos. 003-004 were
18          marked for identification.)
19  BY MR. DUTTON:
20     Q.  Let me show you what I've marked as
21  Exhibit 003 which is the declaration of Timothy
22  Spears and Exhibit 004 which is the subsequent
23  declaration of Timothy Spears.
24     A.  Okay.

Page 114

1      Q.  You've read both of those, right?
2      A.  Yes, but it's been a few weeks since
3  I've last looked at them, so if you don't mind,
4  I'll read them real quickly here.
5      Q.  You didn't include either one in your
6  report, did you?
7      A.  When you say include them in my report,
8  meaning that they are not on my docs relied on
9  listing or that they're not -- it's not cited in
10  the table itself?
11     Q.  In the part of your report that you
12  call work order affidavit/deposition discussion,
13  you did not include either declaration of
14  Timothy Spears, correct?
15     A.  Timothy Spears is not in Table 1 which
16  is on Pages 18 and 19, which I think is in the
17  section you're referencing.
18     Q.  And it's nowhere in that section of
19  your analyses where you actually review
20  affidavits and deposition testimony?
21     A.  No.  There -- there are scores of --
22  there are scores of declarations, and Mr. Spears
23  is just one, but no, there's -- there are plenty
24  of other declarations that are not part of

Page 115

1  Table 1.  Table 1 again was simply a select
2  group which I viewed as being -- that they
3  were -- these individuals were identifying in
4  different ways, certain types of alleged
5  behavior and it again provided background and
6  context of the work that I did, so let me read
7  Mr. Spears here, since you've handed these to me
8  and see what -- just refresh my recollection
9  with respect to these.
10        Okay.  I've read both of these.
11     Q.  Do you see Paragraph 3 of Exhibit
12  004 --
13     A.  Paragraph 3 of Exhibit 004.
14     Q.  Yes.  Which is the second --
15     A.  Yes.
16     Q.  -- declaration of Timothy Spears?
17     A.  Yes.
18     Q.  Now each of the declarations that are
19  presented in Table 1 are declarations that were
20  taken by plaintiff's counsel, right?
21     A.  I'd have to look back to see if I could
22  identify that.  Sometimes, you can tell if
23  there's another signature or a name that I might
24  recognize, but I'd have to look back at them.

Page 116

1      Q.  You can't tell by the mere fact that
2  they're included in your report?
3      A.  No, that wasn't the criteria.  The
4  criteria was whether or not there were
5  allegations that were being made that were the
6  subject of the issues in this case.  Who took
7  them wasn't -- wasn't -- didn't matter to me
8  whether it was taken by your firm or by
9  plaintiff's firm.
10     Q.  So it's just a coincidence that each of
11  these declarations that you cite in this Table 1
12  were taken by plaintiff's counsel?  That didn't
13  factor into your decision at all, Mr. Dudney?
14     A.  It did not.  It did not.
15     Q.  And you didn't include the declaration
16  of Mr. Spears that was taken by plaintiff's
17  counsel, did you?
18     A.  That's correct, it's not in the table.
19     Q.  And you didn't include the declaration
20  of Mr. Spears that was taken by defense counsel,
21  did you?
22     A.  I didn't include one way or the other
23  Mr. Spears in the table.  Again, this is just a
24  small set of the people that were -- that

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 32 of 90

LOUIS DUDNEY                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                       117–120

Page 117

1  provided various statements but Mr. Spears is
2  not one of them that's included.
3      Q.  Do you see where -- in Paragraph 3 of
4  his second declaration, which is marked as
5  Exhibit 004, Mr. Spears says:  At the end of the
6  meeting, the Clark lawyers asked me to sign a
7  declaration which I did.  I read the declaration
8  they gave me but I did not review it closely
9  because I had just returned from the previous
10  day from a long road trip for work and I was
11  very tired.  I currently work as a long haul
12  truck driver.  I have now reviewed my earlier
13  declaration closely and I have noticed a number
14  of statements that are not correct.  In several
15  cases, the declaration says things that are the
16  opposite of what I told the Clark lawyers at our
17  meeting.
18      Do you see that?
19      A.  Yes.
20      Q.  Did you conduct any investigation by
21  reviewing depositions or other declarations to
22  determine whether any of the -- any of the
23  declarations that you rely on, whether any of
24  the declarants believe that they were told

Page 118

1  things or told the Clark's lawyers things at
2  their meeting, that were the opposite of their
3  declaration?
4      A.  I don't know that I can say it was the
5  opposite, because Mr. Merrill, who is included
6  in my -- in my table is somebody who has two
7  declarations in it where his second declaration
8  I would say modifies, for lack of a better term,
9  the statements in his view that he made in his
10  first declaration.
11      Q.  And you don't cite the second
12  declaration in your Table 1, do you?  You just
13  cite the first one.
14      A.  Well, let me look here real quick.
15      Q.  Why don't you refer to Footnote 53,
16  Mr. Dudney, where you cite to the Merrill report
17  or the Merrill declaration -- or 52.
18      A.  Well, 53 is a cite to the declaration.
19  What I'm looking for is to see if I can find the
20  date of his second one.  I don't know if you
21  have that handy, it might save me a step here.
22      Q.  Well, let me suggest that 53 is wrong
23  because his initial declaration was
24  December 12th, 2011, and I don't have an extra

Page 119

1  copy of this, but I'll mark it for you.
2      (WHEREUPON, DUDNEY Deposition
3      Exhibit Nos. 005-006 were
4      marked for identification.)
5  BY MR. DUTTON:
6      Q.  I've just handed you what's been marked
7  as Exhibit 005 which is a copy of the
8  declaration of Joshua Merrill, his first one.
9  Can you tell me what -- on what date Mr. Merrill
10  signed that declaration?
11      A.  It's December 12th, 2011.
12      Q.  And now I'm going to hand you what's
13  been marked as Exhibit 006 which is a second
14  affidavit or a declaration of Mr. Merrill.
15      What's the date of that?
16      A.  April 14th, 2015, which is what I was
17  looking for, because it's not included in my
18  table because it came out after the issuance of
19  my report.  I issued my report on March 27th and
20  this came out on April 14th.
21      Q.  Right.  So the only -- the only one
22  that you relied on for Mr. Merrill is the one
23  that you -- that was taken by plaintiff's
24  counsel, right?

Page 120

1      A.  It's the only one I cited.  I don't --
2  it's -- again, it provided -- he said what he
3  said and he made certain statements and I was
4  then looking at the data and he was not the only
5  one I cite.  I cite 11 or 12 others.
6      Q.  Isn't it true, Mr. Dudney, that each of
7  the declarations that you cite where the
8  declarations taken by plaintiff's counsel in
9  this case?
10      A.  They may be, but as I testified to
11  earlier, I didn't select them on that criteria.
12  I selected them based on declarants that had
13  made either admissions or other statements which
14  were ones that would be the jumping off point,
15  if you will, for the forensic analysis that
16  I did of the Yardi data.
17      Q.  And the other one that you didn't cite
18  that was taken by plaintiff's counsel was the
19  deposition of Alanso Arias, right -- or sorry,
20  the declaration of Alanso Arias.
21      A.  I'm sorry.  What was the question?
22      Q.  You don't include that in Table 1, do
23  you?
24      A.  No.  No, Mr. Arias is not included.

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
121–124

Page 121

1    And whenever it's a good time for a
2  break, we're a little over an hour.
3    Q.  And you didn't include Mr. Arias in
4  Table 1 because at his deposition, he completely
5  recanted the declaration that he gave
6  plaintiff's counsel?
7    A.  I'd have to go back and look at his
8  deposition.  I just don't recall whether that's
9  -- if it is exactly as you just described it or
10  not.  I would have to go back and look at it.
11    Q.  And that was the reason you didn't
12  include him, right?
13    A.  I don't recall making a conscious
14  decision based on what you're describing here.
15  Generally, I understood that there were sort of
16  three categories of people, there were ones that
17  made statements that said they either did X or
18  knew of X and X was something, you know, that
19  might be viewed as improper.  There were people
20  that said the opposite, never did X, no one ever
21  did X, there was nothing improper.  Then you had
22  people in the third category that said some
23  things and then maybe issued a second statement
24  or clarified or augmented their statements in

Page 122

1  deposition testimony or otherwise.  I'm not
2  making judgments about any of these groups of
3  people.  I'm simply identifying that there are
4  certain individuals that made certain
5  allegations or said they did certain things and
6  I'm generally looking at those allegations from
7  a data perspective, and so I don't recall
8  specifically why I chose not to include
9  Mr. Arias, but -- but the reasons I included the
10  ones I did was for the reasons that I stated.
11    Q.  And what reasons were that again?
12    A.  Contextual background because there
13  were allegations that were being made and I was
14  being asked to analyze Yardi data to determine
15  whether or not there was, you know, evidence in
16  the Yardi data which would be consistent with
17  the statements that were being alleged or the
18  people admitted that they were, you know, doing
19  certain things.  I was trying to ascertain
20  whether or not the data was consistent or
21  inconsistent with that.
22    Q.  Were you ever concerned that you would
23  accuse people of manipulating data if it wasn't
24  true?

Page 123

1    MS. WELCH:  Objection to form.
2    THE WITNESS:  Well, I'm not accusing anyone
3  of manipulating data.  I'm simply looking at the
4  data and determining what it says and presenting
5  that, presenting how I did that analysis, so
6  that, you know, Mr. George or others can provide
7  his view on it.
8  BY MR. DUTTON:
9    Q.  Well, you call it manipulation in your
10  report.
11    A.  I think that's the nature of the
12  allegations are that there was manipulation of
13  work order data, so that's why I entitled it
14  that way, but as you see, if you read the
15  sections which I'm sure you have, you know that
16  what I've done is analyze just an enormous
17  amount of data to determine whether or not some
18  of these allegations or statements, whether
19  there is -- those are consistent with the data
20  that I was asked to analyze.
21    Q.  Well, isn't manipulation of work order
22  data one of your conclusions and opinions?
23    A.  I think that what I found is consistent
24  with that, those sets of allegations, that there

Page 124

1  was -- that the data evidences to me that work
2  order data was -- was, in fact, manipulated.
3    Q.  And you say that this is an impropriety
4  which you found, right?
5    A.  I think the data supports that, yes.
6    Q.  Okay.  And my question was, Mr. Dudney,
7  before you reached the conclusion or the opinion
8  that there was work order manipulation and that
9  this was an impropriety, were you concerned at
10  all about unfairly accusing people of this
11  manipulation and impropriety?
12    A.  No.  Again, because I'm not -- I'm not
13  accusing any -- any specific individual.  The
14  data is what it is.  I'm doing the analysis that
15  the data allows me to do, and so to the extent
16  that there are certain individuals that, you
17  know, the data might say otherwise.  At the end
18  of the day, that's for a Court to determine
19  whether or not that that -- that evidence that
20  I've identified through my analyses, whether
21  that, along with everything else that's
22  presented in the case and the argument, whatever
23  the Court's going to conclude, the Court's going
24  to conclude, but from a data perspective which

Page 125

1  is the way I look at it, I understood there were
2  allegations.  I was tasked with analyzing the
3  data, I did that.  The data would be consistent
4  with certain of the allegations.  That's where I
5  am.
6      MR. DUTTON:  All right.  We can take a break.
7      THE WITNESS:  Thanks.
8      THE VIDEOGRAPHER:  This marks the end of DVD
9  No. 2.  We are off the record at 11:37 a.m.
10         (WHEREUPON, a short break was
11          taken.)
12      THE VIDEOGRAPHER:  Here begins DVD No. 3.  We
13  are on the record at 11:49 a.m.
14  BY MR. DUTTON:
15      Q.  Mr. Dudney, before you -- before you
16  reached your conclusions in this case about work
17  order manipulation or manipulation of work order
18  response times, what work did you do to
19  understand the Yardi software?
20      A.  Well, Yardi has been something that
21  I've been involved with since the Benning and
22  Belvoir cases, and so it's been a continuing
23  process on the part of my -- me and my team with
24  respect to Yardi.  So we have talked with people

Page 126

1  at Yardi.  We've obviously analyzed the data
2  itself and we were, depending on the time
3  period, you know, receiving reports or
4  affidavits that were coming from primarily
5  Mr. George, and so we would review those as
6  well.  But it was based on a compilation of
7  statements made by individuals that worked on
8  the projects.
9         In some instances, we -- this was the
10  subject of interviews that I conducted.  We held
11  conversations with individuals at Yardi and then
12  obviously, we analyzed the data, because you can
13  see in the data and/or both the current data and
14  the backup data would help inform as to how --
15  how Yardi worked with respect to the data that
16  was being filled out in certain forms and
17  reports and so forth, so I did all of those.
18  That process is sort of an ongoing thing that we
19  did throughout the analysis that I conducted.
20      Q.  Do you agree with me that the word
21  manipulation connotes intent?
22      A.  I don't think I could testify to that.
23  I'm certainly not testifying about intent or
24  opining on people's intent, so if -- if one were

Page 127

1  to ask me that as -- I would answer it as I just
2  did which is that I don't know that I've done
3  any analysis that is going towards intent.  I'm
4  simply looking at what did or did not happen
5  with respect to the data in light of the
6  allegations or statements that people made.  I
7  think intent to me is a legal term that the
8  Courts will determine whether or not there was
9  intent.
10      Q.  Well, I don't think I was asking about
11  whether or not the Courts were going to --
12  doesn't the word itself, manipulation, connote
13  intent?  I'm asking you about the King's English
14  or the Queen's English.
15      A.  If it does, it wasn't my intention.  My
16  intention was not to convey intent with respect
17  to that.  It was whether or not something was
18  done improperly or not, based on the data
19  whether -- whether -- regardless of whether the
20  person intentionally did it or somehow otherwise
21  did it, I don't think that was part of the
22  analysis.
23      Q.  Did you ever see in your analysis or in
24  your review instances where somebody updated

Page 128

1  Yardi and the effect of that update was not the
2  result they were hoping to get?
3      A.  I'm not sure I understand the question.
4  Let me ask to have that read back, please.
5         (WHEREUPON, the record was read
6          by the reporter as requested.)
7      THE WITNESS:  I'm not -- I'm not sure I can
8  answer that question because I don't know that I
9  can say -- I'm just trying to think of an
10  instance where somebody was hoping to get a
11  certain outcome, and that I somehow knew that
12  and yet the update that they made, didn't
13  achieve that outcome, so I'm not -- there may be
14  instances where I could find transactions where
15  I would have e-mails or other data which might
16  inform me with respect to the person's intent
17  and whether they were successful in achieving
18  what they were trying to do.  I certainly see
19  instances where, you know, there was interaction
20  between individuals around trying to increase
21  the pass/fail rate and the pass portion of that
22  rate, and then achieving that through changes
23  made to the system, but I don't know that
24  I could say or identify a specific transaction

Page 129

1 that would comport with the way you just
2 articulated your question.
3 BY MR. DUTTON:
4      Q.   Did you ever see instances where
5 somebody had updated work order information in
6 Yardi and were confused as to why the particular
7 work order remained a pass or remained a fail on
8 the pass/fail report?
9      MS. WELCH:  Objection to form.
10     THE WITNESS:  I've seen instances where
11 people have -- it -- it appears that work orders
12 have been -- data have been changed, some of
13 those changes might not, depending on what the
14 change was, have an affect on the pass/fail
15 report, for example, but they were changed --
16 the data changed nonetheless between the backup
17 and the -- and the current state of Yardi so
18 that -- you know, we might have to get more
19 specific, but that might be an example that
20 would, I think, fit the criteria that you just
21 laid out.
22 BY MR. DUTTON:
23     Q.   Did you -- did you see any situations
24 where, during the use of the Yardi database,

Page 130

1 people were entering data in fields that
2 resulted in an improper computation of response
3 time in the pass/fail report?
4      A.   Yes, I believe there are examples.  I
5 think, you know --
6      Q.   Can I give you an example?
7      A.   Please.
8      Q.   So are you aware that, for example at
9 Monterey, on many occasions, the handwritten
10 work order time is entered into Yardi reflecting
11 when the -- the particular maintenance tech
12 started working at a particular unit and
13 finished, was entered into the -- what's called
14 the scheduled -- the scheduled start and finish
15 time?
16     A.   Of the labor tab, yes.
17     Q.   Okay.
18     A.   Mr. Merrill testifies to that.
19     Q.   And do you understand that -- well, did
20 Mr. Merrill also indicate that when he used
21 Yardi, he would set the status to in progress,
22 for example in the morning, when he was handing
23 out the work orders to his techs?
24     A.   Yes.

Page 131

1      Q.   And he did -- he did that because that
2 was what he was trained to do, right?
3      A.   I don't know if he -- if he says that
4 he was trained to do it that way, I do know that
5 he says that he did that particularly as it
6 relates to the labor tab, I've seen instances
7 where he's done that.
8      Q.   And as a result of that, the -- the
9 start time that's reflected in the pass/fail
10 report that's used to compute response time as
11 we refer to it, reflects the time that the work
12 order was changed to the in progress status,
13 right?
14     A.   Assuming that there's nothing in the
15 actual fields of the labor tab, that would be
16 correct, because the second criteria of the
17 pass/fail report typically goes through the in
18 progress time.
19     Q.   Have you verified that that is, in
20 fact, how the pass/fail report works?
21     A.   Yes.
22     Q.   When did you do that?
23     A.   I don't know specifically when that
24 took place, but we -- I know it's been done

Page 132

1 through the subject of conversation and
2 discussion with AlixPartners for some time.
3      Q.   Was it after Mr. George's first
4 declaration in the California case?
5      A.   I don't recall the timing of it.
6      Q.   Now, are you also aware of
7 circumstances where a printed work order has
8 printed start time and finish times in the upper
9 left-hand corner?
10     A.   You're saying a screen print or a
11 print?
12     Q.   A printed work order, not a screen
13 print.
14     A.   Not a screen print.  There are -- there
15 are in the left-hand side -- I always call them
16 in the upper left-hand corner, but they're in
17 the left-hand side of the document that, yes,
18 there can be start times that are included.
19     Q.   And finish times, too, right?
20     A.   Yes, there can be.
21     Q.   And do you know how those particular
22 fields on the printed work orders are populated?
23     A.   Depends on the -- generally, as
24 I understand it, the -- the -- if the -- if and

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 36 of 90

LOUIS DUDNEY                                                June 16, 2015
MONTEREY BAY vs. PINNACLE                                   133–136

Page 133

1   when the work order was put into a start status,
2   that was also a status that was available, there
3   is then a start time that can be -- populate
4   that work order field and you would find that --
5   depending on the time period, you would find
6   that in either the downloaded field, in the work
7   order history or it might show up in the start,
8   again, depending on the time period.  The finish
9   time, I believe, I'd have to check this, but I
10  believe it comes from the scheduled finish time.
11      Q.  Are you also aware that if the work
12  order status has been changed to work completed,
13  that a time will show up in the finish time?
14      A.  Yes.
15      Q.  A printed time as opposed to a
16  handwritten time?
17      A.  Correct.
18      Q.  And do you agree that if there is a
19  printed work order with a printed start time and
20  a printed finish time, both of which have been
21  crossed out and a new start and new finish times
22  have been entered in, do you agree that for that
23  particular work order, that is an indication
24  that someone, before handing the work order out,

Page 134

1   had changed the status to work completed?
2       A.  I'd have to check to see if it -- if
3   the status had to change in order for that to be
4   populated, but -- but nonetheless, there are
5   instances where those times are crossed out and
6   then the actual times are put in.
7       Q.  And there are instances where -- after
8   there's already been a response to a work order,
9   that same work order is printed out again with a
10  printed start time and a printed finish time and
11  handed back out to the techs who go back to the
12  home?
13      A.  Could happen.
14      Q.  Let's talk about your -- have you --
15  have you reviewed Mr. George's declaration from
16  2012 and his expert report?
17      A.  Yes.
18      Q.  Are there any technical issues about
19  Yardi database or Yardi software that you
20  believe Mr. George is incorrect about?
21          I'm not asking you to agree with any of
22  his interpretations.
23      A.  No, I understand.
24      Q.  But are there any places where you say

Page 135

1   with respect to Yardi, with respect to the
2   software, with respect to the data fields, that
3   he doesn't have it right?
4       A.  There's not one that I'm thinking of
5   right now that -- where our conclusion was based
6   on the work we had done and the discussions that
7   we had had and looking at scripts and different
8   things, that it was different than what
9   Mr. George had done in terms of the operation of
10  it, given your caveat.  I think the answer is
11  no, I mean, the only caveat I would put in --
12  unless I've included it, and I'm just not
13  thinking of one right now, where either in my
14  March 27th report or my June 5th rebuttal report
15  that I had mentioned that, but I think -- my
16  best recollection is that we didn't take any
17  issue with the technical operation of it from
18  the way Mr. George articulated it.
19      Q.  Okay.  And with respect to -- let's
20  take a look at Sections B and C of your -- of
21  Section 2 of your report.  It's on page --
22      A.  21.
23      Q.  21, 22, 23.
24      A.  Yes.

Page 136

1       Q.  This is your -- you call it a hard copy
2   work order production analysis?
3       A.  Correct.
4       Q.  And your hard copy paper work order
5   comparison to final pass/fail report analysis,
6   right?
7       A.  Yes, for C.
8       Q.  During your forensic analysis,
9   Mr. Dudney, did you make an assumption that
10  there would be a hard copy paper work order for
11  every single work order at Monterey?
12      A.  I didn't make an assumption one way or
13  the other.  It was either -- either it existed
14  or it didn't -- did not exist.
15      Q.  Did you ever look and see or conduct an
16  investigation into the practices that either --
17  for Irwin or Monterey during the periods of time
18  when those projects were attempting to use PDAs
19  or personal digital --
20      A.  I was aware of the existence of the
21  PDAs prior to stepping onto either Fort Irwin or
22  Monterey, just because I was aware of it from
23  the Benning and Belvoir projects, and so I -- in
24  doing the analysis that I did, I was aware that

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
137–140

Page 137

1  the PDA device existed and that it was attempted
2  to have been used for a period of time, and from
3  what I understand from various declarations or
4  deposition testimony, that there were similar
5  issues experienced with respect to the PDAs not
6  updating Yardi for the period of time that the
7  PDAs were used, which was I think more a
8  compressed time period, shorter from what
9  I could garner as compared to what had happened
10  out east.
11      Q.  Well, did -- that was going to be my
12  next question.  Did you ever go back into the
13  documents or did you ever -- during any of your
14  interviews or your declarations that you relied
15  on, attempt to find out during what months or
16  what periods of time the Irwin project
17  maintenance department used PDAs or the Monterey
18  maintenance department used PDAs?
19      A.  We attempted, through interview
20  questions, again, reviewing depositions and
21  other things, to get a handle on what those time
22  periods were, and I don't know that ultimately
23  that there is a -- sort of necessary definitive
24  -- either piece of testimony or documents that I

Page 138

1  can point to that would say that precisely from
2  A to B it was used, and from, you know, C to D,
3  it was not, other than to say that the general
4  gist of the testimony as I recall it was that
5  they were used for a shorter period of time
6  earlier in the project than, say, what the
7  experience I had at Benning and Belvoir, but I
8  don't know that there is a bright line
9  definitive document that I could point to that
10  would tell me exactly that, the month that the
11  PDA stopped being used.
12      Q.  Did you ever attempt to analyze whether
13  there was a correlation between the use of PDAs
14  and the availability of hard copy work orders?
15      A.  I haven't done an analysis like that.
16      Q.  Never attempted that?
17      A.  Not that I recall.
18      Q.  Do you recall any testimony or any
19  declarations or any of your interviews where you
20  have attempted to ask whether there was a
21  correlation between PDA use and the lack of hard
22  copy paper work orders?
23      A.  Well, I -- I knew the function of the
24  PDA which was to -- at least at some level, was

Page 139

1  to have a handheld device that allowed for, in
2  theory, a more efficient interaction between the
3  maintenance technician and what I will call the
4  central sort of maintenance office in terms of
5  the dispatch, and, you know, doing what was
6  required for the residents, so I understood
7  conceptually that that was a different process
8  than the printing out of the work orders and
9  writing on the work orders, as then became the
10  standard after the PDAs were -- were no longer
11  used, but I didn't attempt to do a correlation
12  analysis or otherwise establish a relationship
13  to the availability of hard copy documents as
14  compared to when the PDAs were and were not in
15  use.
16      Q.  Okay.  Did you ever conduct a review of
17  e-mails that had been produced in this case to
18  kind of get a sense of when the PDAs were --
19  were being used?
20      A.  Certainly, have -- have looked at a lot
21  of information that's not just Yardi and so
22  e-mails, Excel files, other things that are
23  produced, so yes, we've seen some of them.  I
24  don't know that I could testify that I have

Page 140

1  seen, you know, every last piece of paper that
2  deals with when the PDAs were and weren't being
3  used.
4      Q.  Well, you've looked a lot at the
5  accounting side of the Pinnacle of these
6  projects, right?
7      A.  Yes, for certain cost categories.
8      Q.  Do you have the general ledgers?
9      A.  Yes, I do have the general ledgers and
10  so for certain cost categories, I've got -- I've
11  gone deep into those.
12      Q.  PDAs would have been a cost that would
13  have been charged to the project, right?
14      A.  I presume so.
15      Q.  Did you -- did you attempt to look at
16  the general ledgers and ascertain when the PDAs
17  were being paid for?
18      A.  Yeah, I'm not sure one could do that,
19  maybe you can, but no, I haven't done an
20  analysis of the general ledger to try and see if
21  that provides any additional detail or not.
22      Q.  Does it make sense to you that there
23  would be fewer hard copy paper work orders
24  available for review if PDAs were being used?

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
141–144

Page 141

1     A.  I think it's possible.  I don't know if
2  I can testify any more to that, but I think the
3  nature of the PDA as I understood it was to rely
4  on technology as a way to do it as opposed to
5  the paper system that's being used now.
6     Q.  Does it make sense to you that for the
7  same work order, if somebody was attempting to
8  use PDAs but for some reason the PDAs weren't
9  working properly, that there might be a work
10  order response that was done with a PDA and no
11  corresponding paper work order and then a
12  subsequent work order response that was done via
13  a paper work order?
14     MS. WELCH:  Objection to form.
15     THE WITNESS:  Let me make sure I understand
16  your question.  Are you asking me if -- for the
17  same incident, there could be two responses, one
18  that was facilitated or circulated around the
19  use of a PDA and a separate repetitive response
20  that was then done by paper?  Are you asking me
21  if that's possible?
22  BY MR. DUTTON:
23     Q.  Yes.
24     A.  I presume it is possible.  Again, I

Page 142

1  don't know that I've seen an instance of it, but
2  I -- it could be possible.
3     Q.  Okay.  Now, in your -- in your report,
4  you say there -- you identify 700 instances, I
5  think you say of situations where the paper work
6  order produced by Pinnacle does not agree with
7  the corresponding data in the annual pass/fail
8  report or the Yardi system, and I just want to
9  clarify what you mean by that.
10     When you say 700 paper work orders
11  produced by Pinnacle with start times
12  handwritten by the maintenance technician --
13     A.  And are you reading from a particular
14  page?
15     Q.  Yes, Page 23.
16     A.  Okay.  I just want to follow along with
17  you.
18     Q.  Page 23.  Now -- now, you've identified
19  -- let's see, 76,970 paper work orders from Fort
20  Irwin, right?
21     A.  Yes.
22     Q.  And 17,267 paper work orders from
23  Moffett and Parks, right?
24     A.  Yes.

