1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5                        SAN JOSE DIVISION

6

7   MONTEREY BAY MILITARY HOUSING,          Case No.  14-cv-03953-BLF
    LLC, et al.,

8                        Plaintiffs,

9           v.                               AMENDED ORDER ON MOTIONS FOR
                                             SUMMARY JUDGMENT[1]
10  PINNACLE MONTEREY LLC, et al.,
                                             [Re:  ECF 147, 151, 153, 154, 206]
11                       Defendants.

12

13        Before the Court are four motions for summary judgment by parties in this complex

14  contract dispute.  Pls.' Mot., ECF 151; Pinnacle Mot., ECF 153; Harrelson Mot., ECF 154;

15  Goodman Mot., ECF 147.  With leave of court, the defendants in this action also filed a

16  supplemental motion for partial summary judgment.  Defs.' Supp. Mot., ECF 206.  The Court

17  heard oral argument on all motions on May 14, 2015 and thereafter took the matters under

18  submission.  For the reasons stated herein, all four motions are GRANTED IN PART and

19  DENIED IN PART.  Defendants' supplemental motion is DENIED.

20  I.    BACKGROUND

21        A.    The Parties

22        This case concerns a crumbling business relationship that has devolved into years of

23  increasingly acrimonious scorched-earth litigation.  At a high level, the parties in this action are,

24  on the one side, entities affiliated with or controlled by Clark Realty Capital, LLC ("Clark

25  Realty") and, on the other side, entities and individuals affiliated with American Management

26  Services LLC ("AMS"), which does business as "Pinnacle."

27  _____

28  [1] This order withdraws and supersedes the Court's July 10, 2015 summary judgment order at ECF
    351.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The principal claims in this action are asserted in the Fifth Amended Complaint filed by

2    the following plaintiffs: (1) Monterey Bay Military Housing, LLC ("MBMH"), a Delaware limited

3    liability company; (2) Clark Pinnacle Monterey Bay LLC ("CPMB"), a California limited liability

4    company; (3) Clark Monterey Presidio LLC, a Delaware limited liability company; (4) California

5    Military Communities LLC ("CMC"), a Delaware limited liability company; (5) Clark Pinnacle

6    California Military Communities LLC ("CPCMC"), a California limited liability company; and

7    (6) Clark Irwin LLC, a Delaware limited liability company.  Pl.'s Fifth Amended Compl. ("5AC")

8    ¶¶ 8-13, ECF 186.

9    The defendants named in the Fifth Amended Complaint are: (1) AMS, a Washington State

10   limited liability company that is the corporate parent of a number of property management

11   "affiliates" including (2) American Management Services California Inc. ("AMSC"), a California

12   corporation.  The other defendants are: (3) Pinnacle Monterey LLC, a Washington State limited

13   liability company; (4) Pinnacle Irwin LLC, a Washington State limited liability company; (5)

14   Goodman Real Estate, Inc., a Washington corporation and Goodman Financial Services, Inc. (now

15   doing business as Goodman Real Estate, Inc.) ("GRE"); (6) Stanley Harrelson, the former Chief

16   Executive Officer ("CEO") for AMS; and (7) John Goodman, AMS's founder and Chairman of

17   the Board.  *Id.* ¶¶ 14-21, 25.

18   Also before the Court are claims that Pinnacle Monterey and Pinnacle Irwin asserted

19   against Clark Realty, CPMB, and CPCMC in a Second Amended Complaint filed in state court on

20   October 24, 2013.  Pinnacle Second Amended Compl. ("Pinnacle SAC"), ECF 1-18.  This Second

21   Amended Complaint also identifies AMS, AMSC, MBMH, CMC, Clark Monterey Presidio, and

22   Clark Irwin as "interested non-parties."  *Id.* ¶¶ 15-16, 20-23.  Similarly, defendants AMSC and

23   AMS have asserted counterclaims against plaintiffs MBMH and CMC in connection with

24   Plaintiffs' Fifth Amended Complaint.  Counterclaims, ECF 214.  Clark, CPMB, CPCMC, Clark

25   Monterey Presidio, Clark Irwin, Pinnacle Monterey, and Pinnacle Irwin are likewise identified as

26   "interested non-parties."  *Id.* ¶¶ 13, 15-16, 18-19, 22-23.

27   Thus, at a high level, Clark Realty, CPMB, CPCMC, Clark Monterey Presidio, Clark

28   Irwin, MBMH, and CMC, which the Court shall collectively refer to as "Plaintiffs," are aligned

2

1   against AMS, AMSC, Pinnacle Monterey, and Pinnacle Irwin (collectively, the "Pinnacle

2   Entities"), as well as John Goodman, GRE, and Stanley Harrelson.  The Court shall refer to the

3   Pinnacle Entities, Goodman, GRE, and Stanley Harrelson collectively as "Defendants."

**B.   Factual Overview**

4

5       In 2001, when this saga began, Clark Realty and AMS joined together to bid for

6   privatization projects in U.S. military housing.[2]  After some rejected bids, the partners eventually

7   won contracts to develop and manage residential properties at Monterey Presidio and Fort Ord in

8   California; Fort Belvoir in Virginia; Fort Irwin, Moffett Field and Parks Reserve Training

9   Grounds in California; and Fort Benning in Georgia.  This lawsuit concerns only the Monterey

10  and Fort Irwin projects, though the parties are embroiled in similar litigation in Georgia

11  concerning Fort Benning and Fort Belvoir.

12      Both of the Monterey and Irwin projects are 50-year projects on land leased from the Army

13  pursuant to 50-year ground leases.  At each location, Clark Realty and AMS set up a series of

14  interrelated limited liability companies to manage, own, and operate the housing projects.  Those

15  agreements are at the heart of this disagreement.

**i.   The Agreements at Issue**

16

17      The bulk of the parties' contract dispute concerns Property Management Agreements

18  ("PMAs") appointing defendant AMSC as the property manager at the Monterey and Irwin

19  projects.  *See* Decl. of Yates M. French, ECF 151-1 Exh. 2 (Monterey PMA); Exh. 3 (Irwin

20  PMA).  The Monterey PMA was entered in 2003 between MBMH—the "Owner" of the

21  property—and AMSC as "Manager."  At Fort Irwin, the PMA was entered in 2004 between

22  CMC—the "Owner"—and AMSC as "Manager."[3]  The PMAs set forth AMSC's responsibilities

23  as property manager for the Owners, which include the authority to enter into residential leases

24

---

25  [2] Defendants allege that Clark Realty and AMS memorialized their joint venture in a term sheet
    and later formed Clark Pinnacle Family Communities LLC to pursue contracts.  Counterclaims ¶¶
26  28-30.  The record before the Court contains no evidence of the formation of or operating
    agreement for this limited liability company.

27  [3] Although MBMH and CMC are identified as "Owners," they actually lease the project real
28  property from special purpose entities that are 49% owned by the United States of America.  5AC
    ¶ 32 n.1.

and incur expenses as needed.  Monterey PMA §§ 6-9.[4]  It is undisputed that AMS carries out

AMSC's property management responsibilities, as AMSC has no employees.  AMSC moreover

undertook the responsibility to secure insurance for itself and for the Owners, which took the form

of including the Owners and the projects in a Master Insurance Program ("MIP") administered by

AMS and its insurance broker, Denver Series of Lockton LLC ("Lockton").  *Id.* ¶ 12.1; 5AC ¶

117.  Section 18 of the PMAs provides that each PMA "shall terminate" "upon the occurrence of"

certain "events" including, *inter alia*, material breach, substantial damage to the project property,

default, or sale of the Owners' interest in the projects.  *Id.* ¶ 18.1.  Important to the issues before

the Court, "theft, fraud, or other knowing or intentional misconduct by [AMSC] or its employees

or agents" is considered an "event of default by the party in respect of which such event occurs"

under subpart (C)(6) of this paragraph.  *Id.* ¶ 18.1.(C)(6).

MBMH and CMC each act at the direction of their managing members—CPMB and

CPCMC respectively.  Of course, CPMB and CPCMC, being limited liability companies in their

own right, cannot act except within the bounds of their own operating agreements.  *See* French

Decl. Exh. 13 (CPMB Op. Ag.); Exh. 14 (CPCMC Op. Ag.).  The parties' other contract disputes

revolve around the allocation of corporate power under these CPMB and CPCMC operating

agreements.  CPMB and CPCMC are comprised of groups of member entities affiliated with Clark

Realty and AMS, and each group appoints one Manager—the "Clark Manager" for the Clark-

affiliated members and the "Pinnacle Manager" for the AMS-affiliated members.  *See* CPMB Op.

Ag. ¶ 2.1(a); ¶ 3.1(a).[5]  For CPMB, the appointed Clark Manager is Clark Realty, and the Pinnacle

Manager is Pinnacle Monterey.  *Id.*  For CPCMC, the appointed Clark Manager is also Clark

Realty, but the Pinnacle Manager is Pinnacle Irwin.  *Id.*  Each operating agreement states that the

members consent to MBMH and CMC entering into service contracts with Clark Realty and AMS

affiliates.  The CPMB operating agreement requires MBMH to enter "into one or more property

---

[4] The PMAs for both the Monterey and Irwin projects are substantially similar.  Unless otherwise noted, exemplary references to the Monterey PMA hold true for the Irwin PMA as well.

[5] The CPMB and CPCMC operating agreements are also substantially similar, and exemplary references are made to the CPMB agreement.

United States District Court
Northern District of California

management agreements . . . with Pinnacle Realty Management Company, an Affiliate of the Pinnacle Group" before the effective date of the agreement, *id.* ¶ 3.15(a)(3), which agreement could be freely transferred, assigned, or subcontracted to AMSC without consent of the Clark Manager, *id.* ¶ 3.15(b).  The CPCMC operating agreement simply requires CMC to "enter into one or more property management agreements . . . with [AMSC]" before the effective date of that agreement.  CPCMC Op. Ag. ¶ 3.15(a)(3).

The CPMB and CPCMC operating agreements delineate what actions each Manager can take without the approval of the other.  Notably, the Clark Manager has "acting authority to make all decisions regarding the management of the Company's business and affairs" except with respect to "Major Decisions."  CPMB Op. Ag. ¶ 3.1(b)(2).  The Pinnacle Manager, as the representative for the minority members, has no authority to "make decisions regarding the management of the Company's business and affairs or to act on, consent to or approve matters of the Company without the vote or signature of the Clark Manager."  *Id.*  The Pinnacle Manager does have the power, however, to vote on Major Decisions, which require the consent of both Managers.  *Id.* ¶ 3.1(b)(3); CPCMC Op. Ag. ¶ 3.1(b)(2).  The key Major Decision in dispute here is defined in the section titled "Management and Rights of Members" at paragraph 3.1(b)(2)(E): "Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision."  The agreement also provides that should there be a deadlock in the voting on Major Decisions, the Pinnacle Manager shall have the sole discretion to resolve deadlocks in voting "with respect to any matter arising under, relating to, or affecting the terms or conditions of the Property Management Agreement" if the deadlock cannot be resolved within seven days.  CPMB Op. Ag. ¶ 3.13(c).  Obviously, the Pinnacle Managers cannot exercise this power to resolve deadlocks unless there is a Major Decision that requires a vote by the Managers.

### ii.  The Relationship Begins to Deteriorate

After securing the Monterey and Irwin projects, the honeymoon was short-lived and discontent began to brew.  In 2005, Clark Realty allegedly decided to deny AMS an equity stake

1    in a new residential project with the Navy.  Counterclaims ¶ 59.  This blow to AMS was worsened

2    by Clark Realty's declaration that it no longer saw value in long-term partnerships with property

3    managers.  *Id.* ¶ 61.  It didn't help matters that at this time, two Clark employees departed for

4    Pinnacle.  Defs.' J.A. ("J.A."), ECF 155, Exhs. K28; K20 (excerpt of T. Guleserian dep.); K63

5    (excerpt of S. Orrantia dep.).  The relationship continued to decline into 2006 and 2007, when

6    Clark began exploring alternatives to the AMS-administered MIP and also directed the cessation

7    of "Clark Pinnacle" co-branding at the projects.  Counterclaims ¶¶ 63-64; J.A. Exhs. K53, K54.  In

8    2008, Clark Realty sought a competitive insurance quote from third party RCM&D.

9    Counterclaims ¶ 65.  In 2009, Clark Realty hired litigation firm Kirkland & Ellis (counsel in this

10   case) and later accounting firm Alix Partners, allegedly to build a case for terminating AMS and

11   its affiliates at the parties' various projects.  *Id.* ¶¶ 66-67.

### iii. Allegations of Misconduct Abound

13       Defendants assert based upon the hiring of outside litigation counsel and auditors in 2009

14   that Plaintiffs breached their fiduciary obligations and acted in bad faith to pursue this and other

15   litigation in order to sever ties with AMS and take over AMSC's 50-year property management

16   agreements for Clark Realty's own financial benefit.  *Id.* ¶¶ 8, 158-67; *see also* Pinnacle SAC ¶¶

17   57-68, 93-116.  Defendants believe that Plaintiffs manufactured trumped up charges of misconduct

18   at the projects in order to terminate AMSC for cause.  *See* J.A. Exhs. K9, K42-44, K81.

19       To hear Plaintiffs tell it, however, Defendants are defalcating agents and disloyal

20   fiduciaries and Plaintiffs are the victims of that misconduct.  Plaintiffs allege that ever since the

21   inception of the Monterey and Irwin projects, AMSC, AMS and AMS's employees have engaged

22   in rampant fraud and other misconduct in a calculated scheme to enrich AMS, its CEO Stanley

23   Harrelson, and its founder and Chairman of the Board John Goodman.  Specifically, a substantial

24   portion of AMSC's compensation under the PMAs is tied to an incentive plan that takes into

25   consideration objective metrics such as the time to complete a work order and to turn over

26   managed residences in preparation for a new tenant.  *See* Monterey PMA Exh. B.  Harrelson

27   allegedly directed AMS and its employees at both projects to falsify work order data stored in a

28   computer system in order to show better response times, which, in turn, would increase AMS's

United States District Court
Northern District of California

incentive fee.  5AC ¶¶ 69-101.  AMS employees allegedly also received kickbacks from third party vendors in the form of monetary "donations" for resident parties (which were then diverted into the employees' own pockets) in exchange for authorizing those vendors to charge inflated service fees to the projects.  *Id.* ¶¶ 139-45.

Furthermore, in connection with the AMS MIP, of which MBMH and CMC were a part, Plaintiffs allege that Goodman and Harrelson directed AMS and Lockton to conceal three types of unauthorized overcharges: (1) using an undisclosed and subjective allocation model to overcharge the military projects for insurance; (2) charging an unauthorized Pinnacle risk management fee; and (3) overcharging MIP participants for an undisclosed general liability aggregate loss fund mischaracterized as a self-insured retention ("SIR") in order to subsidize Goodman's and Harrelson's other real estate projects, which were also a part of the MIP.  *Id.* ¶¶ 102-14.  Although Plaintiffs renewed the insurance each year, they allege that their attempts to uncover the hidden fees were rebuffed by affirmative misrepresentations by Defendants and by Lockton at Defendants' direction.  *Id.* ¶¶ 117-38.

Finally, in 2014, Defendants transacted with Hunt Companies, Inc. ("Hunt") (operating through Hunt Development Group LLC) to transfer substantially all of AMS's assets, excepting the military PMAs, to a newly formed entity—Pinnacle Property Management Services LLC. Plaintiffs allege that Defendants made this transfer for substantially less than fair value and then concealed the transaction from Plaintiffs, all as part of a concerted effort to judgment-proof AMS and put into effect Harrelson's 2010 assertion to the Army that there would be "nothing left to collect" at the end of this lawsuit.  *Id.* ¶¶ 166-84.

### iv.  The Parties Proceed to Litigation

In May 2010, Clark Realty fired the first shot (litigation-wise) by directing the owner entities at Fort Belvoir and Fort Benning to file suit in Georgia in order to terminate the property management agreements at those projects.  The basis for termination was the same as alleged here: fraud and misconduct by AMS employees.  Counterclaims ¶ 68.  Immediately thereafter, Alix conducted a forensic audit of AMS's records at Fort Benning and Clark Realty removed AMS's eastern affiliate—AMSE—from its property management position at that project.  *Id.* ¶ 69.

United States District Court
Northern District of California

1    In late 2011, seeing that Clark Realty might soon turn its sights on Monterey and Irwin,

2    defendants Pinnacle Monterey and Pinnacle Irwin sought to "adjust" the default provision of the

3    PMAs pursuant to their contractual rights under the CPMB and CPCMC operating agreements.

4    *See* 5AC ¶¶ 58-68; Counterclaims ¶¶ 70-75.  Specifically, the Pinnacle Managers proposed that ¶

5    18.1(c)(6) of the PMAs be adjusted to permit termination only for fraud "having a material

6    adverse [e]ffect on [the project Owners]" and even then only after such fraud is left uncured for 15

7    days.  *See* 5AC ¶ 63.  Representatives of Clark Realty and the Pinnacle Managers corresponded

8    over the course of three weeks regarding these proposed adjustments before the Pinnacle

9    Managers ultimately declared a "deadlock" in voting on June 8, 2011.  With declaration of the

10   deadlock, Pinnacle Monterey and Pinnacle Irwin also invoked their respective power under the

11   CPMB and CPCMC operating agreements to resolve deadlocks concerning the PMAs in their

12   "sole discretion."  *Id.* ¶¶ 64-68.

