# EXHIBIT 22

Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 2 of 72

AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                                    1—4

**Page 1**

1     SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         COUNTY OF MONTEREY

3         --oOo--

4  MONTEREY BAY MILITARY HOUSING, LLC, et al.,

5        Plaintiffs,

6

7     vs.     Case Numbers
            M112710

8             M115143

9  PINNACLE MONTEREY, LLC, et al,

10       Defendants.
   _____/

11  AND RELATED CONSOLIDATED ACTION.

12  _____/

13

14      VIDEOTAPED DEPOSITION OF

15        AMADO OLIVARES

16  _____

17      July 11, 2012

18

19

20

21  REPORTED BY: DELAINE HALL, CSR 10164    JOB 465228

22

23

24

25

**Page 2**

1     BE IT REMEMBERED that, pursuant to Notice, and

2  on Wednesday, July 11, 2012, commencing at 8:57

3  a.m., thereof, at 242 Cannery Row, Monterey,

4  California, before me, DELAINE HALL, a Certified

5  Shorthand Reporter, personally appeared

6         AMADO OLIVARES

7  _____

8  called as a witness by the Plaintiffs, who having

9  been first duly sworn, was examined and testified as

10  follows:

11        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1       A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:

4    KIRKLAND & ELLIS, LLP
     300 North LaSalle Street

5     Chicago, Illinois 60654
    BY: JEFFREY L. WILLIAN, Attorney at Law

6    (312) 862-2425
    jeffrey.willian@kirkland.com

7

8

9  FOR THE DEFENDANTS:

10    GREENBERG TRAURIG, LLP
     77 West Wacker Drive, Suite 2500

11    Chicago, Illinois 60601
    BY: THOMAS E. DUTTON, Attorney at Law

12      IAN BURKOW, Attorney at Law
     (A.M. session only)

13    (312) 476-5057
    duttont@gtlaw.com

14

15  ALSO PRESENT: SAM BELLETTO, Videographer

16

17

18

19

20

21

22

23

24

25

**Page 4**

1       I N D E X

2  EXAMINATION BY:       PAGE

3  MR. WILLIAN:        8

4  MR. DUTTON:       277

5  FURTHER EXAMINATION BY:

6  MR. WILLIAN:      278

7    EXHIBITS MARKED FOR IDENTIFICATION

8  NUMBER     DESCRIPTION     PAGE

9  Exhibit 001  Document entitled "High   54
         Level Last Update Statistics-

10        Olivares"

11  Exhibit 002  Work Order Number 199716   76

12  Exhibit 003  Work Order Number 199836   86

13  Exhibit 004  Work Order Number 178432   92

14  Exhibit 005  Work Order Number 178166   98

15  Exhibit 006  Work Order Number 175270  107

16  Exhibit 007  Work Order Number 175270  113

17  Exhibit 008  Work Order Number 233082  118

18  Exhibit 009  Work Order Number 239041  126

19  Exhibit 010  Work Order Number 213853  128

20  Exhibit 011  Work Order Number 213740  130

21  Exhibit 012  Work Order Number 254797  134

22  Exhibit 013  Work Order Number 225296  137
       with Post-it note

23

24  Exhibit 014  Work Order Number 223954  141
       with Post-it note

25



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 3 of 72

AMADO OLIVARES                                              July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                              5–8

Page 5

EXHIBITS MARKED FOR IDENTIFICATION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 015 | Work Order Number 223726 with Post-it note | 145 |
| Exhibit 016 | Work Order Number 223772 with Post-it note | 154 |
| Exhibit 017 | Work Order number 188084 | 157 |
| Exhibit 018 | Work Order number 180877 | 164 |
| Exhibit 019 | Work Order number 188454 | 170 |
| Exhibit 020 | Work Order number 192603 | 172 |
| Exhibit 021 | Document entitled "CDMP Property Management, Family Services, Transition and Operation Plan" dated May 13, 2003 | 173 |
| Exhibit 022 | Work Order number 355215 | 177 |
| Exhibit 023 | Work Order number 384667 | 180 |
| Exhibit 024 | Work Order number 384130 | 187 |
| Exhibit 025 | Work Order number 384124 | 192 |
| Exhibit 025A | Work Order number 384802 | 195 |
| Exhibit 026 | Work Order number 281827 | 200 |
| Exhibit 027 | Work Order number 284967 | 206 |
| Exhibit 028 | Work Order number 379856 | 210 |
| Exhibit 029 | Work Order number 385087 | 213 |
| Exhibit 030 | Work Order number 385231 | 215 |
| Exhibit 031 | Work Order number 385074 | 218 |

Page 6

EXHIBITS MARKED FOR IDENTIFICATION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 032 | E-mail from Ron Calloway dated August 28, 2007 | 222 |
| Exhibit 033 | E-mail from Ron Calloway dated November 5, 2007 | 226 |
| Exhibit 034 | E-mail from Ron Calloway dated December 3, 2007 | 227 |
| Exhibit 035 | Work Order number 453716 | 228 |
| Exhibit 036 | Work Order number 455730 | 231 |
| Exhibit 037 | Work Order number 453513 | 237 |
| Exhibit 038 | Work Order number 453486 | 240 |
| Exhibit 039 | Work Order number 456750 | 242 |
| Exhibit 040 | Work Order number 455791 | 244 |
| Exhibit 041 | Work Order number 454697 | 251 |
| Exhibit 042 | Work Order number 453956 | 254 |
| Exhibit 043 | Work Order number 850507 | 255 |
| Exhibit 044 | Work Order number 865100 | 260 |
| Exhibit 045 | Work Order number 875644 | 262 |
| Exhibit 046 | Work Order number 872865 | 264 |
| Exhibit 047 | Work Order number 846885 | 267 |
| Exhibit 048 | Work Order number 864072 | 270 |
| Exhibit 049 | Declaration of Amado Olivares dated June 27, 2012 | 273 |

Page 7

1   July 11, 2012   P R O C E E D I N G S   8:57 a.m.

2          --oOo--

3       VIDEO OPERATOR:  Good morning.  This marks

4   the beginning of disk number 1 in the deposition of

5   Amado Olivares in the matter of Monterey Bay

6   Military Housing versus Pinnacle Monterey.  This

7   case is being heard before the Superior Court of

8   California in Monterey County.  The case number

9   M112710 and M115143.

10       This deposition is being held at the

11   Monterey Bay Inn at 242 Cannery Road in Monterey,

12   California 93940.  Today is July 11th, 2012.  And it

13   is 8:57 a.m.  My name is Sam Belletto, the

14   videographer, representing Esquire, and our court

15   reporter is Delaine Hall.

16       And, counsel, can you please introduce

17   yourselves for the record.

18       MR. WILLIAN:  My name is Jeff Willian.  I

19   represent the Monterey Bay plaintiffs and their

20   affiliates as reflected in the record.

21       MR. DUTTON:  Tom Dutton on behalf of the

22   defendants in the Monterey action and the plaintiffs

23   in the consolidated action.

24       MR. BURKO:  Ian Burko on behalf of the

25   defendants.

Page 8

1       VIDEO OPERATOR:  Can we please swear the

2   witness.

3       (Whereupon, the witness was duly sworn.)

4          EXAMINATION BY MR. WILLIAN

5   BY MR. WILLIAN:

6   Q.   Good morning, Mr. Olivares.  Can you state

7   your name for the record, please.

8   A.   Amado Olivares.

9   Q.   Where do you reside, Mr. Olivares?

10   A.   In Watsonville, California.

11   Q.   What's your address?

12   A.   248 Hathaway Avenue.

13   Q.   How long have you resided there?

14   A.   For about 15 years.

15   Q.   Have you ever had your deposition taken

16   before?

17   A.   No.

18   Q.   Did you have a chance to prepare for your

19   deposition?

20   A.   Yes.

21   Q.   What did you do to prepare for your

22   deposition?

23   A.   I met with Tom and Ian.

24   Q.   When did you meet with them?

25   A.   Yesterday.



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
9–12

Page 9

1    Q.   How long did you meet with them?
2    A.   About three hours.
3    Q.   What time of the day did you meet with
4    them?
5    A.   At 2:00 p.m.
6    Q.   At 2:00 p.m.  Did you look at any
7    documents in preparation for today's deposition?
8    A.   Yes.
9    Q.   What documents did you look at?
10   A.   Not sure exactly what documents they were.
11   Q.   Well, it was yesterday.  So tell me what
12   you recollect that you looked at.
13   A.   There were some e-mails.
14   Q.   What were the e-mails about?
15   A.   Work orders.
16   Q.   I'll come back to e-mails in a second.
17   Other than e-mails, what other documents did you
18   look at?
19   A.   Declaration, yeah.
20   Q.   Whose declaration?
21   A.   Mike Waibel.
22   Q.   Did you look at any other documents in
23   preparation for your deposition?
24   A.   No.
25   Q.   Did you look at your declaration,

Page 10

1    Mr. Olivares?
2    A.   Yes, I did.
3    Q.   Did you reread that declaration?
4    A.   Yes.
5    Q.   Is there any amendment you want to make to
6    that to make it more truthful and accurate?
7    A.   No.
8    Q.   Did you have any reaction to the Mike
9    Waibel declaration when you read it?
10   A.   I mean, I didn't know anything about it.
11   Q.   Were you aware of any -- withdrawn.
12       When you read the declaration, was there
13   anything in there that you thought was untruthful?
14   A.   I hadn't -- nothing, no.  Basically I had
15   nothing to do with it, so I didn't know if it was
16   true or not.
17   Q.   Were you aware that Mr. Waibel had been
18   tasked in 2007 with updating 2006 work orders?
19   A.   No.
20   Q.   Were you aware that there was a concerted
21   effort by Pinnacle to update -- at Monterey to
22   update 2006 work orders in 2007?
23   A.   No.
24   Q.   Were you part of the process in any way in
25   2007 of updating 2006 work orders?

Page 11

1    A.   I don't remember.
2    Q.   You say you don't remember.
3    A.   I don't remember being part of it, no.
4    Q.   If you spent a substantial amount of
5    several days updating 2006 work orders in 2007, is
6    that the kind of thing you'd think you'd remember?
7        MR. DUTTON:  Objection to the
8    hypothetical.
9        THE WITNESS:  No.  Not in nine years, no.
10   BY MR. WILLIAN:
11   Q.   Have you ever been asked to go back and
12   update work orders from the prior year?
13   A.   I don't remember.
14   Q.   Not talking about just 2007.  I'm talking
15   about in 2010, for example, did you do it then?
16   A.   No.
17   Q.   So as you sit here today you have no
18   recollection of anyone asking you to go back and
19   update prior year work orders?
20   A.   No.
21   Q.   What's the longest time you think that you
22   took to update a work order from the time that it
23   was completed to the time that you did the update?
24       MR. DUTTON:  Objection; no foundation.
25       THE WITNESS:  I don't remember.  I don't

Page 12

1    know exactly how long.
2    BY MR. WILLIAN:
3    Q.   Well, based on your practice how long do
4    you think that -- if we looked at your records, how
5    long will we see that it would take -- withdrawn.
6        If we looked at the records, what do you
7    think the records would show as far as the longest
8    time that it took for you to update a work order
9    from the time it was completed?
10   A.   I'm not sure.
11       MR. DUTTON:  Object to the form.
12   BY MR. WILLIAN:
13   Q.   You think it was more than a month?
14       MR. DUTTON:  Object to the form.
15       THE WITNESS:  I'm not sure.
16   BY MR. WILLIAN:
17   Q.   More than six months?
18       MR. DUTTON:  Same objections.
19       THE WITNESS:  Yeah, I'm not sure.
20   BY MR. WILLIAN:
21   Q.   More than a year?
22       MR. DUTTON:  Same objection.
23       THE WITNESS:  I'm not sure.
24   BY MR. WILLIAN:
25   Q.   You just don't know?



Page 13

1    A.  No.
2    Q.  Is it possible you updated work orders a
3  year after they were completed, Mr. Olivares?
4    A.  I would have to look at the work orders.
5    Q.  So it's possible?
6    A.  I'm not sure.
7    Q.  Can you think of why you would be updating
8  work orders a year after they were completed?
9    A.  No.
10    Q.  Can you think of why you would be updating
11  work orders six months after they were completed?
12    A.  No.
13    Q.  Can you think of why you would be updating
14  work orders two months after they were completed?
15    A.  Yeah.  If I ran the pass/fail report right
16  there.  I mean, I usually would run it within a
17  month, you know, sometimes a little longer,
18  depending on how much time I had.
19    Q.  All right.  So let's focus on when you ran
20  the pass/fail report.  How often did you run the
21  pass/fail report?
22    A.  I would try to run it once a month.
23    Q.  And what is the pass/fail report?
24    A.  It shows if the work order met the
25  response time.

Page 14

1    Q.  How long have you been running the
2  pass/fail report?
3    A.  I don't know.  I'm not sure how long.
4    Q.  How long have you had responsibility for
5  the pass/fail report in your area?
6    A.  I'm not sure how long, when it was tasked,
7  you know, like when I started doing it.
8    Q.  When did you start doing it?
9    A.  I'm not sure when.
10    Q.  When did you become a maintenance
11  supervisor at Monterey?
12    A.  2004.
13    Q.  Did you start running the pass/fail report
14  around that time, 2004?
15    A.  No.
16    Q.  How soon did you begin to run the
17  pass/fail report?
18    A.  I'm not sure how soon after.
19    Q.  When do you first recollect you ran the
20  pass/fail report?
21    A.  Maybe 2006.
22    Q.  And why in 2006 did you begin to run the
23  pass/fail report do you believe?
24    A.  Because it was brought to attention that
25  we were being late on work orders.

Page 15

1    Q.  Who brought that to your attention?
2    A.  I'm not exactly sure who did.  One of my
3  managers or supervisors.
4    Q.  I'm sorry.  Who was your manager in 2006?
5    A.  I think at that time was Jennifer Barrett.
6    Q.  And she told you that you were late on
7  response times for work orders?
8    A.  Yes.
9    Q.  Did agree with her?
10    A.  No.
11    Q.  Did you tell her that you disagreed with
12  her?
13    A.  Yes.  I mean, I'm sure I did and that I
14  would look into it.
15    Q.  Let me go over some ground rules for the
16  deposition today if I could.
17    A.  Okay.
18    Q.  Obviously you had a chance to prepare for
19  your deposition with counsel, correct?
20    A.  Yes.
21    Q.  And you are represented by counsel?
22    A.  Yes.
23    Q.  The way the process will work today is
24  I'll ask a question.  And please wait until I'm
25  finished with my question before you answer.  You

Page 16

1  seem to have done a good job so far.  And I'll do my
2  best to wait until you finish answering before I ask
3  my next question.  That way we don't talk over each
4  other.  I'll ask you to do that even if you know
5  where I'm going with my question.  If you would just
6  wait until it is completely out so that we can have
7  a clean record.  Is that agreeable?
8    A.  Yes.
9    Q.  If you need a break, let me know.  We'll
10  get you a break promptly.  Okay?
11    A.  Okay.
12    Q.  I may finish up my questioning or a line
13  of questioning if it's not too urgent, but let me
14  know if you need a break.  Agreed?
15    A.  Okay.
16    Q.  If you answer a question, I'm going to
17  assume that you understood the question.  Do you
18  understand that?
19    A.  Yes.
20    Q.  If don't understand a question, I would
21  ask that you please tell me that you don't
22  understand the question, and I'll do my best to
23  rephrase it.  I might ask you why you don't
24  understand it, but I'll do my best to rephrase it so
25  it's more understandable.  Do you understand that?



Page 17

1    A.  Yes.
2    Q.  You understand that you are testifying
3  under the penalty of perjury?
4    A.  Yes.
5    Q.  You understand that if you testify
6  untruthfully that you are subject to criminal
7  exposure?  Do you understand that?
8    A.  Yes.
9    Q.  When did you first begin to work for
10  Pinnacle at the Parks of Monterey?
11    A.  October 2003.
12    Q.  Did you go to high school?
13    A.  Yes.
14    Q.  Where did you go to high school?
15    A.  Watsonville High School.
16    Q.  Where is that?
17    A.  Watsonville, California.
18    Q.  When did you graduate?
19    A.  I didn't graduate.
20    Q.  When you began to work for Pinnacle, what
21  was your role at Pinnacle?
22    A.  Maintenance technician.
23    Q.  Who was your supervisor?
24    A.  Boyd Sanderson.
25    Q.  He was your maintenance supervisor?

Page 18

1    A.  Yes.
2    Q.  You indicated you first became a
3  maintenance supervisor in 2004?
4    A.  Yes.
5    Q.  Have you spoken to Mr. Sanderson in the
6  past two years, let's say?
7    A.  Yes.
8    Q.  Under what circumstance have you spoken
9  with him?
10    A.  We're on the same softball team.
11    Q.  What's the name of your team?
12    A.  Ballbusters.
13    Q.  Have you discussed work orders with
14  Mr. Sanderson within the last two years?
15    A.  No.
16    Q.  Have you discussed the fact that he gave a
17  declaration in this case?
18    A.  Yes.
19    Q.  What did Mr. Sanderson say about that?
20    A.  He asked me -- he just asked me one day
21  that, you know, what -- why did he have to meet
22  with -- I'm not sure who he had to meet with, if it
23  was Clark or Pinnacle.
24    Q.  Pinnacle?
25    A.  Yeah.  I'm not sure.  So, I mean, that's

Page 19

1  what he asked me.
2    Q.  What did you say?
3    A.  I just said it was, you know, to discuss
4  work orders.
5    Q.  Did he further talk about work orders with
6  you?
7    A.  No.
8    Q.  Did he further talk about his declaration
9  with you?
10    A.  No.
11    Q.  Did you know that he provided a
12  declaration?
13    A.  I knew he was meeting with attorneys, so I
14  assumed he did.
15    Q.  Did he tell you whether he had any
16  misgivings or doubts about meeting with the
17  attorney?
18    A.  No.
19    Q.  Who wrote your declaration for you?
20    A.  Tom.
21    Q.  Did you make any revisions to the draft
22  that was given to you?
23    A.  That day, yes.
24    Q.  Do you know what revisions you made?
25    A.  No.

Page 20

1    Q.  Were they hand edits you made, or did you
2  just tell them verbally?
3    A.  I don't remember exactly how they were.
4    Q.  In other words, did you get a hard copy of
5  it and edit the draft affidavit -- declaration?
6    A.  I did get a hard copy, yes.
7    Q.  Did you mark it up?
8    A.  I don't think so.  I'm not -- I don't
9  think I wrote on it, no.
10    Q.  So how did you communicate your changes?
11    A.  I talked -- I verbally told him.
12    Q.  Do you remember what those changes were?
13    A.  No.  I know one was my name was spelled
14  wrong, yeah.
15    Q.  How'd he spell it?
16    A.  I'm sure like everybody else does with an
17  R and N.  Like Armando, usually, you know.
18    Q.  He called you Armando?
19    A.  He didn't called me that.  He just maybe
20  spelled it that way.  I don't know.
21    Q.  Have you ever been interviewed by other
22  Pinnacle consultants regarding work orders?
23    A.  Yes.
24    Q.  When was that approximately?
25    A.  This year.  I believe this year.



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 7 of 72

AMADO OLIVARES                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY              21–24

Page 21

1   Q.  Who interviewed you?  Jeff George?
2   A.  No.  What's -- I can't remember the other
3   attorney that was with us this morning.  Dan.  Dan
4   and Andy.
5   Q.  Dan and Andy interviewed you?
6   A.  Yes.
7   Q.  Did anyone from an accounting firm ever
8   interview you?
9   A.  They met -- I met with them to go over how
10  the work orders work, like, how to enter.
11  Q.  When did you meet with them?
12  A.  This year also.
13  Q.  Who was it that you met from accounting?
14  A.  That was Jeff George.
15  Q.  Jeff George?
16  A.  Uh-huh.
17  Q.  Did he take notes of your interview?
18  A.  I don't think he took notes, but it was
19  being recorded.
20  Q.  It was being recorded?
21  A.  Yes.
22  Q.  He had a tape recorder with him?
23  A.  No.  I think it was through the computer.
24  I don't know how, but all I know he told me it was
25  recorded.

Page 22

1   Q.  Did Mr. George ask you if you had ever
2   changed any fails to passes in the work order
3   system?
4   A.  I don't remember if he did.
5   Q.  Who trained you on using the Yardi for
6   work order recording purposes?
7   A.  When I first became a supervisor, Ron
8   Calloway did because I was taking over his spot.
9   Q.  Do you know if Mr. Jeff George interviewed
10  anyone else besides yourself at Pinnacle?
11  A.  Yes.  I know he interviewed Octavio
12  because he was after me.  I'm not sure if he did
13  anybody before or after him.
14  Q.  Was there anyone else with Jeff George
15  when you were interviewed?
16  A.  No.
17  Q.  How long ago was that interview?
18  A.  Months ago.  I'm not sure exactly how
19  long.
20  Q.  It wasn't last week or last month; it was
21  several months ago?
22  A.  As far as I can remember, yes.
23  Q.  Did anyone from the accounting firm or
24  Jeff George follow up with you for a subsequent
25  interview?

Page 23

1   A.  No.
2   Q.  Did anyone from the accounting firm
3   request any documents from you?
4   A.  No.
5   Q.  Has anyone from Pinnacle or Mr. Dutton's
6   law firm requested documents from you?
7   A.  No.
8   Q.  Now you became a maintenance supervisor in
9   2004.  Who did you report to?
10  A.  To Jennifer Barrett.
11  Q.  She was a community director at the time?
12  A.  Yes.
13  Q.  What communities were you in charge of as
14  maintenance supervisor in 2004?
15  A.  NPS.
16  Q.  I'm sorry?
17  A.  NPS, Naval Post Graduate School.  The
18  Presidio Monterey, Wherry Grove.
19  Q.  How do you spell it?
20  A.  W-H-E-R-R-Y.  Pine View Town Homes, La
21  Mesa Cliffs, Terrace Oaks, Capehart Forest.
22  Q.  Spell that.
23  A.  C-A-P-E-H-A-R-T Forest.  Is that seven of
24  them?
25  Q.  Yes.

Page 24

1   A.  Yes, that's it.
2   Q.  How long did you stay as the maintenance
3   supervisor for those seven communities?
4   A.  I'm not exactly sure of the date, but
5   sometime in 2006 I came back to and I worked in Fort
6   Ord for about six months.  I'm not exactly sure if
7   it was exactly six months, a little more or less
8   but -- and then I went back to La Mesa.
9   Q.  So just so it's clear, in 2006 you went to
10  work at Fort Ord?
11  A.  Yes.
12  Q.  As a maintenance supervisor?
13  A.  Yes.  For Lower Stilwell and Hayes Park.
14  Q.  That was for six months, you said?
15  A.  Approximately.
16  Q.  And what caused you to go to Fort Ord to
17  work there as maintenance supervisor for Pinnacle?
18  A.  I was asked to work -- to move.
19  Q.  Who asked you to move?
20  A.  At that time I believe it was Stacia.
21  Q.  Who did you report to when you went to
22  Fort Ord in 2006?
23  A.  Ron was the -- Ron Calloway was the
24  maintenance director, and Stacia was the community
25  director.  And, you know, Shawn was the investment



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
25–28

Page 25

1  manager.
2      Q.   You indicated that after about six months
3  you left Fort Ord and went back to La Mesa?
4      A.   Yes.
5      Q.   Why did that switch occur?
6      A.   Boyd was the supervisor in La Mesa.  So he
7  was -- he left for another job.  So I went back to
8  La Mesa.
9      Q.   Did you resume your old duties --
10     A.   Yes.
11     Q.   -- for those seven communities?
12     A.   Yes.
13     Q.   Who did you report to when you went back
14  to La Mesa?
15     A.   Michelle Calloway.
16     Q.   At that point in time she had become the
17  community director?
18     A.   She was --
19     Q.   Or was she a community manager?
20     A.   I think she was community manager.
21     Q.   For La Mesa?
22     A.   Yes.
23     Q.   How long did you stay in that position of
24  managing -- of the maintenance supervisor at La Mesa
25  after you transferred there from Fort Ord?

Page 26

1      A.   Until 2011, august.
2      Q.   You held the same position from 2006
3  through 2011?
4      A.   Yes.
5      Q.   And that is maintenance supervisor for
6  those seven communities we discussed?
7      A.   Yes.
8      Q.   Who are the different people you reported
9  to during that time period 2006 through 2011
10  starting with Michelle Calloway?
11     A.   After Michelle Calloway, it was Dianne
12  Frye.  And then after Dianne it was Adobe Gordon.
13     Q.   Adobe Gordon?
14     A.   Yes.
15     Q.   From 2006 through 2011, while you were
16  maintenance supervisor, did your duties and
17  responsibilities remain the same?
18     A.   Yeah.
19     Q.   Did your position change at some point in
20  2011?
21     A.   Yes.
22     Q.   How did it change?
23     A.   I became a maintenance director.
24     Q.   Who do you report to now?
25     A.   Michelle Calloway.

Page 27

1      Q.   When in 2011 were you promoted to
2  maintenance director?
3      A.   It was around August.
4      Q.   Who was the maintenance director before
5  you?
6      A.   There wasn't one.
7      Q.   Well, at some point there was a
8  maintenance director before you.  Who was that?
9      A.   Before me it was Josh Merrill, the last
10  maintenance director.  I think we hadn't had one for
11  a while.
12     Q.   How long was that position vacant
13  approximately?
14     A.   Couple years.
15     Q.   Do you know why it was vacant?
16     A.   No.
17     Q.   When you were maintenance supervisor at La
18  Mesa from 2006 to 2011, you indicated you first
19  reported to Michelle Calloway and then later to
20  Dianne Frye.  When was Ms. Frye's position when you
21  reported to her?
22     A.   She was a community manager.
23     Q.   And she took Ms. Calloway's position?
24     A.   Yes.
25     Q.   That's when Ms. Calloway was promoted to

Page 28

1  maintenance director?
2      A.   I'm not sure when that was.
3      Q.   And then during what years did you report
4  to Ms. Frye?
5      A.   I'm not sure exactly what years.
6      Q.   Give me your best estimate.
7      A.   I really have no idea what year, yeah, I
8  mean.
9      Q.   Let's do it this way:  When did you start
10  to report to Adobe Gordon approximately?
11     A.   Same thing.  I don't remember exactly
12  when.
13     Q.   How many years do you think you reported
14  to Adobe Gordon?  One, two, three, four?
15     A.   I'm not sure how long.  I mean, I'm not
16  sure.
17     Q.   More than a year?
18     A.   I'm not exactly sure, I mean, yeah.  I
19  wouldn't be -- yeah, I mean, I don't know how long.
20     Q.   From 2006 through 2011, while you were
21  maintenance supervisor at La Mesa how many
22  maintenance techs reported to you approximately?
23     A.   Five maintenance techs and one maintenance
24  lead.
25     Q.   One maintenance lead you said?



Page 29

1    A.  Yes.
2    Q.  What's the difference between a
3  maintenance tech and a maintenance lead?
4    A.  Basically the lead, you know, is oversees
5  a little more.  Oversees the techs more.
6    Q.  Who were the maintenance leads that
7  reported to you from 2006 to 2011?
8    A.  Lorenzo Suarez.
9    Q.  Can you spell that?
10    A.  Lorenzo Suarez, L-O-R-E-N-Z-O,
11  S-U-A-R-E-Z.
12    Q.  Was he the maintenance lead for you from
13  2006 to 2011?
14    A.  Yes.
15    Q.  Are there any other Pinnacle employees who
16  play on your softball team?
17    A.  No.
18    Q.  Did Jewel Dunn ever report to you?
19    A.  Yes.  When I was in -- when I came back to
20  work in Lower Stilwell.
21    Q.  For that six-month period?
22    A.  Yes.
23    Q.  Did Mr. Verdusco ever report to you?
24    A.  Not until I became maintenance director.
25    Q.  And generally was he a maintenance

Page 30

1  supervisor at the Parks at Monterey?
2    A.  No.  He started as a maintenance tech
3  also.
4    Q.  Do you know when he became a maintenance
5  supervisor?
6    A.  No.
7    Q.  Does Mr. Estrada report to you at all?
8    A.  Not until I became a maintenance director.
9    Q.  And is he currently at Pinnacle?
10    A.  Yes.
11    Q.  Have you spoken with Josh Merrill in the
12  last year?
13    A.  No.
14    Q.  Do you know a Mr. Torres?
15    A.  No.  Mr. Torres?
16    Q.  Mr. Torres?  Do you know an R. Torres?
17    A.  No.
18    Q.  Going back to 2004 when you were
19  maintenance director --
20    A.  Supervisor.
21    Q.  Thank you.  I'll ask the question again.
22  I didn't mean to promote you so early.
23      Going back to 2004 when you were
24  maintenance supervisor, what responsibility did you
25  have for closing out work orders?

Page 31

1    A.  I would close out all the work orders for
2  the seven properties.
3    Q.  In 2004, then, you were the primary person
4  responsible for closing out work orders for those
5  seven communities?
6    A.  Yes.
7    Q.  When you went to Fort Ord in 2006 for six
8  months as maintenance supervisor, what
9  responsibility did you have for closing out work
10  orders there?
11    A.  I was responsible for closing those work
12  orders.
13    Q.  Sole person responsible for closing out
14  those work orders?
15    A.  Yes.
16    Q.  2006 through 2011, before you became
17  maintenance director after you left Fort Ord and
18  went back to those seven communities, were you again
19  the person primarily responsible for closing out
20  work orders for those seven communities?
21    A.  Yes.
22    Q.  Did anyone else have that responsibility
23  for those seven communities, or was that you?
24    A.  I would have my maintenance lead help me
25  also.

Page 32

1    Q.  Mr. Juarez?
2    A.  Suarez.
3    Q.  Did the process as far as you were
4  involved for entering work order information into
5  Yardi and closing it out ever change between 2004
6  and 2011?
7    A.  The process was always changing basically,
8  you know, yeah.
9    Q.  The process was always changing?
10    A.  Yeah.
11    Q.  And how was the process always changing?
12    A.  I don't remember exactly how, but there
13  was always changes.
14    Q.  Describe the changes that occurred in
15  closing out the work orders between 2004 and 2011?
16    A.  I'm not exactly sure what all the changes
17  were, but there was always changes.  I mean, there's
18  just -- you know, there's always changes.
19    Q.  What are the primary changes in process
20  that come to mind as you sit here today between 2004
21  and 2011?
22    A.  Like, one point we were using start -- we
23  would, you know, change the status to start.  At one
24  point we would change it to in-progress.  Sometimes
25  we would leave it as scheduled.  So it would change.



Page 33

1    Q.  Can you think of any other primary changes
2  to the process of closing out work orders that
3  occurred between 2004 and 2011?
4    A.  I'm not sure what other changes, but I'm
5  sure there was.  I just don't remember what they
6  were.  They were just so minor, it wasn't a big
7  deal.
8    Q.  They were so minor, it was not a big deal?
9    A.  Well, I mean, for me entering the work
10  orders, it was just a small change.  So I didn't
11  really take it.
12    Q.  Let's focus on that one change that you do
13  remember.  Can you describe that for us again in
14  detail?
15    A.  What change?
16    Q.  The one that you just identified.
17    A.  Which one?
18    Q.  You only identified one.  It had to do
19  with changing something to do with start then to
20  in-progress.
21    A.  When the work order comes in, you change
22  the status to schedule and then to start and then
23  close out the work order.  That's when it's
24  completed.  Or we would just go --
25    Q.  How was that changed?

Page 34

1    A.  Then the -- or we would -- you know, it
2  was -- I'm not sure which one is first.  You know,
3  which one we did first.  I know sometimes the work
4  order was on call.  We change it to start.  And then
5  when it was completed, just to complete.  And then
6  also we would change it from call to schedule to
7  in-progress.  And then when it was completed, we
8  would hit complete.  So it wasn't always the same.
9    Q.  Why did -- withdrawn.
10        Why were those changes to the process of
11  closing out a work order made?
12    A.  I'm not sure why.  I was just asked to.
13    Q.  Did anybody instruct you to make those
14  changes?
15    A.  Not to make the changes on the work
16  orders, but to, like, from today on start doing it
17  this way.
18    Q.  Who provided you with those instructions?
19    A.  Different -- different managers.
20    Q.  What instructions were provided to the
21  techs as far as keeping notes of when they started
22  the work and completed the work on a given work
23  order?
24    A.  Just verbal instructions.
25    Q.  What were the verbal instructions as far

Page 35

1  as keeping written notes?
2    A.  To put it in all the notes they did at the
3  house.
4    Q.  And were the techs required to write on
5  the work order the start time and the completion
6  time?
7    A.  Yes.
8    Q.  Why were the techs required to write the
9  start time and completion time on the hard copy of
10  the work order?
11    A.  To know how long the job took them.
12    Q.  And to know when they actually showed up
13  at the house to start the work?
14    A.  Yes.
15    Q.  And you needed to know when the tech
16  showed up at the house to start the work in order to
17  put that information into Yardi in order to
18  calculate whether the work order was a pass or fail;
19  is that right?
20    A.  Yes.
21    Q.  In general were the techs who worked you
22  for you pretty good in handwriting the start and
23  completion time on the work order?
24    A.  No.
25    Q.  What did you do to make sure that was

Page 36

1  done?
2    A.  Keep reminding them.
3    Q.  If a tech didn't hand write the start time
4  and the completion time on the hard copy of the work
5  order, what action did you take?
6    A.  Gave them a, you know, verbal warning.
7    Q.  How would you know what time to enter into
8  Yardi, then, if they hadn't handwritten it on the
9  work order?
10    A.  Ask the technician what time they were
11  there.
12    Q.  So you would ask the technician verbally
13  what time they started and what time they completed?
14    A.  Yes.
15    Q.  And then you -- would you, then, hand
16  write that on the work order?
17    A.  Not all the time.  Sometimes.
18    Q.  Sometimes.  And then sometimes you would
19  just enter it into the Yardi system?
20    A.  Yes.
21    Q.  And how far after a tech actually
22  completed the work would you talk to them and say,
23  "okay, you didn't hand write the time.  Tell me
24  verbally when you showed up and when you completed
25  the work"?