Page 143

1     Q.  And 97,500 paper work orders from
2  Monterey, right?
3     A.  Yes.
4     Q.  I'm not good with math, but would you
5  agree with me that that's roughly 190,000 paper
6  work orders?
7     A.  Yes.
8     Q.  You've said you've located over 700
9  paper work orders.  Did you identify every
10  single paper work order you could where the
11  handwritten times did not correspond with the
12  data either in the annual pass report or in the
13  Yardi system?
14     THE WITNESS:  Let me ask to have that one
15  read back, please.
16        (WHEREUPON, the record was read
17         by the reporter as requested.)
18     MS. WELCH:  Objection, form.
19     THE WITNESS:  I'm not --
20  BY MR. DUTTON:
21     Q.  Well, you say you're reviewed a
22  selection of produced hard copy work orders --
23     A.  Correct.
24     Q.  -- for the Monterey and CMC projects?

Page 144

1     A.  Correct.
2     Q.  Okay.  And you come up with over 700
3  paper work orders where you say the
4  corresponding data in the annual doesn't match
5  the data in the annual pass/fail report of the
6  Yardi system?
7     A.  Or the Yardi system, correct.
8     Q.  Or the Yardi -- might match one or the
9  other?
10     A.  Typically, no, because typically, the
11  pass/fail report, except maybe in the case of a
12  hard coded pass would be reflected in the Yardi
13  system currently, and that's Yardi current as
14  opposed to Yardi backup.
15     Q.  My question really was:  How did you
16  come about -- or how did you come up with this
17  selection of 700 or so work orders?
18     A.  Reviewing the individual work orders,
19  first of all to identify the population of the
20  ones produced that had handwriting on them that
21  would evidence start and stop times and then
22  based on that population, there were manual
23  reviews that were done of those work orders to
24  then identify ones that did not agree with the

Page 145

1   pass/fail report or the Yardi system and that
2   the documents themselves, with the handwriting,
3   would provide one answer and again, that answer
4   in terms of start and stop time would be
5   different from what's included in Yardi and that
6   there wasn't -- that I wasn't able to find some
7   other reason that might, you know, reasonably
8   explain based on the evidence that I had, which
9   included Yardi backup in some cases, backup
10  electronic files, Yardi current, pass/fail
11  report data and then the hard copy work orders
12  themselves, and in some more limited cases, I
13  had e-mails and/or Excel files which related to
14  that.
15          I will also say that to the extent that
16  I could identify it, I also sought to look at
17  tracking logs, other sheets of paper that might
18  have data with respect to a work order number
19  that might again inform one with respect to the
20  evaluation of these, so it was a process,
21  Mr. Dutton, of culling through the work orders
22  to identify those that appear to be inconsistent
23  between the paper work order and what the
24  technician wrote and what was recorded in

Page 146

1   pass/fail and I haven't been able to identify an
2   explanation for that based on the evidence that
3   has been provided.
4       Q.  Okay.  And I guess my -- my question
5   was more aiming at the scope of the paper work
6   orders that you reviewed.
7           Did you review all of the paper work
8   orders that you were able to identify?
9       A.  Yes.
10      Q.  And did you then divide that into a
11  subset of all of the paper work orders that had
12  handwritten times and dates?
13      A.  Yes.  We had identified those that had
14  that characteristic.
15      Q.  And then is the resulting 700 or over
16  700 -- what's the exact number?
17      A.  It is -- it is just over 700.  It's a
18  few -- it's a handful over 700.
19      Q.  Okay.  Does that break down to
20  something like 545, isn't it just under 700?
21      A.  No.  I think it's just -- I think it's
22  just a tad over 700.  I want to say right now,
23  it's -- I want to say 702 or something like
24  that, I could be wrong, it's subject to check,

Page 147

1   but it's just over 700 and it's roughly 140 and
2   560 between the two.
3       Q.  140 and 560?
4       A.  I think that's right.
5       Q.  140 at Fort Irwin?
6       A.  Correct.
7       Q.  And 560 at --
8       A.  Monterey.
9       Q.  -- Monterey?
10      A.  Correct.
11      Q.  And did you do -- did you do any work
12  to determine the context in which these paper
13  work orders and -- where there were work orders
14  that -- where the paper work orders didn't match
15  the information in Yardi, did you do any
16  background work to look at the context of those
17  work orders?
18      A.  Help me with what you mean by context.
19      Q.  Well, let's -- let's take Fort Irwin
20  for an example.
21          Now, you are aware that Fort Irwin did
22  not always use the pass/fail report.
23      A.  They had their own derivation of it
24  which is separate from the Yardi programmed one

Page 148

1   where they reported -- if that's what you mean,
2   they reported results using something for a
3   period of time called a matrix as an example
4   which is not the pass/fail report.
5       Q.  Are you aware that they used a report
6   called the work order completion summary report
7   that presented the average response times for
8   each category of work orders?
9       A.  Yes, that's what I'm referring to as
10  the matrix.  That matrix presents an on average
11  basis for a certain period of time.
12      Q.  And they used that matrix, if you will,
13  for -- to support their -- Pinnacle's incentive
14  fees for the first incentive fee period at Fort
15  Irwin from March of 2004 through February
16  of 2005.
17      A.  Sounds right.
18      Q.  And -- and it wasn't until the first
19  quarter of 2006 that Pinnacle began to pull
20  together support for the work order response
21  time portion of its incentive fee for the 2005
22  period.
23      A.  I'd have to check that, but just
24  conceptually, that sounds right to me.

LOUIS DUDNEY                                             June 16, 2015
MONTEREY BAY vs. PINNACLE                                149–152

Page 149

1    Q.   And isn't it the case that most of the
2  updates, most of the 140 that you rely on for
3  Fort Irwin -- in fact, I think all but about 25
4  of those -- strike that.
5        All of the updates that relate to Fort
6  Irwin specifically as opposed to Moffett
7  occurred prior to April 6th, 2006 --
8    A.   I will tell you.
9    Q.   -- out of the 140 and --
10   A.   What was your -- what was your
11 operative date?
12   Q.   April 6, 2006.
13   A.   April 6, 2006.  When you say occurred,
14 just to get -- just to make sure I understood
15 your question correctly, you're talking about
16 the -- the --
17   Q.   There's a last updated by date.
18   A.   That's the one that you're -- that's my
19 question, whether it was the start date or the
20 last updated by date.
21   Q.   Okay.  The last updated by date.
22   A.   And April 6 --
23   Q.   April 6, 2006.
24   A.   Yeah.  Just doing a quick scan of my

Page 150

1  Exhibit 6 to what is -- you've marked as
2  Exhibit 001, even though your marked version of
3  Exhibit 001 doesn't have Exhibit 6 in it.  I
4  have my own copy of that same report so I'm just
5  looking at Exhibit 6 and looking under the last
6  updated date, and all of those last updates
7  occurred before April 6th, 2006, just based on a
8  quick sort of running my finger down the column
9  sort of review.
10   Q.   Well, let me do this, just so we have
11 it in the record.  I will mark as Exhibit 008 a
12 copy of Exhibit 6 from your report.
13       Can you tell me if that is a true
14 reproduction of Exhibit 6?
15           (WHEREUPON, DUDNEY Deposition
16            Exhibit No. 008 was marked for
17            identification.)
18   THE WITNESS:  It appears to be just done with
19 smaller typing.
20 BY MR. DUTTON:
21   Q.   Yeah, sorry about that.
22   A.   But no, it appears to be complete.
23   Q.   So -- and if I wanted to look, there's
24 a column, it's the one, two -- third column from

Page 151

1  the left, that has the last updated date, right?
2    A.   It -- technically, it's the fourth
3  because I have just a sequence number running
4  down which is the first, so it's one, two,
5  three, fourth, if you start with, for example,
6  I'm on Page 3 of 4, the Line 90, you would see
7  that it's 90 and then work order number and last
8  updated by, the last updated date, so that's
9  what I understand that -- that to be Yardi data
10 reflecting that information.
11   Q.   Okay.  And is there anything -- is the
12 sequence by date order?
13   A.   No, the sequence is by number of
14 observations, I believe, with respect to the
15 last updated by individual and then work order
16 number within that individual.
17   Q.   Okay.  With respect to all of the Irwin
18 work orders, there's a -- there's another column
19 that identifies whether or not the work order
20 was at Irwin or at Moffett, right?
21   A.   Yes, it's the tenth column from the
22 left, sort of in the center of the page, it says
23 Irwin/Moffett and it denotes which location it
24 was.

Page 152

1    Q.   And the last date I think for the Irwin
2  update was April 6th, 2006, right?
3    A.   I think the last one that I saw was
4  April 5th, but maybe there's -- actually -- and
5  this was for -- I'm sorry 2006, let me just
6  double-check.  And it's actually -- I misspoke
7  earlier, it's sorted by last updated by name,
8  not by the number of occurrences, so it goes
9  H. Hernandez first, J. Vinson and Lopez, et
10 cetera, and then within that is work order.
11       The last one that I see,
12 Mr. Dutton, is April 5th of 2006, in the Irwin
13 population.
14   Q.   Right.
15   A.   There's a couple at the top of Page 2
16 of 4 on what you've marked as Exhibit 008
17 associated with Midi Lopez.
18   Q.   So there was -- there were none after
19 April 6?
20   A.   There were none that I've included on
21 Exhibit 6 that are after April 6th.
22   Q.   And with respect to the updates by
23 Ms. Lopez, it's correct, is it not, that there
24 are a number of updates that take place in late

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 41 of 90

LOUIS DUDNEY                                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                                           153–156

Page 153

1 March and early April of 2006.
2    A.  Yes.
3           (WHEREUPON, DUDNEY Deposition
4           Exhibit No. 007 was marked for
5           identification.)
6 BY MR. DUTTON:
7    Q.  Let me show you what's been marked as
8 Dudney Exhibit 007, which is a compilation of
9 e-mails to and from Ms. Lopez beginning in
10 February of 2006.
11    A.  Is it one continuous chain or is it
12 just a series of --
13    Q.  It's a series of e-mails to and from
14 Ms. Lopez during this period of time.
15    A.  Okay.  Okay.
16    Q.  And with respect to the first page with
17 Bates stamp ending in 581?
18    A.  Yes.
19    Q.  There's an e-mail from Ms. Lopez
20 concerning a call that she just got from Rick
21 Wimer.
22       Do you see that?
23    A.  This is the one that begins, hey, just
24 got a call from Rick Wimer?

Page 154

1    Q.  Correct.
2    A.  Okay.  If you don't mind, can I just
3 read that section?
4    Q.  Sure.
5    A.  Okay.  I've read that, just that little
6 portion, that little passage.
7    Q.  And this -- in this e-mail, Ms. Lopez
8 is talking about the pass/fail report and the
9 fact that, for certain types of work orders,
10 COMs, the pass/fail report always prints out a
11 star star review --
12    A.  Correct.
13    Q.  And gives only 50 percent credit
14 instead of a one or a zero, right?
15    A.  Correct.
16    Q.  And she's asking if something can be
17 done about that?
18    A.  Yes.
19    Q.  Correct?
20       And then if you go forward a few pages,
21 there's an e-mail with Bates stamp ending in 629
22 AMSCAL1335469.
23       Do you see that?  About the fifth page
24 in?

Page 155

1    A.  Got it.  It's a page that's a
2 February 13, 2006 e-mail?
3    Q.  Correct.
4    A.  From Miriam Lopez to Rick Wimer?
5    Q.  And the subject is pass/fail report,
6 right?
7    A.  Yes.
8    Q.  Have you seen that e-mail before?
9    A.  Let me just read it and see if it jogs
10 my memory.
11       I believe I have, but I'd have to
12 double-check just to see if it's on the list of
13 documents relied upon.  There's obviously a huge
14 volume of documents but...
15    Q.  She -- Ms. Lopez says:  I started with
16 December 2005 and had been working backwards,
17 and then she gives a series of scores for
18 December, November, October, September, August
19 and July, right?
20    A.  Correct, uh-huh, uh-huh.
21    Q.  She gives a starting score -- or a
22 score and then a now score, right?
23       Do you see that?
24    A.  Uh-huh.

Page 156

1    Q.  And it looks like the -- the percentage
2 or the fraction is changing in each instance
3 from a number in the 70s, with the exception of
4 July, which is at .63, to a number in the 90s in
5 each of the corresponding months.
6    A.  Yes.
7    Q.  And then she gives an explanation and
8 then she says:  I am only changing the vendor,
9 COM, star star and Microbio inspection to pass
10 on my copy in the Excel files.
11       Do you see that?
12    A.  Yes.
13    Q.  What do you understand that to mean?
14    A.  Well, that she is changing the --
15 presumably to routine which is what the first
16 e-mail that you pointed me to, is that she is
17 presumably changing or referencing that she's
18 changing anything that has a priority of vendor
19 or COM, which is a turn, or star star to a --
20 which is an appointment designation typically
21 and something called Microbio inspection to a
22 review -- or I'm sorry, to a routine.
23    Q.  So the --
24    A.  That that's what -- in combination with

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 42 of 90

LOUIS DUDNEY                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                       157–160

Page 157

1    these two e-mails.
2        Q.   Let me -- let me ask you this:  Do you
3    believe that she is changing those to a routine
4    in Yardi or do you believe that she is simply
5    changing those to pass in an Excel file that she
6    has downloaded to Yardi?
7        A.   Well --
8        MS. WELCH:  Objection to form.
9    BY MR. DUTTON:
10       Q.   Because I would suggest the latter is
11   what she's doing.
12       A.   I mean, she says, on the Bates page
13   ending in 629, quote, I am only changing the
14   vendor, in quotes, COM, in quotes, double star
15   or double asterisk, in quotes, and Microbio,
16   space, INSP, in quotes, to pass on my copy in
17   the Excel files, and then she goes on to note,
18   if the program was correct, these would
19   automatically pass and the percentage would be
20   correct on the Yardi side of these reports, so I
21   would interpret that to mean that she is -- she
22   is adjusting the Excel file.  I would read that
23   same way.
24       Q.   And not making changes to data in

Page 158

1    Yardi?
2        A.   This e-mail would not -- doesn't talk
3    about making changes in Yardi, so I would not
4    infer from this that this would suggest that --
5    with respect to this e-mail, that she's changing
6    items in Yardi.
7        Q.   And then on -- on the next page, there
8    is an e-mail to Rick Wimer on the same date and
9    this time, there are Excel spreadsheets
10   attached --
11       A.   Yes.
12       Q.   -- for each of the months that are
13   referred to in the prior e-mail; is that
14   correct?
15       A.   Correct.
16       Q.   And have you looked at those
17   spreadsheets to see exactly what Ms. Lopez was
18   doing?
19       A.   To the extent that they were produced
20   as part of the production, we did.
21       Q.   Okay.  Go forward to page -- Bates
22   stamp AMSCAL06531067.
23       Do you see that?
24       A.   067.  That's entitled -- the subject is

Page 159

1    PTE in fences?
2        Q.   Correct.
3        A.   Okay.
4        Q.   And you understand what PTE is, right?
5        A.   Permission to enter.
6        Q.   Correct.  And she is writing to Wes
7    Campbell.
8        Do you know who he is?
9        A.   I believe that he is a maintenance
10   director at some level.  Let me just read if
11   I could.
12       Q.   And do -- do you know who Jerry Vinson
13   is?
14       A.   He may also be a -- I'd have to look on
15   my list, but he may also be a maintenance -- a
16   more senior maintenance person.
17       Let me just read this real quick.
18       Q.   Okay.  And I'm only going to ask you
19   about the portion that is under PTE.
20       A.   Okay.  I'll just read that piece.
21       Okay.  I have read just that portion
22   under PTE.
23       Q.   Were you aware of this issue that on
24   some occasions, POCs or service members who were

Page 160

1    living in the units at Fort Irwin, would call in
2    after a work order had been scheduled and grant
3    permission to enter?
4        A.   I've heard of the instance occurring.
5        Q.   And procedurally or mechanistically, do
6    you know how the Fort Irwin maintenance
7    department handled that, as far as what
8    information should be put into Yardi and updated
9    for that person?
10       A.   Meaning, the specific instance of when
11   it's called in after the fact, if a work
12   order had -- if a resident is listed originally
13   as having no PTE, and then they subsequently
14   call in, what procedurally was supposed to
15   happen in terms of the treatment of it?  Is that
16   what you're asking?
17       Q.   Correct.  Yes.
18       A.   I don't know that I could testify what
19   their procedural treatment was during the period
20   of time that I reviewed, because I don't know if
21   there was a consistent articulation of it.
22       Q.   Well, hypothetically, Mr. Dudney, if it
23   had been an emergency or a -- if it had been an
24   emergency or an urgent work order, do you

Page 161

1   understanding those require response in either
2   one hour or four hours?
3       A.   Correct.
4       Q.   If it had been one of those, and they
5   had been -- a tech had been dispatched to that
6   particular unit --
7       A.   Yes.
8       Q.   -- but there was no PTE and the
9   resident called back and granted PTE
10  subsequently, in that instance, the -- the tech
11  would not actually start work at the unit, let's
12  say --
13      A.   When they --
14      Q.   -- within the period of time called for
15  by the incentive program, within one or four
16  hours.  It could be longer than that?
17      A.   It could be.  In that instance, what
18  they were supposed to do, as I understand it, is
19  note on the work order that they would have
20  tagged their door indicating that they had been
21  there, and that if they did not PTE at the
22  time -- did not have PTE at the time that they
23  got there.
24      Q.   But if subsequently, they were able to

Page 162

1   actually go back out and visit the unit, let's
2   say in the afternoon after PTE had been granted,
3   and they wrote down the time on the paper work
4   order that they started work and the time that
5   they responded to the work, shouldn't the work
6   order nevertheless be a pass, even though the
7   handwritten time was outside of the time
8   parameters of the incentive fee program?
9       A.   My understanding of the application of
10  the incentive program metrics that are in the
11  PMA is that -- it would -- because they don't
12  have a completion time element, that would be
13  one reason why, that because of the first
14  response to attempt -- if they went and visited
15  within the -- either the one or four-hour
16  window, that criteria then would be met,
17  they responded.  That is, I think, tagging the
18  door is considered a response, and so for that
19  reason, they would pass under that scenario that
20  you just derived or articulated.
21      Q.   Now, Ms. Lopez asks the -- she says in
22  the last -- in the middle paragraph, if you can
23  call it that:  If they would grant PTE to enter
24  the yard or the quarters, instead of remembering

Page 163

1   during the day that they have errands to run, we
2   could resolve this issue.
3       Do you see that?
4       A.   I -- I wasn't following along with you,
5   but I read that piece.  So let me just reread it
6   here real quick.  Oh, I see, if we are
7   granted PTE during the day -- I mean, yeah,
8   I see the -- so yes, I see what she says here.
9       Q.   And so, if there was -- if PTE was
10  granted for an emergency or an urgent work order
11  but PTE was only granted in the afternoon, let's
12  say, and the work order were called in the
13  morning, would that be a pass?
14      A.   If they responded based on the call
15  time, within the -- whenever the parameter was
16  for the priority of the work order, so if they
17  responded, but didn't gain access to it, the
18  first time that -- as I testified to a moment
19  ago, I understand that that response in tagging
20  the door and noting that effectuates a response.
21      Q.   I've changed my hypothetical slightly.
22      A.   Okay.
23      Q.   Suppose that when the call is made,
24  that PTE is granted in the afternoon.

Page 164

1       A.   Oh, I see.
2       Q.   Call is made in the morning, I've got
3   an emergency work order.  PTE is granted in the
4   afternoon.  Under that circumstance, would that
5   be a pass or a fail?
6       A.   Well, I would equate that to an
7   appointment.  I mean, that would be very -- to
8   say that, okay, you can come in, I'll give you
9   PTE starting at 4:00 o'clock.  I understood that
10  Midi Lopez testified pretty directly that
11  appointments were not associated with -- or ever
12  used with urgents or emergencies, so that's the
13  way I interpret your hypothetical, is that that
14  sounds like it's an agreement to meet at a
15  different time which would be then my
16  understanding an appointment, but she
17  testified that she really didn't -- they didn't
18  use appointments for emergencies or -- or
19  urgents.
20      Q.   Did she testify that they never did?
21      A.   It's -- it's pretty direct.  I mean,
22  I read it within the last couple of days.  It's
23  pretty direct.  I don't know that -- without
24  going back, I will let the testimony speak for

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
165–168

Page 165

1  itself, but it was pretty direct if I recall.
2      Whenever you're ready at a good
3  breaking point for lunch, that would be great.
4      MR. DUTTON:  Yeah, we're going to take a
5  break for lunch.
6      THE WITNESS:  Sure.
7      THE VIDEOGRAPHER:  This marks the end of DVD
8  No. 3.  We are off the record at 12:40 p.m.
9          (WHEREUPON, a lunch break was
10           taken.)
11     THE VIDEOGRAPHER:  Here begins DVD No. 4.  We
12  are on the record at 1:34 p.m.
13  BY MR. DUTTON:
14     Q.  Good afternoon, Mr. Dudney.  I think we
15  were on Exhibit 007 and can you turn to the
16  e-mail from Rick Wimer to Midi Lopez dated
17  March 27th, 2006 ending in Bates No -- well,
18  it's AMSCAL06525730.
19     A.  730?
20     Q.  Yeah.
21     A.  From Mr. Wimer to Ms. Lopez, yes.
22     Q.  Dated March 27th?
23     A.  Correct.
24     Q.  5:34 p.m.?

Page 166

1      A.  Yes.
2      Q.  At least that's the time that's on the
3  e-mail.
4      Mr. -- Mr. Wimer instructs Ms. Lopez to
5  please run copies of those in red, I'll be over
6  to review with you, thanks, and then there's an
7  attachment called Book1.xls.  Do you see that?
8      A.  I do.
9      Q.  And Book1.xls sets out the month by
10  month pass/fail percentage for each category of
11  work order for the period January 2005 through
12  January 2006.  Do you see that?
13     A.  This printout appears to do that.  I --
14  I don't know that without going back to the
15  electronic file that I can say Book1.xls only
16  contains this, but what is Bate stamped in the
17  last three numbers with 731, which is the page
18  just following that, that's what it appears to
19  be, although it doesn't label the percentages as
20  such, I believe that those numbers appear to me
21  to be pass/fail type percentages.
22     Q.  And have you seen this document before?
23     A.  Yes.
24     Q.  And can you take a look at the -- the

Page 167

1  next document in order, which is also dated
2  March 27th, 2006, and this one has the month by
3  month attached Excel spreadsheets.  Do you see
4  that?  It has the Bate stamp ending in 8236.
5      A.  Yes, and I'm just looking at what
6  periods it has.  It's got 13 Excel files that
7  appear to be attached to it, although they're
8  not printed out as part of this -- what you
9  handed me, and it looks like it covers all the
10  months of 2005 and then January of 2006.
11     Q.  And do you understand it's the same
12  13 months that are depicted on the prior
13  document which is the -- the pass/fail recap
14  that was attached to the other e-mail from
15  March 27th, 2006?
16     A.  Yeah, I would -- I would infer that it
17  is only -- but just pointing out that while 2006
18  appears to be labeled for January in the
19  previous year does not -- it would seem just
20  given the order in the e-mails that that Jan
21  through December that is on Bate stamp 731 that
22  that would represent 2005 data.
23     Q.  Now, the score, if you will, the recap
24  document which is the simple one-page

Page 168

1  spreadsheet --
2      A.  Yes.
3      Q.  -- for routine work orders the -- the
4  score or the pass/fail percentages -- pass/fail
5  percentage is above 90 every single month except
6  for June which is when it is at 90.  Do you see
7  that?
8      A.  That's not correct.  If you look at
9  March, it's 88 percent, but other than that --
10     Q.  Sorry, 88.
11     A.  I would agree with your statement other
12  than March.
13     Q.  Okay.  And then urgent there are one,
14  two, three -- four months below 90.  Do you see
15  that?
16     A.  Are you including Jan 2006 or not or
17  just -- are you looking at '05?
18     Q.  No, just 2005.
19     A.  There are -- there appear to be four
20  that are below 90 and one at 90.
21     Q.  And then for emergencies, there are
22  one, two, three, four -- five that are below 90,
23  correct?
24     A.  Correct, again excluding just -- just

Page 169

1 looking at the Jan through December portion,
2 that's correct.
3    Q.   Now, do you understand -- or from your
4 review of the documents, do you understand that
5 at Fort Irwin the performance incentive fee was
6 calculated on a month-by-month basis instead of
7 on an annual basis?
8    A.   Yes, I've seen discussion around that
9 concept.
10    Q.   And are you aware that the March 27th
11 scorecard, if you will, or recap in the Excel
12 spreadsheets from March 27, 2006, were the first
13 iteration of the pass/fail report broken down
14 into three categories, emergency, urgent and
15 routine, and broken out on a month-by-month
16 basis that was completed or compiled at -- for
17 the Irwin project?
18    A.   I don't know that I could testify that
19 this was the very first time that it was shown
20 like this or not.
21    Q.   Do you -- would you agree that this is
22 the very first time that the Fort Irwin project
23 had used the pass/fail report for the purposes
24 of scoring its incentive fee?

Page 170

1    A.   My understanding, Mr. Dutton, is that
2 2005 that the data reported for that, that that
3 was -- there was use of the pass/fail report for
4 that year as opposed to, for example, 2004 where
5 I understand it there was data used from Yardi,
6 but through a different report, so I think
7 that -- again, subject to check and thinking
8 about it some more, but my initial reaction to
9 your question is that, yes, I think it's the --
10 I think they are at this point now using -- and
11 there certainly is evidence that there is use of
12 the Yardi system in 2005.
13    Q.   Now, hypothetically, Mr. Dudney, there
14 is a big difference between using a report that
15 reports on the average response time and a
16 report that is a pass/fail report which are the
17 average times that -- or the -- the percentage
18 of work orders to which they responded to on a
19 timely basis?
20    MS. WELCH:   Objection to form.
21    THE WITNESS:   Let me ask to have that one
22 read back, please.
23        (WHEREUPON, the record was read
24         by the reporter as requested.)

Page 171

1    THE WITNESS:   There is a difference to my
2 understanding of the two different iterations of
3 this.
4 BY MR. DUTTON:
5    Q.   So, for example, if I had a thousand
6 emergency work orders during a particular year
7 and I responded to 500 of those work orders in
8 30 minutes and I responded to 500 in 75 minutes,
9 my average response time would be below an hour,
10 correct?
11    A.   Yes.
12    Q.   And I could claim a hundred percent of
13 my incentive fee for that portion of the --
14    A.   Well, I don't think -- if you did it
15 that way and it was acceptable to do it that
16 way, then one could approach it -- if that was
17 an acceptable methodology to do that sort of
18 averaging, then --
19    Q.   And that's how it was calculated for
20 the 2004 incentive period, wasn't it?
21    A.   Yes, it was calculated some average.
22 My only point is I don't know that the PMA
23 describes it in that way is --
24    Q.   I'm not asking you about that.