13   This governance dispute spawned a race to different courthouses on June 15, 2011, as

14   Plaintiffs sought a declaration that the proposed adjustments were not effective and Pinnacle

15   Monterey and Pinnacle Irwin sought a declaration that they were.  5AC ¶¶ 183-200;

16   Counterclaims ¶¶ 84-105; Notice of Removal Exh. M (Pinnacle Second Amended Complaint

17   "SAC") ¶¶ 83-92, ECF 1.  The actions were eventually transferred and consolidated before the

18   Superior Court of California for the County of Monterey in December 2011.  On December 28,

19   2011 injunction, the state court entered a status quo injunction precluding either side from taking

20   any actions based on their contentions regarding the disputed adjustments to the PMAs.  On

21   December 26, 2012, the state court entered a second preliminary injunction preventing Plaintiffs

22   from exercising a statutory power to revoke AMSC's agency.

23   Although there is ostensibly one action before this Court, the pleadings remain separate

24   and the Court here details the various claims among the parties.

25   **C. The Claims**

26   Plaintiffs assert twelve claims against Defendants.  MBMH, CPMB, and Clark Monterey

27   seek declaratory judgment against Pinnacle Monterey, AMSC, and AMS that the 2011

28   adjustments to the Monterey project PMA are invalid (First Claim); CMC, CPCMC, and Clark

8

United States District Court
Northern District of California

1  Irwin seek a similar declaration against Pinnacle Irwin, AMSC, and AMS concerning the 2011

2  adjustments to the Irwin project PMA (Second Claim).  MBMH and CMC each seek a declaration

3  against AMSC that the PMAs at the Monterey and Irwin projects respectively terminated

4  automatically due to AMSC's alleged intentional fraud (Third and Fourth Claims).  Aside from

5  these declaratory relief claims, MBMH and CMC seek to hold AMSC, AMS, Goodman, and

6  Harrelson liable for breach of fiduciary duty (Fifth Claim) as well as to hold AMS and the

7  Goodman Entities liable for aiding and abetting the breach of fiduciary duty (Sixth Claim).

8  MBMH and CMC also charge AMSC, AMS, Goodman, and Harrelson with common law fraud

9  (Seventh Claim) and AMSC, AMS, Goodman, Harrelson, and the Goodman Entities with

10  conspiracy to commit fraud (Eighth Claim).  Plaintiffs MBMH and CMC's Ninth Claim is actually

11  two claims for violation of 18 U.S.C. §§ 1961 *et seq.* ("Civil RICO") against all Defendants: one

12  claim for individual liability under 18 U.S.C. § 1962(c) and one claim for conspiracy to violate the

13  RICO statute under 18 U.S.C. § 1962(d).  Finally, MBMH and CMC assert that AMSC, AMS,

14  Goodman, and Harrelson have engaged in deceit in violation of California Civil Code § 1709

15  (Tenth Claim), that AMSC and AMS have engaged in unfair business practices in violation of

16  California Business and Professions Code §§ 17200, *et seq.* ("UCL") (Eleventh Claim), and that

17  AMSC, AMS, Goodman, Harrelson, and the Goodman Entities have been unjustly enriched

18  (Twelfth Claim).  *See* 5AC ¶¶ 183-286.

19          Defendants' claims against Plaintiffs comprise counterclaims by AMSC and AMS against

20  MBMH and CMC in connection with Plaintiffs' Fifth Amended Complaint, as well as a separate

21  set of claims by Pinnacle Monterey and Pinnacle Irwin against Clark Realty, CPMB, and CPCMC.

22  AMSC and AMS[6] seek a declaration that there has not been an "event of default" at the Monterey

23  and Irwin projects sufficient to trigger MBMH and CMC's respective contractual termination

24  rights at those projects (First and Second Counterclaim), as well as a declaration that MBMH and

25  CMC do not have the power to unilaterally terminate the PMAs, do not have a statutory power to

26  revoke the PMAs pursuant to California Civil Code § 2356, and cannot engage a non-Pinnacle

27  _____

28  [6] Although AMSC and AMS are both identified as counterclaimants, the counterclaims are largely
on AMSC's behalf.

United States District Court
Northern District of California

1  affiliate as a property manager at the Monterey and Irwin projects (Third and Fourth

2  Counterclaims).  AMSC and AMS seek damages in connection with MBMH and CMC's breach

3  of obligations under their respective PMAs to pay AMSC certain reimbursable employee expenses

4  at the Monterey and Irwin projects from 2009 through November 2011 (Fifth and Sixth

5  Counterclaims) and in connection with MBMH and CMC's breach of further obligations under the

6  PMAs to pay AMSC incentive fees at the Monterey and Irwin projects since 2011 (Seventh and

7  Eighth Counterclaims).  Moreover, they seek a declaration that AMSC's Incentive Performance

8  Management Plan at the Monterey project was validly amended in 2010 (Ninth Counterclaim) and

9  that its Incentive Performance Management Plan at the Irwin project was validly amended in 2008

10  (Tenth Counterclaim).  Finally, AMSC and AMS seek to hold MBMH and CMC liable for

11  breaches of the implied covenant of good faith and fair dealing in connection with the PMAs at the

12  Monterey and Irwin projects respectively (Eleventh and Twelfth Counterclaims).  *See*

13  Counterclaims ¶¶ 84-167.  Pinnacle Monterey and Pinnacle Irwin respectively seek declarations

14  that the PMAs at the Monterey and Irwin projects were validly amended in 2011 to "adjust" the

15  termination provisions (First and Second Claims).  Both are also suing Clark Realty for breach of

16  fiduciary duty in connection with Clark Realty's actions as the Clark Manager for CPMB and

17  CPCMC (Third and Fourth Claims).  Pinnacle Monterey and Pinnacle Irwin seek an equitable

18  accounting from Clark Realty, CPMB, and CPCMC in connection with the CPMB and CPCMC

19  operating agreements (Fifth and Sixth Claims).  Finally, Pinnacle Monterey and Pinnacle Irwin

20  seek a declaration that any direction to MBMH and CMC to revoke the PMAs at the Monterey and

21  Irwin projects is a "Major Decision" under the CPMB and CPCMC operating agreements over

22  which Pinnacle Monterey and Pinnacle Irwin can exercise control and that the Pinnacle Managers

23  have the sole discretion to assign the PMAs to another Pinnacle affiliate (Seventh and Eighth

24  Claims).  *See* Pinnacle SAC ¶¶ 83-156.

25        **D.   Procedural History**

26        This consolidated action was removed to federal court on September 2, 2014 after

27  spending three years in state court.  At the parties' request, the Court scheduled a trial date in

28  August 2015, and the parties worked diligently to complete fact discovery in March 2015 and

expert discovery in June 2015.  On March 24, 2015, the parties submitted four motions for summary judgment: (1) Plaintiffs' Motion for Partial Summary Judgment, Pls.' Mot., ECF 151; (2) the Pinnacle Entities' Motion for Summary Judgment, Pinnacle Mot., ECF 154; (3) Stanley Harrelson's Motion for Summary Judgment, Harrelson Mot., ECF 153; and (4) John Goodman's Motion for Summary Judgment, Goodman Mot., ECF 147.

On April 7, 2015, the Court denied a motion by Plaintiffs to dissolve the second preliminary injunction entered by the state court in 2012 preventing any of the plaintiff entities from removing AMSC from its current position as property manager for the Monterey and Irwin projects during the pendency of this case.  Corrected Order Denying Mot. to Dissolve Prelim. Inj. ("Inj. Order"), ECF 169.  Shortly thereafter, on April 13, 2015, the Court granted in part Plaintiffs' motion for leave to supplement their complaint with allegations of a new predicate act—the allegedly fraudulent Hunt transaction—in support of their civil RICO claim.  ECF 172.  Following that ruling, the Court also allowed Defendants to file a collective supplemental motion addressing the amended RICO claim.  Defs.' Supp. Mot., ECF 206.

Trial is set to begin on August 3, 2015.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

The moving party seeking summary judgment "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact," *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  A material fact is one that could affect the outcome of suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied this initial burden, the non-moving party must then

"identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Schneider v. TRW, Inc.*, 938 F.3d 986, 991 (9th Cir. 1990).  It is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." *Keenan*, 91 F.3d at 1279 (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).  Moreover, the court makes no credibility determinations and does not weigh the evidence.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## III.    CLARK ENTITIES' MOTION

The Clark Entities seek partial summary judgment on a number of the claims in this lawsuit.  Some of these claims are also the subject of the Pinnacle Entities' motion for summary judgment.  The Court addresses each in turn.

### A.    Automatic Termination of the PMAs

Plaintiffs seek judgment in their favor on their Third and Fourth Claims as well as on AMSC and AMS's First, Second, Ninth, and Tenth Counterclaims on the ground that the Monterey and Irwin PMAs automatically terminated some time ago due to AMSC's fraud and intentional misconduct at the projects.  Pls.' Mot. 13.  At issue here is Section 18 of the PMAs, which addresses termination.  In pertinent part, Paragraph 18.1 provides that "this Agreement *shall* terminate . . . upon the occurrence of any of the following events: . . . ."  (emphasis added).  This paragraph has five subheadings titled "(A) Breach of Agreement," "(B) Excessive Damage," "(C) Default," "(D) Termination of Sublease," and "(E) Sale."  "[T]heft, fraud, or other knowing

United States District Court
Northern District of California

1    or intentional misconduct by [AMSC] or its employees or agents" is an "event of default by the

2    party in respect of which such event occurs" under the "Default" subheading.  Monterey PMA ¶

3    18.1(C)(6).

4        In Plaintiffs' view, the use of the word "shall" renders this termination provision self-

5    executing upon the occurrence of any of the enumerated events.  Therefore, the PMAs

6    automatically terminated many years ago when AMSC's employees first engaged in theft, fraud,

7    or intentional misconduct.  Pls.' Mot. 13-15.  Defendants argue that the termination provision is

8    not self-executing because subparts (A) and (C) in Paragraph 18.1 should be read together.

9    Subparagraph (A) refers to "defaults" that ripen into breaches if left uncured.  In Defendants'

10   view, subparagraph (C) thus merely defines "events of default" "amenable to cure under Section

11   18.1(A)."  Defs.' Opp. 12-13, ECF 178.  As such, the PMAs cannot terminate until after the

12   Owners notify AMSC of the default and AMSC fails to cure it within thirty days.  Neither of these

13   extreme interpretations is particularly persuasive.

14       As a preliminary matter, the Court observes that Plaintiffs do not specify a date or

15   timeframe in which the PMAs supposedly terminated.  Their argument that the 2008 and 2010

16   incentive plan amendments at issue in AMSC and AMS's Ninth and Tenth Counterclaims are

17   invalid because the PMAs had already terminated by that time suggests that Plaintiffs believe

18   termination became effective some time before 2008.  *See* Pls.' Mot. 14.  That is a minor issue.

19   The real trouble with Plaintiffs' interpretation of Paragraph 18.1 is that it permits the absurd

20   situation wherein a PMA would automatically terminate in the ether if an AMSC employee,

21   unbeknownst to any of the contracting parties, steals a pencil that belongs to the project.  Such an

22   outcome cannot have been the intent of the contracting parties.  *See* Cal. Civ. Code § 1638 ("[t]he

23   language of a contract is to govern its interpretation, if the language is clear and explicit, and does

24   not involve an absurdity").  Nor is such an interpretation mandated by any of the cases that

25   Plaintiffs cite, which concerned either conditions precedent to continuing a contract that would

26   otherwise expire by its own terms (*Schwerin Estate Realty Co. v. Slye*, 173 Cal. 170 (1916); *Valer

27   Oil Co. v. Souza*, 182 Cal. App. 2d 790 (1960)), a contract that simply expired by its own terms

28   (*Boogaert v. Occidental Life Ins. Co.*, 150 Cal. App. 3d 875 (1983)), or a contract that became

United States District Court
Northern District of California

13

1    automatically terminable without advance notice, which was then terminated by notice or the

2    cessation of performance (*Nesbitt Fruit Products, Inc. v. Del Monte Beverage Co.*, 177 Cal. App.

3    2d 353 (1960); *Abrams v. St. John's Hosp. & Health Ctr.*, 25 Cal. App. 4th 628 (1994); *United*

4    *States v. Foster Transfer Co.*, 183 F.2d 494 (9th Cir. 1950)).  *See* Pls.' Mot. 14; Pls.' Reply 9, ECF

5    207.  None of those cases has any particular applicability here.

6         The interpretation of Paragraph 18.1 that Defendants advance also holds little water.  To be

7    sure, subparagraph (A) does refer to monetary and non-monetary "defaults."  There is nothing to

8    indicate, however, that the use of "defaults" in (A) refers only to defaults defined in (C).  While

9    this interpretation is somewhat persuasive if one ignores the headings and subheadings in this

10   section, as required by Section 20 of the PMAs, it is ultimately undercut—as Plaintiffs point out—

11   by the express notice and cure provisions contained in certain portions of subparagraph (C), which

12   would be superfluous if subparagraph (A) provided notice and cure for all events of default in

13   (C).[7]  *See* Monterey PMA ¶ 18.1(C)(1), (5); *see* Pls.' Reply 6.  Also superfluous would be the

14   hotly contested "adjustments" that the Pinnacle Managers introduced in 2011 if indeed the PMAs

15   always required notice and an opportunity to cure theft, fraud, or intentional misconduct.

16        Neither party has argued that the Paragraph 18.1 is ambiguous and susceptible to

17   interpretation through the use of extrinsic evidence, nor does it appear ambiguous to the Court.  As

18   such, and giving effect to the parties' entire agreement, as the Court is required to do, *see* Cal. Civ.

19   Code § 1641, the Court concludes that Paragraph 18.1 as a whole sets forth conditions upon which

20   the PMAs become immediately terminable, but that termination is not self-executing.  Several

21   aspects of the clause lead to this conclusion.  First, Paragraph 18.1(C) explains that "[e]ach of the

22   following events [including the fraud provision] shall constitute an event of default *by the party in*

23   *respect of which such event occurs*."  Monterey PMA ¶ 18.1(C) (emphasis added).  The

24   contracting parties could have simply specified events upon which the PMAs "shall" terminate.

25   Instead, the emphasized portion of the preamble to subpart (C) indicates that the party whose

26   conduct triggers an "event" of default is considered to be in default.  The designation of a

27

28

United States District Court
Northern District of California

---

[7] As a practical matter, it is also unclear how one "cures" theft, fraud, or intentional misconduct.

1    defaulting party implies that the non-defaulting party can choose to terminate or can waive the

2    default. *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 602 (1969) ("A breach

3    does not terminate a contract as a matter of course but is a ground for termination at the option of

4    the injured party.").  Second, save for the disputed fraud provision, every other event of default in

5    subparagraph (C) is either triggered after written notice of non-compliance with a contractual

6    obligation—(C)(1) and (5)—or by objectively verifiable and indisputable circumstances such as

7    the filing of a bankruptcy petition—(C)(2), (3), (4).  Subpart (C)(6) is unlike any of these other

8    events because whether theft, fraud, or intentional misconduct has occurred can be vigorously

9    disputed, as it has been here.  That the provision is not phrased in terms of the Owners' allegation,

10   suspicion, or belief that theft or fraud has occurred suggests that objective proof is required to

11   trigger termination.  Finally, subparagraphs 18.1(D) and (E) each provide that the PMAs can be

12   terminated "by any party" upon written notice to the other if the sublease on the projects

13   terminates or if the Owners sell their interest in the projects.  Although the preamble to Paragraph

14   18.1 provides that the PMAs "shall" terminate upon the occurrence of the events listed in the

15   ensuing subparagraphs, clearly "shall" does not mean self-execution in the case of subparagraphs

16   (D) and (E).  These other subparts of Paragraph 18.1 thus indicate that the clause, as a whole,

17   contemplates immediate terminability—but not self-executing termination—upon the occurrence

18   of "events" set forth in its subparts.

19          This interpretation of the termination provision of the PMAs is consistent with the

20   principal-agent relationship between Owners and AMSC.  Under California law, the Owners have

21   a statutory power to revoke AMSC's agency at any time, subject to liability for damages under the

22   PMAs if the revocation is not contractually justified.  *See Pac. Landmark Hotel, Ltd. v. Marriott*

23   *Hotels, Inc.*, 19 Cal. App. 4th 615, 626 (1993), *as modified on denial of reh'g* (Nov. 5, 1993).

24   Subparagraph 18.1(C)(6) excuses the Owners from their contractual obligations if they validly

25   revoke AMSC's agency due to theft, fraud or intentional misconduct.  Plaintiffs' interpretation

26   that the PMAs terminated a long time ago without either party's awareness throws that

27   relationship into disarray.  Moreover, Plaintiffs' assertion that the Army "insisted on the automatic

28   termination provision," *see* Pls.' Reply 8, bolsters the conclusion that the PMAs can be

United States District Court
Northern District of California

15

1    immediately terminated for fraud but that the termination is not self-executing.  Without

2    suggesting that any aspect of the law applicable to government contracts is relevant to the private

3    contractual dispute in this case, the Court observes only that even in the context of government

4    contracts, the government must elect to terminate a contract for default based upon fraud and bears

5    the ultimate burden of proving the existence of a default if the contractor challenges the

6    termination.  *Daff v. United States*, 31 Fed. Cl. 682, 688 (1994) *aff'd*, 78 F.3d 1566 (Fed. Cir.

7    1996); *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1279 (Fed. Cir. 1985).  Thus, had the

8    Army insisted on subparagraph 18.1(C)(6), it is unlikely that the Army would have interpreted the

9    clause to be self-executing.

10          In sum, the Court finds that Paragraph 18.1 of the PMAs permits immediate termination of

11   the agreement if AMSC or its employees engage in theft, fraud, or intentional misconduct.