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
37–40

Page 37

1    A.   It would vary depending on when I was
2   getting around to closing the work order.
3    Q.   Vary by how much time?  One day versus a
4   couple weeks?
5    A.   Yes, or longer.  Depends.
6    Q.   How much longer?
7    A.   It could have been up to a month.
8    Q.   And so it's your testimony that you would
9   ask the techs to recollect when they showed up at a
10  house a month later?
11   A.   Uh-huh.
12   Q.   Yeah?
13   A.   Yes.
14   Q.   And could the techs typically recall when
15  they showed up at a house a month later?
16   A.   Not all the time.
17   Q.   Was there any other record that you could
18  go to to determine when a tech showed up at a house
19  to start a work order if they didn't recall when
20  they showed up and didn't write down the time on a
21  work order?
22   A.   We could call the resident.
23   Q.   Did you ever do that?
24   A.   Yes.
25   Q.   To find out when a tech showed up at the

Page 38

1   house?
2    A.   Yes.
3    Q.   And what type of record would we have of
4   you calling a resident?
5    A.   There wouldn't be one.
6    Q.   Did you have some techs who habitually
7   failed to write down on the work orders when they
8   started the work and when they completed?
9    A.   Yes.
10   Q.   Who was that?
11   A.   All of them.
12   Q.   Who?
13   A.   All of them.
14   Q.   Did you reprimand them in any way?
15   A.   I kept reminding them, I mean.
16   Q.   It's pretty important, right, that they
17  write down the start time and the completion time on
18  the work order.
19       MR. DUTTON:  Object to the form of the
20  question.
21       THE WITNESS:  Yeah.  I mean, it's
22  important.
23  BY MR. WILLIAN:
24   Q.   It's important so you can get accurate
25  information into Yardi, correct?

Page 39

1    A.   Yes.
2    Q.   So you said you had some habitual tech
3   offenders who did not write down the start time and
4   completion time?
5    A.   Yes.
6    Q.   Did you ever write them up in any way so
7   we could go to their file and see that you had
8   reprimanded them?
9    A.   No.
10   Q.   The most you did was a verbal warning?
11   A.   Yes.
12   Q.   Do you think it's clear that the techs
13  know and knew from 2004 to the present that they are
14  to write on the hard copy of the work order the
15  start time and the completion time of their work?
16   A.   Yes.
17   Q.   Who were the technicians that worked for
18  you from 2004 through 2011?
19   A.   I had Keith Reid, Timo Romero.
20   Q.   Better spell these names if you can just
21  to help.
22   A.   T-I-M-O, and then last name is
23  R-O-M-E-R-O.  And then Tony Nguyen N-G-U-Y-E-N.  And
24  Lorenzo Suarez, Eric Ostberg O-S-T-B-R-G (sic), Rudy
25  Ramirez, Ronnie Vida, V-I-D-A.  And that's all that

Page 40

1   I can remember right now.
2    Q.   Which one of those employees no longer
3   work for Pinnacle, if any?
4    A.   Rudy Ramirez doesn't work there.
5    Q.   Any others?
6    A.   That's it, yeah.
7    Q.   So you have testified that from 2004
8   through 2011, you were the person primarily
9   responsible for inputting the tech's start time and
10  completion time into Yardi and closing out the work
11  order; is that true?
12   A.   For my part, yes.
13   Q.   For your part, yes.  Now, what type of
14  system did you have as far as filing the hard copy
15  of the work order with the tech notes after you
16  entered the information into Yardi?
17   A.   I just would put them in a file box.
18   Q.   What order did you put them in the file
19  box?
20   A.   As I was closing them out, I would put
21  them in the file box once I closed them out.  Not by
22  date, just --
23   Q.   You close one out.  You put it in the file
24  box.  And the next one you closed out would go right
25  behind that, et cetera, et cetera?



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 12 of 72

AMADO OLIVARES                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY              41–44

Page 41

1    A.  Yes.
2    Q.  So the hard copies of the work orders are
3 put in the file box in the order in which you closed
4 them out?
5    A.  Yes.
6    Q.  That's the practice that you had from 2004
7 to 2011?
8    A.  That's what I would try to do.  I mean,
9 sometimes they would sit on my desk before they got
10 in the file box for days.
11    Q.  Eventually you got them in the file box?
12    A.  Yes.
13    Q.  Did you ever consciously take a work order
14 with a tech's note on it and throw it out or destroy
15 it?
16    A.  No.
17    Q.  So as far as you know you saved every hard
18 copy of the work order with the tech notes that had
19 their start time and completion time?
20    A.  Yes.
21    Q.  Was there a period of time where you
22 didn't have hard copies of work orders with tech
23 notes because you were using an electronic system of
24 some sort?
25    A.  When -- at one point they were using

Page 42

1 BlackBerry -- not BlackBerry.  They were some type
2 of --
3    Q.  PDAs?
4    A.  Yeah, there you go.
5    Q.  During what time period was that?
6    A.  It was before 2006 sometime.
7    Q.  How long did you use the PDA system before
8 it was discarded and you went back to the old
9 system?
10    A.  Not very long.  It didn't work.
11    Q.  Month, two months, three months?
12    A.  Maybe.  I'm not really sure.
13    Q.  Was it as long as a year that you used the
14 PDA?
15    A.  No, it wasn't that long.
16    Q.  So during those few months, whatever they
17 are, where you used the PDA system, is it the case
18 there would be no hard copy work orders with tech
19 notes on them because you were using the PDA system?
20    A.  Yes.
21    Q.  If you wanted to go back, Mr. Olivares,
22 and figure out when the PDA system started and when
23 it stopped prior to 2006, what records would you
24 look at?
25    A.  I have no idea how to figure that out.

Page 43

1    Q.  With respect to your filing of the hard
2 copy of the work orders with the tech's notes of
3 start time and stop times, as I understand it, you
4 put them in a file box of some sort?
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Yes.
8    Q.  And when a file box was full, what would
9 you do with the file box?
10    A.  Before Shawn Somerville started working
11 there, we didn't have to save them.  So I would save
12 maybe a few months at a time.  And then after that,
13 I would just discard them.
14    Q.  You would discard them?
15    A.  Yeah, the ones that were in my office.
16    Q.  How would you discard them?
17    A.  Throw them in the dumpster.  After Shawn
18 started at some point he, you know, asked us that we
19 needed to start keeping all the work orders and not
20 discard anything, any work orders.
21    Q.  Mr. Somerville started at Pinnacle in the
22 investment manager role in the summer of 2006.  So
23 was it around that time where Mr. Somerville told
24 you to keep the hard copy of the work order?
25    A.  I'm not sure exactly, but I know he did at

Page 44

1 some point tell us not to be throwing them away.
2    Q.  Was that soon after he came to Pinnacle
3 that he told you that?
4    A.  I'm not exactly sure when.
5    Q.  Give me your best recollection because
6 we're talking about a period of time from summer of
7 2006 to when he started until today.  When do you
8 think you received that instruction from him?
9    A.  That's exactly why I don't remember
10 because it's so long.
11    Q.  How long have you been following the
12 practice of saving all your work orders and not
13 discarding them?
14    A.  I'm not sure how long.
15    Q.  What's your best estimate?
16    A.  I would have to look at the work orders.
17    Q.  So we could go back and look at your work
18 orders to figure it out?
19    A.  Yeah.  If they are in the file boxes, I
20 haven't thrown any away.
21    Q.  Give me your best estimate of when you
22 started the practice of saving the work orders.
23    A.  Like I said, I don't remember.
24    Q.  Well, let's try to narrow it down.  We're
25 now in 2012.  Do you think you were following that



Page 45

1 practice in 2010?
2    A.  Yes.
3    Q.  Do you think you were following that
4 practice in 2009?
5    A.  Yes.
6    Q.  Do you think you were following that
7 practice in 2008?
8    A.  Yes.
9    Q.  You think you were following that practice
10 in 2007?
11    A.  Not sure.
12    Q.  Okay.  At a minimum you think you have all
13 of the hard copies of your work orders from 2008 on
14 because Mr. Somerville told you to keep the hard
15 copy of the work orders?
16    A.  Yes.
17    Q.  And you religiously followed that
18 practice?
19    A.  Yes.
20    Q.  Probably the wrong word.  You strictly
21 followed that practice?
22    A.  Yes.
23    Q.  Has anyone from Pinnacle come to you and
24 collected the hard copies of the work orders that
25 you had retained since 2008?

Page 46

1    A.  Yes.
2    Q.  Who did that?
3    A.  It was an outside company.  I'm not sure
4 what the name of it was.
5    Q.  Did you get the originals returned to you?
6    A.  Yes.
7    Q.  Do you know if the other maintenance
8 supervisors had also followed the practice that
9 Mr. Somerville had told you to follow in keeping the
10 hard copy of the work orders?
11    A.  No.
12    Q.  Do you know either way?
13    A.  No.
14    Q.  You ever talk to the other maintenance
15 supervisors about whether they follow that
16 practice --
17    A.  No.
18    Q.  -- of keeping hard copies of work orders?
19    A.  No.
20    Q.  Prior to Mr. Somerville arriving you said
21 you would occasionally discard the hard copies of
22 your work orders?
23    A.  Yes.
24    Q.  What would cause you to decide, oh, I need
25 to today discard the hard copy of the work orders?

Page 47

1 What trigger did you have to discard?
2    A.  I didn't think I would need to go back to
3 them anymore.
4    Q.  How long after you entered them did you
5 think you wouldn't have to go back to them anymore?
6    A.  Basically until the bottom of my desk was
7 full.
8    Q.  When you say the bottom of your desk,
9 describe the bottom of your desk and how it got
10 full.
11    A.  It's probably this open.  I would keep
12 maybe three file boxes under there.  Then I would
13 throw the oldest one away.
14    Q.  And three file boxes represents how many
15 months of work orders approximately based on the
16 order flow that you're familiar with?
17    A.  Couple of months each box.
18    Q.  So each box would represent a couple
19 months, you said?
20    A.  Yes.
21    Q.  Before you threw away any hard copy of the
22 work orders, did you ask your supervisor whether it
23 was okay to do so?
24    A.  No.
25    Q.  You just did it on your own?

Page 48

1    A.  Yes.
2    Q.  Did you consult with any other maintenance
3 supervisors to see if that was a good practice to
4 throw away the work orders?
5    A.  No.
6    Q.  Did you consult with anyone before you
7 threw away the hard copy of the work orders?
8    A.  No.
9    Q.  The instruction from Mr. Somerville to
10 keep hard copies of the work order, was that a
11 instruction verbally communicated to you?  Or was it
12 in an e-mail or both?
13    A.  I don't remember how.
14    Q.  Did Mr. Somerville explain why he wanted
15 the hard copy of the work orders to be kept?
16    A.  I don't remember.
17    Q.  Did anyone to your knowledge, including
18 you, question whether you needed to keep the hard
19 copy of the work orders?
20    A.  I didn't.
21    Q.  You just did it?
22    A.  Yes.
23    Q.  Going back to the pass/fail report, on the
24 pass/fail report you indicated was something that
25 you would print out on a monthly basis or so?



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
49–52

Page 49

1    A.   I wouldn't necessarily print it out.
2  Sometimes I would just pull it up.
3    Q.   I see.  So you could pull it up
4  electronically that way and see how you were doing
5  on the passes and fails?
6    A.   Yes.
7    Q.   How important was it to you to have an
8  acceptable pass percentage?
9    A.   Very.
10    Q.   Why was it very important?
11    A.   Because it reflected what the type of work
12  I did.
13    Q.   What did you think an acceptable pass
14  percentage was?
15    A.   Hundred percent.
16    Q.   What did you think an unacceptable pass
17  percentage was?
18    A.   Anything below that.
19    Q.   If you had 99 percent, you think that's
20  not acceptable?
21    A.   I would look into it to see if it was
22  really 99 percent.
23    Q.   Did your superiors communicate to you what
24  they thought an acceptable pass percentage was?
25    A.   No.

Page 50

1    Q.   Did anyone at the time who you reported to
2  tell you "we want pass percentages above 90 percent
3  or above 95 percent" or words to that effect?
4    A.   I don't remember that.
5    Q.   Was your bonus linked in any way to your
6  pass percentage?
7    A.   No.
8    Q.   Did you -- have you received a bonus for
9  2004 through 2011?
10    A.   Yes.
11    Q.   What was the basis for your bonus as far
12  as your performance?
13    A.   I don't know what it was based on.
14    Q.   Did any of your supervisors from 2004
15  through 2011 tell you you are eligible for this
16  bonus, but you have to qualify for it in the
17  following ways?
18    A.   No.
19    Q.   What was the criteria for you receiving a
20  bonus during those time periods?
21    A.   I don't know.
22    Q.   Did you ever ask?
23    A.   No.
24    Q.   Did you understand that the pass
25  percentage of your communities would be one factor

Page 51

1  that might be considered with respect to whether you
2  got your bonus?
3    A.   I thought my job performance was based on
4  it.
5    Q.   You thought your job performance was based
6  on the pass percentage?
7    A.   No.  On what my bonus would be.
8    Q.   Did your job performance include how
9  responsive you were to responding to work orders?
10    A.   I'm not sure if that's what it was judged
11  on.
12    Q.   Well, I'm just talking about your job
13  performance now.
14    A.   That was part of my job, yes.
15    Q.   Part of your job was to respond to the
16  work orders in a timely manner?
17    A.   Yes.
18    Q.   And that was a very important of your job,
19  wasn't it?
20        MR. DUTTON:  Object to the form.
21        THE WITNESS:  I mean, that was part of my
22  job.
23  BY MR. WILLIAN:
24    Q.   That was an important part of your job,
25  wasn't it?

Page 52

1    A.   It was one of them.
2    Q.   What were the other important parts of
3  your job?
4    A.   Everything that had to do with
5  maintenance.
6        MR. WILLIAN:  All right.  We've been going
7  about an hour.  Do you want to take a short break?
8        MR. DUTTON:  Sure.
9        VIDEO OPERATOR:  We are going off the
10  record at 9:56 a.m.
11            (Recess taken.)
12        VIDEO OPERATOR:  We're going back on the
13  record at 10:04 a.m.
14  BY MR. WILLIAN:
15    Q.   Mr. Olivares, you testified you don't
16  believe you ever went back and updated a large
17  number of work orders from the prior year.  Do you
18  recall that testimony?
19        MR. DUTTON:  Objection; misstates his
20  testimony.
21  BY MR. WILLIAN:
22    Q.   Go ahead.
23    A.   Can you repeat the question?
24    Q.   As I understood your testimony, you
25  testified that you don't believe you ever went back



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 15 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                     53–56

Page 53

1  and updated work orders from a prior year.
2        MR. DUTTON:  Objection; misstates his
3  testimony.
4        THE WITNESS:  I said I didn't remember if
5  I did.
6  BY MR. WILLIAN:
7     Q.  You have no recollection of doing so?
8     A.  No.
9     Q.  And have you ever asked anyone to check
10 the records to see if you did that?
11    A.  No.
12    Q.  Has anyone ever suggested to you that you
13 actually did that?
14    A.  No.
15    Q.  Has anyone asked you if you have done that
16 before I asked you that question?
17    A.  Yes.
18    Q.  Who was it that asked you?
19        MR. DUTTON:  Objection; calls for attorney
20 client privilege.  Mr. Olivares, if you can answer
21 the question without referring to a discussion
22 between counsel and yourself, you can do so.
23 Otherwise, I instruct you not to answer.
24 BY MR. WILLIAN:
25    Q.  Who asked you to do to that?  Who asked

Page 54

1  you for that recollection?
2     A.  I can't answer that.
3     Q.  Well, did any of the accounting folks that
4  interviewed you ask that question?
5     A.  I can't answer that.
6     Q.  Different question.  I'm not asking
7  whether an attorney asked you that.  I'm asking you
8  whether any of the accounting folks, including Jeff
9  George, did they ever ask you that question?
10    A.  No.  I mean, I don't remember that they
11 did that, yeah.
12    Q.  So Mr. George or none of the people who
13 worked for him ever asked you whether you went back
14 and updated prior year work orders?
15    A.  No.
16        (Exhibit 001 was marked for
17        identification.)
18 BY MR. WILLIAN:
19    Q.  I'm going to hand you to Olivares
20 deposition exhibit 1.  I know you haven't seen this
21 before.  These are statistics we've taken out of the
22 Yardi database regarding you in closing out work
23 orders.  I'm going to represent to you that these
24 are accurate, and ask you to assume they are
25 accurate for purposes of your testimony.

Page 55

1     A.  Okay.
2     Q.  All right.  I'll ask you to turn to the
3  third page of this document.  You'll see this page
4  under number 3 is entitled "Statistics Specific to
5  Updates Made in July of 2007."
6     A.  Uh-huh.
7     Q.  Do you see that?
8     A.  Yes.
9     Q.  And the Yardi data shows that on July 5th
10 of 2007 you updated 206 -- I'm sorry -- you updated
11 157 work orders from the 2006 time period.  Do you
12 see that?
13    A.  Yes.
14    Q.  And the Yardi data indicates that on the
15 next day, July 6 of 2007 you updated 302 2006 work
16 orders.  Do you see that?
17    A.  Yes.
18    Q.  The Yardi data indicates that the
19 following day on July 7 of 2007, you updated 85 2006
20 work orders.  Do you see that?
21    A.  Yes.
22    Q.  And the Yardi data indicates that on
23 July 8 of 2007 you updated 89 2006 work orders.  Do
24 you see that?
25    A.  Yes.

Page 56

1     Q.  Would you agree with me that this appears
2  to be a concerted effort and activity by you to
3  update 2006 work orders in July of 2007?
4        MR. DUTTON:  Object to the form.
5        THE WITNESS:  That's what it looks like
6  here.
7  BY MR. WILLIAN:
8     Q.  Why were you updating 2006 work orders in
9  2007 as indicated on this sheet?
10    A.  I don't remember why.
11    Q.  Who asked you to do that, Mr. Olivares?
12    A.  I don't remember.
13    Q.  You wouldn't have just done that on your
14 own, would you?
15    A.  I don't -- I don't know why this was done.
16    Q.  So you are telling us that -- let me ask
17 you this:  Was it pretty unusual for you to go back
18 and update the prior year work orders in the
19 magnitude that are shown here?
20        MR. DUTTON:  Object to the form.
21        THE WITNESS:  Yeah.  Like I said, I'm not
22 sure why.
23 BY MR. WILLIAN:
24    Q.  That's unusual activity for you, isn't it?
25        MR. DUTTON:  Same objection.



AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      57—60

Page 57

1      THE WITNESS:  Yeah.  I'm not sure, you
2  know, how long I usually update them or, I mean, I'm
3  not sure.
4  BY MR. WILLIAN:
5      Q.  My question to you is:  That's unusual
6  activity reflected on the sheet where you updated
7  hundreds of work orders from the prior year, isn't
8  it?
9      MR. DUTTON:  Object to the form.
10      THE WITNESS:  I'm not sure.
11  BY MR. WILLIAN:
12      Q.  You're not sure whether that is unusual?
13      A.  No.  I mean, I have to look at everything
14  else to see if I've been doing that all along or how
15  often I do it.
16      Q.  So as you sit here, you don't know whether
17  you've been doing that all along, updating hundreds
18  of work orders from the prior year?
19      A.  No.
20      MR. DUTTON:  Same objection.
21  BY MR. WILLIAN:
22      Q.  You just don't know?
23      A.  No.
24      Q.  Don't you think that if someone asked you
25  to -- withdrawn.

Page 58

1      So it's your testimony that you have no
2  recollection of going back in 2007 and updating
3  hundreds of work orders from the prior year?
4      A.  No, I don't remember.
5      Q.  Let me try to refresh you a little bit.
6      A.  Okay.
7      Q.  Memory is funny sometimes.  Sometimes it
8  comes back once you hear about a fact that you had
9  forgotten, so I'm going to try to refresh you.
10  Okay?
11      A.  Okay.
12      Q.  Do you recall that in July of 2007
13  Michelle Calloway came to you and asked you to
14  update 2006 work orders to help Pinnacle in its
15  incentive fee submission?
16      A.  I don't remember that.
17      Q.  Did you ever communicate with Stacia
18  Schuster about updating work orders?
19      A.  I don't remember doing that.
20      Q.  In the past have you ever communicated
21  with Stacia Schuster about updating work orders?
22      A.  I don't remember.
23      Q.  In July of 2007, who did you report to?
24      A.  I'm not sure which one of those three
25  was -- you know, what time period which one of these

Page 59

1  three I reported to.  I don't know which one was
2  working in 2007.
3      Q.  Now, if you take July 5th of 2007, you see
4  you updated 157 work orders in one day.  Do you see
5  that?
6      A.  Yes.
7      Q.  That's an unusually high number, isn't it,
8  Mr. Olivares?
9      MR. DUTTON:  Object to the form.
10      THE WITNESS:  I'm not sure.
11  BY MR. WILLIAN:
12      Q.  Well, the following day on July 6 of 2007,
13  you updated 302 work orders.  That's an unusually
14  high number of work orders to update in a single
15  day, isn't it?
16      MR. DUTTON:  Objection to the form.
17      THE WITNESS:  I'm not sure.
18  BY MR. WILLIAN:
19      Q.  When you updated these 2006 work orders in
20  July of 2007, so at least six months after those
21  work orders were completed, did you have the hard
22  copy of the work orders in front of you to consult
23  when you updated these?
24      MR. DUTTON:  Object to the form.
25      THE WITNESS:  I'm not sure.

Page 60

1  BY MR. WILLIAN:
2      Q.  What information were you looking at when
3  you updated these hundreds of work orders in July of
4  2007?
5      A.  I'm not sure.
6      MR. DUTTON:  Object to the form.
7      Amado, you got to wait.
8      THE WITNESS:  Oh, okay.
9  BY MR. WILLIAN:
10      Q.  What was your goal in updating these work
11  orders?
12      MR. DUTTON:  Object to the form.
13      THE WITNESS:  I'm not sure.
14  BY MR. WILLIAN:
15      Q.  Mr. Olivares, weren't you told to go
16  change fails in the work orders and make them into
17  passes, and that's what you were doing in July of
18  2007?
19      A.  I don't remember that.
20      Q.  Let me try to refresh you.  Look at the
21  next box below the one you were looking at.
22      A.  This one here?
23      Q.  No, this one here.
24      A.  Okay.
25      Q.  This indicates that in the 2006 work

Page 61

1  orders that you updated in 2007, that on the monthly
2  report 742 of them were fails.  Do you see that?
3      A.  Yes.
4      Q.  And on the annual report only two of those
5  were left as fails.  Do you see that?
6      A.  Yes.
7      Q.  That indicates that you changed
8  approximately 740 fails to passes.  Do you see that?
9          MR. DUTTON:  Object to the form of the
10  question.  No foundation.
11  BY MR. WILLIAN:
12      Q.  Does that refresh you that your goal was
13  to change fails to passes?
14      A.  No.
15          MR. DUTTON:  Objection; no foundation.
16  BY MR. WILLIAN:
17      Q.  No recollection either way?
18      A.  No.
19      Q.  What criteria did you use in changing
20  fails to passes on the work orders when you looked
21  at them in 2007?  Ask the question again.
22      What criteria did you look at in changing
23  the 2006 work orders from fails to passes?
24          MR. DUTTON:  Objection; no foundation.
25          THE WITNESS:  I'm not sure what I used

Page 62

1  here.
2  BY MR. WILLIAN:
3      Q.  Do you know what methodology you followed
4  to change the fails to passes?
5          MR. DUTTON:  Object to the form.
6          THE WITNESS:  What I used here?
7  BY MR. WILLIAN:
8      Q.  When you changed the 2006 work orders in
9  2007 to fails to passes, what methodology did you
10  follow to change those fails to passes?
11          MR. DUTTON:  Same objection; no
12  foundation.
13          THE WITNESS:  I'm not sure what I used
14  here.
15  BY MR. WILLIAN:
16      Q.  Can you think of anything that would
17  refresh your recollection, that would help you
18  recollect why in July of 2007 you were changing
19  hundreds of fails to passes on 2006 work orders?
20          MR. DUTTON:  Objection; no foundation.
21          THE WITNESS:  I can't think of anything.
22  BY MR. WILLIAN:
23      Q.  Has anyone alerted you to -- recently to
24  this fact that in 2007 you were changing hundreds of
25  2006 work orders?

Page 63

1          MR. DUTTON:  Objection.  Instruct you not
2  to answer.  Calls for privileged communication.
3  BY MR. WILLIAN:
4      Q.  I'm not asking you to answer that
5  question.  Has anyone told you that the data
6  indicates that in 2007 you changed hundreds of 2006
7  work orders?
8          MR. DUTTON:  Amado --
9          THE WITNESS:  I can't answer that.
10  BY MR. WILLIAN:
11      Q.  Why can't you answer that?
12          MR. DUTTON:  Mr. Willian, he's not going
13  to answer that question because it calls for
14  attorney-client privilege communication.  Ask your
15  next question.
16  BY MR. WILLIAN:
17      Q.  Has anyone other than attorneys told you
18  that?
19      A.  No.
20      Q.  Let me ask it this way:  When you came to
21  this deposition were you aware of the fact in 2007
22  you had updated hundreds of 2006 work orders?
23          MR. DUTTON:  Same objection and instruct
24  you not to answer the question.
25          MR. WILLIAN:  Totally improper.

Page 64

1      Q.  Were you aware of that fact?
2          MR. DUTTON:  He's not going to ask the
3  question, Mr. Willian.  Ask your next question.
4  BY MR. WILLIAN:
5      Q.  Are you following your attorney's
6  instructions?
7      A.  Yes, I am.
8      Q.  So you are not going to tell me whether
9  you were aware when you came to this deposition --
10      A.  No.
11      Q.  -- whether you updated hundreds of 2006
12  work orders in 2007?
13          MR. DUTTON:  Mr. Willian, I have
14  instructed him not to answer.
15          MR. WILLIAN:  On what grounds?  Let's make
16  sure, because this will be in front of the court.
17          MR. DUTTON:  It calls for attorney-client
18  privileged communications.
19          MR. WILLIAN:  And you are instructing your
20  witness not to answer.
21      Q.  And you are going to follow the
22  instructions?
23      A.  Yes.
24      Q.  When you came to this deposition are you
25  aware of any other time periods where you went back



AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                           65—68

Page 65

1  to the prior year and updated hundreds of prior work
2  orders?
3      A.  I don't remember.  Not that I remember.
4      Q.  Let me ask you to turn to the next page of
5  this document, exhibit 1.  This is a separate chart
6  to the prior one.  And this indicates that on
7  April 9th of 2010, you updated 163 2009 work orders.
8  Do you see that?
9      A.  Yes.
10     Q.  And on April 11, 2010, you updated 267
11  2009 work orders.  Do you see that?
12     A.  Yes.
13     Q.  And the following day on April 12 of 2010,
14  you updated 73 2009 work orders.  Do you see that?
15     A.  Yes.
16     Q.  Now, why in April of 2010 were you
17  updating hundreds of 2009 work orders, Mr. Olivares?
18         MR. DUTTON:  Objection; no foundation.
19         THE WITNESS:  I don't know.
20  BY MR. WILLIAN:
21     Q.  Wasn't it the case that Michelle Calloway
22  asked you to go back and update 2009 work orders?
23         MR. DUTTON:  Same objections.
24         THE WITNESS:  Don't remember that.
25

Page 66

1  BY MR. WILLIAN:
2      Q.  Isn't that an unusually large number of
3  work orders to update on any given day in April of
4  2010?  163, 267?
5          MR. DUTTON:  Same objections.
6  BY MR. WILLIAN:
7      Q.  Is that an unusually large number to
8  update in one day?
9      A.  I'm not sure.
10     Q.  Based on your practice over the past many
11  years since 2004, that's a lot of work orders to
12  update in one given day, isn't it, Mr. Olivares?
13         MR. DUTTON:  Same objections.
14         THE WITNESS:  I'm not sure.  Sorry.
15         MR. DUTTON:  Same objection.
16  BY MR. WILLIAN:
17     Q.  How many work orders did you typically
18  close in one day, Mr. Olivares, on average?  Ten,
19  twenty?
20     A.  I'm not sure how many.
21     Q.  On average how many work orders did you
22  close on any given day between 2004 and 2010?
23     A.  I would say it varies.
24     Q.  What's the range?
25     A.  I don't have an exact range.  I mean, it

Page 67

1  could be one work order to hundreds.
2      Q.  To hundreds.  So sometimes you would close
3  hundreds of work orders in one day?
4      A.  Yes.
5      Q.  But you don't recall -- and the record
6  will show that, right?  So you think the record will
7  show that some days you closed out hundreds of work
8  orders?
9      A.  Yes.
10     Q.  That's closing them out, not just updating
11  them; is that correct?
12     A.  Correct.
13     Q.  Now, here you are going back and updating
14  prior year work orders.  Does this refresh you now
15  that you had done that in the past?
16     A.  No.
17     Q.  So despite seeing these statistics you
18  have no recollection of having ever gone back and
19  updating prior year work orders?
20     A.  I don't remember this.
21     Q.  Has anybody ever asked you about going
22  back and updating prior year work orders in the 2010
23  time period?
24         MR. DUTTON:  To extent you can answer
25  anybody other than counsel, Mr. Olivares, you can

Page 68

1  answer the question.
2          THE WITNESS:  I don't remember.
3  BY MR. WILLIAN:
4      Q.  Did Jeff George or the accounting folks
5  ever ask you, "hey, Mr. Olivares, did you ever go
6  back in 2010 and update prior year work orders?"
7      A.  Not that I remember.
8      Q.  Can you think of anything that would
9  refresh you why in 2010 you would be updating
10  hundreds of 2009 work orders?
11     A.  I can't think of any right now.
12     Q.  What would we do to try to refresh your
13  recollection, if anything?
14     A.  I'm not sure.
15     Q.  Did anyone ever steal your password and
16  use it to close out hundreds of work orders to your
17  knowledge?
18     A.  Not to my knowledge.
19     Q.  If you go back to the prior page,
20  Mr. Olivares, go back to 2007.  If you go to the
21  second row of columns to July 18 of 2007 the
22  highlighted 126, do you see that?
23     A.  Yes.
24     Q.  On that day you closed out 126 -- I'm
25  sorry -- you updated 126 2006 work orders.  Do you



AMADO OLIVARES                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                69–72

Page 69

1    see that?
2      A.  Yes.
3      Q.  Do you know why you would be closing out
4    126 -- withdrawn.
5          Do you know why you would be updating 126
6    2006 work orders on July 18th of 2007?
7      A.  I don't know why.
8      Q.  On July 20 of 2007 you updated 75 2000
9    (sic) work orders.  Do you see that?
10     A.  Yes.
11     Q.  Do you know why on July you would be
12   updating 75 2006 work orders?
13     A.  No.
14     Q.  Mr. Olivares, weren't you updating these
15   2006 work orders in 2007 to assists in the incentive
16   fee submission that Pinnacle was going to make?
17     A.  I don't remember that.
18     Q.  Do you understand that Pinnacle's
19   incentive fee, in part, is based on the percentage
20   of passes that it receives on work order response
21   time?
22         MR. DUTTON:  Objection to the form.
23         THE WITNESS:  Now I do.
24   BY MR. WILLIAN:
25     Q.  When did you learn that fact?

Page 70

1          MR. DUTTON:  Objection to the form.
2          THE WITNESS:  I'm not sure when.
3    BY MR. WILLIAN:
4      Q.  How far back did you learn that fact?
5      A.  I don't remember when.
6      Q.  One year?  Two years?  Three years?  Four
7    years?
8          MR. DUTTON:  Object to the form of the
9    question.
10   BY MR. WILLIAN:
11     Q.  Help me.
12     A.  I'm not sure.
13     Q.  I apologize if I asked this, Mr. Olivares,
14   but when you updated the 2006 work orders in 2007,
15   did you have the hard copy work order in front of
16   you with the maintenance tech notes for each work
17   order that you updated?
18     A.  When I updated these?
19     Q.  Yeah.
20     A.  I don't remember.
21     Q.  When you updated the 2009 work orders in
22   2010, as reflected on the last page of Olivares
23   exhibit 1, did you have the hard copy of the work
24   order with the maintenance tech notes in front of
25   you when you updated those hundreds of work orders

Page 71

1    in 2010?
2      A.  I don't remember.
3      Q.  Do you know what you referred to, if
4    anything, in updating the 2009 work orders in 2010?
5          MR. DUTTON:  Objection; no foundation.
6          THE WITNESS:  I don't remember what it was
7    or if I even closed these.
8    BY MR. WILLIAN:
9      Q.  Did anyone assist you in 2007 in updating
10   the 2006 work orders?
11     A.  I don't remember.
12     Q.  Did you report to anyone on your progress
13   in 2007 in updating the 2006 work orders?
14     A.  I don't remember this.
15     Q.  Did you report to anyone in 2010 on your
16   progress in updating the 2009 work orders?
17     A.  I don't remember this.
18     Q.  Do you accept responsibility for updating
19   the work orders in 2007?
20         MR. DUTTON:  Object to the form of the
21   question.
22   BY MR. WILLIAN:
23     Q.  Let me ask it again.  Do you accept
24   responsibility for being the person responsible for
25   updating the 2006 work orders in 2007?