Page 172

1        My -- if you take those same numbers
2 and apply the pass/fail report and calculate the
3 percentage fee that way as was done in
4 subsequent years, my hypothetical would yield a
5 50 percent pass rate, correct?
6    A.   Yes, it would.
7    Q.   And that could potentially make a large
8 difference in the incentive fee that Pinnacle
9 was entitled to, correct?
10    A.   Yes.
11    Q.   Under the -- under the second option or
12 the -- the -- the pass/fail report, because
13 there's no averaging, every work order counts
14 for itself?
15    MS. WELCH:   Objection to form.
16    THE WITNESS:   There -- as I understand the
17 way it works, it's -- each one is calculated
18 individually and it rolls into the totals that
19 are shown, but yes, every -- every work order
20 counts and is listed on the pass/fail report.
21 BY MR. DUTTON:
22    Q.   Now, assuming that the March 27th
23 scores that are in Exhibit 7 were the first
24 iteration of the pass/fail scores for 2005,

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
173–176

Page 173

1  have -- has AlixPartners calculated the
2  percentage or the dollar amount of increase and
3  incentive fee that Pinnacle would have earned if
4  its pass/fail score had been based on the
5  March 27th, 2006 numbers as opposed to the
6  March -- or sorry, as opposed to the April 6th,
7  2006 numbers?
8     A.  I don't know that -- we may have.  I
9  don't recall one way or the other if we've run a
10  calculation like that.  Not -- one does not come
11  to my mind as I think about it, but it may be
12  that someone on my team ran that.
13     Q.  Well, take a look -- let's see, it's
14  three or four pages later at Bate stamp
15  AMSCAL06542264.  Do you see that?
16     A.  Yes, this is a March -- or March 30th,
17  2006 e-mail?
18     Q.  Yeah, it's the March 30th, 2006 e-mail
19  again forwarding something called a pass/fail
20  recap that has an attachment that's entitled
21  Book1.xls.  Do you see that?
22     A.  Yes.
23     Q.  And attached there you have the same
24  months and essentially the same scores, correct?

Page 174

1     A.  Let me compare.  Unless I missed one,
2  they seem to be identical.
3     Q.  Okay.  And then if you take a look at
4  the next page in the exhibit, the page ending in
5  Bate Stamp No. 2266, do you see that?
6     A.  Yes.
7     Q.  And there is a -- an e-mail and the
8  subject is work order November2005.xls?
9     A.  Yes.
10     Q.  And Ms. Lopez sends that to Mr. Wimer,
11  correct?
12     A.  It is from Ms. Lopez to Mr. Wimer on
13  the 31st of 2006.
14     Q.  And November 2005, that was -- that was
15  the month according to the score sheet on the
16  previous page where the percentage -- the past
17  percentage was 80 for November and 67 -- sorry,
18  80 for urgents -- 80 for emergencies, 67 for
19  urgents for November 2005, right?
20     A.  Yes.
21     Q.  And Ms. Lopez sends Mr. Wimer this
22  update on March 31st, 2006.  She says, here is
23  the update, thank goodness, it took me quite a
24  while, et cetera.  Do you see that?

Page 175

1     A.  I do.
2     Q.  And then she says, I will work on May,
3  June urgent and emergency, March emergency and
4  finally January of 2006 urgent and emergency,
5  and she says, these should not take me as long
6  since I have figured an easy way to do it.  Do
7  you see that?
8     A.  Yes.
9     Q.  And if you just look at the score sheet
10  on the previous page of Exhibit 007, the months
11  that --
12     A.  Is that the one labeled 265 just so I
13  have them in order?
14     Q.  Yes.
15     A.  Okay.
16     Q.  The months that Ms. Lopez identifies or
17  the months where the scores -- May, June urgent
18  and emergency.  In June the scores are 77 for
19  emergencies and 85 for urgents, correct?
20     A.  77 and 85 for emergency and urgent for
21  May of 2005 respectively.
22     Q.  She also says she's going to work on
23  March, but that -- March emergencies, but March
24  emergencies are already at 99 according to this

Page 176

1  score?
2     A.  Yes.
3     Q.  And then on April 1st, 2006, do you see
4  that?
5     A.  I'm sorry.  Are you going to another
6  e-mail?
7     Q.  Yes.
8     A.  Which one is this?
9     Q.  2747 is the Bate stamp numbers.
10     A.  2747.  Okay.
11     Q.  And Ms. Lopez sends her -- sends her
12  data to Jerry Vinson, herself, Ronnie Motley and
13  Wes Campbell?
14     A.  Yes.
15     Q.  For security purposes?
16     A.  Just in case I do not want to lose my
17  data -- yes.
18     Q.  And then finally, on April 6th, 2006,
19  Ms. Lopez sends to Rick Wimer and Wes Campbell
20  which she says is the final time I will send you
21  these and she's sending the pass/fail reports
22  for the 2005 to January 2006 period?
23     THE WITNESS:  I'm sorry.  I just -- I got
24  distracted for a second.  Could you read that

Page 177

1  back please for me?

2      (WHEREUPON, the record was read

3        by the reporter as requested.)

4      THE WITNESS: Yeah, the only -- just to be

5  clear, the e-mail attachments are -- they're

6  more numerous than for -- they include -- in

7  addition to all of 2005 and January of 2006, it

8  appears to include February of 2006 and then

9  also a -- something called pass/fail

10  summary.xls, so there's a couple additional

11  files, but yes, I -- I note that those are

12  attachments to this particular e-mail.

13  BY MR. DUTTON:

14      Q.  And that's the type of information that

15  you reviewed when you were doing your forensic

16  analysis, correct?

17      MS. WELCH:  Objection to, form.

18      THE WITNESS:  Yeah, there were a number of --

19  yes, there were a number of Excel files that

20  were -- were available to us.  I don't know that

21  we had them for every instance that an e-mail

22  said they were there, but we -- we endeavored to

23  review the Excel files that Ms. Lopez was using

24  as part of our review.

Page 178

1  BY MR. DUTTON:

2      Q.  And if you look back at Exhibit 008,

3  which is Exhibit 6 from your report, and that's

4  the comparison of the handwritten work orders?

5      A.  Yes.

6      Q.  To the work order paper copies and --

7  and the annual pass/fail reports and other

8  information, do you see that?

9      A.  I do.

10      Q.  And if you look at the e-mail -- or the

11  work orders that were last updated by Ms.

12  Lopez --

13      A.  Yes.

14      Q.  -- would you agree with me that --

15  well, the largest number of dates on which

16  Ms. Lopez last updated work orders are during

17  the period from March 29th, 2006, through

18  April 5th, 2006?

19      A.  Without doing an actual count, I would

20  agree that it appears -- because if I'm reading

21  the -- if I understand your question, I would on

22  Page 2 of 4 to Exhibit 6 to my Exhibit 001

23  report for purposes of this deposition, but

24  Exhibit 6 inside the report, from Line 76 going

Page 179

1  backward up until Line 45, so said differently,

2  Line 45 to Line 76 I believe all fall within the

3  window in terms of last updated by Ms. Lopez

4  that you pointed to, and that -- just visually

5  that -- the number of last updates are greater

6  than the number of updates that Ms. Lopez has

7  attributed to her -- if you go on to Page 1 of

8  4, so yes.

9      Q.  So out of a total of 44 work orders

10  that were last updated by Ms. Lopez, 31 of them

11  were updated within those five or six days

12  between March 30th -- or March 29th and

13  April 5th, 2006?

14      A.  Correct, they were.

15      Q.  And those were all emergency and urgent

16  work orders, correct?

17      A.  Yes, I believe they are.

18      Q.  Did you ever come across any evidence

19  where Ms. Lopez updated routine work orders in

20  Yardi to -- to change the work order response

21  time for routine work orders?

22      A.  I'd have to look back at the data.

23  I -- there may well be ones where she updated a

24  routine.  They just didn't make the requirements

Page 180

1  that I utilized to include the listing of work

2  orders that I did on my Exhibit 6 since these

3  are all urgents and emergencies.

4      Q.  And you mention in a number of -- or I

5  think you mention in a report that you saw a

6  number of instances where the information that

7  was in Yardi implied that a work order had

8  failed yet the pass/fail report that was used to

9  score Pinnacle's incentive fee was hard-coded so

10  that it would pass.  Do you recall that?

11      A.  There are instances where you see that

12  if you look at the Yardi data, it would show a

13  fail from a calculation perspective, but then it

14  was hard-coded to a pass because there were

15  certain -- well, I -- one, I saw instances of

16  that, yes, and I also understood too that the

17  hard-coding to a pass was a technique that was

18  utilized for different reasons, but one of them

19  was with respect to appointments that might fall

20  outside the accepted window.

21      Q.  And that was something that -- that

22  Pinnacle disclosed to the owner and to the Army

23  at Fort Irwin, correct?

24      A.  With respect to appointments, yes, they

Page 181

1  were aware of that.
2      Q.  With respect to appointments --
3      A.  Mr. Winter was aware of that if I -- as
4  I remember.
5      Q.  And the Army was aware of that too,
6  right?
7      MS. WELCH:  Objection, foundation.
8      THE WITNESS:  Yeah, I -- I don't know that I
9  can say dispositively that they were, but I
10  would -- my assumption would be that they were
11  just because it was known to Mr. Winter and
12  therefore the owner.
13  BY MR. DUTTON:
14      Q.  Now, did you review the 44 examples
15  where Ms. Lopez was the last person to have
16  updated information in Yardi and the work order
17  response time in Yardi and the handwritten tech sheets did not agree with the
18  handwritten tech sheets?
19      A.  Yes.
20      Q.  Did you review all of them?
21      A.  Yes.
22      Q.  Did you notice that on a number of
23  occasions the work orders that were last updated
24  by Ms. Lopez were -- referred to other work

Page 182

1  orders?
2      A.  There are some instances where that
3  occurs.
4      Q.  And did you -- did you pull those and
5  review those also?
6      A.  To the extent that we could identify
7  them.
8      Q.  And did you review the spreadsheets
9  that were attached to these work orders, in
10  particular, the -- the description of the work
11  orders, the emergency and urgent work orders
12  that Ms. Lopez changed?
13      A.  I may be misunderstanding your
14  question, but are you asking me did we review
15  the descriptions included in the Excel
16  spreadsheets --
17      Q.  Yes.
18      A.  -- that were part of the e-mails that
19  you were just walking me through?
20      Q.  Yes.
21      A.  Okay.  Yes, we -- we did review those,
22  and as I said, there were a number of different
23  spreadsheets and we did comparisons of the
24  spreadsheets to what was included in Yardi in an

Page 183

1  effort to understand which of those spreadsheets
2  most closely resembles what was ultimately input
3  into Yardi.
4      Q.  And then on the -- in the description
5  of the -- well, in the description that was
6  pulled out of Yardi and put into Excel for
7  emergency and urgent work orders, did you note
8  that oftentimes the description signifies either
9  an a.m. or a p.m.?
10      A.  There are ones that have sometimes
11  dates and then they have either an a.m. or a
12  p.m. in them, yes.
13      Q.  And did you ask anybody what that
14  meant?
15      A.  I don't know if -- if at the time -- I
16  don't know that I've asked anybody in an
17  interview or one of my team has asked anybody in
18  particular with respect to that.  I don't know
19  that I've had that conversation.
20      Q.  Did you review any depositions to see
21  if the -- if the Clark legal team had asked
22  anybody during depositions what that meant?
23      A.  I don't -- I don't recall.
24      Q.  Did you do any analysis to see whether

Page 184

1  that practice either identifying -- inserting a
2  date in either a a.m. or an p.m. whether that
3  practice was used with respect to routine work
4  orders as opposed to urgents and emergencies?
5      A.  I don't know that I've done a
6  comparison of the breakdown, if you will, or the
7  distribution of that particular demarcation
8  juxtaposing that against priority.
9      Q.  Let me show you what I'll mark as
10  Exhibit 009 -- I think that's right.
11          (WHEREUPON, DUDNEY Deposition
12           Exhibit No. 009 was marked for
13           identification.)
14  BY MR. DUTTON:
15      Q.  Mr. Dudney, I'm handing you what's been
16  marked as Exhibit 009, and Exhibit 009 I believe
17  is a Yardi example that you pulled and that you
18  cite frequently in your report, specifically
19  work order No. 124874.
20      A.  Yes, let me just orient myself.  Give
21  me a second to do that.
22      Q.  Actually, Mr. Dudney, I referred to
23  this one as one of the -- as one of the Trifecta
24  work orders or since we're in Chicago and we did

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
185–188

Page 185

1  just win the Stanley Cup, I'll call them the hat
2  trick of work orders.
3      A.  Okay.
4      Q.  Okay?  So turn to Page 38 of your
5  report.
6      A.  Okay.
7      Q.  And at the bottom of Page 38 in the
8  last bullet, you say, therefore, this work order
9  appears to be an example of, one, the
10  handwritten notes on a paper work order not
11  matching the annual pass/fail report.  Two,
12  Yardi labor data indicates a technician working
13  at two residences at the same time, and, three,
14  Yardi backup data corroborating failing
15  handwritten dates and times listed on a paper
16  work order.  So all three of your analyses apply
17  to this example, right?
18      A.  That's what I've noted here on Page 38.
19      Q.  Now, take a look at Exhibit 009.  Okay?
20      A.  Yes.
21      Q.  Exhibit 009 is the work order
22  information for work order 124874?
23      A.  Yes.
24      Q.  And you can tell from the call date

Page 186

1  that the call came at November 30th, 2005 at
2  3:07 p.m.  Do you see that?
3      A.  Correct.
4      Q.  And the call apparently didn't go
5  through the call service.  Apparently the call
6  went through the leasing office at Fort Irwin.
7  Do you see that?  Because the call was
8  created by K -- the work order was created by
9  K. Hicks?
10      A.  Yes.
11      Q.  Do you know who K. Hicks is?
12      A.  I don't.
13      Q.  I'll represent to you that she's one of
14  the work order staff that works in -- or worked
15  in the leasing office at Fort Irwin.
16      A.  Okay.
17      Q.  And the call came in at 3:07 p.m.  Do
18  you see that?
19      A.  Yes.
20      Q.  On November 30th, 2005?
21      A.  Yes.
22      Q.  And let's -- let's go to the paper work
23  order first.  Do you see --
24      A.  Yes.

Page 187

1      Q.  So the paper work order -- interesting,
2  the paper work order says the status is
3  scheduled, right?
4      A.  Yes.
5      Q.  And the problem description is POC
6  states only toilet is clogged.  Do you see that?
7      A.  Yes.
8      Q.  What does it indicate to you,
9  Mr. Dudney, that the status of this work order
10  is scheduled?
11      A.  That simply that that reflects the
12  status of the -- that someone had selected in
13  Yardi at the time that this was printed out.
14      Q.  And if you look down the left column,
15  you'll see that underneath call time, which is
16  the same as the call time in Yardi, there's a
17  start time.  Do you see that?
18      A.  Yes.
19      Q.  And the start time is for 10:00 a.m.
20  Do you see that?
21      A.  Yes.
22      Q.  And that's before the call time,
23  correct?
24      A.  That's correct.

Page 188

1      Q.  What does that indicate to you,
2  Mr. Dudney?
3      A.  Simply that that's -- well, it's
4  impossible to schedule something prior to a
5  call.
6      Q.  How do you know that it's impossible to
7  schedule something?
8      A.  Because if they haven't called at least
9  per the data, then how would it be scheduled.
10      Q.  Do you know whether it's possible if
11  you received a call, to simply schedule that
12  call for a technician five hours earlier in the
13  Yardi database?
14      A.  Is it -- can one -- are you asking me
15  can one go in and change the data such that or
16  to make it --
17      Q.  I'm not talking about changing the
18  data.
19      A.  Okay.
20      Q.  I'm talking about a call comes in at
21  3:07 in the afternoon.
22      A.  Yes.
23      Q.  I am the dispatcher at Fort Irwin.
24      A.  Oh, I see.  Uh-huh.

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
189–192

Page 189

1    Q.   And I schedule that call for 10:00 a.m.
2    that day.
3    A.   Ah.  You're asking me technically if
4    that's possible?
5    Q.   Yes.
6    A.   I'd have to check.  I believe it is,
7    but I'd have to check if one could actually
8    physically do that or if it prevents you from
9    doing that.
10    Q.   And the finish time that's stated --
11    that's printed below is 10:29 a.m.  Do you see
12    that?
13    A.   That's correct.
14    Q.   What does that indicate to you,
15    Mr. Dudney?
16    A.   That the scheduled labor tab has a
17    10:29 a.m. entry in it.
18    Q.   So -- and in the backup data on the
19    backup tape, where is the scheduled time
20    reflected, Mr. Dudney?
21    A.   Well, I've got one backup tape I think
22    that's printed and I don't have -- in terms of
23    the printout that's provided, I don't have the
24    scheduled portion of the labor tab.  That's only

Page 190

1    showing me the actual, but you can see on the
2    status history, the previous page, that the
3    scheduled is shown at 3:30 and then the work
4    completed shows at 8:45 all on 11-30.
5    Q.   Okay.  And now on the backup tape, is
6    there an entry for appointment time?
7    A.   No.
8    Q.   Well, take a look down at the left-hand
9    column under general information.  Do you see
10    that?
11    A.   Yes, it has p.m. there, but no time.
12    Q.   So there is a -- an entry in the
13    appointment time for p.m., correct?
14    A.   Yes.
15    Q.   And in the description up on the top
16    right-hand column, the date is 11-30, there is a
17    p.m. and then there's PTE, toilet.  Do you see
18    that?
19    A.   Correct.
20    Q.   Do you know what that indicates,
21    Mr. Dudney?
22    A.   That there was permission to enter and
23    that the issue was a toilet.
24    Q.   And when was there permission to enter?

Page 191

1    A.   Well, the okay to enter is checked yes.
2    The access entry notes on the first page of
3    current Yardi say PTE, no pets and then it gives
4    a phone number.
5    Q.   Did you ask what the significance of
6    the p.m. entry was either in the appointment
7    time field or up in the description?
8    A.   We reviewed to the extent that there
9    was discussion about it.  Again, I don't know
10    that I had the opportunity to directly ask
11    anybody about it at the time that I conducted my
12    interviews, but we would have reviewed any
13    description about that in the various
14    depositions to the extent it was provided.
15    Q.   Do you recall what you reviewed?
16    A.   Not as I sit here today.  I'd have to
17    look back at the --
18    Q.   Do you recall anyone for the Clark
19    legal team asking somebody what the significance
20    of the p.m. entry was in the description or in
21    the appointment required?
22    A.   I don't recall one way or the other if
23    they asked that question or not just as I sit
24    here now.

Page 192

1    Q.   Now, are you aware that the Clark legal
2    team has provided your report to the United
3    States Attorney for the Eastern District of
4    Virginia?
5    A.   No.
6    Q.   Did you give them permission to do
7    that?
8    A.   I don't recall having a discussion with
9    them one way or the other about it.
10    Q.   Did you prepare this report knowing
11    that it would be used by the Clark legal team to
12    provide information for -- to the U.S. Attorney
13    for the Eastern District of Virginia?
14    A.   It wasn't something that I recall
15    discussing with the Clark legal team one way or
16    the other so -- excuse me, I -- it was not
17    something that I was asked to do.  I was not
18    asked to prepare a report for the district
19    attorney.  I prepared the report for the reasons
20    that I stated in my -- in my report itself but
21    that's --
22    Q.   Have you responded to any questions
23    from the United States Attorney for the Eastern
24    District of Virginia with respect to your expert

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
193–196

Page 193

1   report?
2   A.   No, I have not been asked any questions
3   with respect to the -- that I understand that
4   were attributable to the U.S. Attorney.
5   Q.   Have you been asked to supply any
6   information to the U.S. Attorney?
7   A.   Not to my knowledge.
8   Q.   In your comparison of backup tapes to
9   current Yardi, from that comparison you're able
10   to identify, are you not, all of the work orders
11   in Yardi where Midi Lopez was the last person to
12   have updated either an emergency or an urgent
13   work order?
14   THE WITNESS:  Let me ask to have that
15   question read back, please.
16   (WHEREUPON, the record was read
17   by the reporter as requested.)
18   THE WITNESS:  Yes, to the extent that she is
19   the last person that recorded her time, I would
20   be able to run an -- an analysis of that data to
21   identify those where Ms. Lopez was the last one
22   to update.
23   BY MR. DUTTON:
24   Q.   And during your review in comparison of

Page 194

1   the backup tape to current -- the current Yardi
2   database for Fort Irwin, have you noticed the
3   number of occasions where the only update that
4   Ms. Lopez made to an urgent or an emergency work
5   order was including the date and either a.m. or
6   p.m. in the problem description area?
7   THE WITNESS:  Let me just ask to have that
8   read back to make sure I understand the
9   question.
10   (WHEREUPON, the record was read
11   by the reporter as requested.)
12   THE WITNESS:  I don't know that I've run a
13   separate analysis to identify just those entries
14   that have that characteristic.
15   BY MR. DUTTON:
16   Q.   Have you noticed any where the only
17   thing Ms. Lopez did was in the description added
18   the date and either a.m. or p.m. next to the
19   date like the example that I've just provided
20   you in Exhibit --
21   A.   Well, I don't think that's accurate for
22   the --
23   Q.   I'm not saying that this exhibit made
24   that change.  I'm saying that there are a number

Page 195

1   of occasions where the only change that
2   Ms. Lopez made was to add the letters that
3   the -- the date and a.m. or p.m. in the
4   description field.  Have you noticed any of
5   those?
6   A.   My best recollection, Mr. Dutton, is
7   that, yes, there are some of those that exist.
8   I'd have to go back and check.  My only point
9   was this example that you have in front of me
10   now is not an example of that because the actual
11   current Yardi has actual times which are 3:15 to
12   3:40 p.m. on 11-30 and that's different.
13   Q.   I agree with you.
14   A.   Okay.  Yeah.
15   Q.   Okay.  So -- so let's assume that the
16   backup tape just didn't have the 11:30 p.m.
17   electrical fixtures in -- or whatever the
18   description is.
19   A.   This is a toilet issue.
20   Q.   Right.  So let's assume that it just
21   said toilet issue or toilet clogged.
22   A.   Yes.
23   Q.   Have you seen situations where
24   Ms. Lopez updated Yardi by simply putting the

Page 196

1   date in either a.m. or p.m. in the description
2   field?
3   A.   There may well be.  I just -- I haven't
4   run a separate analysis to try and quantify the
5   number of times that that happened as opposed to
6   others.  There's obviously a lot of changes that
7   can happen from the backup tape to current
8   Yardi, that being just one.
9   Q.   Have you asked yourself why would
10   Ms. Lopez bother to go into the Yardi database
11   and update the description field that way,
12   Mr. Dudney?
13   A.   I have looked in general at all kinds
14   of updates that were made particularly as it
15   relates to impacting the -- to the extent that
16   these changes would impact the pass/fail
17   report so --
18   Q.   Well, that change wouldn't impact the
19   pass/fail report, would it?
20   A.   No, that description would not.  The
21   change in the actual times would, though, that
22   I pointed out.
23   Q.   Why would -- why would Ms. Lopez change
24   the description field to add the date and either

Page 197

1  a.m. or p.m.?
2      A.  I don't know that I can testify as to
3  what reason she might have had to do that.
4      Q.  You haven't asked her?
5      A.  I haven't.  I have not asked her that.
6      Q.  You haven't asked counsel to ask her?
7      A.  I don't know that I can testify to that
8  because we've asked counsel a lot of questions
9  around the -- the work orders.  I don't remember
10  having a specific conversation around that
11  particular data point, but it may be that --
12      Q.  You're not aware that counsel has asked
13  for --
14      A.  I'm not as I sit here today without
15  going back and looking at the record that I can
16  be a hundred percent certain on that.
17      Q.  Were you asked to assemble a group of
18  work orders where Ms. Lopez was the last person
19  to have updated either an emergency or urgent
20  work order for the 2005 incentive fee period?
21      A.  It wasn't asked of me that way, no, I
22  was -- and the ask was much more broad in terms
23  of -- meaning that I was given leave to conduct
24  the data analysis in whatever method and way

Page 198

1  I thought was appropriate in light of what
2  I knew.  Obviously the results of my work order
3  analysis identified certain work orders that are
4  enumerated on Exhibit 6 and I believe Exhibit 5
5  to what you've marked as Exhibit 001, and from
6  that you can see a certain number that were
7  Ms. Lopez but that fell out of that review, but
8  primarily the criteria that I was using was to
9  identify situations where the work order data
10  had written information that would -- that was
11  inconsistent with what was reported in current
12  Yardi, if you will, and that as in this case it
13  looked like originally the proper work order
14  time was input and then response time and then
15  it was subsequently changed which would have an
16  impact on the pass/fail report.
17      Q.  Mr. Dudney, did you put together Lopez
18  Exhibit 41 for her deposition?
19      A.  I'd have to see what that looks like if
20  you'd like to show that to me.  I don't remember
21  that one off the top of my head.
22      Q.  I'm going to show you, Mr. Dudney, what
23  I've marked as Exhibit -- I think is
24  Exhibit 010.

Page 199

1      A.  My last one is 009, so yeah.
2          (WHEREUPON, DUDNEY Deposition
3          Exhibit No. 010 was marked for
4          identification.)
5  BY MR. DUTTON:
6      Q.  Exhibit 010 is a work order example
7  again from your report for work order
8  No. 124395.  Do you see that?
9      A.  I do.  Let me just get to that page
10  where it's referenced.
11      Q.  And Exhibit 124395 appears in Table 11
12  at Page 39.
13      A.  You said exhibit and I think you meant
14  to say work order number?
15      Q.  Okay.  Work order 124395 which I've
16  marked as Exhibit 010 --
17      A.  Yes.
18      Q.  -- appears on Table 11, Page 39 of your
19  report.
20      A.  Correct.
21      Q.  But it's not a work order that has a
22  hat trick because there's no Yardi backup data
23  for it, right?
24      A.  There appears to be -- I don't have it

Page 200

1  as part of what you handed me here, and
2  I presume this is the complete what I'll call
3  packet and we produced packets for each of the
4  work orders that were contained in Exhibits 5
5  and 6 so --
6      Q.  I believe it is.
7      A.  Okay.
8      Q.  And you don't say it is an example of
9  all three of your analyses.  You only -- you
10  only say that for -- for 124874, but for some
11  reason it's on -- it makes Table 11 -- can
12  you -- can you figure out why you include it in
13  Table 11, Mr. Dudney?
14      A.  Let me just read the context of the
15  table.
16      Q.  And let me say now that I see
17  Footnote 1 of Table 11 --
18      A.  Yes.
19      Q.  -- there's a discrepancy between work
20  order 124874 which you -- which you write up.
21      A.  Yes.
22      Q.  The footnote in table -- footnote in
23  Table 11 seems to suggest that there is a Yardi
24  backup, so we'll leave that one subject to

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
201–204

Page 201

1  check, but I wasn't able to find it so --
2      A.  Okay.  Let me just read the --
3      Q.  And it's not in the text of your
4  report.
5      A.  Let me just read this.  Okay.  And I'm
6  sorry.  Your question -- I was just refreshing
7  myself with respect to Table 11.
8      Q.  My question is does work order 124395
9  belong in Table 11?
10     A.  Yes.
11     Q.  Why?
12     A.  Because if you look at Table 11, what
13  you'll see is it -- what it does is it has three
14  groupings of rows, each grouping being two rows
15  each and you can see that it compares the two
16  work orders that you've identified as -- or put
17  in front of me as Dudney Exhibit 009 and then
18  Dudney Exhibit 010.  It actually orders them in
19  the reverse of how you gave them to me, but what
20  you show is -- what it shows is that based on
21  the Yardi system labor tab in the annual
22  pass/fail report, the same technician was at two
23  different locations at the same time, so -- on
24  the same day.