12   Termination is not, however, self-executing upon the first instance in which such misconduct

13   occurs.  Rather, the Owners must notify AMSC that the PMAs are terminated for default, as the

14   project owners at Fort Benning and Fort Belvoir did with AMS's eastern affiliate in 2010 and

15   2012.  5AC ¶ 49.  No similar notification occurred here before the state court entered its first

16   status quo injunction in 2011.  In any case, the facts underlying the Owners' purported contractual

17   authority to terminate are sharply disputed because Defendants challenge whether any theft, fraud,

18   or intentional misconduct ever occurred.  Defs.' Opp. 15-16.  Most significantly, the parties

19   dispute the credibility of Plaintiffs' witnesses to the alleged work order manipulation.  *Compare*

20   French Decl. Exh. 31 (decl. of D. Frye) *with* J.A. Exh. K19 (excerpt of D. Frye dep.); French Decl.

21   Exh. 33 (Dec. 12, 2011 decl. of J. Merrill) *with* J.A. Exh. J8 (Apr. 14, 2015 decl. of J. Merrill);

22   French Decl. Exh. 35 (decl. of. C. Johnson) *with* J.A. Exh. K25 (excerpt of C. Johnson dep.);

23   French Decl. Exh. 37 (decl. of M. Waibel) *with* J.A. Exh. K68 (excerpt of M. Waibel dep.); French

24   Decl. Exh. 39 (Feb. 9, 2015 decl. of J. Dunn) *with* J.A. Exh. J2 (Apr. 8, 2015 decl. of J. Dunn).

25   Credibility is a determination better left to the jury and thus precludes summary judgment.

26   *Anderson*, 477 U.S. at 255.  As such, the Court cannot conclude as a matter of law that the PMAs

27   have terminated due to AMSC's alleged misconduct.

28          Plaintiffs' motion is therefore DENIED with respect to Plaintiffs' Third and Fourth Claims

United States District Court
Northern District of California

1    and AMSC and AMS's First, Second, Ninth, and Tenth Counterclaims.

2        **B.    AMSC and AMS's Breach of Fiduciary Duties**

3        Plaintiffs seek judgment on their Fifth Claim that AMSC and AMS breached fiduciary

4    duties owed to MBMH and CMC under the PMAs in connection with the falsification of work

5    order data.  Pls.' Mot. 15-18.  It is undisputed that an agent owes its principal "a fiduciary duty to

6    act loyally for the principal's benefit in all matters connected with the agency relationship."

7    Restatement (Third) Of Agency § 8.01 (2006).  Defendants oppose Plaintiffs' motion and seek

8    judgment in their own favor on the ground that AMSC and AMS owed no fiduciary duty because

9    AMSC is an independent contractor, that any duty owed was limited to the obligations set forth in

10   the PMAs and does not extend to the misconduct charged in Plaintiffs' complaint, and that in any

11   case there are disputes of fact concerning whether any breach occurred.  Defs.' Opp. 17-18; *see*

12   *also* Pinnacle Mot. 15-16.  The Court agrees with Defendants only on the last proposition.

13       As a matter of contract interpretation, AMSC is indisputably engaged as MBMH's and

14   CMC's agent in connection with the leasing and management of the Monterey and Irwin projects.

15   As the California courts have recognized in the context of property management agreements, "the

16   very nature of a managerial relation is to delegate authority from principal to agent."  *Woolley v.*

17   *Embassy Suites, Inc.*, 227 Cal. App. 3d 1520, 1531 (1991).  "An agent is anyone who undertakes

18   to transact some business, or manage some affair, for another, by authority of and on account of

19   the latter, and to render an account of such transactions."  *Id.* (internal citations and quotation

20   marks omitted).  "The chief characteristic of the agency is that of representation, the authority to

21   act for and in the place of the principal for the purpose of bringing him or her into legal relations

22   with third parties."  *Id.* (quoting *McCollum v. Friendly Hills Travel Center*, 172 Cal. App. 3d 83,

23   91 (1985) (internal quotation marks omitted)).

24       Here, the principal-agent relationship between the project Owners (MBMH and CMC) and

25   AMSC as property manager is defined throughout the PMAs.  Notably, AMSC is engaged "to

26   lease and manage" the projects for the Owners.  Monterey PMA ¶ 1.1.[8]  In connection with this

27   _____

28   [8] Although the PMAs expressly provide that headings are not to be used to construe the contract,
     the Court notes that the heading of Section 1, "Appointment of Managing Agent," is entirely

United States District Court
Northern District of California

1   arrangement, AMSC has broad authority to act on MBMH's and CMC's behalf to advertise, lease,

2   manage, maintain, and operate the projects, which further includes the collection of rent and

3   management of finances. *Id.* §§ 2-4, 6, 7, 9. Indeed, Paragraphs 9.1 and 9.2 respectively

4   contemplate that AMSC can select "national vendors in order to receive volume-pricing discounts

5   for the benefit of the Owners" and that AMSC may perform repairs for reasonable fees.

6   Moreover, AMSC is authorized to obtain insurance, "as an expense of the Project," for its and the

7   Owners' mutual benefit. In other words, AMSC is authorized to bind the Owners to its insurance

8   policy and to charge the expense to MBMH and CMC. *Id.* ¶ 12.1. Overall, the delegation of

9   authority is to such an extent that the Owners agree to limit contact with AMSC and its

10  employees, reposing significant trust in AMSC's management of the projects. *See id.* ¶ 18.6.

11  However, AMSC's actions are still circumscribed by the Owners' delegation of authority, and

12  AMSC may not act beyond that authority without the Owners' consent. *E.g.*, *id.* ¶¶ 6.1, 7.4, 9.1,

13  9.2. AMSC is thus MBMH and CMC's agent and owes them a fiduciary duty in connection with

14  all of the duties set forth in Sections 2, 3, 4, 6, 7, 9, and 12 of the PMAs.

15         Defendants' attempt to cast AMSC in the role of an independent contractor with no

16  fiduciary duty to MBMH and CMC is unavailing. Defs.' Opp. 17; Pinnacle Mot. 15.

17  "[I]ndependent contractor and agent are not mutually exclusive legal categories." *APSB Bancorp*

18  *v. Thornton Grant*, 26 Cal. App. 4th 926, 930 (1994). Rather, the Court must look to whether the

19  independent contractor acts on the principal's behalf and is subject to the principal's control. *Id.*

20  As the Court has already explained, the PMAs delegate significant managerial authority to AMSC

21  but subjects AMSC's actions to high-level control by the Owners. It is therefore beyond dispute

22  that AMSC is the managerial agent for MBMH and CMC at the Monterey and Irwin projects

23  respectively.

24         Contrary to Defendants' assertion, Section 10 of the PMAs does not "expressly disclaim[]

25  any fiduciary relationship" between the Owners and AMSC. Defs.' Opp. 17. Section 10 provides

26  that "[AMSC] is engaged independently in the business of property management and acts

27

28
_____

consistent with the conclusion that AMSC was engaged to be MBMH's and CMC's agent.

hereunder as an independent contractor" but further states that "[e]xcept as specifically set forth in this Agreement, Manager shall not act as the agent of Owners; and, except as provided in this Agreement, no Owner shall act as the principal of Manager."  The clear implication of this last sentence is that AMSC is MBMH and CMC's agent with respect to the delegated authority expressly set forth in the PMAs and thereby owes a fiduciary duty.  The Court is likewise unpersuaded by Defendants' assertion that the PMAs "do not create an agency" with respect to the misconduct charged in Plaintiffs' claims.  *See* Defs.' Opp. 18; Pinnacle Mot. 16.  The authority delegated to AMSC encompasses the management of the projects as well as the obtention of insurance for the Owners.  *See, e.g.*, Monterey PMA ¶¶ 1.1 ("Each Owner hereby engages Manager as its sole and exclusive property manager to lease and manage [the project]"), 9.1, 9.2, 12.1.  AMSC is responsible for ensuring that its employees carry out its obligations under the PMAs and AMSC's compensation, as set forth in Section 15 and Exhibit B, contemplates that AMSC will manage the projects faithfully for the Owners' benefit.[9]  *See also* Monterey PMA § 8.  Such obligations would certainly not include manipulating work order data to improve AMSC's incentive compensation, as an agent's fraud upon its principal is never authorized.  Cal. Civ. Code § 2306.  As such, the misconduct alleged in Plaintiffs claims—work order data manipulation and self-dealing in connection with the Master Insurance Program—fall within the scope of AMSC's agency.  *See* 5AC ¶¶ 213-23.

Plaintiffs here only seek judgment that the alleged falsification of work order data breached AMSC's fiduciary duty to MBMH and CMC.  Pls.' Mot. 17.  To the extent AMSC's employees did manipulate the work order data at the Monterey and Irwin projects in order to artificially inflate AMSC's incentive compensation, such manipulation would be a breach of AMSC's fiduciary duties to MBMH and CMC.  With that being said, as discussed above, there are factual disputes as to whether there actually was intentional manipulation of the work order data.

---

[9] Or, more accurately, AMS's employees.  Because AMSC has no employees and AMS is evidently AMSC's authorized subagent to perform the duties set forth in the PMAs, Defendants do not appear to dispute the fact that to the extent AMSC owes any fiduciary duty to MBMH and CMC, AMS also owes that same duty.  Cal. Civ. Code § 2349; *Mendoza v. Rast Produce Co.*, 140 Cal. App. 4th 1395, 1404 (2006).

United States District Court
Northern District of California

1    Plaintiffs' motion for summary judgment on their Fifth Claim is therefore DENIED.  AMSC and

2    AMS's motion in their favor on this claim is also DENIED.

3           **C.   Validity of the June 2011 "Adjustment" to the PMAs**

4           The Clark and Pinnacle Entities dispute whether the Monterey and Irwin PMAs were

5    validly adjusted in June 2011 by the Pinnacle Manager at each project.  Plaintiffs seek a

6    declaration that the adjustments are invalid (Plaintiffs' First and Second Claims).  Defendants

7    assert that the adjustments are valid (Pinnacle Managers' First and Second Claims).  Both sides

8    have moved for summary judgment in their favor on this issue.  Pls.' Mot. 17-18; Pinnacle Mot.

9    21-23.

10          The disputed "adjustments" purport to change Paragraph 18.1(C)(6) of the Monterey and

11   Irwin PMAs and the circumstances under which AMSC defaults on those PMAs if AMSC/AMS

12   or its employees engage in theft, fraud, or intentional misconduct.  If valid, Paragraph 18.1(C)(6)

13   of the projects' PMAs would be "adjusted" to read:

14                          Theft, fraud, or other knowing or intentional misconduct by
15                          [AMSC] or its employees or agents having a material adverse effect
                       on [MBMH or CMC]; provided, however, (1) if [AMSC] takes
16                          appropriate measures to correct, and otherwise prevent the
                       recurrence of any such events of default and (2) [AMSC] remedies
17                          any confirmed event of default within 15 days of learning of such
                       default (to the extent that such default is susceptible of being cured),
18                          then such acts shall be deemed not to have a material adverse effect
                       and the Property Management Agreement shall not be terminated.

19   Plaintiffs argue that these proposed adjustments are void as a matter of law and as a matter of

20   public policy.  They assert that the adjustments impermissibly allow an agent to gain an advantage

21   over its principal, that the exculpatory nature of the provision violates California Civil Code §

22   1668 and is against public policy, and that in any event the PMAs require all amendments to the

23   PMAs be in writing executed by MBMH, CMC, and AMSC, which did not occur in this instance.

24   Pls.' Mot. 17-18.  This issue narrowly involves corporate power under the CPMB and CPCMC

25   operating agreements and concerns a dispute between the Clark and Pinnacle Managers

26   thereunder.  Plaintiffs' first argument concerning AMSC's improper advantage over its principal

27   and their third argument based upon the lack of written agreement between MBMH and CMC and

28   AMSC to amend the PMAs thus concern the wrong parties and the wrong contracts.  Those

1    arguments are therefore largely inapposite to the Court's consideration of whether the Pinnacle

2    Managers acted within the scope of their corporate power under the operating agreements to direct

3    CPMB and CPCMC to adjust the PMAs at Monterey and Irwin.

4         As to Plaintiffs' second argument that the proposed adjustments exculpate AMSC and

5    AMS from their fraud and therefore violate public policy and California Civil Code § 1668, the

6    Court agrees with Defendants that the addition of notice and an opportunity to cure is not a

7    complete exemption of liability but rather, if valid, a limitation on MBMH's and CMC's

8    termination rights.  *See* Defs.' Opp. 18-19; *see CAZA Drilling (California), Inc. v. TEG Oil & Gas*

9    *U.S.A., Inc.*, 142 Cal. App. 4th 453, 470-75 (2006).  There is no public policy against a principal

10   providing its agent with additional contractual protections, which would be the effect of the

11   Pinnacle Managers' adjustments to the PMAs, if held valid.  Thus, while notice and an

12   opportunity to cure defaults based upon an agent's theft or fraud may not be sound *private* policy,

13   the law does not prohibit such provisions in agency agreements.

14        This does not mean, however, that the disputed adjustments were a valid exercise of the

15   Pinnacle Managers' deadlock resolution power.  Per the CPMB and CPCMC operating

16   agreements, Major Decisions can only be undertaken by vote of both the managing Clark Manager

17   and the minority Pinnacle Manager.  CPMB Op. Ag. ¶ 3.1(b)(3).  In the event of a deadlock in

18   voting with respect to "any matter arising under, relating to, or affecting the terms or conditions of

19   the Property Management Agreement," the Pinnacle Manager can resolve the deadlock "in its sole

20   discretion" if the dispute cannot be resolved within 7 days.  *Id.* ¶ 3.13(c).  In order for there to be a

21   deadlock "in voting," there must have been a vote.  *Id.*  The undisputed factual record before the

22   Court establishes that there had been no vote by the CPMB and CPCMC Managers when the

23   Pinnacle Managers prematurely declared a deadlock on June 8, 2011.

24        There is no dispute that the series of letters between Stanley Harrelson on behalf of the

25   Pinnacle Managers and W. Cleveland Johnson on behalf of the Clark Managers from May 13,

26   2011 to June 14, 2011 constitute the universe of evidence relevant to this issue.  There is

27   furthermore no apparent dispute that the changes the Pinnacle Managers attempted to make to the

28   PMAs required a Major Decision vote under Paragraph 3.1(b)(3)(E) of the CPMB and CPCMC

United States District Court
Northern District of California

21

operating agreements.[10]  On May 13, 2011, Harrelson sent on behalf of Pinnacle Monterey and

Pinnacle Irwin identical letters titled "Notice of Major Decision" that proposed the disputed

adjustments and purported to "vote" on the proposals pursuant to the Major Decisions provision of

the operating agreements.  J.A. Exh. F1.  The letters demanded the following response from the

Clark Managers:

> If you agree with the proposed adjustments, please sign below and
> return to me.  If we need to discuss or change these adjustments, I
> welcome your suggestions.  If you are inclined to vote against any of
> the proposed adjustments, please share your analysis and rationale.
> If you fail to respond to this letter on or before May 20, 2011,
> Pinnacle shall deem your non-response a deadlock pursuant to
> Section 3.13(c).

*Id.*  It is clear that the parties had not previously discussed these changes to the PMAs, as

Johnson's May 19, 2011 response on behalf of the Clark Managers contained ten questions

regarding the wording and intent behind the proposed adjustments.  Notably, Johnson asked:

> 1.  What is meant by "material adverse effect" on the Owners?
> 2.  What is meant by "appropriate measures to correct" fraud?
> 3.  What is meant by a "confirmed event of default"?
> 4.  What types of fraud do you contend are or are not "susceptible
>     to being cured"?

J.A. Exh. F2.  Moreover, Johnson expressed disagreement with the manner in which Harrelson

had attempted to force a Major Decision vote: "We disagree with your interpretation of the

Operating Agreement to require a 'response' to your letters within seven days of the date of your

letters, and believe you have set an arbitrary deadline for us to respond in order to create a

deadlock."  *Id.*

Harrelson responded for the Pinnacle Managers in an undated letter stating: "we appreciate

your questions, and we are not ready to declare a deadlock.  Quite the contrary – we are happy to

discuss with you the adjustments to the Property Management Agreements . . . ."  J.A. Exh. F3.

---

[10] The Court pauses here only to observe that the operating agreements clearly contemplate a
difference between *amendment* to the parties' various agreements and *adjustment* to the "terms
and conditions" of the PMAs.  *Compare* CPCMC ¶ 3.1(b)(3)(E) *with* ¶ 3.1(b)(3)(F); *see also id.* ¶
3.1(b)(3)(G) ("Amendment to the MBMH Operating Agreement or the MBL Operating
Agreement . . . to the extent such amendment would cause an adjustment to the terms or
conditions of the Property Management Agreement"); ¶ 7.1.  It is not clear what difference there is
between an amendment and an adjustment, nor is it clear that the Pinnacle Managers' proposed
changes could fairly be characterized as an "adjustment to the terms and conditions" of the PMAs.

United States District Court
Northern District of California

1    Rather than answer Johnson's targeted questions concerning the wording of the proposed

2    adjustments, Harrelson offered vague platitudes about the Pinnacle Managers' desire "to keep

3    Monterey and Irwin focused on the goal of our partnership" and their expectation that "the

4    adjustments we have proposed to Section 18(C) of both agreements will get Clark and Pinnacle

5    talking again and acting like partners" and suggested a face-to-face meeting with an Army

6    representative to discuss the proposed adjustments.  *Id.*  On June 3, 2011, Johnson declined

7    Harrelson's request for a face-to-face meeting, noting that because Harrelson had failed to answer

8    any of his questions, "we do not think such a meeting will be productive until we have received

9    written responses to our questions."  J.A. Exh. F4.  Johnson requested written responses to his

10   questions by June 8 and also requested that Harrelson drop claims against Johnson and Clark

11   employees Doug Sandor and Larry Nussdorf that some Pinnacle entity (it is not clear which) had

12   filed in Virginia.  *Id.*

13       On June 8, 2011, Harrelson asserted that it was improper for Johnson to attempt to seek

14   dismissal of claims in Virginia "as a precondition to meeting about our California projects" and

15   noted that by that point it had been three weeks since the Pinnacle Managers proposed the

16   disputed adjustments.  J.A. Exh. F5.  The Pinnacle Managers then declared a "deadlock" "pursuant

17   to Section 3.13(c) of the Operating Agreements" and signaled commencement of the "7 day period

18   for resolution set forth in the Operating Agreements."  *Id.*  The letter stated that "[a]bsent a

19   meeting, Pinnacle's proposed adjustments shall become effective on June 16, 2011, pursuant to

20   the terms of the Operating Agreements."  *Id.*  In a June 14, 2011 letter, Johnson sharply disputed

21   the existence of a deadlock because "an actionable 'deadlock' must occur 'in voting'" and

22   "Pinnacle has not called a vote, either by calling a meeting for that purpose pursuant to California

23   LLC Act (Section 17104(c)(i)) or by obtaining the Clark Managers' written consent to vote absent

24   such a meeting."  J.A. Exh. F6.  Both sides then filed suit on June 15, 2011.