Page 72

1          MR. DUTTON:  Object to the form of the
2    question.
3          THE WITNESS:  I don't remember doing this.
4    BY MR. WILLIAN:
5      Q.  Do you accept -- do you accept
6    responsibility for it being done under your name?
7          MR. DUTTON:  Asked and answered.  You can
8    answer it again.
9          THE WITNESS:  Yeah.  I don't remember
10   doing this.  I don't accept or say I didn't do it.
11   I don't remember it.
12   BY MR. WILLIAN:
13     Q.  Do you accept responsibility in 2010 for
14   updating the 2009 work orders where it shows your
15   name is next to the last update?
16     A.  Same thing.  I don't remember doing this.
17     Q.  So you neither accept or reject
18   responsibility because you just don't recall?
19     A.  I don't recall doing this.
20     Q.  Prior to signing your declaration,
21   Mr. Olivares, which you signed on June 27 of 2012,
22   had anyone asked you at that point whether or not
23   you recollected updating 2006 work orders in 2007?
24         MR. DUTTON:  Object to the form of the
25   question.  And, Mr. Olivares, I instruct you not to



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
73–76

Page 73

1   reveal the contents of any communication between you
2   and your attorneys in this case.
3        THE WITNESS:  I don't remember if they
4   did.
5   BY MR. WILLIAN:
6        Q.   Let me be clear.  Okay?  You signed this
7   declaration on June 27 of 2012.
8        A.   Right.
9        Q.   Prior to that time, did your attorneys ask
10  you if you recollected updating 2006 work orders in
11  2007?
12       MR. DUTTON:  Object and instruct you not
13  to answer.  Directly calls for attorney-client
14  communications.
15  BY MR. WILLIAN:
16       Q.   Can you answer that question for me,
17  Mr. Olivares?
18       MR. DUTTON:  He's not going to answer the
19  question, Mr. Willian.
20  BY MR. WILLIAN:
21       Q.   Are you -- are you capable of answering
22  that question for me, but you refuse to because your
23  attorney is telling you not to?
24       MR. DUTTON:  I instruct you not to answer
25  the question.

Page 74

1   BY MR. WILLIAN:
2        Q.   It's different.  Are you capable of
3   answering that question?
4        MR. DUTTON:  Same instruction.  Instruct
5   you not to answer.  It's an improper question and
6   you know it.
7        MR. WILLIAN:  Not when you submit false
8   evidence to a court.
9        MR. DUTTON:  I move to strike.  Ask the
10  next question.
11  BY MR. WILLIAN:
12       Q.   Prior to June 27, 2012, when you signed
13  this declaration, Mr. Olivares, had anybody asked
14  you if you had updated 2006 work orders in 2007?
15       MR. DUTTON:  Same objection.
16  Mr. Olivares, to the extent that you can answer the
17  question without revealing communications between
18  yourself and attorneys, you can do so.
19       THE WITNESS:  I don't remember.
20  BY MR. WILLIAN:
21       Q.   You don't remember either way?
22       A.   I don't remember being asked.
23       Q.   When were you first asked if you
24  recollected updating 2006 work orders in 2007?  I
25  just want to know when.

Page 75

1        MR. DUTTON:  Objection.  Instruct you not
2   to answer to the extent that it calls for
3   attorney-client communications.
4        MR. WILLIAN:  Tom, it's totally improper.
5   I just want to know when.  I don't know what the
6   communication was.
7        Q.   When?
8        A.   I don't know when.  I don't remember when.
9        Q.   Relative to today's deposition on July 11
10  and when you signed this June 27, 2012 declaration,
11  when were you asked that question?
12       MR. DUTTON:  I'm going to object.  You
13  cannot ask him what attorneys said to him.  All
14  right?  It's an improper area.  So you are asking
15  him when attorneys asked that question.  And to the
16  extent you can answer the question, Amado, without
17  revealing attorney-client communications, you may do
18  so.
19  BY MR. WILLIAN:
20       Q.   I'm not asking who asked it of you.  I'm
21  asking when were you asked that question?
22       A.   I really don't think I was ever asked that
23  question.
24       Q.   So no one's ever asked you, despite all
25  these objections, whether or not in 2007 you updated

Page 76

1   2006 work orders?
2        A.   As far as I can remember, nobody asked me
3   if I did this.
4        Q.   Has anybody ever asked you whether you
5   updated -- putting aside the year, updated work
6   orders from the prior year?
7        MR. DUTTON:  Objection.  To the extent
8   that you can answer the question without divulging
9   communications with your attorneys, you can do so.
10       THE WITNESS:  Yeah.  I don't think anybody
11  asked me if I had done that.
12       MR. WILLIAN:  So during the break will you
13  find his prior testimony where he said he was asked
14  that question and alert me to it.  I'll review it
15  with you during the break.
16       Q.   Mr. Olivares, let's go through some of the
17  2006 work orders that you updated in 2007.  I'm
18  going to be showing you a packet of information
19  regarding each updated work orders.  This is
20  Olivares exhibit 2.
21       (Exhibit 002 was marked for
22       identification.)
23  BY MR. WILLIAN:
24       Q.   So the first page of Olivares exhibit 2 is
25  a hard copy of the work order.  Do you recognize



AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                            77—80

Page 77

1   that in general?
2       A.  I don't recognize this specific work
3   order.
4       Q.  But in general do you recognize this is a
5   hard copy of a work order?
6       A.  Yes.
7       Q.  This is the type of hard copy work orders
8   you have worked with every day since 2004, correct?
9       A.  Yes.
10      Q.  You see this happens to be the hard copy
11  of the work order that has the handwriting of a tech
12  on it.  You see -- how do you pronounce that?
13  Jorges?
14      A.  George.
15      Q.  George, I'm sorry.  George's handwriting.
16  Do you see that?
17      A.  Yes.
18      Q.  And you recognize George's handwriting
19  because you have seen it for many years, correct?
20      A.  Yes.
21      Q.  And here he indicates that he started this
22  work order on July 7th and finished -- at 10:15 and
23  finished the work on July 7th at 11:10.  Do you see
24  that?
25      A.  Yes.

Page 78

1       Q.  And the work that he did was touch up
2   paint in the master bathroom.  Do you see that?
3       A.  Yes.
4       Q.  If you go to the lower right-hand corner
5   you see the call time for this work order is 7/3 of
6   2006.  Do you see that?
7       A.  Yes.
8       Q.  And this is a routine work order
9   obviously, correct?
10      A.  Yes.
11      Q.  And based on the call time and the time
12  that George showed up to start the work on July 7th,
13  that's a fail, right, because that's more than 72
14  hours, correct?
15      A.  That's what it shows.
16      Q.  And if you turn to the next page, you'll
17  see this is a page taken out of the monthly
18  pass/fail report at the time.
19      A.  Uh-huh.
20      Q.  And this monthly report correctly shows
21  that that work order, indeed, registered as a fail
22  because the hours from call to start were 95.58
23  hours.  Do you see that?
24      A.  Yes.
25      Q.  And that's accurate based on the tech

Page 79

1   notes, correct?
2       A.  Based on those notes, yes.
3       Q.  If you turn to the next page, you'll see
4   this is a copy of a page taken out of the annual
5   work order submission made by Pinnacle to Clark and
6   the Army.  And you'll see that that same work order
7   now is shown as a pass.  Do you see that?
8       A.  I see that.
9       Q.  And you will see that the hours from call
10  to start are now reading 23 hours and 58 minutes.
11  Do you see that?
12      A.  Yes.
13      Q.  And we agreed, there's nothing in the tech
14  notes that would support those 23 hours and 58
15  minutes, correct?
16      A.  Yes.
17      Q.  If you turn to the next page, you will see
18  that this is backup to the annual submission.  And
19  you'll see this now indicates that the start date
20  for that work order was July 4th of 2006, not
21  July 7th of 2006.  Do you see that?
22      A.  Yes.
23      Q.  And the start time then was -- you see the
24  start time 7/9.  Do you see that?
25      A.  Uh-huh.

Page 80

1       Q.  What does that represent?
2       A.  Not sure.
3       Q.  Okay.  Now, if we turn to the next page,
4   these are snapshots out of Yardi.  And if we go to
5   the sort of lower right-hand corner, you'll see
6   "updated by."  Do you see that?
7       A.  Yes.
8       Q.  This indicates that A. Olivares -- that is
9   you, correct?
10      A.  Yes.
11      Q.  -- on July 20 of 2007, was the last person
12  to update this work order.  Do you see that?
13      A.  Yes.
14      Q.  And you'll see that the in-progress time
15  is now reading July 4th of 2006 at 7:09 a.m.  Do you
16  see that?
17      A.  Yes.
18      Q.  And so isn't it the case, Mr. Olivares,
19  what you did here with this work order is that on
20  July 20 of 2007 you took this work order from July
21  of 2006, a year earlier, and you updated by changing
22  the in-progress time to make it from a fail to a
23  pass.  That's what is reflected here, correct?
24      MR. DUTTON:  Object to the form.
25      THE WITNESS:  I'm not sure if that's what

Page 81

1  was done.
2  BY MR. WILLIAN:
3      Q.  Well, it was changed on July 20, 2007,
4  from a fail to a pass, correct?
5      A.  I'm not sure if it passed.  But, I mean,
6  it was changed.  The times are different here.
7      Q.  And the in-progress time of July 4th of
8  2006 at 7:09 a.m., do you see that?
9      A.  Yes.
10     Q.  And you understand that Yardi, if there's
11  no actual labor time, will pull that as the start
12  time, the actual start time, for purposes of
13  calculating the pass/fail, correct?
14     A.  I'm not sure if it pulls it off of the
15  actual or scheduled time.
16     Q.  If you turn to the second page,
17  Mr. Olivares -- and you have substantial familiarity
18  with the Yardi, correct?
19     A.  Yes.
20     Q.  Turn to the last page of this exhibit.
21     A.  Oh, the last page.
22     Q.  This is the labor tab.  And you'll see
23  that there's no actual labor time entered in there.
24  Do you see that?
25     A.  Yes.

Page 82

1      Q.  Do you understand that in calculating the
2  pass/fail, if there's no actual labor time, Yardi
3  defaults to the in-progress time as reflected on the
4  prior page of this exhibit?
5      A.  I'm not sure if it reads it from the
6  scheduled time or the in-progress.
7      Q.  Can you see anything, Mr. Olivares, that
8  would justify putting for the in-progress time --
9  I'll ask the question again.
10         I'll ask you to turn to the second page of
11  this exhibit.  Second to last page, I'm sorry.  Now
12  looking at the second to last page of the Olivares
13  exhibit 2, you'll see the in-progress time is
14  July 4th of 2006.  Do you see that?
15     A.  Yes.
16     Q.  What does the in-progress time represent
17  to you, Mr. Olivares?
18         MR. DUTTON:  At that time?
19  BY MR. WILLIAN:
20     Q.  At that time.
21     A.  At that time I don't remember what exactly
22  it stood.
23     Q.  In general what does the in-progress time
24  represent, Mr. Olivares?
25     A.  The work is in-progress.

Page 83

1      Q.  Did the in-progress time represent back in
2  2007 that that was also the time that the work was
3  started?
4      A.  I'm not sure what it was.
5      Q.  Now, can you find any information from the
6  tech notes, in other words, page 1 of exhibit 2,
7  that indicates that the in-progress time should have
8  been July 4th of 2006 as opposed to when the work
9  was started on July 7, 2006?
10     A.  I can see all the notes weren't put in.
11     Q.  Pardon me?
12     A.  All the notes aren't on here.
13     Q.  Let's focus on my question.
14     A.  No, I know, but it's not complete.
15     Q.  Correct.  Let's focus on my question.
16  Okay?  With respect to the first page, you see the
17  tech notes from George.  Do you see that?
18     A.  Yes.
19     Q.  There's no indication that George started
20  the work or anyone from Pinnacle started the work on
21  July 4th of 2006, which is the time you have down
22  for the in-progress time, correct?
23     A.  Yeah, it's a different time.
24     Q.  Do you know why the time is different?
25     A.  I do not.

Page 84

1      Q.  Now, Mr. Olivares, doesn't this refresh
2  you that you were changing in-progress times to
3  change fails from passes?
4      A.  No.
5      Q.  You have no recollection either way?
6      A.  No.
7      Q.  Wouldn't you agree, Mr. Olivares, that
8  this example I've shown you should be a fail, not a
9  pass, because the work wasn't started until July 7th
10  of 2006, and the call-in date for the work was
11  July 3rd of 2006?
12         MR. DUTTON:  Object to the form.
13         THE WITNESS:  If there's no other
14  paperwork or if the tech didn't say different.
15  BY MR. WILLIAN:
16     Q.  Based on the information I've shown you,
17  you believe this should be a fail; is that correct?
18         MR. DUTTON:  Object to the form.
19         THE WITNESS:  If there's nothing else.  If
20  there's no other work order or the tech doesn't say
21  something different.
22  BY MR. WILLIAN:
23     Q.  You don't recall consulting with George a
24  year later about the time that he started this
25  particular work order, do you?



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 23 of 72

AMADO OLIVARES                                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                                      85—88

Page 85

1     A.  I don't recall entering these notes.
2     Q.  You don't recall entering these notes?
3     A.  No.
4     Q.  And so just so I'm clear, assuming there's
5  no contrary information out there, and we're not
6  aware of any or I would show it to you, you believe
7  that the work order in exhibit 2 should be a fail,
8  not a pass, correct?
9     A.  If there's nothing else.
10    Q.  The answer is yes?
11    A.  If there's nothing else.
12       MR. DUTTON:  Objection; asked and
13  answered.
14  BY MR. WILLIAN:
15    Q.  I need a complete answer.  If there's
16  nothing else, the answer is yes?
17    A.  If the tech doesn't say something
18  different or there's not any other paperwork.
19    Q.  Then this should be a fail, not a pass,
20  correct?
21    A.  If there's nothing else.
22    Q.  That's one.  I have many examples.  So I'm
23  going to keep going through these with you to see if
24  you can help me why you were doing this,
25  Mr. Olivares.  If something comes to mind, let me

Page 86

1  know.
2       MR. DUTTON:  Move to strike.  Just ask a
3  question.
4       (Exhibit 003 was marked for
5       identification.)
6  BY MR. WILLIAN:
7     Q.  I'm going to hand you Olivares exhibit
8  number 3.  Olivares exhibit number 3 is going to
9  follow the same format.  You'll see that George
10  wrote that he started this work on July 7th at
11  11:15, and he completed the work the same day at
12  11:35.  You'll see that the call-in date was
13  July 3rd of 2006.  And that should be a fail based
14  on the tech notes and when the call was made,
15  correct, Mr. Olivares?
16    A.  If there was nothing else, no other
17  paperwork.
18    Q.  What paperwork would there be,
19  Mr. Olivares?
20    A.  Other work orders or, like I said, the
21  technician saying different.
22    Q.  So you think the technician may say "I
23  wrote July 7th, but I really didn't mean it"?
24    A.  No.  I mean, they could say I went to the
25  house and I assessed the situation, but I didn't

Page 87

1  write my notes.  And I went back and finished the
2  job on the 7th.
3     Q.  If a tech goes to the house to assess the
4  situation and didn't do the work and goes back
5  later, he's supposed to write that down.
6     A.  He's supposed to, yes.
7     Q.  Now, again, you see from the lower
8  right-hand corner, Mr. Olivares, you are updating a
9  2006 work order a year later in 2007, correct?
10    A.  On which page?
11    Q.  The first page, lower right-hand corner.
12    A.  It shows 2006.
13    Q.  All right.  Good point.  If you go to
14  second to last page, Mr. Olivares, you'll see there
15  you are updating the work order on July 20, 2007,
16  more than a year later after this work order was
17  completed, correct?
18    A.  That's what it shows here.
19    Q.  Do you know why you were doing that?
20    A.  I do not.
21    Q.  If you go to the second page of exhibit 3,
22  you'll see this work order according to the monthly
23  work order analysis was registered as a fail because
24  it took 92 plus hours from call to start.  Do you
25  see that?

Page 88

1     A.  I see that.
2     Q.  And based on the tech notes, it appears to
3  be properly registered as a fail, correct?
4     A.  To those times, yes.
5     Q.  If you turn to the next page, which is a
6  screenshot from the annual incentive fee submission
7  by Pinnacle, you see that the call to start is now
8  less than an hour.  It's .68.  Do you see that?
9     A.  Yes.
10    Q.  So someone changed the call to start so
11  that they responded on the same day that this work
12  order to fix a screen door was called in, correct?
13    A.  That's what it shows here.
14    Q.  And we can agree that there's nothing in
15  the tech notes that indicates that someone actually
16  responded to this routine work order to fix a screen
17  door on the same day?
18    A.  Not on this copy.
19    Q.  And if you go to the second to last page,
20  Mr. Olivares, you'll see that someone has put in the
21  in-progress time to be July 3rd, the same day the
22  work order was called in, at 11:01 a.m.  Do you see
23  that?
24    A.  I see that.
25    Q.  And do you understand that the difference



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 24 of 72

AMADO OLIVARES                                      July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                  89—92

Page 89

1 between the scheduled time on that page of July 3rd,
2 2006 at 10:37 a.m., and the in-progress time, which
3 is, again, the same day 7/3/2006 at 11:01 a.m., that
4 the difference between those is what is used in this
5 case to calculate the pass/fail.  Do you understand
6 that?
7     A.  I'm not sure what was -- how it was
8 reading at this time.
9     Q.  Well, just to help you here, if you go
10 back to the annual submission that shows the hours
11 from call to start to be .68, do you see that?
12     A.  I see that.
13     Q.  You understand that's the difference
14 between the scheduled time of 10:37 and the
15 in-progress time of the same day of 11:01 a.m.?
16     A.  I see that.
17     Q.  So now you understand that Yardi was
18 calculating the past/fail from the difference
19 between the scheduled time and the in-progress time,
20 right?
21     A.  I see that here.
22     Q.  And that's something that you likely knew
23 when you were updating this work order a year later,
24 2007, true?
25         MR. DUTTON:  Objection to form.

Page 90

1         THE WITNESS:  Not sure.
2 BY MR. WILLIAN:
3     Q.  Just don't know either way?
4     A.  (Witness shakes head.)
5     Q.  Now, based on the information I've
6 provided to you here in exhibit 3, wouldn't you
7 agree that this work order should have been a fail,
8 not a pass?
9         MR. DUTTON:  Objection to the form.
10        THE WITNESS:  The same thing.  If there
11 was nothing else and the technician didn't say
12 anything different.
13 BY MR. WILLIAN:
14     Q.  So my question to you is:  Based on the
15 information I've provided to you here today you
16 believe this work order should be a fail, not a
17 pass, right?
18     A.  If there was nothing else.
19     Q.  I'm not aware of anything else.  Are you?
20     A.  I'm not aware that this is the only thing
21 either.
22     Q.  Assuming there's nothing else, this should
23 be a fail, correct?
24     A.  If there's nothing else.
25     Q.  Can you just answer my question?

Page 91

1         MR. DUTTON:  Objection.  He's answered
2 your question.
3 BY MR. WILLIAN:
4     Q.  You agree this should be a fail if there's
5 nothing else?  Yes?
6     A.  If there's nothing else.
7     Q.  Is that a yes?
8     A.  If there's nothing else.
9     Q.  Why won't you say yes?  Why do you have
10 trouble with that word?
11        MR. DUTTON:  Objection.  Move to strike.
12 BY MR. WILLIAN:
13     Q.  Can you say yes?
14        MR. DUTTON:  Ask him a question.
15 BY MR. WILLIAN:
16     Q.  I'm asking him to say yes.
17     A.  I am -- I'm answering the question.  If
18 there's nothing else.
19     Q.  Then yes?
20     A.  If there's nothing else.
21     Q.  You won't say the word "yes"?
22     A.  No.
23     Q.  How come you won't say the word "yes"?
24     A.  Because that's my answer.
25     Q.  You don't think it's a yes answer?

Page 92

1     A.  No.
2     Q.  You understand you are under oath to tell
3 the truth?
4     A.  I do.
5     Q.  And it's not a yes answer because why?
6     A.  Because there might be something else with
7 this.
8     Q.  Why don't you say, "yes, unless there's
9 something else"?  Are you willing to say that?
10     A.  No.
11     Q.  Are you aware of any other information,
12 Mr. Olivares, that would suggest that the work order
13 in exhibit 3 should be a pass instead of fail?
14     A.  I'm not aware, no.
15     Q.  Have we refreshed you yet on the fact that
16 in 2007 you were updating 2006 work orders and
17 changing them from fails to passes?
18     A.  That's what this shows.
19     Q.  Have we refreshed you on the fact that you
20 did that?
21     A.  I don't remember doing that.
22     Q.  Let's keep trying to refresh you.
23     A.  Okay.
24        (Exhibit 004 was marked for
25        identification.)



AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      93—96

Page 93

1  BY MR. WILLIAN:
2      Q.  Handing to you Olivares exhibit 4.
3  Olivares exhibit 4 is a hard copy of a work order on
4  the first page with the same series of documents we
5  looked at before.  In this case there are
6  handwritten tech notes.  That's from an F -- who is
7  that?  Martin?
8      A.  Frank Martin.
9      Q.  And that's his handwriting, correct?  You
10 have seen it over the years?
11     A.  It's his name.
12     Q.  Do you believe that's his handwriting?
13     A.  Yeah.
14     Q.  And Mr. Martin, was he a tech who worked
15 for you?
16     A.  When I was in Lower Stilwell, yes.
17     Q.  So at the time that you updated this work
18 order, Mr. Martin didn't work for you, did he?
19     A.  It's in the 2006 when he worked for me,
20 when I worked in Lower Stilwell.
21     Q.  So if we go to --
22     A.  That's right, the times.
23     Q.  When you updated this work order on
24 July 18th of 2007, Mr. Martin did not work for you,
25 correct?

Page 94

1      A.  Not in -- I mean, like I said, I don't
2  know the exact time when I came back and forth.  We
3  have to look at that.
4      Q.  Mr. Martin work for you in May of 2006?
5      A.  I'm not sure, but I know I was in Fort Ord
6  during that time.  So I'm not sure the exact time.
7      Q.  Mr. Martin writes in here he started the
8  work on this work order on May 24th of 2006.  He
9  started that work at 8:00 o'clock, and he finished
10 that work the same day at 10:00 o'clock.  Do you see
11 that?
12     A.  Yes.
13     Q.  And if you compare that to the call time
14 of May 19th, 2006, that would be a fail, correct?
15     A.  Well, something is wrong here.
16     Q.  Why is that?
17     A.  Because you can see the time from call to
18 start, 94.
19     Q.  What page are you looking at?
20     A.  Second page.
21     Q.  Let's focus on the first page.  Okay?  So
22 on the first page you see the call time May 19th of
23 2006.  Do you see that?
24     A.  Yes.
25     Q.  And if you go below that you see the

Page 95

1  in-progress time of May 23rd, 2006.  Do you see
2  that?
3      A.  Yes.
4      Q.  In-progress represents what in that case,
5  Mr. Olivares?
6      A.  That the work is -- they are working on
7  it.
8      Q.  But according to Mr. Martin's notes, he
9  didn't start until the next day.  But either way,
10 it's a fail whether he started on May 23rd or May
11 24th, correct?
12     A.  That's what this shows right here.
13     Q.  If you go to the next page, this is a
14 monthly snapshot of the work orders back in 2006.
15 Shows that this work order, indeed, was a fail
16 because the hours from call to start were 94.02
17 hours; is that correct?
18     A.  It doesn't make sense here.
19     Q.  Why doesn't it make sense?
20     A.  Because it was completed in less time in
21 49.
22     Q.  What are you looking at?
23     A.  Right there next to the 94.
24     Q.  Okay.  However, the call to start time you
25 understand that's the time that's being used to

Page 96

1  measure the pass/fail.  Do you understand that?
2      A.  Yeah.  But it just -- it's less time, you
3  know, to complete the work order.
4      Q.  If you look at Mr. Martin's notes, do you
5  see that?
6      A.  I see that.
7      Q.  He started that more than 72 hours after
8  the call in, correct?
9      A.  That's what his notes show.
10     Q.  And based on the -- I already asked you
11 that.
12         If you go to the annual submission, the
13 next page, you'll see the hours from call to start
14 was reduced from several days to the work being done
15 on the same day in .3 hours.  Do you see that?
16     A.  Yeah.
17     Q.  And if you go to the second to last page,
18 you'll see, again, that you were the last person to
19 update this work order on July 18th, 2007, more than
20 a year later, correct?
21     A.  Yes.
22     Q.  And isn't it the case that what you did,
23 Mr. Olivares, based on the documentation we're
24 looking at is you changed the in-progress time so
25 that the work appeared to start on the same day the



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 26 of 72

AMADO OLIVARES                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                 97–100

Page 97

1 call came in on May 19th of 2006?
2    A. I don't remember doing that.
3    Q. That's what this document seems to
4 indicate, correct?
5        MR. DUTTON: Objection to the form.
6        THE WITNESS: Correct.
7 BY MR. WILLIAN:
8    Q. And, in fact, the way that this change was
9 made it indicates that the response was in 18
10 minutes since the call came in. That's remarkably
11 fast for a routine work order?
12       MR. DUTTON: Same objection.
13       THE WITNESS: No. Sometimes we get there
14 right away.
15 BY MR. WILLIAN:
16    Q. Now the work -- withdraw that.
17       Now, isn't it the case, Mr. Olivares, that
18 based on the information I've shown you here, I'm
19 not aware of any other information to the contrary,
20 that this work order in exhibit 4 should have been a
21 fail?
22    A. If there's nothing else. I mean, we have
23 to check with the tech to see if there's anything
24 else.
25    Q. And if there's nothing else, and I'm not

Page 98

1 aware of anything else, you would agree based on
2 tech notes on page 1 that this work order should
3 have been a fail, correct?
4    A. Yes.
5        MR. DUTTON: Object to form.
6 BY MR. WILLIAN:
7    Q. And does that refresh you why you were
8 changing passes to fails in 2007 in looking at 2006
9 work orders?
10    A. No.
11    Q. You agree you were, though, correct?
12       MR. DUTTON: Objection to the form.
13       THE WITNESS: That's what it shows.
14 BY MR. WILLIAN:
15    Q. But you still have no recollection?
16    A. No.
17       (Exhibit 005 was marked for
18       identification.)
19 BY MR. WILLIAN:
20    Q. I'm handing you to you Olivares exhibit 5.
21 Olivares exhibit 5, again, follows the same format
22 as the prior work order. You'll see on the first
23 page there's handwritten notes indicating that Josh
24 Merrill started this work order on May 23rd at 8:44
25 and finished the same day at 9:03. And the work

Page 99

1 order was to adjust the socket contacts. Do you see
2 that?
3    A. Yeah.
4    Q. In May of 2006, did Josh Merrill work for
5 you?
6    A. I don't remember.
7    Q. Now, based on the tech notes, this work
8 order should have been a fail, correct?
9        MR. DUTTON: Object to the form.
10       THE WITNESS: With these notes, yes.
11 BY MR. WILLIAN:
12    Q. If you go to the second page, you will see
13 that, indeed, the monthly work order report for that
14 time period of May of 2006 indicated this work order
15 was a fail because the call to start time was 111
16 hours and 37. Not 37 minutes, but .37 hours. Do
17 you see that?
18    A. Yes. On the same thing, something is
19 reading wrong on the report.
20    Q. As far as hours from start to complete;
21 that's your point?
22    A. Yeah. So, I mean, who knows if the rest
23 is right too.
24    Q. Well, the hours from start complete, now
25 that is an indication of the time it took to do the

Page 100

1 work, isn't it, Mr. Olivares?
2    A. No.
3    Q. What is it then?
4    A. The work order is completed.
5    Q. The hours from start to complete, is that
6 how a pass/fail is be measured? No, right?
7    A. No.
8    Q. Now, if you go to the annual submission,
9 you will see that this work order is now a pass
10 because the time from call to start actually is only
11 .52 hours. Do you see that?
12    A. Yes.
13    Q. So according to the annual submission, the
14 work was started on the same day, but that's not
15 what Mr. Merrill's notes indicate, correct?
16    A. That's not what it shows.
17    Q. Then if you go to second to last page,
18 you'll see that again, Mr. Olivares, you were the
19 last person to update this work order on July 18th
20 of 2007, more than one year after the work was
21 complete, correct?
22    A. That's what it shows.
23    Q. What you did, again, here, Mr. Olivares,
24 is you went into the in-progress box and you changed
25 that so that the -- it would reflect the work



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

Page 101

1  started on May 18th, 2006, rather than what
2  Mr. Merrill's notes indicate, which were May 23rd,
3  2006, correct?
4      A.  That's what it shows.  I don't remember
5  doing that.
6      Q.  And the time that you have indicates that
7  the work started on may 18th at 4:19 p.m. and --
8  withdrawn.
9          (Discussion held off the record.)
10  BY MR. WILLIAN:
11      Q.  Mr. Olivares, looking at exhibit 5, do you
12  agree that based on the information I've provided to
13  you, and I'm not aware of any other information, and
14  based on the technician notes that this work order
15  should have been a fail, but based on changes you
16  made, it came out as a pass in the annual report?
17      A.  No.  Right here if you look at the last
18  page, it shows a work order was issued to somebody
19  else.  So we got to find their paperwork.
20      Q.  If you look at the -- all right.  Let's
21  take a break while I deal with something else.
22      VIDEO OPERATOR:  This marks the end of
23  disk number 1.  We are going off the record at
24  11:01 a.m.
25          (Recess taken.)

Page 102

1      VIDEO OPERATOR:  This marks the beginning
2  of disk number 2.  We're going back on the record at
3  11:12 a.m.
4  BY MR. WILLIAN:
5      Q.  We were looking at Olivares exhibit 5.
6  And you agree, Mr. Olivares, that based on the
7  handwritten tech notes by Josh Merrill that this
8  work order should have been a fail, not a pass?
9      MR. DUTTON:  Object to the form.  No
10  foundation.
11      THE WITNESS:  On this one right here, if
12  you look at the last page, it shows that it was
13  issued to somebody else.  So that means this
14  technician went over there.  So, you know, it
15  doesn't mean it failed.
16  BY MR. WILLIAN:
17      Q.  Mr. Olivares, those notes doesn't mean
18  that Mr. Dunn went over there, does it?
19      MR. DUTTON:  Objection; asked and
20  answered.
21  BY MR. WILLIAN:
22      Q.  That's not what those notes reflect?
23      A.  It shows it was issued to another
24  technician.
25      Q.  But doesn't mean that technician went over

Page 103

1  there, does it?
2      A.  Doesn't mean he didn't.
3      Q.  Okay.  And then let's go ahead and compare
4  the start time that was scheduled for Mr. Dunn of
5  May 21st.  Do you see that?
6      A.  Yeah.
7      Q.  That certainly doesn't explain why you
8  entered the start time in the in-progress field on
9  the prior page of May 18th, does it?
10      A.  It doesn't explain that, no.
11      Q.  By entering the May 18th, 2006 into the
12  in-progress field, which you did, that made this
13  into a pass, true?
14      MR. DUTTON:  Object to the form.
15      THE WITNESS:  If you look at the last
16  page --
17  BY MR. WILLIAN:
18      Q.  Yes.
19      A.  His schedule time was to finish at 5/21 --
20  I mean, on 5/21 at 11:00.  That's what the completed
21  date shows right here, 5/21 at 11:00.
22      Q.  I'm not focused on completed,
23  Mr. Olivares.  I'm talking about call to start.
24  That's what we're focused on for pass/fail.  Do you
25  understand that?

Page 104

1      MR. DUTTON:  Object to the form of the
2  question.
3      THE WITNESS:  I understand that.  But I'm
4  saying something is completely wrong here.  I mean,
5  it's way off, all the numbers are on every page.
6  BY MR. WILLIAN:
7      Q.  You are the person to last update this,
8  correct?
9      A.  Right.
10      Q.  And let's focus on what is important for a
11  pass/fail, Mr. Olivares.  Okay?  What is important
12  is the call to start time, correct?
13      MR. DUTTON:  Object to the form of the
14  question.
15  BY MR. WILLIAN:
16      Q.  Correct?
17      A.  For a pass, yes.
18      Q.  Yes.  And if you look at the tech notes
19  that we have, and I'm not aware of any others, the
20  start time was May 23rd, correct?
21      A.  That's what -- for Josh Merrill, yes.
22      Q.  And what you did is you put in a start
23  time in the in-progress field of May 18th, correct?
24      MR. DUTTON:  Object to the form of the
25  question.

AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
105–108

Page 105

1        THE WITNESS:  I don't remember putting
2   that in.
3   BY MR. WILLIAN:
4      Q.   These documents indicate you did, correct?
5        MR. DUTTON:  Object to the form of the
6   question.
7   BY MR. WILLIAN:
8      Q.   Whether you recollect it or not.
9      A.   It shows that's what happened, but, I
10  mean, it also shows over here that there should be
11  more paperwork.
12     Q.   Based on the documents I've given you,
13  including the handwritten notes of Mr. Merrill when
14  he started the work on May 23rd, this work order in
15  exhibit 5 should have been a fail, correct,
16  Mr. Olivares?
17       MR. DUTTON:  Object to the form of the
18  question.  Asked and answered.
19       THE WITNESS:  I don't agree with that
20  because of everything that is here.
21  BY MR. WILLIAN:
22     Q.   So you think it should be a pass?
23     A.   Yes.
24     Q.   Tell me why you think it should be a pass
25  despite the tech notes, Mr. Olivares.

Page 106

1      A.   Because there's paperwork missing right
2   here.
3      Q.   Can you explain why you would have put the
4   start time as May 18th when there's nothing that
5   indicates the start time should be May 18th?
6        MR. DUTTON:  Objection; no foundation.
7   BY MR. WILLIAN:
8      Q.   Can you explain that?
9        MR. DUTTON:  Objection; no foundation.
10       THE WITNESS:  I don't remember doing that.
11  BY MR. WILLIAN:
12     Q.   Can you explain it in any way why you put
13  May 18th as the start time when there's no
14  documentation to support that?
15       MR. DUTTON:  Objection; no foundation.
16       THE WITNESS:  I can't.
17  BY MR. WILLIAN:
18     Q.   Are you refreshed yet that in 2007 you
19  were updating 2006 work orders?
20     A.   I don't remember doing it.
21     Q.   You agree you were doing it, correct?
22     A.   That's --
23       MR. DUTTON:  Object to the form of the
24  question.
25  BY MR. WILLIAN:

Page 107

1      Q.   Go ahead.
2      A.   That's what -- I mean, my sign-in is
3   there, but I don't remember doing that.
4        (Exhibit 006 was marked for
5        identification.)
6   BY MR. WILLIAN:
7      Q.   Handing to you Olivares deposition exhibit
8   6.  This exhibit follows the same format as the
9   others.  You see this is a routine work order
10  started by Josh Merrill on May 16th at 3:23 p.m. and
11  finished on 3:00 -- on the same day at 3:35 the same
12  day and it relates to adjusting water valve.  Do you
13  see that?
14     A.   I see that.
15     Q.   And that's a fail, correct, according to
16  the tech notes, Mr. Olivares?
17     A.   That's what it shows.
18     Q.   And on the monthly work order analysis,
19  indeed, that registers as a fail because it took 114
20  hours from call to start, correct?
21     A.   That's what it shows.
22     Q.   If you go to the annual submission, you
23  will see that the hours from call to start have been
24  changed such that call to start time was ten hours
25  instead of 114, correct?