Page 202

1      So if you look at the very -- the third
2  of the three columns -- or I'm sorry, of rows,
3  you'll see that once the update was done by
4  Ms. Lopez, what happened was that the Yardi data
5  showed that Mr. Stevenson, the technician, was
6  at two different locations, one was ANZI2428 and
7  the other was ANZI2412 at the same time.
8      Q.  Okay.
9      A.  That's what that shows.
10     Q.  Now, are you familiar with how
11  emergency work orders were staffed at Fort
12  Irwin?
13     A.  Generally speaking.
14     Q.  Let's -- let's refer back to
15  Exhibit 009, can we?
16     A.  Okay.
17     Q.  Exhibit 009 is an urgent work order,
18  correct?
19     A.  Yes.
20     Q.  And Exhibit 009 is called in at 3:07 in
21  the afternoon, right?
22     A.  Yes.
23     Q.  And Exhibit 010 is a routine work
24  order, correct?

Page 203

1      A.  Correct.
2      Q.  And it was scheduled for the 30th,
3  correct, the following day?
4      A.  Yes.
5      Q.  And according to the -- according to
6  the handwritten notes for the routine work order
7  on Exhibit 010, Mr. Stevenson, who was the tech
8  that was assigned to both of these, was at the
9  work order doing the work order that's been
10  marked as Exhibit 010, correct?
11     A.  He indicates that he was doing that
12  between 3:00 and 3:45 on November the 30th
13  replacing two balusters.
14     Q.  Okay.  And do you see the -- for
15  routine work orders, do you see how -- do you
16  see in the description field in the appointment
17  required field, how an appointment has been
18  identified for this work order?
19     A.  There's just something that says --
20  it's the same sort of entry that we saw before
21  which it says appointment required and it just
22  has the entry p.m., but what I note is it
23  doesn't have the star star designation which is
24  what Ms. Lopez testified to as I understand it

Page 204

1  was a designation for appointments which were
2  used when routines needed to have an appointment
3  in that -- in that, as I understand it, that
4  wasn't used for urgents and emergencies.
5      Q.  Did she say when she started using that
6  star star nomenclature?
7      A.  I'd have to look back to -- to
8  associate a date with it.
9      Q.  Did she say that -- Ms. Lopez say that
10  the work order clerks who took the orders were
11  always consistent with that nomenclature?
12     A.  I'd have to look back at her testimony
13  on that.
14     Q.  Have you seen a number of updates to
15  Yardi, Mr. Dudney, where Ms. Lopez is simply
16  inserting a star star next to the description in
17  the description field of Yardi?
18     A.  She -- she does use that -- that
19  nomenclature, so I have seen that nomenclature
20  used before.
21     Q.  Okay.  Are you aware that routine work
22  orders are scheduled during the day and then if
23  emergency work orders are called in during the
24  day, Ms. Lopez will call a tech at a nearby home

Page 205

1  and ask the tech to go handle the emergency?
2      A.  I've heard of the concept before
3  certainly that that has occurred, that there --
4  there are declarants who talk about that
5  concept.
6      Q.  Would you agree with me that this is an
7  example of an emergency work order coming in
8  during the day at the same time that tech --
9  Mr. Stevenson is at a home performing a routine
10  work order?
11      A.  The 3:07 does come in the middle of the
12  3:00 to 3:45 window that he says that he was at
13  this particular -- the location denoted in
14  Dudney Exhibit 010.
15      Q.  And you recall, don't you, that
16  Mr. Stevens is scheduled to do the 3:05 -- or
17  sorry, scheduled to do the -- sorry, scheduled
18  to do the urgent work order five hours earlier
19  than he could have because the call came in at
20  3:07 and the scheduled time is 10:00 a.m.?
21      A.  Again, I don't have the -- well, I have
22  in current Yardi the scheduled time.  I don't
23  have it for the backup in the printout what the
24  scheduled time is there other than it shows in

Page 206

1  the status history which doesn't comport in
2  terms of the scheduled time to what's included
3  on -- in the current Yardi where I do have it in
4  the printout you gave me and so it's scheduled
5  here for 10 to 10 -- 10:00 a.m. to 10:29 which
6  is what's reflected in the paper work order.
7      Q.  Now, Mr. Dudney, how do you think that
8  Mr. Stevenson got a paper work order if he was
9  out in the field performing -- replacing
10  ballasts at Mr. Cantu's residence?  How would he
11  get the paper work order to go to Mr. Riley's
12  residence to unclog the toilet?
13      A.  There could be a number of ways he
14  could get it.
15      Q.  How do you understand things worked at
16  Fort Irwin?
17      A.  Well, I understand that there were
18  times where the -- the technicians received
19  paper work orders from the folks that were
20  printing those out and that they were given some
21  in the beginning of the day.  If I recall
22  correctly, there were other instances where they
23  got them later.  There were also instances where
24  they were called so --

Page 207

1      Q.  So you don't know?
2      A.  No, I think it worked different ways.
3  I don't think it worked only one way.
4      Q.  Exhibit 009 was called in at 3:07 p.m.
5  Can we agree on that?
6      A.  Yes, that's what the data shows me.
7      Q.  And if Mr. Stevenson's schedule is
8  right, he is out at Mr. Cantu's home replacing
9  two ballasts at that time, correct?
10      A.  Correct.
11      Q.  There is a paper work order associated
12  with Exhibit 009, correct?
13      A.  Yes.
14      Q.  How did Mr. -- how did Mr. Stevenson
15  get that paper work order?
16      A.  You can't tell from the face of the
17  document itself.
18      Q.  Is that important to you to know?
19      A.  It's just -- of course I'd like to know
20  as much as I can about any situation but the --
21  the work order doesn't tell you -- or the
22  handwriting and the other designations don't
23  tell you how he physically got the sheet that he
24  ultimately had when he then wrote on it here as

Page 208

1  he has --
2      Q.  Would a call to a resident be a
3  response to an emergency or an urgent work
4  order?
5      A.  I don't think just a call.  If
6  I remember correctly in terms of the criteria, I
7  think that it has to be a -- more than just a
8  call.
9      Q.  Didn't Mr. Milligan's e-mail to
10  Mr. Winters say a response could be anything
11  from calling a vendor to going out and doing the
12  work at the resident's house?
13      A.  Well, but that's -- right, that's
14  calling a vendor versus going out and doing the
15  work at the resident's house.  That's different
16  than a call to the resident.
17      Q.  How about a call to the resident to
18  say, you know, I'll come over and fix your
19  toilet and the resident says, I'm not there, why
20  don't you wait until tonight?
21      A.  If it is, then that would -- something
22  I would expect to see noted in some way that
23  there was a call or something in the notes and
24  there isn't anything like that here.

Page 209

1    Q.   Now, the only thing that there is is
2  the unusual situation that the scheduled time is
3  five hours earlier than the call time on
4  Exhibit 009, right?
5    A.   Yes.
6    Q.   And both -- both of these work orders
7  have the date and p.m. in the description field,
8  right?
9    A.   Yes, they do.
10   Q.   And both of these work orders say that
11 an appointment is required in the p.m., correct?
12   A.   They both have that designation on the
13 current Yardi, and for the one that I have the
14 backup tape, it also has that similar
15 designation.
16   Q.   And a lot of the examples out of the
17 140 -- sorry, out of the 115 that you have for
18 Fort Irwin are like this, aren't they?
19   A.   When you say "like this," what
20 characteristic are you pointing to?
21   Q.   A routine work order where the call
22 comes in during the middle of a tech's
23 performance, a routine work order.
24   A.   Well, none of the ones that I have for

Page 210

1  these are routines.  They're all -- well,
2  I should say this:  For Midi Lopez they're all
3  emergencies and urgents.  I can look more
4  broadly.  There are very few routines for the
5  100 and, whatever it is, 15 or 20 that relate to
6  Irwin.  It's not until you get to Moffett that
7  you see, excuse me, more routines.  In fact,
8  I've only got one routine that I've noted I
9  think of just a quick scan of these pages.
10   Q.   Did Mr. Milligan's e-mail to
11 Mr. Winters describing what constitutes a pass
12 under the work order system at Fort Irwin
13 indicate that appointments were only made for
14 routine work orders?
15   A.   Oh, does e-mail -- I'd have to look
16 back at the e-mail to see if it has that.  I --
17 I recall more directly Ms. Lopez's testimony on
18 the issue.
19   Q.   Let me show you what I'll mark as
20 Exhibit 011.  Do you see that?
21   A.   Yeah.
22       (WHEREUPON, DUDNEY Deposition
23        Exhibit No. 011 was marked for
24        identification.)

Page 211

1    THE WITNESS:  And whenever you get to a
2  stopping point, just since we've been going an
3  hour, I want to stretch my legs at some point.
4  BY MR. DUTTON:
5    Q.   Can you tell me what Exhibit 011 is,
6  Mr. Dudney?
7    A.   It is -- let me just flip to my version
8  of it.  Exhibit 7 which you've marked as
9  Deposition Exhibit 011, but it's Exhibit 7 to my
10 March 27th, 2015 report, which has been marked
11 as Exhibit 001 in this deposition, is a copy,
12 double-sided, of what I would call the labor
13 analysis with respect to Monterey and I'm just
14 flipping to see if it's complete here.
15   Q.   Well, at the bottom it says 1 of 32.
16   A.   Yeah, I'm just making sure that each of
17 the pages is here.
18   Q.   I'll represent to you that it's all 32
19 pages, Mr. Dudney.
20   A.   I have -- I would agree with that.  I
21 have just confirmed it real quick.
22   Q.   Now, my understanding from your
23 description of compiling this exhibit is that
24 you analyze work order data at Monterey that

Page 212

1  contained both a technician name and data
2  populated in the actual start and finish time,
3  correct?
4    THE WITNESS:  Let me ask to have that
5  question back read back, please.
6        (WHEREUPON, the record was read
7         by the reporter as requested.)
8    THE WITNESS:  I think that's correct.
9  BY MR. DUTTON:
10   Q.   So you think it is correct?
11   A.   Yes.
12   Q.   And based on this review, you
13 identified a -- a number of instances at the
14 Monterey project where the Yardi listed the same
15 technician as working on two different homes at
16 the same time?
17   A.   Yes.
18   Q.   And you state that it's your
19 understanding that there may be explanations for
20 certain of these data anomalies.  Do you see
21 that?
22   A.   Yes.
23   Q.   What explanations are there?
24   A.   There can be instances where, for

Page 213

1  example, if a -- if a work -- the work to
2  complete a job might have been left open, if,
3  for example, someone was called away from one
4  job site or work order site to a second site and
5  if they -- if the technician kept, if you will,
6  the clock running on site No. 1 and then went to
7  site No. 2, did the work and then came back to
8  site No. 1, if there's an extended, you know,
9  period of time like that, so that would be an
10  example of an anomaly that I controlled for for
11  purposes of identifying the items here.
12      Q.  That's one anomaly.  Can you think of
13  any others?
14      A.  Yes, there's what I would call --
15  I would call it the multiple -- large sets of
16  work orders.  There are some instances where
17  there are numerous work orders that are
18  overlapping for the same technician and it's
19  more than just the straight -- more
20  straightforward ones that I've included here on
21  Exhibit 011, whereby it was unclear to me as
22  I reviewed the work order data what -- what
23  conclusion one could draw from that, so
24  I excluded those because of the nature of the

Page 214

1  multiple work orders that surrounded those.  So
2  I controlled for those by again removing those
3  from the population that I considered for
4  purposes of this overlap analysis.
5      Q.  What others?
6      A.  I also looked at instances where the
7  overlap was, if I remember correctly, there's
8  a -- I have a schedule, by the way, that it's
9  not an exhibit, but it's a work paper that lays
10  out each and every one of these, but I will tell
11  you that if the overlap I --
12      Q.  Can you cite it to me so I can find it?
13      A.  I can describe it to you.
14      Q.  Have you produced it?
15      A.  Yes, we have.  There's one for
16  Monterey.  There's one for --
17      Q.  Is there a Bates number or some way to
18  identify it other than going through all of the
19  documents that you've produced?
20      A.  It's Bates numbered.  I don't have the
21  number memorized.  It's a portrait document that
22  lays out from top to bottom what the reductions
23  are, if you will, in the population, but --
24  another one was for overlaps that were for

Page 215

1  15 minutes or less, I believe.  I excluded those
2  primarily because of just the way that Yardi
3  defaults to various time increments unless you
4  manually go in and change it and so I looked for
5  circumstances like that.
6          Then I also controlled for and removed
7  things that I'll call the AB units, meaning that
8  if it was the same address but an A unit and a
9  B unit or a C unit where it seemed as if based
10  on the property description that the units were
11  in very close physical proximity, I excluded
12  those as well.
13          I also excluded situations where the
14  tenant name appeared to be the same even if the
15  address information was different.  There was
16  circumstances like that, so I excluded those as
17  well and obviously I -- I only -- I had excluded
18  from the population also things that were, you
19  know, not completed, et cetera, and so I had --
20  they had to first meet the criteria of having
21  the information that would allow me to make the
22  comparison that I have in Exhibit 011.  So those
23  are some of the primary ones that I did.  There
24  are a couple of other adjustments that are

Page 216

1  listed on this work paper, but those are some of
2  the primary ones that I did.
3      Q.  And after all those adjustments at
4  Monterey, you have a total of 1,025 pairs of
5  work orders, right?
6      A.  Correct.
7      Q.  Take a look at the last one on Page 32
8  of 32, row 125 -- or rows 1025.  Do you see
9  that?
10      A.  Yes.
11      Q.  And do you know whether these are
12  emergency work orders or are routine work
13  orders?
14      A.  I don't have that listed here.  I'd
15  have to pull up the specific work order to tell
16  you the priority of the work order.
17      Q.  So the unit that's listed in the first
18  row 1025 is OK10104.  Do you see that?
19      A.  Correct.
20      Q.  Do you know where that is?
21      A.  I don't off the top of my head, no.
22      Q.  And the second one, which is two days
23  earlier, is OK10163.  Do you see that?
24      A.  Yes.

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
217–220

Page 217

1    Q.   Do you know where those units are in
2  proximity to each other at Fort -- sorry, at
3  Monterey?
4    A.   I -- I don't have them on a map or
5  something, so no, I don't know the -- I haven't
6  been to those particular units.
7    Q.   Now, you have the last updated date,
8  correct?
9    A.   Yes.
10   Q.   And you have the -- the labor employee,
11  correct, Mr. Perez?
12   A.   Yes.
13   Q.   And for the first 1025 the actual start
14  time date in Yardi is 4:00 p.m., right?
15   A.   Correct.
16   Q.   And for the second 1025 the actual
17  start date/time is 4:41 p.m.  Do you see that?
18   A.   Correct.
19   Q.   So that's 41 minutes after -- the
20  response time 41 minutes after the response
21  time for the other one?
22   A.   Correct.
23   Q.   And the reason that this example is
24  here is because the finish time is the same?

Page 218

1    A.   No, it's because they overlap for more
2  than 15 minutes at two different units on the
3  same day.
4    Q.   But there's 41 minutes where they don't
5  overlap?
6    A.   That's correct.
7    Q.   Okay.  And the criteria on which
8  Pinnacle's incentive fee was measured, it wasn't
9  measured as of January 2011, but it was measured
10  was response time, correct?
11   A.   The last part of your question I would
12  agree to.  I didn't get the first part on what
13  it wasn't measured by.  I wasn't following that.
14   Q.   Well, you're aware that changes were
15  made to Pinnacle's incentive plan, correct?
16   A.   Yes.
17   Q.   And those changes purportedly took
18  place for the year beginning January 2010 at
19  Monterey, correct?
20   A.   I think that's right.
21   Q.   And Mr. Merrill and Mr. Perez worked at
22  Monterey, correct?
23   A.   Yes.
24   Q.   And this work order is dated

Page 219

1  January 2011, correct?
2    A.   Yes.
3    Q.   So this would be after those changes
4  took place, right?
5    A.   I believe that's correct.
6    Q.   Okay.  So the response time which is
7  the date and time that counted under the
8  original incentive fee plan is 41 minutes
9  different, correct?
10   A.   Yes, it is, still shows same guy at two
11  different places for 19 minutes, but yeah, the
12  first part doesn't overlap.
13   Q.   Okay.
14   A.   The first 41 minutes.
15   Q.   So that's how you put this together,
16  examples like this would be examples where the
17  same guy is in two different places at the same
18  time?
19   A.   If you look at -- I mean, look at the
20  one above it, the same -- same situation --
21   Q.   What do you think is more realistic,
22  that the guy was actually in two places at the
23  same time or that the finish time, the time that
24  didn't count on Pinnacle's incentive fee plan,

Page 220

1  was carelessly entered?
2    A.   Well, I -- what I can say is that
3  definitively a person can't be in two physical
4  places at one time.  As to how it was entered, I
5  can only say what the result of how the data was
6  entered shows which is 1,025 pairs at Monterey
7  over a long period of time where two people --
8  one person is at two different places at the
9  same time in light of the criteria that I used.
10   Q.   Mr. Dudney, I thought that you were
11  doing this analysis to show corroboration of
12  people changing response times falsely in Yardi.
13   A.   There were I believe -- there were also
14  again allegations with respect to some of the
15  changes that took place that led to occurrences
16  where two people would be at the same place at
17  the same time which obviously was an
18  impossibility, and so there were statements in
19  that regard and so I just had heard about that,
20  and so one of the things I did was look at both
21  Monterey and Irwin to see if that phenomena
22  occurred and that's what generated --
23   Q.   I'm sorry.  The -- the time that
24  mattered for Pinnacle's incentive fee was what

Page 221

1   time?
2       A.   Which location are you talking about?
3       Q.   Both locations, Mr. Dudney.
4       A.   It's -- it's the response time.
5       Q.   Right.  And it's always been the
6   response time for those two locations, right?
7       A.   Yes, to my understanding.
8       Q.   No other time matters, correct?
9   MS. WELCH:  Objection to form.
10      THE WITNESS:  I believe that's correct.
11  BY MR. DUTTON:
12      Q.   So as far as Pinnacle's incentive fee,
13  if you wanted to change data in Yardi to
14  increase Pinnacle's incentive fee, you could
15  change the response time, correct?
16      A.   If you changed the response time to
17  make something a fail to a pass, you could
18  influence it that way if it was done correctly.
19      Q.   Changing the actual time or the finish
20  time wouldn't make any difference, correct?
21      A.   That's correct.  It's only the response
22  time that matters for purposes of the incentive
23  fee as I understand it.
24      Q.   It could be very well accurate that

Page 222

1   work -- the first work order in row 1025 was
2   responded to at 4:00 p.m. on January 10th, 2011,
3   right?
4       A.   I'm sorry.  You're talking about work
5   order No. 1388700?
6       Q.   Yes.
7       A.   And I'm sorry.  The question again was?
8       Q.   It could be entirely correct that that
9   work order was responded to by Mr. Perez at
10  4:00 p.m. on January 10th, 2011?
11      A.   Could be.
12      Q.   And 41 minutes later, he could have
13  responded to work order 1387880 at a -- at a
14  nearby home on the same day, correct?
15      A.   You're asking me if it's possible?
16      Q.   Yes.
17      A.   Sure, it's possible.  It's not what's
18  recorded in Yardi, but it's possible.
19      Q.   Well, it is what's recorded in Yardi,
20  isn't it, that he responded to the first work
21  order at 4:00 p.m. and he responded to the
22  second one at 4:41 p.m.?
23      A.   While he was still at the first unit
24  and reported that he was there until

Page 223

1   5:00 o'clock per Yardi.
2       Q.   What he says is he responded to both of
3   those, and that's the --- that's the date and
4   time that matters as far as the incentive fee is
5   concerned, right, Mr. Dudney?
6       A.   I would agree that the response time is
7   what drives the incentive fee.
8       Q.   And that's what Pinnacle employees are
9   alleged to have done, right, changed data in
10  Yardi to increase Pinnacle's incentive fee?
11      A.   Well, it's what some of them have said
12  they have done and then there are also
13  allegations --
14      Q.   And that's what you were attempting to
15  see what was corroborated, right?
16      A.   Those were the general set of
17  allegations that I was looking at.
18          Is now a good time for a break?
19      MR. DUTTON:  Sure.
20      THE WITNESS:  Thanks.
21      THE VIDEOGRAPHER:  This is the end of DVD
22  No. 4.  We are off the record at 2:50 p.m.
23          (WHEREUPON, a short break was
24          taken.)

Page 224

1           (WHEREUPON, DUDNEY Deposition
2           Exhibit No. 012 was marked for
3           identification.)
4       THE VIDEOGRAPHER:  Here begins DVD No. 5.  We
5   are on the record at 3:00 p.m.
6   BY MR. DUTTON:
7       Q.   I'm handing you, Mr. Dudney, what's
8   been marked as Exhibit 012.  Exhibit 012 is a
9   complete version of Exhibit 8 from your report,
10  all 19 pages are reproduced.
11      A.   Yes, I see all 19 pages, and it appears
12  to be Exhibit 8 which is being marked as Dudney
13  Exhibit 012 to Dudney Deposition Exhibit
14  No. 001.
15      Q.   I hope that clarified things.  I'm not
16  sure that it did.
17      A.   It may not have.
18      Q.   Well, Deposition Exhibit 012 is
19  essentially the same type of analysis that we
20  just looked at in Deposition Exhibit 011 except
21  it is for Irwin, Moffett and Parks, correct?
22      A.   Yes.
23      Q.   And in this exhibit, you analyze
24  602 pairs of work orders, correct?

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 59 of 90

LOUIS DUDNEY                                          June 16, 2015
MONTEREY BAY vs. PINNACLE                              225–228

Page 225

1     A.  Yes.
2     Q.  And I want to ask you just about a few
3  of them, Mr. Dudney.
4     A.  Okay.
5     Q.  Take a look at the rows that are marked
6  as rows 10.  There are two of them.  Do you see
7  that?
8     A.  Yes, with --
9     Q.  Work orders 1529280?
10    A.  Yes.
11    Q.  And 1529431.  Do you see those?
12    A.  Yes, I do.
13    Q.  The first work order that -- based on
14  call date is work order 1529280, right?
15    A.  Correct.
16    Q.  And that came in on October 31st at
17  8:00 a.m., correct?
18    A.  Yes.
19    Q.  And the actual start time and date for
20  that work order is 10:09 a.m.  Do you see that?
21    A.  I think it says 11:09.
22    Q.  11:09, sorry.
23    A.  Yes.
24    Q.  And the next work order or its pair,

Page 226

1  the call time for that is 11:27 a.m.
2     A.  Yes.
3     Q.  And according to that work order, the
4  actual start time was 11:25 a.m. which is two
5  minutes earlier.  Do you see that?
6     A.  Yes.
7     Q.  You're not going to quibble about two
8  minutes, are you?
9     A.  I don't make an observation with
10  respect to two minutes one way or the other.
11    Q.  Okay.  But the second work order starts
12  approximately 15 minutes after the first one
13  starts, right?
14    A.  Approximately.
15    Q.  And finishes approximately 23 minutes
16  before the second one ends, right?
17    A.  Yes.
18    Q.  Now, it's entirely possible, is it not,
19  that Mr. Arias who was out performing the first
20  work order got a call from wherever that he
21  needed to stop what he was doing and go over and
22  do a second work order that was a higher
23  priority work order, correct?
24    A.  Is it possible?  Yes, it's possible.

Page 227

1     Q.  And he could have completed that work
2  order and then gone back and completed the
3  second work order all within the time parameters
4  that are on Exhibit -- Deposition Exhibit 012?
5     A.  I can't -- without looking back at more
6  detail to respond to your question, I can't
7  answer any more other than it is possible, but I
8  don't know without looking at a map, you know,
9  the proximity of the two units and/or the nature
10  of the problem to see if, in fact, it could be
11  done.
12    Q.  Well, take a look at the example in
13  rows 13.  Do you see that?
14    A.  One second.  Let me mark those.  Okay.
15    Q.  So the first example for Exhibit 13 is
16  a work order that was called in at 5:34 a.m. --
17    A.  Yes.
18    Q.  -- on July 3rd, 2006.  Do you see that?
19    A.  Correct.
20    Q.  And does the fact that it was called in
21  at 5:34 a.m. on July 3rd, 2006, indicate to you
22  that it's either an urgent or an emergency?
23    A.  No.
24    Q.  No?

Page 228

1     A.  I mean, it might be, but that -- just a
2  sheer call time itself doesn't necessarily tell
3  me that.
4     Q.  The work order is scheduled at -- or
5  the work order is actually started at 8:00 a.m.?
6     A.  Correct.
7     Q.  And is completed at 9:30 a.m.?
8     A.  Correct.
9     Q.  And then the second work order, that
10  call came in at 6-29 -- on 6-29-06 and the
11  actual start time for that work order is
12  8:50 a.m. which is approximately 50 minutes
13  after the first work order, right?
14    A.  Correct.
15    Q.  And the second work order, work order
16  198510 is completed according to this document
17  at 9:10 a.m.?
18    A.  Correct.
19    Q.  Which is 20 minutes before the prior
20  work order was completed at 9:30 a.m.?
21    A.  Correct.
22    Q.  So again, this is actually the reverse
23  situation where apparently there's a more urgent
24  work order that is scheduled first, that work

Page 229

1  order is interrupted and then the scheduled work
2  order is performed and then the tech could have
3  gone back and completed the first work order
4  that was started earlier, correct?
5      A.  I wouldn't agree with that.  I don't
6  think that -- unless we look at the actual work
7  order documents or Yardi itself, you can't tell
8  just based on the data that's on the face of
9  this exhibit the -- I don't believe I've got the
10  priority here, so I don't know that we can
11  conclude dispositively that just because it came
12  in at 5:34 a.m. that that necessarily means that
13  it was a higher priority work order and nor can
14  you conclude the opposite which is just because
15  the -- the one that was called in -- the second
16  of the pair that was called in at 11:56 a.m. and
17  it was conducted per Yardi or was completed as
18  of 7-3, that that necessarily meant that it was
19  not a more urgent one.
20      Q.  Well, have you dug down into those work
21  orders, Mr. Dudney, to look at them and see
22  whether that's -- whether this is a possible
23  scenario?
24      A.  I've looked at data related to all

Page 230

1  these.  I've just -- I've only included the data
2  that I've got here, so I just can't recall the
3  specifics of individual work orders without
4  pulling it up in Yardi.
5      Q.  You know, now, both of these were last
6  updated by Midi Lopez.  One of them was updated
7  in July of 2006.  The second one which is --
8  which two days after it --
9      A.  Correct.
10      Q.  -- was responded to?
11      A.  Yes.
12      Q.  And the second one was updated in March
13  of 2007.  Do you see that?
14      A.  Yes, March 13th of 2007.
15      Q.  Have you looked at the update to see
16  exactly what data was changed?
17      A.  I believe that we have.  I just --
18  again, as I sit here today, I can't recall the
19  specific of individual work orders like that.
20      Q.  Okay.  Take a look at row 22,
21  Mr. Dudney -- or should I say rows 22 and
22  these -- these calls both came in on
23  September 29th, 2005.  Do you see that?
24      A.  Yes.