25       Regrettably, the correspondence between Harrelson and Johnson reads less like amicable

26   communications between business partners and more like posturing in anticipation of litigation.[11]

27   

28   [11] The tenor of the correspondence is akin to that of the discovery meet-and-confer letters with
     which every judge is familiar, wherein the parties clearly have no interest in making a meaningful

1    There is no attempt to compromise, to hear the other side, or to address the counterparty's

2    concerns.  In short, the letters demonstrate that the Pinnacle and Clark Managers failed to agree on

3    anything.  That breakdown in communication undermines the Pinnacle Managers' claims to the

4    validity of their proposed adjustments.  As Plaintiffs note, the operating agreements require the

5    CPMB and CPCMC Managers to "meet for the transaction of Company business at such places

6    and times as are mutually convenient to them."  CPMB Op. Ag. ¶ 3.9.  The Managers may,

7    however, "transact Company business by written consent without a formal meeting."  *Id.*  Here,

8    there was no formal meeting and there was no written consent to transact business without a

9    formal meeting.  Indeed, the record reflects an absence of consent to conduct the vote on the

10   Pinnacle Managers' proposed Major Decision adjustments.

11           After the May 14, 2015 oral argument on the present motions, Defendants requested leave

12   to submit additional evidence showing that the CPMB and CPCMC Managers had, in the past,

13   regularly transacted business without a formal meeting.  Defs.' Admin. Mot. to File Add'l Evid.,

14   ECF 239.  This request was unorthodox to say the least, as the parties' summary judgment

15   motions had already been thoroughly and extensively briefed and were submitted following oral

16   argument.  In any case, the Court has reviewed Defendants' proffered evidence and does not find

17   it relevant to the narrow issue of whether the Clark Managers provided written consent to forego a

18   formal meeting in connection with voting on the proposed adjustments at issue here.[12]  For one, it

19   is not clear that the "business" conducted in writing in each of Defendants' examples concerned

20   Major Decisions, which are narrowly and expressly defined under the CPMB and CPCMC

21   operating agreements.  *See* Decl. of Alice Y. Chu, ECF 239-1 Exhs. 1-15; CPMB Op. Ag. ¶

22   3.1(b)(3).  Even if requests for reimbursements of capital expenses are Major Decisions,

23   Defendants' proffered supplemental evidence shows, at most, that the Managers consented to

24   transact prior business without a formal meeting.  There is no evidence that the Clark Managers

25   had waived the requirement of a formal meeting for all of the companies' future business,

26

27   _____

     effort to resolve their dispute without court intervention.

28   [12] Defendants' Administrative Motion for Leave to File Additional Evidence is GRANTED.

                                              24

especially since they expressly invoked that requirement in connection with the disputed
adjustments.  J.A. Exh. F6.

Absent compliance with the procedural requirements of the operating agreements, there
was no valid vote on the Pinnacle Managers' adjustments and therefore no "deadlock . . . in
voting" sufficient to trigger the Pinnacle Managers' deadlock resolution power under Paragraph
3.13(c).  Defendants do not identify any persuasive authority to the contrary.  The cases that
Defendants rely on to establish a deadlock in the face of the Clark Managers' hesitation stand only
for the proposition that where a contract requires the parties to negotiate, a refusal to negotiate
constitutes a "deadlock" in negotiation.[13]  *See Beach Air Conditioning & Heating, Inc. v. Sheet
Metal Workers Int'l Ass'n Local Union No. 102*, 55 F.3d 474, 477 (9th Cir. 1995) ("an employer
cannot escape the interest arbitration clause by refusing to negotiate, because the contract imposes
not only a duty to accept a settlement imposed by the arbitrators once negotiations fail, but also a
duty to negotiate in the first place"); *M.R.S. Enterprises, Inc. v. Sheet Metal Workers' Int'l Ass'n,
Local 40*, 429 F. Supp. 2d 72, 79 (D.D.C. 2006) (citing *Beach* for same proposition).  Defendants
have identified no similar provision of the operating agreements *requiring* the company managers
to vote on a Major Decision such that a failure to do so within a given timeframe could be
characterized as a "deadlock . . . in voting" under Paragraph 3.13(c).  In fact, there could not have
been a meaningful vote when the Pinnacle Managers declared a deadlock because the Clark
Managers' unanswered questions establish that there was no meeting of the minds concerning the
*meaning* of essential terms in the proposed adjustments.[14]

---

[13] The CPMB operating agreement states that the agreement "will be construed in accordance with
the laws of the State of Maryland."  CPMB Op. Ag. ¶ 7.4.  The CPCMC operating agreement
provides for construction under California Law.  CPCMC Op. Ag. ¶ 7.4.  The parties are
presumably fully aware of these choice of law provisions and have not identified any unique
differences between Maryland and California contract law that should inform the Court's
construction of these agreements.

[14] To the extent Defendants would argue that the terms can be understood with reference to similar
provisions in the Clark Managers' other agreements, the Court finds that contrary to Defendants'
representations, the notice and cure provisions in CPMB and CPCMC's limited liability operating
agreement and land leases with the Army are completely inapposite.  Defs.' Opp. 19-20.  Rather
than permitting an opportunity to cure fraud that has a materially adverse effect, the ground lease
agreements define a "Termination Default" as a default for failure to comply with material
provisions of the agreement (as defined in paragraph 19.a), that has gone uncured "and []

United States District Court
Northern District of California

1        To be sure, it would be unreasonable (and perhaps a breach of their own fiduciary

2   obligations) for the Clark Managers to withhold their votes indefinitely.  Under such instances,

3   however, the Pinnacle Managers have other available remedies such as an action to compel

4   specific performance, as provided for in Paragraph 6.2(a)(2) of the operating agreements,[15] or

5   invocation of the California Corporations Code to compel a meeting or vote.  *See* Cal. Corp. Code

6   § 17704.07(f)-(h).  The Pinnacle Managers' declaration of a deadlock would even be tenable had

7   they set a formal meeting time and date and the Clark Managers failed to attend.  Instead,

8   Johnson's May 19, 2011 letter proved to be prescient: rather than observe contractual

9   requirements, pursue available remedies, or attempt to answer the Clark Managers' questions,

10  Pinnacle Monterey and Pinnacle Irwin simply declared a "deadlock" and crowned themselves the

11  victors.  There can be no conclusion from this course of conduct other than that the Pinnacle

12  Managers constructed the entire exchange for the purpose of declaring and resolving a voting

13  deadlock on adjustments to the PMAs that would prevent termination of their affiliate's agency.

14  Such conduct was patently unreasonable.  Clearly, the operating agreements would not permit the

15  Pinnacle Managers to demand, without prior notice or discussion, a vote on a proposed Major

16  Decision within 24 hours and then declare a deadlock one day later.  There is no meaningful

17  distinction between that extreme hypothetical and what occurred here.

18        In sum, it was premature for the Pinnacle Managers to declare a "deadlock . . . in voting"

19  on June 8, 2011 because no valid vote had been taken.  As such, the Pinnacle Managers had no

20  occasion to exercise their power to resolve deadlocks in voting and the purported adjustments to

21  the Monterey and Irwin PMAs never became effective.  Plaintiffs' motion for summary judgment

22

23  ────────────────────

24  constitutes fraud or results in material adverse impact on the other Party . . . ."  J.A. Exh. A5 at §
    19.i(1) (emphasis added); *id.* Exh. A6 at § 19.i(1).  Defendants' "cursory reading" of these
    provisions generously ignores the reference to paragraph 19.a, the conjunctive "and," and the
25  disjunctive "or" to arrive at the conclusion that CPMB and CPCMC "enjoy cure rights for fraud,
    in addition to the requirement of a 'material adverse impact.'"  *Cf.* Defs.' Opp. 20.

26  [15] Indeed, in an analogous case that Defendants brought to the Court's attention, the minority
    member of a limited liability company sought and obtained a preliminary injunction to protect its
27  minority corporate governance rights when the majority members refused to allow the plaintiff to
    participate in an important vote.  *See generally Wisdom Import Sales Co., L.L.C. v. Labatt
28  Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003).

1  is therefore GRANTED on their First and Second Claims and on the Pinnacle Managers' First and

2  Second Claims.  The Pinnacle Monterey's and Pinnacle Irwin's motion in their favor on these

3  claims is accordingly DENIED.

4  **D.    Statutory and Contractual Rights to Revoke or Terminate the PMAs**

5  Plaintiffs seek judgment on AMSC and AMS's Third and Fourth Counterclaims

6  concerning MBMH's and CMC's statutory power and contractual right to remove AMSC, and

7  Pinnacle Monterey's and Pinnacle Irwin's Seventh and Eighth Claims concerning Clark Realty's

8  ability, as Clark Manager for CPMB and CPCMC, to direct the removal of AMSC without

9  triggering a "Major Decision" vote.  Pls.' Mot. 19.  Plaintiffs assert that MBMH and CMC have

10  both a statutory power and a contractual right to terminate the PMAs and that revocation of the

11  PMAs is not a "Major Decision" defined in the CPMB and CPCMC operating agreement.  *Id.*  As

12  such, Clark Realty's ability to remove AMSC and appoint its own preferred property manager

13  would appear to be unfettered.

14  The Court previously found in connection with its preliminary injunction order that

15  MBMH and CMC have a contractual right to terminate the PMAs based upon expressly defined

16  events of default in those agreements and that MBMH and CMC also have the statutory *power* to

17  revoke AMSC's agency at will because the agency created through the PMAs was not coupled

18  with an interest in the subject matter of the agency.  Inj. Order at 12-15.  Moreover, the CPMB and

19  CPCMC operating agreements permit the Clark Managers at each to enforce the termination

20  provision of the PMAs without triggering a Major Decision vote.  *Id.* at 19-20.  Defendants have

21  offered no compelling argument to deviate from those findings.

22  As already explained above, Defendants' attempt to cast AMSC in the role of an

23  "independent contractor" is unpersuasive because PMAs expressly contemplate an agency

24  relationship within the scope of the delegated authority.  Defendants' attempt to distinguish

25  *Woolley* and *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.*, 19 Cal. App. 4th 615 (1993),

26  cases that involved hotel management contracts, on the basis that those cases are limited to

27  personal and non-delegable service contracts is furthermore unavailing.  Defs.' Opp. 21.  It is

28  undisputed that AMSC could not personally perform the duties it had contracted to perform

27

1    because ASMC has no employees and relies upon AMS to provide services.  That AMSC has the

2    authority to delegate its duties to a capable (and pre-approved, by way of the CPMB and CPCMC

3    operating agreements) subagent is perfectly within the bounds of agency law and does not serve to

4    remove the PMAs from the realm of generally applicable agency law.  *See* Cal. Civ. Code § 2349.

5    Moreover, as the Court already found, MBMH and CMC delegated authority to AMSC under the

6    PMAs, thereby creating an express agency.  There is nothing in the property management

7    agreements here to suggest that AMSC was merely a franchisee or otherwise in a "close personal

8    working relationship" with MBMH and CMC.  *See* Defs.' Opp. 21.  In that respect, Defendants'

9    reliance on *Husain v. McDonald's Corp.*, 205 Cal. App. 4th 860, 868 (2012), a case addressing a

10   franchise agreement, is inapposite to the issues at hand.  *Id.*

11        In sum, Defendants advance no persuasive argument that the PMAs differ in any material

12   way from the property management agreements addressed in *Woolley* and *Pacific Landmark*.  As

13   such, the Court adopts the conclusions from its April 17, 2015 order finding that the PMAs create

14   a revocable agency and that MBMH and CMC, as principals, have the statutory power under

15   California Civil Code § 2356 to revoke AMSC's agency at any time.  Inj. Order at 12-15.

16        Who decides how MBMH and CMC should act is a separate matter.  MBMH and CMC

17   cannot act except at the direction of their members.  CPMB and CPCMC were created for the

18   express purpose of being a member and acting as the managing member for MBMH and CPCMC

19   respectively.  *See, e.g.*, CPMB Op. Ag. ¶ 1.5.  It is undisputed that the CPMB and CPCMC

20   operating agreements specifically confer onto the Clark Manager for each company "acting

21   authority to make all decisions regarding the management of the Company's business and affairs"

22   except with respect to "Major Decisions," which must be undertaken by vote of both the Clark and

23   Pinnacle Managers.  *Id.* ¶ 3.1(b)(2)-(3).  Outside of voting on Major Decisions, the Pinnacle

24   Manager has no authority to "make decisions regarding the management of the Company's

25   business and affairs or to act on, consent to or approve matters of the Company without the vote or

26   signature of the Clark Manager."  *Id.*  ¶ 3.1(b)(2).

27        It should thus become clear that Plaintiffs' power to act unilaterally to terminate the PMAs

28   or revoke AMSC's agency depends on whether such actions are "Major Decisions" under the

operating agreements.  The key Major Decision at issue here is defined at Paragraph 3.1(b)(3)(E) of the CPMB operating agreement (Paragraph 3.1(b)(2)(E) of the CPCMC agreement), which states: "Adjustments to the terms or conditions of the Property Management Agreement (as herein defined), but the decision to enforce or take any other action with respect to any of the terms or conditions thereof shall not be deemed a Major Decision."  Plaintiffs thus contend that termination of the PMAs and revocation of AMSC's agency is an action to "enforce or take any other action with respect to any of the terms or conditions" of the PMAs and not a Major Decision.  Pls.' Mot. 19.  Plaintiffs are unquestionably correct that *termination* under Paragraph 18.1 of the PMAs is an action to enforce the agreement and is therefore not a Major Decision.  In that respect, the Court adopts its prior finding from the preliminary injunction order.  Inj. Order at 20.  As the Court noted in that prior order, however, an exercise of the statutory power to revoke does not fall neatly within that exception.  *Id.*  By the same token, revocation is also not an "adjustment to the terms or conditions" of the PMAs, and therefore does not appear to be a Major Decision under that definition of the term.  *Id.* n.13.  Defendants offer little on this point, arguing cursorily that revoking the PMAs is "a Major Decision on which Pinnacle Monterey and Pinnacle Irwin have a contractual right to vote."  Defs.' Opp. 20.

Interpreting the letter of the CPMB and CPCMC operating agreements, the only conclusion that the Court can reach as a matter of law is that these operating agreements do not restrain the Clark Manager's unilateral power to direct revocation of AMSC's agency at the Monterey and Irwin projects.  The authority granted to the Clark Managers is broad.  Moreover, given that revocation is not an "adjustment" to the terms of the PMAs, and given the *breadth* of the exception to the "adjustment" Major Decision defined at Paragraph 3.1(b)(3)(E), it is clear that the CPMB and CPCMC members intended that there would be little hindrance to the Clark Manager's management of CPMB's and CPCMC's "business" as managing member of MBMH and CMC.  Indeed, the PMAs themselves provide that AMSC can rely on the direction or consent of the Clark Manager as the act of the Owner.  Monterey PMA ¶ 18.7.  As such, if AMSC is directed to vacate the premises by the Clark Manager for CPMB and CPCMC, the PMAs instruct AMSC that that is the act of the Owner.  Of course, the parties are well aware that the statutory

United States District Court
Northern District of California

1  power of a principal to revoke an agency is "independent and distinguishable from a contractual

2  right" to terminate that relationship.  *Pac. Landmark Hotel*, 19 Cal. App. 4th at 625.  "If the

3  exercise of the statutory revocation power is contractually unjustified, damages may be in order."

4  *Id.* at 626.  In that respect, the Pinnacle Managers' financial interests in the PMAs are still

5  protected.

6          Likewise, in the absence of evidence to the contrary, the Court is persuaded by Plaintiffs'

7  argument that the operating agreements do not expressly provide that the appointment of a

8  property manager that is not affiliated with Defendants constitutes a Major Decision.  Pls.' Mot.

9  19.  Paragraph 3.15 of the operating agreements states that the members consent to entry of certain

10  services agreements, including the following:  "MBMH shall enter into one or more property

11  management agreements (the "Property Management Agreements" or the "Pinnacle Member

12  Service Contracts") with Pinnacle Realty Management Company ("Pinnacle Management"), an

13  Affiliate of the Pinnacle Group, on or before the Effective Date for the provision of property

14  management services."  CPMB Op. Ag. ¶ 3.15(a)(3).  Given the time limitation of that clause, it is

15  better understood as a condition precedent to the effective validity of the operating agreements, as

16  opposed to a contractual requirement that the PMAs always and forever involve a Pinnacle

17  affiliate.  Moreover, and as a practical matter, the parties consented to permit MBMH and CMC to

18  terminate AMSC for theft, fraud, or intentional misconduct.  All parties acknowledge that AMS

19  provides services on AMSC's behalf because AMSC is a "special purpose entity" with no

20  employees.  *See* Pls.' Exh. 54 (Defs.' Resp. to Reqs. for Admis.) at 6-7.  It strains credulity to

21  suggest that the parties to the CPMB and CPCMC operating agreements intended to authorize

22  MBMH and CMC to terminate one defalcating agent only to then require the Owners to appoint

23  an affiliate of that agent—potentially some new "special purpose entity" with no employees of its

24  own created for the sole purpose of signing the PMAs—in its stead.  The end result would be that

25  AMS, the true provider of services at the projects, could never be removed from its property

26  management position regardless of how much theft and fraud it commits.  As Defendants have

27  provided no persuasive authority for such an interpretation of the operating agreements, Plaintiffs

28  are entitled to summary judgment.