Page 108

1      A.   That's what it shows.
2      Q.   And if we skip to the second to last page
3   you'll see, again, Mr. Olivares, that you were the
4   last person to update this work order more than a
5   year later after it was completed, correct?
6      A.   That's what it shows.
7      Q.   What you did here, according to the
8   documentation, is you input a new start time in the
9   in-progress field of May 12, 2006, with a time of
10  8:00 a.m., correct?
11     A.   I don't remember doing that.  That's what
12  it shows here.
13     Q.   And would you agree with me, based on the
14  information that I have given to you here, including
15  the handwritten tech notes, that this work order
16  which was reflected as a pass in Pinnacle's annual
17  submission should have been a fail?
18       MR. DUTTON:  Object to the form of the
19  question.
20       THE WITNESS:  On this one, the sprinklers
21  are leaking.  This as soon as the day would have
22  came in, this is something we send directly to the
23  contractor, because we don't take care of
24  landscaping issues.  So this probably got taken care
25  of that day.



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
109–112

Page 109

1  BY MR. WILLIAN:
2      Q.  Can you point to any information that
3  indicates that it got taken care of that day?
4          MR. DUTTON:  Other than what he just
5  pointed to?
6  BY MR. WILLIAN:
7      Q.  Yeah.
8      A.  As soon as it comes in, the work order, we
9  call the landscaper.  We don't print out the work
10  order for them.  We just tell them 402 Boona, corner
11  of the yard, there's a sprinkler leaking.
12      Q.  Mr. Olivares, who did the work to fix this
13  sprinkler?
14      A.  I don't know.  I mean, adjusted water
15  valve doesn't mean that was a repair.
16      Q.  Says Josh Merrill did the work, didn't he?
17      A.  He adjusted the water valve.  Doesn't say
18  anything about repairing the leak.
19      Q.  Well, adjusting the water valve could
20  repair the leak, right?
21      A.  I doubt it.
22      Q.  You don't know either way, do you?
23      A.  No.
24      Q.  Are you aware of anything -- any
25  handwritten information that would indicate that

Page 110

1  Pinnacle actually started the work on May 12 of 2006
2  at 8:00 a.m. as you indicated when you updated a
3  year later?
4          MR. DUTTON:  Other than what he just
5  testified to?
6          THE WITNESS:  We would have called the
7  contractor, like I said.
8  BY MR. WILLIAN:
9      Q.  Did you check to see if you called the
10  contractor when you inputted this new start time a
11  year later?
12      A.  I don't remember.
13      Q.  You just made up the time, didn't you,
14  Mr. Olivares?  You didn't check.
15          MR. DUTTON:  Object; argumentative.
16          THE WITNESS:  I don't remember doing that.
17  BY MR. WILLIAN:
18      Q.  Is there anything on the hard copy of the
19  work order that indicated that you called the
20  contractor right away?
21      A.  There's nothing on there, no.
22      Q.  Based on the information I've given you
23  here, Mr. Olivares, shouldn't exhibit 6 have been a
24  fail rather than a pass?
25          MR. DUTTON:  Objection; asked and

Page 111

1  answered.
2          THE WITNESS:  I don't agree with that.
3  BY MR. WILLIAN:
4      Q.  You don't agree with it because of why?
5      A.  Because this is a work order for a
6  contractor.
7      Q.  Where does it say work order for
8  contractor on here?  Point it out for me.
9      A.  All the grounds go to the landscaper.
10      Q.  Can you point to anything that says this
11  went to a contractor?
12          MR. DUTTON:  Objection; asked and
13  answered.  He just told you.
14          THE WITNESS:  Like I said, all the work
15  orders go to the landscaper.
16  BY MR. WILLIAN:
17      Q.  Do you know whether this work order went
18  to a landscaper right away?
19      A.  All of them do.
20      Q.  And if a work order for a landscaper goes
21  to the landscaper right away, do you get a pass on
22  that even if the landscaper doesn't come out?
23      A.  They call us at the end of the day and
24  tell us if the work was complete.
25      Q.  Okay.  So if you went to a landscaper

Page 112

1  right away -- let me ask you this.  Back up.
2          What record do you have of calling a
3  landscaper or a vendor on a work order?
4      A.  We don't keep record.
5      Q.  Aren't you supposed to include tech notes
6  indicating how you handle the work order?
7      A.  We -- now we do that, but before we didn't
8  add those notes on the work order.
9      Q.  When did you start that practice,
10  Mr. Olivares?
11      A.  I would say within the last couple of
12  years.
13      Q.  And so it's your testimony that in 2006
14  when you were handling a work order the tech who was
15  handling it didn't have to write a note that the way
16  he handled it was calling a contractor?
17          MR. DUTTON:  Object to the form of the
18  question.  Misstates his testimony.
19          THE WITNESS:  If I was -- like, if I was
20  scheduling, I wouldn't have given it to a tech to go
21  check.  I would have called the landscaper directly.
22  BY MR. WILLIAN:
23      Q.  And you are supposed to record that when
24  you a handle a work order by calling a landscaper,
25  right?



Page 113

1    A.  Now we are, yes.
2    Q.  And before you wouldn't record it any way.
3  So how would you know whether someone did that or
4  not in handling a work order?
5    A.  We would verify that the work was done.
6    Q.  So you are saying that you had no record
7  of calling contractors in response to work orders?
8    A.  Right.
9    Q.  So just to be clear on exhibit 6, when you
10  input the time in the start time a year later of
11  where you inputted that the work was started May 12,
12  2006 at 8:00 a.m., you didn't have any source
13  material to look at to know whether that was true or
14  not, did you, Mr. Olivares?
15    A.  I don't remember.
16      (Exhibit 007 was marked for
17      identification.)
18  BY MR. WILLIAN:
19    Q.  Handing to you exhibit 7.  Exhibit 7
20  follows the same format as the others.  You'll see
21  that the first page is a hard copy of a work order
22  signed by Josh Merrill.  Indicates that he started
23  the work on 5/22 at 11:16 and finished it at 11:34.
24  Do you see that?
25    A.  Yes.

Page 114

1    Q.  And it has to do with the fluorescent
2  light in the kitchen.  Do you see that?
3    A.  Yes.
4    Q.  You wouldn't call a contractor for that,
5  would you, Mr. Olivares?
6    A.  It doesn't look like it, no.
7    Q.  In fact, Mr. Merrill indicates that he
8  replaced the ballast, right?
9    A.  Yes.
10    Q.  And that's a fail based on the tech notes,
11  correct?
12      MR. DUTTON:  Object to the form of the
13  question.
14  BY MR. WILLIAN:
15    Q.  Mr. Olivares?
16    A.  Like I said, again, there's -- the numbers
17  aren't right on this report.
18    Q.  Mr. Olivares, based on the tech notes
19  that's a fail --
20    A.  Based on the tech notes.
21      MR. DUTTON:  Objection to the form of the
22  question.
23      MR. WILLIAN:  Please wait until I'm
24  finished with my question before you object.
25    Q.  Mr. Olivares --

Page 115

1      MR. DUTTON:  Objection to the form of the
2  question.
3  BY MR. WILLIAN:
4    Q.  Mr. Olivares, based on the tech notes the
5  work order in exhibit 7 is a fail, correct?
6      MR. DUTTON:  Objection to the form of the
7  question.
8      THE WITNESS:  If that's all the notes we
9  have.
10  BY MR. WILLIAN:
11    Q.  And, indeed, if you look at the monthly
12  work order analysis you'll see that the hours from
13  call to start were 94.7, correct?
14    A.  Yeah.  But same thing.  Start to complete,
15  it's off, so the report is wrong.
16    Q.  But the hours from call to start matches
17  the tech notes, doesn't it?
18    A.  That does, but the rest of it on the
19  report is wrong.
20    Q.  And when we are measuring a pass rate we
21  look at the time from call to start, correct?
22    A.  Yes.
23    Q.  And if you go to the annual submission,
24  Mr. Olivares, you will see that someone changed the
25  hours from call to start to .45 hours instead of

Page 116

1  94.7 hours.  Do you see that?
2    A.  Yes.
3    Q.  And that person, if we go to second to
4  last page, was you, correct?
5    A.  That's what it shows.
6    Q.  And what you did a year later is you
7  updated the start time to the May 18th at 1:30.  So
8  basically you indicated that Mr. Merrill showed up
9  within minutes of receiving the call to fix a
10  fluorescent light, right?
11    A.  That's what the report shows.
12    Q.  But in reality the notes from Mr. Merrill
13  indicate that he didn't show up to fix the
14  fluorescent light until four days later, correct?
15      MR. DUTTON:  Object to the form of the
16  question.  Misstates the documents.
17      THE WITNESS:  That's what this shows here.
18  BY MR. WILLIAN:
19    Q.  Mr. Olivares, would you agree with me
20  based on the information I've given you, including
21  the handwritten tech notes of when this work was
22  started, that the work order in exhibit 7 should
23  have been a fail not a pass?
24      MR. DUTTON:  Objection to the form of the
25  question.



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 31 of 72

AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                            117–120

Page 117

1    THE WITNESS:  If there's nothing.  But
2 there's something wrong on the last work order too.
3 It was -- you know, something is not printing right
4 on these work orders because this was scheduled on
5 the 21st.  So if it was the day it was scheduled, it
6 would have passed, and those times should have
7 printed here.
8 BY MR. WILLIAN:
9    Q.   All right.  Mr. Olivares, let's focus on
10 my question.  Based on the tech notes this work
11 order in exhibit 7 should have been a fail, but you
12 changed the start time to make it a pass; isn't that
13 true?
14    MR. DUTTON:  You answered the question.
15 Asked and answered.
16    THE WITNESS:  I don't remember doing that.
17 BY MR. WILLIAN:
18    Q.   I appreciate you don't remember doing
19 that, but that's what happened, correct?
20    MR. DUTTON:  Objection to the form.
21    THE WITNESS:  I don't know.
22 BY MR. WILLIAN:
23    Q.   Wouldn't you agree that the information in
24 exhibit 7 indicates that this work order should have
25 been a fail?

Page 118

1    MR. DUTTON:  Objection to the form of the
2 question.  It's a different question.
3    THE WITNESS:  Like I said, if there is
4 nothing else with this work order.
5 BY MR. WILLIAN:
6    Q.   Then it should be a fail?
7    A.   If there's nothing else.
8    Q.   Do you know why you changed the start time
9 to May 18th of 2006, Mr. Olivares?
10    MR. DUTTON:  Objection to the form.
11    THE WITNESS:  I don't remember doing that.
12 BY MR. WILLIAN:
13    Q.   Do you agree you did it, though?
14    A.   No.
15    Q.   Do you think someone stole your password
16 and did it?
17    A.   I don't remember doing that, so I can't.
18    Q.   Are you refreshed now at all that you
19 changed hundreds of 2006 work orders from fails to
20 passes in 2007?
21    A.   I don't remember doing it.
22    (Exhibit 008 was marked for
23    identification.)
24 BY MR. WILLIAN:
25    Q.   Handing to you Olivares exhibit 8.  This

Page 119

1 follow the same format as the prior exhibit.  You
2 will see this is an emergency work order.  The call
3 time was 9/10/2006 at 10:39.  The start time was
4 9/11/2006 at 7:45 a.m.  We can agree that that is a
5 fail, correct?
6    MR. DUTTON:  Objection to the form of the
7 question.
8 BY MR. WILLIAN:
9    Q.   Based on the tech notes?
10    MR. DUTTON:  Same objection.
11    THE WITNESS:  That's what it shows here.
12 BY MR. WILLIAN:
13    Q.   If you look at the second page of this
14 exhibit 8, you see that, indeed, it registered as a
15 fail because it took 21.1 hours from call to start,
16 correct?
17    MR. DUTTON:  Objection; no foundation.
18    THE WITNESS:  That's what it shows.
19 BY MR. WILLIAN:
20    Q.   And, indeed, that matches the handwritten
21 tech notes that I should have pointed out of 9/11 at
22 10:30 when the work was started, correct?
23    MR. DUTTON:  Objection; no foundation.
24    THE WITNESS:  No, it does not.
25 BY MR. WILLIAN:

Page 120

1    Q.   If you look at the call-in time of 9/10 at
2 10:39 and you compare that to the start time of 9/11
3 at 10:30.
4    A.   It's wrong.
5    Q.   How is it wrong?
6    A.   The call came in at 10:30.
7    Q.   10:39?
8    A.   10:39.
9    Q.   Yeah?
10    A.   And it shows we were there at 10:30.  It
11 should have been 23-point, like, five hours.
12    Q.   That's still a fail, correct?
13    A.   It's wrong.  The report is wrong.
14    Q.   I'm sorry.  That's still a fail, isn't it?
15    A.   With those notes, but the report is wrong.
16 So, I mean, I don't see how we are, you know,
17 comparing it when the report is not accurate.
18    Q.   You think you should get a pass when your
19 own report is not accurate?
20    MR. DUTTON:  Objection to the form of the
21 question.
22    THE WITNESS:  Like I said, the report is
23 not accurate.
24 BY MR. WILLIAN:
25    Q.   Can you agree with me, Mr. Olivares, that

Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 32 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      121–124

Page 121

1  when you look at the first page, including the tech
2  notes, that this work order should be a fail?
3        MR. DUTTON: Object to the form of the
4  question.
5        THE WITNESS: If there's nothing else
6  wrong. I mean, there's obviously something wrong
7  here.
8  BY MR. WILLIAN:
9    Q. Focus on my question, Mr. Olivares. Can
10  you agree with me that based on the tech notes this
11  work order should be a fail?
12    A. No.
13    Q. Why?
14    A. Because I don't think this is accurate.
15    Q. Look at the tech notes.
16    A. That's still not accurate. I mean, I'm
17  pointing it out to you it's not accurate.
18    Q. Why are the tech notes not accurate?
19    A. The report is not accurate.
20    Q. Focus on the tech notes. The tech notes
21  of 9/11 10:30 for a start time, why is that not
22  accurate, Mr. Olivares?
23    A. Because maybe there's something -- there's
24  more paperwork.
25    Q. Now you are speculating, aren't you?

Page 122

1        MR. DUTTON: Objection to the form of the
2  question.
3  BY MR. WILLIAN:
4    Q. Right?
5        MR. DUTTON: Objection to the form of the
6  question.
7  BY MR. WILLIAN:
8    Q. Show me what is inaccurate about the 9/11
9  10:30 start time that's hand written in by the tech?
10    A. That's what it shows there.
11    Q. Based on the handwritten tech notes or
12  even based on the printed start time on the work
13  order it's a fail, correct?
14        MR. DUTTON: Objection to the form of the
15  question.
16        THE WITNESS: That's what it shows there.
17  BY MR. WILLIAN:
18    Q. If you go to the monthly report, it shows
19  that it's a fail, correct?
20    A. That's what it shows.
21    Q. If you go to the annual report, you will
22  see that someone shortened the response time to .2
23  hours to make it a pass, correct?
24        MR. DUTTON: Objection to the form.
25        THE WITNESS: That's what it shows there.

Page 123

1  BY MR. WILLIAN:
2    Q. And that someone was you looking at the
3  second to last page, Mr. Olivares, correct?
4    A. My name is there.
5    Q. And you were the person who changed the
6  start time in the progress field to 9/10/2006 at
7  10:51 a.m. giving the impression that the emergency
8  was responded to in less than an hour, correct?
9        MR. DUTTON: Objection to the form of the
10  question. No foundation.
11        THE WITNESS: That's what it shows there.
12  BY MR. WILLIAN:
13    Q. Why did you make that change?
14    A. I don't remember doing it.
15    Q. By making that change, though, you did
16  change this work order from a fail to a pass,
17  correct?
18    A. I don't remember doing that change.
19    Q. I understand you don't remember doing that
20  change, but by making that change and shortening the
21  start time you made this work order from a fail to a
22  pass, correct?
23        MR. DUTTON: Objection to the form.
24        THE WITNESS: Like I said, I don't
25  remember making that change.

Page 124

1  BY MR. WILLIAN:
2    Q. This document indicates you made the
3  change, correct?
4    A. That's what it shows.
5    Q. Have we refreshed you at all that you made
6  hundreds of changes to 2006 work orders changing
7  fails to passes in 2007?
8    A. No.
9    Q. Who -- let me ask you this, Mr. Olivares:
10  Someone must have told you to do this. Who told you
11  to do this? I don't think you would have done this
12  on your own.
13        MR. DUTTON: Objection. Move to strike
14  the comment.
15  BY MR. WILLIAN:
16    Q. You are under oath. Tell us who would
17  have told you to do this.
18    A. I don't remember anybody telling me to do
19  this or doing this.
20    Q. Do you think you would have just started
21  changing fails to passes a year later on your own,
22  Mr. Olivares?
23    A. Like I said, I don't remember doing this.
24    Q. Who do you think the likely person was who
25  told you to do this?



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
125–128

Page 125

1      MR. DUTTON:  Objection to the form of the
2  question.  No foundation.
3      THE WITNESS:  I don't remember any of
4  this.  I mean, I don't remember anybody telling me
5  this or changing, you know.
6  BY MR. WILLIAN:
7      Q.  Would you agree based on what you have
8  seen and based on the fact you were going back and
9  correcting work orders a year later, that that's
10  something that you would not have done on your own?
11      MR. DUTTON:  Objection to the form of the
12  question.
13      THE WITNESS:  Like I said, I don't
14  remember doing this.
15  BY MR. WILLIAN:
16      Q.  I understand.  But would you agree that
17  that's something you would not have done on your
18  own; that someone likely told you to do it?
19      A.  I don't know why I would have done it.
20      Q.  You would have only done it if someone
21  asked you to do it, correct, Mr. Olivares?
22      A.  I don't know.
23      Q.  You think you might have gone back and
24  changed work orders a year later just on your own?
25      A.  I don't know.

Page 126

1      Q.  Wouldn't you -- you just don't know?
2      A.  Right.
3      (Exhibit 009 was marked for
4      identification.)
5  BY MR. WILLIAN:
6      Q.  Handing you Olivares exhibit 9.  This
7  follows the same format as the other exhibits.  You
8  will see this is an urgent work order.  The call in
9  time was 9/24/06.  And you'll see that the tech
10  indicated that he responded on 9/25/06 at 9:30, and
11  completed the work approximately an hour later.  The
12  tech notes indicate nails sticking up on carpet
13  strip, hammer them down, adjust blind.  Do you see
14  that?
15      A.  I see that.
16      Q.  Based on the tech notes that is a fail,
17  correct?
18      A.  That's what it shows here.
19      Q.  And if you go in this case to the third
20  page you will see that, indeed, this work order
21  reflected that the hours from call to start was
22  12.50 hours and therefore it was a fail, right?
23      A.  Same thing on this one.  The hours are
24  wrong.
25      Q.  Based on the tech notes, Mr. Olivares, it

Page 127

1  is a fail, correct?
2      MR. DUTTON:  Objection to the form of the
3  question.
4      THE WITNESS:  That's what it shows here.
5  BY MR. WILLIAN:
6      Q.  And what you did, if you go to the second
7  to last page, is you changed the start time to
8  September 24th rather than September 25th thereby
9  making it a pass, correct?
10      A.  That's what it shows here.  I don't
11  remember doing that.
12      Q.  And in the way that you altered the time,
13  the in-progress start time happened approximately
14  half hour after the call actually came in, correct?
15      A.  That's what it shows.
16      Q.  All right.  So by making this alteration
17  in the start time, Mr. Olivares, you changed this
18  work order a year later from a fail to a pass,
19  correct?
20      A.  That's what it shows here.
21      Q.  Why did you do that?
22      A.  I don't remember making the change.
23      Q.  Who likely told you to do this,
24  Mr. Olivares?  You are not going to tell me?
25      A.  Like I said, I don't remember doing the

Page 128

1  change.
2      Q.  Would you agree, though, that this is
3  something you wouldn't have done on your own, right?
4  This is not part of your regular duties to go back
5  and change work orders a year later, is it?
6      A.  I mean, you know, I don't know.  I don't
7  remember doing it.
8      Q.  Based on the information I've given you,
9  including the tech notes, would you agree that the
10  work order in exhibit 9 should have been a fail not
11  a pass, Mr. Olivares?
12      A.  That's what it shows here.
13      (Exhibit 010 was marked for
14      identification.)
15  BY MR. WILLIAN:
16      Q.  Do you understand that you were making
17  these changes to help Pinnacle with its incentive
18  fee submission?
19      A.  Like I said, I don't remember making the
20  changes.
21      Q.  I'm handing you exhibit 10.  This follows
22  the same format.  This is an urgent work order
23  regarding plumbing, sink backed up, toilet leaks
24  from bottom of tank.  The call time was 7/29/2006 at
25  7:10.  And you'll see that the response time was the



Page 129

1  following day.  Do you see that?
2      MR. DUTTON:  Object to the form of the
3  question.
4      THE WITNESS:  Does it say it's the
5  following day?
6  BY MR. WILLIAN:
7      Q.  Yes, because the tech notes are next to
8  the start time which is scheduled the following day
9  at 7:30 on 7/30/2006.
10     MR. DUTTON:  Object to the form of the
11 question.
12 BY MR. WILLIAN:
13     Q.  Do you see that?
14     A.  Yeah.
15     Q.  So that's a fail, correct?
16     MR. DUTTON:  Objection to the form of the
17 question.
18 BY MR. WILLIAN:
19     Q.  Based on tech notes?
20     A.  That's what it shows there.
21     Q.  And the monthly report shows that that was
22 a fail because it took 84 hours from call to start,
23 correct?
24     A.  That's what it shows.
25     Q.  And what you did, Mr. Olivares, is you

Page 130

1  changed the call to start time so the response was
2  on the same day as the call-in date and the call to
3  start time was .4 hours, right?
4      A.  That's what it shows there.
5      Q.  And the way you did that as reflected in
6  the second to last page on July 8th of 2007, you
7  changed this July 2006 work order such that the
8  start time was no longer July 30, but was July 29th
9  at 7:39 p.m.
10     A.  That's what it shows.
11     Q.  And that changed this work order from a
12 fail to a pass, right?
13     A.  That's what it shows.
14     Q.  Based on the information I provided to
15 you, including the tech notes, do you agree that
16 this work order should have been a fail?
17     A.  That's what it shows here.
18     Q.  Do you know why you were making this
19 change a year later, changing this work order from a
20 fail to a pass?
21     A.  I do not remember this.
22     (Exhibit 011 was marked for
23     identification.)
24 BY MR. WILLIAN:
25     Q.  I'm handing to you Olivares exhibit 11.

Page 131

1  This is a routine work order.  The call-in time was
2  July 29 of 2006, and the start time was
3  approximately two weeks later on August 14th of
4  2006.  And the issue had to do with a closet door
5  latch split the door.  And also there's a reference
6  to two electrical outlets not working.  Do you see
7  that?
8      A.  Yes.
9      Q.  The hours from call to start were 260, so
10 that would be a fail, correct?
11     A.  Yes.
12     Q.  And what you did is you went in and
13 changed the work order nearly a year later to change
14 the hours from call to start to 27 hours instead of
15 260 hours, correct?
16     MR. DUTTON:  Object to the form of the
17 question.
18     THE WITNESS:  On this work order right
19 here.
20 BY MR. WILLIAN:
21     Q.  Yes.
22     A.  This is -- at this time, this was a new
23 house.  So it's under warranty.  We sent it to
24 Giacalone.
25     Q.  You did what?

Page 132

1      A.  See how it has this writing right here?
2      Q.  Yes.
3      A.  That's the warranty contractor for the new
4  homes.  So same thing.  As soon as that work came in
5  for the closet door latch and all that, we would
6  have sent it to the contractor to do it under
7  warranty.  You know, what it looks like is Carota,
8  he went over there and replaced this also later.
9      Q.  Why would you replace something twice?
10     A.  No.  Like, he replaced the GFI.  And he
11 worked on -- you know, he replaced the GFI, but we
12 sent it to the contractor to repair the split door
13 or faucet.
14     Q.  Who is this Delarosa?
15     A.  That would be somebody from Yardi or,
16 like, the answering service typing in the notes.
17     Q.  And who is the tech who worked on this?
18 Carota?
19     A.  Yes.
20     Q.  And did Carota actually do the work?
21     A.  I don't see his handwritten notes.
22     Q.  You see the tech notes, replaced GFCI and
23 tenant plug to see why top plug only works.  Do you
24 see that?
25     A.  Yes.



Page 133

1    Q.   Was that work Mr. Carota would have done?
2    A.   I'm not sure.  On this house, probably not
3  because Giacalone is the electrical contractor, so
4  they might have did that.
5    Q.   What you did, though, is you changed the
6  start time to July 30, 2006, thereby making this
7  into a pass, correct?
8       MR. DUTTON:  Object to the form.
9       THE WITNESS:  If you look at the last
10  page, it looks like it was issued to two people.
11  BY MR. WILLIAN:
12    Q.   Okay.  Let's just stick with my question,
13  though, for a second.  So what you did is you
14  changed the start time to July 30, 2006, making it a
15  pass, right?
16    A.   I'm not sure if that's what I did.  I
17  don't remember doing that.
18    Q.   This document indicates you did that,
19  correct?
20    A.   That's what this shows.
21    Q.   There's no documentation here that
22  indicates the start time was actually July 30, 2006,
23  the time you changed it to, is there?
24       MR. DUTTON:  Objection to the form of the
25  question.

Page 134

1       THE WITNESS:  There's no time at all.
2  BY MR. WILLIAN:
3    Q.   I just want to make sure you are answering
4  my question.  There's no documentation in this
5  package that I have given you that indicates that
6  the actual start time was the time that you input
7  here, July 30, 2006 at 3:06 p.m.?
8       MR. DUTTON:  Objection to form.
9       THE WITNESS:  There's nothing here.
10  BY MR. WILLIAN:
11    Q.   Do you know why you put in that time?
12    A.   I don't remember doing that.
13    Q.   Would you agree based on the information
14  I've shown you here this should have been a fail,
15  not a pass?
16    A.   No.
17    Q.   Do you agree that you input a time that
18  has no basis?
19    A.   I wouldn't agree to having inputted the
20  time.  I don't remember.
21       (Exhibit 012 was marked for
22       identification.)
23  BY MR. WILLIAN:
24    Q.   I'm handing to you exhibit 12, which is
25  another copy of a work order that you updated nearly

Page 135

1  a year later.  This is an urgent work order.  You
2  will see that the call time was November 1st, 2006
3  at 6:53.  And the start time was 11/2/2006 at 6:56.
4  And you'll see some tech notes there on what was
5  actually.  Do you see that?
6    A.   Yes.
7       MR. DUTTON:  Objection to the form of the
8  question.
9  BY MR. WILLIAN:
10    Q.   This is a fail, correct, based on the tech
11  notes?
12       MR. DUTTON:  Objection to the form of the
13  question.  There are no tech notes.
14       THE WITNESS:  There's no time on the tech
15  notes.
16  BY MR. WILLIAN:
17    Q.   Based on the hard copy of the work order
18  this as fail, correct?
19       MR. DUTTON:  Objection to the form of the
20  question.  Misreads the document.
21       THE WITNESS:  No.
22  BY MR. WILLIAN:
23    Q.   Why not?
24    A.   Because this work order came in at
25  6:53 p.m. after hours.  So the tech would have

Page 136

1  received the call, you know, from the answering
2  service, and then they would have gone to the house
3  and taken care of the issue that day and not filled
4  out any paperwork.  So the next morning me or
5  whoever is doing the scheduling would have printed
6  it out as 6:56 a.m. and handed them the copy to put
7  in their notes.
8    Q.   Where does this show that the tech went
9  out and did the work within eight hours or four
10  hours of the time of the call time?
11    A.   It doesn't show any time.
12    Q.   So you will see here that the time that
13  you input in to make this fail into a pass, if you
14  turn to the second to last page, you indicated that
15  the tech started the work on 11/1/06 within, oh,
16  about a half hour after the call came in.  Do you
17  see that?
18    A.   Yes.
19    Q.   You input that time almost -- well, not
20  quite a year later when you updated this work order,
21  correct?
22    A.   That's what it shows here.
23    Q.   You had no basis to input the start time
24  as 11/1/06 at 7:22 p.m., did you?
25       MR. DUTTON:  Objection; misstates his



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 36 of 72

AMADO OLIVARES                                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                               137–140

Page 137

1  testimony.
2      THE WITNESS:  I don't remember entering
3  these notes.
4  BY MR. WILLIAN:
5      Q.  But you -- I know you don't remember it.
6  But you didn't have any basis for entering that date
7  and that time for the start time, did you?
8      A.  Like I said, I don't remember entering the
9  notes.
10     Q.  By entering -- well, this document
11 indicates you entered those notes, right?
12     A.  That's what it shows.
13     Q.  By entering that new start time of 11/1/06
14 at 7:22 p.m., that changed this from a fail to a
15 pass, right?
16     A.  That's what it shows here.
17         (Exhibit 013 was marked for
18         identification.)
19 BY MR. WILLIAN:
20     Q.  I'm handing to you exhibit 13.  Now, in
21 the front page of exhibit 13 is a Post-it with some
22 handwriting.  It says:  "Closed out and adjusted
23 times, Amado, 8:25 p.m."  Do you see that?
24     A.  Yes.
25     Q.  That's your handwriting?

Page 138

1      A.  Yes.
2      Q.  We found that on a stack of hard copy work
3  orders, Mr. Olivares.  Why were you writing "closed
4  out and adjusted times" on that Post-it note?
5      MR. DUTTON:  No foundation.
6      THE WITNESS:  I don't know.
7  BY MR. WILLIAN:
8      Q.  Pardon me?
9      A.  I don't know.
10     Q.  Did you ever have the practice of writing
11 closed out and adjusted times on work orders?
12     A.  Not that I can remember.
13     Q.  Now, if you look at the technician notes,
14 this is a routine work order and the call time was
15 August 22nd, 2006 at 2:48 p.m.  And the start time,
16 according to the tech notes, is 8/25/2006 at 3:30.
17 Do you see that?
18     A.  On which page?  On the first one?
19     Q.  Second page.
20     A.  Second page.
21     Q.  I'm reading the tech notes.
22     A.  Yes.
23     Q.  That's a fail, correct?
24     MR. DUTTON:  Objection to the form of the
25 question.

Page 139

1      THE WITNESS:  That's what it shows.
2  BY MR. WILLIAN:
3      Q.  If you go to the annual submission, you'll
4  see that the hours from call to start were only an
5  hour .97.  Do you see that?
6      A.  Yes.
7      Q.  And on the monthly report it indicates
8  that the hours from call to start were, again, an
9  hour 97.  Do you see that?
10     A.  Yes.
11     Q.  And if you go to the second to last page
12 you were the last person to update this work order
13 approximately -- well, you updated it on 8/25/06,
14 correct?
15     A.  Yes.
16     Q.  And when you updated this you -- for the
17 start time in the in-progress field, you put in
18 instead of the tech note start time of 8/25/06, you
19 put in 8/22/06 at 4:46.  Do you see that?
20     A.  That's what it shows here.
21     Q.  Now, why were you inputting a different
22 start time?
23     MR. DUTTON:  Objection to the form of the
24 question.  The in-progress time.
25     THE WITNESS:  I don't remember doing this.

Page 140

1  BY MR. WILLIAN:
2      Q.  But by inputting the 8/22/06 in-progress
3  start time, that changed this from a fail to a pass,
4  correct?
5      MR. DUTTON:  Objection to the form of the
6  question.
7      THE WITNESS:  That's what it shows here,
8  yes.
9  BY MR. WILLIAN:
10     Q.  And this is an example of you relatively
11 contemporaneously inputting a start time that was
12 different than the tech notes, right?
13     A.  Like I said, I don't remember doing this.
14     Q.  Mr. Olivares, isn't it the case that from
15 time to time that when you closed out work orders
16 you put in a start time that was different than the
17 tech notes in order to make sure that the work order
18 was a pass instead of a fail?
19     A.  No.
20     Q.  That's what this document shows, doesn't
21 it?
22     A.  That's what it shows.
23     Q.  Isn't it the case you did that from time
24 to time, Mr. Olivares?
25     A.  No.