Page 231

1      Q.  And they were both last updated on
2  September 30th, 2005, right?
3      A.  Correct.
4      Q.  So -- so literally a day after the call
5  where responded to, they were last updated in
6  Yardi, correct?
7      A.  Correct.
8      Q.  By the same person?
9      A.  Yes.
10      Q.  And so on -- with respect to the first
11  row 22, the work order was responded to at
12  2:40 p.m.  Do you see that?
13      A.  I do.
14      Q.  And according to the second work order,
15  the work order was responded to at 3:55 p.m.  Do
16  you see that?
17      A.  Yes.
18      Q.  How does this support or corroborate
19  allegations that people were changing response
20  times in Yardi to increase an incentive fee,
21  Mr. Dudney?
22      A.  This only goes -- this analysis and its
23  companion which is Dudney Exhibit 011 to the
24  deposition here today, analyzes the data with

Page 232

1  respect to allegations that were made or
2  descriptions that were given as part of the
3  allegations that were made that because of
4  changes that were being made to Yardi data
5  that -- some of the circumstances that took
6  place or what resulted was the impossible and
7  that was that two -- the data showed that the
8  same tech was at two different physical
9  locations at the same time, and so that would be
10  a -- a consequence of inaccurate data being put
11  into -- into the system.  And I believe there's
12  at least one declarant who says that this
13  occurred as a result of changes that were being
14  made to try and make fails into passes, that
15  that was one of the consequences of that.  So I
16  was curious to see how many times -- or how
17  often the data demonstrated that there were, in
18  fact, two techs at the same place -- or I'm
19  sorry, two techs -- the same tech at two
20  different places at the same time.  Let me get
21  that right.
22      Q.  But it's entirely plausible that the
23  response times could be accurate for both of
24  these, right, the response times don't overlap?

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
233–236

Page 233

1    A.  Well, the response time for the second
2  one comes during a period where the tech was
3  supposedly at the first location, so they
4  overlap in that respect that there's two places,
5  the second place being responded to while
6  supposedly the tech was still at the first
7  place.
8    Q.  Which one of these response times was
9  falsified to increase Pinnacle's pass
10  percentage, Mr. Dudney, the first one or the
11  second one?
12    A.  I -- I didn't conduct the analysis that
13  way.  I just looked for circumstances where
14  there were -- whether or not and to what extent
15  there were -- there was a prevalence of
16  duplicates, if you will.
17    Q.  Isn't that the allegation of this
18  complaint that you're supposedly analyzing?
19    A.  The allegation was that changes were
20  being made to Yardi and that some of the effects
21  of that -- and that those changes were being
22  made to increase the pass/fail results.  One of
23  the observations, though, was that the -- one of
24  the what I'll call unintended consequences was

Page 234

1  that there would be circumstances whereby the
2  same technician was shown at the same -- or
3  different places at the same time and so I was
4  looking to find instances of that and that's
5  what Exhibit 8 does -- I'm sorry, Exhibit 8 to
6  my report which is Dudney Deposition Exhibit
7  012.
8    Q.  But the pair at row 22 doesn't --
9  doesn't give you any information about whether
10  or not the response time, which is in the column
11  that you've identified as actual start
12  date/time -- sorry, actual start time/date,
13  doesn't give you any information about whether
14  either of those was allegedly falsified,
15  correct?
16    A.  We'd have to look at it to see if I
17  have actual paper work orders for that because
18  part of the issue is that, number one, I don't
19  have paper work orders for all of the data that
20  I have in Yardi, and then obviously there are --
21  I mean, there's a lot of reasons why I might not
22  have the underlying paper work order information
23  that would allow me to evaluate each of these
24  beyond the data that's in Yardi, so then what

Page 235

1  I'm left to do is look at the data in Yardi.  I
2  don't know as I sit here today whether that
3  particular pair at row 22 has backup
4  handwritten -- backup -- or I should say
5  supporting paper work orders that have
6  handwritten notations on them or not.  I would
7  have to check our files to determine that.
8    Q.  You don't know whether the time that
9  was entered for row -- the row 22 work orders,
10  the response time, was falsified one way or the
11  other, do you?
12    A.  I don't know if -- I can't say just
13  based on the face of this that with a hundred
14  percent certainty that the response time was
15  falsified.  What I can say is that it's
16  impossible for the same person to be at two
17  different locations at the same time, so the
18  data is -- is creating an impossibility and
19  that's what the purpose of I think Dudney
20  Exhibit 012 was designed to do was to check for
21  that to see given the controls that we put in
22  place, would we still identify numerous
23  situations where that impossibility occurred in
24  light of the allegations that were being made

Page 236

1  and we found that 1,025 times in one case and --
2    Q.  So your testimony is it's impossible
3  for Mr. Gonzalez to start a work order at
4  2:40 p.m., take a break and go to another work
5  order at 3:55 p.m., complete that second work
6  order at 4:20 and then return to the first one
7  and complete it at 4:40?  Do you believe that's
8  impossible?
9    A.  That's not what I testified to.
10    Q.  Well, I thought I heard you use the
11  word impossible, Mr. Dudney.
12    A.  I did as to -- you can't --
13    Q.  If the data said that this was --
14    MS. WELCH:  Can you let him finish please,
15  Mr. Dutton?
16    THE WITNESS:  It's impossible for a person to
17  be at two places at one time.  That was what I
18  testified to.
19  BY MR. DUTTON:
20    Q.  Take a look at row 29 -- sorry, not row
21  29.  Row -- the row 28s.
22    A.  Row 28, okay.
23    Q.  I'm getting tired.
24    Oh, sorry.  25.  I just circled it

Page 237

1 before I asked the question. Do you have row 25
2 in front of you?
3    A.  Yeah, let me just mark them so I don't
4 get them confused. Okay.
5    Q.  Okay. Now -- so row 25 involves two
6 work orders that came in on January 1st, 2006,
7 right?
8    A.  Oh, I'm sorry. You're at 25. I was
9 looking at 22 again.
10    Q.  25.
11    A.  25, okay. What date did you say?
12    Q.  January 1st, 2006.
13    A.  Got it.
14    Q.  One work order comes in 6:15 p.m., the
15 other comes in at 6:53 p.m., right?
16    A.  Correct.
17    Q.  How many techs worked the after-hours
18 shift at Fort Irwin, Mr. Dudney?
19    A.  I can't testify as to how many they did
20 at any point in time.
21    Q.  And how did they keep track of their
22 time?
23    A.  I believe that they had -- they still
24 deployed tracking logs.

Page 238

1    Q.  When -- when a call came in after
2 hours, they didn't get a printed work order,
3 right?
4    A.  I believe that that certainly can be
5 the case. I don't know if that was the case on
6 all situations, but that was certainly a
7 possibility.
8    Q.  And typically there were -- there was
9 not a full staff during the overnight hours,
10 right?
11    A.  That's correct.
12    Q.  And only urgent and emergency work
13 orders were responded to during the overnight
14 work hours, correct?
15    A.  That's -- that's my understanding.
16    Q.  And it wouldn't be unusual if there
17 were limited staff for a person to respond to
18 one work order and then respond to another work
19 order later?
20    A.  It certainly could be that one person
21 could respond to two work orders, one earlier
22 and one later, sure.
23    Q.  And since there were no work orders --
24 there's only work order tracking sheets, you

Page 239

1 can't tell one way or the other whether the
2 tracking sheets were off or the tech was off or
3 what? There's not a paper work order for each
4 work order, is there?
5    A.  Again, I -- well, I don't believe that
6 I have a paper work order with handwritten notes
7 for every instance on Dudney Deposition
8 Exhibit 012, so, you know, this -- this one we'd
9 have to look back in the production to see if
10 that kind of a paperwork order exists for it,
11 but I don't know as I sit here today whether or
12 not that exists.
13    Q.  All right. And did you -- well, this
14 is for Fort Irwin, right?
15    A.  Correct.
16    Q.  And I think you said you were doing
17 this analysis because of the allegation that
18 people were entering false information into
19 Yardi to change the response time and,
20 therefore, increase Pinnacle's incentive fee?
21    A.  It was that premise, but then it -- the
22 point was -- and the reason I did this is
23 because as a consequence of that alleged
24 allegation, there was -- there were statements

Page 240

1 made in -- at least by one declarant, if not
2 more, that it would sometimes create a situation
3 where the data would then show the same tech at
4 two places at the same time.
5    Q.  And that declarant was Mr. Weber?
6    A.  I believe that's correct.
7    Q.  Now, there's a lot of entries on here
8 for work orders that were called in and
9 performed after January 1st, 2008, aren't there?
10    A.  Yeah, they're not sorted in a way that
11 would easily let me quantify it, but certainly
12 just eyeballing it, looking at the call date and
13 the call time, I think it spans -- I mean,
14 there's activity across the board I've got on
15 this page which is 13 of 19, for example, I've
16 got calls times in '11, call times in '06, '07,
17 '08.
18    Q.  I just asked, Mr. Dudney, whether there
19 were a lot of them on there that were after
20 January 1, 2008. Do we agree on that?
21    A.  I think that there are. Yes, I think
22 there are a fair number of them.
23    Q.  Can we also agree that after January 1,
24 2008, response times were no longer used to

Page 241

1 calculate Pinnacle's incentive?
2      MS. WELCH:  Objection to form, calls for a
3 legal conclusion.
4      THE WITNESS:  My understanding is that there
5 was some modification which occurred that
6 resulted in it not being utilized after that
7 point in time.
8 BY MR. DUTTON:
9      Q.   That wasn't my question.  I wasn't
10 asking a legal question.  I was just asking
11 Pinnacle no longer used response time to support
12 its claim for an incentive fee after January 1,
13 2008, right?
14      A.   That's -- for the time periods that
15 would be covered prior to that, that's my -- or
16 subsequent to that date, that's my understanding
17 is that they no longer used that.
18      Q.   So falsifying response times in Yardi
19 after January 1, 2008, wouldn't give Pinnacle
20 any extra incentive fee, would it?
21      A.   If it's not being used, then I think by
22 definition it couldn't.  It would obviously
23 change the performance statistics to the extent
24 that anyone is looking at those, but it wouldn't

Page 242

1 go to the incentive fee if it was no longer
2 being used for that.
3      Q.   Did you need to just go past January 1,
4 2008, to boost the numbers in your analysis?
5      A.   No, I didn't -- I didn't put a limiter
6 on the date whatsoever because the data was what
7 it was, so I looked across the entire population
8 of data.
9      Q.   Data from after January 1, 2008, does
10 not support your -- the assertions that you're
11 trying to corroborate, does it?
12      A.   It -- well, it certainly continues to
13 demonstrate that -- that data being put into
14 Yardi is demonstrating what is -- given the
15 start and stop times of the -- that are
16 included, something that's physically impossible
17 to have the same tech at two locations, and so
18 that's what it was designed to do.  And I didn't
19 limit it as to its time period where I show
20 those.  I looked at it for the entire set of
21 population of data that I had.
22      Q.   With respect to page -- let's move on
23 to Monterey, Mr. Dudney, because I think we've
24 discussed Irwin, Moffett and Parks for quite

Page 243

1 sometime.  With respect to Monterey, you have a
2 graph.
3      A.   You're on page?
4      Q.   Page 31.
5      A.   Yes.
6      Q.   Which is a comparison of the monthly to
7 annual pass/fail percentage January 2006 to June
8 of 2007.  Do you see that?
9      A.   Yes.
10      Q.   And you're generally familiar, aren't
11 you, with the fact that at Monterey there were
12 two discreet periods of time when a large amount
13 of data in Yardi was updated?
14      A.   I'm generally aware that there were
15 periods of time where there was more activity
16 with respect to updating because of the timing
17 of the incentive fee, you know, calculation
18 preparation.
19      Q.   Isn't it correct that there were a
20 large number of updates made to the data in
21 Yardi at Monterey in the June and July of 2007
22 period when the incentive fee data for the
23 preceding year 2006 was being prepared?
24      A.   Yes, that I believe is correct.

Page 244

1      Q.   And isn't it also true that in December
2 of 2007, there were a number of updates made to
3 the work order data in Yardi for the first half
4 of 2007?
5      A.   Again, subject to check I believe
6 that's also correct.
7      Q.   And those two discreet periods are the
8 two discreet periods from which the lion's share
9 of your examples with respect to Monterey comes?
10      A.   A lot of them come from that period.
11      Q.   And that -- those two periods of time
12 kind of correspond with the gap between the
13 annual and the monthly pass/fail report that's
14 on Page 31, right?
15      A.   Yes, there's a lot of updates that
16 would go to that gap that you see there on that
17 chart.
18      Q.   And did you do any research or any
19 digging into the data to see if you could find
20 an explanation for the gap between the monthly
21 and annual pass/fail percentage that's shown to
22 go from roughly June of 2006 to July of 2007?
23      A.   I -- I looked at --
24      Q.   Or May of 2007?

Page 245

1    A.   Yeah, I looked at a number of different
2   pieces of information with respect to everything
3   from statements to deposition testimony to
4   e-mails and correspondence and of course the
5   data itself to try and understand what was
6   occurring here as part of the analysis that
7   I did.
8    Q.   And you understand that in June and
9   July of 2007, Mr. Somerville was putting
10  together his data package for the 2006 incentive
11  fee and that was the first time that
12  Mr. Somerville had used either the pass/fail
13  report or had submitted an incentive fee
14  package, right?
15   A.   I think that's right.
16   Q.   And you understand that Mr. Somerville
17  actually had to ask Darin Singh of Clark, hey,
18  which reports from Yardi did you use last year
19  in order to calculate the incentive fee, right?
20   A.   I don't recall if he asked Mr. Singh or
21  not, but he may have.
22   Q.   And Mr. Singh actually pointed him
23  towards the report that he should use.  Do you
24  recall that?

Page 246

1    A.   I don't recall one way or the other on
2   that.
3    Q.   Well, you discuss in your -- in your
4   report a document that you found which attaches
5   a spreadsheet that's called June 2006 fails or
6   Junefails.xls.  Do you see that?
7    A.   Yeah, if you don't mind, let me just
8   quickly buzz through starting on Page 30 this
9   section just to get my -- speed our Q and A on
10  this.
11   Q.   I think the first time you mention it
12  is on Page 35.
13   A.   Okay.  Let me just quickly read this.
14   MR. DUTTON:  Could you just mark the time?
15        (3:29 p.m.)
16  BY MR. DUTTON:
17   Q.   Mr. Dudney, do you have my question in
18  mind?
19   A.   You were asking me about the June --
20  the June e-mail that I referenced?
21   Q.   Right.  You reference it on Page 35; is
22  that correct?
23   A.   Yes, and I'm just trying to get a
24  context for it here leading up to it just from

Page 247

1   the beginning of this section.
2    Q.   Well, I'm going to compare it to the
3   graph on Page 31 if you want context.
4    A.   Okay.
5    Q.   Now, the graph on 31 compares the
6   monthly pass/fail report for June of 2006 to the
7   annual for June of 2006, right?
8    A.   Correct.
9    Q.   And you know from your work that
10  because of the June fails memo and because it
11  was passed around to Mr. Merrill, Mr. Anderson
12  and Mr. McDaniel, that there were corrections
13  made to the pass/fail report or updates made,
14  however you want to put it, to -- to change the
15  information, correct?
16   A.   There were -- there were changes made
17  to the Yardi data that impacted the -- the
18  pass/fails.
19   Q.   And am I right -- I mean -- and it's
20  hard for me to understand, but am I right that
21  if you draw a line from June 2006 up, in June
22  of 2006 the annual pretty much matches the
23  monthly?
24   A.   Yes.

Page 248

1    Q.   Okay.
2    A.   And noting that -- and there's a
3   footnote on it, but just to be clear, it's just
4   Footnote 82 that I would just draw your
5   attention to that -- with respect to that is
6   that one thing that this comparison does, it
7   does what you described.  It just compared the
8   monthly pass/fail report to the annual pass/fail
9   report and it does in June show roughly the same
10  number for all intents and purposes recognizing
11  as Footnote 82 describes that the monthly would
12  not reflect any updates that would have changed
13  and otherwise failing reported to a pass prior
14  to the creation of the monthly, so just as a
15  concept --
16   Q.   Well, that's what I'm suggesting.  What
17  this shows, doesn't it, is that when they
18  reviewed the monthly work orders in June
19  of 2007 -- or 2006 and updated them, you know,
20  the updates resulted in the annual matching the
21  monthly?
22   A.   Well, it by definition would unless
23  there was another set of changes, right, because
24  if you had done updates to something to change

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
249–252

Page 249

1   monthly to annual, then it would bring -- it
2   would make one -- they would become one and the
3   same in that regard.
4       Q.   Right.  So my question -- and they did
5   those updates contemporaneously in June of 2006
6   after they passed out the Junefails.xls document
7   that you discuss on Page 35?
8       A.   Let me just look here.
9       Q.   You state that Junefails.xls X file
10  included 253 of the 255 work orders that were
11  changed to passes for the June 2006 monthly
12  pass/fail report.
13      A.   Yeah -- I'm sorry.  I just want to read
14  this paragraph.
15          Okay.  And if I could have the question
16  read back after I just read those two
17  paragraphs.
18          (WHEREUPON, the record was read
19             by the reporter as requested.)
20      THE WITNESS:  It's a July 10th e-mail, so I
21  think it was done in July of 2006, not June
22  of 2006.
23  BY MR. DUTTON:
24      Q.   Do you know when the monthly pass/fail

Page 250

1   reports were provided to the owner?
2       A.   I don't know the exact date.
3       Q.   It was not at the -- exactly on the end
4   of the month.  Wasn't there a reporting date
5   that occurred sometime after?
6       A.   I think the answer is yes.  I don't
7   know the exact date.
8       Q.   My -- my question is this:  For all of
9   the other months in 2006 and for the first
10  quarter of 2007, so May of '06, July through
11  December of '06, January, February, March,
12  et cetera, of '07, you didn't find any examples,
13  any further examples of efforts to update the
14  monthly pass/fail report, did you?
15      MS. WELCH:  Objection to form.
16      THE WITNESS:  I found the ones that I've
17  identified here.  I'm not sure how else to
18  answer your question.  I mean, this was a
19  particular instance where I found an e-mail and
20  was able to analyze because of the nature of the
21  Excel file the activity --
22  BY MR. DUTTON:
23      Q.   Listen to my question.  You didn't find
24  any other months in 2006 or 2007 where a monthly

Page 251

1   pass/fail report was updated within a few days
2   after the end of the month other than June which
3   you reported on?
4       A.   Yeah, that's the one that -- that is in
5   my mind, not to say that there aren't other
6   ones, but that's the one that I pointed to in
7   this report.
8       Q.   And the data, the comparison of the
9   monthly to the annually, the only one of those
10  dates or months where there is a -- pretty much
11  a match is June of 2006, right?
12      A.   Yeah, which is not surprising in light
13  of if the -- if the annual reflects the changes,
14  then you would expect it that those two would
15  match up to the changes are made --
16      Q.   I think we're in agreement on that.
17      A.   Yeah.
18      Q.   And my question is, did you identify
19  anything that happened in May of 2005 that would
20  have caused the sudden divergence from --
21  between the annual and the monthly pass/fail
22  reports?
23      A.   May of 2005?
24      Q.   Yeah.

Page 252

1       A.   2005 is not on this chart.
2       Q.   Sorry, May of 2006.  I get confused by
3   the month of May.
4       A.   Okay.  Sorry.
5       Q.   May of 2006, that's the first month
6   where there's a big drop and a gap between the
7   monthly and the annual, right?
8       A.   There is a -- that's the -- for the
9   data that's included on this chart, that would
10  be the first month, I mean, the -- January '06
11  has some kind of a difference, but there's a --
12  visibly a larger difference for May of 2006.
13      Q.   And then the difference goes even
14  larger in July and August and September and
15  October and November all the way through
16  January 2001 -- sorry, 2007, right?
17      A.   Yeah, I think from January 2007, that
18  data point, there's still a large gap, and then
19  starting in February of 2007, it's much closer
20  and I would say that the lines after that are
21  much more consistent.
22      Q.   And -- and this is really the only year
23  where you've kind of found this pattern where
24  there was a wide discrepancy -- or the only

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
253–256

Page 253

1    period of time, I guess is a better question,
2    where there was a wide discrepancy between the
3    monthly results and the annual results?
4        A.  Well, we focused on this period in part
5    because of the additional data we had with
6    respect to as you've pointed out the -- the
7    information that we had in terms of the 2006
8    e-mail and what happened that I talk about in my
9    report, so that's why I think we captured this
10   data.  I'm not -- I'd have to look back at the
11   data, Mr. Dutton, to see if there were other
12   periods where I've got both the annual and the
13   monthly to see how close they are.
14       Q.  Did you investigate or did anyone ask
15   whether the discrepancies between the monthly
16   pass/fail reports and the annual pass/fail
17   reports and the updates to the 2006 data and
18   first quarter -- or first half 2007 data that we
19   know occurred are related?
20       THE WITNESS:  Let me ask to have that one
21   read back.  I didn't --
22           (WHEREUPON, the record was read
23            by the reporter as requested.)
24       MS. WELCH:  Objection to form.

Page 254

1        THE WITNESS:  I don't understand the
2    question.  I'm sorry.
3    BY MR. DUTTON:
4        Q.  So we know that for -- for a period of
5    time starting in May of 2006 and going through
6    May of 2007, the monthly pass/fail reports --
7    just -- just the percentage of pass/fail for
8    the monthly -- as reflected in the monthly
9    reports goes down?
10       A.  Yes, I would agree with it goes down by
11   comparison with the annual.  I would agree with
12   that.
13       Q.  And we know that in the summer of 2007
14   and in December of 2007, decisions were made to
15   update first the 2006 work order data and then
16   the first half of 2007 work order data, right?
17       A.  Yes.
18       Q.  Do you know why those updates were
19   done?
20       A.  From what I can tell and what I've
21   seen, part of the reason was that there was an
22   interest in increasing the -- the pass levels
23   that would be reflected in the reports.
24       Q.  Do you know what caused the pass levels

Page 255

1    to go down starting in May of 2005?
2        A.  I don't know that I've seen -- unless
3    there's something I'm not thinking about in the
4    report that would dispositively tell me
5    precisely why it went down from May to -- or
6    from June to July.
7        Q.  You haven't done any forensic analysis
8    of the documents to determine whether there was
9    a cause for the decline in the pass/fail
10   percentage for those months?
11       A.  Well, I've looked at the data to see
12   what the differences were and done the analyses
13   that I have to the extent there -- you know,
14   that there are documents that explain that.  I
15   don't know that I have those noted, but I would
16   have to go back and look at the documents to see
17   if, in fact, documents exist to do that.  I'm
18   not recalling them as I sit here today.
19       Q.  So you don't have a hypothesis as to
20   why?
21       A.  I don't articulate a hypothesis here
22   other than as it relates to the fact that
23   then -- how it was dealt with in terms of the
24   changes as opposed to the why.

Page 256

1           (WHEREUPON, DUDNEY Deposition
2            Exhibit No. 013 was marked for
3            identification.)
4    BY MR. DUTTON:
5        Q.  Let me show you what's been marked as
6    Dudney Exhibit 013.  Can you confirm that that's
7    a copy of your Exhibit 5 from your expert
8    report?  All 13 pages are there, Mr. Dudney.
9        A.  Yes.  What you've handed me as Dudney
10   Deposition Exhibit 13 appears to be a complete
11   copy, although smaller again, of Dudney
12   Deposition Exhibit 001 and Exhibit 5 to that
13   Dudney Deposition Exhibit 001, so it seems to be
14   a copy of that.
15       Q.  I'm not trying to diminish your
16   exhibits.
17       The -- Exhibit 013 is a comparison of
18   the paper work order to the monthly pass/fail
19   reports and to the annual pass/fail reports in
20   Yardi, correct, at Monterey?
21       A.  Correct.
22       Q.  And the data that's set forth in
23   Exhibit 013 is part of the data that you
24   analyzed to prepare the graph on Exhibit 31,

Page 257

1   right -- or it's related data?
2       A.   It's related data.  It's a different
3   set of data, but it's related.  These are --
4   these are really the work orders that are --
5   these are the work orders that -- where the
6   paper work order copy was located in the
7   Pinnacle production and it implied a fail, and
8   then there was subsequent data which showed that
9   it was a pass on the annual pass/fail report and
10  sometimes on the monthly, but not always.
11      Q.   And when you say it was implied -- it
12  implied a fail, that's based on your analysis,
13  right?
14      A.   It's based on my review of the paper
15  work orders with handwritten notes on them
16  indicating the time when the -- when the tech
17  visited the property or responded to the
18  property and the incident that would be
19  reported.
20      Q.   Now, the other thing that you talk
21  about at Monterey is the unit turn analysis,
22  right?
23      A.   Yes.
24      Q.   And at Monterey -- and not at Fort

Page 258

1   Irwin, unit turns were in a -- were part of the
2   incentive fee plan, right?
3       A.   I believe that's correct.
4       Q.   Now, I believe that you set out on
5   Page 40 your understanding of the turn component
6   or the unit turn component of Pinnacle's
7   property management incentive fee, right?
8       A.   Yes.
9       Q.   And you state on Page 40, specifically
10  Pinnacle would earn 100 percent credit for unit
11  turns completed in five business days or less.
12  Do you see that?
13      A.   Yeah, middle first paragraph
14  specifically.
15      Q.   75 percent credit for unit turns
16  completed in six business days, correct?
17      A.   Yes.
18      Q.   And 50 percent credit for unit turns
19  completed in seven business days?
20      A.   Correct.
21      Q.   Now, the document that you cite as
22  evidence of what Pinnacle reported for the 2006
23  incentive fee year, that was a document that
24  Mr. Somerville gave to Mr. Cohen in 2007 as part

Page 259

1   of the 2006 incentive fee package, right?
2       A.   I think that's right.
3       Q.   And that document was essentially a
4   work order analysis like the pass/fail report
5   except it was for COM work orders, right?
6       A.   Right, which is a turn.
7       Q.   And it was obvious from the face of the
8   document the amount of time or the number of
9   hours that was -- sorry, that the -- that the
10  report calculated between start -- sorry,
11  between call and start, right?
12      A.   I can say that one can figure it out by
13  looking at it.  I mean, that's what we did.
14  Whether -- the extent of obviousness of it, I
15  don't want to comment on, but we analyzed the
16  document and understood --
17      Q.   24 hours in a day, you can divide the
18  number by 24, pretty much figure out how many
19  days it took to complete the turn, right?
20      A.   One can do that math, yes.
21      Q.   You think Mr. Cohen could do the math?
22      A.   Yes.
23      Q.   Mr. Cohen graduated from business
24  school?