United States District Court
Northern District of California

United States District Court
Northern District of California

1        Finally, the Court rejects Defendants' assertion that termination or revocation of the PMAs

2   also constitutes "sale, pledge, transfer, conveyance or other disposition of any substantial asset of

3   the Company," a further Major Decision defined under the operating agreements.[16]   CPMB Op.

4   Ag. ¶ 3.1(b)(3)(A); CPCMC Op. Ag. ¶ 3.1(b)(2)(A).   Defendants' position is premised on their

5   contention that the right to retain fees generated by the PMAs is a "substantial asset" of CPMB

6   and CPCMC.   In support, they rely on a June 6, 2002 document prepared by "Clark Pinnacle

7   Family Communities LLC" and submitted to the Army, which states that the ability to earn fees

8   through services is "Clark Pinnacle's most valuable asset." [17]   J.A. Exh. H-3 at MBMH-

9   CMC00199030; see Defs.' Mot. for Leave 3; Defs.' Opp. to Mot. to Dissolve Prelim. Inj. 3-5, 11-

10  12, ECF 61.   Other evidence submitted by Defendants demonstrates the value of the fees projected

11  to be generated under the PMAs over the 50-year life of the projects.   See Defs.' Mot. for Leave 3-

12  4.   Ultimately, this evidence fails to persuade that termination or revocation of the PMAs

13  constitutes disposition of a "substantial asset" of CPMB or CPCMC sufficient to trigger the voting

14  requirement.

15        As Plaintiffs previously noted in briefing the preliminary injunction against revocation,

16  Defendants' invocation of the "substantial asset" Major Decision fails in two critical respects.

17  Pls.' Reply to Mot. to Dissolve Prelim. Inj., ECF 63.   First, the operating agreements state that

18  "[s]ale, pledge, encumbrance, transfer, conveyance or other disposition of any substantial asset of

19  the Company" is a Major Decision "except as otherwise permitted in this Agreement."   CPMB

20  Op. Ag. ¶ 3.1(b)(3)(A); CPCMC Op. Ag. ¶ 3.1(b)(2)(A).   The Court has already determined that

21

22  _____

    [16] Defendants on July 13, 2015 sought leave to seek reconsideration of the Court's summary
23  judgment ruling on the ground that the Court failed to consider this alternative Major Decision
    implicated by termination or revocation of the PMAs.  Defs.' Mot. for Leave, ECF 357.  This
24  argument was not fairly presented (in fact, barely mentioned) in Defendants' extensive briefing on
    summary judgment and was therefore properly rejected on that basis alone.  See Pinnacle Mot. 3;
25  Defs.' Opp. 20; see also Keenan, 91 F.3d at 1279.  In any case, the Court has considered and
    rejected the argument on the merits, even after considering the additional arguments and evidence
26  that the parties proffered in connection with Defendants' motion for leave to seek reconsideration
    and the parties prior briefing concerning the preliminary injunction.

27  [17] The same submission also promises a "guarantee" of performance by Clark Pinnacle through the
    structuring of asset management and service contracts as "third party contracts that allow
28  dismissal in the event of non-performance."  J.A. Exh. H-3 at MBMH-CMC00199030.

the operating agreements clearly permit the Clark Manager to enforce the termination provision of the PMAs without a Major Decision vote.  Second, and more fundamentally, there is no evidence that the PMAs are assets owned by CPMB and CPCMC, as those entities are neither parties to the PMAs, nor are they entitled to the fees generated from the PMAs.  *See* Inj. Order at 20 n.13.  Indeed, Plaintiffs have introduced evidence into the record demonstrating that Defendants did not previously treat the PMAs as assets of CPMB and CPCMC, having pledged the future fees from the PMAs as collateral without first obtaining approval from the Clark Managers.  *See* Pls.' Reply to Mot. to Dissolve Prelim. Inj. at 6; Decl. of Donna Welch ECF 64 Exhs. 7-9.  Due to the paucity of evidence submitted by Defendants and the persuasive argument and evidence by Plaintiffs, the Court thus finds that the PMAs are not substantial assets of CPMB and CPCMC.  In sum, none of the Major Decisions identified by Defendants require a vote by the CPMB and CPCMC managers in order to enforce the termination provision of the PMAs or revoke AMSC's agency under California law.

Plaintiffs' motion for summary judgment is accordingly GRANTED with respect to AMSC and AMS's Third and Fourth Counterclaims and with respect to Pinnacle Monterey's and Pinnacle Irwin's Seventh and Eighth Claims.

### E.    MBMH and CMC's Breach of the Implied Covenant of Good Faith and Fair Dealing in the PMAs

Plaintiffs assert that AMSC and AMS's Eleventh and Twelfth Counterclaims against MBMH and CMC for breach of the implied covenant of good faith and fair dealing fail as a matter of law because MBMH and CMC acted reasonably and in accordance with the terms of the PMAs.  Pls.' Mot. 19.  The bad faith conduct that AMSC and AMS ascribe to MBMH and CMC include attempting to terminate the PMAs without notice and an opportunity to cure, attempting to terminate on the basis of "unproven facts" or "immaterial" conduct, asserting a statutory power to revoke AMSC's agency, and hiring outside counsel and special forensic accountants to investigate the potential fraud and misconduct.  Counterclaims ¶¶ 158-67.  The Court has found that MBMH and CMC have both a contractual right to terminate as well as a statutory power of revocation and, as such, the bad faith claims cannot be based upon a valid exercise of either.  *Carma Developers*

1    *(Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373-74 (1992).

2            There are, however, factual disputes surrounding whether any theft, fraud, or intentional

3    misconduct permitting termination of the PMAs actually occurred.  The gravamen of AMSC and

4    AMS's bad faith claims is not that the implied covenant circumscribes MBMH's and CMC's

5    contractual authority to audit AMSC, hire legal counsel, and terminate the PMAs, but rather that

6    MBMH and CMC exercised that discretionary authority in bad faith.  *See* Defs.' Opp. 21-23

7    (citing *McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1154-55 (N.D. Cal. 2002)).

8    Defendants' version of how their relationship with the Clark entities reached this point in litigation

9    is premised upon the idea that Plaintiffs purposefully sought ways to terminate the parties'

10   relationship for cause mostly out of greed and disgust with Pinnacle.  *See id.* at 4-5, 22.  There is

11   some evidence that the Clark-Pinnacle relationship began to sour in 2005 when Clark no longer

12   desired to engage in long-term military partnerships and, as a result, two Clark employees left to

13   join AMS in pursuit of contracts with a different partner. J.A. Exhs. K28; K20 (excerpt of T.

14   Guleserian dep.); K63 (excerpt of S. Orrantia dep.).  The relationship deteriorated further in 2006

15   when Clark explored alternative insurance options.  *Id.* Exhs. K53, K54.  Indeed, the evidence

16   suggests that in 2009, long before the filing of this lawsuit, Clark had already begun strategizing

17   termination options—particularly terminations for cause—because the "relationship [with AMS]

18   is probably damaged beyond repair."  *Id.* Exh. K43; *see also* Exhs. K9, K42, K44, K81.  Under

19   this version of events, Defendants' thus properly advance a bad faith claim on the premise that:

20                   the conduct of the defendant . . . demonstrates a failure or refusal to
21                   discharge contractual responsibilities, prompted not by an honest
                     mistake, bad judgment or negligence but rather by a conscious and
22                   deliberate act, which unfairly frustrates the agreed common
                     purposes and disappoints the reasonable expectations of the other
23                   party thereby depriving that party of the benefits of the agreement.

24   *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990), *as modified on*

25   *denial of reh'g* (Oct. 31, 2001).  In this respect, Defendants' claims do not seek to vary the express

26   terms of the PMAs, but rather hold MBMH and CMC liable for deliberately and unfairly

27   exploiting those express terms to frustrate AMSC's reasonable expectations.  *Cf. Carma*, 2 Cal.

28   4th at 374; Pls.' Mot. 19-21.

United States District Court
Northern District of California

1    To be sure, these claims depend entirely on a jury concluding that there was no theft, fraud,

2    or intentional misconduct at the project.  However, rendering all justifiable inferences in

3    Defendants' favor, to the extent that a jury exonerates AMSC and AMS of the charged

4    misconduct, that jury could also reasonably conclude, after inspecting this evidence, that MBMH's

5    and CMC's efforts to terminate AMSC were undertaken in bad faith and for improper motive.  As

6    such, Plaintiffs' motion for summary judgment is DENIED with respect to AMSC and AMS's

7    Eleventh and Twelfth Counterclaims.

8    **F.    Clark Realty's Breach of Fiduciary Duties Under the Operating Agreements**

9    Plaintiffs claim that Clark Realty is entitled to summary judgment on Pinnacle Monterey's

10   and Pinnacle Irwin's Third and Fourth Claims alleging breach of fiduciary duties in connection

11   with Clark Realty's actions as the Clark Manager for CPMB and CPCMC.  Pls.' Mot. 21-24.

12   Plaintiffs contend that Clark Realty acted within the scope of its authority under the operating

13   agreements and that there is no evidence that it engaged in any self-dealing.  *Id.* at 22-23.

14   Plaintiffs moreover assert that Pinnacle Monterey and Pinnacle Irwin have suffered no injury from

15   Clark Realty's alleged misconduct separable from the purported injury to CPMB and CPCMC as

16   companies and that they therefore have no standing to assert their respective breach of fiduciary

17   duty claims.  *Id.* at 23-24.

18   It is undisputed that Clark Realty, acting as the Clark Manager for CPMB and CPCMC,

19   owes some fiduciary duty to the Pinnacle Managers—Pinnacle Monterey and Pinnacle Irwin.  Cal.

20   Corp. Code § 17704.09(f).  As the California courts have long recognized:

> 21    [M]ajority shareholders, either singly or acting in concert to
> 22    accomplish a joint purpose, have a fiduciary responsibility to the
>       minority and to the corporation to use their ability to control the
> 23    corporation in a fair, just, and equitable manner.  Majority
>       shareholders may not use their power to control corporate activities
> 24    to benefit themselves alone or in a manner detrimental to the
>       minority.  Any use to which they put the corporation or their power
> 25    to control the corporation must benefit all shareholders
>       proportionately and must not conflict with the proper conduct of the
> 26    corporation's business.

27   *Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 108 (1969).  Much as with AMSC and AMS's

28   implied covenant claims, disputes of material fact preclude summary judgment for either side on

United States District Court
Northern District of California

34

the fiduciary duty claims against Clark Realty.  If Defendants' narrative of the breakdown in the Clark-Pinnacle relationship is found to be true, Clark Realty's hiring of forensic auditors and outside counsel to construct a strategy to terminate the PMAs and effectively forcibly unwind the parties' military housing venture could be a breach of its fiduciary duty to the Pinnacle members of CPMB and CPCMC.  To the extent Clark Realty is using CPMB and CPCMC funds to pay for those outside accountants and legal counsel, a jury could find that the expenses are not "reasonable, third-party, out-of-pocket expenses allocable to the operation and management of the Company."[18]  CPMB Op. Ag. ¶ 3.6.  Indeed, it would certainly appear inequitable to use the Pinnacle Managers' own money to pay for outside legal counsel to remove their affiliate and diminish their return on investment.  Defendants have moreover produced evidence that Pinnacle Monterey and Pinnacle Irwin have a direct interest in the PMAs because they receive 20% of AMSC's gross fees under those agreements.  *See* Defs.' Opp. 24; J.A. Exh. K10 (excerpt of J. Carrosino dep.) at 8:15-9:23.  Rendering reasonable inferences in Defendants' favor, there is thus at least a triable issue of fact concerning the direct injury that Pinnacle Monterey and Pinnacle Irwin have individually sustained from Clark Realty's alleged misconduct in attempting to remove AMSC at the Monterey and Irwin projects as part of a scheme to benefit its own interests over those of the Pinnacle Managers.  In sum, whether Clark Realty breached its fiduciary duty to Pinnacle Monterey and Pinnacle Irwin is a question for the jury.

Plaintiffs' motion for summary judgment is therefore DENIED as to Pinnacle Monterey's and Pinnacle Irwin's Third and Fourth Claims.

### G.    MBMH and CMC's Breach of Contract For Failure to Pay Burden Expenses

Finally, Plaintiffs seek partial summary judgment on the portion of AMSC and AMS's Fifth and Sixth Counterclaims alleging that MBMH and CMC breached the PMAs in failing to pay AMSC's payroll "burden expenses" from 2009 to 2011.  Pls.' Mot. 25; Pls.' Reply 15.  Plaintiffs argue that MBMH and CMC did not breach the PMAs by failing to pay burden expenses because the "burden rate of 45% of the actual salary for payroll expenses" set forth in Paragraphs

---

[18] The Court observes that to the extent legal fees are expressly reimbursable under the operating agreements, such fees pertain only to "in-house accountants and legal counsel."

1    8.2 and 15.5 of the PMAs was not owed, all reimbursable expenses had to be approved on an

2    annual basis, and no burden charge was approved during the years 2003-2011.  *Id.*  Defendants'

3    rejoinder to this argument is that actual salaries and payroll expenses must be approved each year,

4    but that the 45% burden rate does not, as it is expressly set forth in the PMAs.  Defs.' Opp. 24.

5         Defendants' interpretation is more true to the language of the PMAs.  While Paragraphs

6    8.2 and 15.5 both provide for reimbursement of expenses "subject to" or "to the extent set forth in

7    an approved Plan," both provisions also expressly set forth a 45% burden rate *included* with

8    AMSC's salary expenses.  Were this burden rate subject to change or annual approval in each

9    Plan, the language of the PMAs would not be so definite and precise on the percentage of the

10   burden rate to be paid.  In fact, taking Plaintiffs' argument to its logical conclusion, rejection or

11   alteration of the 45% burden rate would require written amendment approved by Owners MBMH

12   and CMC and Manager AMSC.  Monterey PMA Section 22.  The better interpretation is thus that

13   the 45% burden rate is set in stone in connection with salary expenses that are approved each year.

14   Defendants have provided some evidence that AMSC's budget *was* approved each year.  Defs.'

15   Opp. 24; *see* J.A. Exh. K80 (excerpts of J.L. Winters dep.).  Plaintiffs have supplied no evidence

16   either to affirmatively show a lack of approval or to rebut Defendants' showing.  As such,

17   Plaintiffs have failed to satisfy their moving burden.  Plaintiffs' motion for summary judgment is

18   accordingly DENIED with respect to AMSC and AMS's Fifth and Sixth Counterclaims.

19   **IV.    PINNACLE ENTITIES' MOTION AND DEFENDANTS' SUPPLEMENTAL**
20   **MOTION**

21        The Pinnacle Entities seek summary judgment on all claims in this lawsuit, arguing that

22   Plaintiffs' tort claims are barred for a variety of reasons and that Defendants should prevail on

23   their contract claims.  In their supplemental motion, Defendants raise arguments concerning

24   Plaintiffs' civil RICO claim that relate to the arguments already addressed in the Pinnacle Entities'

25   briefing.  The Court therefore addresses those arguments together.[19]

26   _____

27   [19] Along with their reply briefs, Defendants also submitted a separate set of objections to
     Plaintiffs' evidence submitted in opposition to Defendants' motions for summary judgment.  ECF
28   210-8.  These objections do not comply with Civil Local Rule 7-3(c) and the Court disregards
     them as a result.

United States District Court
Northern District of California

**A.    Claims Relating to the Master Insurance Program Fraud**

The Pinnacle Entities contend that all of Plaintiffs' claims resting on Defendants' alleged fraud in connection with administration of the Master Insurance Program ("MIP") that insured the Monterey and Irwin projects (Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Claims) are time-barred because Plaintiffs were on inquiry notice of the basis for their claims by March 2008 at the latest.  Pinnacle Mot. 10-12.

Plaintiffs first alleged the insurance fraud in connection with state law claims asserted in September 2012 and later incorporated those fraud allegations into their civil RICO claim introduced in August 2014.  If the Pinnacle Entities are correct that inquiry notice occurred no later than March 2008, then Plaintiffs' claims fail under any applicable statute of limitations, whether the three-year statute of limitations for fraud or fraudulent breach of fiduciary duty, or the four-year statute of limitations for violations of RICO and California's UCL.  *See* Cal. Code of Civ. Proc. § 338(d) (three-year limitations period for cause of action on the ground of fraud or mistake that begins to accrue upon "the discovery, by the aggrieved party, of the facts constituting the fraud or mistake"); Cal. Bus. & Prof. Code § 17208 (four-year statute of limitations on UCL claims); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1479 (2014) (four-year limitations period for breach of fiduciary duty, but three-year period applies to fraudulent breaches); *Pincay v. Andrews*, 238 F.3d 1106, 1108-10 (9th Cir. 2001) (four year limitations period for civil RICO begins to run at constructive notice "regardless of any fiduciary relationship between the injured and the injurer").  Plaintiffs factually dispute that they ever had actual knowledge of the concealed MIP overcharges or that they failed to diligently investigate potential fraud, asserting that they were repeatedly mislead by Pinnacle and Lockton representatives throughout the course of the MIP's troubled history.  *See* Pls.' Opp. 2-12, ECF 183.  Plaintiffs moreover argue that due to these affirmative acts of concealment, they are entitled to equitable tolling of the statute of limitations.  *Id.* at 15-16.