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 37 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                     141–144

Page 141

1   Q.  How do you explain this document, then?
2   A.  I don't know.
3       (Exhibit 014 was marked for
4       identification.)
5   BY MR. WILLIAN:
6   Q.  This is from the same stack of documents,
7   exhibit 14, that has your Post-it note on it that
8   says "closed out and adjusted times."  You will see
9   this is a work order that is routine, that the call
10  in time was 8/19/06.  The start time was 8/25/06.
11  Pertained to screws that hold a dishwasher in place.
12  Here they indicate that the time to start was 8:00
13  o'clock and finished by 8:23.  Do you see that?
14  A.  Yes.
15  Q.  According to this work order, that should
16  be a fail, correct?
17      MR. DUTTON:  Objection to the form of the
18  question.
19      THE WITNESS:  It doesn't have a date.
20  BY MR. WILLIAN:
21  Q.  Well, based on the start time that's on
22  the hard copy of the work order, that's a fail.
23      MR. DUTTON:  Objection to the form of the
24  question.
25  BY MR. WILLIAN:

Page 142

1   Q.  Isn't it?
2       MR. DUTTON:  Misstates the document.
3       THE WITNESS:  But that's not the time that
4   the tech does the work, though.  There's no time on
5   there.
6   BY MR. WILLIAN:
7   Q.  Is there anything that indicates here that
8   the start time was within 72 hours of the call time
9   of 8/19/06?
10      MR. DUTTON:  Objection to the form of the
11  question.  You can answer.
12      THE WITNESS:  Not on here.
13  BY MR. WILLIAN:
14  Q.  And the annual work order submission
15  indicates that it took only 40 hours to respond to
16  the call, correct?
17  A.  That's what it shows.
18  Q.  And that's what the monthly work order
19  says as well, correct?
20  A.  That's what it shows.
21  Q.  And this shows that you, Mr. Olivares,
22  updated this work order on August 25th, '06.  So
23  that's within several days of when the work order
24  first came in, but you put as the start time in the
25  in-progress field that it was started on 8/20/06 at

Page 143

1   7:46 a.m.  Do you see that?
2   A.  Yes.
3   Q.  And by putting in that time, you made this
4   work order into a pass instead of a fail, correct?
5   A.  Like I said, I don't remember doing it.
6   Q.  That is the time that you put in there,
7   correct?
8   A.  I don't remember doing -- doing it.  So I
9   don't know if I'm the one that I did.  Like I said,
10  I don't remember doing it.
11  Q.  This documents indicates you were the one
12  that did it.
13  A.  That's what it shows.  It has my name on
14  it.
15  Q.  And based on the work order, you don't see
16  anything there that indicates that the work was
17  actually started on August 20 at 7:46 as you
18  indicated, correct?
19  A.  It doesn't show anything.
20  Q.  Does this refresh you, Mr. Olivares, that
21  from time to time when you closed out work orders
22  you changed the start times to make the work orders
23  into a pass?
24  A.  No.
25  Q.  That's what this indicates; don't you

Page 144

1   agree?
2       MR. DUTTON:  Objection.  Totally
3   misreading the document.
4       MR. WILLIAN:  Stick to objections instead
5   of talking.
6       MR. DUTTON:  You're asserting --
7       MR. WILLIAN:  Stick to objections.
8       MR. DUTTON:  It's a bad faith question.
9       MR. WILLIAN:  I don't think so.
10      MR. DUTTON:  That's my objection.  You are
11  misreading the document.
12      MR. WILLIAN:  Thank you.
13  Q.  Do you want to answer the question?
14  A.  Those notes are.  But, I mean, I don't
15  remember doing any of that.
16  Q.  This documents indicates that the time
17  that was put in for the start time by you, I know
18  you don't recall doing it, does not match the actual
19  start time, correct?
20      MR. DUTTON:  Objection to the form of the
21  question.  It misstates the document.
22      THE WITNESS:  That's what the document
23  shows.
24  BY MR. WILLIAN:
25  Q.  Do you know why you would be writing on a



Page 145

1  Post-it note adjusted times to work orders you were
2  closing out?
3      A.  I do not.
4          (Exhibit 015 was marked for
5          identification.)
6  BY MR. WILLIAN:
7      Q.  This is a work order.  The call-in time
8  was 8/18/2006.  The start time was scheduled to be
9  8/25/06.  The tech wrote in 10:06 to 10:32.  And the
10  tech notes indicate stripped and re-caulked tub.
11  Left card.  Do you see that?
12     A.  I see that.
13     Q.  When the tech wrote in just the time of
14  when they did the work, you understood that that
15  typically meant that they did the work on the date
16  that the work was scheduled for, in this case
17  8/25/06, right?
18         MR. DUTTON:  Objection; misstates the
19  document.
20         THE WITNESS:  No.
21  BY MR. WILLIAN:
22     Q.  Is there anything that indicates here that
23  the work was started on a date other than what is
24  reflected in the hard copy of the work order,
25  8/25/06?

Page 146

1          MR. DUTTON:  Mr. Olivares, anything on
2  here means review the entire document.
3          MR. WILLIAN:  Really, just limit yourself
4  to objections, Tom.
5          THE WITNESS:  It doesn't show any date for
6  the technician.  He didn't hand write anything.
7  BY MR. WILLIAN:
8      Q.  Well, he hand wrote 10:06 to 10:32.  Do
9  you see that?
10     A.  The time, yes.
11     Q.  And the start time, what is that supposed
12  to signify there where it says 8/25/06?
13     A.  That's when we hit start on the work
14  order.
15     Q.  That's when you were going to start the
16  work?
17     A.  That's when it is printed.
18     Q.  And you are printing the work order to
19  hand it to the tech to go do the work, aren't you,
20  Mr. Olivares?
21     A.  Yes.
22     Q.  And so that start time gives us a good
23  idea that the work was started on 8/25/06 because
24  that's when it was printed and handed to the tech,
25  correct?

Page 147

1          MR. DUTTON:  Objection to the form of the
2  question.
3          THE WITNESS:  You know, it could have --
4  we could have given it to him the day before and
5  then reprinted it again.
6  BY MR. WILLIAN:
7      Q.  Now, that's unlikely, Mr. Olivares,
8  please.
9      A.  How do you know that?
10         MR. DUTTON:  Objection to the form of the
11  question.
12  BY MR. WILLIAN:
13     Q.  Wasn't it your typical practice to print a
14  work order, and when you printed out it, it would
15  show start time 8/25 when you were printing it out
16  to hand it to the tech to go do the work; wasn't
17  that the typical practice?
18         MR. DUTTON:  Objection to the form of the
19  question.  Misstates the document.
20         THE WITNESS:  Not always.
21  BY MR. WILLIAN:
22     Q.  Was that the typical practice,
23  Mr. Olivares?
24         MR. DUTTON:  Objection to the form of the
25  question.

Page 148

1          THE WITNESS:  Not always.
2  BY MR. WILLIAN:
3      Q.  Can you answer my question?  Was it a
4  typical practice?
5          MR. DUTTON:  Objection; asked and
6  answered.
7          THE WITNESS:  Sometimes we wouldn't be
8  able to print the work order that day.  So we would
9  print it to them, you know, after.  Or when we were
10  closing out work orders, we realize the technician
11  did something, so we needed to reprint it for them
12  to write in their notes.
13  BY MR. WILLIAN:
14     Q.  And why couldn't you print a work order on
15  a given day?
16         MR. DUTTON:  Objection to the form of the
17  question.
18  BY MR. WILLIAN:
19     Q.  What problem would you have?
20     A.  If I wasn't in my office.
21     Q.  Someone can't print a work order for you?
22     A.  No.
23     Q.  You are the only one that can print a work
24  order?
25     A.  Yes.  I mean, I have -- my office is in



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
149–152

Page 149

1  the warehouse.  There's one computer.  All the techs
2  are out in the field.  And if I'm out in the field,
3  nobody can print a work order.
4      Q.  So it's your testimony that no one has
5  ever printed a work order other than you for people
6  who are handling your work?
7      MR. DUTTON:  Objection; misstates his
8  testimony.
9      THE WITNESS:  Yes, they have, but they
10  don't do it usually.
11  BY MR. WILLIAN:
12      Q.  Can we agree that a fair reading of this
13  document is that the work was started on August 25th
14  of 2006, and the tech notes indicate that he arrived
15  there at 10:06?
16      MR. DUTTON:  Objection.  Objection to the
17  form of the question.
18  BY MR. WILLIAN:
19      Q.  Isn't that a fair reading?
20      A.  I agree with the time.  I don't agree with
21  the date.
22      Q.  What date is the start time, then,
23  Mr. Olivares?
24      A.  I don't know.
25      Q.  This indicates on the second to last page

Page 150

1  that you updated this work order on 8/25/06, and you
2  indicated a start time in the in-progress field of
3  August 19th of 2006 at 7:37 a.m.  So according to
4  you, the tech went out the very next day and did the
5  work at 7:37 a.m.  Do you see that?
6      A.  I do.
7      MR. DUTTON:  Objection to the form of the
8  question.  You are completely misreading the
9  document again, Mr. Willian.
10  BY MR. WILLIAN:
11      Q.  Am I misreading that in some way,
12  Mr. Olivares?
13      A.  Can you repeat?
14      Q.  This document indicates that you put in
15  the start time in the in-progress field for
16  8/19/2006 at 7:37 a.m., right?
17      MR. DUTTON:  That's the in-progress time.
18      MR. WILLIAN:  Hey, stop.  Object.
19      MR. DUTTON:  You keep -- okay.  Objection;
20  you're misreading the document.  That's the
21  in-progress.
22      MR. WILLIAN:  I'll tell you what.  We're
23  going to bring it to the court, Tom.  Object.
24      MR. DUTTON:  You know what?  You can
25  continue to ask bad faith questions.

Page 151

1      MR. WILLIAN:  Yeah, right.  You submitted
2  false affidavits to the court.  I sure hope you have
3  a chance to correct that.
4      MR. DUTTON:  Mr. Willian --
5  BY MR. WILLIAN:
6      Q.  Mr. Olivares, stick with my question, I'll
7  ask it again.  Now, you inputted this in-progress
8  time of 8/19/06 at 7:37 a.m.  Do you see that?
9      A.  That's what it shows, but I don't remember
10  doing that.
11      Q.  I understand that.  And that -- you are
12  inputting that time as the time that the work was to
13  start, correct?
14      MR. DUTTON:  Objection to the form of the
15  question.
16      THE WITNESS:  That's what it shows here.
17  BY MR. WILLIAN:
18      Q.  And can we agree that there's nothing in
19  the hard copy work order that indicates that the
20  work actually started on 8/19/06 at 7:37 a.m.?
21      A.  It doesn't show a date when it started.
22      Q.  What date does it show?
23      A.  It doesn't show a date when it was
24  started.
25      Q.  Can I ask you to focus on my question?

Page 152

1  There's nothing in the work order that shows that
2  the work started on 8/19/06 at 7:37 a.m. as you
3  inputted that date in time into the in-progress
4  field?
5      MR. DUTTON:  Objection to the form of the
6  question.
7      THE WITNESS:  Not on this paper.
8  BY MR. WILLIAN:
9      Q.  Would you agree that if the correct start
10  time for this work, as indicated on the hard copy of
11  the work order, is 8/25/06 that this be would be a
12  fail, not a pass?
13      MR. DUTTON:  Objection to the form of the
14  question.  It's a bad faith question.
15      THE WITNESS:  If we use 8/25.
16  BY MR. WILLIAN:
17      Q.  I want you to go to the last page.  Now,
18  on the last page here you have inputted actual labor
19  time.
20      A.  Uh-huh.
21      Q.  Do you see that?
22      A.  I see the times there.
23      Q.  And you indicate the start time of 8/19/06
24  at 10:06 a.m.  Do you see that?
25      A.  I see that.

Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 40 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                         153–156

Page 153

1    Q.   Where in the hard copy work order does it
2  indicate this work started on 8/19?
3    A.   It doesn't on here.
4    Q.   Do you know why you would be entering
5  8/19/06 as the start time when the hard copy work
6  order doesn't reflect that?
7    A.   I don't remember doing that.
8    Q.   Would you be the person inputting the
9  information into the labor tab here for the actual
10  work time?
11    A.   If I'm closing out these work orders, yes.
12    Q.   Do you agree that based on the information
13  in the hard copy of the work order that this should
14  have been a fail, rather than a pass?
15        MR. DUTTON:  Object to the form of the
16  question.
17        THE WITNESS:  If they use the 8/25.
18  BY MR. WILLIAN:
19    Q.   Which is the start time indicated here?
20        MR. DUTTON:  Objection to the form of the
21  question.
22        THE WITNESS:  Yes, but not the handwritten
23  time.
24  BY MR. WILLIAN:
25    Q.   I'm sorry.  There's no handwritten time

Page 154

1  that indicates a different date than 8/25, is there?
2        MR. DUTTON:  Objection to the form of the
3  question.
4        THE WITNESS:  There's no date.
5        (Exhibit 016 was marked for
6          identification.)
7  BY MR. WILLIAN:
8    Q.   Let's do one more of these before lunch,
9  Mr. Olivares.  Handing to you exhibit 16.  This is a
10  work order.  It's a routine work order.  The call
11  time was 8/18/2006, 5:53 p.m.  The start time
12  according to the work order, which could be the
13  print time when you hand this to the tech, is
14  8/25/06.  Do you see that?
15    A.   I see that.
16        MR. DUTTON:  Objection to the form.
17  BY MR. WILLIAN:
18    Q.   And the finish time is 8/25/06 at
19  11:00 p.m.  What is that supposed to signify.
20        MR. DUTTON:  Objection to the form of the
21  question.
22        THE WITNESS:  Right here it just shows
23  finish time.  But that is not, I mean, a good time,
24  because we don't finish work at 11:00 p.m.
25  BY MR. WILLIAN:

Page 155

1    Q.   What is the significance of the finish
2  time?  What is it supposed to reflect?
3        MR. DUTTON:  Objection to the form of the
4  question.  No foundation.
5        THE WITNESS:  I'm not sure what it means.
6  BY MR. WILLIAN:
7    Q.   This indicates that the description was
8  hallway bathroom, showers not working, no water
9  coming into the showerheads, two bathrooms in the
10  house.  Please inspect and repair.  So that's a
11  routine work order, correct?
12    A.   Yes.
13    Q.   And based on the information in the hard
14  copy of the work order that indicates, this should
15  have been a fail, correct?
16    A.   There's no -- there's no handwritten date.
17    Q.   Based on the hard copy of this work order,
18  it indicates the start time of 8/25/06.
19        MR. DUTTON:  Objection to the form of the
20  question.
21  BY MR. WILLIAN:
22    Q.   That would be a fail, correct?
23        MR. DUTTON:  That's another bad faith
24  question.  I object.
25        THE WITNESS:  But there's no actual

Page 156

1  handwritten note from the technician when he started
2  the work.
3  BY MR. WILLIAN:
4    Q.   If you turn to the last page of this
5  document, it indicates that the labor time that was
6  put into document was 8/19/06 at 8:58 a.m.  Do you
7  see that?
8    A.   I see that.
9    Q.   Can you point to any basis to substantiate
10  that that's the correct start time?
11    A.   There's no handwritten notes here --
12    Q.   Sir, can you --
13    A.   -- with the date.
14    Q.   Right.  Can you point to any handwritten
15  notes or any basis for the accuracy of that start
16  time, 8/19/06?
17    A.   No.
18    Q.   And you'll see that you were the person to
19  last update this work order on 8/25/06, correct?
20    A.   That's what it shows.
21    Q.   Would you agree with me that based on the
22  information in the hard copy of the work order, this
23  should have been a fail instead of pass?
24        MR. DUTTON:  Objection to the form of the
25  question.



Case 5:14-cv-03953-BLF    Document 404-3    Filed 08/03/15    Page 41 of 72

AMADO OLIVARES                                           July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                        157–160

Page 157

1        THE WITNESS:  If we use the 8/25 date,
2   because there's no handwritten date on there.
3        MR. WILLIAN:  Let's take a lunch break.
4        VIDEO OPERATOR:  We're going off the
5   record at 12:12 p.m.
6        (Lunch recess taken.)
7            AFTERNOON SESSION
8        VIDEO OPERATOR:  We're going back on the
9   record at 1:10 p.m.
10       (Exhibit 017 was marked for
11       identification.)
12  BY MR. WILLIAN:
13       Q.  Mr. Olivares, I'm handing you Olivares
14  exhibit 17.  This is a packet of material regarding
15  a work order.  You will see that on the first page
16  of the work order that a tech Keith -- who is Keith?
17       A.  He's a technician.
18       Q.  What's his last name?
19       A.  Reid.
20       Q.  Keith Reid wrote in here that he did this
21  work on 6/12/06.  Do you see that?
22       MR. DUTTON:  Object to the form of the
23  question.
24       THE WITNESS:  I'm sorry.  Can you repeat
25  that?

Page 158

1   BY MR. WILLIAN:
2        Q.  If you look at the tech notes by Keith,
3   you'll see that he wrote in here that he started the
4   work on 6/12/06 at 1:20, and completed it the same
5   day at 2:30.  Do you see that?
6        A.  Yes.
7        Q.  You'll see in the bottom right-hand corner
8   the call-in date for this routine work order was
9   6/8/2006.  Do you see that?
10       A.  Yes.
11       Q.  And that's a fail based on the tech notes
12  in the call-in date?
13       A.  With those times, yes.
14       Q.  And you will see that in the monthly work
15  order report, it's reported as a pass, which is the
16  next document, because the hours from call to start
17  in this report are 10.55 hours.  Do you see that?
18       A.  Yes.
19       Q.  Do you see anything in the tech notes that
20  indicate that this work was actually started ten
21  hours after the call-in date of 6/8/2006?
22       A.  I don't see anything, no.
23       Q.  And if you turn to the second to last
24  page, you will see that you were the last person to
25  update this work on 6/12/06, which is the date that

Page 159

1   Mr. Keith finished the work, correct?
2        MR. DUTTON:  Object to the form.
3        THE WITNESS:  That's what it shows there.
4   BY MR. WILLIAN:
5        Q.  And in the status history under the
6   in-progress time for the start time you put in
7   6/9/06 at 7:16 a.m.  Do you see that?
8        MR. DUTTON:  Objection to the form.
9        THE WITNESS:  That's what it shows there.
10  BY MR. WILLIAN:
11       Q.  And that is not the time that Mr. Keith
12  started the work according to his notes.  He started
13  the work several days later on June 12 of 2006,
14  correct?
15       A.  That's what his notes show.
16       Q.  Do you know why you put in the start time
17  in the in-progress field of 6/9/06?
18       MR. DUTTON:  Object to the form of the
19  question.
20       THE WITNESS:  I don't remember entering
21  the notes or why I would have done that.
22  BY MR. WILLIAN:
23       Q.  Do you agree that you putting in 6/9/06 in
24  the in-progress field for the start time that made
25  this work order a pass instead of a fail?

Page 160

1        MR. DUTTON:  Object to the form of the
2   question.
3        THE WITNESS:  The pass, it goes with
4   the -- with the start time, doesn't it?
5   BY MR. WILLIAN:
6        Q.  I'm sorry.  What's your testimony?
7        A.  The pass/fail is on the actual start
8   times, not on the in-progress.
9        Q.  Yes.  But do you understand that Yardi
10  defaults from the actual labor time to the
11  in-progress time in the status history when -- if
12  there's no actual labor time calculated in the
13  pass/fail?
14       A.  No, I didn't know that.
15       Q.  Do you know why the in-progress time is
16  listed as 6/9/06 when the work wasn't started
17  according to the tech notes until July 12 of '06?
18       A.  No, I do not.
19       Q.  Would you agree that the 6/9/06 -- let's
20  take a short break.
21       VIDEO OPERATOR:  We're going off the
22  record at 1:15 p.m.
23       (Discussion held off the record.)
24       VIDEO OPERATOR:  We're going back on the
25  record at 1:18 p.m.



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
161–164

Page 161

1  BY MR. WILLIAN:
2      Q.   Do you know why the work completed date
3  that you entered here of 6/9/06 is in there when the
4  tech notes indicate work was not completed until
5  6/12/06?
6          MR. DUTTON:  Objection to the form of the
7  question.
8          THE WITNESS:  No, I do not.
9  BY MR. WILLIAN:
10     Q.   Mr. Olivares, isn't this an example of you
11  contemporaneously inputting information into Yardi
12  to make a failed work order into a pass?
13         MR. DUTTON:  Objection to the form of the
14  question.
15         THE WITNESS:  I don't remember doing that.
16  BY MR. WILLIAN:
17     Q.   That's what this document reflects,
18  though, correct?
19         MR. DUTTON:  Objection to the form.
20         THE WITNESS:  Like I said, I don't
21  remember doing that.
22  BY MR. WILLIAN:
23     Q.   That's what the document reflects, though,
24  correct?
25         MR. DUTTON:  Same objection.

Page 162

1          THE WITNESS:  That's what -- it shows I
2  was the last one to update it.
3  BY MR. WILLIAN:
4      Q.   And the information that I've shown you
5  shows that you input information to make it a pass
6  when it should have been a fail, true?
7          MR. DUTTON:  Objection to the form of the
8  question.
9          THE WITNESS:  No.
10  BY MR. WILLIAN:
11     Q.   Why not?
12     A.   I mean, because I was the last one to
13  update it, but that doesn't mean I changed those.
14  BY MR. WILLIAN:
15     Q.   Well, you inputted the in-progress and the
16  work completed dates that doesn't match the tech
17  notes, correct?
18         MR. DUTTON:  Objection to the form of the
19  question.
20         THE WITNESS:  How do you know?
21  BY MR. WILLIAN:
22     Q.   You think someone else did it?
23     A.   No.  I'm saying if I go into a work order
24  and hit save without making any changes, I'm going
25  to be the last one to save it whether I did a change

Page 163

1  or not.
2      Q.   I don't know what that means.  So let me
3  just ask you:  Did you input the in-progress time
4  and the work completed time in this work order?
5      A.   Not that I know of.
6      Q.   You think someone else did it?
7      A.   I don't know.
8      Q.   You understand that by having the 6/9/06
9  time and date in the in-progress field that that is
10  the field that is used for the pass/fail report?
11     A.   That's what this shows right here.
12     Q.   And isn't it likely, sir, that you are the
13  one who inputted that time as opposed to someone
14  else since you are shown as the person to last
15  update?
16     A.   No.
17     Q.   Who else would have done it, Mr. Olivares?
18     A.   I don't know.
19     Q.   Help me.  Who else would have been
20  inputting that information in the Yardi system when
21  it was your responsibility?
22     A.   I don't know.
23     Q.   Did anyone else have responsibility for
24  closing out these work orders other than you in June
25  of 2006?

Page 164

1      A.   Just my maintenance lead.
2      Q.   And when you updated this work order and
3  closed it out, you didn't make sure that the
4  in-progress and work completed date matched the tech
5  notes, did you?
6      A.   I don't know what I did.
7      Q.   Well, they don't match, do they?
8      A.   Not with the notes, no.
9      Q.   Would you agree that based on the tech
10  notes that this work order should have been a fail?
11         MR. DUTTON:  Objection to the form.
12         THE WITNESS:  Just with these notes, yes.
13         (Exhibit 018 was marked for
14         identification.)
15  BY MR. WILLIAN:
16     Q.   Handing to you Olivares exhibit 18.
17  Olivares exhibit 18 is another work order.  You'll
18  see that the work was performed by Josh Merrill as
19  he wrote down here in handwriting on May 31st,
20  started at 11:43, completed at 12:10 the same day.
21  Do you see that?
22         MR. DUTTON:  Objection.  Ask him to review
23  the document that's in front of you.
24  BY MR. WILLIAN:
25     Q.   Mr. Olivares --



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 43 of 72

AMADO OLIVARES                                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                                165–168

Page 165

1   A.   Just a minute.
2        MR. DUTTON:  Please give him time to
3   review the document you have just shown him.  It's a
4   multi-page document.
5        THE WITNESS:  Okay.
6   BY MR. WILLIAN:
7   Q.   I'll ask the question again.  Referring to
8   the handwritten tech notes on the first page, the
9   handwritten tech notes by Josh Merrill indicates
10  that he started the work on May 31st at 11:43 and
11  finished the same day 12:10, correct?
12  A.   That's what it shows here.
13  Q.   And the work was replacing lightbulbs.
14  A.   Yes.
15  Q.   The time when this work order was called
16  in was May 24th of 2006, correct?
17  A.   Yes.
18  Q.   And according to the tech notes, that
19  would be a fail, correct?
20  A.   That's what it shows here.
21  Q.   If you turn to the monthly Yardi report,
22  you will see it's registered as a pass because the
23  hours from call to start were input so that they
24  registered 16.18 hours.  Do you see that?
25  A.   Yes.

Page 166

1   Q.   And if you go to the second to last page,
2   you see that you were the last person to input data
3   into this work order and close it out, correct?
4   A.   That's what it shows here.
5   Q.   And the in-progress time shows that the
6   work started on May 25th of 2006, not May 31st as
7   reflected in Mr. Merrill notes, correct?
8   A.   That's what it shows here.
9   Q.   And you would have input that in-progress
10  time?
11  A.   I wouldn't have -- like, I would have put
12  the work order, you know, from call to schedule to
13  in-progress.
14  Q.   Did you input the in-progress time, sir?
15  A.   I wouldn't have typed it in, no.
16  Q.   Who typed it in, then?
17  A.   It automatically auto fills.
18  Q.   Who is responsible for making sure that
19  the time in the in-progress is accurate?  Is that
20  you, Mr. Olivares?
21  A.   This time when -- it auto fills.
22  Q.   Let me ask you the question again.  Who is
23  responsible for making sure the in-progress time is
24  accurate?
25  A.   I'm responsible for entering the notes

Page 167

1   accurately.
2   Q.   And the time and dates accurately, true?
3   A.   Yes.
4   Q.   And do you understand that the in-progress
5   time of 5/25/06 is not a correct time; the work was
6   actually started on 5/31?  Do you understand that?
7   A.   I understand that, yeah.
8   Q.   And do you understand this work order that
9   you last updated indicates the work was completed on
10  May 25th of 2006, when, in fact, it was completed on
11  May 31st, correct?
12  A.   That's just when it was put on
13  in-progress; not when it was started.
14  Q.   It does say work completed 5/25/06,
15  doesn't it?
16  A.   That's what it shows here.
17  Q.   And the work was actually completed on
18  5/31, correct?
19       MR. DUTTON:  Objection to the form.  No
20  foundation.
21       THE WITNESS:  That's what it shows here.
22  BY MR. WILLIAN:
23  Q.   Let's go to the final page, Mr. Olivares.
24  In the labor schedule tab, did you input this
25  information?

Page 168

1   A.   I don't know.  I don't remember if I did.
2   Q.   Who else would have put this information,
3   other than you?
4   A.   My maintenance lead would close out work
5   orders sometimes.
6   Q.   Do you see the maintenance lead's name on
7   this work order anywhere?
8   A.   No.
9   Q.   Is it safe to say, Mr. Olivares, that
10  based on the documentation we've looked at that you
11  inputted this start time into the Yardi system?
12  A.   I mean, it could have been -- like I said,
13  if I was the last one to make any update, my name
14  would be there.  But, you know, the same -- Josh
15  Merrill did some updating too.  You see his name on
16  the front.
17  Q.   Okay.  But as far as closing out the work
18  order, when you close out a work order,
19  Mr. Olivares, are you supposed to close it out so
20  that the start time and completion times are
21  accurate?
22  A.   Yes, if I enter all the notes.
23  Q.   Ultimately is that your responsibility to
24  ensure that the start date and time and the
25  completion date and time are accurate when you close



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
169–172

Page 169

1    out a work order?
2        A.   When I close out a work order, yes.
3        Q.   And it appears you closed out this work
4    order, true?
5        A.   Not necessarily.
6        Q.   You are the last one to update it; is that
7    true?
8            MR. DUTTON:  Objection to the form.
9            THE WITNESS:  Yes.
10   BY MR. WILLIAN:
11       Q.   But even though you are the last one to
12   update it, you don't know if you closed it out?
13       A.   No.
14       Q.   Does it indicate that anyone else closed
15   out this work order?
16       A.   It wouldn't do that.
17       Q.   Would you agree that based on the
18   handwritten tech notes that this work order should
19   have been a fail and not a pass?
20           MR. DUTTON:  Objection to the form.
21           THE WITNESS:  With these notes right here.
22   BY MR. WILLIAN:
23       Q.   Yes.
24       A.   With these notes here, yeah.
25       Q.   I'm sorry.  I need to make that clear.

Page 170

1    When you say these notes here you are pointing to --
2        A.   With these times.
3        Q.   Mr. Merrill's handwritten notes, based on
4    those handwritten notes, this work order should have
5    been a fail, correct?
6        A.   With these, yes.
7            (Exhibit 019 was marked for
8            identification.)
9    BY MR. WILLIAN:
10       Q.   I'm handing to you Olivares Exhibit 19.
11   The first page of Olivares Exhibit 19 indicates that
12   Keith, the tech, started the work on June 16th of
13   '06 at 10:30 and completed the work the same day at
14   11:00.  Do you see that?
15       A.   I do.
16       Q.   That's a routine work order, correct?
17       A.   Yes.
18       Q.   And the call-in date for this work was
19   June 9 of 2006.  Do you see that?
20       A.   Yes.
21       Q.   Therefore, this, based on the hard copy of
22   the work order and the tech notes, should have been
23   a fail, correct?
24       A.   On this one right here, this would have
25   been another contractor issue.  We would have called

Page 171

1    a trash company to deliver the trash cans.
2        Q.   Then why would Keith have actually started
3    the work if someone else is going to do it,
4    Mr. Olivares?
5        A.   The trash company would deliver to our
6    yard, and we would deliver to the residents.  So we
7    would have -- as soon as the work order came in, we
8    would have called the trash company.
9        Q.   Does it say that anywhere here?
10       A.   It does not.
11       Q.   And if you turn to the second to last page
12   of this document, you see you were the last person
13   to update this work order, correct?
14       A.   I see that, yes.
15       Q.   As far as the in-progress start time, you
16   put in 6/9/06 at 1:16 p.m.  Do you see that?
17       A.   Yes.
18       Q.   And by putting in that time instead of the
19   handwritten notes by the tech that he started the
20   work on 6/16/06, that made this work order into a
21   pass, right?
22           MR. DUTTON:  Objection to the form of the
23   question.
24           THE WITNESS:  But the work order was
25   started before this, before his time.

Page 172

1    BY MR. WILLIAN:
2        Q.   Can you point to anything on the work
3    order that says it was started on 6/9/06 at
4    1:16 p.m. as you entered into this document?
5        A.   No.
6            (Exhibit 020 was marked for
7            identification.)
8    BY MR. WILLIAN:
9        Q.   Handing to you Olivares exhibit 20, which
10   is a another work order.  It indicates that George
11   started this work on June 19, 2006 at 11:20 and
12   finished it the same day at noon.  Do you see that?
13       A.   Yes.
14       Q.   And this is an emergency work order
15   because it involves a smoke detector malfunctioning,
16   right?
17       A.   Yes.
18       Q.   And you'll see that the call-in time was
19   6/19/06 at, looks like, 8:27 a.m.
20           MR. DUTTON:  Object to the form.
21   BY MR. WILLIAN:
22       Q.   Can you read that?
23       A.   On this one right here, I need to make a
24   correction.  This work order was actually urgent.
25   We should have changed the category on it.



Page 173

1    Q.   Why is that urgent instead of emergency as
2   it is stated?
3    A.   Because smoke detectors weren't going off.
4   They were just randomly going off, like, if the
5   batteries are low.  Not, like, going off like
6   there's a fire or smoke or carbon monoxide
7   constantly.
8    Q.   You were the last one to update this work
9   order, correct?
10    A.   Yes.
11    Q.   Did you correctly change the status from
12   emergency to urgent if that's what you thought it
13   was at the time?
14        MR. DUTTON:  Objection to the form.
15        THE WITNESS:  It doesn't look like I did
16   that.
17        (Exhibit 021 was marked for
18        identification.)
19   BY MR. WILLIAN:
20    Q.   I'm going to hand to you exhibit 21, which
21   is a copy of CDMP Property Management Family
22   Services Transition and Operations Plan for
23   Monterey.  Have you seen this before?
24    A.   No.
25    Q.   You see under the emergency service

Page 174

1   request examples are -- and then the last bullet is
2   fire alarm sounding.  Do you see that?
3    A.   I see that.
4    Q.   And in this work order we've been looking
5   it is randomly sounding or going off, correct?
6        MR. DUTTON:  Object to the form of the
7   question.
8        THE WITNESS:  That's what it says.  It
9   says randomly going off.
10   BY MR. WILLIAN:
11    Q.   And under urgent request, I don't see any
12   examples there of fire alarm if only randomly going
13   off for no reason or words to that effect.  You
14   don't see that, do you?
15    A.   I do not.
16    Q.   Based on the CDMP document I've put in
17   front of you, would you agree that if a smoke
18   detector that is randomly sounding for no reason,
19   that should be an emergency work order?
20    A.   No.
21    Q.   So what's your principal basis for saying
22   that is urgent instead of emergency?
23        MR. DUTTON:  Objection; asked and
24   answered.
25        THE WITNESS:  Like I said earlier, it

Page 175

1   was -- if it's constantly going off like there's a
2   fire or there's smoke, then that's an emergency.  If
3   it's just beeping randomly like, you know, a smoke
4   detector starts beeping when your battery starts to
5   get low, it's not an emergency.
6   BY MR. WILLIAN:
7    Q.   Does this say that it's just -- withdrawn.
8        Okay.  Did anyone tell you that those were
9   the criteria to follow as you described them?
10    A.   I don't remember that.
11    Q.   Regardless, with respect to exhibit 20,
12   you never changed that from an emergency to urgent,
13   did you?
14    A.   No.
15    Q.   And with respect to the time that you
16   entered for when the work was started and in the
17   in-progress field what's entered is 6/19 at
18   9:41 a.m., but the tech notes show the work wasn't
19   started until 11:20.  Do you see that?
20    A.   I see that.
21    Q.   Can you explain that discrepancy?
22    A.   I cannot.
23    Q.   Would you agree you are the person
24   responsible for entering in the in-progress start
25   time of 6/19/2006 at 9:41 a.m.?

Page 176

1    A.   No.
2    Q.   Who did that?
3    A.   I don't know.
4    Q.   You are the last person to update it,
5   right?  So you were the person responsible for
6   ensuring the time entered as far as the start and
7   completion time were accurate, correct?
8    A.   Yeah.  But, like I said, I don't remember
9   entering any of that.  I could have just been the
10   last one to update it.
11    Q.   The work completed in the status history
12   shows the work was completed June 19th at
13   11:00 a.m., but if you look at the tech notes, it
14   wasn't completed until noon.  Do you see that?
15    A.   I do.
16    Q.   That's a discrepancy, right?
17    A.   Yes.
18    Q.   Can you explain the discrepancy?
19    A.   I cannot.
20    Q.   Were you the person responsible for
21   entering in the accurate completion time into the
22   Yardi system?
23    A.   I -- yeah.  Me or my maintenance lead.
24    Q.   Does it appear that you did that here?
25    A.   It appears that I was the last one to



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 46 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      177–180

Page 177

1  update it.
2     Q.  Did you enter the completion time of
3  11:00 a.m. when the tech notes show the completion
4  time was noon?
5     A.  I don't know.
6     Q.  Would you agree if this is an emergency
7  work order, that this work order would be a fail?
8     A.  With those notes, yes.
9        (Exhibit 022 was marked for
10        identification.)
11 BY MR. WILLIAN:
12    Q.  I'm handing to you deposition exhibit 22,
13 which is another work order.  The tech notes
14 indicate that the work was done on July 13th of
15 2007.  It was started at 1:15 and it was completed
16 at 1:25 that same day.  Do you see that?
17    A.  Yes.
18    Q.  And this is a routine work order?
19    A.  Yes.
20    Q.  The call-in date of the work order was
21 actually July 5th of 2007.  Do you see that in the
22 lower right-hand corner of the first page?
23    A.  Yes.
24    Q.  Based on the hard copy of the work order
25 and the tech notes, this work order should have been

Page 178

1  a fail, true?
2     A.  With those notes, yes.
3     Q.  And you'll see that as the information was
4  entered into Yardi, it indicated that the hours from
5  call to start, instead of being a fail, were 53.93
6  hours and therefore were a pass.  Do you see that?
7     A.  Yes.
8     Q.  And the reason that resulted is because
9  whoever, if you turn to the last page, entered the
10 data into the actual labor tab indicated that the
11 start date of this work was July 7th, 2007, at
12 1:15 p.m. instead of July 13th as indicated by the
13 tech notes.  Do you see that?
14    A.  Yes.
15    Q.  Were you the person responsible for
16 entering in the incorrect start date of July 7,
17 2007?
18    A.  I'm not sure.
19    Q.  You were the last person to update this
20 work order, correct?
21    A.  Yes.
22    Q.  Would you agree that by, whoever did it,
23 entering the incorrect start date of July 7, 2007
24 into this work order, that it was a pass instead of
25 a fail?