Page 260

1       A.   I don't know that answer.
2       Q.   Well, I'm thinking he could probably do
3   the math.
4            So -- so your claim isn't that -- that
5   Pinnacle concealed or hid its calculation method
6   for unit turns; you're just claiming that
7   Pinnacle used the wrong method for unit terms.
8   Is that what you're saying?
9       A.   I certainly don't have an opinion that
10  they concealed it.
11      Q.   Well, if they showed it to Mr. Cohen,
12  they didn't conceal it, did they?
13      A.   No, and nor do I make a -- I don't make
14  such a statement that they concealed it.
15      Q.   I thought the allegations in this case
16  were about fraud and racketeering and failure to
17  disclose key information, are they not?
18      A.   Again, I think that's probably better
19  asked of counsel.  My general understanding is
20  that there certainly are fraud-related claims
21  and as I understand, RICO-related claims.
22      Q.   Are there any breach of contract
23  related claims in this litigation, Mr. Dudney?
24      A.   I don't know that I could say one way

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
261–264

Page 261

1  or the other because I don't know what the
2  position is legally in terms of, for example, a
3  failure to maybe perform -- something that would
4  be consistent with fiduciary duty or a report
5  issue with respect to work orders given the
6  language in the PMA, so I -- I really couldn't
7  answer that question as to whether or not there
8  are some sort of breach of contract type claims.
9      Q.  Are you aware if Pinnacle ever received
10  notice of default from Clark at Monterey that it
11  was improperly calculating its unit turn fee?
12     A.  I'm unaware of any notice of a default.
13     Q.  Are you aware that Pinnacle was ever
14  given an opportunity to cure the allegation that
15  it wrongly calculated its unit turn component of
16  its incentive fee?
17     A.  I'm not -- again, I'm not aware that
18  there was a notice of default and so if there
19  was -- and I'm not -- similarly I'm not aware of
20  any notice that would be solved by a cure period
21  or anything like that.
22     Q.  Are you -- is it your understanding
23  that Pinnacle is alleged to have defrauded the
24  owner by falsifying information relating to its

Page 262

1  calculation of unit turn fee?
2      A.  I don't know that I could testify about
3  what all the allegations are with respect to
4  this.  I was just simply asked to look at the
5  calculation and that's what I've done as part of
6  what starts on Page 40 in terms of how it was
7  calculated and how that compared to what was
8  laid out in the PMA and it was different.
9      Q.  What were the business hours at
10  Monterey?
11     A.  I'd have to look.  Generally speaking
12  if I recall, they were what one -- what people
13  would consider to be normal business hours.  I
14  don't know if they were exactly 8:00 to 5:30 or
15  something similar to that, but I'd have to --
16  I'd have to look at additional data to tell you.
17     Q.  And would Saturday be a business day?
18     A.  I don't know that I comment on whether
19  Saturday is included as a business day.
20     Q.  Would Sunday be a business day?
21     A.  Excuse me for one second.
22     Q.  How many hours are in a business day?
23     A.  It depends on how one defines a
24  business day.

Page 263

1      Q.  Well, you agree with me that the
2  Pinnacle incentive fee with respect to unit
3  turns used the phrase business day, correct?
4      A.  I believe that it did, yes.
5      Q.  All right.  How many hours in a
6  business day, Mr. Dudney?
7      A.  It would depend on -- typically when
8  people talk about business days, in my
9  experience, they talk about the entirety of the
10  day as opposed to, for example, a number of
11  hours, like so let's say eight hours.  I mean,
12  there might be eight hours in a business day,
13  but typically when it's -- my experience has
14  been when you talk about a business day, it's,
15  you know, Wednesday is a business day, Thursday
16  is a business day.  Sunday might not be a
17  business day.
18     Q.  And did they include after hours?
19     A.  Well, the way that they did the
20  calculation, they -- they included whole days
21  and then made adjustments to -- calculated
22  differently than what I understand and read the
23  PMA to be.
24     Q.  Based on your reading of what a

Page 264

1  business day is.  Does it describe in the PMA
2  how to measure a business day, Mr. Dudney?
3      A.  No, it does not, but I would say that
4  the -- there's consistency between the way
5  I interpret it and the way it was calculated
6  except for the addition of extra days.  I don't
7  think the difference emanates from a calculation
8  of the number of hours less than 24 in a
9  business day, just mathematically the way that
10  that calculation was submitted.
11     Q.  Would it include hours on Saturday and
12  Sunday?
13     A.  I think there's a version that includes
14  Saturday and then there's a version that
15  excludes Saturday and Sunday, if I remember
16  correctly.  So I think it was looked at both
17  ways.
18     Q.  Well, in any event the facts are that
19  Pinnacle -- Pinnacle's report in support of its
20  incentive fee for unit turns disclosed the
21  calculations it was using to Mr. Cohen, right?
22     MS. WELCH:  Asked and answered.
23     THE WITNESS:  It's -- to my understanding the
24  calculation that I looked at I understood was

Page 265

1  shared with -- with the owner's representative,
2  and so if, in fact, Mr. Cohen saw that
3  particular document that I have in my mind's
4  eye, then that calculation is included on there
5  and I analyzed that based on that.
6  BY MR. DUTTON:
7     Q.  Did you talk to Mr. Cohen about what
8  his understanding of a business day was?
9     A.  I've talked to Mr. Cohen, but I didn't
10  have a conversation with him about that issue if
11  I remember correctly.
12    Q.  When he approved Pinnacle's incentive
13  fee with respect to unit turns every year, did
14  you ask him about his interpretation of the
15  words business day, Mr. Dudney?
16    A.  I have not asked him, if I recall
17  correctly, what his interpretation of a business
18  day was.
19    Q.  Who asked you to put this section about
20  unit turns in your report, Mr. Dudney?  Was it
21  the Clark legal team?
22    A.  Counsel for Clark asked me to take a
23  look at that.
24    Q.  Now, there is a section in your report,

Page 266

1  Mr. Dudney, where you do an analysis of
2  Mainscape, right?
3     A.  Yes.
4     Q.  And you look at the contracts between
5  Pinnacle and Mainscape, right?
6     THE WITNESS:  I'm sorry.  Could you read that
7  last part of the question back?
8        (WHEREUPON, the record was read
9          by the reporter as requested.)
10    THE WITNESS:  Yes.
11  BY MR. DUTTON:
12    Q.  And with respect to the services that
13  were contracted for, you do kind of a before and
14  after analysis of the cost of those services and
15  you conclude for each service that after
16  Mainscape was no longer the vendor, the cost of
17  those services declined?
18    A.  Yes, generally.
19    Q.  And in each of those analyses, you make
20  an adjustment for inflation from before to
21  after, right?
22    A.  Yes.
23    Q.  So let's take a look at Exhibit 9 of
24  your report which I'm going to mark as

Page 267

1  Exhibit 014 for the deposition.
2        (WHEREUPON, DUDNEY Deposition
3          Exhibit No. 014 was marked for
4          identification.)
5  BY MR. DUTTON:
6     Q.  Here you are, Mr. Dudney.
7     A.  Thank you.
8     Q.  I hope I didn't make that one too
9  small.
10    A.  It started out small, so I may refer
11  to -- let me just check and make sure it's the
12  same thing.
13       Yes.  Again, it's a smaller version of
14  it, but it looks like it's the same thing in my
15  report so --
16    Q.  Okay.  And now help me with
17  Exhibit 014.  This is an analysis of the
18  landscaping contract?
19    A.  Yes.
20    Q.  And the first row is a row entitled
21  Contract Landscaping Per GL.  Can you tell me
22  what that represents?
23    A.  It represents, as I articulate in the
24  report, you can see that I pulled -- if you look

Page 268

1  on Page 56, I pulled a particular general ledger
2  code which was 7060-00 contract yards and
3  ground, and then I reviewed records with respect
4  to those charges.  So there were a number of
5  charges that were included over time in those
6  various years for that line item and -- but
7  that's where the source data comes from, the
8  general ledger itself.
9     Q.  And then you make a series of
10  adjustments, right?
11    A.  Correct.
12    Q.  You have an adjustment for installation
13  slash removal?
14    A.  Yes.
15    Q.  You have an adjustment for irrigation
16  parts?
17    A.  Correct.
18    Q.  You have an adjustment for premove-in
19  maintenance?
20    A.  Yes.
21    Q.  You have an adjustment for storm?
22    A.  Correct.
23    Q.  And you have an adjustment for
24  miscellaneous?

Page 269

1    A.   Yes.
2    Q.   What are those adjustments for?
3    A.   Those adjustments are -- you can see in
4  Footnote 1, they were made for what I would call
5  out-of-scope services or one-time
6  non-reoccurring charges based on what I -- the
7  descriptions I saw in the general ledger, so
8  what I was doing was removing costs that might
9  skew a comparison of one year to the next
10 because of a particular expense.
11       So, for example, in 2008, you know,
12 there was a significant -- well, in 2006 through
13 2008 and actually all the way up to 2013, there
14 were a fair number, although at very different
15 levels, irrigation parts that were being
16 purchased and so I removed those to try and
17 isolate then the more traditional and typical
18 landscaping services that were being provided as
19 opposed to irrigation system parts.
20   Q.   Okay.  And after that there is a row
21 called analyzed costs.  Do you see that?
22   A.   Yes.
23   Q.   And so those are the costs per year
24 after your adjustments, right?

Page 270

1    A.   Correct.
2    Q.   And then you have a component called
3  average CPI adjustment, correct?
4    A.   Yes.
5    Q.   And average CPI adjustment -- well,
6  what does that do?
7    A.   It makes -- it creates a number which
8  would be considered the real dollar as compared
9  to a nominal dollar, and so what it does is it
10 basically puts things into 2004 dollars I
11 believe so that you can then compare one year to
12 the next.
13   Q.   So it puts everything in 2004 dollars?
14   A.   Correct.
15   Q.   Okay.  And then you do a weighted
16 average CPI adjustment actual cost on a per unit
17 basis, right?
18   A.   Yes.
19   Q.   And that's how you do your comparison?
20   A.   Yes, I look at available units for each
21 of the periods where the costs were incurred
22 because that's the way that landscaping charges
23 are incurred on an available unit basis and so
24 then I compared averages for the -- the weighted

Page 271

1  average on the CPI adjusted dollars of -- all in
2  2004 dollars for the Mainscape period as
3  compared to the post-Mainscape period and then
4  calculated the differential that I did.
5    Q.   So you think that landscape charges are
6  correlated with the number of units?
7    A.   Yes.
8    Q.   What's the basis for that assumption?
9    A.   Looking at the contracts and the way
10 that the charges are -- are rendered, the
11 contracts provide costs in various figures based
12 on that consideration of those metrics in terms
13 of how many units there are, and it's also
14 consistent with discussions that I've had with
15 individuals from the owner with respect to their
16 understanding of the provision of those types of
17 services that they're -- that they're -- they're
18 driven by or correlated by the number of
19 available units because landscaping is provided
20 to not just occupied units, but also available
21 units.
22   Q.   What are -- what are Pinnacle's
23 contractual obligations in entering into
24 contracts such as the landscaping contract?

Page 272

1    A.   I'm not sure I understand your question
2  when you say their contractual obligations.  In
3  what respect?
4    Q.   Well, Pinnacle -- we talked earlier
5  that Pinnacle has an obligation -- or the owner
6  has the right to insist upon Pinnacle getting
7  three bids for a contract like the landscaping
8  contract, right?
9    A.   I understand that the owner can -- can
10 request -- what I understand is for contracts
11 above 25,000 that Pinnacle is supposed to get
12 three written bids, but the owner can also, you
13 know, do other -- take other steps as
14 I understand it to evaluate costs and --
15   Q.   The owner has the right to approve or
16 disapprove of expenditures over $25,000, right?
17   A.   I believe that's correct.
18   Q.   The owner could have said, no way,
19 that's too much money, we're not paying it,
20 correct?
21   A.   I -- again, without interpreting the
22 contract, but just as a nonlegal layperson, my
23 understanding is that they had the ability to do
24 that if they so chose.

Page 273

1    Q.  But Pinnacle was to supposed to
2  exercise its best judgment in getting the best
3  deal possible for the project, right?
4    A.  Again, without taking your
5  characterization and your question as being me
6  rendering a legal opinion on it, my
7  understanding is that there was -- you know,
8  that Pinnacle had certain responsibilities with
9  respect to providing the services that were
10  required by the manager.
11    Q.  And those services had to be within a
12  range of reason, right, the cost of those
13  services?
14    A.  I don't know what the contract says
15  with respect to the reasonability of the charges
16  but is -- but -- so I really can't comment one
17  way or the other on that.
18    Q.  Are you ever -- are you aware that
19  Pinnacle ever received a notice of default with
20  respect to its contracting with Mainscape over
21  landscaping?
22    A.  I'm not aware of a notice of default
23  with respect to Mainscape's landscaping.
24    Q.  Were you aware whether Pinnacle was

Page 274

1  ever given an opportunity to cure any alleged
2  overcharges with respect to its contract with
3  Mainscape?
4    A.  Similarly I'm not aware of whether
5  there was any notice that was provided which
6  would then result in an ability to employ some
7  cure.
8      I think we're a little bit over an
9  hour.  Whenever you get a minute, I'll just take
10  a quick break.
11    MR. DUTTON:  All right.  Well, why don't you
12  take a break.
13    THE WITNESS:  Okay.  Just to stretch my legs
14  here.
15    THE VIDEOGRAPHER:  We are off the record at
16  4:03 p.m.
17      (WHEREUPON, a short break was
18      taken.)
19      (WHEREUPON, DUDNEY Deposition
20      Exhibit No. 015 was marked for
21      identification.)
22    THE VIDEOGRAPHER:  Here begins DVD No. 6.  We
23  are on the record at 4:13 p.m.
24

Page 275

1  BY MR. DUTTON:
2    Q.  Mr. Dudney, I'm going to show you what
3  has been marked as Exhibit 015.  Exhibit 015 is
4  another part of your Mainscape analysis and this
5  is the analysis of the trash removal contract,
6  right?
7    A.  Yes.
8    Q.  And this analysis is pretty much the
9  same format as the analysis we just looked at
10  for the landscaping contract, right?
11    A.  Yes.
12    Q.  You take the total amount of the trash
13  removal costs from the GL for each year, right?
14    A.  Yes.
15    Q.  You make adjustments for out-of-scope
16  services, one-time charges and general ledger
17  reclassifications, right?
18    A.  Yes.
19    Q.  And then you make your CPI adjustments
20  and you take a weighted average by adjusting the
21  number of occupied units every year and you come
22  up with the weighted average CPI adjusted actual
23  cost per unit from '04 to '08 and the weighted
24  average CPI adjustment and actual cost per unit

Page 276

1  from 2009 to 2014 and you get a difference?
2    A.  Correct.
3    Q.  And would you agree with me just
4  looking at it that the net dollars on the top
5  line and even the dollars after the adjustment
6  are pretty much the same every year?
7    A.  I -- when you say the net dollars and
8  then the dollars after the adjustment, what are
9  you referring to?
10    Q.  Just the total amount of dollars
11  unadjusted.
12    A.  Ah, so the very top line.
13    Q.  Yeah.
14    A.  You're saying that on -- before I make
15  the adjustments, that on average, they're
16  roughly the same; is that what you are --
17    Q.  Yeah.  In fact, if anything, they're
18  higher in the latter period than they are in the
19  earlier period.
20    A.  Yeah, I mean, I would -- they are
21  higher in the latter period.  There's also
22  greater adjustments that I do to the latter
23  periods just because of the nature of the
24  various categories that I pull out.  So I would

Page 277

1  suggest that the first place to start is -- if
2  you're going to do a comparison, is look at
3  analyzed costs and then again you have to
4  consider the -- the timing of the cost as well
5  as the number of average occupied units since
6  that's what is influencing trash.
7      Q.  Right.  And -- and would you agree with
8  me that the differential that you -- the
9  percentage difference that you calculate is
10  after you adjust -- comes primarily from the
11  adjustments you make for CPI and for average
12  occupied units?
13     A.  I mean, those are parts of the
14  calculation.  I didn't -- I didn't attempt to
15  run calculations that didn't include a CPI
16  adjustment and/or an average occupied unit
17  adjustment so --
18     Q.  Did you do any kind of sensitivity
19  analysis to see what the results would be
20  without your various adjustments for the average
21  number of occupied units or the CPI?
22     A.  No.
23     Q.  And this analysis, like the landscaping
24  analysis, assumes that trash removal costs were

Page 278

1  correlated with the number of units?
2      A.  It's -- it's that the -- one needs to
3  consider the -- the number of units because of
4  the nature of the costs and the nature of the
5  contract, so yes, there is a -- there can be a
6  correlation, but there are also situations where
7  as I point out in my rebuttal report, you have
8  situations where the same number of units are
9  available, but there was a negotiation to bring
10  the cost down.  So it's -- you have to consider
11  the number of units when you're looking at cost,
12  but you also have to consider the nature of the
13  costs themselves and that's what I think I've
14  done here.
15          (WHEREUPON, DUDNEY Deposition
16           Exhibit No. 016 was marked for
17           identification.)
18  BY MR. DUTTON:
19     Q.  Let me show you what's been marked as
20  Exhibit 016.
21     A.  Okay.
22     Q.  Exhibit 016 is your analysis of
23  Mainscape's contract cleaning?
24     A.  Yes.

Page 279

1      Q.  And this one is slightly different from
2  the other one, so why don't you explain to me
3  how this one's different.
4      A.  It's just different in that this is
5  driven by the number of turns and so we had to
6  look at the number of turns that were provided
7  by unit type or size, so bedrooms and -- and you
8  can see that there's -- I divide the costs by
9  these various categories for the time periods
10  that I've analyzed and then calculated the
11  weighted average price difference based on that.
12  And so I took actual data from the general
13  ledger account 6910 and determined the number of
14  turns as well as the average costs that were
15  being incurred on a pre-CPI basis and then I
16  adjusted those in the work papers that underlie
17  this exhibit in the same conceptual fashion as
18  what I've done with the other ones.  So it's the
19  same CPI index and the same general concept
20  that's being applied here and then it's being
21  applied to the number of actual turns that
22  occurred by size.
23     Q.  What is the line percentage of turns
24  observed -- or the row, what does that mean?

Page 280

1      A.  It's the percentage of turns that occur
2  in those various unit types or the size of the
3  bedrooms, if you will, and so that's what
4  allowed us to calculate a weighted average price
5  difference by taking the number of turns that
6  occurred at each different level or size.
7      Q.  Why do you use the CPI index for L.A.,
8  Riverside and Orange County?
9      A.  Because that's the CPI index that's
10  included within the PMA with respect to CMC.
11     Q.  Was there a CPI adjustment in any of
12  the Mainscape contracts themselves?
13     A.  I don't think in turns, but I think,
14  yes, with respect to -- I think it has CPI --
15  CPI or CPI-like escalators in the five-year
16  contract for trash and for -- for landscaping.
17     Q.  Why did you use the CPI index that was
18  in the PMA?
19     A.  Because it was -- that was one
20  consideration as to why I used the one I did.
21  It was because that was included by the parties
22  when they were negotiating with respect to
23  looking at values of certain aspects of the
24  contract over time, so that was something that

Page 281

1 was negotiated previously between the parties --
2    Q.   Between the owner and -- between Clark
3 and Pinnacle is what you're saying?
4    A.   Correct, that's my understanding of it.
5    Q.   Fort Irwin is in San Bernardino County,
6 isn't it?
7    A.   I don't know that I can tell you the --
8 I mean, it's 30 minutes outside of Barstow, that
9 may be --
10    Q.   You don't know what county --
11    A.   I don't know the -- I don't know off
12 the top of my head the county that it resides.
13    Q.   Is there a difference between the CPI
14 for L.A., Riverside and Orange County as opposed
15 to San Bernardino County?
16    A.   I don't know that -- I'd have to look
17 to see if there -- if there's a difference there
18 to --
19    Q.   Mainscape's competition come from San
20 Bernardino County, wouldn't it?
21    A.   I -- I can't testify where it would all
22 come from.  I mean, they were an Ohio-based or
23 Indiana-based company originally before they got
24 out there so...

Page 282

1    Q.   Did you use the same Orange County,
2 L.A., and Riverside County CPI in all of your
3 calculations?
4    A.   With respect to this analysis, yes,
5 it's the same CPI adjustment.
6          (WHEREUPON, DUDNEY Deposition
7          Exhibit No. 018 was marked for
8          identification.)
9 BY MR. DUTTON:
10    Q.   Now, finally, let me show you what I've
11 marked as Exhibit 018, and I'm skipping one.
12 I'm going out of order, so Exhibit 018 is a
13 ledger or a schedule of cash deposits made by
14 Ron Calloway and cash deposits made by Rick
15 Wimer.  Do you see that?
16    A.   Yes.
17    Q.   Were you asked to include these cash
18 deposits in your report, Mr. Dudney?
19    A.   Yes.
20    Q.   By the Clark legal team?
21    A.   Yes.
22    Q.   And what's your understanding what
23 these ledgers show?
24    A.   Cash deposits on particular dates that

Page 283

1 were made by Mr. Calloway in the case of
2 Exhibit 13 in certain portions that are labeled
3 cash deposits by Ron Calloway, that total 76,377
4 as shown on Page 3 of 4, and that covers the
5 time period, excuse me, from roughly November of
6 2006 through December 2012.  And then on Page 4
7 of 4, it's a series of cash deposits made by
8 Mr. Wimer beginning in December of 2003 and
9 continuing through February of 2012 totalling of
10 just over 86,500.
11    Q.   And with respect to the -- the table or
12 the schedule of cash deposits made by Ron
13 Calloway that's not accurate, is it?  Ron
14 Calloway did not make any deposits -- cash
15 deposits into these banks, did he?
16    A.   As opposed to who?  I'm not sure I'm
17 following your question.
18    Q.   As opposed to his wife who did the
19 banking?
20    A.   Oh.
21    Q.   You didn't read the depositions?
22    A.   It's -- I've reviewed the depositions.
23 The -- I've associated them -- as I've
24 understood it, it was a production related to

Page 284

1 Mr. Calloway and accounts that he was associated
2 with and so that's the reason that I've entitled
3 that.  Having said that, the title isn't meant
4 to denote anything other than that association
5 or affiliation that I've mentioned.
6    Q.   Well, Ron Calloway did not make the
7 cash deposits?
8    A.   I'm not testifying one way or the other
9 other than to say that these bank statements
10 that are shown for these Bates numbers reference
11 cash deposits from which I understand
12 Mr. Calloway is a signatory to these accounts.
13    Q.   And you've read the testimony how the
14 source of the money that was deposited in
15 Mr. and Mrs. Calloway's account?
16    A.   I have, although I don't recall -- I
17 recall Mr. Wimer more because he -- and I think
18 he mentioned that he had some gambling winnings,
19 so that one just sort of stuck in my head.  I
20 don't recall what Mr. Calloway's testimony was
21 with respect to his articulated source of the
22 money.
23    Q.   Why are these schedules included in
24 your report?

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
285–288

Page 285

1    A.   Because I was asked to include them.
2    Q.   Any other reason?
3    A.   No, it was part of the scope of the
4  work that I was asked to do was to include and
5  compile this information as shown on Exhibit 013
6  and so my team and I did that.
7    Q.   Does the schedule of deposits made
8  to Mr. -- into Mr. Calloway's bank account
9  either by Mr. Calloway or by his wife, does that
10 relate to any of the other analyses that you've
11 done?
12   A.   Well, let's start with Mr. Wimer.
13   Q.   I asked you about Mr. Calloway,
14 Mr. Dudney.  I'd appreciate an answer.
15   A.   No.  Sure.  I'd be happy to.  With
16 respect to Mr. Calloway, I understand I -- that
17 at least there have been inquiries by counsel
18 around Mr. Calloway's relationship with vendors
19 and so that's the context that I understood that
20 as part of that, his bank accounts were
21 subpoenaed.
22      With respect to my opinions, I don't
23 have an opinion that is specific to vendor
24 activity at Monterey.  My opinions with respect

Page 286

1  to Monterey all -- are all circulating around
2  the work order or largely circulate around the
3  work order related issues, so in that way this
4  one is a bit different.
5    Q.   Let me ask my question again then.
6  Does the schedule of deposits into
7  Mr. Calloway's bank account relate to any of the
8  other analyses that you have done in your expert
9  report?
10   A.   Only to the extent that work orders
11 include work done by vendors at times and so
12 this is -- there's a relationship in that I've
13 interviewed Mr. Calloway, he had senior
14 management responsibility within the technician
15 group there and so in that way they relate, but
16 again, I was simply asked to compile the cash
17 deposits which is what I did.
18   Q.   So what analyses have you done of work
19 orders performed by vendors at Monterey?  Which
20 analyses is that in your report, Mr. Dudney?
21   A.   I looked through tens of thousands of
22 work orders.
23   Q.   In your report, which analyses is that?
24   A.   Any of them, Mr. Dutton, that -- that

Page 287

1  involve Monterey work orders.  In order for me
2  to identify the work orders that I did, I had to
3  review a population of work orders that included
4  work orders that interfaced with vendor and so
5  that was part of the process I went -- I went
6  through to result in the analyses I have.
7    Q.   All right.  So let's go back then
8  because I think the work orders that you looked
9  at and the analyses that you did, work orders
10 for Monterey, you reviewed the paper work
11 records you found for Monterey, right, for
12 handwritten times?
13   A.   I ultimately worked my way down to ones
14 that had handwritten time, but, for example,
15 there were ones that had handwritten time that
16 also referenced third-party vendors and
17 I excluded those in order to get down to the set
18 that I utilized.  So my point was simply that
19 the work that I and my team had to do -- we had
20 to understand which work orders appeared to have
21 vendor involvement and which ones didn't in
22 order to get down to the set of work orders that
23 we ultimately analyzed.
24   Q.   Did any of the analyses of work orders

Page 288

1  that appear in your report have anything to do
2  with vendor performed work orders at Monterey?
3    A.   The ultimate set that I include don't
4  because I worked as part of my process to
5  exclude those.
6    Q.   And your ultimate set is the set of
7  analyses that you claim corroborate or support
8  the assertions about work order falsification,
9  right?
10   A.   There's -- I think they're consistent
11 with the allegations.
12   Q.   And none of that relates to
13 Mr. Calloway's -- deposits into Mr. Calloway's
14 bank account, does it, work order response
15 times, Mr. Dudney?
16   A.   Not separate from what I've described
17 earlier.  There's not an additional connection
18 there other than through the vendor work orders
19 that we called out to get to the set.
20   Q.   How do Mr. Wimer's gambling winnings
21 relate to your analyses, Mr. --
22   MS. WELCH:  Objection to form.
23   THE WITNESS:  Well, I don't know that I can
24 testify that all of these relate to gambling

Page 289

1 winnings. I just understand that Mr. Wimer
2 testified that that was at least one source of
3 his reason for the cash deposits. So having
4 said that, I know that there are allegations or
5 issues surrounding both from my own interview of
6 Mr. Wimer as well some of the allegations made
7 by declarants, that Mr. Wimer had an -- a -- at
8 points in time a non-arm's length what I'll call
9 related -- relationship to Mainscape in that he
10 had a longstanding relationship with them, had
11 worked for them at some point in time, they had
12 helped him out when he was having some
13 difficulties at some years earlier and there
14 were questions raised about the nature of that
15 relationship and so --
16 BY MR. DUTTON:
17     Q. Raised by who?
18     A. Certain of the -- there is --
19     Q. The Clark legal team?
20     A. Well, certainly counsel for Clark
21 raised questions. I raised questions based on
22 my interview of Mr. Wimer because he -- after
23 some back and forth, I learned about his
24 relationship with Mainscape, but it took awhile.