"In some cases, the conduct of a defendant will toll the statute of limitations under the doctrine of fraudulent concealment.  The doctrine is properly invoked only if a plaintiff establishes 'affirmative conduct upon the part of the defendant which would, under the circumstances of the

1    case, lead a reasonable person to believe that he did not have a claim for relief.'" *Volk v. D.A.*

2    *Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (quoting *Gibson v. United States*, 781 F.2d

3    1334, 1345, (9th Cir. 1986)); *accord Regents of Univ. of California v. Superior Court*, 20 Cal. 4th

4    509, 533 (1999).  The party advocating tolling "must demonstrate that they had neither actual nor

5    constructive notice of the facts constituting their claims for relief" and "must establish that they

6    used due diligence in trying to uncover the facts."  *Volk*, 816 F.2d at 1415-16 (citing *Rutledge v.*

7    *Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978), and *Conerly v.*

8    *Westinghouse Electric Corp.*, 623 F.2d 117, 120 (9th Cir. 1980); *accord Fox v. Ethicon Endo-*

9    *Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) ("a potential plaintiff who suspects that an injury has

10   been wrongfully caused must conduct a reasonable investigation of all potential causes of that

11   injury").  The opposing party's "silence or passive conduct does not constitute fraudulent

12   concealment," nor can the plaintiff's "mere ignorance of the cause of action" toll the statute.  *Volk*,

13   816 F.2d at 1416.

14         Here, significant factual disputes preclude judgment as a matter of law for the Pinnacle

15   Entities.  For example, the undisputed factual record suggests that Plaintiffs became aware of their

16   potential cause of action in April 2004, when Plaintiffs' senior asset manager AJ Caputo began

17   making inquiries regarding the details of the insurance program and "why the actual premiums are

18   so much higher than what was budgeted."  Opp. Decl. of Yates M. French, ECF 176 Exh. 43.

19   However, there is also evidence to indicate that at that time, Plaintiffs diligently investigated the

20   calculation underlying those curiously high premiums.  *See id.* Exh. 47, 73, 84, 86, 93.  *Cf. Pincay*,

21   238 F.3d at 1110 (constructive notice in civil RICO case at written disclosure of allegedly

22   excessive charge that plaintiffs failed to investigate).  In fact, Mr. Caputo testified that although he

23   did not specifically investigate the funding for a general liability aggregate disclosed in 2004, he

24   did request clarification from Defendants regarding overall pricing, including that they "stop

25   changing the methodology that you are using to determine the cost of the insurance."  *See* J.A.

26   Exh. C6 181:2-22; French Opp. Decl. Exhs. 48-50.  Similarly, Plaintiffs dispute the significance of

27   a 2006 analysis by Bryon Krug suggesting that Pinnacle was "using a captive [insurance

28   program]" with "inaccurate and arbitrary" billing, which Plaintiffs' witness recalled was a "crazy

United States District Court
Northern District of California

38

idea." *See* J.A. Exh. D4-D5; French Opp. Decl. Exh. 249 (C. Johnson Dep.) 198:13-199:6.
Drawing reasonable inferences in Plaintiffs' favor and because there was never a fulsome
disclosure of the MIP premiums that completely unbundled the various included fees, the Court
cannot conclude as a matter of law that Plaintiffs actually knew of the alleged overcharges or
failed to diligently investigate the potential overcharges before 2008.

In similar fashion, the critical communications in 2008 could reasonably support an
inference that Defendants and Lockton continued to actively mislead Plaintiffs regarding the
origin and purpose behind the aggregate fund and risk management fees.  Most notably, David
Krull, Pinnacle's former General Counsel and Head of Risk Management, explained to Mr.
Caputo that the risk management fee was identical to what "would be provided by any other
broker or servicing company and are built into the total premium charged to each client," thereby
suggesting the fee was paid to Lockton and not Defendants.  French Opp. Decl. Exhs. 94-95.  The
Pinnacle Entities challenge the proper *interpretation* of this email, and of much of Plaintiffs'
evidence.  *See* Pinnacle Reply 5-6, ECF 208.  Their vigorous opposition exposes only one thing:
the proper interpretation of the factual record—whether Plaintiffs conducted a reasonable
investigation and whether they were reasonably mislead by Defendants' affirmative statements in
2008—is subject to reasonable dispute and must therefore be left to the jury.  Although there is
significant evidence that Plaintiffs' representatives were made aware of the fees and surcharges
before 2008, Plaintiffs have also put forth evidence that could reasonably support an inference that
Pinnacle employees actively hid critical information from Plaintiffs or otherwise lulled them into
complacency with misleading reassurances.  Furthermore, inasmuch as the parties also vigorously
dispute the credibility of key witnesses to this entire exchange, the issue of credibility is also a
question for the jury.  *See* Pls.' Opp. 5 n.2, 11.

As such, rendering all justifiable inferences in Plaintiffs' favor, a reasonable jury could
find that Plaintiffs diligently investigated the MIP premium overcharges and that Defendants
actively mislead Plaintiffs concerning the nature and provenance of the MIP premium breakdowns
such that the statute of limitations was tolled as a result.  *Beneficial Standard Life Ins. Co. v.
Madariaga*, 851 F.2d 271, 276 (9th Cir. 1988).  The Pinnacle Entities' motion for summary

United States District Court
Northern District of California

39

1    judgment that Plaintiffs' MIP fraud-based claims are time-barred is therefore DENIED.

2         **B.    Claims Relating to the Vendor Scheme**

3         The Pinnacle Entities further assert that all of Plaintiffs' claims premised upon allegedly

4    undisclosed money and gifts to AMS employees from third party vendors (Fifth, Sixth, Seventh,

5    Eighth, Ninth, and Tenth Claims) are insufficient because there was no fraud, because the claims

6    are time-barred due to Plaintiffs' earlier awareness of the vendor "donations," and because such

7    contributions caused no damage to Plaintiffs.  Pinnacle Mot. 13-14.  Plaintiffs "refute any

8    knowledge of this highly inappropriate vendor practice," and argue on the basis of that denial that

9    summary judgment should be denied.  Pls.' Opp. 16.  Plaintiffs moreover contend that the

10   evidentiary record reflects that AMSC authorized inflated fees to be paid to vendors such as Main

11   Scape and Five Star, thereby injuring Plaintiffs.  *Id.*

12        Drawing reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs' claims

13   based upon the alleged vendor fraud are barred by the statute of limitations.  As discussed above,

14   the statutes of limitations applicable to Plaintiffs' Fifth through Tenth claims require that those

15   claims be brought either within three or four years of discovering the factual basis for the claims.

16   Cal. Code of Civ. Proc. § 338(d); *Am. Master Lease*, 225 Cal. App. 4th at 1479; *Pincay*, 238 F.3d

17   at 1108-10.  The evidence that Pinnacle's Community Director Rick Wimer solicited and received

18   donations from vendors to fund a resident "Extravaganza" only to divert that money to himself

19   and other AMS employees is alarming, to be sure.  *See* French Opp. Decl. Exhs. 117-19, 142.

20   However, it is undisputed that Defendants' investment manager at the Irwin project, Stacia

21   Schuster, notified Plaintiffs' asset manager, Guy Winters, of this practice in or around December

22   2007 to January 2008.  French Opp. Decl. Exh. 118; *id.* Exh. 164 (G. Winters dep.) at 169:7-11.

23   Those practices appear to have ceased after 2008.  *See, e.g.*, *id.* Exh. 119 at AMSE-

24   FBFC14103077 (June 17, 2010 draft memorandum by investigator James C. Milligan indicating

25   that the "[p]rogram was terminated immediately" after Ms. Schuster became aware of it in late

26   2007).  Equally undisputed is that Plaintiffs first asserted claims based upon the vendor fraud in

27   September 2012.  As such, these claims are outside of even the longest applicable statute of

28   limitations.

United States District Court
Northern District of California

1    Plaintiffs' only apparent argument around the statute of limitations is that the Pinnacle

2    Entities mischaracterize Mr. Winters's testimony and that he actually testified that "Ms. Schuster

3    told him that **no** vendor donations ever went to Pinnacle employees, but were instead intercepted

4    and returned by Ms. Schuster." Pls.' Opp. 13 (citing French Opp. Decl. Exh. 164 at 169:8-11 and

5    *id.* Exh. 141 ¶ 5) (emphasis in original). Plaintiffs mistake interpretation for fact. Mr. Winters

6    testified that Ms. Schuster informed him that "there were bonuses given by a vendor to

7    individual—certain individuals on the Pinnacle staff" and indicated that "she had intercepted this

8    and had resolved the matter." French Opp. Decl. Exh. 164 (G. Winters dep.) at 169:7-11.

9    Likewise, Mr. Winters's declaration indicates that "Ms. Schuster assured me that the envelopes

10    [containing the donations] had been returned to the vendor and that the issue had been addressed."

11    *Id.* Exh. 141 ¶ 5. Neither of these statements can reasonably be construed as affirmative

12    concealment of past misconduct or even reassurance that "no vendor donations *ever* went to

13    Pinnacle employees." Pls.' Opp. 13 (emphasis added). Indeed, in a 2010 investigation

14    memorandum by former AMS investment manager James Milligan, he comments on the

15    "*openness* with which [the vendor practice] was carried out." French Opp. Decl. Exh. 119 at

16    AMSE-FBFC14103078. The record thus reveals that Plaintiffs were on inquiry notice of the

17    vendor misconduct by January 2008 at the latest. In contrast to the MIP scheme, wherein

18    Plaintiffs diligently sought to understand the insurance premium calculations and were rebuffed by

19    incomplete disclosures and affirmative assurances, there is no evidence indicating that Plaintiffs

20    undertook any diligent investigation in connection with the vendor misconduct or the injury that it

21    caused to them nor even that the necessary facts were concealed from them. Even if Mr. Winters

22    believed that Ms. Schuster had intercepted *all* of the illicit contributions in 2008, Plaintiffs' own

23    evidence suggests awareness of earlier misconduct that should have triggered investigation into

24    the *extent* of the misconduct. *See* French Opp. Decl. Exh. 118; *id.* Exh. 164 (G. Winters dep.) at

25    168:10-169:1. Plaintiffs have therefore failed to demonstrate a triable issue of fact surrounding

26    the timeliness of their claims based upon the alleged vendor misconduct and the Pinnacle Entities

27    are entitled to judgment as a matter of law on that theory.

28    The Pinnacle Entities' motion for summary judgment is therefore GRANTED with regard

1  to the portions of Plaintiffs' Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Claims that are based

2  upon improper solicitation and receipt of monetary contributions from third party vendors.

3  **C.   Breach of Fiduciary Duty and Aiding and Abetting Claims**

4  The Pinnacle Entities seek summary judgment in their favor on Plaintiffs' Fifth Claim by

5  MBMH and CMC against AMSC and AMS for breach of fiduciary duty and on the Sixth Claim

6  against AMS for aiding and abetting the breach of fiduciary duty.  The Pinnacle Entities' principal

7  argument is that AMSC and AMS owed no fiduciary duties to MBMH and CMC in connection

8  with the PMAs.  Pinnacle Mot. 15-16.  The Court has already considered and rejected these

9  arguments in Part III.B., *supra*, and found that the PMAs create an agency relationship under

10 which AMSC owes a fiduciary duty in connection with all of the misconduct alleged in Plaintiffs'

11 Fifth Claim.  Defendants' only argument against the Sixth Claim for aiding and abetting is that

12 there can be no such claim where there is no primary liability.  Pinnacle Mot. 16-17.  Factual

13 disputes regarding the underlying misconduct preclude summary judgment for either party on

14 these claims.  The Pinnacle Entities' motion for summary judgment is accordingly DENIED with

15 respect to Plaintiffs' Fifth and Sixth Claims.

16 **D.   Civil RICO Claim**

17 The Pinnacle Entities challenge the legal viability of Plaintiffs' RICO claim (Ninth Claim)

18 in a number of respects, which the Court will address in turn.  Pinnacle Mot. 17-21.  The

19 Racketeer Influenced and Corrupt Organizations ("RICO") Act, passed in 1970 as Title IX of the

20 Organized Crime Control Act, provides for both criminal and civil liability.  18 U.S.C. §§ 1961-

21 1968.  As the Supreme Court has long recognized, "Section 904(a) of RICO, 84 Stat. 947, directs

22 that '[t]he provisions of this Title shall be liberally construed to effectuate its remedial purposes.'"

23 *United States v. Turkette*, 452 U.S. 576, 587 (1981).

24 Plaintiffs bring civil claims against all Defendants under §§ 1962(c) and (d) of the RICO

25 act.  *See* 5AC ¶ 252.  Section 1962(c) makes it "unlawful for any person employed by or

26 associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of

27 such enterprise's affairs through a pattern of racketeering activity."  A successful claim under §

28 1962(c) thus requires evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of

United States District Court  
Northern District of California

racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). An "enterprise" is broadly defined under § 1961(4) to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." A "pattern" simply requires "at least two acts of racketeering activity," or "predicate acts," committed within ten years. 18 U.S.C. § 1961(5). The definition of "racketeering activity" is likewise expansive, encompassing significant portions of Title 18 of the U.S. Code, and in particular including mail fraud, *id.* § 1341, and wire fraud, *id.* § 1343, which are the predicate acts complained of in this case. *See id.* § 1961(1); 5AC ¶¶ 260, 263-64. Section 1962(d) makes it "unlawful for any person to conspire to violate" any subsection of § 1962.

The Pinnacle Entities argue that Plaintiffs cannot establish the essential elements of a civil RICO claim because: (1) Plaintiffs have not adequately pled a RICO enterprise; (2) Plaintiffs cannot prove a RICO claim in connection with the alleged vendor misconduct because AMSC and AMS committed no predicate acts and because Plaintiffs cannot establish injury from the misconduct; and (3) Plaintiffs cannot establish that Defendants are distinct from the enterprise alleged in connection with the work order fraud. Pinnacle Mot. 17-21. In a supplemental motion, Defendants also argued that the allegedly fraudulent transfer of assets underlying AMS's recent transaction with Hunt is insufficiently related to the other misconduct of the alleged enterprise and moreover that Plaintiffs have no standing to prosecute this transaction because they have not been injured by it. Defs.' Supp. Mot. 2-7.

The Pinnacle Entities' arguments regarding the vendor scheme are largely moot because the Court has determined that the applicable statutes of limitation bar Plaintiffs' claim for damages stemming from this alleged misconduct. On the Pinnacle Entities' further argument that Plaintiffs have no evidence that AMSC or AMS committed any predicate acts in connection with the alleged vendor scheme, Plaintiffs' opposition is tellingly silent. Pinnacle Mot. 18-19; *see generally* Pls.' Opp. Indeed, the communications from and/or involving AMSC and AMS employees reflect a lack of specific intent to defraud or conceal the vendor practices. *See* French Opp. Decl. Exhs. 117-19, 142; *id.* Exh. 164 at 169:7-11, 168:10-169:1. Absent such specific intent to defraud or, indeed, actual transmissions through the mail or wires in furtherance of that intent, Plaintiffs

<div style="margin-left: auto">United States District Court<br>Northern District of California</div>

1     cannot prove the existence of any indictable predicate acts in connection with the alleged vendor

2     scheme.  *Howard v. Am. Online Inc.*, 208 F.3d 741, 748 (9th Cir. 2000); *Eclectic Properties E.,*

3     *LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) ("The mail and wire fraud

4     statutes are identical except for the particular method used to disseminate the fraud, and contain

5     three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in

6     furtherance of that scheme, and (C) the specific intent to defraud.").  Similarly, there is no

7     evidence that either Harrelson or Goodman knew of or participated in the vendor scheme or made

8     any wire or mail transmissions in furtherance of that scheme.  Plaintiffs' own evidence suggests

9     that at the earliest, Harrelson became aware of the vendor practice at Fort Irwin at the same time

10    that Ms. Schuster disclosed the practice to Mr. Winters and even then, it is not clear whether and

11    when Harrelson found out about the specifics or whether AMSC and AMS upper management

12    endorsed the practice.  French Opp. Decl. Exh. 144 (Harrelson Dep.) at 322:8-324:18.  This paltry

13    evidence is insufficient, even rendering inferences in Plaintiffs' favor, to create a triable issue of

14    fact regarding Harrelson's commission of indictable acts of wire or mail fraud in furtherance of

15    the vendor scheme.  As such, the Court will not consider the vendor scheme as predicate acts in

16    connection with Plaintiffs' RICO claim.  *Howard*, 208 F.3d at 748.

17          The Court addresses each of the Pinnacle Entities' remaining arguments in turn.

18                    **i.    Conduct of an Enterprise**

19          The Pinnacle Entities' argument that Plaintiffs have failed to properly allege a RICO

20    enterprise is largely premised upon their own characterization of the alleged enterprise as a "hub-

21    and-spoke" or "rimless wheel" enterprise with no structure.  *See* Pinnacle Mot. 17-18.  This

22    definitional approach to the enterprise requirement is overly formalistic, as it is well established

23    that the "breadth of the 'enterprise' concept in RICO" encompasses "*any* union or group of

24    individuals associated in fact" for a common purpose of engaging in a course of conduct.  *Boyle v.*

25    *United States*, 556 U.S. 938, 949 (2009); *see also Turkette*, 452 U.S. at 583; 18 U.S.C. § 1961(4).

26          In their reply, the Pinnacle Entities quickly abandon this argument and instead shift gears

27    to argue that the alleged enterprise does not work because the predicate acts that Plaintiffs have

28    identified are insufficiently related to establish a "pattern" of racketeering activity.  Pinnacle Reply

United States District Court
Northern District of California

44

1    10-12.  Somewhat confusingly, and perhaps in recognition of the fact that the relatedness

2    argument is a new one on which Plaintiffs had no opportunity to respond, the Pinnacle Entities

3    also appear to be arguing that the fraudulent schemes that the enterprise allegedly carried out are

4    insufficiently related predicate acts to establish the existence of an *enterprise*.  *See id.* at 10 ("The

5    key ingredient missing from Plaintiffs' RICO recipe, however, is evidence showing that the

6    alleged predicate acts were sufficiently related.  Plaintiffs' overarching RICO enterprise therefore

7    fails as a matter of law.").