Page 179

1     A.  If that's what was entered, yeah.
2     Q.  Yes.  And you'll see that you last updated
3  this work order on July 16th, 2007, so three days
4  after the actual work was completed, right?
5     A.  That's what it shows.
6     Q.  You are the person responsible for making
7  sure that the start dates and the completion dates
8  are accurate, correct?
9     A.  Yes.
10    Q.  In fact, you indicate that the work was
11 completed in the labor tab on July 7, 2007, when, in
12 fact, we know the work was not completed until
13 July 13th of 2007, correct?
14       MR. DUTTON:  Objection to the form of the
15 question.  No foundation.
16       THE WITNESS:  Yeah.  I don't know if I
17 entered those notes.
18 BY MR. WILLIAN:
19    Q.  Whoever entered those notes, and you were
20 the last person to update, but whoever entered those
21 notes, indicated that the work was finished on
22 July 7, 2007, when it was actually finished on
23 July 13, 2007, right?
24       MR. DUTTON:  Objection; no foundation.
25       THE WITNESS:  That's what it shows.

Page 180

1  BY MR. WILLIAN:
2     Q.  Now, we've looked at several examples of
3  incorrect start and date times being entered into
4  Yardi relatively contemporaneous with the finish of
5  the work order.  Why was that being done,
6  Mr. Olivares?
7        MR. DUTTON:  Objection; misstates his
8  testimony.
9        THE WITNESS:  I don't know.  I don't
10 remember doing that.
11 BY MR. WILLIAN:
12    Q.  Do you have any knowledge here that could
13 help me why these incorrect start and completion
14 dates are being entered into Yardi right around the
15 time that you were closing out the work orders?
16       MR. DUTTON:  Objection; no foundation.
17       THE WITNESS:  No.
18       (Exhibit 023 was marked for
19       identification.)
20 BY MR. WILLIAN:
21    Q.  Handing to you exhibit 23.  Exhibit 23 is
22 another copy of a work order.  The tech notes
23 indicate that the work was done on September 5th of
24 2007 at 12:15.  It was started at that time, and
25 that it was finished at 12:40 of the same day.  I'm



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 47 of 72

AMADO OLIVARES                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                181–184

Page 181

1  going to withdraw that question and state it again.
2      I've given you exhibit 23. And the work
3  order indicates that the -- according to the
4  handwritten tech notes, that the work was started on
5  9/5/07 at 12:15 and was completed the same day at
6  12:40. Do you see that?
7          MR. DUTTON: Object to the form.
8  Mr. Olivares, take your time and read the document.
9  BY MR. WILLIAN:
10     Q. Can you answer that question,
11  Mr. Olivares?
12         MR. DUTTON: Please give him time to read
13  the document you just showed him.
14         THE WITNESS: That's what the notes show.
15  BY MR. WILLIAN:
16     Q. You will see that the call date for the
17  work was 8/30/07 in the lower right-hand corner of
18  the first page of this exhibit, yes?
19     A. Yes.
20     Q. And, therefore, based on the tech notes,
21  this is a fail, correct?
22         MR. DUTTON: Object to the form of the
23  question.
24         THE WITNESS: On this one it says a tree
25  fell. So we would have responded with a contractor

Page 182

1  before to pick up the tree.
2  BY MR. WILLIAN:
3      Q. Where does it say that?
4      A. It doesn't. But if you see he repaired
5  the fence without removing the tree. The tree had
6  to have been removed. We wouldn't be able to repair
7  the fence until the tree was gone.
8      Q. Mr. Olivares, the notes says that the tree
9  fell in March of 2007. The work order wasn't called
10  in until 8/30/07. Do you see that?
11     A. Yes.
12     Q. So you weren't responding to a tree that
13  had suddenly fallen on or about 8/30/07. That had
14  happened in March according to these notes, right?
15         MR. DUTTON: Objection; no foundation.
16         THE WITNESS: And we don't -- we don't
17  know if the -- if the tree was ever picked up.
18  BY MR. WILLIAN:
19     Q. There's no indication that you in any way
20  responded, tree or not, before 9/5/07, right?
21         MR. DUTTON: Objection to the form of the
22  question.
23         THE WITNESS: We would not sent -- I'm
24  sorry. We would not enter any notes when we called
25  out a contractor.

Page 183

1  BY MR. WILLIAN:
2      Q. Mr. Olivares, on the face of the first
3  page of exhibit 23, this work order is a fail,
4  correct?
5          MR. DUTTON: Objection to the form of the
6  question. Asked and answered.
7          THE WITNESS: With these notes, yes. But
8  not with -- if we count the time that we picked up
9  the tree.
10  BY MR. WILLIAN:
11     Q. You are speculating whether or not you
12  picked up the tree, true?
13         MR. DUTTON: Objection to the form of the
14  question.
15         THE WITNESS: We had to pick up the tree
16  to fix the fence.
17  BY MR. WILLIAN:
18     Q. Then there should be a work order showing
19  you picked up the tree, right?
20     A. I mean, this is the work order.
21     Q. Are there any notes indicating that you
22  picked up the tree?
23     A. There is not.
24     Q. If I go to the last page of this document,
25  it indicates that the start time for the work was

Page 184

1  8/31/07 at 12:15 p.m. Do you see that?
2      A. Yes.
3      Q. And the tree, by the way, that supposedly
4  fell, that was in March.
5      A. Yeah.
6      Q. Can you show me anything in this document
7  that supports this start time entry of 8/31/07 at
8  12:15 p.m.?
9      A. No.
10     Q. By inputting 8/31/07 at 12:15 p.m. into
11  the start time as opposed to 9/5/07, that made this
12  work order a pass instead of a fail, true?
13         MR. DUTTON: Object to the form of the
14  question.
15         THE WITNESS: That's what it shows here.
16  BY MR. WILLIAN:
17     Q. And you are, Mr. Olivares, the last person
18  to update this work order on 9/5/07, the date the
19  work was complete, right?
20     A. That's what it shows.
21     Q. Are you the person responsible for
22  inputting the 8/31/07, 12:15 p.m. start time in the
23  actual labor tab?
24     A. I'm not sure if I did that.
25     Q. You were responsible for making sure that



Case 5:14-cv-03953-BLF  Document 404-3  Filed 08/03/15  Page 48 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      185–188

Page 185

1  time there was accurate, weren't you?
2      A.  But I'm not sure if I entered that time.
3      Q.  Well, Mr. Olivares, if you look at the
4  finish time for the work, whoever put it in there,
5  also put in the fact that the work was finished on
6  August 31st of '07 at 12:45 p.m. when we know it
7  wasn't finished until September 5th, '07, right?  Do
8  you see that?
9          MR. DUTTON:  Object to the form of the
10  question.
11          THE WITNESS:  That's what it shows here.
12  BY MR. DUTTON:
13      Q.  Help me, Mr. Olivares.  Who is putting in
14  the false start and finish time?
15          MR. DUTTON:  Objection to the form of the
16  question.  No foundation.
17          THE WITNESS:  I don't know.
18  BY MR. WILLIAN:
19      Q.  Who could have possibly done it besides
20  you?
21      A.  Anybody that has Yardi access.
22      Q.  Who do you think would have put it in
23  other than you?
24      A.  I don't know.
25      Q.  Do you rule yourself out as the person who

Page 186

1  put in the actual labor time for start and finish?
2      A.  I'm not taking responsibility for doing
3  that.
4      Q.  Is it possible you did it?
5      A.  I don't remember doing it.
6      Q.  Putting aside whether you remember it or
7  not, do you believe that it's possible, based on the
8  fact that you were the last to update this work
9  order and that you are responsible for making sure
10  there's accurate start and finish times, that you
11  were the one who entered that information into the
12  labor tab?
13      A.  No.
14      Q.  You don't think you did that?
15      A.  No.
16      Q.  So you think someone else entered in false
17  data?
18          MR. DUTTON:  Objection to the form of the
19  question.
20          THE WITNESS:  I don't know.
21  BY MR. WILLIAN:
22      Q.  Let's figure out who it was, then,
23  Mr. Olivares.  Who would you have done that?
24      A.  I don't know.
25          /////

Page 187

1          (Exhibit 024 was marked for
2          identification.)
3  BY MR. WILLIAN:
4      Q.  I'm handing to you Olivares exhibit 24.
5  This work order, which is a routine work order,
6  indicates that the work was started on September 4th
7  at 3:45 p.m. and was finished the same day at
8  4:15 p.m., right?
9          MR. DUTTON:  Objection.  Let him read the
10  document, please.
11          THE WITNESS:  Just a minute.  That's the
12  time it shows.
13  BY MR. WILLIAN:
14      Q.  And if you look at the call date for the
15  work order, it's dated 8/29/07.  And, therefore,
16  based on the tech notes, this routine work order
17  should have been a fail, right?
18      A.  With those notes, yes.
19      Q.  Yet whoever inputted the data into Yardi
20  input data to show that the hours from call to start
21  were 51.77 hours, making this a pass, correct?
22      A.  That's what it shows.
23      Q.  And if you go to the last page of this
24  document, you'll see whoever inputted the start time
25  for this work order inputted 8/31/07 at 3:45 p.m.

Page 188

1  when the work actually started on 9/4/07.  Do you
2  see that?
3          MR. DUTTON:  Objection to the form of the
4  question.  No foundation.
5          THE WITNESS:  That's what it shows.
6  BY MR. WILLIAN:
7      Q.  Whoever input the data into the actual
8  labor tab indicated that work was completed on
9  8/31/07, when it was actually completed on 9/4/07,
10  correct?
11      A.  That's what it shows here.  And just so
12  you know, on the last few that have this downloaded
13  thing, this download was done before I -- I was the
14  last one to update.  I have never, ever downloaded
15  anything.  So somebody else was downloading these.
16      Q.  Let me finish my question again.  I'll
17  come back to that.
18          Going back to exhibit 24, Mr. Olivares,
19  you were the last one to update this work order
20  on --
21      A.  Which page are we looking at?
22      Q.  Second page.  Second page of exhibit 24
23  indicates you were the last one to update.
24      A.  Second page doesn't do that.
25      Q.  I'm sorry.  I misspoke.  I'll ask the



AMADO OLIVARES                                            July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                        189–192

Page 189

1  question again.  The second to last page of
2  exhibit 24 indicates that you were the last one to
3  update this work order on 9/5/07, correct?
4      A.   That's what it shows.
5      Q.   It was your responsibility to ensure that
6  there was accurate start and finish time for this
7  work order, true?
8      A.   Yes.
9      Q.   And we can agree that the start and finish
10 time in Yardi as reflected on the last page is not
11 accurate, true?
12     A.   That's what it shows.
13     Q.   By putting inaccurate time into Yardi as
14 to the start time, that made this work order a pass
15 instead of a fail, true?
16         MR. DUTTON:  Objection; no foundation.
17         THE WITNESS:  That's with those notes,
18 yes.
19 BY MR. WILLIAN:
20     Q.   Were you, Mr. Olivares, the likely person
21 who input the incorrect start and finish times into
22 Yardi?
23         MR. DUTTON:  Objection; no foundation.
24         THE WITNESS:  No.
25

Page 190

1  BY MR. WILLIAN:
2      Q.   I'm sorry?
3      A.   No.
4      Q.   Who did it?
5      A.   I don't know.
6      Q.   Does anyone else have access to your
7  password?
8      A.   I don't know.  But somebody downloaded
9  this document and I didn't.
10     Q.   Let me ask you about your download issue.
11 Where does it say that it was downloaded?
12     A.   Right here on second to last page.
13     Q.   Where does it say it was downloaded?
14     A.   Right under work completed.
15     Q.   So it says it was downloaded.  So it was
16 downloaded according to this at 8/31/07.  How does
17 that somehow justify in any way the false start and
18 completion times entered into the labor tab?
19     A.   Well, the only thing it justifies is I'm
20 not only one that has been updating this, because I
21 didn't do that.  Because I would never do it on any
22 work order.
23     Q.   You were the last one to update this work
24 order, right?
25     A.   Yeah, but that doesn't mean I added all

Page 191

1  those times.  It definitely means I didn't download
2  it.  So it could mean somebody else added those
3  times too.
4      Q.   So let's focus on the significance of
5  downloaded.  What does that mean when something is
6  downloaded?
7      A.   I have no idea.
8      Q.   You have been working with Yardi now for,
9  not quite a decade, but getting there.  You don't
10 know what that downloaded field means?
11     A.   No.
12     Q.   No idea?
13     A.   None.
14     Q.   So when you are saying that other people
15 had access to Yardi or this work order because it
16 was downloaded, you really don't know that because
17 you don't know what it means, right?
18     A.   Well, I know you have to drop the box
19 down, change the status and do something with
20 download.
21     Q.   So you know enough about the download
22 field to know that someone has to manually go in
23 there and enter that information?
24     A.   Yeah.  But I don't know what it does when
25 they do that.

Page 192

1      Q.   Have you ever put information into a
2  downloaded field?
3      A.   No.
4      Q.   Does the download -- I've asked that
5  question.
6          Based on the information in the tech
7  notes, can we agree that this work order should have
8  been a fail instead of a pass?
9      A.   With those notes.
10     Q.   That's a yes with those notes?
11     A.   Yes.
12         (Exhibit 025 was marked for
13         identification.)
14 BY MR. WILLIAN:
15     Q.   I'm handing to you exhibit 25.  Exhibit 25
16 is another work -- routine work order indicating
17 that the work was performed on September 4th at
18 10:30, and the work was finished the same day at
19 10:45, correct?
20     A.   Yes.
21     Q.   And the call-in date for the work order
22 was 8/29/07, making this work order a fail, true?
23     A.   That's what it shows.
24         MR. DUTTON:  Object to the form of the
25 question.  No foundation.



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 50 of 72

AMADO OLIVARES                                    July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                    193–196

Page 193

1  BY MR. WILLIAN:
2      Q.  If you go into Yardi you'll see, however,
3  that it's a pass because, based on the information
4  that someone input, the hours from call to start
5  were 46.58 hours.  Do you see that?
6      A.  Yes.
7      Q.  And we'll see on the second to last page
8  you were the last one to update this work order on
9  September 5th of 2007.  So day after the work was
10 completed, right?
11     A.  That's what it shows.
12     Q.  However, if you go to the last page and
13 look at the actual labor start and finish time,
14 someone input the data indicating the work was
15 started on 8/31/07 at 10:30, when the work was
16 really started on 9/4, 10:30.  Do you see that?
17         MR. DUTTON:  Objection to the form of the
18 question.  No foundation.
19         THE WITNESS:  I see that.
20 BY MR. WILLIAN:
21     Q.  And by inputting the start date as 8/31/07
22 instead of 9/4/07 according to the tech notes, then
23 that made this work order into a pass in the Yardi
24 system rather than a fail, right?
25         MR. DUTTON:  Objection to the form of the

Page 194

1  question.
2          THE WITNESS:  That's what it shows.
3  BY MR. WILLIAN:
4      Q.  And you'll see that whoever put in the
5  data into the actual labor field also indicated the
6  work was finished on 8/31/07, when it was actually
7  finished on 9/4/07, correct?
8          MR. DUTTON:  Objection to the form of the
9  question.
10         THE WITNESS:  Yes.  On this one also, it
11 shows somebody is downloading this.
12 BY MR. WILLIAN:
13     Q.  Now, Mr. Olivares, you were responsible
14 for ensuring that the start time and the finish time
15 and the actual labor tab were accurate, true?
16     A.  Yes.
17     Q.  And they are not accurate, true?
18         MR. DUTTON:  Objection to the form of the
19 question.  No foundation.
20         THE WITNESS:  Not to these notes.
21 BY MR. WILLIAN:
22     Q.  Can you explain why the start date and the
23 finish dates are falsely reflected in the Yardi
24 system in contrast to the tech notes?
25     A.  I cannot.

Page 195

1      Q.  Doesn't it indicate to you, Mr. Olivares,
2  that you were responsible for indicating those --
3  withdrawn.
4          Doesn't this document indicate to you,
5  Mr. Olivares, that you were the person likely for
6  inputting the incorrect start and finish times --
7      A.  No.
8      Q.  -- into Yardi?
9      A.  No.
10     Q.  Do you think you were?
11     A.  No.
12     Q.  You think someone else did it?
13     A.  I know I didn't do it.
14     Q.  Who else do you think likely did it?
15     A.  I don't know.
16     Q.  It's your job, though, to make sure that
17 the data inputted into the labor tab was accurate,
18 right?
19         MR. DUTTON:  Objection to the form of the
20 question.
21         THE WITNESS:  Yes.
22         (Exhibit 025A was marked for
23         identification.)
24 BY MR. WILLIAN:
25     Q.  I'm handing to you exhibit 25, which is

Page 196

1  another work order.  And you'll see here this work
2  order, according to the tech notes, started on
3  9/5/07 and was completed at 1:40 p.m. and was
4  completed the same day at 2:45 p.m.  Do you see
5  that?
6          MR. DUTTON:  Objection to the form of the
7  question.
8          THE WITNESS:  Yes.
9  BY MR. WILLIAN:
10     Q.  This is a routine work order that was
11 called in on August 30 of 2007, correct?
12     A.  Yes.
13     Q.  Based on the work order and the tech
14 notes, this should have been a fail, correct?
15     A.  From those notes, yes.
16     Q.  Yet in Yardi it is a pass because the
17 hours from call to start are only 22.42 hours.  Do
18 you see that?
19     A.  I see that.
20     Q.  And if you go to the actual labor tab on
21 the last page, whoever entered this information
22 indicated the start time for the work was 8/31/07 at
23 1:45 p.m. instead of 9/5/07 at 1:40 p.m., correct?
24         MR. DUTTON:  Objection to the form.
25         THE WITNESS:  Yeah.  This one right here,



Page 197

1   there should be more times.
2   BY MR. WILLIAN:
3      Q.   And by inputting the start time of 8/31/07
4   instead of 9/5/07, that made this a pass into Yardi,
5   correct?
6          MR. DUTTON: Objection to the form.
7          THE WITNESS: That's what it shows. On
8   page 1, there's times missing because looks like
9   they were twice. If you can see, at one time it was
10  pending, and the second time it was completed.
11  BY MR. WILLIAN:
12     Q.   Can you find any information on the front
13  of this work order that indicates that the start day
14  was actually 8/31/07 as that time and date are put
15  into the actual labor tab?
16     A.   It doesn't have anything written, but
17  there is definitely two times they were at this
18  house.
19     Q.   Where does it say that?
20     A.   One time it was pending, and the second
21  time they went back and completed it.
22     Q.   Where does it say pending?
23     A.   Right here on your right side.
24     Q.   And why does pending mean you have been to
25  the house?

Page 198

1      A.   Because it means you went and you looked
2   to see what was wrong and maybe you need parts, but
3   the job is pending.
4      Q.   If a tech went to the house to investigate
5   the situation, the tech is supposed to write that
6   down that they arrive at the house, correct?
7          MR. DUTTON: Objection to the form.
8          THE WITNESS: They are supposed to.
9   BY MR. WILLIAN:
10     Q.   And that is not reflected here, is it?
11     A.   No. They only did part of the notes.
12     Q.   In fact, if you look at the note at the
13  bottom of the page it says: "9/5, I have yet" -- "I
14  have to get the fan from the Presidio to replace the
15  motor." Is that motor?
16     A.   Yes.
17     Q.   So what that tells you is the initial
18  visit was on 9/5, and that there was a follow-up
19  visit after that, correct?
20         MR. DUTTON: Objection; no foundation.
21         THE WITNESS: Tells me on 9/5 they went to
22  get the motor from the Presidio.
23  BY MR. WILLIAN:
24     Q.   Okay. But this also indicates that the
25  first visit was likely on 9/5, and they visited and

Page 199

1   they decided they had to go get the fan -- or the
2   motor, correct?
3          MR. DUTTON: Objection to form.
4          THE WITNESS: It doesn't say which one is
5   the first visit.
6   BY MR. WILLIAN:
7      Q.   Based on the tech notes, do you believe
8   that this should have been a fail instead of a pass?
9          MR. DUTTON: Objection to the form.
10         THE WITNESS: No.
11  BY MR. WILLIAN:
12     Q.   Where in the tech notes does it say that
13  there was a visit to the house that would suggest
14  this should be a pass?
15     A.   It doesn't. I mean, at this point when
16  it's questionable, the technician would be called
17  and asked what time they would have arrived to the
18  home. And we would have just typed in the work
19  order -- the notes on the work order.
20     Q.   Were you the person to enter the
21  information into the actual labor tab on the last
22  page?
23     A.   I don't know.
24     Q.   Do you think someone else entered that
25  into -- that information into the labor tab like the

Page 200

1   last few ones?
2      A.   I don't remember doing any of it. Same
3   thing. Somebody downloaded them. Like I said, I
4   don't download the information.
5      Q.   What would be a reason for someone
6   downloading one of these work orders?
7      A.   I don't know.
8      Q.   Have you ever seen anyone download a work
9   order before?
10     A.   No.
11         (Exhibit 026 was marked for
12         identification.)
13  BY MR. WILLIAN:
14     Q.   Handing to you exhibit 26, which is a
15  routine work order to repair door. Mr. Dunn's tech
16  notes indicate the work was started on 1/23 at 4:10,
17  and was completed the same day at 4:25. Do you see
18  that?
19     A.   Yes.
20     Q.   And if you look in the lower right-hand
21  corner, you see the work order was first called on
22  1/17/07, making this a fail according to the tech
23  notes, correct?
24     A.   With the tech notes, yes.
25     Q.   And if you go into Yardi, you see that



Page 201

1  this work order registers as a pass because, when
2  someone put in the start time, it resulted in the
3  hours from call to start of 54.82 hours from call to
4  start. Do you see that?
5      A.  Yes.
6      Q.  If you go to the last page of this
7  exhibit, in the actual labor tab you will see that
8  someone put in the actual start date for the work of
9  1/19/07 at 4:10 p.m. instead of what the tech notes
10 reflect, which is 1/23 at 4:10 p.m., correct?
11     A.  That's what it shows.
12     Q.  As a result of entering in to Yardi the
13 incorrect start time of 1/19/07 that resulted this
14 work order being a pass instead of a fail, right?
15         MR. DUTTON: Objection; no foundation.
16         THE WITNESS: That's what it shows here.
17 BY MR. WILLIAN:
18     Q.  Indeed, the actual finish time that
19 someone inputted into Yardi is 1/19/07 when, in
20 fact, the actual finish time for the work is 1/23.
21 That's, again, an incorrect entry, right?
22         MR. DUTTON: Objection to the form of the
23 question. No foundation.
24         THE WITNESS: On this one right here, I
25 don't know if I entered the notes. But I can tell

Page 202

1  you if there was entered on 4 -- 1/23 at 4:38, you
2  see how it shows that, it shows 4:38 p.m., I get out
3  before that time, so that wouldn't have been me.
4  That's what I'm telling you on this one. I always
5  leave at 4:30. I mean, I would have entered the
6  notes the following day and I wouldn't have -- it
7  would have not showed 4:38, because that's the time
8  that work order was closed out.
9  BY MR. WILLIAN:
10     Q.  Let me focus on that, because I'm not sure
11 you are reading this correctly, Mr. Olivares, to be
12 candid with you. You are looking at the work
13 completed time of 1/19/07 at 4:38 p.m. Do you see
14 that?
15     A.  Yes.
16     Q.  Now, you actually last updated this on
17 1/23/07, not 1/19/07. Okay?
18     A.  Okay.
19     Q.  So the 4:38 doesn't apply to the date you
20 updated it. It applies to the false date when the
21 work was completed, 1/19/07.
22         MR. DUTTON: Objection to the form.
23 There's no foundation.
24 BY MR. WILLIAN:
25     Q.  Right? Do you see that?

Page 203

1      A.  I don't see that, no.
2      Q.  What's the significance of the 4:38 p.m.,
3  which is next to the work completed date of 1/19/07?
4      A.  I don't know. I mean, when the work was
5  completed, but it wasn't completed on that time if
6  you are saying that.
7      Q.  I agree with you.
8      A.  It was completed at 4:30, not 4:38.
9      Q.  Okay. Let's focus on the days for a
10 minute. You are focusing on minutes. We know the
11 work was actually completed on 1/23/07, right, from
12 the tech notes?
13         MR. DUTTON: Objection; no foundation.
14         THE WITNESS: From the tech notes.
15 BY MR. WILLIAN:
16     Q.  And, therefore, we know that the work
17 completed date of 1/19/07 on the second to last page
18 and 1/19/07 of the last page, those dates are
19 incorrect.
20         MR. DUTTON: Objection; no foundation.
21 BY MR. WILLIAN:
22     Q.  Right?
23     A.  They don't match, yeah. They are not the
24 same.
25     Q.  And we know that you last updated this

Page 204

1  e-mail -- this work order, rather, on 1/23/07, which
2  was the day that the actual work was completed,
3  right?
4          MR. DUTTON: Objection; no foundation.
5          THE WITNESS: It is the same time as the
6  first page.
7  BY MR. WILLIAN:
8      Q.  I just need to make sure the record is
9  clear. You updated this work order on the same day
10 the work was completed according to the tech notes,
11 correct?
12         MR. DUTTON: Objection; no foundation.
13         THE WITNESS: I was the last one to update
14 it.
15 BY MR. WILLIAN:
16     Q.  Yes, you need to listen to my question and
17 answer that. Okay? I didn't ask whether you were
18 the first or last. I'm just saying that you were
19 the last person to update this work order, and you
20 did so on 1/23/07, which was the same day that the
21 work was finished, right?
22         MR. DUTTON: Objection to the form of the
23 question.
24         THE WITNESS: Yes, I was the last one.
25



AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                            205–208

Page 205

1  BY MR. WILLIAN:
2      Q.  You were the person who was responsible
3  for ensuring that the start time and the completion
4  dates in the actual labor tab of Yardi, which is
5  reflected in the last page of this exhibit, were
6  accurate, true?
7      A.  Yes.
8      Q.  Who was the person who entered in the
9  inaccurate start and completion dates in Yardi?
10         MR. DUTTON:  Objection to the form,
11  foundation.
12         THE WITNESS:  I don't know.
13         MR. DUTTON:  You need to wait,
14  Mr. Olivares.
15  BY MR. WILLIAN:
16     Q.  Was it likely you?
17         MR. DUTTON:  Objection; no foundation.
18         THE WITNESS:  I don't know.
19  BY MR. WILLIAN:
20     Q.  Is it possible it was you?
21     A.  No.
22         MR. DUTTON:  Same objection.
23  BY MR. WILLIAN:
24     Q.  No?
25     A.  I don't -- I wouldn't have did that.

Page 206

1      Q.  Who did it?
2         MR. DUTTON:  Objection; no foundation.
3         THE WITNESS:  I don't know.
4  BY MR. WILLIAN:
5      Q.  Who else would have had the ability to go
6  in there and enter in those start -- those incorrect
7  start and finish dates in Yardi?
8         MR. DUTTON:  Objection; no foundation.
9         THE WITNESS:  I don't know.
10  BY MR. WILLIAN:
11     Q.  In a work order that you had
12  responsibility for closing out?
13         MR. DUTTON:  Same objection.
14  BY MR. WILLIAN:
15     Q.  Can you think of anybody?
16         MR. DUTTON:  Same objection.
17         THE WITNESS:  No.
18  BY MR. WILLIAN:
19     Q.  I'm going to keep trying to jog your
20  recollection here, Mr. Olivares.  I'm trying to get
21  some help on what was going on here.
22         MR. DUTTON:  Move to strike.  Ask a
23  question, please.
24         (Exhibit 027 was marked for
25         identification.)

Page 207

1  BY MR. WILLIAN:
2      Q.  Handing you exhibit 27.  This work order
3  shows that this routine work order was started by
4  apparently Mr. Warren on January 29th at 4:00 p.m.,
5  and was finished the same day at 4:40 p.m.  Do you
6  see that?
7      A.  Yes.
8      Q.  And you'll see that the call date for the
9  work order was 1/25/07.  Do you see that?
10     A.  Yes.
11     Q.  And that makes this a fail, this work
12  order, correct?
13         MR. DUTTON:  Objection to the form of the
14  question.  No foundation.
15         THE WITNESS:  Yes.
16  BY MR. WILLIAN:
17     Q.  And if you look at the Yardi data, you
18  will see that someone indicated the hours from call
19  to start were only 25.63 hours, making this a pass.
20  Do you see that?
21         MR. DUTTON:  Same objection.
22         THE WITNESS:  Yes.
23  BY MR. WILLIAN:
24     Q.  If you go to the last page of this
25  exhibit, you'll see that the reason this work order

Page 208

1  was a pass in Yardi is someone entered an incorrect
2  start date of 1/26/07 of 4:00 p.m. when the work was
3  actually started at 1/29/07.  Do you see that?
4         MR. DUTTON:  Objection to the form of the
5  question.  No foundation.
6         THE WITNESS:  Yes.
7  BY MR. WILLIAN:
8      Q.  And as a result of entering into Yardi the
9  incorrect start date of 1/26/07, it became a pass,
10  right?
11         MR. DUTTON:  Objection to the form of the
12  question.
13         THE WITNESS:  That's what it shows.
14  BY MR. WILLIAN:
15     Q.  Once again, you, Mr. Olivares, were the
16  last person to update this work order.  And you did
17  so on 1/29/07, so the date that the work was
18  completed.  Can you tell us why the start date is
19  1/26/07 instead of the correct date of 1/29/07.
20         MR. DUTTON:  Objection to the form of the
21  question.  No foundation.
22         THE WITNESS:  No.
23  BY MR. WILLIAN:
24     Q.  Were you the person responsible for
25  entering in the false start date of 1/26/07?



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
209–212

Page 209

1      MR. DUTTON: Same objection.
2      THE WITNESS: No.
3  BY MR. WILLIAN:
4    Q.  Who was?
5    A.  I don't know.
6      MR. DUTTON: Same objection.
7  BY MR. WILLIAN:
8    Q.  Were you the person responsible for
9  ensuring that the start date was accurate in the
10  labor tab?
11      MR. DUTTON: Same objection.
12      THE WITNESS: Yes.
13  BY MR. WILLIAN:
14    Q.  And you didn't do that did you?
15    A.  I didn't do what?
16    Q.  Make sure that the start date was accurate
17  in the labor tab.
18    A.  I don't remember this work order, yeah.
19      MR. WILLIAN: All right.  We need to
20  change the tape, so why don't wake take a short
21  break?
22      VIDEO OPERATOR: This marks the end of
23  disk number 2.  We are going off the record at
24  2:14 p.m.
25      (Recess taken.)

Page 210

1      VIDEO OPERATOR: This marks the beginning
2  of disk 3.  We're going back on the record at
3  2:24 p.m.
4      MR. WILLIAN: We're going to make a
5  correction to the record.  I marked two exhibit
6  25's.  And the second one we are going to make into
7  25A.  And for the record that is Bates number AMS
8  Monterey 00881769.
9      MR. DUTTON: That's the second one?
10      MR. WILLIAN: Yes.
11      MR. DUTTON: The first one is Bates
12  number -- and then 26 is -- okay, thank you.
13      (Exhibit 028 was marked for
14      identification.)
15  BY MR. WILLIAN:
16    Q.  Handing you exhibit 28.  Exhibit 28 is
17  another work order.  It's a routine order.  The work
18  was started on 8/25/07 at 11:15.  Do you see that?
19      MR. DUTTON: Objection to the form.  No
20  foundation.  Please let him read.
21      THE WITNESS: Yes, I see that.
22  BY MR. WILLIAN:
23    Q.  And the call-in date for the worker order
24  is 8/21/07 making this work order, according to the
25  tech notes, a fail; is that true?

Page 211

1      MR. DUTTON: Objection to the form of the
2  question.
3      THE WITNESS: That's what it shows here.
4  BY MR. WILLIAN:
5    Q.  Yet, if you go into Yardi, you will see
6  that this work order registers as a pass because of
7  the time someone put in for call to start resulted
8  in a call to start time of 45.02 hours.  Do you see
9  that?
10      MR. DUTTON: Objection to the form of the
11  question.
12      THE WITNESS: That's what it shows here.
13  BY MR. WILLIAN:
14    Q.  You will see that if you go to the last
15  page, that the start date that was put in for the
16  start of the work order was 8/23/07 at 11:15 instead
17  of 8/25/07 as reflected in the notes; is that true?
18      MR. DUTTON: Objection to the form of the
19  question.
20      THE WITNESS: That's what it shows here.
21  BY MR. WILLIAN:
22    Q.  By inputting the incorrect start time of
23  8/23/07, that resulted in a pass; is that true?
24      MR. DUTTON: Objection; no foundation.
25      THE WITNESS: That's what it shows here.