Page 290

1 And then also there were issues that were raised
2 by one or more, at least -- at least one, I
3 think it was Ms. Foster maybe -- or Jodi George
4 I think, I'm sorry, who raised a question about
5 his relationship with Mainscape.
6         And then also I think there are
7 admissions in the record around the fact that
8 Mainscape was one of the vendors that
9 contributed money to what they called the
10 extravaganza and that occurred one or more
11 years, and that as a result of that, Mr. Wimer
12 seemed to be the central player from the
13 project's perspective interacting with Mainscape
14 on this and that part of what he did was receive
15 funds and then distribute excess funds at least
16 at -- at least one time in the form of gift
17 cards to employees. So that's just at a high
18 level generally what I understand about
19 Mr. Wimer and his interaction with Mainscape.
20     Q. Subpoenas went out to Mainscape, did
21 they not?
22     A. I couldn't tell you if they did or
23 didn't.
24     Q. Did you ever review documents from

Page 291

1 Mainscape?
2     A. If they were produced, I would have.
3 I'd have to look at my list to see if I've got
4 an actual production from Mainscape or not.
5     Q. Did Clark legal team provide you with
6 the documents that were produced by Mainscape?
7     A. I'm not -- I don't differentiate that
8 often between -- which production things come out
9 of because I'm just looking at the documents
10 themselves, unless I have a reason to make that
11 distinction, so I don't -- I don't recall making
12 a distinction with respect to Mainscape and
13 whether something came from them or came from
14 Pinnacle or came from Clark. So I'd have to
15 look back at my records to see if I have the
16 Mainscape production.
17     Q. Mainscape is the only vendor that you
18 single out in your report, right?
19     A. Yes.
20     Q. And Mr. Wimer is the only employee of
21 Pinnacle at Fort Irwin that you have a schedule
22 of cash deposits for, right?
23     A. That's correct.
24     Q. And Mr. Wimer as you said was the

Page 292

1 person at Pinnacle who collected money --
2 solicited and collected money from vendors,
3 including Mainscape, to fund the extravaganza
4 and if any money was left over, to purchase gift
5 cards for Pinnacle employees, right?
6     A. I think that's generally correct.
7     Q. And your testimony is that you don't
8 recall one way or the other ever having received
9 and reviewed Mainscape documents, Mr. Dudney?
10     A. No, that's not what I said. You asked
11 about the Mainscape production. I've certainly
12 reviewed Mainscape documents. What I can't
13 distinguish between sitting here is whether
14 those came from a Mainscape production or it
15 came through some other production without me
16 looking at the Bates numbers.
17     Q. Find any evidence in the Mainscape
18 production, Mr. Dudney, of any improper payments
19 to Mr. Wimer from Mainscape?
20     A. Did you ask me did I?
21     Q. Yeah.
22     A. I didn't -- again, I didn't segregate
23 out the Mainscape production, so I haven't done
24 that analysis and I don't recall that I've

Page 293

1  identified any documents regardless of the
2  production that would evidence that beyond the
3  allegations that I've mentioned and the results
4  of the interview that I had with them.
5      Q.  So in your summary of opinions, I think
6  we've been through everything that relates to
7  Summary A.
8      A.  Yes.
9      Q.  Okay?
10     A.  I think that's right.
11     Q.  Summary B basically takes the work that
12 you did for the Georgia case for Fort Benning
13 and Fort Belvoir and assumes that Pinnacle is
14 terminated at the Monterey and the CMC projects
15 and that the projects would enjoy the same rate
16 of savings that you calculated at Belvoir and
17 Benning projects, right?
18     A.  No, that's not I don't think an
19 accurate articulation of what Opinion B is.
20     Q.  Well, you say assuming in light of
21 these similarities that Pinnacle is terminated
22 at the Monterey and CMC projects and that the
23 projects enjoy the same 10.7 percent savings
24 experienced at the Benning and Belvoir projects

Page 294

1  after Pinnacle's termination, such reduced costs
2  would amount to 21 million over the life of
3  Monterey and CMC projects to date, right?
4      A.  Yes, I didn't try and follow every
5  single word, but, yes, the distinction that I'm
6  making with your previous question to what is
7  written here is that -- is that the -- what I'm
8  doing is that if Pinnacle is terminated and
9  if they enjoy the same savings rate that has
10 been experienced on average at Benning and
11 Belvoir, then the -- that amount result in
12 $21 million.  That --
13     Q.  Over the remaining life of the Monterey
14 and CMC projects?
15     A.  No, that is the -- that is a savings
16 rate -- as you see it says such reduced cost
17 would amount to approximately $21 million over
18 the life of the projects to date, meaning that
19 Pinnacle is still there, that in -- Benning and
20 Belvoir have experienced a savings rate on a
21 weighted average basis of 10.7 percent, and
22 if -- if one were to evaluate or consider that
23 experience that has been enjoyed at Benning and
24 Belvoir and wanted to understand the financial

Page 295

1  context of the -- what that kind of a savings
2  rate would have meant to Monterey and CMC
3  compared to what they paid, that number would be
4  $21 million, because Pinnacle hasn't been
5  removed at Benning and Belvoir where they have
6  at -- I'm sorry, they haven't been removed at
7  CMC and Monterey, whereas they have at Benning
8  and Belvoir.
9      Q.  So the period of time that you have
10 calculated this incentive fee -- or sorry, this
11 savings of -- I think it's a total of $20
12 million is what you calculate for both projects
13 combined, 21 million?
14     A.  It's $21 million on a combined basis if
15 you do a comparison of the rate of savings that
16 has been enjoyed at Benning and Belvoir and you
17 apply that rate to the historical costs that
18 have been incurred by --
19     Q.  So you get that number by --
20     A.  By CMC and --
21     Q.  -- looking at the historical cost from
22 the start of each project, right?
23     A.  Which -- are you talking about how I --
24 how I mathematically derived the 21 million?

Page 296

1      Q.  Yes.
2      A.  I look at that by applying the
3  10.7 percent to the same equivalent set of costs
4  by category that I looked at Benning and
5  Belvoir, those same sets of controllable costs,
6  and if one applies that 10.7 percent to those
7  same cost categories at CMC and Monterey, that
8  math would result in a -- in a $21 million
9  figure.
10     Q.  And those costs are from the period
11 March 1, 2004, through the end of 2014?
12     A.  It's through the end of when
13 I calculated it, yes, I think it's through the
14 end of 2014.
15     Q.  You say to the end of 2014 on Page 63.
16     A.  Yes.
17     Q.  I'm assuming that's what it is.
18     A.  Yes.
19     Q.  All right.  So at -- at CMC this
20 $10,568,000 is a ten percent savings that starts
21 on March 1, 2004, and goes all the way through
22 the end of 2014?
23     THE WITNESS:  I'm sorry.  Can I ask to have
24 that question read back.

Page 297

1        (WHEREUPON, the record was read
2        by the reporter as requested.)
3     THE WITNESS:  Yes, it's from the -- it's for
4  the entirety of the project with respect to
5  Pinnacle's involvement and the controllable
6  expenses that were incurred to again provide
7  a -- a context for what the savings that Benning
8  and Belvoir have seen post removal of Pinnacle
9  and what the financial context of that is if
10  an -- if a similar rate of savings had been
11  enjoyed at -- at CMC and Monterey.
12  BY MR. DUTTON:
13     Q.  And so with respect to Monterey, just
14  listen to my question, Mr. Dudney, the savings
15  is derived from taking the 10.7 percent which
16  you've calculated at the other projects and
17  applying that to controllable costs at Monterey
18  from October 1, 2003, through the end of 2014?
19     A.  Yes, for the purpose that I described
20  in my -- what you've marked as Exhibit 1 as well
21  as what I've clarified with respect to
22  Mr. Potter's criticisms in my June 5th, 2015
23  rebuttal report.
24     Q.  And with respect to Section C of your

Page 298

1  summary opinion, that is about disgorgement,
2  right?
3     A.  Yes.
4     Q.  And basically Section C just calculates
5  the total fees that was received by Pinnacle at
6  each of the projects, correct?
7     A.  Yes.
8     Q.  And there are two categories of fees.
9  There is property incentive management fees,
10  right?
11     A.  Yes.
12     Q.  And there is management fees at each
13  project, correct?
14     A.  Correct.
15     Q.  And you've simply summed up the total
16  amounts that were actually paid, right?
17     A.  Yes.
18     Q.  And you have not set off any other
19  compensation or reimbursement that Pinnacle was
20  entitled to, but didn't receive?
21     A.  I have not offset these numbers for
22  claims for fees or other amounts that Pinnacle
23  believes it is due and owing.  I haven't done
24  such an offset.

Page 299

1     Q.  And you've excluded from the 2012, 2013
2  and 2014 calculations at both projects the
3  amount of incentive fees that Pinnacle is due
4  under the contracts, right?
5     A.  Yes, because I understand that --
6     Q.  Because they weren't paid?
7     A.  Whatever amount may be due, if any,
8  there hasn't been a payment is my understanding,
9  so that's why there was nothing to disgorge and
10  so I pulled those out.
11     Q.  And you have not offset from these
12  numbers the value of the property management
13  agreements themselves, have you?
14     A.  I have not offset anything with respect
15  to any alleged value of the property management
16  agreements.
17     Q.  Is it your understanding that if the
18  property management agreements were terminated
19  that Pinnacle would forfeit its interest, its
20  financial interest in the property management
21  agreements?
22     MS. WELCH:  Objection, calls for a legal
23  conclusion.
24     THE WITNESS:  Yeah, I don't know that I have

Page 300

1  a view or a conclusion one way or the other.
2  BY MR. DUTTON:
3     Q.  Do you have a view or conclusion that
4  the property -- whether or not the property
5  management agreements have a value to Pinnacle?
6     A.  Well, I look at them in -- in the
7  context of the solvency analysis that I do and
8  with respect to my evaluation of the claims in
9  this case, and so from that perspective, I have
10  a -- from a solvency standpoint, I have a
11  viewpoint which is that there -- for
12  consideration under that paradigm, there's
13  little to no value that should be ascribed to
14  them separate and apart from what I've done in
15  terms of looking at the cash flows with them,
16  but that's the context in which I looked at it.
17     Q.  Have you reviewed Pinnacle's financial
18  statements from prior to the litigation?
19     A.  I may have at some point.  I don't --
20  as I sit here today, I can't recall if I did.
21  When you -- when you say the litigation, just
22  the Monterey litigation or the whole --
23     Q.  The entire litigation.
24     A.  I may have at some point, Mr. Dutton.

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 78 of 90

LOUIS DUDNEY                                          June 16, 2015
MONTEREY BAY vs. PINNACLE                                  301–304

Page 301

1  I mean, I've been involved in this case since
2  '09.
3      Q.  Are -- are you familiar with the
4  allegations of the -- I think it's the fifth
5  amended complaint that was filed in this case?
6      A.  I've seen the fifth amended complaint.
7      Q.  Are you familiar with the allegations
8  in that complaint that Pinnacle financial
9  statements showed that Pinnacle in its entirety
10  had a value of upwards $160 million in March
11  of 2010?
12     THE WITNESS:  Let me ask to have that read
13  back.
14          (WHEREUPON, the record was read
15          by the reporter as requested.)
16     THE WITNESS:  I don't recall a specific
17  allegation with respect to that.
18  BY MR. DUTTON:
19     Q.  Okay.  Section D addresses your
20  opinions concerning the sale from AMS or
21  American Management Services of certain assets
22  to a newly formed company called Pinnacle
23  Property Management Services, correct?
24     A.  Yes.

Page 302

1      Q.  And what documents did you review in
2  order to give your opinions in that matter?
3      A.  Quite a few.  It was the confidential
4  information memoranda that was put together by
5  Alexander Hutton.  It was various bid-related
6  documents that were produced with respect to
7  other parties or summaries of those bids.  It
8  was financial projections that were prepared by
9  Pinnacle.  It was financial statements of AMS.
10  There was the agreements -- the purchase and
11  sale agreement documents themselves that
12  articulate how the transaction was structured
13  and all the Ts and Cs or the terms and
14  conditions around that.
15        I also looked at deposition testimony.
16  I read Mr. Petrie's testimony.  I read -- I
17  think it's Mr. Hardman who is the -- who is the
18  Alexander Hutton representative.  I reviewed
19  Mr. Hunt's deposition testimony.  I reviewed
20  Mr. Harrelson's deposition testimony.
21  I reviewed Mr. Goodman's deposition testimony in
22  that regard, Mr. Graf's testimony.
23        I also looked at e-mail correspondence
24  in other contemporaneous information that was

Page 303

1  being shared.  I also looked at due diligence
2  documents in this -- some of these came
3  subsequent to the issuance of my March 27th
4  report.  Obviously some of the depositions were
5  taken after that, but writ large as I sit here
6  today, those would be examples of the kinds of
7  documents that I looked at for purposes of this
8  analysis.
9      Q.  On page -- Pages 65 and 66, you go
10  through an analysis of the sale process.  Do you
11  see that?
12     A.  I think it's a description more than an
13  analysis per se.  I just describe what
14  I understand took place.
15     Q.  And your understanding is that sometime
16  in the first -- last quarter of 2012, first
17  quarter of 2013 Pinnacle hired Alexander Hutton?
18     A.  I -- I have it noted is they were
19  engaged in the first quarter of 2013.
20     Q.  And Alexander Hutton essentially acted
21  as investment banker or a broker to help market
22  the nonmilitary assets of AMS?
23     A.  Yes.
24     Q.  And you understand that not all of the

Page 304

1  assets of AMS were sold in connection with the
2  sale?
3      A.  I do.
4      Q.  And have you made an effort to
5  determine whether the assets that were sold were
6  substantially all of the assets or a portion of
7  the assets, or what portion of Pinnacle's assets
8  were sold in connection with the sale to Hunt?
9      A.  A significant portion.  It was all the
10  nonmilitary assets largely that left then the
11  AMS to then hold the military contracts and then
12  a series of I'll call them one off either
13  receivables or other financial assets or certain
14  liabilities that existed then post transaction.
15     Q.  Now -- now, what were the assets, the
16  nonmilitary assets that were sold?  What was the
17  nature of those assets?
18     A.  Management agreements in a business
19  around the management of essentially apartment
20  buildings.
21     Q.  Anything else?
22     A.  That was the nature of the business.
23  They were a series and I forget the total number
24  of management agreements.  There was also a -- a

Page 305

1  smaller what is termed asset management business
2  as well that is part of what was conveyed.
3      Q.  And that was owned by an entity other
4  than AMS, correct?
5      A.  As I understand it, it was --
6  I understand that earlier in time, roughly 2011,
7  that business was owned -- there was a business
8  that owned -- I think it was 50/50
9  Mr. Harrelson, Mr. Goodman or something close to
10 that that was considered the asset management
11 business, and then I believe that that asset
12 management business was contributed as part of
13 AMS or became part of the AMS business at and
14 around that 2011 time period and then it was
15 subsequently included in the assets that were
16 sold is my understanding.
17     Q.  When you say contributed to the AMS
18 business, did the original entity that owned the
19 asset management business receive any
20 compensation at the time that those assets were
21 contributed to the AMS business?
22     A.  No, there was some -- I don't know that
23 I can say whether definitively they're not -- or
24 not there was some compensation at the time, but

Page 306

1  I do know that there were issues that were
2  raised by Mr. Harrelson and he felt like he was
3  not fairly treated with respect to the
4  contribution of those assets.
5      Q.  Now, fraudulent transfers, you -- I --
6  I read in your CV that you actually work in this
7  area quite frequently; is that correct?
8      A.  I've been involved in a number of
9  fraudulent transfer cases over time.
10     Q.  Okay.  And -- and if I understand it
11 correctly, and you can correct me if I'm wrong,
12 the owners in this case are potential creditors
13 because they have claims against AMS; is that
14 right?
15     A.  Yes, they would have what you would
16 call disputed or -- and/or contingent claims
17 against AMS.
18     Q.  And the idea of a fraudulent transfer
19 is the -- the debtor, if you will, and I'm using
20 that term not as you would use it in a -- in the
21 context of a bankruptcy, but just whoever the
22 creditor is claiming owes money is transferring
23 assets with the intent to hinder or delay or
24 defraud a creditor, right?

Page 307

1      A.  Not exactly.  It's one of two -- that
2  is one element of it, but there are essentially
3  two -- the -- the way it works to my
4  understanding from my experience in doing these
5  types of cases is that there is -- the first
6  criteria is you can have actual fraud which is
7  the sentence that you just read with actual
8  intent to, and it says at the top of Page 64,
9  hinder, delay or defraud any creditor or debtor,
10 full stop.
11         Then, second, there is a concept
12 legally that's called constructive fraud, and
13 constructive fraud is when a series of
14 conditions exist and that is that -- that, one,
15 you don't receive a reasonably equivalent value
16 in exchange for a transfer and the debtor was
17 essentially insolvent and -- and there are two
18 articulations of how solvency is determined, but
19 if you're -- the premise goes that if you're
20 insolvent and you don't get reasonably
21 equivalent value for an asset that went out the
22 door, that's a constructive fraud for purposes
23 of fraudulent transfer law.
24     Q.  And -- and I take it that based on the

Page 308

1  summary of opinions that you have in your
2  report, that you are talking about the
3  constructive version of that?
4      A.  I am.  I don't have a separate opinion
5  with -- I don't render a separate opinion with
6  respect to actual intent to hinder, delay or
7  defraud, although I will say that the
8  characterizations financially of the
9  transactions that I've looked at may well go to
10 the plaintiff's assertion that, in fact, there
11 was an actual intent to hinder, delay or defraud
12 a creditor, and so I've -- I -- I might -- as
13 I understand it, might be asked to describe
14 how -- my understanding of how the transaction
15 worked that might be a component of that
16 situation, but I don't opine that one way or the
17 other because that's a legal determination.
18     Q.  And in your expert report, your
19 opinions relate to transactions that you claim
20 or that you opine represent constructively
21 fraudulent transfers, correct?
22     A.  That's correct.
23     Q.  And you don't opine that any
24 transaction is a transaction made with actual

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 80 of 90

LOUIS DUDNEY                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                        309–312

Page 309

1  intent to hinder, delay or defraud any creditor?
2      A.   That's correct.  I don't have an
3  opinion that says that, but I -- as I understand
4  it, the -- because I've analyzed or
5  deconstructed the transaction and understood
6  how -- understand how it works for the purposes
7  of my report, that some of those observations
8  that I make in the report, I could anticipate
9  that those might be used by counsel to make
10  whatever case it's going to make as if it
11  decides to assert on behalf of the plaintiffs
12  that there was, in fact, actual intent to
13  hinder, delay or defraud a creditor.
14      Q.   Now, your understanding is that the
15  transfer -- well, the owners in this case are
16  the potential creditors, right?
17      A.   Yes, it's the claim -- it's essentially
18  the claim -- the claimants who would be the
19  plaintiffs.
20      Q.   The owners are making a claim for
21  fraudulent transfer?
22      A.   Yes, as I understand it.
23      Q.   And is it your understanding that the
24  owners had the ability to seize control of the

Page 310

1  assets that were actually transferred and turn
2  them into cash to satisfy a potential judgment?
3      MS. WELCH:  Objection, form.
4      THE WITNESS:  If I understand your question
5  correctly, and let me just make sure I've got
6  it, which is you're asking me whether or not
7  I understand if the creditors or the owners as
8  the creditor in this discussion we're having had
9  the right to seize --
10  BY MR. DUTTON:
11      Q.   Not the right.
12      A.   Okay.
13      Q.   The ability.
14      A.   The ability to seize the assets that
15  were transferred?
16      Q.   Let's assume that there was a big
17  judgment, that you're -- let's assume that
18  there's a $20 million judgment and that that
19  judgment is trebled and then you throw
20  attorneys' fees on top of that and you have a
21  great big whopping judgment.  Okay?
22      A.   Large number, yes.
23      Q.   And how are the owners going to get --
24  going to turn the assets that were transferred

Page 311

1  to PPMS into cash to satisfy those judgments?
2      A.   Well, if they -- if the owners obtained
3  a judgment against AMS that would then bring --
4  and they were a substantial creditor and let's
5  just say for sake of your question, if you're
6  okay with it, that at that point that would make
7  what are now disputed claims liquidated and
8  let's -- if we assume for a second that that
9  would swamp AMS in terms of its financial
10  resources, so one avenue -- and there are
11  different ones, but one avenue would be that
12  there could be an assignment for the benefit of
13  creditors that could take place to basically
14  avoid a bankruptcy.  There could also be a
15  bankruptcy where there's a prepackaged deal
16  where the owners in settlement of their claims
17  get certain rights and interests in the assets
18  of AMS so -- because there are potentially other
19  creditors.
20      Having said that, the way that they
21  would turn those into cash could be a
22  couple-fold.  One is they could as the -- they
23  could take over the equity, for example, if it's
24  demonstrated that there's no value to equity of

Page 312

1  AMS, they could as part of a bankruptcy, for
2  example, become the equity holders and they
3  could choose to simply run those assets or
4  manage them and collect the cash flows from them
5  and do whatever they thought was appropriate.
6  They could obviously sell the assets in some
7  way, shape or form as part of a --
8      Q.   When you say "sell the assets," sell
9  the property management agreements?
10      A.   They could sell the property management
11  agreements.  They could restructure the
12  business, sell portions of the business to
13  manage those -- those contracts.  I mean, there
14  are several thousand employees that were employed
15  by the businesses that were -- or the business
16  that was sold as part of that asset sale, so
17  there would be -- and I could go on.  I mean,
18  there could be machinations of that, but
19  conceptually those would be ways that they could
20  extract value from those assets if they were
21  awarded a judgment and able to move forward with
22  certain actions that a creditor has.
23      Q.   Can you assign a personal services
24  contract?

LOUIS DUDNEY                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                         313–316

Page 313

1    MS. WELCH:  Objection, calls for a legal
2  conclusion.
3    THE WITNESS:  Yeah, I can't -- I can't opine
4  one way or the other about that.
5  BY MR. DUTTON:
6    Q.  Is it possible for a bankruptcy court
7  to sell a personal services contract out of
8  bankruptcy?
9    MS. WELCH:  Same objection.
10   THE WITNESS:  Yeah, I don't have an opinion
11  about that.
12  BY MR. DUTTON:
13   Q.  You don't know one way or the other?
14   A.  It's not something I've looked at here
15  for purposes of this.
16   Q.  Are you aware that the property
17  management agreements between AMS and its
18  nonmilitary clients allow for termination for
19  convenience?
20   A.  Yes.
21   Q.  There's no obligation that the
22  management of AMS would have to continue working
23  for a new owner?
24   A.  I -- I think that's correct.  I don't

Page 314

1  think there's an obligation to do it.
2    Q.  There's no obligation that the
3  customers of AMS would have to stay with the
4  company if the company had new ownership or was
5  somehow sold in bankruptcy to the owners, right?
6    A.  I think it -- again, I've reviewed a
7  number of the individual contracts that were
8  conveyed as part of the sale and I think they
9  have termination provisions which would allow
10  some flexibility with respect to that, so yes,
11  they would have some ability to cancel the
12  contract.
13   Q.  They probably have default conditions
14  like the one in the property management
15  agreements that you've seen that say that if
16  Pinnacle declares bankruptcy, the agreements are
17  terminated?
18   A.  It's -- I -- I would have to look to
19  see about that particular aspect of the
20  agreement, but having provisions like that is
21  not uncommon.
22   Q.  So just how is it that the owners if
23  they had a judgment or any judgment creditor,
24  would turn these assets into cash or -- or some

Page 315

1  type of money that they could use to satisfy a
2  judgment?
3    A.  Because everything that you just said,
4  putting aside the legal or the questions that
5  you asked me, putting aside the legal
6  determinations that I think you were asking me,
7  while they could happen, they also may not
8  happen, and so whether or not the clients would
9  stay with the business if there was a judgment,
10  is -- it's not -- it's certainly not definitive
11  that they would not.  There -- as I said the
12  organization is a 2600-person organization
13  roughly that's providing services and -- to
14  those entities and whether or not and to what
15  extent that they would stay with the company
16  would depend on the facts and the circumstances
17  as to how the -- the creditors in this set of
18  questions that we're talking about, how they
19  elevated themselves to something other than
20  where they sit today and what benefit they
21  might -- they might obtain.
22   Q.  Don't fraudulent transfer claims assume
23  that the creditor is injured as a result of the
24  fraudulent transfer?