8          As the Supreme Court explained in *Turkette*, "[t]he enterprise is an entity . . . a group of

9    persons associated together for a common purpose of engaging in a course of conduct" whereas

10   the pattern of racketeering activity is "a series of criminal acts as defined by the statute."  452 U.S.

11   at 583.  "While the proof used to establish these separate elements may in particular cases

12   coalesce, proof of one does not necessarily establish the other."  *Id.*  Thus, "[t]he 'enterprise' is not

13   the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity

14   in which it engages."  *Id.*; *see Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007).

15         Here, Plaintiffs have alleged that AMS, AMSC, Goodman, and Harrelson are associated in

16   fact with a common purpose to conduct AMSC, AMS, and other Pinnacle affiliates as property

17   management companies in a manner so as to essentially fleece Plaintiffs for the defendants' own

18   financial benefit.  Pls.' Opp. 19-20; 5AC ¶ 253.  On an as-needed basis, the enterprise associated

19   with other parties to accomplish its purpose.  5AC ¶ 255-59.  If proven, this is sufficient to

20   establish the existence of an "ongoing organization, formal or informal," wherein the "various

21   associates function as a continuing unit" for a "common purpose of engaging in a course of

22   conduct."  *Turkette*, 452 U.S. at 583.  This is all that is required under established law to prove the

23   existence of a RICO enterprise.  *See Odom*, 486 F.3d at 552.  Indeed, as the Ninth Circuit

24   recognized in *Odom*, "[t]he continuity requirement does not, in itself, require that every member

25   be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated

26   in any way," only that the associates' behavior evinces "ongoing rather than isolated activity."  *Id.*

27   at 552-53 (internal quotation marks and citations omitted); *see generally Boyle*, 556 U.S. at 951.

28         The Pinnacle Entities' reliance on *Reich v. Lopez*, 38 F. Supp. 3d 436 (S.D.N.Y. 2014), to

United States District Court
Northern District of California

45

1    suggest that relatedness has a place in the enterprise analysis is misplaced.  *See* Pinnacle Reply 10-

2    12.  For one, the Ninth Circuit has never adopted the Second Circuit's horizontal and vertical

3    relatedness framework so heavily relied upon in *Reich*.  *United States v. Bingham*, 653 F.3d 983,

4    992 n.5 (9th Cir. 2011); *see Reich*, 38 F. Supp. 3d at 451-53.  More fundamentally, *Reich*, along

5    with all of the other cases that the Pinnacle Entities cite in their reply brief, considered the

6    relatedness of predicate acts in connection with the existence of a "pattern" of racketeering activity

7    and not whether a proper RICO enterprise had been identified.  As such, Defendants proffer no

8    convincing argument that Plaintiffs' alleged enterprise fails as a matter of law.

9         The Pinnacle Entities' argument that the work order manipulation scheme fails the

10   distinctiveness requirement of a RICO enterprise is also unpersuasive.  Pinnacle Mot. 20-21;

11   Pinnacle Reply 14.  It is undisputed that under 18 U.S.C. § 1962(c), a plaintiff must prove the

12   existence of at least two distinct entities: "(1) a 'person'; and (2) an 'enterprise' that is not simply

13   the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533

14   U.S. 158, 161 (2001).  An enterprise can moreover be comprised entirely of legal entities.  *United*

15   *States v. Blinder*, 10 F.3d 1468, 1473 (9th Cir. 1993).  In the situation of corporate entities, the

16   Supreme Court has noted that "incorporation's basic purpose is to create a distinct legal entity,

17   with legal rights, obligations, powers, and privileges different from those of the natural individuals

18   who created it, who own it, or whom it employs."  *Cedric Kushner*, 533 U.S. at 163.  Here, the

19   Pinnacle Entities assert that the alleged enterprise comprising defendants AMS, AMSC,

20   Goodman, Harrelson, Pinnacle Monterey, and Pinnacle Irwin fails because "all of these persons

21   and entities are interrelated parent, subsidiaries and their officers."  Pinnacle Mot. 21.  As

22   Plaintiffs note, this argument ignores the distinct legal entities that Defendants chose to create and

23   ignores the other entities that are alleged to have associated with Defendants to form the alleged

24   enterprise.  *See* Pls.' Opp. 22-24.  While it is apparently undisputed that AMSC and AMS are alter

25   egos, Defendants cannot shed their other corporate distinctions when it suits them, particularly

26   where it is alleged that the separate corporate entities were critical in carrying out the racketeering

27

28

United States District Court
Northern District of California

46

1    activity.[20]  *See* 5AC ¶¶ 33-34, 253-56, 258-60.  Furthermore, there can be no dispute that

2    defendants Goodman and Harrelson are "persons" distinct from the corporate entities.  Insofar as

3    they are alleged to have used AMS and its affiliates as vehicles to carry out various fraudulent

4    schemes against Plaintiffs for the purpose of enriching themselves, that is sufficient to satisfy the

5    distinctness requirement of § 1962(c).  *Cedric Kushner*, 533 U.S. at 165.  The enterprise that

6    Plaintiffs have alleged is therefore adequate under § 1962(c) and distinct from the persons they

7    seek to hold liable.  *Accord Waldrup v. Countrywide Fin. Corp.*, No. 2:13-CV-08833-CAS, 2015

8    WL 93363, at *7 (C.D. Cal. Jan. 5, 2015).

9                    **ii.  Pattern of Racketeering Activity**

10         "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the

11   racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal

12   activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

13   Defendants here challenge only the relatedness of the alleged predicate acts.

14         Defendants contend—in the Pinnacle Entities' reply brief and in Defendants' collective

15   supplemental briefing—that the various schemes to defraud—work order manipulation, vendor

16   misconduct, MIP overcharges, and fraudulent transfer of assets—are all separate and unrelated

17   schemes insufficient to sustain the existence of a "pattern of racketeering activity."  Pinnacle

18   Reply 10-12; Defs.' Supp. Mot. 2-4.  Defendants argue that the alleged schemes all involve

19   different participants, different methods of commission, and different results and are therefore

20   wholly unrelated.  Pinnacle Reply 11; Defs.' Supp. Mot. 3-4.  Plaintiffs counter that all of the

21   alleged schemes have as their "central goal enriching Defendants at the expense of Plaintiffs," a

22   pattern culminating in the transfer of assets to Hunt in order to prevent Plaintiffs from recovering

23   any of the fraudulently diverted funds.  Pls.' Opp. 20; Pl.'s Supp. Opp. 4-5.  As discussed above,

24

25   _____
     [20] The Court notes, moreover, that there is no evidence to indicate that all of the various entities
26   affiliated with AMS that are alleged to have associated with Defendants to form the alleged
     enterprise—including entities not named as defendants in this lawsuit—are in fact wholly-owned
27   subsidiaries of AMS, as was the case in *Ice Cream Distributors of Evansville, LLC v. Dreyer's
     Grand Ice Cream, Inc.*, No. 09-5815 CW, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010), and
28   *Chagby v. Target Corp.*, 358 F. App'x 805 (9th Cir. 2009), both relied upon by the Pinnacle
     Entities.

United States District Court
Northern District of California

1    the Court will only consider predicate acts in connection with the alleged work order

2    manipulation, MIP overcharge, and fraudulent transfer schemes.  These are sufficiently related to

3    establish a pattern of racketeering activity under § 1962(c).

4         The relatedness requirement to establish a "pattern" of racketeering activity is not a high

5    threshold.  Indeed, "whether the predicate acts alleged or proven are sufficiently related is seldom

6    at issue."  *Medallion Television Enters., Inc. v. SelecTV of Cal. Inc.*, 833 F.2d 1360, 1363 (9th Cir.

7    1987), *cert. denied*, 492 U.S. 917 (1989) (citing *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d

8    187, 192 (9th Cir. 1987)); *see also Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 44 (1st Cir.

9    1991) ("The relatedness test is not a cumbersome one for a RICO plaintiff.").  In assessing the

10   relatedness of predicate acts, the Supreme Court has directed a "flexible" approach looking to

11   whether the alleged criminal acts "have the same or similar purposes, results, participants, victims,

12   or methods of commission, or otherwise are interrelated by distinguishing characteristics and are

13   not isolated events."  *H.J.*, 492 U.S. at 240 (quoting former 18 U.S.C. § 3575(e)); *see also Howard*

14   *v. Am. Online Inc.*, 208 F.3d 741, 749 (9th Cir. 2000).

15        In regards to the work order manipulation, insurance overcharges, and fraudulent transfer,

16   Plaintiffs have adequately established a pattern of related fraudulent schemes furthered by the

17   alleged predicate acts of mail and wire fraud.[21]  *See Sun Sav. & Loan Ass'n*, 825 F.2d at 196.  The

18   work order and insurance fraud involved similar participants (AMS, Goodman, and Harrelson)

19   who worked with or through other entities to accomplish a similar objective against the same

20   victim (defrauding Plaintiffs) through similar methods of commission (purposefully concealed

21   overcharges in connection with contracted-for services over which Defendants had absolute

22   control).[22]  The 2014 Hunt transaction likewise involved the same core participants; this time with

23

24   [21] Defendants argue for the first time in reply that the predicate acts alleged in connection with the
     Hunt transaction do not qualify as mail or wire fraud.  Defs.' Supp. Reply 5.  This is not the first
25   time that Defendants have attempted to advance a new argument for the first time in a reply brief.
     Such arguments are improper, and the Court declines to address them here.  *Pirozzi v. Apple, Inc.*,
26   966 F. Supp. 2d 909, 918 n.3 (N.D. Cal. 2013); *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406,
     1417 n.12 (9th Cir. 1990).

27   [22] A layperson unfamiliar with complex property development and management agreements might
28   wonder whether there was a certain amount of moral hazard built into the various contracts at
     issue in this case, as they all seem to incent the very kind of self-dealing of which each side

United States District Court
Northern District of California

United States District Court
Northern District of California

1  the related purpose of preventing Plaintiffs from recovering anything in judgment should the

2  fraudulent schemes be proven.  Thus, Plaintiffs, relying principally upon *Todaro v. Orbit Int'l*

3  *Travel, Ltd.*, 755 F. Supp. 1229, (S.D.N.Y. 1991), properly assert that "the same participants

4  engaged in a scheme to enrich themselves by defrauding Plaintiffs" and, in furtherance of that

5  scheme, concealed the fraudulent transfer of assets to Hunt designed to "protect ill-gotten gains

6  from judgment."  Pls.' Opp. 5; *accord Todaro*, 755 F. Supp. 1229, at 1236 (finding pattern based

7  upon similar purpose "to carry out a scheme to defraud plaintiffs of certain funds and thereafter

8  protect those funds from judgment" and similar participants—"the individual defendants and the

9  corporations over which they exercised 'total control'"); *Sun Sav. & Loan Ass'n*, 825 F.2d at 192.

10  Indeed, there is some evidence to substantiate this assertion, as Plaintiffs have the sworn testimony

11  of Deputy Assistant Secretary of the Army Joseph F. Calcara, who attests to a May 2010 meeting

12  with defendant Harrelson regarding the parties' litigation wherein Harrelson threatened that "there

13  would be nothing left to collect" by the end of this lawsuit.  Decl. of Jessica Bluebond-Langner,

14  ECF 220-1, Exh. 1 ¶ 4.

15      Defendants' efforts to distinguish *Todaro* are unavailing.  *See* Defs.' Supp. Reply 4-5.

16  *Todaro* considered the same relatedness characteristics identified in *H.J.* and determined, as the

17  Court does here, that the similarity of participants, purpose, and results in the alleged schemes was

18  sufficient to constitute a "pattern" of racketeering activity.  *Todaro*, 755 F. Supp. at 1236.

19  *Howard* does not hold to the contrary, as there the Ninth Circuit concluded only that merely

20  having the same participants is insufficient to relate one predicate act to another for purposes of

21  the pattern inquiry.  *Howard*, 208 F.3d at 749.  By contrast, the Court finds here that the alleged

22  work order manipulation scheme, MIP overcharges, and recent transfer of assets are "not isolated

23  events," and are sufficiently similar in participants, purpose, victim, and result to constitute a

24  "pattern" of racketeering activity "interrelated by distinguishing characteristics."  *H.J.*, 492 U.S. at

25  240.  Furthermore, given the numerous ways in which this scheme to defraud Plaintiffs has

26  manifested, Plaintiffs have easily demonstrated the continuing nature of Defendants' alleged

27

28  accuses the other.

United States District Court
Northern District of California

1  pattern of racketeering activity.  *Id.* ("proof that a RICO defendant has been involved in multiple

2  criminal schemes would certainly be highly relevant to the inquiry into the continuity of the

3  defendant's racketeering activity").

4        **iii. Standing**

5        Finally, Defendants in supplemental briefing challenge Plaintiffs' standing to pursue a civil

6  RICO claim in connection with the allegedly fraudulent transfer of AMS's assets to Hunt.  Defs.'

7  Supp. Mot. 5-7.  Defendants contend that because Plaintiffs have not yet secured a judgment, any

8  injury potentially stemming from the fraudulent transfer is purely speculative and Plaintiffs cannot

9  demonstrate that they have sustained the injury to "business or property" required by the RICO

10  statute.  *Id.*; Defs.' Supp. Reply 3, ECF 228; *see* 18 U.S.C. § 1964(c).  Defendants' argument

11  largely depends on a finding that the Hunt transaction is unrelated to the work order manipulation

12  and insurance fraud schemes that Plaintiffs have alleged as part of their RICO claim.  Defs.' Supp.

13  Reply 3.  As the Court has concluded that the Hunt transaction is related to and a continuation of

14  Defendants' scheme to defraud Plaintiffs in connection with the parties' military residential

15  projects, Plaintiffs need not establish actual injury from the transfer itself.  It is sufficient that

16  some part of the pattern of racketeering activity comprised of the work order fraud, insurance

17  fraud, and fraudulent transfer injured Plaintiffs in their business or property.  *Deppe v. Tripp*, 863

18  F.2d 1356, 1366 (7th Cir. 1988) ("merely because one of the racketeering acts was not successful

19  does not mean that it is unavailable to establish a pattern").  There is no dispute that Plaintiffs have

20  at least demonstrated a jury question on that type of injury here.  *See* Bluebond-Langner Decl.

21  Exhs. 2, 21-22.

22        Based on the foregoing, the Pinnacle Entities' motion for summary judgment is

23  GRANTED with respect to the vendor fraud portion of Plaintiffs' civil RICO claim (Ninth Claim)

24  and DENIED with respect to the other arguments advanced against the claim.  For the reasons

25  stated above, Defendants' supplemental motion for partial summary judgment is DENIED.

26      **E.    Pinnacle Managers' 2011 Amendments to the PMAs**

27        The Court has determined that the Pinnacle Managers' attempt to adjust the PMAs in 2011

28  was ineffective and that Plaintiffs are entitled to judgment on their First and Second Claims and

1  the Pinnacle Managers' First and Second Claims.  *See* Part III.C, *supra*.  The Pinnacle Entities'

2  motion in their favor on those same claims, Pinnacle Mot. 21-23, is accordingly DENIED.

3      **F.    Incentive Plan Amendments to the PMAs in 2008 and 2010**

4        The Pinnacle Entities seek summary judgment on AMSC and AMS's Ninth Counterclaim

5  that the Monterey PMA Incentive Plan was validly amended in 2010 and their Tenth Counterclaim

6  that the Irwin PMA Incentive Plan was validly amended in 2008.  *Id.* at 23.  As the moving party,

7  the Pinnacle Entities have adequately demonstrated that CMC, AMSC, and the Clark and Pinnacle

8  Managers for CPCMC followed the procedure set forth in Paragraph 7.1 of the PMAs to negotiate

9  and approve in writing an amended Incentive Plan to replace the one set forth in Exhibit B to the

10 Irwin PMA.  *Id.* at 9-10; J.A. Exhs. C59, G2.  The Secretary of the Army approved this

11 amendment, and the amended plan was implemented "for the year it was approved," beginning in

12 2008.  J.A. Exh. C57 (excerpt of J.L. Winters dep.) 247:6-11.  The parties followed a similar

13 procedure to amend the Incentive Plan at the Monterey project in 2010.  *Id.* Exh. G1.

14       Plaintiffs' only argument against summary judgment on the Ninth and Tenth

15 Counterclaims is that the PMAs automatically terminated long before these amendments were

16 made.[23]  *See* Pls.' Opp. 18-19.  As the Court found in Part III.A, *supra*, the PMAs did not

17 terminate of their own accord as of the first instance in which an AMSC employee committed

18 theft, fraud, or knowing misconduct.  Rather, MBMH and CMC were required to affirmatively

19 terminate the agreements, and they never gave notice of termination before filing suit.  As such,

20 the intervening amendments to the Irwin PMA in 2008 and to the Monterey PMA in 2010 are

21 valid so long as the parties followed the proper procedure for amendment.  The Pinnacle Entities

22 have adequately demonstrated that the necessary procedures were followed and that all interested

23 parties assented to the amendments in writing.  Plaintiffs have put forth no evidence to the

24 contrary.  The Pinnacle Entities are therefore entitled to summary judgment and their motion is

25 GRANTED with respect to the Ninth and Tenth Counterclaims by AMSC and AMS.

---

27 [23] Plaintiffs' opposition brief appears to be largely targeted at the proposed 2011 adjustments to the termination provision of the PMAs, and not to the Incentive Plan amendments.  In any case, because Plaintiffs advanced a similar argument in their moving papers, the Court addresses that argument here.  *See* Pls.' Mot. 14.