Page 212

1  BY MR. WILLIAN:
2    Q.  You, Mr. Olivares, were the last person to
3  update this work order on 8/30/07, so several days
4  after the completion of the work.  Do you see that?
5    A.  Yes.
6    Q.  You were the person responsible for
7  ensuring that the start and finish date for the work
8  was accurate, correct?
9    A.  That's what it shows here.
10    Q.  And, in fact, the start date for the work
11  and the finish date for the work, at least the first
12  set of work that they did, is incorrectly input into
13  Yardi as 8/23/07?
14      MR. DUTTON: Objection; no foundation.
15  BY MR. WILLIAN:
16    Q.  True?
17    A.  That's what it shows here.
18    Q.  Mr. Olivares, weren't you the likely
19  person who input the incorrect start and finish time
20  into Yardi?
21      MR. DUTTON: Objection; no objection.
22      THE WITNESS: No.
23  BY MR. WILLIAN:
24    Q.  Who was?
25    A.  I don't know.



AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                            213–216

Page 213

1    Q.  Based --
2        (Exhibit 029 was marked for
3        identification.)
4    BY MR. WILLIAN:
5    Q.  I'm handing to you exhibit 29.  Exhibit 29
6    is another work order.  It reflects that for this
7    routine work order the work was started on 9/5/07 at
8    11:00 o'clock and was completed at 12:05 p.m.  Do
9    you see that?
10   A.  Yes.
11   Q.  According to the work order, the call-in
12   date of the work was 8/31/07.  Do you see that?
13   A.  Yes.
14   Q.  That makes this routine work order a fail
15   based on the tech notes, correct?
16       MR. DUTTON:  Objection; no foundation.
17       THE WITNESS:  Based on these notes, yes.
18   BY MR. WILLIAN:
19   Q.  And if you look at the Yardi data, you'll
20   see that the way the information was entered into
21   Yardi caused this work order to be a pass because
22   the hours from call to start were 71.67 hours.  Do
23   you see that?
24   A.  Yes.
25   Q.  If you look at the last page, the reason

Page 214

1    why those hours registered as the time from call to
2    start is that someone inputted the start date for
3    the work as 9/3/07 instead of 9/5/07.  Do you see
4    that?
5        MR. DUTTON:  Objection to the form of the
6    question.
7        THE WITNESS:  That's what it shows here.
8    BY MR. WILLIAN:
9    Q.  By inputting the false start time 9/3/07,
10   that resulted in a pass instead of a fail if the
11   tech start time had been put in.
12       MR. DUTTON:  Objection; no foundation.
13   BY MR. WILLIAN:
14   Q.  True?
15   A.  That's what it shows here.
16   Q.  You, Mr. Olivares, were the last person to
17   update this work order on 9/5/07.  So the day the
18   work was actually done or completed, were you the
19   person responsible for entering in the false start
20   date of 9/3/07 and the false finish date for the
21   work of 9/3/07?
22       MR. DUTTON:  Objection; no foundation.
23       THE WITNESS:  I don't remember doing that.
24   BY MR. WILLIAN:
25   Q.  Do you think you likely did it?

Page 215

1        MR. DUTTON:  Objection; no foundation.
2        THE WITNESS:  I don't remember doing that.
3    BY MR. WILLIAN:
4    Q.  Do you think you likely did it?
5        MR. DUTTON:  Objection; no foundation.
6        THE WITNESS:  No, because this work order,
7    same thing, was downloaded.  I wouldn't have did
8    that.
9    BY MR. WILLIAN:
10   Q.  Why does the download mean someone else
11   likely entered in the false start and finish time?
12       MR. DUTTON:  Objection; no foundation.
13       THE WITNESS:  Well, it means somebody else
14   was doing something with this work order.
15   BY MR. WILLIAN:
16   Q.  Can you think of who would have entered
17   into Yardi the false start and finish time?  Help me
18   out here.  Who would have done that?
19       MR. DUTTON:  Objection; no foundation.
20       THE WITNESS:  I don't know.
21   BY MR. WILLIAN:
22   Q.  No idea?
23   A.  No.
24       (Exhibit 030 was marked for
25       identification.)

Page 216

1    BY MR. WILLIAN:
2    Q.  Handing to you exhibit 30.  Exhibit 30 is
3    another routine work order.  The tech notes indicate
4    that the actual start time for the work was 9/4/07,
5    and the date of the call was 8/31/07, making this a
6    fail according to the tech notes; is that true?
7        MR. DUTTON:  Objection to the form of the
8    question.
9        THE WITNESS:  That's what the notes show.
10   BY MR. WILLIAN:
11   Q.  If you look into Yardi, you will see that
12   the information input into Yardi resulted in this
13   routine work order being a pass because the hours
14   from call to start were 68.67 hours, correct?
15       MR. DUTTON:  Same objection.
16       THE WITNESS:  That's what it shows here.
17   BY MR. WILLIAN:
18   Q.  And the reason for that is if you go to
19   the last page of this exhibit, you will see someone
20   entered into Yardi a false start date of 9/3/07 and
21   a false finish date of 9/3/07.  Do you see that?
22       MR. DUTTON:  Objection; no foundation.
23       THE WITNESS:  That's the time it shows on
24   here.
25



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
217–220

Page 217

1  BY MR. WILLIAN:
2      Q.  And you were the last person to update
3  this work order, Mr. Olivares, on 9/5/07.  Were you
4  the person most likely to have inputted this false
5  start and finish time?
6          MR. DUTTON:  Objection; no foundation.
7          THE WITNESS:  No.
8  BY MR. WILLIAN:
9      Q.  By inputting the false start time of
10  9/3/07 instead of 9/4/07, which is what's reflected
11  by the tech notes, that resulted in a pass instead
12  of a fail, true?
13          MR. DUTTON:  Objection; no foundation.
14          THE WITNESS:  That's what it shows here.
15  BY MR. WILLIAN:
16      Q.  If you didn't input the false start and
17  finish time, who did, Mr. Olivares?
18          MR. DUTTON:  Objection; no foundation.
19          THE WITNESS:  I don't know.
20  BY MR. WILLIAN:
21      Q.  You were the person responsible for making
22  sure that the data entered into Yardi for the start
23  and finish time were accurate, true?
24      A.  Yes.
25      /////

Page 218

1          (Exhibit 031 was marked for
2          identification.)
3  BY MR. WILLIAN:
4      Q.  Hand to you exhibit 31.  Exhibit 31 is
5  another routine work order.  You'll see from the
6  tech notes the work was started on 9/5/07 at 10:20
7  and was completed the same day at 10:45.  The
8  call-in date for the work order was 8/31/07, making
9  this work order a fail according to the tech notes,
10  true?
11          MR. DUTTON:  Objection; no foundation.
12          THE WITNESS:  Yeah.  On this one it could
13  be the backyard faucet has been replaced, like, not
14  that he replaced it.  Might have already been done.
15  BY MR. WILLIAN:
16      Q.  I'm sorry.  You are saying the backyard
17  faucet may have been already done --
18      A.  Yeah.
19      Q.  -- before 9/5/07?
20      A.  Yes.
21      Q.  Does it say that anywhere here?
22      A.  It does not.
23      Q.  Are you just speculating now,
24  Mr. Olivares?
25          MR. DUTTON:  Objection.

Page 219

1          THE WITNESS:  It says it has been
2  replaced, not that he replaced it.
3  BY MR. WILLIAN:
4      Q.  When he wrote the backyard faucet has been
5  replaced, isn't he writing that's the work that he
6  performed on 9/5/07?
7      A.  I'm not sure.
8      Q.  Well, he is supposed to put the work that
9  he did on 9/5/07.  Do you see any other description
10  of work done other than the backyard faucet has been
11  replaced?
12      A.  I do not.
13      Q.  Isn't that description, the backyard
14  faucet has been replaced, likely refer to the work
15  that was done by the tech on 9/5/07?
16      A.  Maybe.
17      Q.  Would you agree with me that based on the
18  tech notes, this work order should have been a fail?
19          MR. DUTTON:  Objection to the form of the
20  question.
21          THE WITNESS:  Can you repeat that?
22  BY MR. WILLIAN:
23      Q.  Do you agree with me that based on the
24  technician notes that this work order should have
25  been a fail?

Page 220

1          MR. DUTTON:  Same objection.
2          THE WITNESS:  With that time, yes.
3  BY MR. WILLIAN:
4      Q.  If you go to the last page of this
5  document, you will see that someone entered the
6  start date of the work on nine -- as 9/3/07 instead
7  of 9/5/07, making this work order a fail instead of
8  a pass, correct?
9          MR. DUTTON:  I think you misspoke.
10  BY MR. WILLIAN:
11      Q.  I did, thank you.  You'll see, if you look
12  at the last page of this exhibit, someone entered
13  the start date of 9/3/07, instead of the tech's
14  notes of 9/5/07, making this work order in Yardi a
15  pass instead of a fail.
16      A.  Yeah.  If you look at the notes, on the
17  second to last it shows backyard faucet was
18  replaced.  So there might be another work order with
19  those times and these notes because neither of these
20  match the front.
21      Q.  I can agree that the start time and the
22  finish time don't match the front.  Is that what you
23  are saying?
24      A.  Or the notes.
25      Q.  If you look at the work order number on



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
221–224

Page 221

1 the last page of this exhibit, you'll see that the
2 work order number is 385074 in the upper left-hand
3 corner. Do you see that?
4     A. Yes.
5     Q. And that matches the hard copy of the work
6 order 385074?
7     A. Yes.
8     Q. Do you have any -- withdrawn.
9         Were you the last person to update this
10 work order, Mr. Olivares, on 9/5/07, the day that
11 the work was completed?
12     A. That's what it shows here.
13         MR. DUTTON: Objection to the form.
14 BY MR. WILLIAN:
15     Q. Do you have any explanation why there's an
16 incorrect start date of 9/3/07?
17         MR. DUTTON: Objection to the form. No
18 foundation.
19         THE WITNESS: I don't have an explanation.
20 BY MR. WILLIAN:
21     Q. Did you enter into Yardi the false start
22 and finish date?
23         MR. DUTTON: Objection; no foundation.
24         THE WITNESS: No.
25

Page 222

1 BY MR. WILLIAN:
2     Q. Who did?
3     A. I don't know.
4         (Exhibit 032 was marked for
5         identification.)
6 BY MR. WILLIAN:
7     Q. In 2007, did you report to Ron Calloway?
8     A. I'm not positive. I know I did report to
9 Ron Calloway. I'm not sure the time, the exact
10 date.
11     Q. Let me hand to you exhibit 32. Exhibit 32
12 is an e-mail from Ron Calloway, cc to Michael Waibel
13 to -- it says "good morning, all." Do you see that?
14     A. Yes.
15     Q. And did you understand at this time in
16 August of '07 that Mr. Calloway was the maintenance
17 director?
18     A. Yes.
19     Q. And as a result you reported to him; is
20 that true?
21     A. Yes.
22     Q. And do you believe that, based on the way
23 Mr. Calloway has addressed this e-mail, "good
24 morning, all," that he's sending this to a number of
25 people, including yourself?

Page 223

1         MR. DUTTON: Objection; no foundation.
2 BY MR. WILLIAN:
3     Q. Feel free to look at the e-mail or read
4 it.
5     A. I know he's sending it to several people.
6 I don't know if he is sending it to me.
7     Q. Do you believe you received this?
8     A. I don't remember.
9     Q. Mr. Calloway says in this e-mail which
10 goes to all: "I'll be doing the end of the month
11 maintenance report Saturday, 9/1/07." Did you have
12 responsibility for getting your end of the month
13 maintenance report done on a monthly basis?
14     A. We had to make sure all the work orders
15 were closed out.
16     Q. And that was your job?
17     A. Yes.
18     Q. He further says: "Please ensure that you
19 have closed all work orders and scrubbed them to
20 ensure they pass." Do you see that?
21     A. I do.
22     Q. Is it the case that Mr. Calloway in the
23 past had told you to scrub e-mails to ensure they
24 pass?
25         MR. DUTTON: Objection; no foundation.

Page 224

1         THE WITNESS: To scrub e-mails?
2 BY MR. WILLIAN:
3     Q. To ensure they pass --
4     A. Can you repeat that?
5     Q. -- as this e-mail says.
6         MR. DUTTON: Ask the question again.
7         THE WITNESS: Can you repeat that?
8 BY MR. WILLIAN:
9     Q. Sure? Have you seen this e-mail before.
10     A. No.
11     Q. Did you see it in preparation for your
12 deposition?
13     A. I don't remember.
14     Q. It's possible?
15     A. I don't remember.
16     Q. When was the last time you think you saw
17 this e-mail?
18         MR. DUTTON: Objection; no foundation.
19         THE WITNESS: I don't remember seeing it.
20 BY MR. WILLIAN:
21     Q. Mr. Calloway says: "Please ensure that
22 you have closed all work orders and scrubbed them to
23 ensure they pass." Do you see that?
24     A. Yes.
25     Q. So Mr. Calloway is instructing you



Page 225

1   assuming you received this e-mail, to scrub your
2   work orders to ensure they pass, correct?
3          MR. DUTTON:  Objection to the foundation.
4          THE WITNESS:  To do what?
5   BY MR. WILLIAN:
6      Q.   Mr. Calloway is instructing you to -- and
7   I'm reading from the e-mail -- to scrub your work
8   orders to ensure they pass.  Do you see that?
9          MR. DUTTON:  Objection; foundation.
10         THE WITNESS:  Yeah.  But what does he mean
11  by scrub?
12  BY MR. WILLIAN:
13     Q.   He's asking you to -- you tell me.  What
14  did he mean by scrub?
15         MR. DUTTON:  Objection; no foundation.
16         THE WITNESS:  I don't know.
17  BY MR. WILLIAN:
18     Q.   You ever hear Mr. Calloway use the word
19  "scrub"?
20     A.   No.
21     Q.   You ever hear anyone use the term "scrub"
22  in connection with work orders?
23     A.   No, not that I can remember.
24     Q.   Wasn't it common, Mr. Olivares, that
25  people would talk about scrubbing the work order

Page 226

1   data?
2      A.   I don't remember that.
3      Q.   You've got other e-mails from Mr. Calloway
4   where he refers to scrubbing the data.  Do you
5   remember any of those?
6      A.   I do not.
7      Q.   So it's your testimony as you sit here
8   today you have never heard of someone referring to
9   scrubbing the work orders to ensure they pass?
10     A.   I don't remember that.
11         (Exhibit 033 was marked for
12         identification.)
13  BY MR. WILLIAN:
14     Q.   I'm handing you exhibit 33.  This is
15  another Ron Calloway e-mail.  This one dated
16  11/5/07.  He refers to end of the month.  Says:
17  "Good morning, all.  I'll be picking up the RMC for
18  the end of October today.  Also scrub your work
19  orders pass/fail.  My monthly report is due this
20  week.  Thank you.  Have a great week."  Do you see
21  that?
22     A.   I do.
23     Q.   And you would be giving -- you would have
24  to ensure that your monthly report was completed so
25  that Mr. Calloway could aggregate the monthly

Page 227

1   reports into a single report; is that true?
2          MR. DUTTON:  Objection; no foundation.
3          THE WITNESS:  Can you repeat that?
4   BY MR. WILLIAN:
5      Q.   You had to ensure that you finished your
6   monthly pass/fail report and had it up to date so
7   that Mr. Calloway could aggregate the different
8   monthly reports from the different sections of the
9   Parks at Monterey, true?
10     A.   Yes, that I had it accurately up to date.
11     Q.   Do you believe that the "good morning,
12  all" is an e-mail to you, among others?
13         MR. DUTTON:  Objection; no foundation.
14         THE WITNESS:  I'm not sure.
15  BY MR. WILLIAN:
16     Q.   Now, here Mr. Calloway is, again, talking
17  about scrubbing your work orders pass/fail.  Does
18  that refresh you that Mr. Calloway has used the word
19  "scrubbing" your work orders with you?
20     A.   No.
21     Q.   Do you deny that you received these last
22  two e-mails?
23     A.   No, but I just don't remember them.
24         (Exhibit 034 was marked for
25         identification.)

Page 228

1   BY MR. WILLIAN:
2      Q.   Here's another e-mail, exhibit 34, which
3   is an e-mail from Ron Calloway dated 1/23/07.  And
4   it is an e-mail addressed to "good morning, all.
5   Please go through November work orders, close out
6   and scrub so your pass percentage is good."  Do you
7   see that?
8      A.   Yes.
9      Q.   You likely received this e-mail, didn't
10  you?
11     A.   I'm not sure.
12     Q.   Does this refresh you that Mr. Calloway
13  was telling you to scrub your e-mail so the
14  percentage of passes is good?
15     A.   I don't remember this e-mail.
16     Q.   When Mr. Calloway was your boss, did you
17  follow his directions?
18     A.   I believe so.
19     Q.   What's an RMC?
20     A.   Rate your maintenance card.
21     Q.   Let's look at some work orders from 2008.
22         (Exhibit 035 was marked for
23         identification.)
24  BY MR. WILLIAN:
25     Q.   Hand to you exhibit 35.  This is a work



AMADO OLIVARES                                                July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                           229–232

Page 229

1    order that indicates it's an emergency.  The call
2    time on the emergency work order was 5:08, and the
3    handwritten notes indicates that the work was
4    started on January 9 of '08 at 9:00 o'clock and
5    completed at 10:15.  Do you see that?
6         MR. DUTTON:  Objection to the form of the
7    question.
8         THE WITNESS:  Just a minute.  Okay.
9    BY MR. WILLIAN:
10       Q.  Do you see that?
11       A.  Yes.
12       Q.  And you'll see whether this work order is
13   classified as an emergency or routine, according to
14   the tech notes it's a fail, true?
15       A.  That's what it shows here.
16       Q.  If you go into Yardi, you will see that
17   someone reclassified the work order as routine.  But
18   it registers as a pass because the hours from call
19   to start were 70.20.  Do you see that?
20       A.  Yes.
21       Q.  And the reason it was call to start of 70
22   hours is because whoever put in the start time on
23   the last page indicates that the work started on
24   1/8/2008 at 9:00 a.m. instead of 1/9/2008, correct?
25       A.  That's what it shows.

Page 230

1        Q.  As a result of entering the false start
2    time instead of the correct start time of 1/9/08,
3    this work order registered as a pass in Yardi
4    instead of a fail.
5         MR. DUTTON:  Objection; no foundation.
6    BY MR. WILLIAN:
7         Q.  True?
8         A.  That's what it shows here.
9         Q.  The last page also shows falsely that the
10   finish date was 1/8/08 when the finish date was
11   1/9/08, correct?
12        MR. DUTTON:  Objection; no foundation.
13        THE WITNESS:  That's the time it shows.
14   BY MR. WILLIAN:
15        Q.  And if you look at the person who last
16   updated this work order, it was you, Mr. Olivares,
17   on January 10th of 2008, one day after the work was
18   completed, correct?
19        MR. DUTTON:  Objection; no foundation.
20        THE WITNESS:  That's the time it shows
21   here.
22   BY MR. WILLIAN:
23        Q.  You were the person responsible for
24   ensuring that the start time and the finish time
25   were accurately entered into Yardi; is that correct?

Page 231

1         A.  Yes.
2         Q.  And that was not done, correct?
3         MR. DUTTON:  Objection; no foundation.
4         THE WITNESS:  The times don't match.
5    BY MR. WILLIAN:
6         Q.  And who input the false start time and
7    finish time into Yardi?
8         MR. DUTTON:  Objection; no foundation.
9         THE WITNESS:  I don't know.
10   BY MR. WILLIAN:
11        Q.  Did you?
12        A.  I don't know.
13        MR. DUTTON:  Objection; no foundation.
14        (Exhibit 036 was marked for
15            identification.)
16   BY MR. WILLIAN:
17        Q.  I'm handing to you exhibit 36.  Exhibit 36
18   is another work order routine.  And according to the
19   tech notes, the work was first started on
20   January 15th of 2008.  And the call time was
21   January 8th of 2008, making this work order,
22   according to the tech notes, a fail.  Do you see
23   that?
24        MR. DUTTON:  Objection; no foundation.
25        THE WITNESS:  Sorry.  I haven't finished

Page 232

1    looking through it.  Go ahead.
2    BY MR. WILLIAN:
3         Q.  My question to you was:  Based on the
4    first page of the work order and looking at the tech
5    notes, this work order should have been a fail, not
6    a pass, correct?
7         MR. DUTTON:  Objection; no foundation.
8         THE WITNESS:  The way the time is written,
9    yes.
10   BY MR. WILLIAN:
11        Q.  And if you go into Yardi you will see that
12   the work order was registered as a pass because the
13   hours from call to start were 46.55 hours.  Do you
14   see that?
15        MR. DUTTON:  Objection; no foundation.
16        THE WITNESS:  I see that.  And I also see
17   that on the page before last, the first -- the first
18   and third item, they were already taken care of by
19   somebody else.  You know, when he got there, they
20   were already okay/so we need to find the other
21   paperwork.
22   BY MR. WILLIAN:
23        Q.  Mr. Olivares, let's go to the -- back to
24   the first page.
25        A.  Okay.

AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
233–236

Page 233

1    Q.   And you will see that it was the tech,
2  Keith, who wrote on 11/15/08, "okay on the light in
3  bathroom number 1 not working."  And he's the one
4  who wrote "okay lock on outside storage broke."
5  Right, he wrote those?
6         MR. DUTTON:  11/15/08?
7  BY MR. WILLIAN:
8    Q.   1/15/08.
9    A.   He wrote the sliding screen door is okay.
10  Backyard has been cut.  Replace both toilet
11  flappers.  He replaced kitchen sink flapper.  If he
12  would have did anything on the bathroom light, he
13  would have put on there repaired bathroom light or
14  repaired the sliding screen door.  So when he got
15  there, they were already okay.
16    Q.   Are you suggesting that someone else had
17  responded to this work order earlier?
18    A.   Yes.
19    Q.   And so you are positive of that,
20  Mr. Olivares?
21    A.   I mean, the light's not going to start
22  working after -- when it's burnt out.
23    Q.   The okay could mean he fixed it; isn't
24  that the case?
25    A.   He put what he did on the other ones.  On

Page 234

1  that one, he didn't do anything.
2    Q.   So if there had been -- someone had
3  responded to this work order sooner, we should see
4  other tech notes on a work order?
5         MR. DUTTON:  Objection; no foundation.
6         THE WITNESS:  There should be another work
7  order.
8  BY MR. WILLIAN:
9    Q.   You'll see, if you go to the last page of
10  this document, that someone entered the start date
11  of 1/10/08 with a start time of 12:15 p.m., and that
12  the work was actually finished on 1/10/08 at
13  12:45 p.m.  Now, if you compare those times, they
14  are five days earlier than the notes of the tech,
15  which indicated that he did the work on 1/15/08 at
16  12:15 and finished at 12:45, right?
17         MR. DUTTON:  Objection to the form.
18         THE WITNESS:  That's what it shows here.
19  BY MR. WILLIAN:
20    Q.   And you can find no basis in the work
21  order to indicate that the start date was actually
22  1/10/08, can you?
23         MR. DUTTON:  Objection to the form.
24         THE WITNESS:  There's nothing on here.
25

Page 235

1  BY MR. WILLIAN:
2    Q.   You, Mr. Olivares, were the person who
3  last updated this work order on 1/15/08 when the
4  work was actually completed.  Do you know why you
5  didn't ensure that the start date and the finish
6  date were accurately entered into Yardi?
7         MR. DUTTON:  Objection; no foundation.
8         THE WITNESS:  I do not.  Like I said,
9  somebody was in this work order.  Downloaded it.
10  BY MR. WILLIAN:
11    Q.   Do you know who input the incorrect start
12  and finish date into Yardi?
13         MR. DUTTON:  Objection; no foundation.
14         THE WITNESS:  I don't know who input that
15  time.
16  BY MR. WILLIAN:
17    Q.   Was it you?
18         MR. DUTTON:  Objection; no foundation.
19         THE WITNESS:  No.
20  BY MR. WILLIAN:
21    Q.   So someone put in the false start and
22  finish date?
23         MR. DUTTON:  Objection; no foundation.
24         THE WITNESS:  I don't know.  I didn't.
25

Page 236

1  BY MR. WILLIAN:
2    Q.   Someone else did?
3         MR. DUTTON:  Objection; no foundation.
4         THE WITNESS:  I don't know.
5  BY MR. WILLIAN:
6    Q.   How else did it get there?
7         MR. DUTTON:  Objection; no foundation.
8         THE WITNESS:  I don't know if it's
9  inaccurate.
10  BY MR. WILLIAN:
11    Q.   Was this work finished on 1/10/08 at
12  12:45 p.m.?
13         MR. DUTTON:  Objection; no foundation.
14         THE WITNESS:  It looks like it was started
15  at a different time.
16  BY MR. WILLIAN:
17    Q.   Again, you can't point to any date entry
18  or time entry on the work order to support that
19  theory, can you?
20    A.   By the stuff being complete when he got
21  there.
22    Q.   And just so the record is clear, the
23  reason why you think it was complete when he got
24  there is because why?  Just read the language.
25         MR. DUTTON:  Objection; no foundation.



AMADO OLIVARES
July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY
237–240

Page 237

1    THE WITNESS: The sliding screen door is
2  okay.  Backyard has been cut.  Light in the master
3  bathroom is okay.  Replaced both toilet paper
4  holders.  Replaced kitchen sink stopper.  Two of
5  those items were done.  They were fine.
6  BY MR. WILLIAN:
7    Q.  I understand.  You believe there was a
8  prior attempt to fix the screen door and fix the
9  light, right?
10   A.  Yes.
11     MR. DUTTON:  Objection; misstates his
12 testimony.
13 BY MR. WILLIAN:
14   Q.  And we should be able to find a work order
15 to reflect that, correct?
16     MR. DUTTON:  Objection; no foundation.
17     THE WITNESS:  We should.  I mean, there
18 should be.  It was done.
19     (Exhibit 037 was marked for
20     identification.)
21 BY MR. WILLIAN:
22   Q.  Handing you exhibit 37.  This is a routine
23 work order.  The tech notes indicate that the work
24 was started on 1/9/08 and at, looks like,
25 1:00 o'clock, but the time doesn't really matter.

Page 238

1  It was started on 1/9/08.  The call time for the
2  work order was 1/4/08.  Do you see that?
3    A.  Yes.
4    Q.  According to the tech notes, this work
5  order should have been a fail?
6      MR. DUTTON:  Objection; no foundation.
7  BY MR. WILLIAN:
8    Q.  True?
9      MR. DUTTON:  Objection; no foundation.
10     THE WITNESS:  With the tech notes.
11 BY MR. WILLIAN:
12   Q.  Yes, according to the tech notes?
13     MR. DUTTON:  Objection; no foundation.
14     THE WITNESS:  Yes.
15 BY MR. WILLIAN:
16   Q.  You see that this work order registers as
17 a pass in Yardi because the hours call from to start
18 were 68.68.  And the reason for that is, if you go
19 to the last page, someone entered the start date for
20 the work as 1/7/08 instead of 1/9/08.  Do you see
21 that?
22   A.  I do.
23   Q.  By having that false start date of 1/7/08
24 entered into Yardi instead of the correct time
25 1/9/08, that resulted in this work order being a

Page 239

1  pass instead of a fail, true?
2      MR. DUTTON:  Objection; no foundation.
3      THE WITNESS:  That's what it shows here.
4  BY MR. WILLIAN:
5    Q.  Also the finish date for the work is
6  incorrectly entered.  With respect to the first
7  entry, it shows the finish date of the work 1/7/08,
8  when the finish date of the initial work was 1/9/08.
9      MR. DUTTON:  Objection; no foundation.
10 BY MR. WILLIAN:
11   Q.  Do you see that?
12     MR. DUTTON:  Same objection.
13     THE WITNESS:  That's the time it shows on
14 there.
15 BY MR. WILLIAN:
16   Q.  And you were the last person to update
17 this work order on 1/15/08 shortly after the work
18 was finally completed.  Were you the person who
19 entered in to Yardi the false start and finish date?
20     MR. DUTTON:  Objection; no foundation.
21     THE WITNESS:  I didn't.  I don't know
22 which times I entered in or why I updated it.
23 BY MR. WILLIAN:
24   Q.  Were you the person responsible for
25 ensuring that the start and finish dates in Yardi

Page 240

1  were accurate?
2    A.  Yes.
3    Q.  And can we agree that by entering into
4  Yardi the false start date of 1/7/08, this resulted
5  in the work order being a pass instead of fail?
6      MR. DUTTON:  Objection; no foundation.
7      THE WITNESS:  I don't remember entering
8  that.
9  BY MR. WILLIAN:
10   Q.  I understand that.  But as a result of
11 someone entering into Yardi the false start date of
12 1/7/08 instead of 1/9/08, that resulted in this work
13 order being a pass instead of a fail?
14     MR. DUTTON:  Objection; no foundation.
15     THE WITNESS:  That's what this shows.
16 BY MR. WILLIAN:
17     (Exhibit 038 was marked for
18     identification.)
19 BY MR. WILLIAN:
20   Q.  I'm handing to you exhibit 38.  This is an
21 e-mail that, according to the tech notes, the work
22 started on 1/9/07 in contrast to the call-in of 1/4.
23     MR. DUTTON:  There's a lot of handwriting
24 on the first page and a lot of information.  Why
25 don't you let him read the document before you ask



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
241–244

Page 241

1 him the question?
2 BY MR. WILLIAN:
3    Q.  If you look at the first page of this
4 exhibit 38, you will see the tech notes indicate
5 that the work did not start until 1/9.  Do you see
6 that?
7    A.  That's the first date, but there's also
8 times on the bottom, but it doesn't have a date.
9    Q.  Do you see any times where the work was
10 started earlier than 1/9?
11    A.  No.
12    Q.  If you turn to the last page, you'll see
13 that the start date that someone entered into the
14 labor tab was 1/7/08, making this work order a pass
15 instead of a fail, correct?
16       MR. DUTTON:  Objection to the form.
17       THE WITNESS:  That's what it shows here.
18 BY MR. WILLIAN:
19    Q.  You were the last person to update this
20 work order on 1/23/08; is that true?
21    A.  That's what it shows here.
22    Q.  And you had responsibility for ensuring
23 that the start date and finish date were accurate;
24 is that true?
25    A.  Yes.

Page 242

1    Q.  And do you know who entered the false
2 start date into Yardi with respect to this work
3 order?
4       MR. DUTTON:  Objection; no foundation.
5       THE WITNESS:  I don't know who entered any
6 times here.
7 BY MR. WILLIAN:
8    Q.  Were you the person likely who entered the
9 start date and the completion date into Yardi?
10    A.  I don't know.
11       (Exhibit 039 was marked for
12       identification.)
13 BY MR. WILLIAN:
14    Q.  Handing to you exhibit 39.  Exhibit 39 is
15 a routine work order where the tech notes indicate
16 that the work started on 1/14/08, and the call-in
17 time for the work order was 1/9/08, meaning that
18 this work order should have been a fail, true?
19       MR. DUTTON:  Objection; no foundation.
20       THE WITNESS:  That's what the time shows.
21       MR. DUTTON:  Please let him read the
22 document.
23 BY MR. WILLIAN:
24    Q.  If you look at the second page the hours
25 from call to start were 46.28 hours, making this

Page 243

1 work order as entered into Yardi a pass, right?
2    A.  That's what it shows here.
3    Q.  And the reason for that is, if you go to
4 the last page, is someone entered the start date as
5 being falsely 1/11/08 instead of 1/14/08, making
6 this work order a pass instead of a fail.
7       MR. DUTTON:  Objection; no foundation.
8 BY MR. WILLIAN:
9    Q.  Correct?
10       MR. DUTTON:  Same objection.
11       THE WITNESS:  That's what it shows here.
12 BY MR. WILLIAN:
13    Q.  And the work order also falsely indicates
14 the work was completed on 1/11/08 when it really was
15 completed on 1/14/08.
16       MR. DUTTON:  Same objection.
17 BY MR. WILLIAN:
18    Q.  True?
19       MR. DUTTON:  Same objection.
20       THE WITNESS:  That's what the notes shows.
21 BY MR. WILLIAN:
22    Q.  Mr. Olivares, you were the last one to
23 update this work order on 1/15/08; is that correct?
24    A.  That's what it shows here.
25    Q.  Do you know who entered the false start

Page 244

1 time and completion time into Yardi?
2       MR. DUTTON:  Same objection.
3       THE WITNESS:  I don't know who entered
4 these times.
5       MR. WILLIAN:  All right.  Let's take a
6 short break.
7       VIDEO OPERATOR:  We are going off the
8 record at 3:05 p.m.
9          (Recess taken.)
10       VIDEO OPERATOR:  We're going back on the
11 record at 3:16 p.m.
12       (Exhibit 040 was marked for
13       identification.)
14 BY MR. WILLIAN:
15    Q.  Handing you exhibit 40.  Exhibit 40 is
16 another work order.  The work indicates that Keith
17 started the work on January 15th of 2008 at 12:45.
18 It's a routine work order.  The call-in time for the
19 work order is January 8 of 2008 making this work
20 order a fail on its face, correct?
21       MR. DUTTON:  Object to the form of the
22 question.  No foundation.  Please let him read the
23 document.
24       THE WITNESS:  With these times.
25



AMADO OLIVARES                                      July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      245–248

Page 245

1  BY MR. WILLIAN:
2    Q.  With the times --
3    A.  That are written on here.
4    Q.  -- that the tech wrote on THAT work order?
5    A.  Yes.
6    Q.  And if you go to the second page of this
7  document, you'll see that the information entered
8  into Yardi registered this work order as a pass
9  because the hours from call to start were 46 hours.
10  Do you see that?
11    A.  Yes.
12    Q.  And the reason why the call to start was
13  46 hours is that someone in the labor tab entered
14  the start date for work order falsely as 1/10 --
15  starting 1/10/08 instead of reflecting the tech
16  notes of 1/15/08, correct?
17    MR. DUTTON:  Objection; no foundation.
18    THE WITNESS:  Those are the times in here,
19  yes.  They are not the same.
20  BY MR. WILLIAN:
21    Q.  In other words, the 1/10/08 start time is
22  false, right?
23    MR. DUTTON:  Objection; no foundation.
24    THE WITNESS:  It's not the same.
25

Page 246

1  BY MR. WILLIAN:
2    Q.  It's not the same as the tech time of
3  1/15/08, correct?
4    A.  Yes.
5    Q.  And, indeed, the finish time that someone
6  falsely entered into the Yardi is 1/10/08 when the
7  tech indicates that he completed the work on
8  1/15/08, correct?
9    MR. DUTTON:  Objection; no foundation.
10    THE WITNESS:  That's the time entered in
11  there.
12  BY MR. WILLIAN:
13    Q.  So the finish date is an incorrect time,
14  right?
15    MR. DUTTON:  Objection; no foundation.
16    THE WITNESS:  It doesn't match.
17  BY MR. WILLIAN:
18    Q.  And you were the last person to update
19  this work order on 1/15/08, the date that the work
20  was actually completed, Mr. Olivares.  Were you
21  responsible for making sure the start time and the
22  finish time were accurate?
23    A.  Yes.
24    Q.  And they are not accurate, correct?
25    MR. DUTTON:  Objection; no foundation.