Page 316

1    A.  The -- because there has to be a
2  reasonably equivalent value or a lack thereof in
3  order for a transfer to be avoided, that's how a
4  creditor is injured and so you find you have to
5  demonstrate that there was not reasonably
6  equivalent value that was provided.
7    Q.  Are you familiar with the fact that if
8  a creditor cannot show that the debtor's assets
9  would be available for execution of a judgment,
10  that there is no fraudulent transfer claim
11  because there's no injury?
12   A.  Again, it sounds to me like a bit of a
13  legal opinion as to what the courts would say as
14  to whether or not the assets would be available,
15  but I -- I do understand that there is a concept
16  that -- that the creditors have to be or
17  demonstrate through the claim that they are
18  injured and, again, the primary way that I'm
19  involved in those claims is by analyzing
20  reasonably equivalent value as I did here.
21   Q.  And -- and reasonably equivalent value
22  injures a creditor because if the asset has a
23  value that the creditor could use to satisfy a
24  judgment and the asset is sold for less than

Page 317

1  reasonably equivalent value, then the amount of
2  money that the creditor could seize or control
3  to satisfy a judgment has been diminished,
4  correct?
5      A.  Generally I think that's correct.
6      Q.  But if the asset is an intangible asset
7  that doesn't have a value except to the -- to
8  the debtor, for example, then the creditor
9  hasn't been injured, right?
10     A.  There may be scenarios that would --
11  would meet that criteria that you're describing,
12  but I think again each -- each case is very
13  individualistic in terms of its assessment.  You
14  can certainly have intangible assets that are
15  very valuable that can be sold to third parties
16  or otherwise converted into value, so there's a
17  variety of ways that it could manifest itself.
18     Q.  Now, you don't express an opinion one
19  way or the other in your expert report that the
20  $30 million purchase price paid for the assets
21  was less than the reasonably equivalent value,
22  do you?
23     A.  The sale itself, no, I do not.
24     Q.  So the -- the letter from Alexander

Page 318

1  Hutton, for example, which opines -- or purports
2  to opine that the sale price of $30 million can
3  be seen as reasonably equivalent value, you
4  don't have any disagreement with that?
5      A.  I haven't challenged the $30 million as
6  a -- as not being representative of fair value,
7  it's -- that opinion -- I've looked at a lot of
8  transactions in my career and that's the first
9  time I've seen an opinion like that by an
10  investment banker, but nonetheless, the -- I
11  have not challenged the $30 million top line
12  price for purpose of the -- the analysis that
13  I've done.
14     Q.  And you don't have an opinion then that
15  the assets that AMS sold to PPMS were worth tens
16  or million dollars more than 30 million?
17     A.  I do not.
18     Q.  And Mr. -- or Alexander Hutton's letter
19  also states that $30 million can be seen as the
20  fair market value because of the process, the
21  bidding process that was -- was gone through in
22  connection with the sale, right?
23     A.  They do talk about that.
24     Q.  And you're familiar with -- generally

Page 319

1  familiar with the law and it's your
2  understanding that typically all other things
3  being equal, fair market value is seen as
4  reasonably equivalent value?
5      A.  Yes.
6      Q.  Your opinions solely relate to what you
7  call purchase price adjustments, and essentially
8  these are payments or adjustments that were made
9  after the $30 million purchase price was agreed
10  to?
11     A.  I have a series of opinions around
12  certain transfers that were made that would
13  be -- they're viewed as deducts because they are
14  deducts to the $30 million top line price.
15  There are a series of those that then I identify
16  as fraudulent transfers.
17     Q.  Well, they're not deducts to the price,
18  are they?
19     A.  They're deducts to the enterprise value
20  of the entity.
21     Q.  They're a disposition of the proceeds,
22  correct?
23     A.  They're also deducted in order to get
24  to the net cash that is provided so --

Page 320

1      Q.  Well, the ultimate proceeds are after
2  the deductions, I'll agree with you there --
3      A.  Yes.
4      Q.  -- but it's not -- it's not an
5  adjustment to the purchase price, is it?
6      A.  I think mechanically the way it worked
7  was no, it wasn't, but they -- the practical
8  aspect of it was that they resulted to our early
9  part of our -- my point on this is that they --
10  they have the effect of a certain deduction
11  given the portion of the company that was sold.
12     Q.  You're familiar with the concept of
13  fraudulent transfer law that if -- if the debtor
14  transfers an asset that has a lien on it and the
15  lien is greater than the value of the asset,
16  then it's not a fraudulent transfer?
17     A.  Uh-huh.  There's certainly --
18     Q.  Correct?
19     A.  There's certainly a body of case law
20  around that.  It's -- it's a complex area and so
21  it's not quite as cut and dry, but yes, the --
22  the value of the lien is something that is --
23  can be considered.
24     Q.  And the reason that that's not a

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 83 of 90

LOUIS DUDNEY                                          June 16, 2015
MONTEREY BAY vs. PINNACLE                             321–324

Page 321

1  fraudulent transfer is because if there is a
2  preexisting lien, then transferring the asset
3  has no -- causes no injury to the creditor?
4      A.  Depends on the -- my understanding is
5  it depends on the nature of the lien.
6      Q.  And the nature of the asset?
7      A.  Yes.
8      Q.  Now, do you know what the value of
9  management equity in Pinnacle would have been
10 and AMS would have been if there had been a
11 hundred-million-dollar judgment against AMS?
12     THE WITNESS:  Let me ask to have the question
13 read back to make sure i got it.
14         (WHEREUPON, the record was read
15          by the reporter as requested.)
16     THE WITNESS:  Zero.
17 BY MR. DUTTON:
18     Q.  You're claiming that these -- the use
19 of the proceeds of the purchase price for
20 payment of liabilities assumed by the buyer --
21 sorry -- yeah, payment for liabilities assumed
22 by buyer funded by seller, do you see that?
23     A.  Which page are you looking at?
24     Q.  I'm on Page 68, liabilities assumed by

Page 322

1  buyer --
2      A.  I'm sorry.  One second.
3      Q.  -- funded by seller.  I think I'm
4  reading that correctly.
5      A.  There was a reduction in the
6  consideration -- well, I'm sorry.  You're
7  looking at -- there were liabilities that were
8  conveyed for Pinnacle to PPMS and those were
9  deductions that then were in terms of what the
10 net cash proceeds were that were paid --
11     Q.  So -- so as a result of the
12 transaction, a lot of -- almost all of the
13 employees from AMS became employees of PPMS,
14 right?
15     A.  Yes, I think the way it worked is that
16 they were stopped being employees one day of one
17 entity and then started being employees the next
18 day of the other entity.
19     Q.  And the $4.2 million that's associated
20 with accrued site level vacation liabilities,
21 that's the amount of money that AMS owed its
22 employees for accrued vacation at each of the
23 sites, right?
24     A.  Yes.

Page 323

1      Q.  And when they became employees of PPMS,
2  PPMS had those liabilities, right?
3      A.  Yes.
4      Q.  And so part of the proceeds were used
5  to fund those liabilities, correct?
6      A.  Yes, correct.
7      Q.  Would -- would -- if there had been
8  a -- or would a judgment creditor have priority
9  to those liabilities over the employees that had
10 accrued --
11     A.  I think that's a legal question.  I
12 don't think so, but I think it's a legal
13 question.
14     Q.  All right.  The second 1,478,000
15 associated with corporate level vacation
16 liabilities, that's essentially the same thing
17 except it's for a different group of employees,
18 right?
19     A.  Correct.
20     Q.  So that's money that AMS owed to
21 corporate level employees for vacation
22 liabilities and when they became PPMS employees,
23 PPMS owed that money?
24     A.  Correct.

Page 324

1      Q.  And AMS funded that liability?
2      A.  There was -- I would say it slightly
3  differently is that there was a recognition of
4  that in the purchase such that PPMS was able to
5  reduce the amount of cash that it paid in
6  recognition of assumption of that liability.
7      Q.  AMS used the proceeds even if it bid on
8  credit, to fund that liability, right?
9      A.  The liability was -- was transferred
10 and there was a reduction to the proceeds as a
11 result of it, I mean --
12     Q.  The proceeds were deducted by
13 $1.4 million --
14     A.  Yes.
15     Q.  -- because of that liability?
16     A.  Correct.
17     Q.  And do you know whether or not a
18 judgment creditor would have had priority over
19 the employees with respect to that accrued
20 vacation liability?
21     A.  Again, I think it's a legal question
22 and not something that I considered because
23 these aren't part of the fraudulent transfers
24 that I claim.

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
325–328

Page 325

1    Q.   These are not part of the fraudulent
2  transfers?
3    A.   No, sir.
4    Q.   Okay.  So everything that's in
5  Section 2, liabilities assumed by buyer, funded
6  by seller, are not part of the fraudulent
7  transfers?
8    A.   No, they're separately denoted.  The
9  fraudulent transfers are noted in Table 34 on
10  Page 88.  These are just the deductions --
11    Q.   You should have said that earlier then
12  I could have --
13    A.   I wasn't sure where you were going, but
14  I got the sense that you were maybe
15  misconsidering those, but, yeah, it's Page 88
16  are the list of the transfers that I list and
17  include.
18    MR. DUTTON:  Ah.  All right.  Why don't we
19  take a break and then we can come back and
20  finish this up.
21    THE WITNESS:  Great.  Thank you.
22    THE VIDEOGRAPHER:  We are off the record at
23  5:11 p.m.
24

Page 326

1         (WHEREUPON, a short break was
2           taken.)
3    THE VIDEOGRAPHER:  We are on the record at
4  5:20 p.m.
5  BY MR. DUTTON:
6    Q.   A couple things, Mr. Dudney.  So the --
7  the -- the transfers, whether you refer to them
8  as transfers of the proceeds of the purchase
9  price or transfers after the purchase price,
10  the $30 million was agreed to or whatever you
11  want to call them, these are transfers in
12  Table 34 that you believe were made and you
13  believe that they are constructive fraudulent
14  transfers?
15    A.   Yes.
16    Q.   Okay.  And with respect to the specific
17  bonuses that you categorize or itemize in
18  Table 34, those are the bonuses that were paid
19  to AMS managers -- senior managers for their
20  work in putting together the sale of assets that
21  was ultimately made to Hunt, right?
22    A.   I wouldn't describe them that way.
23    Q.   Okay.  What would you describe them as,
24  Mr. Dudney?

Page 327

1    A.   There are a series of agreements for
2  four of the five that are listed.  As
3  I understand it, I don't believe that
4  Mr. Orrantia has an agreement.  Mr. Petrie I
5  believe testified that Mr. Orrantia was paid a
6  $250,000 bonus because Mr. Petrie made a
7  judgement that that was an amount of money that
8  he should be paid.  He had from -- from what
9  I saw in the record, had very little involvement
10  in the deal.  I think it was described that he
11  put Mr. Hunt in touch at one point in time
12  with -- with Mr. Goodman and arranged for a
13  meeting, but that was all that seemed to be
14  taking place with Mr. Orrantia.
15       With respect to the other gentlemen,
16  they had agreements that were -- as I read them,
17  they were bonus agreements that provided for a
18  bonus in the event that there was a transaction
19  at various levels and so I would -- they weren't
20  as I could -- as far as I could tell based on
21  the record, they did not appear to be very
22  actively involved in the sale process itself
23  with Hunt as an example, taking Mr. Hunt's
24  testimony as an example, he describes -- and

Page 328

1  it's consistent with Mr. Graf that, you know, it
2  was really Mr. Hunt and Mr. Goodman that -- and
3  that's Mr. John Goodman, not Larry, that were
4  involved in the negotiating of the deal.
5       So these were bonuses, though, that
6  were paid contingent upon a deal getting done at
7  what I would consider to be very reduced -- very
8  reduced enterprise values, so I'm not --
9  I haven't been able to identify what I would
10  consider to be reasonably equivalent value that
11  was provided for purposes of those bonuses.
12    Q.   Okay.  So -- and when you say "those
13  bonuses," you're talking about Mr. Graf's bonus,
14  Mr. Larry Goodman's bonus, Mr. John Carrosino's
15  bonus and Mr. Schwabe's bonus?
16    A.   Yes, and Mr. Orrantia, except that he
17  didn't have the bonus agreement.  The other
18  folks did.
19       The other thing I would point out with
20  respect to those bonuses for everybody but
21  Orrantia, because again Orrantia doesn't have an
22  agreement, is that agreement has some terms and
23  conditions which again I'm not rendering a legal
24  opinion with respect to it, but I noted it when

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 85 of 90

LOUIS DUDNEY                                             June 16, 2015
MONTEREY BAY vs. PINNACLE                                    329–332

Page 329

1  I reviewed the contracts, that it would appear
2  to indicate that for any of the management
3  members that obtained an ownership interest in
4  PPMS, that they wouldn't be due the bonus yet
5  they were paid the bonus nonetheless.  So anyway
6  that's -- there were a number of reasons that
7  I included those as fraudulent transfers, but
8  those are a couple.
9    Q.  Okay.  So you basically -- what your --
10  what your opinion is is that Mr. Graf's work
11  that he did in order to earn this bonus of
12  $420,000, in your opinion, is not worth -- or is
13  not the reasonably equivalent value of $420,000?
14    A.  Given -- generally speaking, that's
15  correct that there was -- I mean, he was a
16  highly-compensated individual that had been -- a
17  bonus agreement that was put together that the
18  top rung, if you will, of that bonus ladder was
19  I believe an enterprise value target of
20  $20 million which is two-thirds of what the
21  value of the entity ultimately was demonstrated
22  to be, so it -- he got his full bonus, if you
23  will, for delivering something that was
24  two-thirds, excuse me, of what was actually

Page 330

1  delivered, and so there was a fair
2  differentiation from that.  And again, I think
3  there's a -- there's a case to be made and again
4  I'm not opining on this, but I just noted it
5  that the management bonus recipients should not
6  have received the bonus in light of the terms
7  and conditions of the bonus agreement itself.
8    Q.  And with respect to Mr. Larry Goodman,
9  John Carrosino and Eric Schwabe, you have the
10  same opinions?
11    A.  That's correct.  It's not -- it's not
12  directed just at one of those individuals.  It's
13  conceptually the same across the board.
14    Q.  And you also state in here that you
15  believe that the payment to Mr. Harrelson of
16  $675,000 for the asset management business, if
17  you will, that went along with the cascade and
18  olympic portfolio or platform, that that was not
19  reasonably equivalent value?
20    MS. WELCH:  Objection to form.
21    THE WITNESS:  That there -- my opinion is
22  that Mr. Harrelson -- as I understand it, that
23  contribution had occurred years earlier, that
24  that actually had taken place years earlier and

Page 331

1  so it had already happened, and so now then
2  there's a subsequent payment that's made out of
3  this deal for 675,000.  Mr. Goodman testifies
4  that his view was that this was worth zero, but
5  nonetheless, this was an amount that he and
6  Mr. Harrelson agreed to, but that was
7  essentially a -- a payment for an asset that
8  already existed and had been transferred again,
9  as I said, years earlier, so it's not the same
10  transaction --
11  BY MR. DUTTON:
12    Q.  The asset was -- the asset was owned
13  separately from AMS, correct?
14    A.  It was at one point in time.
15  I understand that it was contributed and I talk
16  about that in here, I think, in --
17    Q.  Was there any --
18    A.  -- 2011.
19    MS. WELCH:  Can you let him finish?
20  BY MR. DUTTON:
21    Q.  Was there any compensation at the time
22  for that contribution?
23    A.  Not to my -- the allegation that
24  Mr. Harrelson is making in some of the

Page 332

1  discussions and e-mails and things back and
2  forth is no, so if I -- if I assume and take him
3  at his word on that, that -- that there was
4  none, but it was nonetheless contributed to the
5  business and yet now years later he's getting a
6  payment for it, that's to me two separate
7  transactions now because the asset was already
8  in the control of the business.
9    Q.  Do you know whether the business had
10  the legal right to control the asset without
11  Mr. Harrelson's consent?
12    MS. WELCH:  Objection, calls for a legal
13  conclusion.
14    THE WITNESS:  Yeah, I -- I haven't analyzed
15  the -- the legal aspect of that, but my just
16  understanding from a financial perspective was
17  that the -- AMS had ownership of that asset at
18  the time of the transfer.
19  BY MR. DUTTON:
20    Q.  Have you seen any documents evidencing
21  AMS's ownership of that asset?
22    A.  Well, I think the purchase and sale
23  agreement allowed AMS to convey that as part of
24  that --

Case 5:14-cv-03953-BLF   Document 330-6   Filed 07/02/15   Page 86 of 90

LOUIS DUDNEY                                                    June 16, 2015
MONTEREY BAY vs. PINNACLE                                          333–336

Page 333

1    Q.   That wasn't my question.  My question
2  was have you seen any assets conveying ownership
3  of that asset to AMS?
4    A.  I think you mean documents?
5    Q.  Yeah.  Didn't I say documents?
6    A.  You said assets, yes.
7    Q.  Okay.  Have you seen any documents
8  conveying ownership of that asset to AMS from
9  the entity controlled by Mr. Harrelson and
10  Mr. Goodman?
11    A.  I don't -- I think -- I don't know that
12  there are specific documents other than
13  Mr. Harrelson articulating this issue in such a
14  way that would be consistent with the conclusion
15  that they were transferred and contributed years
16  earlier --
17    Q.  You said Mr. Harrelson now.  I think
18  you mean Mr. Goodman?
19    A.  No, it was Mr. Harrelson had said that
20  it -- that he felt that those assets were
21  contributed, and at the time they were
22  contributed, he didn't get compensation --
23    Q.  And where did you discuss that?
24    A.  I'm sorry?

Page 334

1    Q.  Where do you discuss that?
2    A.  It's on Page 86, Mr. Harrelson's
3  payment, and I also talk about it -- I don't
4  know if I -- I may talk about it as well in my
5  rebuttal report.  Let me just look.  Oh, no, I
6  don't because he doesn't -- Mr. Potter doesn't
7  talk about reasonably equivalent value.
8    Q.  You say for value of asset management
9  rights that were previously contributed to
10  Pinnacle, I see no evidence of a formal
11  contractual obligation, John Goodman stated it
12  was of no value, Pinnacle -- you say Pinnacle is
13  insolvent -- my question was what's your basis
14  for saying that the asset management rights were
15  previously contributed to Pinnacle?
16    A.  There are -- I don't know if they're
17  e-mails or other correspondence involving
18  Mr. Harrelson and Mr. Goodman on this issue,
19  that it was something that took place -- again,
20  my best recollection is that it was in 2011.
21  There may also be some deposition testimony
22  around that, but it's -- Mr. Harrelson has an
23  e-mail, if I remember correctly, or a letter
24  that talks about this issue.

Page 335

1    Q.  Your report does not cite to any
2  specific documents that support the proposition
3  that the asset management rights were previously
4  contributed to Pinnacle, does it?
5    A.  I believe that now the letter from
6  Goodman, the resolution of outstanding matters
7  letter, references this particular transaction.
8  I'd have to look back at it to see if it talks
9  about the timing of it, but I don't have a
10  specific footnote cite for the previously
11  contributed aspect of the prior -- of that
12  sentence.  I'd have to look to see if it's in
13  Goodman's letter or if it's -- if it's only in
14  the Harrelson memoranda that I am thinking
15  about.
16    Q.  You don't have any contract or
17  documentation that definitively determines
18  whether or not the transfer of the asset
19  management business to PPMS was an equity
20  contribution, right?
21    A.  I don't have -- I don't know that we
22  have documentation or that I've seen
23  documentation that shows the form of how that
24  was -- how that transfer took place.  It's just

Page 336

1  referenced to the fact that the transfer had
2  taken place again years earlier and then as part
3  of this now later transaction, Mr. Harrelson was
4  being paid out allegedly for it.
5    Q.  And your opinion about -- of reasonably
6  equivalent value, why is it your opinion that
7  $675,000 is not the reasonably equivalent value
8  of these assets?  Is it because you believe that
9  Mr. Harrelson had no claim whatsoever in light
10  of the contribution?
11    A.  Because it's not a contemporaneous
12  transfer.  The assets were already in the
13  business and the creditors would have a right to
14  those, and then there's now years later a
15  payment associated with those or -- or a
16  distribution of some kind.
17    Q.  How would creditors be able to seize or
18  get their hands on asset management assets?
19    A.  To the extent that they were granted
20  any rights in the equity of AMS, the same way
21  that AMS would -- as equity shareholders would
22  conduct the affairs of AMS, a creditor who steps
23  into the shoes of those equity holders could
24  perform the same role.

Page 337

1    Q.   Now, you're familiar with fraudulent
2  transfer law, right?
3    A.   To the extent that it impacts the kinds
4  of analyses that I do, I have a familiarity with
5  it.  I'm again not a lawyer and so I can't
6  testify about the legal aspects of it, but just
7  I understand generally the parameters of it.
8    Q.   And you understand that the Uniform
9  Fraudulent Transfer Act does not provide a cause
10 of action against the officers or the directors
11 of a corporation who direct an allegedly
12 fraudulent transfer?
13   MS. WELCH:  Objection, calls for a legal
14 conclusion.
15   THE WITNESS:  Yeah, I don't have an opinion
16 one way or the other about that.
17 BY MR. DUTTON:
18   Q.   You're aware that the only -- the
19 potential defendants in a fraudulent transfer
20 act are the transferees or the transferors,
21 right?
22   MS. WELCH:  Objection, calls for a legal
23 conclusion.
24   THE WITNESS:  Yeah, not something that I've

Page 338

1  rendered an opinion on.
2  BY MR. DUTTON:
3    Q.   Mr. Goodman didn't transfer these
4  assets, did he?
5    MS. WELCH:  Objection to form.
6    THE WITNESS:  I would characterize it that --
7  oh, Mr. Goodman, is that what you asked about?
8  I thought you said --
9  BY MR. DUTTON:
10   Q.   Yeah.  Mr. John -- these weren't
11 Mr. John Goodman's assets, he did not transfer
12 them to anybody, he's not a transferor nor is he
13 a transferee?
14   A.   I'll say this that the -- without
15 rendering a legal opinion as to the definition
16 of a transferor, Mr. Goodman was the --
17 certainly as a majority equity holder of AMS, it
18 was clear to me that he directed the transfer or
19 made the agreement, and he testified as much,
20 between Mr. Harrelson and Mr. Goodman and so it
21 was his decision as the primary shareholder of
22 AMS to reach an agreement to provide these funds
23 based on, you know, claims that Mr. Harrelson
24 was making so -- bless you -- I'm not sure -- so

Page 339

1  to me in a nonlegal way, AMS is transferring
2  the -- is the transferor of the assets, but it's
3  being done at the direction and at the approval
4  of the primary shareholder because he's the
5  individual that negotiated these things.
6    Q.   That's kind of the way corporations
7  work, isn't it, Mr. Dudney?
8    A.   Depends.  Sometimes shareholders are
9  active, other times management runs it and
10 shareholders are more passive.  In this case I
11 think Mr. Goodman's more active with respect to
12 this type of transaction.
13   Q.   Finally, you talk about -- well, what
14 do you know about the holdings that Pinnacle had
15 and that the individual principals of Pinnacle
16 had in the Hunt Pinnacle military deals?
17   THE WITNESS:  Let me ask to have that
18 question read back.  I'm not sure I followed it.
19        (WHEREUPON, the record was read
20         by the reporter as requested.)
21   MS. WELCH:  Objection to form.
22   THE WITNESS:  I'm not sure I -- when you say
23 the Hunt Pinnacle military deals, are you
24 referring to some of the notes or something

Page 340

1  else?
2  BY MR. DUTTON:
3    Q.   You have this -- you have this
4  provision at the bottom of your report at the
5  bottom of Page 88 --
6    A.   Okay.
7    Q.   -- that goes over to Page 89.  Do you
8  see that?
9    A.   Yeah, let me just quickly read it here
10 because it's a long report.  Okay.  I've
11 refreshed on that, two paragraphs.
12   Q.   You don't know the structure of the
13 holdings that AMS had or that the individual
14 principals of AMS had in the Hunt Pinnacle
15 military deals that were sold or that were --
16 yeah, that were sold to Hunt in March of 2011,
17 right?
18   A.   I think that's fair.  I have limited
19 information at this point with respect to that
20 transaction.
21   Q.   Your -- your conclusion or your
22 statements made on Page 88 are based on a single
23 document describing the flow of funds from the
24 Hunt closing, but you don't have any knowledge

Page 341

1  of the legal basis that was used to put together
2  the flow of funds from the Hunt closing?
3      A.   I don't think I have the closing
4  documentation with respect to that transaction.
5  I just have the flow of funds.
6      Q.   And you understand that in real estate
7  deals, there are often multiple parties that
8  have interests in a particular deal through
9  multiple entities?
10     A.   They -- they -- real estate deals many
11  times involve single asset entities or single
12  property entities that are structured in a
13  particular way and there could be multiple
14  versions -- or multiple iterations of that for
15  different properties.
16     Q.   For example, with respect to the --
17  let's just take the Monterey project.
18  Mr. Harrelson and Mr. Goodman had a direct
19  interest in those projects through Pinnacle
20  Monterey, correct?
21     A.   Correct.
22     Q.   And AMS had an interest in those
23  projects through its relationship with AMSC, its
24  subsidiary?

Page 342

1      A.   That's my understanding.
2      Q.   And if, for example, the entirety of
3  the Pinnacle affiliated interest was sold, you
4  would expect some payout to go to the interest
5  held by Pinnacle Monterey and some payout to go
6  to the interest that was held by AMS?
7      A.   And I'm sorry, your -- the beginning
8  part of your question was what -- if what was
9  sold?
10     Q.   Well, the entire Pinnacle affiliated
11  interest in the Monterey project was sold.
12     A.   I would expect there to be a
13  distribution of proceeds consistent with the
14  ownership structure of that entity.  Again,
15  considering whether or not in the position of
16  that entity with respect to its creditors,
17  obviously we have a real situation here with
18  this litigation, but putting that aside for a
19  second, just conceptually that's the way I would
20  think about it.
21     Q.   And that's the way you think about the
22  Hunt Pinnacle transaction as well, right?
23     A.   I don't really have a lot of thought
24  around the Hunt Pinnacle transaction other than

Page 343

1  what I've articulated here just because I have,
2  you know, very limited documentation around it,
3  and so I've made the notation that I have --
4  recognizing that if more fulsome information was
5  provided that I might be able to look at those
6  transactions in light of the transfers of value
7  that took place during the pendency of this
8  litigation in its various stages.
9      Q.   Okay.  And I guess the only point I was
10  making is that the distributions that were made
11  pursuant to the flow of funds from the Hunt --
12  from the Hunt closing were probably made
13  consistent with the ownership structure of the
14  Pinnacle affiliated entities and the individuals
15  in the Hunt closing?
16     A.   I can't testify one way or the other.
17  That would be like a -- that would be my
18  assumption barring having seen -- without having
19  seen the documents, since that's the way
20  typically transactions work, but again I
21  can't -- I can't really testify one way or the
22  other just because I've seen such limited
23  information with respect to that transaction.
24         MR. DUTTON:  All right.  Can we take a short

Page 344

1  break?  And I think we will wrap this up.
2      THE WITNESS:  Okay.
3      THE VIDEOGRAPHER:  We are off the record at
4  5:42 p.m.
5         (WHEREUPON, a short break was
6         taken.)
7      THE VIDEOGRAPHER:  We are on the record at
8  5:47 p.m.
9      MR. DUTTON:  Mr. Dudney, I don't have any
10  further questions for you at this time.
11     THE WITNESS:  Okay.  Thank you, Mr. Dutton.
12     THE VIDEOGRAPHER:  This marks the end of DVD
13  No. 6 and the deposition of Mr. Dudney.  We are
14  off the record at 5:48 p.m.
15         (FURTHER DEPONENT SAITH NAUGHT.)
16
17
18
19
20
21
22
23
24

LOUIS DUDNEY
MONTEREY BAY vs. PINNACLE

June 16, 2015
345–348

Page 345

1   STATE OF ILLINOIS   )

2                       )  SS:

3   COUNTY OF W I L L   )

4     I, Shannon R. Roberts, a notary public within

5   and for the County of Will and State of

6   Illinois, do hereby certify that heretofore,

7   to-wit, on June 16, 2015, personally appeared

8   before me, at 77 West Wacker Drive, Suite 3100,

9   Chicago, Illinois, LOUIS DUDNEY, in a cause now

10   pending and undetermined in the United States

11   District Court, Northern District of California,

12   San Jose Division, wherein MONTEREY BAY MILITARY

13   HOUSING, LLC, et al. are the Plaintiffs, and

14   PINNACLE MONTEREY, LLC, et al. are the

15   Defendants.

16     I further certify that the said witness was

17   first duly sworn to testify the truth, the whole

18   truth and nothing but the truth in the cause

19   aforesaid; that the testimony then given by said

20   witness was reported stenographically by me in

21   the presence of the said witness, and afterwards

22   reduced to typewriting by Computer-Aided

23   Transcription, and the foregoing is a true and

24   correct transcript of the testimony so given by

Page 346

1   said witness as aforesaid.

2     I further certify that the signature to the

3   foregoing deposition was reserved by counsel for

4   the respective parties.

5     I further certify that the taking of this

6   deposition was pursuant to Notice, and that

7   there were present at the deposition the

8   attorneys hereinbefore mentioned.

9     I further certify that I am not counsel for

10   nor in any way related to the parties to this

11   suit, nor am I in any way interested in the

12   outcome thereof.

13     IN TESTIMONY WHEREOF:  I have hereunto set my

14   hand and affixed my notarial seal this 18th day

15   of June, 2015.

16

17

18

19

20

       _____

21        NOTARY PUBLIC, WILL COUNTY, ILLINOIS

22

23

24

Page 347

1            DEPOSITION ERRATA SHEET

2

3

4   Our Assignment No. 104669

5   Case Caption: MONTEREY BAY

6   vs. PINNACLE

7

8     DECLARATION UNDER PENALTY OF PERJURY

9   I declare under penalty of perjury

10   that I have read the entire transcript of

11   my Deposition taken in the captioned matter

12   or the same has been read to me, and

13   the same is true and accurate, save and

14   except for changes and/or corrections, if

15   any, as indicated by me on the DEPOSITION

16   ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under

18   oath.

19     Signed on the _____ day of

20   _____, 20___.

21

22   _____

23      LOUIS DUDNEY

24

Page 348

1            DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24      LOUIS DUDNEY

Page 349

1        DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24         LOUIS DUDNEY