51

### G.   Unjust Enrichment

Finally, the Pinnacle Entities seek summary judgment on Plaintiffs' Twelfth Claim for unjust enrichment on the ground that unjust enrichment is not an independent cause of action under California law.  Pinnacle Mot. 25.  This aspect of the motion appears unopposed, as Plaintiffs do not address the argument in their opposition and the Pinnacle Entities' do not return to it in their reply.  To the limited extent that unjust enrichment couched as such is not an independent claim for relief, the Court agrees with the Pinnacle Entities and shall grant their motion on Plaintiffs' Twelfth Claim.  *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004).  However, to the extent that unjust enrichment is a permissible theory of recovery for Plaintiffs' other claims in this case, the Court will not bar Plaintiffs from pursuing such remedies if a jury finds in their favor.  *See, e.g.*, *Am. Master Lease*, 225 Cal. App. 4th at 1486-88 (disgorgement on the basis of unjust enrichment available remedy against disloyal fiduciaries).  The Pinnacle Entities' motion for summary judgment is accordingly GRANTED on Plaintiffs' Twelfth Claim for unjust enrichment.

## V.   STANLEY HARRELSON'S MOTION

Stanley Harrelson individually moves for summary judgment on all of Plaintiffs' claims against him, which include breach of fiduciary duty (Fifth Claim), fraud (Seventh Claim), conspiracy to commit fraud (Eighth Claim), civil RICO (Ninth Claim), deceit (Tenth Claim), and unjust enrichment (Twelfth Claim).  The Court has already granted the Pinnacle Entities' motion for summary judgment on the Twelfth Claim for unjust enrichment, *see* Part IV.G, *supra*, and does so here as well with the same proviso that while unjust enrichment is not a standalone claim in this lawsuit, Plaintiffs are not precluded from seeking remedies on a theory of unjust enrichment.

As to the remaining claims, only two of Harrelson's arguments warrant scrutiny: whether his personal liability is limited by express provisions in the CPMB and CPCMC operating agreements, and whether Plaintiffs have sufficient evidence against him to go forward on their civil RICO claim.  Harrelson Mot. 13-17.  The Court addresses each in turn.

### A.   Contractual Limitation on Liability

The Court finds persuasive Harrelson's argument that he is shielded from personal liability

United States District Court
Northern District of California

1   by the CPMB and CPCMC operating agreements, at least with respect to some of Plaintiffs'

2   claims against him.  Harrelson Mot. 16-17.  Section 7.6, which can be found in both the CPMB

3   and CPCMC operating agreements, provides in pertinent part:

4          No constituent member in or agent of a Member or Manager, nor
       any advisor, trustee, director, officer, employee, beneficiary,

5          shareholder, participant, representative or agent of a Member or
       Manager, shall have any personal liability, directly or indirectly,

6          *under or in connection* with this Operating Agreement or any
       agreement made or entered into under or pursuant to the provisions

7          of this Operating Agreement.

8   CPMB ¶ 7.6 (emphasis added).  It is undisputed that Harrelson was AMS's CEO at all relevant

9   times and therefore an "officer" within the meaning of this provision.  Furthermore, the scope of

10  this limitation on personal liability is broad as, according to its own terms, it reaches liability that

11  arises in connection with the operating agreements and PMAs (entered pursuant to provisions of

12  the operating agreements).  The work order and insurance fraud that form the basis of Plaintiffs'

13  Fifth, Seventh, Eighth, and Tenth Claims all arise in connection with the provision of services and

14  collection of payments (albeit inflated payments) specifically set forth in the PMAs.  As such, the

15  CPMB and CPCMC operating agreements limit Harrelson's personal liability as to those claims.

16        Plaintiffs argue that this limitation on liability is unenforceable to the extent it exculpates

17  disloyal fiduciaries from the consequences of their own misconduct.  Pls.' Combined Opp. to

18  Harrelson and Goodman (hereinafter Pls.' Combined Opp.) 24-25.  The argument is unpersuasive

19  because, as Harrelson notes, Section 7.6 merely exempts employees and officers from personal

20  liability.  Harrelson Reply 14-15.  This Court has already concluded that Plaintiffs may still pursue

21  their tort claims against defendants AMSC and AMS, including their claims for breach of

22  fiduciary duty.  As such, Section 7.6 does not violate California Civil Code § 1668 nor any policy

23  against immunizing fiduciaries from the consequences of betraying their trust.  *Cohen v. Kite Hill*

24  *Cmty. Assn.*, 142 Cal. App. 3d 642, 654 (1983).  Harrelson is therefore entitled to summary

25  judgment that Section 7.6 of the CPMB and CPCMC operating agreements shields him from

26  personal liability for Plaintiffs' Fifth, Seventh, Eighth, and Tenth Claims.

27        The same limitation of personal liability does not pertain to Plaintiffs' civil RICO claim,

28  however, as Section 7.6 cannot be read so broadly as to completely exculpate an individual from

53

United States District Court
Northern District of California

1   his own misconduct, particularly where that misconduct is so inimical to the contractual

2   relationship created by the operating agreements.  To the extent that Plaintiffs can prove their

3   RICO claim, they will have demonstrated that Harrelson conducted or participated in the affairs of

4   an enterprise whose purpose was to defraud Plaintiffs by personally committing indictable acts of

5   wire or mail fraud in furtherance of one or more of the alleged work order, insurance fraud, or

6   fraudulent transfer schemes.  *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F.

7   Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("*WellPoint I*") (in multi-defendant suit, RICO requires

8   proof that each defendant committed two predicate acts); *see also* 18 U.S.C. § 1962(c) (making it

9   "unlawful for *any person* . . . to conduct or participate . . . in the conduct of such enterprise's

10  affairs *through a pattern* of racketeering activity" (emphasis added)).  Should that be the case,

11  Harrelson's reading of Section 7.6 would completely exculpate him from liability for his own

12  misconduct and would accordingly be unenforceable under California Civil Code § 1668.  More

13  fundamentally, a civil RICO claim depends on behavior that is extrinsic to the contractual

14  relationship and could not possibly have been within the contemplation of the contracting parties.

15  As Harrelson has not offered any case authority permitting such a broad interpretation of Section

16  7.6 as to exempt personal liability for racketeering, the Court declines to adopt such an

17  interpretation here.

18      Harrelson's motion for summary judgment based upon the limitation of personal liability

19  found in Section 7.6 of the CPMB and CPCMC operating agreements is accordingly GRANTED

20  as to Plaintiffs' Fifth, Seventh, Eighth, and Tenth Claims, and DENIED as to the Ninth Claim.

21          **B.    Civil RICO Claim**

22      On the merits of the civil RICO charge against him, Harrelson also contends that Plaintiffs

23  have no evidence that he committed two predicate acts, that he managed or operated the alleged

24  enterprise, or that he participated in a RICO conspiracy.  Harrelson Mot. 14-16.  Disputes of

25  material fact preclude summary judgment for Harrelson on this claim.

26      With respect to predicate acts, Plaintiffs need only identify transmissions using the mail or

27  wire that furthered the scheme to defraud.  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,

28  903 F. Supp. 2d 880, 913 (C.D. Cal. 2012) ("*WellPoint II*"); *see generally Bridge v. Phoenix Bond*

United States District Court
Northern District of California

1    & Indem. Co., 553 U.S. 639, 648 (2008).  The record contains ample electronic communications

2    from Harrelson concerning both the incentive fees at the Monterey and Irwin Projects and the

3    MIP.  *See* French Opp. Decl. Exhs. 30-31, 81, 186-87 (communications regarding work order data

4    and incentive fees); *see id.* Exhs. 37, 129, 202 (communications regarding MIP).  Furthermore, the

5    evidence indicates that Harrelson had, at the relevant time, a financial interest in AMS and the

6    MIP, as well as the authority to direct both AMS's conduct and the allocation of insurance

7    premiums under the MIP.  French Opp. Decl. Exh. 140 (S. Harrelson dep.) 49:4-6, 28:17-19; *id.*

8    Exh. 161.  Given this information, the allegations of similar work order manipulation at the Fort

9    Belvoir and Fort Benning projects, and conflicting testimony from AMS employees concerning

10   what they were instructed to do with respect to work order data and the method by which that

11   instruction was communicated, a reasonable jury could infer that Harrelson had a specific intent to

12   defraud Plaintiffs and furthered that scheme through his email communications with site-level

13   management.  Likewise, evidence establishing Harrelson's review of and participation in defining

14   the allocation model for the MIP could reasonably support an inference that he operated the

15   conduct of the alleged enterprise and specifically intended to enrich his own properties by

16   defrauding the military projects.  *See id.* Exh. 37.  The same evidence of Harrelson's involvement

17   in both activities supports an inference that he participated in the management of the alleged

18   enterprise of associated-in-fact entities with the common purpose to defraud Plaintiffs.  *Reves v.*

19   *Ernst & Young*, 507 U.S. 170, 185 (1993).

20        Moreover, even absent evidence of Harrelson's personal commission of predicate act

21   transmissions, there is sufficient evidence of his motive, opportunity, and participation that a

22   reasonable jury could find that he assented to the work order and MIP fraudulent schemes, thereby

23   conspiring to violate § 1962(c).  *United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984); *see also*

24   *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) *modified*, 425 F.3d 1248 (9th Cir.

25   2005); 18 U.S.C. § 1962(d).  This is not to say that Plaintiffs will have an easy time proving these

26   allegations, only that given sufficient evidence in the record and disputes concerning credibility,

27   and rendering all justifiable inferences in Plaintiffs' favor, the issue of Harrelson's personal

28   conduct in connection with the alleged RICO enterprise is unsuitable for disposition at summary

1    judgment.  Harrelson's motion for summary judgment is accordingly DENIED with respect to

2    Plaintiffs' Ninth Claim asserting violations of 18 U.S.C. §§ 1962(c) and (d).

3    **VI.    JOHN GOODMAN'S MOTION**

4         John Goodman also moves individually on all of Plaintiffs' claims against him, which

5    include breach of fiduciary duty (Fifth Claim), fraud (Seventh Claim), conspiracy to commit fraud

6    (Eighth Claim), civil RICO (Ninth Claim), deceit (Tenth Claim), and unjust enrichment (Twelfth

7    Claim).  Many of Goodman's arguments are redundant of issues already addressed in this order

8    and the Court addresses them only briefly here.  As with Harrelson's motion, the Court finds that

9    Section 7.6 of the CPMB and CPCMC operating agreements shields Goodman from personal

10   liability on Plaintiffs' Fifth, Seventh, Eighth, and Tenth Claims, as there is no dispute that

11   Goodman, as founder and Chairman of the Board, is a "director" within the meaning of that

12   provision.  Goodman Mot. 23-24.  Furthermore, the Court finds that Plaintiffs cannot maintain a

13   standalone claim for unjust enrichment against Goodman, though they are free to pursue remedies

14   founded in unjust enrichment to the extent the theory is permissible.  *Id.* at 24-25.  Goodman's

15   motion for summary judgment is accordingly GRANTED with respect to Plaintiffs' Fifth,

16   Seventh, Eighth, Tenth, and Twelfth Claims.

17        Goodman also asserts that there is no factual or evidentiary basis for holding GRE liable

18   for aiding and abetting Goodman's alleged breach of fiduciary duty.  Goodman Mot. 15.  Plaintiffs

19   offer little in opposition to this argument and no evidence showing that the GRE knew that

20   conduct in connection with the MIP constituted a breach of duty and substantially assisted in or

21   encouraged that breach.  Pls.' Combined Opp. 20; *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App.

22   4th 1138, 1144 (2005).  Goodman's motion for summary judgment is accordingly GRANTED in

23   regard to Plaintiffs' Sixth Claim against GRE.

24        On the issue of civil RICO, the Court has determined that material factual disputes

25   preclude judgment as a matter of law that Plaintiffs' claims based upon the alleged insurance fraud

26   are time-barred.  Goodman's arguments to this effect are therefore rejected.  Goodman Mot. 16-

27   19.  Much like Harrelson, Goodman also argues that Plaintiffs have no evidence that he personally

28   committed two predicate acts in furtherance of any of the alleged fraudulent schemes and

United States District Court
Northern District of California

1   moreover that they have no evidence of his participation in a RICO conspiracy.  *Id.* at 19-23.

2   However, much as with Harrelson, disputed issues of fact preclude summary judgment in

3   Goodman's favor.

4           To be sure, the only communications that Plaintiffs attribute to Goodman are an October

5   2002 letter stating that "Pinnacle makes no fee for our part in coordinating this insurance" and a

6   December 2002 email indicating that the MIP could be profitable for Pinnacle.  Pls.' Combined

7   Opp. 2; French Opp. Decl. Exhs. 2, 3.  However, these communications side by side demonstrate

8   duplicity and, accordingly, support an inference of specific intent to defraud.  Whether these

9   communications are time-barred is a question of fact for the jury, given the evidence of continuing

10  misrepresentations concerning the MIP fees.  Furthermore, the evidentiary record also reflects

11  Goodman's continuing oversight into AMS's operations.  Critically, a June 9, 2003 email from

12  David Krull that Goodman has offered in his own support indicates that he retained control over

13  many aspects of AMS's finances.  Decl. of John Goodman, ECF 149, Exh. 1.  Curiously enough,

14  the same email recapitulates a directive, presumably from Goodman, that "no activities shall be

15  allowed by any Pinnacle or AMS personnel that are fraudulent/deceitful, etc."  *Id.*  This is an

16  unusual enough instruction that a jury could infer something other than well-intentioned honesty

17  from the directive.  Finally, as the relationship between Goodman and Harrelson began to decline,

18  each appears to have sought to scapegoat the other.  French Opp. Decl. Exhs. 129, 134.  The

19  unfortunate fallout from this is that a jury could infer from their communications that *both* are

20  responsible for the alleged misconduct.  As such, there is sufficient evidence to reach a jury

21  concerning Goodman's personal participation in the conduct of the alleged enterprise to defraud

22  Plaintiffs, as well as of his assent to the conspiracy to carry out the same.  *Reves*, 507 U.S. at 185;

23  *Tille*, 729 F.2d at 619.  Goodman's motion for summary judgment is accordingly DENIED with

24  respect to Plaintiffs' Ninth Claim asserting violations of 18 U.S.C. §§ 1962(c) and (d).

25  **VII.   ORDER**

26          For the foregoing reasons, IT IS HEREBY ORDERED that:

27          1.      Plaintiffs' Motion for Partial Summary Judgment is GRANTED IN PART and

28  DENIED IN PART.

United States District Court
Northern District of California

United States District Court
Northern District of California

a.      Plaintiffs' motion is GRANTED with respect to their First and Second Claims and the Pinnacle Monterey's and Pinnacle Irwin's First and Second Claims.  The proposed adjustments to the Monterey and Irwin PMAs do not violate public policy, but the PMAs were not validly adjusted in 2011 because there was no deadlock in voting by the CPMB and CPCMC managers.

b.      Plaintiffs' motion is GRANTED with respect to Pinnacle Monterey's and Pinnacle Irwin's Seventh and Eighth Claims and AMSC and AMS's Third and Fourth Counterclaims.  MBMH and CMC have a contractual right to terminate and a statutory power to revoke AMSC's agency at the Monterey and Irwin projects.  Nothing in the CPMB and CPCMC operating agreements supports the assertion that termination or revocation of the PMAs is a "Major Decision" requiring a vote by both managers for each company.

c.      The remainder of Plaintiffs' motion is DENIED.  As the Court found above, the termination provision of the PMAs is not self-executing.  AMSC is MBMH's and CMC' agent at the Monterey and Irwin projects and owes them a fiduciary duty as such.  Factual disputes concerning the actual occurrence of theft, fraud, or intentional misconduct at the projects precludes summary judgment.

2.      The Pinnacle Entities' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

a.      The Pinnacle Entities' motion is GRANTED with respect to the portions of Plaintiffs' Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Claims that are based upon improper solicitation and receipt of monetary contributions from third party vendors because those claims are time-barred and Plaintiffs cannot prove that any defendants in this action committed predicate acts in furtherance of the alleged vendor scheme.

b.      The Pinnacle Entities' motion is GRANTED with respect to Plaintiffs' Twelfth Claim.

c.      The Pinnacle Entities' motion is GRANTED with respect to AMSC and AMS's Ninth and Tenth Counterclaims.  The Incentive Plans at the Monterey and Irwin projects were validly amended because the PMAs did not automatically terminate before those

58

1   amendments were proposed and agreed upon by all concerned parties.

2              d.       The remainder of the Pinnacle Entities' motion is DENIED.

3         3.        Defendants' Supplemental Motion for Partial Summary Judgment is DENIED;

4         4.        Stanley Harrelson's Motion for Summary Judgment is GRANTED IN PART and

5   DENIED IN PART.

6              a.       Harrelson's motion is GRANTED with respect to Plaintiffs' Fifth, Seventh,

7   Eighth, and Tenth Claims because Section 7.6 of the CPMB and CPCMC operating agreements

8   limit his personal liability on those claims.

9              b.       Harrelson's motion is GRANTED with respect to Plaintiffs' Twelfth Claim.

10             c.       The remainder of Harrelson's motion is DENIED because Section 7.6 of the

11   CPMB and CPCMC operating agreements cannot limit his liability under RICO, and factual

12   disputes concerning his involvement in the alleged enterprise preclude summary judgment.

13        5.        John Goodman and GRE's Motion for Summary Judgment is GRANTED IN

14   PART and DENIED IN PART.

15             a.       Goodman's motion is GRANTED with respect to Plaintiffs' Fifth, Seventh,

16   Eighth, and Tenth Claims because Section 7.6 of the CPMB and CPCMC operating agreements

17   limit his personal liability on those claims.

18             b.       Goodman's motion is GRANTED with respect to Plaintiffs' Sixth Claim

19   against GRE and Plaintiffs' Twelfth Claim.

20             c.       The remainder of Goodman's motion is DENIED because Section 7.6 of the

21   CPMB and CPCMC operating agreements cannot limit his liability under RICO, and factual

22   disputes concerning his involvement in the alleged enterprise preclude summary judgment.

23        **IT IS SO ORDERED.**

24   Dated: July 23, 2015

25

26   BETH LABSON FREEMAN
     United States District Judge

27

28

*United States District Court*
*Northern District of California*