Page 247

1    THE WITNESS:  They don't match.
2  BY MR. WILLIAN:
3    Q.  Do you know why -- were you the person who
4  entered in the false start and finish time for this
5  work?
6    MR. DUTTON:  Objection; no foundation.
7    THE WITNESS:  I don't know.
8  BY MR. WILLIAN:
9    Q.  By entering in the false start time, that
10  resulted in this work order being a pass instead of
11  fail, true?
12    MR. DUTTON:  Objection; no foundation.
13    THE WITNESS:  The times don't match, yeah.
14  BY MR. WILLIAN:
15    Q.  All right.  My question was a little bit
16  different.  By entering in the false start time,
17  that made this work order a pass instead of a fail,
18  true?
19    MR. DUTTON:  Objection; no foundation.
20    THE WITNESS:  I don't know if it's false.
21  BY MR. WILLIAN:
22    Q.  Let's go take a look at it, then.  You are
23  saying that you don't know if the start time of
24  1/10/08 is false?
25    MR. DUTTON:  Asked and answered.

Page 248

1    THE WITNESS:  It doesn't match that, but I
2  don't know if it's false.  I mean, we could have
3  asked the technician something or, you know, there
4  could be another paper.  I mean, who knows?  It
5  doesn't match the handwritten notes, but I don't
6  know if it's false.
7  BY MR. WILLIAN:
8    Q.  The handwritten notes indicate this work
9  was started 1/15/08, right?
10    MR. DUTTON:  Objection; asked and
11  answered.
12    THE WITNESS:  That's what the happened
13  written notes say.
14  BY MR. WILLIAN:
15    Q.  And the time that was inputted into Yardi
16  indicates that this work started 1/10/08, correct?
17    A.  Those are the times, yes.
18    Q.  You don't see anything in the hard copy of
19  the work order that indicates that the work actually
20  started at 1/10/08 consequently 12:45 p.m.  Do you
21  see that?
22    A.  I don't -- I mean, I see that it's not the
23  same, yes.
24    Q.  In fact, given the fact that the start
25  time as entered into Yardi at 1/10/08 at 12:45 p.m.



Page 249

1  and the handwritten notes are 1/15/08 at 12:45 p.m.,
2  didn't someone just likely put in an incorrect start
3  date?
4      A.  I don't know.
5          MR. DUTTON:  Objection; no foundation.
6  BY MR. WILLIAN:
7      Q.  You see how the start times match 12:45
8  and 12:45?
9      A.  I do.
10     Q.  Doesn't that tell you that someone just
11 changed the date on the start time?
12         MR. DUTTON:  Objection; no foundation.
13         THE WITNESS:  No.
14 BY MR. WILLIAN:
15     Q.  No?
16     A.  No.
17     Q.  Mr. Olivares, didn't you enter into the
18 Yardi a false start date?
19         MR. DUTTON:  Objection; no foundation.
20         THE WITNESS:  I did not.
21 BY MR. WILLIAN:
22     Q.  Well, someone did, right?
23     A.  I don't know.
24         MR. DUTTON:  Objection; no foundation.
25

Page 250

1  BY MR. WILLIAN:
2      Q.  That's what these record indicate to you,
3  don't they?
4          MR. DUTTON:  Objection; no foundation.
5          THE WITNESS:  No.
6  BY MR. WILLIAN:
7      Q.  So point us to -- point the court out --
8  in fact, help the court.  Point the court to where
9  the 1/10/08 start date is correct?
10     A.  I mean, I don't know if it's incorrect.
11 Like I said, this was done, you know, a few days
12 after, you know, I could have asked the technician
13 if there was a different time.  Or there could have
14 been another work order.
15     Q.  Do you know that you did that, or are you
16 speculating for me now, Mr. Olivares?
17     A.  I know I didn't enter false information.
18     Q.  Are you speculating about talking to the
19 tech about the start time?
20     A.  I'm saying that could have happened.
21     Q.  Do you know if it happened?
22     A.  I do not.
23     Q.  Do you have any recollection of that
24 happening?
25     A.  No.

Page 251

1      Q.  Do you see any evidence of that happening
2  here?
3      A.  No.
4          (Exhibit 041 was marked for
5          identification.)
6  BY MR. WILLIAN:
7      Q.  Handing to you exhibit 41.  Exhibit 41 is
8  another work order.  It indicates that the work was
9  started on 1/10, and that the work was called in on
10 1/7.  That's an urgent work order.  And based on the
11 face of this work order, you would agree that the
12 work order should have been a fail?
13         MR. DUTTON:  Objection; no foundation.
14         THE WITNESS:  With these times, yes.
15 BY MR. WILLIAN:
16     Q.  You see that the way the way the
17 information was entered into Yardi it was a pass
18 because it shows the hours from call to start was 71
19 hours, and it was changed -- priority was changed
20 from a urgent to a routine.  Do you see that?
21     A.  I do.
22     Q.  If you look at the problem description,
23 the resident stated that the filter checked out
24 because the resident stated they are having a hard
25 time breathing in the home.  Would you agree that's

Page 252

1  an urgent work order when someone is having a hard
2  time breathing in the home?
3      A.  Not on this case.
4      Q.  Why not?
5      A.  Because this system, it's not, like, a
6  forced aired heater.  It's radiant heat.  So it
7  doesn't have any air that blows through the house to
8  cause them, you know, having to have breathing
9  issues.
10     Q.  Regardless, even if this work order was a
11 routine, it would have been a fail, true?
12         MR. DUTTON:  Objection; no foundation.
13         THE WITNESS:  With these times, yes.
14 BY MR. WILLIAN:
15     Q.  And you will see that, if you go to the
16 last page of this exhibit, that someone entered in
17 to Yardi, that while the start date was 1/10/08,
18 someone put in the start time of 10:15 a.m. where
19 the tech had written 12:15.  Do you see that?
20     A.  Yes.
21     Q.  And by making that small little two-hour
22 change, someone was able to make this work order a
23 pass in Yardi instead of a fail, true?
24     A.  Yes.
25         MR. DUTTON:  Objection; no foundation.



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
253–256

Page 253

1   BY MR. WILLIAN:
2      Q.   You see that you were the last person to
3   update this work order on 1/10/08, the day the work
4   was completed, true?
5      A.   Yes.
6      Q.   Was it you, Mr. Olivares, who input the
7   incorrect start time to make this a pass instead of
8   a fail?
9          MR. DUTTON:  Objection; no foundation.
10         THE WITNESS:  Not that I know of.
11  BY MR. WILLIAN:
12     Q.   Do you know of anyone else who put in the
13  false start time?
14         MR. DUTTON:  Objection; no foundation.
15         THE WITNESS:  Like I said, I don't know if
16  it's false.
17  BY MR. WILLIAN:
18     Q.   If you go by the tech notes, they didn't
19  start until 12:15, right?
20         MR. DUTTON:  Objection; no foundation.
21         THE WITNESS:  According to the tech notes,
22  yes.
23  BY MR. WILLIAN:
24     Q.   Do you know who put in the incorrect start
25  time?

Page 254

1          MR. DUTTON:  Objection; no foundation.
2          THE WITNESS:  I don't know if it's
3   incorrect.
4   BY MR. WILLIAN:
5      Q.   Can you point to any information
6   Mr. Olivares, and you are under oath, that would
7   suggest the start time of 12:15 is the correct start
8   time?
9      A.   It does not match.
10         (Exhibit 042 was marked for
11         identification.)
12  BY MR. WILLIAN:
13     Q.   Handing you exhibit 42.  Exhibit 42 is
14  another work order.  It indicates that the work was
15  started on 1/9/08.  Do you see that?
16         MR. DUTTON:  Objection; no foundation.
17  Please let him review the document.
18         THE WITNESS:  Okay.  I see that's the
19  handwritten date, yes.
20  BY MR. WILLIAN:
21     Q.   And you agree that handwritten date of
22  1/9/08 was the date the work was started --
23     A.   No.
24     Q.   -- according to the tech notes?
25     A.   I do not.

Page 255

1          MR. DUTTON:  Objection.
2   BY MR. WILLIAN:
3      Q.   When was the work started?
4      A.   If you look at the page 1, the notes,
5   technician notes, he already replaced the wax ring.
6   He removed all this stuff in that unit.  On 1/9 was
7   when he finished it, was when he went -- if you see
8   the little arrow, that's the day he picked up the
9   dehu after the unit was dry.
10     Q.   All right.  So when did he start the work,
11  then?
12     A.   He started on 1/6, 9:15.
13     Q.   Now you just went and read the labor tab
14  data, right?
15     A.   Well, he definitely started it before 1/9.
16  I mean, that's clear.
17     Q.   From the tech notes, can you tell the time
18  and the date that he actually started the work?
19     A.   No.
20         (Exhibit 043 was marked for
21         identification.)
22  BY MR. WILLIAN:
23     Q.   I'm handing to you exhibit 43.  Exhibit 43
24  is a another copy of the work order.  It indicates
25  the work was started on this routine work on

Page 256

1   1/14/09, and the call-in time for the work order was
2   1/6/09, making this work order a fail on its face,
3   true?
4          MR. DUTTON:  Objection; no foundation.
5          THE WITNESS:  If you look at those times,
6   yes.
7   BY MR. WILLIAN:
8      Q.   And you'll see --
9          MR. DUTTON:  Please let him read the
10  document.
11  BY MR. WILLIAN:
12     Q.   Feel free to read the document to answer
13  any of my questions, Mr. Olivares.  You will see
14  that with respect to the data that was entered into
15  Yardi, this work order registered as a pass.  And
16  that's because the -- so you will see that this work
17  order was in the Yardi as a pass, because if you go
18  to the last page, whoever entered into Yardi the
19  start date for the work order entered that the start
20  time for the work order was 1/9/09, instead of the
21  actual time start of 1/15/09.  Do you see that?
22         MR. DUTTON:  Objection; no foundation.
23         THE WITNESS:  I see.
24  BY MR. WILLIAN:
25     Q.   And someone also falsely entered into

AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
257–260

Page 257

1  Yardi the finish time of 1/9/09 instead of the
2  actual finish time of 1/14/09.
3          MR. DUTTON:  Objection; no foundation.
4          THE WITNESS:  That's the time entered,
5  yes.
6  BY MR. WILLIAN:
7      Q.  And you were the last person to update
8  this work order on 1/14/09, the date that work was
9  actually completed.  Do you see that?
10          MR. DUTTON:  Objection; no foundation.
11          THE WITNESS:  I do.
12  BY MR. WILLIAN:
13      Q.  And you will see that, as you testified
14  before, you were the person responsible for ensuring
15  the start time and finish times were accurately
16  entered into Yardi?
17      A.  Yes.
18      Q.  And do you know why you did not ensure the
19  start time and finish times were accurately entered
20  into Yardi?
21          MR. DUTTON:  No foundation.
22          THE WITNESS:  I don't know if they are
23  accurate.
24  BY MR. WILLIAN:
25      Q.  They appear inaccurate, don't they,

Page 258

1  Mr. Olivares?
2          MR. DUTTON:  Objection; no foundation.
3          THE WITNESS:  Just with these notes, yes.
4  I mean, like I said, we don't know if any
5  conversations were brought up with the technician or
6  if there's another work order.
7  BY MR. WILLIAN:
8      Q.  There's no indication of that being the
9  case.  You are just speculating again, aren't you,
10  Mr. Olivares?
11          MR. DUTTON:  Objection; no foundation.
12          THE WITNESS:  Like I said, I wouldn't have
13  entered false information.
14  BY MR. WILLIAN:
15      Q.  Well, I have heard you say that, but you
16  have agreed with me these documents contain false
17  information, right?
18          MR. DUTTON:  Objection; misstates
19  testimony.
20          THE WITNESS:  The times don't match, but I
21  don't know if they are false.
22  BY MR. WILLIAN:
23      Q.  Okay.  Well, we'll just stand on your
24  prior testimony.
25          MR. DUTTON:  Move to strike the comment.

Page 259

1  Just ask the questions.
2  BY MR. WILLIAN:
3      Q.  Is there any testimony you said before you
4  want to change?
5          MR. DUTTON:  Objection to the form of the
6  question.
7          THE WITNESS:  I'm not sure.
8  BY MR. WILLIAN:
9      Q.  So isn't it the case here, Mr. Olivares,
10  that it appears that someone likely entered a false
11  start and finish date in the Yardi.
12          MR. DUTTON:  Objection; no foundation.
13          THE WITNESS:  I don't know it's false.
14  BY MR. WILLIAN:
15      Q.  Can you point to me any information that
16  would suggest that it's accurate?
17      A.  I don't have any -- you know, I mean, like
18  I said, we need to look at more work orders or, you
19  know, know what -- you know, if there was any
20  conversation with the technician.
21      Q.  You are not aware of any as you sit here
22  today?
23      A.  No.
24      Q.  And, again, the tech notes were supposed
25  to be complete as far as when they started, when

Page 260

1  they completed, what they did, correct?
2      A.  Yes.  But also sometimes there's two work
3  orders for one.
4      Q.  Do you see any indication there's two work
5  orders here, Mr. Olivares?
6      A.  Not for that one.  But, I mean, just like
7  this one, there's at least two.  You guys aren't
8  calling it.
9      Q.  Let's stick with the one we're talking
10  about.  Do you see any indication there's two work
11  orders for exhibit 43?
12      A.  I do not.
13          (Exhibit 044 was marked for
14          identification.)
15  BY MR. WILLIAN:
16      Q.  Handing you exhibit 44.  This is another
17  work order.  It indicates that the work was started
18  on 1/27/09.  Do you see that?
19      A.  I do.
20      Q.  And that the call-in time for the work was
21  1/23/09, making this routine work order a fail on
22  its face, correct?
23          MR. DUTTON:  Objection; no foundation.
24          THE WITNESS:  Yes.
25



Page 261

1 BY MR. WILLIAN:
2    Q.   And if you go to the last page, the labor
3 tab, you'll see that someone entered a start time of
4 1/26/09 instead of 1/27/09, making this work order,
5 because of that 1/26/09 start time, a pass instead
6 of a fail.  Yes?
7    A.   It passed with those times, yes.
8    Q.   You were the last person to update this
9 work order on 1/27/09, and you had responsibility
10 for ensuring accuracy of the information for the
11 start and finish date, correct?
12    A.   Yes.
13    Q.   And you will see that certainly someone
14 entered an incorrect finish date of 1/26/09, a false
15 finish date, right, Mr. Olivares?
16       MR. DUTTON:  Objection to the foundation.
17       THE WITNESS:  I'm not sure if it's false.
18 BY MR. WILLIAN:
19    Q.   Mr. Olivares, it says 1/26/09 finish date.
20 You entered that information.  And if you look at
21 the tech notes, the work was not finished until
22 1/27/09, right?
23       MR. DUTTON:  Objection; no foundation.
24       THE WITNESS:  I don't know if I entered
25 that information.  And, I mean, I don't know if it's

Page 262

1 inaccurate.
2 BY MR. WILLIAN:
3    Q.   Based on the tech notes, it's inaccurate,
4 right?
5    A.   It doesn't match this, but I don't know if
6 it's an inaccurate time.
7    Q.   Come on, Mr. Olivares.  Based on the tech
8 notes, it's inaccurate when that work was finished,
9 right?
10    A.   It's not the same.
11    Q.   You are the one who entered the incorrect
12 information, aren't you, Mr. Olivares?
13       MR. DUTTON:  Objection; no foundation.
14       THE WITNESS:  I don't know if it's
15 inaccurate.
16 BY MR. WILLIAN:
17    Q.   Did you enter the information, the 1/26
18 start time and the 1/26 finish time?
19    A.   I don't know.  I was the last one to
20 update, but I don't know if I entered the time.
21       (Exhibit 045 was marked for
22       identification.)
23 BY MR. WILLIAN:
24    Q.   Exhibit 45 is another routine work order.
25 The call-in time for the work order was 2/6/09 at

Page 263

1 8:37.  The start time was 2/9/09 at 11:50, making
2 this work order a fail on its face, correct?
3       MR. DUTTON:  Objection; no foundation.
4 Please let him read the document.
5       THE WITNESS:  That's what it shows with
6 this time.
7 BY MR. WILLIAN:
8    Q.   You will see that the start time that was
9 entered for the work was 2/09/2009 at 8:00 a.m.
10 Instead of 11:50 a.m.  Do you see that?
11    A.   That's what it shows here.
12    Q.   By making that change in time, that
13 changed this work order from a fail to a pass, true?
14       MR. DUTTON:  Objection; no foundation.
15       THE WITNESS:  That's what it shows here.
16 BY MR. WILLIAN:
17    Q.   And you can see no basis in this document
18 to indicate that the start time should have been at
19 8:00 a.m. on 2/9/09, correct?
20       MR. DUTTON:  Objection; no foundation.
21       THE WITNESS:  It doesn't show anything.
22 BY MR. WILLIAN:
23    Q.   I'm sorry.  Doesn't show anything?
24    A.   No.
25    Q.   And you were the last person to update

Page 264

1 this work order on 2/10/09, the day after the work
2 was completed, correct, Mr. Olivares?
3    A.   That's what it shows.
4    Q.   And who input the incorrect start time
5 into Yardi?
6       MR. DUTTON:  Objection; no foundation.
7 BY MR. WILLIAN:
8    Q.   Was that you?
9    A.   I don't know if I entered the time here.
10    Q.   Who else would have entered it besides
11 you?
12       MR. DUTTON:  Objection; same objection.
13       THE WITNESS:  I don't know.
14       (Exhibit 046 was marked for
15       identification.)
16 BY MR. WILLIAN:
17    Q.   Hand you exhibit 46.  This is another work
18 order.  It's a routine work order.  It indicates
19 that the tech Keith started the work on
20 February 6/09 at 3:15.  The call-in time for the
21 work was February 3rd, 2009 at 11:57, making this
22 work order a fail on its face, true?
23       MR. DUTTON:  Objection; no foundation.
24       THE WITNESS:  That's what it shows for
25 this time.



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 68 of 72

AMADO OLIVARES                                      July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                    265–268

Page 265

1 BY MR. WILLIAN:
2     Q.   You see that it passed in Yardi because,
3 if you turn to the last page, someone entered the
4 Yardi start date as 2/6/09.  But instead of matching
5 the tech start time of 3:15, someone put in
6 11:30 a.m.  Do you see that?
7     A.   That's the time entered.
8     Q.   By putting 11:30 a.m. instead of 3:15 p.m,
9 that made this work order a pass instead of a fail,
10 true?
11     A.   This is a pass.
12     Q.   There's nothing in this work order that
13 indicates that the start time should have been
14 11:30, correct?
15        MR. DUTTON:  Objection; no foundation.
16        THE WITNESS:  I'm sorry.  Can you repeat?
17 BY MR. WILLIAN:
18     Q.   There's nothing in this work order that
19 suggests the actual start time should have been
20 11:30, correct?
21     A.   There's nothing written on here, no.
22     Q.   And you last updated this work order on
23 2/10/09.  And you were the person responsible for
24 ensuring the start time and the finish time were
25 accurate, correct?

Page 266

1     A.   Yes.
2     Q.   And are you the likely person who entered
3 into Yardi the false start time?
4        MR. DUTTON:  Objection; no foundation.
5        THE WITNESS:  I don't know if they are
6 false.  And I don't know if I entered the time
7 either.
8 BY MR. WILLIAN:
9     Q.   Well, the start time doesn't match the
10 tech notes, correct?
11        MR. DUTTON:  Objection; no foundation.
12        THE WITNESS:  It doesn't match, but I
13 don't know if it's false.
14 BY MR. WILLIAN:
15     Q.   Based on the tech notes, do you believe
16 that's an incorrect start time of 11:30 a.m.?
17        MR. DUTTON:  Objection; no foundation.
18        THE WITNESS:  It's not the same, but I
19 don't know if it's incorrect.
20 BY MR. WILLIAN:
21     Q.   Is there anyone else besides you who would
22 have entered into Yardi incorrect start and finish
23 information?
24        MR. DUTTON:  Objection; no foundation.
25        THE WITNESS:  I don't think I entered

Page 267

1 incorrect information.
2 BY MR. WILLIAN:
3     Q.   Well, let's look at the finish time,
4 Mr. Olivares.
5     A.   I did.
6     Q.   That's at 12:00 p.m. on 2/6/09.  Do you
7 see that?
8     A.   Yes.
9     Q.   That doesn't match the tech note either,
10 does it?
11     A.   No.
12     Q.   The tech notes says that the work was
13 finished by 12:45.  Can you explain that
14 discrepancy?
15        MR. DUTTON:  Objection; no foundation.
16        THE WITNESS:  I cannot.
17 BY MR. WILLIAN:
18        (Exhibit 047 was marked for
19        identification.)
20 BY MR. WILLIAN:
21     Q.   Handing to you exhibit 47.  Exhibit 47 is
22 another work order.  It indicates that the start
23 time for the work was 1/8/09 at 3:00 o'clock, and
24 the call-in time for this routine work order was
25 1/2/09, making this work a fail on its face,

Page 268

1 correct?
2        MR. DUTTON:  Objection; no foundation.
3        THE WITNESS:  With this time, yes.
4 BY MR. WILLIAN:
5     Q.   If you go to the second to last page of
6 this work order, you will see that the start time
7 entered into this work order is 1/5/09 instead of
8 1/8/09, making this work order a pass, correct?
9        MR. DUTTON:  Please let him read the
10 document.
11        THE WITNESS:  On this one, it was
12 completed on another work order.  So that's probably
13 what the notes are.
14 BY MR. WILLIAN:
15     Q.   What page are you referring to?
16     A.   Second to last or third to last.
17     Q.   Where in this work order does it indicate
18 it was completed on another work order?
19     A.   On the technician notes on the bottom.
20     Q.   It says "completed on work order
21 number 851202."
22     A.   Yeah.
23     Q.   Do you see anything that would indicate
24 that the start date for this work order, as
25 reflected on page 1, should have been 1/5/09 as



Case 5:14-cv-03953-BLF   Document 404-3   Filed 08/03/15   Page 69 of 72

AMADO OLIVARES                                          July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                      269–272

Page 269

1  opposed to 1/8/09 as written by the tech in
2  handwriting?
3      MR. DUTTON: Objection; no foundation.
4      THE WITNESS: I don't see it.
5  BY MR. WILLIAN:
6      Q. And it also indicates that the finish date
7  for the work incorrectly was 1/5/09, correct, when
8  the tech notes indicates that the work was completed
9  at the earliest on 1/8/09.
10     MR. DUTTON: Objection; no foundation.
11     THE WITNESS: That's what it shows.
12 BY MR. WILLIAN:
13     Q. And you were the last person to update
14 this work order on 1/9/09. Do you know why there
15 are incorrect dates in the start and finish dates?
16     MR. DUTTON: Objection; no foundation.
17     THE WITNESS: I don't know if they are
18 incorrect.
19 BY MR. WILLIAN:
20     Q. Do you have any information that you can
21 point to on the tech notes that would indicate that
22 these are correct dates?
23     A. I think it needs to be researched when it
24 says right here completed on a different work order.
25     /////

Page 270

1      (Exhibit 048 was marked for
2      identification.)
3  BY MR. WILLIAN:
4      Q. Mr. Olivares, I'm handing you exhibit 48.
5  This indicates that the -- this urgent work order
6  was started one 1/23/09 and the call-in time was on
7  1/22/09. Do you see that?
8      A. Yes.
9      Q. And the work was started at 9:10 a.m. on
10 1/23/09 when the call-in time was the day prior at
11 2:06 p.m., making this work order a fail on its
12 face.
13     MR. DUTTON: Objection; no foundation.
14 BY MR. WILLIAN:
15     Q. Correct?
16     A. Yes.
17     Q. And if you go to the last page, you will
18 see that someone inputted the start time such that
19 the start date and time was 1/22/09 at 3:45 p.m.
20     A. Yes.
21     Q. Instead of as reflected in the tech notes
22 1/23/09 at 9:10 a.m. Do you see that?
23     MR. DUTTON: Objection; no foundation.
24     THE WITNESS: I do.
25

Page 271

1  BY MR. WILLIAN:
2      Q. Can you see any basis in the work order
3  for entering the start time of 1/22/09?
4      A. Yes.
5      Q. Where is that?
6      A. This -- you see how it has number 2, 3 and
7  4, number 4 is my handwriting. And I went in and
8  inspected the house, how it says so up there,
9  "inspected by Amado." And I also found we should
10 replace a filter the day before. So the next day I
11 gave it to the technician, and he was there at 9:10
12 to 10:45. There is no times on there, but if you
13 look this is very clear that I inspected it because
14 it says it on there. And I found other issues that
15 needed to be done.
16     Q. Is this your handwriting on this tech
17 note?
18     A. Item number 4.
19     Q. That's your handwriting?
20     A. Above the line. Right here.
21     Q. That's your handwriting?
22     A. Yes, it is.
23     Q. And when you wrote in your tech notes, did
24 you say the day that you actually responded to the
25 urgent work order?

Page 272

1      A. I did not.
2      Q. Good practice would require you to do
3  that?
4      A. That's something I missed, yes. But, I
5  mean, I can tell you it wasn't before 9:00 a.m. I
6  wouldn't have gone to, you know, woke up the
7  resident. I would have gone the day before when the
8  work order came in.
9      Q. The writing below that, is that yours as
10 well?
11     A. No. That's the technician and his time on
12 the top.
13     Q. All right. So you put in the start time
14 of 1/22/09 at 3:45 p.m. And you put that in even
15 though you didn't write in the tech notes, right?
16     A. Yes.
17     Q. And as you sit here today you think that's
18 an accurate time entry you put in there?
19     A. Yes.
20     Q. You remember putting that one in?
21     A. I mean, it's my writing. That's clearly
22 my writing.
23     Q. That's your writing. It doesn't say when
24 you were there?
25     A. It does not.



Page 273

1    MR. WILLIAN:  Let's take a short break and
2 we'll wrap it up.
3    VIDEO OPERATOR:  We're going off the
4 record at 3:47 p.m.
5    (Recess taken.)
6    VIDEO OPERATOR:  We are going back on the
7 record at 3:54 p.m.
8    (Exhibit 049 was marked for
9    identification.)
10 BY MR. DUTTON:
11    Q.   Mr. Olivares, I'm handing you your
12 declaration.  Did you sign this declaration?
13    A.   Yes.
14    Q.   And you understand you signed this under
15 the penalty of perjury?
16    A.   Yes.
17    Q.   Did you draft this declaration?
18    A.   Did I what?
19    Q.   Did you draft this declaration?
20    A.   What do you mean?
21    Q.   Did you write it yourself?
22    A.   No.
23    Q.   Who drafted it for you?
24    A.   Tom.
25    Q.   Tom Dutton sitting next to you?

Page 274

1    A.   Yes.
2    Q.   Did you go back and check any records
3 before you signed this declaration?
4    A.   No.
5    Q.   Did you attempt to refresh your
6 recollection about anything before you signed this
7 declaration?
8    A.   Yes.
9    Q.   What did you do to refresh your
10 recollection before you signed this declaration?
11    A.   Just -- I don't know.  I mean, we just --
12 we were just talking I guess.  I mean, I don't know
13 of a specific thing.
14    Q.   Who were you talking with that refreshed
15 your recollection?
16    A.   I was talking with Tom.
17    Q.   In speaking with Tom, it helped refresh
18 your recollection on things?
19    MR. DUTTON:  You can answer yes or no.
20    THE WITNESS:  Yeah.  I'm not sure.  Like,
21 yes.  I mean, no, I don't know.  I mean, I don't
22 know what, you know, exactly, like, what you mean.
23 You know, I mean, we were talking about the work
24 order issue.
25    MR. DUTTON:  Octavia --

Page 275

1    MR. WILLIAN:  Please don't cut him off.
2    MR. DUTTON:  Mr. Olivares, when I say
3 answer yes or no, you can answer yes or no.
4    THE WITNESS:  Okay.
5    MR. DUTTON:  You can't, and you should
6 not, divulge the content of our communications.
7 Okay?
8    THE WITNESS:  Okay.
9 BY MR. WILLIAN:
10    Q.   Let me ask the question again,
11 Mr. Olivares.  I asked you if you refreshed your
12 recollection about events relative to this
13 declaration before you signed it.  You said you did.
14 I asked you how.  And you said in conversations with
15 Tom.  Do you recall that?
16    A.   I did say that.
17    Q.   And what about your conversation with Tom
18 Dutton refreshed your recollection about events in
19 your declaration?
20    A.   I can't talk about them.
21    Q.   Did discussions with Mr. Dutton refresh
22 your recollection about events in -- described in
23 your declaration?
24    MR. DUTTON:  You can answer yes or no,
25 Mr. Olivares.

Page 276

1    THE WITNESS:  Yes.
2 BY MR. WILLIAN:
3    Q.   What did Mr. Dutton tell you that
4 refreshed your recollection?
5    MR. DUTTON:  I'll instruct you not to
6 answer that.
7    MR. WILLIAN:  It's an improper instruction
8 again.  Because you refreshed his recollection, I
9 have a right to know what you said to refresh his
10 recollection.
11    Q.   So what did Mr. Dutton --
12    MR. DUTTON:  You have the right --
13 BY MR. WILLIAN:
14    Q.   What did Mr. Dutton say to you that
15 refreshed your recollection?
16    MR. DUTTON:  You have the right,
17 Mr. Willian, to have any documents that I showed him
18 that may have refreshed his recollection.  All
19 right?  You do not have the right to discuss
20 attorney-client communications with Mr. Olivares.
21    I instruct you not to answer the question.
22 BY MR. WILLIAN:
23    Q.   Are you going to follow your attorney's
24 instruction?
25    A.   Yes.



AMADO OLIVARES
MONTEREY BAY vs. PINNACLE MONTEREY

July 11, 2012
277–280

Page 277

1    Q.  Did Mr. Dutton show you any documents to
2  refresh your recollection?
3    A.  I'm not sure if -- I mean, I'm not sure.
4    Q.  You're not sure if Mr. Dutton showed
5  you --
6    A.  That had to do with this, with this, with
7  what I said here.
8    Q.  Before you signed this declaration, did
9  Mr. Dutton show you some documents that helped
10  refresh your recollection?
11    A.  I had -- I need to read this and see what
12  I mean, yeah.
13    Q.  If you need to read this to answer that
14  question, go ahead.
15    A.  No.  He didn't show me any documents about
16  this.
17    Q.  All right.  So your memory was refreshed
18  regarding events in your declaration based on
19  conversations with Mr. Dutton?  Yes or no.
20    A.  Yes.
21    Q.  That's all I have for now.  Thank you,
22  Mr. Olivares.
23        EXAMINATION BY MR. DUTTON
24  BY MR. DUTTON:
25    Q.  Mr. Olivares, one question with respect to

Page 278

1  exhibit 49, which is your declaration.
2        When Mr. Willian handed it to you, you
3  read it, right?
4    A.  I just scanned over it.
5    Q.  And you read it before you signed it,
6  right?
7    A.  Yes, I did.
8    Q.  Is there anything in your declaration that
9  you would like to change as inaccurate?
10    A.  No.
11        FURTHER EXAMINATION BY MR. WILLIAN
12  BY MR. WILLIAN:
13    Q.  I do have a quick question.
14    A.  Yes.
15    Q.  Do you have any fear, Mr. Olivares, of
16  losing your job if you falsified Yardi data?
17    A.  Do I?  Of course.
18    Q.  All right.  That's all I have.  Thank you.
19        VIDEO OPERATOR:  This concludes today's
20  deposition.  We are going off the record at the end
21  of disk number 3 at 4:00 p.m.
22        (Whereupon, the deposition was adjourned
23        at 4:00 p.m.)
24            --oOo--
25

Page 279

1            CERTIFICATE OF REPORTER
2
3
4        I, DELAINE HALL, a Certified Shorthand
5  Reporter, hereby certify that the witness in the
6  foregoing deposition was by me duly sworn to tell
7  the truth, the whole truth and nothing but the truth
8  in the within-entitled cause;
9        That said deposition was taken down
10  in shorthand by me, a disinterested person, at the
11  time and place therein stated, and that the
12  testimony of the said witness was thereafter reduced
13  to typewriting, by computer, under my direction and
14  supervision;
15        I further certify that I am not of
16  counsel or attorney for either or any of the parties
17  to the said deposition, nor in any way interested in
18  the event of this cause, and that I am not related
19  to any of the parties thereto.
20
21        DATED:  July 12, 2012
22
23        _____
24            DELAINE HALL, CSR 10164
25

Page 280

1        DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No. 352587
5  Case Caption:  MONTEREY BAY MILITARY HOUSING
6  vs. PINNACLE MONTEREY
7
8      DECLARATION UNDER PENALTY OF PERJURY
9      I declare under penalty of perjury
10  that I have read the entire transcript of
11  my Deposition taken in the captioned matter
12  or the same has been read to me, and
13  the same is true and accurate, save and
14  except for changes and/or corrections, if
15  any, as indicated by me on the DEPOSITION
16  ERRATA SHEET hereof, with the understanding
17  that I offer these changes as if still under
18  oath.
19      Signed on the _____ day of
20  _____, 20___.
21
22  _____
23      AMADO OLIVARES
24
25



AMADO OLIVARES                                              July 11, 2012
MONTEREY BAY vs. PINNACLE MONTEREY                              281–282

Page 281

1          DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25          AMADO OLIVARES

Page 282

1          DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25          AMADO OLIVARES

